UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCUS CAMERON | : | NO.: 3:21-cv-00165-OAW |
| | : | |
| v. | : | |
| | : | |
| STEVEN STEBBINS, ET AL | : | JULY 3, 2023 |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(a), defendants, **Bryan Nolan, Mark Squires, Town of Enfield and Enfield Police Department**, hereby submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## I. THE COMPLAINT

Plaintiff, Marcus Cameron, by way of a Five-Count Complaint filed with this Court on February 9, 2021 [Doc. 1], brought action against defendants, Bryan Nolan, Mark Squires, Town of Enfield and Enfield Police Department, pursuant to 42 U.S.C. § 1983, and Connecticut Common Law.

In Count I, the plaintiff alleges unreasonable seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

In Count II, the plaintiff alleges the use of unreasonable and excessive police force; and summary punishment, in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

In Count III, the plaintiff alleges a 42 U.S.C. § 1983 violation against the Town of Enfield and Enfield Police Department for a failure to recruit, train, discipline and supervise.

In Count IV, the plaintiff alleges a 42 U.S.C. § 1983 violation against the Town of Enfield for drafting and implementing an unconstitutional policy by creating an atmosphere that does not discourage its employees from falsely charging and illegally seizing citizens.

In Count V, the plaintiff alleges Defamation *Per Se* against defendant Nolan, defendant Squires and the Enfield Police Department for statements filed in the affidavit accompanying the Arrest Warrant Application for the plaintiff.

## II. <u>FACTUAL BACKGROUND</u>

This matter stems from an investigatory stop of the plaintiff that occurred on November 12, 2018, at the Brookfield Plaza in Enfield, Connecticut, and the subsequent arrest of the plaintiff. (See Local Rule Statement, hereinafter "LRS", ¶¶ 13, 31 and 59.)

On May 22, 2018, Steven Stebbins approached Marcus Cameron at Cameron's house, 49 Foxcroft Road in Enfield, CT, to speak to Cameron about Cameron's driving habits. (**LRS ¶ 1**.) On May 23, 2018, Marcus Cameron submitted a complaint against Steven Stebbins to the Connecticut State Police. (**LRS ¶ 2**.) On May 26, 2018, Steven Stebbins observed Cameron drive by Stebbins' residence at 44 Foxcroft Road in Enfield, CT multiple times in approximately a five-minute span, back and forth. (**LRS ¶ 3**.) After Cameron drove past Stebbins' house multiple times on May 26, 2018, Stebbins called the Enfield Police Department to document Cameron's actions. (**LRS ¶ 4**.) Cameron went to the Enfield Police Department on May 26, 2018, after he saw an Enfield Police Officer respond to Stebbins' house that day and saw that they spoke with each other. Cameron wanted to find out if a 911 call was placed and what the allegation in the 911 call was. (**LRS ¶ 5**.) On May 26, 2018, Cameron spoke with

James Laurino at the Enfield Police Department. There, Sgt. Laurino advised Cameron that Detective Gary Castle was the officer that spoke with Mr. Stebbins. Cameron and Sgt. Laurino spoke for about 15 minutes, in which Cameron gave his version of events. Cameron declined the opportunity to speak with Detective Castle and was only concerned that these complaints were going to continue and Cameron wanted his version of events documented. (**LRS ¶ 6**.) On May 28, 2018, Cameron was sitting outside of his house at 49 Foxcroft Road with a friend, and they observed Mr. Stebbins drive past the house multiple times, before stopping and getting out at a neighbor's house, but Cameron did not document this interaction with the Enfield Police Department. (**LRS ¶ 7**.) On May 30, 2018, Cameron was driving past Stebbins' house when an unidentified male stepped out into the road and asked Cameron something to the effect of "if he was lost". (**LRS ¶ 8**.) After this incident, Cameron went to the Enfield Police Department for their assistance in identifying the individual who stepped out into the road and to possibly pursue charges for obstructing traffic. (**LRS ¶ 9**.) At the Enfield Police Department, Cameron met with Lieutenant Mark Squires. Cameron did not provide his full name because Lt. Squires never asked for his full name. Lt. Squires made this report for documentation purposes only. (**LRS ¶ 10**.) Cameron did not have any interactions with Enfield Police Department, Bryan Nolan and/or Mark Squires from May 30, 2018, until November 12, 2018. (**LRS ¶ 11**.)

On October 11, 2018, Troop H Commanding Officer Lieutenant Daniel Loughman of the Connecticut State Police sent Cameron a letter informing him of the results of the Internal Affairs Complaint Cameron filed against Stebbins. The report concluded that although Stebbins failed to identify himself to Cameron when he should

have, the investigation failed to substantiate Cameron's claim that Stebbins threatened Cameron. **(LRS ¶ 12**.)

On November 12, 2018, Stebbins was leaving his residence at 44 Foxcroft Road in Enfield, CT and observed Cameron walking down his driveway at 49 Foxcroft Road and enter a vehicle parked on the road. (**LRS ¶ 13**.) Stebbins noticed the vehicle Cameron got into was following behind him as they drove through their neighborhood, so Stebbins took a left onto Colony Road and immediately pulled over to ascertain if Cameron was going to stop behind him or continue driving. (**LRS ¶ 14**.) Cameron drove past Stebbins but then pulled over onto the right side of the road ahead of Stebbins. (**LRS ¶ 15**.) Stebbins, utilizing the MDT in his vehicle, ran the registration plate attached to the vehicle that was following him, and the results showed that the vehicle was registered to Marcus Cameron. Stebbins then became concerned about why Cameron was following him. (**LRS ¶ 16**.)

Stebbins pulled away from the side of the road, went around Cameron's vehicle that was pulled over, and ultimately took a right onto Route 5 (Enfield St.) to head north to I-91. (**LRS ¶ 17**.) As Stebbins was traveling north on Route 5, he noticed Cameron's vehicle was behind him, so Stebbins pulled into the 360 Federal Credit Union parking lot to ascertain if Cameron would follow him. (**LRS ¶ 18**.) Stebbins saw Cameron's car continue north on Route 5, and after about 90 seconds, Stebbins pulled back out onto Route 5 to continue his route to I-91 southbound. (**LRS ¶ 19**.) As Stebbins was traveling northbound on Route 5, he observed Cameron's vehicle in a parking lot on his left, which housed Fallon & Associates, LLC. (**LRS ¶ 20**.) Stebbins continued northbound on Route 5, lost sight of Cameron's vehicle behind him, and then Stebbins

took a left onto the I-91 southbound ramp, pulling over onto the shoulder to see if Cameron would drive past him. (**LRS ¶ 21**.) A short time later, Stebbins observed Cameron's vehicle enter the I-91 southbound on-ramp and traveled past Stebbins' parked vehicle. (**LRS ¶ 22**.) Stebbins waited roughly 90 seconds and then re-entered the highway. As he entered the highway, Stebbins merged into the left lane of three lanes. There, he noticed Cameron's vehicle pulled over on the right shoulder with its hazard lights activated. (**LRS ¶ 23**.) As Stebbins passed Cameron's vehicle, Cameron turned his hazard lights off, and Cameron merged into the right lane of three on the highway. (**LRS ¶ 24**.)

Stebbins contacted his supervisor, Sgt. Stephen Samson, and asked for guidance. Sgt. Samson told Stebbins to contact the Enfield Police Department. (**LRS ¶ 25**.) Stebbins merged over to take the Exit 47E off-ramp and contacted Enfield Police Department dispatch. He informed dispatch that Marcus Cameron was following him and requested dispatch send an officer towards his location, as Stebbins did not know what Cameron's intentions were. (**LRS ¶ 26**.) As Stebbins traveled through the intersection of Route 190 and Phoenix Avenue, he observed Cameron's vehicle was still behind him, and Cameron's vehicle was stopped at the red light at the intersection Stebbins just passed through. (**LRS ¶ 27**.) At this point, Stebbins advised the Enfield Police Dispatcher that he was turning into the Brookfield Plaza shopping center to await the arrival of the Enfield Police officers. (**LRS ¶ 28**.) As Stebbins was waiting for the Enfield Police officers arrive, he observed Cameron's vehicle parked in the shopping center's parking lot to his left but did not see Cameron exit his vehicle. Enfield Police officers arrived on scene and Stebbins' call with the dispatcher ended. (**LRS ¶ 29**.)

Enfield Police Sgt. Nolan arrived at Brookside Plaza in response to patrol units requesting a supervisor because an off-duty Connecticut State Police Trooper had called and requested assistance as he was being followed by a former neighbor. (**LRS ¶ 30**.) Upon Nolan's arrival, he was briefed by Enfield Police Department personnel already on scene. Nolan was informed that Stebbins had been the subject of a CSP Internal Affairs investigation due to a complaint filed by Cameron; that Stebbins and Cameron were neighbors; that the complaints filed by Cameron were found to be unfounded by the State Police investigation; they suspected Cameron may have recently been notified about the status of his case; and Stebbins stated that Cameron had been following him while Stebbins was in his department issued cruiser. (**LRS ¶ 31**.) When Nolan asked Cameron why he was following Stebbins, Cameron stated that he felt uncomfortable around Stebbins, he was pulling over to let Stebbins go around him and pulled over onto the side of I-91 to use his phone. (**LRS ¶¶ 32-33**.) When Cameron spoke to Enfield Police Officer Croteau, who responded to Brookside Plaza before Sgt. Nolan did, Officer Croteau informed Cameron that he was "absolutely not" under arrest. (**LRS ¶ 34**.) At the end of Nolan's conversation with Cameron, Cameron provided his cell phone number so Nolan could follow-up with him, and Nolan informed Cameron that he was free to go. (**LRS ¶ 35**.)

On November 13, 2018, Stebbins provided Nolan with a written statement and the In-Car Camera footage from Stebbins' cruiser, which Nolan reviewed. (**LRS ¶ 38**.) On November 15, 2018, Cameron and Nolan spoke briefly on the phone, but the call ended up getting disconnected. (**LRS ¶ 40**.) Nolan tried calling Cameron back on November 15, 2018, multiple times, but was not able to connect, and left Cameron a

voicemail. Nolan left Cameron a voicemail on November 19, 2018, stating that he needed to speak with Cameron about the incident, and to call him back, but Cameron did not return his call. (**LRS ¶ 41**.)

On November 20, 2018, Nolan went to Cameron's residence at 49 Foxcroft Road, and although there was a vehicle in the driveway and lights on in the house, nobody answered the door. (**LRS ¶ 43**.)

Stebbins and his family moved from their Foxcroft Road home as a result of Cameron's actions being very troublesome and have instilled fear for the safety of Stebbins' family, wife and himself. (**LRS ¶ 56**.) Stebbins is concerned that Cameron, working as a probation officer, has access to probationees, and Stebbins fears that Cameron will use that access to intimidate, harass and endanger the physical safety of Stebbins and his family. (**LRS ¶ 57**.)

Nolan signed the Arrest Warrant Aaaaapplication on December 5, 2018, requesting Cameron be charged with 3rd Degree Stalking for Cameron's actions on November 12, 2018. (**LRS ¶ 58**.) Nolan based his opinion that Stebbins was in reasonable fear of Cameron from Stebbins' statement that he gave to Nolan on November 13, 2018. (**LRS ¶ 45**.) Nolan believed that probable cause existed to charge Cameron with 3rd Degree Stalking based on Stebbins' sworn statement and other information Nolan had available to him at that time. (**LRS ¶ 46**.) Nolan did not penalize Cameron when making his determination of probable cause because Cameron did not provide Nolan with Cameron's version of events. (**LRS ¶ 47**).

The Arrest Warrant Application was notarized by Lt. Squires on December 5, 2018. It was signed by the prosecutorial official on December 6, 2018 and signed by the judge on December 10, 2018. (**LRS ¶ 59**.)

On December 11, 2018, Cameron was arrested by Enfield Police Officer Brandon Caires, pursuant to an active Arrest Warrant, which was signed off on by a prosecutor and a judge. (**LRS ¶ 60**.) Officer Caires was the individual who physically put the handcuffs on Cameron, with Nolan and other Enfield Police officers present on scene. (**LRS ¶ 61**.) Cameron stated that the handcuffs were too tight and suffered striations on his wrists from them. Cameron never sought any medical treatment for the striations on his wrists, and never received any medical treatment for the striations on his wrists. (**LRS ¶ 62**.) Cameron never had any physical contact and/or touching between himself and Bryan Nolan, or between himself and Mark Squires. (**LRS ¶ 63**.) As part of Cameron's arraignment, he was entered into an accelerated rehabilitation program. This program did not require an admission of guilt on Cameron's behalf. (**LRS ¶ 64**.) Throughout Cameron's post-arrest process and arraignment, Cameron never challenged the finding of probable cause in his Arrest Warrant Application that ultimately led to his arrest. (**LRS ¶ 65**.)

## III. LAW AND ARGUMENT

### A. Standard Of Review On Motion For Summary Judgment

#### i. Motion For Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." Fed. R. Civ. P. 56(c.) A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (*quoting Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating the absence of a genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548 (1986). In determining whether a material issue of fact exists, the Court must resolve all ambiguities and draw all inferences against the moving party. *See Anderson*, 477 U.S. at 255. The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts, which give rise to a genuine issue. *See Celotex*, 477 U.S. at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). The moving party satisfies the burden of demonstrating no genuine issue of material fact in dispute exists

where they point to the absence of evidence to support an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 322-23.

**ii. Qualified Immunity**

Qualified Immunity shields police officers and other government actors from suits for damages under 42 U.S.C. § 1983, unless his or her actions violate clearly established rights of which an objectively reasonable official would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct 2727 (1982). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based upon mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009) (*quoting Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004) (Kennedy, J., dissenting)).

"Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis deleted). The Supreme Court has emphasized that the "'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Pearson* 555 U.S. at 231 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640, n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, the Court has "repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*.)

In *Pearson*, the Supreme Court also modified the two-step qualified immunity test it set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001). Under *Saucier*, a reviewing Court would first have to determine "'whether there is even a wrong to be addressed in an analysis of immunity. If, and only if, the Court finds a violation of a constitutional right, the Court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability.'" *Delauri v. New Jersey Division of State Police*, Civil Action No. 05-4165 (FLW), 2009 WL 222983, at *5 (D.N.J. Jan. 27, 2009) (*quoting Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007)). "The second step of the Saucier analysis asks whether a reasonable officer would have known his conduct to be unlawful given the specific circumstances and facts of the case." *Id*. (citing *Saucier v. Katz*, 533 U.S. at 199.) "In other words, a defendant is not entitled to qualified immunity if, at the time of the incident, the right that was violated was clearly established." *Id.* (*citing* Torisky *v. Schweiker*, 446 F.3d 438, 443 (3d Cir. 2006) ("This second inquiry must be undertaken in light of the specific context of the case").)

However, in *Pearson*, the Court relaxed the rigid two-step application of the *Saucier* analysis. The Court stated that the first prong "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson* 555 U.S. at 236-37. In addition, "[a]lthough the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent," the first prong "create[s] a risk of bad decision making," specifically in those instances

where a Court decides a rather nuanced constitutional claim early on in litigation where the factual basis for the claims have not been fully developed through discovery. *Id*. at 237. Thus, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

In addressing the second prong, courts are mindful that "[t]he qualified immunity inquiry … concerns an 'officer's mistake as to what the law requires' and acknowledges that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" *Stephenson v. Doe*, 332 F.3d 68, 79 (2d Cir. 2003) (*quoting Saucier*, 533 U.S. at 205). In other words, the qualified immunity inquiry determines "the objective reasonableness of the officer's belief in the lawfulness of his actions. If the officer reasonably believed that his actions did not violate plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken." *Loria v. Gorman*, 306 F.3d 1271, 1282 (2d Cir. 2002) (internal citations omitted). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct…. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.

Thus "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*. at 202; *see also, Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015). Put another way, qualified immunity will apply unless "existing precedent [has] placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014) (internal citations and quotation

marks omitted); *Lane v Franks*, 134 S.Ct. 2369, 2383 (2014); *Stanton v. Sims*, 134 S.Ct. 3, 4-5 (2013); *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011); *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d. Cir. 2014).

### B. PLAINTIFF'S CLAIM FOR UNREASONABLE SEIZURE FAILS AS A MATTER OF LAW

In Count I, the plaintiff contends that Lt. Squires and Sgt. Nolan's actions at Brookfield Plaza on November 12, 2018 resulted in the unreasonable seizure of the plaintiff, in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.

The defendants dispute that the plaintiff was ever seized on November 12, 2018 at Brookfield Plaza, unreasonably or otherwise; and the interaction was purely an investigatory stop, lasting longer than necessary because Cameron requested that an Enfield Police Department supervisor respond to the scene. (**LRS ¶ 36**.)

The Second Circuit, in determining whether a seizure has occurred, looks at the following factors: "the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992.)

Under the Fourth Amendment, "the ultimate measure of the constitutionality of a government search or seizure is reasonableness." *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014) (internal quotations omitted.) The reasonableness of a search or seizure is "generally determined by balancing "the particular need to search or seize against the privacy interests invaded by such action." *Id.* (citing *Terry v. Ohio*, 392 U.S.

1, 20-21, 88 S.Ct. 1868.) Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868).

"Reasonable suspicion to conduct a *Terry* stop exists when a law enforcement officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *United States v. Bell*, 733 Fed. App'x 20, 21 (2d Cir. 2018) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868 (alteration omitted).) A *Terry* stop is not necessarily unreasonable even if the facts available suggest "less than a fair probability of wrongdoing." *Id*. An officer need only have a "reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" U.S. v. *Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).) In reaching this conclusion, an officer is "entitled to draw on his own experience and specialized training to make inferences" but may not "rely on an inchoate and unparticularized suspicion or hunch." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008.) In determining whether an officer had reasonable suspicion warranting a Terry stop, a Court "must consider the totality of the circumstances surrounding the stop" and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citations and quotation marks omitted).

When evaluating whether an investigative stop is reasonable, "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). In assessing whether a detention is too long in duration to be justified as an investigative stop, the Court considers "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*. at 686.

In the instant matter, the Enfield Police Department received a call from Stebbins on November 12, 2018, with a concern that he was being followed by a former neighbor. (**LRS ¶¶ 13, 26, 28, 29, 30**.) Enfield Police Sgt. Nolan arrived on scene at Brookside Plaza in Enfield, CT, and was briefed by the Enfield Police officers already on scene. (**LRS ¶ 31**.) Prior to Nolan arriving on scene, Enfield Police Officer Croteau spoke with Cameron, and informed Cameron that he was "absolutely not" under arrest. (**LRS ¶ 34**.) Nolan was informed that Stebbins had been the subject of a CSP Internal Affairs investigation due to a complaint filed by Cameron; that Stebbins and Cameron were neighbors; that the complaints filed by Cameron were found to be unfounded by the State Police investigation; they suspected Cameron may have recently been notified about the status of his case; and Stebbins stated that Cameron had been following him while Stebbins was in his department issued cruiser. (**LRS ¶ 31**.) Nolan spoke with Cameron, asking him why he was following Stebbins, and gathered other general information about the incident. (**LRS ¶ 32**.) At the end of Nolan's conversation with Cameron, Cameron provided his cell phone number so Nolan could follow-up with him, Cameron was informed that he was free to go, and at no point was Cameron placed

under arrest. (**LRS ¶¶ 35, 73**.) Enfield Police personnel were on scene at Brookside Plaza, and this interaction with Cameron would have been shorter if he had not requested that a supervisor respond to the scene. (**LRS ¶¶ 36, 72**.)

Applying the factors from *Glover* to determine if a seizure occurred, there were several police officers on scene, but that was due to the involved party, Steven Stebbins, being a Connecticut State Trooper, that Cameron requested that a supervisor from Enfield Police Department respond to the scene, further adding to the number of police officers on scene and the duration of the interaction. There was no mention of a display of weapons by any of the law enforcement officers present beyond the fact that on-duty law enforcement officers carry a service weapon on their hips. Cameron was informed multiple times that he was not under arrest, and he was never moved from the scene to the police station, the back of a police vehicle, or to a police room. *Glover,* 957 F.2d at 1008. Taken in total, an objective, reasonable person would not believe that they were seized.

For the foregoing reasons, the plaintiff's claim of unreasonable seizure fails as a matter of law and summary judgment should be granted as to Count I.

**i. If The Court Finds That The Plaintiff Was Seized, The Plaintiff's Claim For Unreasonable Seizure Still Fails As A Matter Of Law Because The Seizure Was Reasonable**

When determining whether an investigative stop or a seizure is reasonable, "common sense and ordinary human experience must govern over rigid criteria." *Sharpe* 470 U.S. at 685. Under the Fourth Amendment, "the ultimate measure of the constitutionality of a government search or seizure is reasonableness." *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014) (internal quotations omitted.) The reasonableness of a search or seizure is "generally determined by balancing "the

particular need to search or seize against the privacy interests invaded by such action." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20-21, 88 S.Ct. 1868.) Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868).

"Reasonable suspicion to conduct a *Terry* stop exists when a law enforcement officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *United States v. Bell*, 733 Fed. App'x 20, 21 (2d Cir. 2018) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868 (alteration omitted).) A *Terry* stop is not necessarily unreasonable even if the facts available suggest "less than a fair probability of wrongdoing." *Id*. An officer need only have a "reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" U.S. v. *Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). In reaching this conclusion, an officer is "entitled to draw on his own experience and specialized training to make inferences" but may not "rely on an inchoate and unparticularized suspicion or hunch." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008). In determining whether an officer had reasonable suspicion warranting a Terry stop, a Court "must consider the totality of the circumstances surrounding the stop" and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citations and quotation marks omitted).

In the present case, at the time of Stebbins' call to the Enfield Police Department on November 12, 2018, the Enfield Police Department was informed that Stebbins was being followed by a former neighbor, Marcus Cameron, and Stebbins did not know what Cameron's intentions were. (**LRS ¶ 26**.) When the Enfield Police officers and Sgt. Nolan arrived on scene at Brookfield Plaza, they were informed that Stebbins had been the subject of a CSP Internal Affairs investigation due to a complaint filed by Cameron; that Stebbins and Cameron were neighbors; that the complaints filed by Cameron were found to be unfounded by the State Police investigation; they suspected Cameron may have recently been notified about the status of his case; and Stebbins stated that Cameron had been following him while Stebbins was in his department issued cruiser. (**LRS ¶ 31**.) Nolan then had a conversation with Cameron to get his side of the story, which Cameron stated he did not feel comfortable around Stebbins, Cameron pulled over to let Stebbins drive around him, and Cameron pulled over to use his cellphone. (**LRS ¶¶ 32, 33**.) Nolan did not arrest Cameron on scene at Brookside Plaza because Nolan felt that further investigation was needed. (**LRS ¶¶ 73, 74**.)

Taking the circumstances of November 12, 2018, in totality, the Court should find that Enfield Police Sgt. Bryan Nolan had reasonable, articulable suspicion to question Marcus Cameron at Brookfield Plaza. Before Nolan arrived on scene, the Enfield Police Department was aware, through Stebbins' call to Enfield Police Dispatch, that he was being followed by a former neighbor and did not know what the neighbor's intentions were. (**LRS ¶ 26**.) Upon arriving on scene, Sgt. Nolan was informed that Stebbins had been the subject of a CSP Internal Affairs investigation due to a complaint filed by Cameron; that Stebbins and Cameron were neighbors; that the complaints filed by

Cameron were found to be unfounded by the State Police investigation; they suspected Cameron may have recently been notified about the status of his case; and Stebbins stated that Cameron had been following him while Stebbins was in his department issued cruiser. (**LRS ¶ 31**.) Given this information, it was objectively reasonable for Sgt. Nolan to then question Marcus Cameron about the events, and determine if, and why Cameron may be following Stebbins. This interaction lasted longer than necessary because Cameron requested that a supervisor from Enfield Police Department respond on scene after already speaking with the Enfield Police officers who responded, Cameron was not placed under arrest, and was informed that he was not under arrest when he first spoke with Enfield Police Officer Croteau before Sgt. Nolan arrived. (**LRS ¶¶ 34-36, 72-74**).

Further, the plaintiff did not present any evidence that Enfield Police Lt. Mark Squires had any involvement with the Brookside Plaza incident on November 12, 2018, and Lt. Squires was never on scene during the plaintiff's alleged seizure.

Accordingly, the Court should find that the alleged seizure of the plaintiff at Brookfield Plaza on November 12, 2018, was objectively reasonable, and that Sgt. Nolan had reasonable, articulable suspicion to detain and question Marcus Cameron for 5-10 minutes.

For the foregoing reasons, the plaintiff's claim of unreasonable seizure fails as a matter of law and summary judgment should be granted as to Count I.

### C. The Plaintiff's Claim for Unreasonable Seizure As To His Arrest On December 11, 2018, Fails As A Matter Of Law

Probable cause to effectuate an arrest exists where the officers "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable

caution in the belief that an offense has been committed by the person to be arrested." *See Boyd v. New York*, 336 F.3d 72, 75-76 (2d Cir. 2003). More specifically, in order to establish probable cause for an arrest, an officer need only establish "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13, 103 S.Ct. 2317 (1983). Thus, "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful." *Krause v. Bennett*, 887 F.2d 363, 371 (2d Cir. 1989); *Curley v. Suffern*, 268 F.2d 65, 70 (2d Cir. 2001). Once police officers possess facts sufficient to establish the existence of probable cause, they are not required or permitted to sit as a prosecutor, judge or jury. *See id.*, at 372. Rather, "[t]heir function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Id.* Moreover, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 125 S.Ct. 588, 593 (2004). Accordingly, "[w]hen determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

"Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007). A plaintiff may rebut this presumption by demonstrating that "the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that

such false or omitted information was necessary to the finding of probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (internal quotations omitted) (*quoting Golino v. New Haven*, 950 F.2d 864, 870-71 (2d Cir. 1991)). Recklessness on the part of the affiant may be inferred where the information omitted was critical to the determination of probable cause. *See Golino*, 950 F.3d at 871.

The determination of probable cause is a question of law for the Court where there exists no dispute as to what facts were relied upon for the demonstration of probable cause. *See Walczyk,* 496 F.3d at 157. In the case of an arrest pursuant to a warrant, there can be no dispute as to what facts were relied upon by the defendant to establish probable cause as the facts are memorialized within the Arrest Warrant Affidavit. *Id.* Accordingly, whether the Arrest Warrant Affidavit, on its face, demonstrates the existence of probable cause is a question of law for the Court. *Id.* In making this determination, "a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate." *Id.*

The evaluation of a claim that an arrest warrant contained false statements or omitted material information is governed by the corrected affidavits doctrine. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Under the corrected affidavits doctrine, the reviewing Court examines all of the information possessed by the officers when they applied for the arrest warrant. *Id.* at 744. Moreover, the Court must remove allegedly false information, insert omitted information, and then decide if "the contents of the 'correct affidavit' would have supported a finding of probable cause…." *Soares*, 8 F.3d at 920 (citation omitted). "If probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred…. [I]f the corrected affidavit does

not support an objective finding of probable cause, then the court should conclude that material factual disputes prevent summary judgment…." *Id.* at 920-21 (citations omitted); *see also Escalera*, 361 F.3d at 744. Whether omitted information is relevant to the probable cause determination is a question of law for the Court. *See Walczyk*, 496 F.3d at 158.

In the instant matter, the plaintiff challenges defendant Nolan's Arrest Warrant Affidavit in that it omitted information that the plaintiff believes will affect the probable cause determination. Cameron disagrees with the stated attempts made to contact him by Officer Nolan and/or the Enfield Police Department after the November 12, 2018 incident, but admits that Officer Nolan left Cameron a voicemail at some point after November 15, 2018. (**LRS ¶ 80**.) Cameron also alleges that Officer Nolan omitted from the Arrest Warrant Application the complaint that Cameron made to the Enfield Police Department on May 30, 2018, but when Cameron made that complaint, he did not provide his full name to Lt. Mark Squires, despite Cameron feeling like a victim of harassment, because Lt. Squires did not ask Cameron for his full name. (**LRS ¶ 10**.) Cameron's complaint to the Enfield Police Department on May 30, 2018 may have been overlooked because Cameron did not identify himself to Lt. Squires, so Cameron's name could not have been entered into the report key for identifiable information. (**LRS ¶ 54**.) Cameron also claims that Officer Nolan lied in the Arrest Warrant Application about there being construction in the Foxcroft Road neighborhood. (**LRS ¶ 81**.) Cameron denied ever having received a letter on October 15, 2018 from Connecticut State Police Internal Affairs Lieutenant Eric Cooke stating that the Internal Affairs investigation based on the complaint Cameron filed against Stebbins, and that Officer

Nolan lied in the Arrest Warrant Application about Cameron actually receiving this letter. (**LRS ¶ 82**.) This is a mischaracterization of the language in the Arrest Warrant Application completed by Officer Nolan, as the Arrest Warrant Application states that Connecticut State Police Internal Affairs Lieutenant Eric Cooke mailed Cameron a letter on October 11, 2018, informing Cameron of the completion of the Internal Affairs investigation based on the complaint Cameron filed against Stebbins; the Arrest Warrant Application does not state that Cameron ever received said letter from CSP Lt. Eric Cooke. (**LRS ¶ 83**.)

Cameron does not dispute any of the instances referenced by Stebbins that on November 12, 2018, Cameron was either traveling behind Stebbins' vehicle in traffic, that Cameron drove past Stebbins' vehicle in traffic, and that Cameron ended up in the same parking lot as Stebbins on November 12, 2018. (**LRS ¶¶ 14, 15, 18, 21-24, 27, 29**).

Taking all of the alleged falsehoods as true, and including the alleged omissions, Cameron believes were present in the Arrest Warrant Application, probable cause still exists. If the alternate route in Cameron's and Stebbins' neighborhood was not blocked by construction, Stebbins, despite having a reasonable fear of Cameron, still could have driven past Cameron's house. This does not change the fact that there were various instances where Cameron was either traveling behind Stebbins' vehicle in traffic, driving past Stebbins' vehicle in traffic, and ending up in the same parking lot as Stebbins on November 12, 2018. (**LRS ¶¶ 14, 15, 18, 21-24, 27, 29**.) Cameron's misinterpretation of the Arrest Warrant Affidavit that he received notice on October 11, 2018 about the Internal Affairs investigation result has already been clarified, that Lt. Cooke sent the

letter on October 11, 2018, not that Cameron received the letter on October 11, 2018, or that Cameron received the letter at all. (**LRS ¶ 83**.) Cameron disagrees with the stated attempts made to contact him by Officer Nolan and/or the Enfield Police Department after the November 12, 2018 incident, but admits that Officer Nolan left Cameron a voicemail at some point after November 15, 2018, so there is at least one documented attempt by Officer Nolan to get Cameron's side of the story regarding the November 12, 2018 incident. (**LRS ¶ 80**.) Finally, if the May 26, 2018 and May 30, 2018, complaints that Cameron made to the Enfield Police Department were included in the Arrest Warrant Application, they would only provide context on a disagreement that happened six months before the date of this incident and would not have affected the determination of Officer Nolan that Stebbins had a reasonable fear of Cameron, and that probable cause existed based on the events of November 12, 2018. (**LRS ¶¶ 49-51**.)

For the foregoing reasons, plaintiff's arrest was premised upon probable cause, and summary judgment must be granted as to Count I.

### D. PLAINTIFF'S CLAIMS OF EXCESSIVE FORCE FAILS AS A MATTER OF LAW BECAUSE THE PLAINTIFF FAILED TO DEMONSTRATE ANY PHYSICAL INVOLVEMENT BY THE NAMED DEFENDANTS IN THE PLAINTIFF'S ARREST

"[A] [p]olice officer's application of force is excessive … if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and motive." *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (*citing Graham v. Connor,* 490 U.S. 386, 397 (1989)). Application of the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. Further, this evaluation

must consider all the facts of the case, including "the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest". *Id.* at 396; *Carey v. Maloney,* 480 F.Supp.2d 548, 556 (D.Conn. 2007). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 of hindsight. . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham, 490* U.S. at 396.

Unquestionably, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id*. at 397. "[A]s other courts within the Second Circuit have recognized, [t]he right to make an arrest carries with it the right to use some degree of physical coercion as long as the force used is reasonable based on the perception of the arresting officer at the time of the arrest." (Citations omitted; internal quotation marks omitted.) *Lawson v. County of Suffolk*, 920 F.Supp.2d 332, 341 (E.D.N.Y. 2013.) Courts also consider "whether force was applied in a good faith effect to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251-52 (2d Cir. 2001).

In addition to the reasonableness standard set forth above, "to prevail on an excessive force claim, a plaintiff must show not only that the amount of force used was objectively unreasonable, but that he suffered some compensable injury as a result."

*Ferraresso v. Town of Granby*, 646 F.Supp.2d 296, 306 (D.Conn. 2009) (citing *Graham v. Connor*, supra, 490 U.S. 396). To that end, "[c]ourts in this Circuit have dismissed excessive force claims brought under the Fourth Amendment where a plaintiff only suffers a de minimis injury." *Porath v. Bird*, 9:11-CV-963 (GLD/CFH), 2013 WL 2418253, at *7 (N.D.N.Y. June 3, 2013). "De minimis injuries include short term pain, swelling, and bruising, … brief numbness from tight handcuffing, … claims of minor discomfort from right handcuffing, and … superficial scratches…" (Citation omitted; internal quotation marks omitted.) *Id.* When a plaintiff cannot prove that he suffered any compensable injuries that are more than de minimis, there can be no claim for excessive force. *See Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *4 (S.D.N.Y. March 21, 2005).

Generally, in order to state a claim pursuant to 42 U.S.C. § 1983, plaintiff must establish that a person, acting under color of state law, committed an act which deprived plaintiff of a federal right. *See Kentucky v. Graham*, 473 US. 159, 166, 105 S.Ct. 3099 (1985). Section 1983 imposes liability upon a defendant only where he/she personally "subjects or causes to be subjected the complainant to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986); *Snider v. Dylag*, 188 F.3d 51, 54 (2d Cir. 1999). "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d at 323; *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir.1995); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir.2001); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995). Accordingly, a

plaintiff must show that defendants were personally involved in the unconstitutional conduct alleged in order to state a cognizable claim for damages under § 1983. *Id.*

In the instant matter, the plaintiff did not present any evidence that there was any physical contact between himself and either Bryan Nolan or Mark Squires. When the plaintiff was arrested on December 11, 2018, Enfield Police Officer Caires was the individual who executed the arrest of the plaintiff. (**LRS ¶ 60**.) Enfield Police Officer Caires was the individual who physically put the handcuffs on the plaintiff. (**LRS ¶ 61**.) The plaintiff claimed to have suffered striations on his wrists from the handcuffs, but never sought any medical treatment nor received any medical treatment for said striations. (**LRS ¶ 51**.) Finally, the plaintiff admitted that he never had any physical contact and/or touching between himself and Bryan Nolan, or between himself and Mark Squires. (**LRS ¶ 63**.) Further, the plaintiff does not allege that any of the defendants should have intervened to prevent the plaintiff from suffering from excessive force.

For the foregoing reasons, the plaintiff's claim of excessive force fails as a matter of law and summary judgment should be granted as to Count II.

### E. PLAINTIFF'S CLAIMS OF FAILURE TO TRAIN, DISCIPLINE, AND SUPERVISE FAIL AS A MATTER OF LAW

In Count III, the plaintiff alleges that the Town of Enfield and Enfield Police Department failed to recruit, train, discipline and supervise. (Plaintiff's Complaint, ¶¶ 77-80.)

It is settled law that supervisors cannot be held liable in a § 1983 suit solely on a theory of *respondeat superior*. *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 511

(S.D.N.Y. 2008) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). Plaintiff must show a supervisor was personally involved in a constitutional violation via:

> (1) directly participating in the violation; (2) failing to remedy the wrong after it comes to his attention; (3) creating a policy or custom under which unconstitutional practices occur, or allowing the continuation of such custom or policy; (4) being grossly negligent in supervising subordinates who committed the wrongful acts; or (5) failing to act on information indicating that unconstitutional acts are occurring.

*Id.* (*citing Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).) To survive summary judgment, a plaintiff's § 1983 claim for supervisory liability must be supported by specific facts. *Id.* at 513. "The bare fact that [a supervisor] occupies a high position in [a police department] is insufficient to sustain [plaintiff's] claim." *Id.* (Internal citation omitted.) In supervisory liability claims, the misconduct of the subordinate must be "affirmative[ly] link[ed]" to the action or inaction of the supervisor. *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598 (1976.) "[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (internal citation omitted.).

Although Squires was a Lieutenant and Nolan was a Sergeant within the Enfield Police Department, Squires' only involvement in this lawsuit was taking a May 30, 2018 report from Cameron at Enfield Police Department, and that Squires reviewed Nolan's Arrest Warrant Application. There is no evidence that Squires was present for any alleged unconstitutional action by Nolan. The warrant established probable cause, even after application of the corrected-affidavits test, and, accordingly, there is no basis for § 1983 supervisory liability as to Squires.

For the foregoing reasons, summary judgment should be granted as to Count III.

### F. PLAINTIFF'S *MONELL* COUNT FAILS AS A MATTER OF LAW

Plaintiff does not include an individually identified *Monell* claim, but plaintiff does claim that the defendant, Town of Enfield, has drafted and implemented unconstitutional policies that create an atmosphere that does not discourage its employees from falsely charging and illegally seizing citizens. (Plaintiff's Complaint, Count IV, ¶¶ 83-84.)

The United States Supreme Court first recognized a direct claim against a municipal entity itself as a "person" within the meaning of § 1983 in *Monell v. Dept. of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2427, 56 L. Ed. 2d 611 (1978.) In so recognizing, the Court held that a municipality may be held liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Id.; see also, Oklahoma v. Tuttle*, 471 U.S. 808, 810, 105 S. Ct. 2018, 56 L. Ed. 2d 791 (1985). A municipality may not, therefore, be held liable under § 1983 on a *respondeat superior* theory solely for injuries inflicted by its employees or agents. *See Monell*, 436 U.S. 691, 694. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Consistent with the foregoing, in order to state a cognizable claim against a municipality pursuant to § 1983, a plaintiff must: (1) prove the existence of a municipal policy or custom, the exercise of which caused a deprivation of the plaintiff's

constitutional rights; and (2) establish an affirmative link between the policy and the alleged constitutional violation. *See Oklahoma v. Tuttle*, 471 U.S. at 817, 823. Stated differently, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008); *Simms v. City of New York*, 480 Fed. App'x 627, 629 (2d Cir. 2012); *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997) ("it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.").

A plaintiff may satisfy the policy, custom or practice requirement in one of four ways, namely by demonstrating:

> (1) a formal policy endorsed by the municipality, … (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," … (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, … or (4) a constitutional violation resulting from [policymakers'] failure to train municipal employees . . . .

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019) (internal citations omitted). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an "affirmative link," between the policy and the deprivation of his constitutional rights." *Id.*

"The mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds Leatherman v. Tarrant County Narcotics*

*Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160 (1993). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24, 195 S.Ct. 2427 (1985.)

Here, plaintiff is unable to show any issue of material fact that the alleged deprivations of constitutional rights were caused by an unconstitutional custom, policy, or practice of the Town of Enfield or the Enfield Police Department, because no custom, policy, or practice exists that encourages unconstitutionally seizing and falsely charging citizens. (**LRS ¶¶ 66-68**).

Defendant Nolan has undergone the requisite trainings, including recertifications, and trainings on racial biases, in order to become an Enfield Police Department Lieutenant. (**LRS ¶ 78.)** Defendant Squires attended the Police Academy in 1999, then a 16-20 week field training program with the Enfield Police Department, and would participate in recertification trainings every three years. (**LRS ¶ 79**).

Further, the plaintiff in his complaint does not cite to any conduct that demonstrates a policy or procedure to deny individuals of their constitutional rights.

For the foregoing reasons, the plaintiff's claim of *Monell* fails as a matter of law and summary judgment should be granted as to Count IV.

### G. THE PLAINTIFF'S CLAIMS FOR A FIFTH AND FOURTEENTH AMENDMENT VIOLATION FAIL AS A MATTER OF LAW DUE TO THE "MORE SPECIFIC PROVISION" RULE

"If a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under substantive due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 833, 118

S. Ct. 1708, 1710, 140 L. Ed. 2d 1043 (1998). A substantive due process analysis is inappropriate where the alleged claims are "covered by" the Fourth Amendment. *Id.* In the present case, the plaintiff, in Count I, alleges that he was unreasonably seized by defendants Nolan and Squires. In Count II, the plaintiff alleges that he was subjected to unreasonable and excessive force. The Fourth Amendment covers searches, seizures and excessive force. Therefore, the plaintiff's claims of an unreasonable seizure and excessive force must be analyzed under the more specific provision that specifically covers the plaintiff's alleged unreasonable seizure and excessive force, the Fourth Amendment, and not the generalized provisions of substantive due process.

Accordingly, summary judgment should be granted as to the plaintiff's Fourteenth Amendment claim in Count I, and as to the plaintiff's Fifth and Fourteenth Amendment claims in Count II, and in Count III.

### H. THE PLAINTIFF'S CLAIM OF AN EIGHTH AMENDMENT VIOLATION FAILS AS A MATTER OF LAW

"The Eighth Amendment applies to the punishment of convicted offenders and does not regulate pre-conviction interactions between the police and the public." *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). In the present case, the plaintiff claims that his Eighth Amendment protections were violated by the Enfield defendants. However, the plaintiff was never convicted of the crimes he was arrested for, and was entered into an accelerated rehabilitation program as part of his arraignment, which did not require an admission of guilt on Cameron's behalf. (**LRS ¶ 64**). Therefore, because

Cameron was never convicted after his arrest, the Eighth Amendment does not apply to him.

Accordingly, summary judgment should be entered for the defendants for the plaintiff's Eighth Amendment claim in Count II, and in Count III.

### I. All Of Plaintiff's Claims Against The Enfield Police Department Fail As A Matter Of Law

It is axiomatic that a municipal police department is not an independent legal entity and, therefore, is not subject to suit under section 1983. *See Rose v. City of Waterbury*, 2013 WL 1187049, at *9 (D. Conn. Mar. 21, 2013) (Connecticut statutes "contain no provision establishing municipal departments, including police departments, as legal entities separate and apart from the municipality they serve, or providing that they have the capacity to sue or be sued ... Rather, ... it is the municipality itself which possesses the capacity to sue and be sued."); *see also Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 164 (D. Conn. 2005) (holding that municipal police department is not a municipality or a person subject to suit under section 1983) (citing cases).

Accordingly, all claims by Plaintiff brought against the Enfield Police Department must fail and judgment should enter as a matter of law.

### J. The Individual Defendants Are Afforded Qualified Immunity With Regard To Plaintiff's Constitutional Claims

Notwithstanding the fact that plaintiff has failed to demonstrate a violation of his constitutional rights as set forth above, plaintiff's claims would, nevertheless, be barred by the doctrine of qualified immunity, as the conduct of defendants was objectively reasonable under the circumstances presented.

As discussed above in Section A(ii) of this Memorandum, qualified immunity shields government officials from suits for damages under 42 U.S.C. § 1983, unless

their actions violate clearly established rights of which an objectively reasonable official would have known. *Pearson,* 555 U.S. at 231-32. "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. [It] is an immunity from suit rather than a mere defense to liability . . ." *Saucier*, 533 U.S. at 200-201 (internal citations and quotation marks omitted).

The identification of the "right" at issue "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. A right is "clearly established" when "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft*, 563 U.S. at 741 (*citing Anderson*, 483 U.S. at 640); *see also Plumhoff*, 134 S.Ct. at 2023 ("[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any reasonable official* in the defendant's shoes would have understood that he was violating it." (emphasis added) (internal citation omitted).) "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgment about open legal questions." *Ashcroft*, 563 U.S. at 2084.

In the context of applying the defense of qualified immunity to allegations asserting a lack of probable cause, the test to be applied for immunity purposes is not probable cause in fact but "***arguable probable cause***." *Escalera*, 361 F.2d at 743. "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id. (quoting Golino*,950 F.2d at 870 (internal quotations omitted)); *see also Walczyk*, 496 F.3d at 163. "Thus, the

analytically distinct test for qualified immunity is more favorable to the officers that the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest." *Escalera*, 361 F.3d at 743.

Moreover, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Accordingly, "[w]hen determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola*, 298 F.3d at 162.

The undisputed evidence in the instant matter unequivocally demonstrates the existence of arguable probable cause for plaintiff's arrest. First, it is undisputed that on November 12, 2018, Cameron was either traveling behind Stebbins' vehicle in traffic, that Cameron drove past Stebbins' vehicle in traffic, and that Cameron ended up in the same parking lot as Stebbins on November 12, 2018. (**LRS ¶¶ 14, 15, 18, 21-24, 27, 29**.) Second, Sgt. Nolan did not place Cameron under arrest at Brookside Plaza on November 12, 2018, because Sgt. Nolan felt that more of an investigation was needed before an arrest could be made. (**LRS ¶ 74**.) Third, Sgt. Nolan left Cameron a voicemail on November 15, 2018, to discuss the events of November 12, 2018, and get Cameron's side of the story. (**LRS ¶ 80**.)

At a minimum, there are arguable grounds for an investigatory detention of Cameron at the Brookfield Plaza on November 12, 2018, which entitles Nolan to qualified immunity. The grounds for an investigatory detention were set forth in Section C. Those same undisputed facts demonstrate that, at minimum, reasonable police

officers could disagree whether or not an investigatory detention was constitutional. Accordingly, Nolan is entitled to qualified immunity regarding the investigatory detention of Cameron on November 12, 2018.

Similarly, the undisputed facts presented in Section D, applicable here as well, demonstrate that, at a minimum, arguable probable cause existed for the arrest of Cameron on December 11, 2018. Officers of reasonable competence, in the same circumstances and possessing the same knowledge as Sgt. Nolan and the rest of defendants, could disagree on whether the probable cause test was met based upon the statement of Stebbins, and the pre-existing complaints Cameron made to Enfield Police Department about Stebbins six months before the events of this lawsuit.

Furthermore, as discussed above in Section C, even applying the corrected affidavit test, including the previous complaints the plaintiff made to Enfield Police Department about Stebbins six months prior to the plaintiff's arrest, there is still at least arguable probable cause. The undisputed facts show that, on November 12, 2018, Cameron was either traveling behind Stebbins' vehicle in traffic, that Cameron drove past Stebbins' vehicle in traffic, and that Cameron ended up in the same parking lot as Stebbins. (**LRS ¶¶ 14, 15, 18, 21-24, 27, 29**.) That taken in conjunction with Stebbins' statement to Sgt. Nolan, and the supporting video footage from Stebbins' In-Car-Camera, was sufficient for probable cause, or at the very least reasonable officers could disagree as to whether probable cause existed, and a magistrate would likely have signed the warrant. Accordingly, defendants are afforded qualified immunity and are entitled to judgment as a matter of law as to Count I.

Additionally, it was reasonable for defendants to arrest plaintiff based on the December 5, 2018, arrest warrant, which was reviewed and signed by both the prosecuting attorney and a judge. "As a reasonable officer confronted with the situation [the officer] encountered and possessing the same information he did could have believed there was probable cause to arrest … and at a minimum, reasonable officers could disagree as to whether there was probable cause for such an arrest … [the defendant officer] is entitled to qualified immunity." *See Marchand v. Simonson*, 16 F.Supp. 3d 97, 115-16 (D. Conn. 2014).

Although the defendants claim it is undisputed that Cameron never had any physical contact with either defendant Nolan and/or defendant Squires, even if the Court should find that the plaintiff has a plausible alternate version of facts leading to a possible finding of excessive force, the amount of force under plaintiff's theory is so minimal that defendant Nolan and defendant Squires are protected by qualified immunity.

Consistent with the rationale set forth above, Squires would be entitled to qualified immunity on any claim of supervisory liability. The reasons described in Section E above, there is no basis for a supervisory liability claim under the undisputed facts, but even if one existed, reasonable person in the shoes of Squires could disagree whether their conduct violated the constitutional protections owed to Cameron.

Finally, although it is clear, as set forth above, that there is no basis for a claim pursuant to the Fifth, Eighth or Fourteenth Amendments, if this Court were to disagree, then such would not be clearly established law in this Circuit, and the individual

defendants Nolan and Squires would be entitled to qualified immunity on any such claim brought pursuant to the Fifth, Eighth and/or Fourteenth Amendments.

Accordingly, the defendants are entitled to summary judgment in their favor as to Count I and Count II.

### K. THE PLAINTIFF'S CLAIM FOR DEFAMATION *PER SE* FAILS AS A MATTER OF LAW

"At common law, to establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinski*, 319 Conn. 394, 430 (2015) (quotation marks and brackets omitted.). "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 431 (quoting *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004).) "[T]o be actionable, the statement must be false ... and under the common law, truth is an affirmative defense to defamation ... the determination of the truthfulness of a statement is a question of fact for the jury." *Id.* (quoting *Cweklinsky*, 267 Conn. at 228–29, 837 A.2d 759.) The statement must also "convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Crismale v. Walston*, 184 Conn. App. 1, 18 (App. Ct. 2018). Defamation is "actionable *per se*" if it either "charges a crime which involves moral turpitude or to which an infamous penalty is attached," or it "injure[s] a man in his profession and calling." *Id.* (quoting *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 850–51(App. Ct. 2005).) "[T]he modern

view" of a crime to which an infamous penalty is attached "is that the crime be a chargeable offense which is punishable by imprisonment. " *Silano v. Cooney*, 189 Conn. App. 235, 245 (App. Ct. 2019) (quoting *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 493 (App. Ct. 1987)).

Further, "statements made in connection with police investigations are generally not actionable because they are protected by qualified privilege." *See, e.g.*, *Hohmann v. GTECH Corp.*, 910 F. Supp. 2d 400, 405 (D. Conn. 2012) (citing *Hopkins v. O'Connor*, 282 Conn. 821, 832, 925 A.2d 1030 (2007)). A quasi-judicial privilege applies to communications "made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding." *Hopkins*, 282 Conn. at 832, 925 A.2d 1030; *see also Kelley v. City of Hamden*, No. 3:15-CV-00977 (AWT), 2017 WL 3763839, at *3 (D. Conn. Aug. 30, 2017) (applying the privilege to "information contained in police reports and the arrest warrant application"). "When considering whether a qualified privilege protects a defendant in a defamation case," the first inquiry "is whether the privilege applies, which is a question of law," while "[t]he second is whether the applicable privilege nonetheless has been defeated through its abuse, which is a question of fact." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009) (citations omitted).

In Count V of the plaintiff's complaint, he alleges that the defendants, Bryan Nolan and Mark Squires, engaged in defamatory actions by repeating Steven Stebbins' allegedly false statements in an Arrest Warrant Application for Cameron, that he was speeding, drove dangerously, and engaged in stalking. (**LRS**, ¶ 84.) The plaintiff mischaracterizes what Enfield Police Sgt. Bryan Nolan's affidavit was used for. The

plaintiff claims that Bryan Nolan's affidavit was filed in support of co-defendant Steven Stebbins' application for a restraining order, however, Stebbins filed for a protective order on November 13, 2018; the first hearing for Stebbins' protective order was on November 23, 2018; the second and final protective order hearing, where Stebbins' request was ultimately denied, was on December 14, 2018; and Sgt. Nolan's affidavit in question was written and filed in support of the Arrest Warrant Application for Marcus Cameron, which was completed on December 5, 2018. (**LRS ¶¶ 58, 75-77**.)

Further, regarding the allegation of stalking against Cameron, Sgt. Nolan stated that he based his determination for that charge based on the events of November 12, 2018. (**LRS ¶ 58**.) It is undisputed that on November 12, 2018, Cameron was either traveling behind Stebbins' vehicle in traffic, that Cameron drove past Stebbins' vehicle in traffic, or that Cameron ended up in the same parking lot as Stebbins on November 12, 2018. (**LRS ¶¶ 14, 15, 18, 21-24, 27, 29**).

Finally, the defendants are entitled to the protected quasi-judicial privilege regarding the filed Arrest Warrant Application and accompanying affidavit as they are statements made regarding a police investigation. *See, Hohmann*, 910 F. Supp. 2d at 405; *Hopkins*, 282 Conn. at 832.

For the foregoing reasons, the plaintiff's claim of Defamation *Per Se* fails as a matter of law and summary judgment should be granted as to Count V.

## IV. CONCLUSION

WHEREFORE, for all of the foregoing reasons, defendants request that the Court grant them summary judgment on all claims set forth in plaintiff's Complaint.

DEFENDANTS,
BRYAN NOLAN, MARK SQUIRES, TOWN OF ENFIELD and ENFIELD POLICE DEPARTMENT

By /s/ Eric E. Gerarde

Thomas R. Gerarde
ct05640
Eric E. Gerarde
ct31120
Howd & Ludorf, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
(860) 249-1361
(860) 249-7665 fax
tgerarde@hl-law.com
egerarde@hl-law.com

**CERTIFICATION**

This is to certify that on July 3, 2023, a copy of the foregoing Memorandum of Law in Support of Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Eric E. Gerarde
Eric E. Gerarde