**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**MARCUS CAMERON,**

**Plaintiff**

**NO.: 3:21-cv-00165OAW**

**v.**

**STEVEN STEBBINS, et al.**

**Defendants**

# PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

All of the named Defendants have filed Motions for Summary Judgment on this matter, relying on similar bases in support of their motions. Plaintiff hereby submits an omnibus Opposition to address the Motions as a whole, given the interconnected nature of the claims. In accordance with Local Rule 56(a)(2), Plaintiff incorporates his responses to each of the Defendants' Statements of Material Fact, along with his Additional Facts establishing genuine disputes as required under the same Local Rule.

## I. FACTUAL BACKDROP

On May 22, 2018, Plaintiff, an employee of the Commissioner of Probation in Massachusetts, was seized and threatened by Defendant Steven Stebbins, a Connecticut state trooper. (ASOF ¶1-8). This occurred in Plaintiff's driveway, outside of his property in Enfield, Connecticut. *Id.* The details of this first seizure

are discussed in the Additional Statement of Facts ("ASOF") and in Plaintiff's Argument, below.

After the initial seizure, Plaintiff filed an Internal Affairs complaint against Defendant Stebbins. Additionally, Plaintiff sent an email to Eric Cooke of the Connecticut State Police detailing the events. (Ex. GG). Once notified that Plaintiff filed an internal affairs complaint against him, Defendant Stebbins, along with the other named defendants in this action, sought to enact both judicial and extra-judicial revenge on Plaintiff.

**Stebbins Begins Manufacturing a "Paper Trail"**

Just four days after their initial encounter, on May 26, 2018, Plaintiff was driving down his street when a woman walked out into the middle of the road, right in front of his car. (Ex. B, p. 258:15-25). He immediately slowed down, allowing the woman to continue to cross, but she simply stopped. Unbeknownst to him, Defendant Stebbins was inside the house calling 911 on Plaintiff for "speeding" by his wife. (Ex. I). A police cruiser, which was at Defendant Stebbins' residence, followed Plaintiff's guest. (*Id*). Mr. Cameron followed behind them. Believing that these events would continue, Plaintiff sent another email to a Lieutenant Cooke outlining what had happened, and articulating exactly what was happening: that Defendant Stebbins was manufacturing events to create a "paper trail" against Plaintiff. (*Id.*) .

On May 28, 2018, Plaintiff was working in his garage with a friend, when Defendant Stebbins drove by Plaintiff's house numerous times in a black muscle car. (ASOF ¶20).

Due to construction, Plaintiff was forced to pass Defendant Stebbins' house several times during the day of May 30, 2018 (there are usually two separate streets that connect Foxcroft back to Route 5 in Enfield. However, due to construction, it was not feasible for Plaintiff to avoid passing Defendant Stebbins' home). (ASOF ¶21). While driving past Defendant Stebbins' home, a white man who was with Stebbins, later identified as Alex Vasichenko, walked into the middle of the road and began to yell at Plaintiff, asking him "are you fucking lost?". Mr. Cameron told the man to have a nice day and "God bless you" and continued on. (Ex. K). Defendant Stebbins watched from the driveway. *Id.*

**Defendant Samson Works with Defendant Stebbins to Investigate Plaintiff and Impose Extra-Judicial Summary Punishment**

Defendant Stebbins' immediate supervisor, Defendant Samson (who was a Sergeant in "Troop H" at the time), was assigned to investigate Plaintiff's Internal Affairs complaint. (ASOF ¶24). On June 8, 2018, Sergeant Samson formally notified Trooper Stebbins about the complaint and requested from Stebbins memorandum explaining the events of May 22.

On June 21, 2018, Plaintiff was driving in Enfield, Connecticut when Defendant Stebbins pulled up behind him and began to follow him. (Ex. A p. 115:1-

5). While following Plaintiff, Stebbins ran Plaintiff through the COLLECT database several times. (Ex. A p. 115:5-7; Ex. H). Between Defendant Stebbins and other officers at his Troop, they ran Plaintiff's name and/or license plate through the COLLECT database ***at least*** **twenty-nine (29) times** after May 22, 2018! (Ex. H).

Defendant Samson sent an email to Plaintiff informing him he would be in charge of the investigation and requested to set up a time to meet. (Ex. D, p. 21:11-14, 18-21). On June 25, 2018, Defendant Samson arrived at Plaintiff's Foxcroft property. The conversation quickly turned, and Defendant Samson attempted to convince Plaintiff to change his story, telling Plaintiff that he was a "bulldog" when it came to investigations. (Ex. L).

Defendants Samson and Stebbins began to dig into Plaintiff's history as a law enforcement officer and probe his employer, the Massachusetts Trial Court, to tell them that Plaintiff was not complying with his requirement to be a Massachusetts resident, and that he lived in Connecticut (although he did not). (ASOF ¶31). Further, despite having no evidence that Plaintiff did not have two driver's licenses, Stebbins and Samson began investigating this in an effort to charge Plaintiff with a crime. (ASOF ¶34). Thus, Samson's investigation consisted of obtaining a written statement from Defendant Stebbins, and then, with the assistance of the man he was supposed to be investigating, attempting to find a way to get Plaintiff fired and/or charged with a crime. (Ex. B, pp. 270:10-25, 271:1-25).

On July 8, 2018, a woman was standing outside Defendant Stebbins' house taking pictures of his unmarked police car. (Ex. C, p. 89:10-17). Stebbins believed

the incident was related to Plaintiff and Defendant Squires wrote a report that was later used to support the arrest warrant against Plaintiff. (Ex. Y). Defendant Stebbins later admitted in his deposition and admitted in an audio recording that he did not have evidence that Plaintiff was connected to the woman. (Ex. O, Ex. C, p. 89:10-17). On July 15, 2018, Defendant Stebbins was observed outside Plaintiff's house in plain clothes and wrote down Plaintiff's license plate and ran it through the COLLECT system again without cause. (Ex. A, p. 120:1-7; Ex. H).

On July 17, 2018, Defendant Samson and at least two other Connecticut State Police personnel[1], including Defendant Stebbins (who was the subject of the investigation), called Plaintiff's supervisor at the Massachusetts Trial Court. (the transcript of the audio has been included as Ex. P). After they believed the call had ended, they began to discuss the investigation and further strategy, calling Plaintiff an asshole, implying that Plaintiff was going to play the race card, mimicking their encounters with black people, discussing the manner in which they might get witnesses to make statements for the investigation[2], and ways to attach Plaintiff's credibility. *Id.* Again, Plaintiff was the complainant and Stebbins the subject of the investigation. Further, Defendant Stebbins was ordered not to discuss the

---

[1] The deposition testimony differs as to who was in the room, but there were at least three people, with Stebbins apparently walking in after the phone call was made, but in time to discuss the matter with the others in the room.

[2] One of these witnesses was a postal worker that Defendant Samson hoped would say that Plaintiff was "playing that racial card." *Id.* Defendant Samson did, in fact, obtain the phone number of the postal worker, whom he called for a lengthy period of time and wrote a statement, purportedly from said postal worker that she believed Marcus Cameron was racist against white people and used drugs. (Ex. D, pp. 136-139).

investigation with anyone other than legal counsel or STOP support personnel. (Ex. N). Neither Stebbins nor Samson deny that he violated this order.

On August 7, 2018, Defendant Stebbins followed Plaintiff while Plaintiff was in his friend's car. (Ex. A, p. 129). Defendant Stebbins, yet again, ran the car's license plate through the COLLECT database. (Ex. H). Later, Mr. Cameron received a call stating that a Connecticut state vehicle in his driveway. (Ex. A, p. 133). Mr. Cameron called and reported this to the Enfield Police Department. This occurred again on September 18, 2018. (Ex. B, p. 163:11-17; Ex. H). In the meantime, no progress on the Internal Affairs investigation was communicated to Plaintiff, despite his email to Defendant Samson on July 25, 2023. (Ex. B, p. 234:1-4).

**After the Internal Affairs Investigation is Completed, Defendant Stebbins Works to Get Plaintiff Arrested.**

On October 11, 2018, Defendant Samson submitted his official report on the internal affairs complaint. (Ex. B, p. 281:12-13). Defendant Samson's report was changed at least three times (Ex. D, p. 87:10). He found that Mr. Cameron's claim could not be supported or was inaccurate, and he considered the May 22 incident a traffic stop. *Id.* Samson also stated that Stebbins had the authority to stop Plaintiff, but he should have activated his MVR and identified himself. *Id.* The end of the report stated that further investigation should be done into Plaintiff's work and residence. (ASOF ¶45, 47). Defendant Samson claimed that Plaintiff should not live in Enfield as a Massachusetts Trial Court as a Probation Officer. (*Id.*). Plaintiff had

already informed Defendant Samson that he owns a house in both Springfield, MA and Enfield, CT. As a result of all of this, Plaintiff received a letter from his work stating that there was a complaint about his violating the residency requirement. (Ex. Q). Further, Defendant Samson sought to have criminal charges pursued against Plaintiff for having driver's licenses in two states. (Ex. A).

On November 12, 2018, Defendant Stebbins was at his home at Foxcroft. (ASOF, ¶57). Despite his testimony under oath, wherein he stated that he was in fear of Plaintiff, he chose to drive past the Plaintiff's residence rather than take an alternate route that was closer to Route 5 and would completely avoid any possible contact with Plaintiff. (ASOF, ¶58-60). Additionally, the route taken by Defendant Stebbins was not an efficient route to get back to his new home (*Id.*). *A description of events leading up to Plaintiff's seizure on November 12, 2018 has been detailed in Plaintiff's Additional Statement of Facts in paragraphs 55-82.*

Defendant Stebbins could have pulled over Plaintiff himself (he had jurisdiction to do so), yet he did not do so (Ex. C, p. 128:9-12). He then directed the seizure with the Enfield Police on scene. (Ex. EE, beginning approx. at the 1:42 mark, wherein Defendant Stebbins orders the Enfield PD officer not to let Plaintiff go, then subsequently asks her if her mic is on. She responds that it is not, but that Stebbins' mic is on, wherein he immediately turns it off.). After Plaintiff was free to go, and came back from the pet store, he asked Defendant Nolan who the other officer on scene was, and Defendant Nolan refused to answer Plaintiff and just drove away. (Ex. E, p. 184;15-23).

**Enfield Defendants Manufacture "Probable Cause" to Arrest Plaintiff**

The next day, Defendant Stebbins filed for a protective order against Plaintiff, claiming that he was in fear for his and his family's safety. (Ex. S; Ex. T).

Enfield Police Officers began patrolling up and down Mr. Cameron's Street on November 20, 2018. (ASOF ¶88). This, despite Defendant Stebbins having already moved from the area. (Ex. C, p. 155:1-2). Also, at this time, Plaintiff had not been charged with a crime. They would eventually pull into his driveway and walk around, inspecting his car and walking on his lawn. (Ex. U; Ex. V; Ex. W).

Defendant Nolan then "investigated" the incident to find probable cause to charge Plaintiff with a crime. He was advised to seek official IA documents from Connecticut State Police's legal department. (Ex. E, p. 23:10-16). He instead received documents from Stebbins and Samson (Ex. B, p. 271:10-18). He has no recollection of reviewing any of Plaintiff's previous complaints and/or reports against Defendant Stebbins. (Ex. E, p. 94:1-18). He did not factor in another statement by an Enfield Police Sergeant stating that Plaintiff and Stebbins' issues boiled down to a neighborly dispute. (Ex. E pp. 110:7-12). He made several false statements in his application for an arrest warrant, including that Stebbins never exited his vehicle, when in fact he was out of his vehicle directing EPD officers. (See ASOF, ¶ 93). Nolan included "evidence" that did not exist or occur. For example, he

included the woman taking pictures of Stebbins' car as evidence of Plaintiff stalking him (Ex. Y).

After being apprised of the facts and background, he made the determination to apply for the arrest warrant for Stalking in the third degree, based solely on the events of November 12, 2018. (Ex. Y, Ex. E pp. 39:1-12). He did not factor in relevant evidence that would tend to show that there was no probable cause to believe that Defendant Stebbins was reasonably in fear of his safety. (Ex. E pp. 50:11-19). He does not recall ever charging anyone with stalking in the third degree. (Ex. E pp. 196:1-9, 167:14-19). The entire set of events that formed the basis of his probable cause took less than one half hour. (Ex. E pp. 194:9-196:5). He agreed that Stebbins' fear had to be reasonable to charge Plaintiff with a crime but did not know the reasonable fear that Stebbins had. (Ex. E, p. 50:8-24).

Thus, despite all of the evidence that Stebbins was not in reasonable fear, that Plaintiff did not repeatedly follow or lie in wait for Stebbins, and the fact that the entire set of events could not substantiate a charge for stalking in the third degree, and despite his testimony that he formed the basis of his charge on the events of November 12, 2018 alone, he applied for an application for an arrest warrant to arrest plaintiff under the same charge. It is important to note that nothing changed from November 12, 2018, other than statements about previous encounters between Stebbins and Plaintiff that could have impacted Nolan's decision. He admitted that the video footage alone did not show a reckless act. (Ex. E, p. 151:15-21). Thus, speaking with Stebbins on scene and viewing Stebbins' dash

cam video was not enough to arrest Plaintiff on November 12, 2018. The only further information Nolan gathered to support his finding of probable cause was Stebbins' stories about their past encounters and internal affairs report.

**Defendant Stebbins' Attempt to Prop Up the Criminal Charges by Seeking a Protective Order**

On November 23, 2018, Defendant Stebbins and Plaintiff attended a hearing for the protective order. The judge determined that he would allow a continuance but told them both that they should consider not pursuing the matter. (Ex. X). He concluded they had better things to do than argue over a situation that did not warrant a protective order. (*Id.*). At the second hearing for a protective order on December 14, 2018, the protective order was denied. The judge did not find that the facts warranted a protective order, echoing the first judge's advice. (Ex. BB).

At Stebbins' deposition, he was confronted with his statements that he said Plaintiff drove slowly past his house, and others where he said that Plaintiff drove past his house at a high rate of speed. (Ex. C, p. 211-212). He then stated that he had a problem with Plaintiff driving both fast and slow past his house. (*Id.*).

**Plaintiff's Arrest, Excessive Force and Subsequent Detention**

Plaintiff was officially arrested for third degree stalking on December 11, 2018. During the arrest, one Enfield Officer used excessive physical force by shoving Plaintiff against the car when Plaintiff was complying peacefully and respectfully.

This event was audio recorded. (Ex. Z). Plaintiff was yet again questioned by Defendants Nolan, Squires, and another Officer about his residency while back at the station. (Ex. B pp. 177:23-25). They detained Plaintiff longer than necessary, stating that they could set him bail if he was a Connecticut resident, despite bail already having been set. (Ex. B pp. 178:1-19). This was obviously an attempt to get Plaintiff to admit that he was a Connecticut resident, and evidence that the Enfield Defendants were working with Defendants Stebbins and Samson to subject Plaintiff to extra-judicial punishment. Eventually, he was released and scheduled for an arraignment on December 18, 2018. The following day, Plaintiff was put on leave because of the pending criminal investigation. (Ex. Q). The police continued to travel by Plaintiff's house for several months until the criminal case was eventually dismissed and sealed on March 8, 2019.

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment will not lie if the dispute about a fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The moving party bears the burden of showing that there is no genuine dispute of material fact:

> "A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995)

Summary judgment is a "drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Accordingly, the moving party bears a heavy burden of demonstrating the absence of any material issues of fact. Moreover, in reviewing a Rule 56 motion, a district court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion. If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d 157, 160 (2d Cir. 1999), quoting *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). The Local Rules for the District of Connecticut even stress the "heavy burden" borne by the moving party and encourage caution when deciding to file summary judgment motions:

> "A party moving for summary judgment bears a heavy burden. A party may obtain summary judgment as to a claim or defense only when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law as to that claim or defense – or the part of that claim or defense – on which summary judgment is sought. In deciding a motion for summary judgment, the court must assume that a trier of fact would resolve all factual disputes in favor of the party opposing summary judgment. All admissible evidence favorable to the party opposing the motion (including direct, indirect, and circumstantial evidence, and evidence admissible only for a limited purpose such as impeachment), and all permissible inferences based on such evidence, must be credited if such evidence and inferences could be credited by a trier of fact. The Court must disregard all evidence supporting the moving party that the jury would not be required to believe with regard to a disputed issue of fact, and must resolve all credibility questions in favor of the party opposing summary judgment. Local Rule 56(c).

**B. Qualified Immunity**

The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was "objectively reasonable" for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*, at 154 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, (1987)). "In determining whether a right is clearly established, [courts]

consider (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *McGarry v. Pallito*, 687 F.3d 505, 512 (2d Cir.2012). **"Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."** *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999). (Emphasis added).

## III. ARGUMENT

### A. Plaintiff's Search and Seizure Allegations

Defendants challenge that Plaintiff was even seized at all during his multiple encounters with them, including when between 7-10 officers surrounded his vehicle. (Ex. B, p. 299, 18-25, 300:1-15). *United States v. Glover*, 957 F.2d 1004 (2nd Cir. 1992), states:

> "As we stated in [*United States v. Hooper,* 935 F.2d 484, 489 (2d Cir. 1991)], there are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment. *See* 935 F.2d at 490. The first type is a consensual encounter whereby an individual willingly agrees to speak to law enforcement personnel. *See id.* Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a "seizure" implicating the Fourth Amendment's protections. *See id.; see also Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Springer,* 946 F.2d at 1016; *United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990). Discussing the parameters of such consensual encounters, the Supreme Court recently observed in *Bostick* that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of

that individual ...; ask to examine the individual's identification ...; and request consent to search his or her luggage ... as long as the police **do not convey a message that compliance with their requests is required.**" 111 S.Ct. at 2386 (citations omitted).

The second type of encounter, based on the principles enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), involves a limited investigative stop of an individual and/or his or her bags. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *see also Hooper,* 935 F.2d at 490, 492–93. Although limited in scope, such investigative detentions are "seizures" under the Fourth Amendment, *see, e.g., Hooper,* 935 F.2d at 490, and must be based on "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884).

The third and final type of encounter is an arrest—plainly a Fourth Amendment "seizure"—that must be based on probable cause. *See, e.g., Hooper,* 935 F.2d at 490; *United States v. Bradley,* 923 F.2d 362, 364 (5th Cir.1991).

To determine whether a "seizure" has occurred triggering the Fourth Amendment's protections, a court must consider " '**if, in view of all of the circumstances surrounding the [encounter], a reasonable person would have believed that he [or she] was not free to leave.'** " *Lee,* 916 F.2d at 819 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, *J.*))); *see also Bostick,* 111 S.Ct. at 2389.

**The test is an objective one, *see, e.g., Springer,* 946 F.2d at 1016; *Lee,* 916 F.2d at 819, based on how a reasonable innocent person would view the encounter**. *Bostick,* 111 S.Ct. at 2388. As a guide to applying this test, we have enumerated certain factors that might suggest that a seizure occurred, namely:

the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the

> police station or a police room. *Lee,* 916 F.2d at 819; *see also Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, *J.*); *Springer,* 946 F.2d at 1016.

With that in mind, Plaintiff has alleged that he was unreasonably and unlawfully seized on three separate occasions:

<u>May 22, 2018:</u>

It is unclear why Defendant Stebbins is now contesting that he did not seize Plaintiff on May 22, 2018, as the Connecticut State Police and his own co-defendant have already found that he conducted a traffic stop and violated departmental policy. (SAMSON 002). Nevertheless, he is now claiming that because he didn't aim his pistol at the Plaintiff, he therefore didn't seize him under the 4th Amendment, and that Defendant Stebbins' actions fall under his liberty to "talk to people."

Plaintiff was pulling into the driveway at 49 Foxcroft Road in Enfield, to meet a friend. (ASOF ¶2). Defendant Stebbins approached Plaintiff to speak to him about his "driving habits." (Stebb. Dep, at 31:21-22). Defendant Stebbins pulled up to Plaintiff's residence at approximately 40-50 miles per hour, nearly hitting the SUV of Plaintiff's friend. (ASOF ¶3-4). Defendant Stebbins got out of his cruiser, approached the Plaintiff, and placed his hand on his firearm. (ASOF ¶ 5). Stebbins then aggressively questioned Plaintiff, stating "what the hell are you doing" and instructed Plaintiff to "get out of the car" and that he was here to talk to Plaintiff "man to man." (ASOF ¶ 6, 9). From there Defendant Stebbins refused to identify himself:

At this point he kind of retreats so I'm already now exiting. He squares off with me.

He says, What? You want to play like that? All right, I'll be back. I'm going to take care of you. I got something for you.

Like, What?

He walks off.

I'm live, Yo, matter of fact. What's your name?

He refuses to answer.

What's your badge number?

He refuses to answer.

Where do you work?

He refuses to answer.

So at that point, I wrote down the license plate number and then I ended up calling 911. The first phone call I called --

As a result of this encounter, Defendant Stebbins was found to have violated department policy. (Samson dep, at 78:18-22). Defendant Stebbins admits that he did not identify himself to Plaintiff and it was because Plaintiff "had an attitude." (Stebb. Dep, at 38:15-22). He failed to adhere to published, departmental traffic stop procedures. (Ex. DD).

Nevertheless, Stebbins is now claiming that because he didn't aim his pistol at the Plaintiff, he therefore didn't seize him, and that Stebbins' actions fall under his liberty to "talk to people," like "anyone else." This is an interesting argument and defense: had Defendant Stebbins *not* have been a police officer, and was just like "anyone else," he is suggesting that he would have had the right to speed up to Plaintiff's house, get out of the car, put his hand on his fully displayed pistol, walk onto Plaintiff's property, give an exit order to Plaintiff to get out of the car, "square up" against Plaintiff, curse at him, tell him he wants to talk man to man, subject him to questioning and say on his way out that he is going to take care of Plaintiff. **The Plaintiff was arrested and charged for far less.**

It is also very telling that the Plaintiff's challenges to Defendant's outrageous and unlawful conduct were deemed "defiant," and therefore not subject to Fourth Amendment protection. This again displays the tone-deafness (and inaccuracy) of the Defendants' legal arguments. On the one hand, Stebbins claims that his conduct is acceptable and lawful, and that everyone has the liberty to commit the aforementioned acts, but on the other hand, civilians do not have a right to be frustrated or question the officer that has seized them without losing their Fourth Amendment protection. First, Plaintiff did what Stebbins told him to do: he got out of the car. Second, he answered Stebbins questions. Third, he did what any reasonable person would and should have done: confirm that the man accosting him was an actual police officer. The fact that he was not doing it with a positive affect does not render his Fourth Amendment rights null and void.

Stebbins' seizure of plaintiff was not based on any "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'". See *Sokolow,* supra. He simply wanted to use his status as a police officer to confront a neighbor[3] that he had a problem with. He failed to adhere to known departmental standards for traffic stops, which falls under the second, definitive category of police interactions discussed in *Glover*, which is a seizure. Further, the fact that Stebbins approached the Plaintiff at a high rate of speed, came into Plaintiff's driveway while Plaintiff was still in the car, ordered Plaintiff out of the car, put his hand on his firearm and used aggressive language, both verbal and body language, suggests that a "reasonable innocent person" would view the encounter as a seizure, and that compliance was mandatory. "[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe,* 470 U.S. 675, 685 (1985).

Further still, Defendant Stebbins' retreat, refusal to identify himself upon request and failure to report the traffic stop (violations of department policy) show clearly that he knew that the seizure was unlawful and unreasonable.

<u>November 12, 2018:</u>

It is argued by the Enfield defendants that the Plaintiff was not seized on November 12, 2018, when 7-10 police officers surrounded his vehicle and began to

[3] Stebbins believed that they were neighbors, however Plaintiff simply owned the house and visited frequently. He rented it to a friend and maintained his primary residence in Massachusetts.

question him. Plaintiff was told that he was not under arrest but being detained. (Ex. B, p. 212:16-20). Defendant Nolan, the Sergeant on scene for the Enfield Police Department, specifically told Plaintiff that he was required to provide his name and address to them. (Ex. E, p. 33:15-24; Ex. FF). Plaintiff complied. A video of the stop has been provided as Exhibit FF, which demonstrates all of the *Mendenhall* factors were present, clearly indicating that Plaintiff was seized. The plaintiff additionally submitted to the authority of the officers on the ground. See *Brendlin v. California,* 551 U.S. 249, 254 (2007), stating that to constitute a seizure, physical force or submission to police authority must occur.

This seizure was also based on Stebbins falsely reporting that Plaintiff was stalking him over a period of less than thirty minutes. Enfield PD were taking commands from Defendant Stebbins, who directed them *not* to let Plaintiff go, and to wait for his supervisor (Samson) to arrive. (Ex. EE). Stebbins could have pulled over Plaintiff himself but had the Enfield PD do it. He called Samson before he called 911, despite being in fear for his safety, and followed Plaintiff into the Brookside Plaza. Defendant Nolan admitted that Plaintiff told him on the scene that Defendant Stebbins had been harassing him. (Ex. E, p. 130:3-7). The fact that Plaintiff was black and the officers that he is accusing of harassment were white was irrelevant to Nolan. (*Id.,* at p. 192:1-7). Plaintiff's license was taken from him. (Ex. B, p. 291:1-5). After Plaintiff came back from the pet store, Defendant Nolan was still in the parking lot. When Plaintiff asked him who the other officer on scene was, Nolan refused to answer Plaintiff and just drove away. (Ex. E, p. 184;15-23).

In short: there is sufficient, if not overwhelming evidence that proves that Defendant Stebbins used the Enfield Police Department to initiate a seizure of Plaintiff at the Brookside Plaza. Stebbins and Samson orchestrated and controlled the stop. Rather than conduct the stop based on any reasonable suspicion, Enfield Police officers instead just took directive from, and believed the stories of, Connecticut State Police Officers.

<u>December 11, 2018:</u>

Enfield Defendants cite *Boyd v. New York*, 336 F.3d 72, 75-76 (2nd. Cir. 2003) to define probable cause, when the arresting officers "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Here, Defendant Nolan, along with a fellow officer, Caires, effectuated the stop and arrest of Plaintiff. First, Defendant Nolan included knowingly false information and omitted material evidence in his arrest warrant application. (See ASOF ¶93). A fellow Enfield Sergeant already investigated Plaintiff and Stebbins' past accusations and indicated that it was a "waste of time." (ASOF ¶95). Two separate judges indicated the same. (Ex. X; Ex. BB). Defendant Nolan included in his arrest warrant application past accusations of Stebbins but did not include past police reports and accusations by Plaintiff. Despite including past history in his application, Nolan based his charges solely on events that occurred in less than thirty minutes. (ASOF ¶101). The charge, "stalking in the third degree" requires a

finding that a person recklessly causes another person to reasonably fear for his or her physical safety or suffer emotional distress by willfully and repeatedly following or lying in wait for such other person. C.G.S. Sec. 53a-181e. Nolan didn't remember if he even bothered to ask where Steven Stebbins was going on November 12, 2018. (Ex. E, p. 48:11-12). He did not know what fear Steven Stebbins had of Plaintiff. (ASOF ¶97). Any reading of Defendant Nolan's deposition testimony will show that his finding of probable cause is a question to be presented to the jury, in that he could not specifically articulate all of the facts that he relied upon in coming to his finding and the question presented would be "was it objectively reasonable for the officers to believe that probable cause existed, or could officers of reasonable competence disagree on whether the probable cause test was met?" *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). In other words, was it "objectively reasonable ... to believe that [the defendant's] action did not violate the law?" *Russo v. Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007). While probable cause for arrest is distinct from probable cause for prosecution, lack of probable cause to arrest implies lack of probable cause to prosecute. *Pizarro v. Kasperzyk*, 596 F. Supp. 2d 314, 319 (D. Conn. 2009), quoting *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir.1999).

All of the aforementioned demonstrates that the Enfield Defendants should not enjoy the presumption that Nolan's finding of probable cause was reasonable. The evidence on the record in fact shows the opposite: that no reasonable officer could find probable cause to arrest the Plaintiff for stalking in the third degree over

a period of less than thirty minutes. Thus, the seizure (arrest) of Plaintiff was unlawful and unreasonable. Further the keeping of Plaintiff longer than was necessary in order to aid Defendant Stebbins and Samson in trying to get Plaintiff to admit that he lived in Connecticut was also unreasonable. (ASOF ¶105-107).

### B. Plaintiff's Excessive Force and Summary Punishment Allegations

Plaintiff's claims for excessive force stem from being physically abused at the hands of the Enfield Defendants during his arrest. (ASOF ¶103). Plaintiff was respectful and compliant, even speaking casually with Defendant Nolan. (Ex.FF) Yet for no reason, he was shoved up against the cruiser and physically manhandled by Officer Caires. Thus, for stalking in the third-degree charge, physical abuse of Plaintiff was unreasonable under the circumstances.

Under the same Count (II) of his Complaint, Plaintiff included summary punishment in violation of his due process rights under the U.S. Constitution and incorporated all of the previous averments to support it. To state a cognizable section 1983 claim premised on a due process violation, a plaintiff must show that "as the result of conduct performed under color of state law, [he or she] was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).

The record contains overwhelming evidence of the Defendants, in their capacities as law enforcement officers, using their position and internal affairs investigation to enact extra-judicial summary punishment on the Plaintiff:

a. Defendants Stebbins and Samson were working together to investigate Plaintiff's residence, attempting to get Plaintiff fired from his position as a Probation Officer.

b. Defendants Stebbins and Samson were working together to investigate whether Plaintiff had two driver's licenses so that they could have him criminally charged.

c. Defendants Stebbins, Samson and Nolan worked together to manufacture an arrest warrant without obtaining official records through Connecticut State Police after they were unsuccessful in getting Plaintiff fired.

In support of these allegations, the evidence produced in discovery shows that Defendants Stebbins and Samson readily admit that they worked together on the investigation of Plaintiff, all the while Stebbins was the actual subject of the investigation itself. In fact, Defendant Samson didn't think there was anything wrong with it at all. (Ex. D, p. 32:13-17). Nor did Defendant Stebbins[4]. (Ex. C, p. 114:9-13). Both agreed that citizens have a right to a fair internal affairs investigation. (Ex. C, p. 115:16-18; Ex. D, p. 33:16-24). Yet throughout the investigation of Plaintiff's claims about Stebbins, both Stebbins and Samson sought to use their positions to punish Plaintiff:

[4] Stebbins' testimony was that he did not believe that anyone would think it was biased for him to be in the room as the subject of an investigation while the investigator was calling the complainant's employer. Ex. C, p. 129:15-21).

a. Defendant Stebbins and others in his Troop ran Plaintiff's license plate information through the COLLECT database twenty-nine (29) times (Ex. H)

b. Defendant Stebbins actively tried to investigate plaintiff's witnesses (Ex. C, p. 192:12-16)

c. Defendant Stebbins sought out information about Plaintiff's employment and provided it to Samson (Ex. D, p. 164:23-24, 165:1-2).

d. Defendant Stebbins deleted evidence even after receiving a litigation hold as part of this lawsuit. (Ex. C, p. 18:12-21)

e. Defendant Samson sent two Troopers up to Massachusetts just to see if Plaintiff was living there (Ex. D, p. 188:1-10)

f. Samson allowed Stebbins to send him rough drafts of his statement for the investigation. (Ex. D, p. 166:8-23).

g. Samson sought criminal charges against Plaintiff over his driver's license, despite not having any evidence that Plaintiff made false statements about it. (Ex. D, p. 64:19-21, 76:21-24).

h. Samson, Stebbins and two others strategized about how they would seek to get Plaintiff to "change his tune," and orchestrate the investigation in a way that was favorable to Stebbins. (Ex. P).

i. Defendants did tell Plaintiff's employer that he was a resident of Connecticut. (Ex. B, p. 193:15-21).

j. Defendants Stebbins, Samson and Nolan collaborated to manufacture criminal charges against Plaintiff.

Plaintiff was put on leave from his job, and lost money as a result. Additionally, this was not just a deprivation of property, but liberty as well. "Liberty, as enshrined in the Fourteenth Amendment, is a broad notion, and one of the many freedoms it encompasses is the freedom to engage in any of the common occupations of life." *Donato v. Plainview-Old Bethpage Central School District*, 96 F.3d 623, 630 (2d Cir. 1996). Accordingly, liberty interests may be implicated when the government imposes "a stigma or badge of disgrace," *Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971).

Plaintiff was not afforded a fair internal affairs investigation, and instead the Defendants used their positions and power as police officers to instead investigate Plaintiff and exercise summary punishment outside of the court system, by going after Plaintiff's employment, as well as through the court system, by means of manufacturing criminal charges, as described earlier. Thus, the record is full of evidence by which a trier of fact could find that the Defendants committed excessive force and summary punishment in violation of Plaintiff's due process rights.

### C. Plaintiff's Additional 1983 Claims Against the Town of Enfield

Plaintiff incorporates his argument regarding Defendant Nolan (a supervisor) and Defendant Squires with respect to his seizures at the hands of the Enfield Police into this argument as well. Nolan is a Sergeant, and Squires a Lieutenant.

Ample evidence exists regarding Nolan's manufacturing of probable cause, with Lieutenant Squires' approval, as well as detaining Plaintiff unreasonably, as outlined in Plaintiff's ASOF, the Background of this Memorandum, and in the aforementioned argument section.

Plaintiff additionally testified to facts that support the additional theories against the Town of Enfield and its individual defendants. Plaintiff testified as to the following:

a. Defendant Nolan committing perjury in an arrest warrant application. (Ex. B, p. 275:18-23)
b. Enfield Defendants' knowing failure to properly investigate (*Id.,* p. 276:7-22, p. 277:7-14, 15-23)
c. Defendant Nolan's inability to appropriately handle racial conflict, to the detriment of Plaintiff (*Id.,* p. 277:1-6)
d. The Enfield Defendants' looking the other way with respect to tampering with evidence (turning video on and off, etc.) (*Id.,* p. 277:23-25)

All of the allegations and supporting evidence on the record submitted in Plaintiff's opposition suggest that a trier of fact could reasonably find that the Town of Enfield failed to recruit, train and supervise, and had unconstitutional policies.

**D. Defendants' Actions are not Protected by Qualified Immunity**

The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gonzalez*, 728 F.3d at 154 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "In determining whether a right is clearly established, [courts] consider (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *McGarry v. Pallito*, 687 F.3d 505, 512 (2d Cir.2012).

Here, the clearly established constitutional rights that Defendants violated were Plaintiff's Fourth Amendment Right protecting him from unreasonable searches and seizures, his Eight Amendment Right against cruel and unusual punishment, and his Fifth and Fourteenth Amendment Rights protecting him from the loss of liberty and/or property without due process. These are basic rights and officers of reasonable competence could not possibly disagree with the legality of the Defendants' actions given the aforementioned evidence supported by this opposition. See *Varrone v. Bilotti,* 123 F.3d 75, 79 (2nd Cir. 1997). Lastly, "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999).

### E. Plaintiff's Defamation Claims

Plaintiff's defamation claim is supported by the facts on the record, through his ASOF and subsequent factual background in this opposition, as well as supporting exhibits, including his deposition testimony. Additionally, With each publication by the defendant, a new cause of action arises. *Cweklinsky v. Mobil Chem. Co.,* 267 Conn. 210, 217, 837 A.2d 759, 764 (2004). Plaintiff's allegations specifically implicate the defendants for making these statements with malice in fact or actual malice. See *Gallo v. Barile*, 284 Conn. 459, 935 (2007). "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or reckless disregard of whether it was false. Malice in fact is sufficiently shown by proof that the [statement was] made with improper and unjustifiable motives." *Hohmann v. GTECH Corp.,* 910 F. Supp. 2d 400, 406–07 (D. Conn. 2012). Every one of Plaintiff's allegations, and the evidence on the record, suggests that the defendants were using improper motives and/or outright knew that their statements were false when they were made. Thus, no privilege may prevent them from reaching a jury.

## IV. CONCLUSION

For the aforementioned reasons, Plaintiff's claims should be presented to a jury. The Defendants have failed to meet their heavy burden of demonstrating that there are no genuine disputes of material fact. They are not protected by qualified immunity, and Plaintiff has provided sufficient evidence on the record such that this Court should DENY Defendants' Motions and schedule this matter for a jury trial.

Plaintiff, by his attorneys:

/s/ Michelle S. Cruz
Michelle S. Cruz, Esq.
Law Offices of Michelle S. Cruz
35 Center Street, Suite 35
Chicopee, MA 01013
(413) 592-9400
Cruz4law@gmail.com
Juris: 428425

/s/ Ryan P. McLane
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com
Juris: 438176

**CERTIFICATE OF SERVICE**

I do hereby certify that a true copy of the above document was served upon the parties and/or attorneys of record via ECF and electronic mail on August 11, 2023.

/s/ Ryan P. McLane