**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**MARCUS CAMERON,**

**Plaintiff**

**NO.: 3:21-cv-00165OAW**

**v.**

**STEVEN STEBBINS, et al.**

**Defendants**

**PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS**
**[Local Rule 56(a)(2)]**

1. Plaintiff is a Massachusetts resident who works for the Massachusetts Trial Court. (Ex. A, pp. 4:25; 5:2).
2. On May 22, 2018, Plaintiff was driving to his property at 49 Foxcroft Road in Enfield, Connecticut to meet a friend. (Ex. A, p. 66:14-16).
3. As plaintiff backed up into his driveway, he saw Stebbins' police cruiser drive up to his residence at about 40-50 miles per hour. (Ex. A, p. 64:13-14).
4. Defendant Stebbins pulled partially into Plaintiff's driveway and almost hit Plaintiff's guest's white SUV parked in front of the mailbox. (Ex. A, p. 64:10-16).
5. Defendant Stebbins approached the garage, where Plaintiff was still seated in his car, while Stebbins placed his hand on his firearm. (Ex. A, p. 64:19-22).

6. Defendant Stebbins began to accost the Plaintiff with obscenities, stating: "'What the hell are you doing?' Or 'What the fuck are you doing?'" (Ex. A, pp. 64:23-25, 69:10-13).
7. Plaintiff replied amicably and respectfully, referring to Defendant Stebbins as "Sir" and answering his questions. (Ex. A, p. 65:1-17).
8. Plaintiff then asked whether Defendant Stebbins intended to give him a ticket or arrest him. (Ex. A, p. 65:13-17).
9. Defendant Stebbins asked Plaintiff to "get out of the car" and informed him that he was, "…here to talk to you man to man." (Ex. A, p. 65: 23-24).
10. Once Plaintiff got out of the car, Defendant Stebbins began to retreat. As he did, he threatened the Plaintiff saying, "What? You want to play like that? All right, I'll be back. I'm going to take care of you. I got something for you." (Ex. A, pp. 66:4-6, 71:14-16).
11. Defendant Stebbins left Plaintiff's property without properly identifying himself as a police officer, despite being specifically asked by Plaintiff whether he was in fact an officer. (Ex. A, p. 66:9-15).
12. In an effort to determine Defendant Stebbins' identity, Plaintiff took down his cruiser's license plate and called 911 to report the incident. (Ex. A, p. 66:16-18).
13. On May 22, 2018, Defendant Stebbins ran the Plaintiff through the COLLECT database five times. (Ex. H).

14. On May 23, 2018, Plaintiff filed a formal complaint to the Connecticut State Police in an email. (Ex. A, p. 65:19-20)

15. Plaintiff felt threatened by Defendant Stebbins after May 22, 2018, and feared future retaliation due to their close proximity (Ex. A, p. 73:2-8).

16. The next day, on May 26, 2018, Plaintiff was driving to the gym when Defendant Stebbins' wife walked directly into his line of travel. (Ex. A, p. 78:8-18).

17. Plaintiff responded by pausing and waiting for the woman to pass, while unbeknownst to him, Defendant Stebbins was inside calling 9-1-1 and making a complaint about the Plaintiff. (Ex. I).

18. When Plaintiff and his guest left his residence that same day, an additional cruiser that was in Defendant Stebbins' driveway, followed their vehicle. (Ex. A p. 87:13-17; Ex. I).

19. In response, Plaintiff immediately went to the Enfield Police Department to inform them that Defendant Stebbins may be calling continuously in an attempt to have them "investigate" him. (Ex. I).

20. On May 28, 2018, Plaintiff and the man who was residing at 49 Foxcroft Road, Jean Paul, were sitting in front of the house as Defendant Stebbins drove by 49 Foxcroft Road about "five to ten times" in a black muscle car, gesturing and staring. (Ex. A, p. 96:2-8, 19-22).

21. On May 30, 2018, due to construction, Plaintiff had to drive by Defendant Stebbins house twice. (Ex. A, p. 103:3-5; Ex. J).

22. On the second time Plaintiff drove by, a guest at Defendant Stebbins house, later identified as Alex Vasichenko, began to shout obscenities at the Plaintiff and asked several times, "why are you on this side of the street?" and "are you fucking lost?" while Defendant Stebbins was in his driveway watching. (Ex. A, p. 107:11-14; Ex. K).
23. Plaintiff went to the Enfield Police Department after the altercation to file a report and pursue harassment charges on the unidentified male. (Ex. A, pp. 109:23-110:9).
24. On May 31, 2018, Defendant Samson was appointed as the investigator for Plaintiff's Internal Affairs complaint against Defendant Stebbins. (Ex. L; Ex. M; Ex. D, p. 22:1).
25. On June 21, 2018, Plaintiff was driving in Enfield and observed a Connecticut State Police vehicle following him. (Ex. A p. 115:1-5).
26. It was later discovered that the Officer who followed Plaintiff was Defendant Stebbins and that he had run Plaintiff's license plate and name through the COLLECT database three times on that occasion. (Ex. A p. 115:5-7; Ex. H).
27. On June 25, 2018, Defendant Samson met with the Plaintiff at 49 Foxcroft Road. (Ex. D, p. 34:16-18).
28. During the conversation, Samson tried to dissuade the Plaintiff from continuing the investigation by saying, "All I'm saying is, I'm a bulldog when it comes to investigations, I drive hard all I'm saying is, you sure you guys

can't work it out or something you gentlemen can work out instead…" (Ex. L pp. 9).

29. Defendant Samson also recorded the conversation with his cell phone hidden in his shirt pocket. (Ex. D, p. 35:10-23).

30. Defendant Samson, rather than investigating the Internal Affairs Complaint, began to investigate Plaintiff, with the assistance of Defendant Stebbins (Ex. L pp. 13; Ex. M pp. 9-10; Ex. B, p. 278:14-25, 279:1-25, 280:1).

31. Defendant Stebbins was ordered not to communicate with anyone other than legal counsel or STOP support personnel regarding the Internal Affairs allegations. (Ex. N).

32. Defendant Stebbins disregarded this order, along with Defendant Samson. (Ex. D, p. 50:6-14).

33. Part of Defendants' investigation into Plaintiff included searching for him at his place of work and questioning his employer. (Ex. L p. 15).

34. On July 15, 2018, Defendant Stebbins ran the license plate of a vehicle in Plaintiff's driveway through the COLLECT database. (Ex. H).

35. On July 17, 2018, Defendant Samson called Plaintiff's supervisor at the Massachusetts Probation Office and left a voicemail requesting to speak about Plaintiff regarding an investigation (Ex. O; Ex. P).

36. However, the voicemail was extended and did not disconnect after Defendant Samson was done speaking to the employer (Ex. P).

37. During this voicemail, Defendants Stebbins and Samson can be overheard discussing the Plaintiff, referring to him as an "asshole", coordinating to have a postal worker make a statement that Plaintiff was "playing that race card," and making comments suggesting that Plaintiff's claim is diminished because he is African American, or that he is only bringing the claims because he is African American (Ex. O; Ex. P).
38. There were possibly four individuals speaking about the Internal Affairs allegations while the voicemail was being recorded. (Samson Depo. 28:16-23).
39. One individual, Martin Pirog, used "blaccent" to mimic his interactions with African Americans. (Ex. D pp. 150:9-16).
40. When asked if this was appropriate, Defendant Samson stated that was just how Troop H is. (Ex. D pp. 150:14-16).
41. During the Defendants' investigations into Plaintiff, Defendant Stebbins and other Troopers ran Plaintiff through the COLLECT database at least 29 times (Ex. H).
42. Defendants sent Trooper Pirog and Trooper Joyal to Plaintiff's apartment in Massachusetts (Ex. D pp. 188:1-10).
43. Additionally, a retired trooper called the Probation office in Massachusetts to inquire about a residency requirement, then sent the information to Defendant Samson (Ex. D pp. 13:4-15).

44. Defendant Samson then sought guidance to see if he could charge Plaintiff with a crime for having a Massachusetts driver's license, despite never confirming that Plaintiff had two licenses. (Ex. D pp. 66:18-23).
45. Defendant Samson spoke with Attorney Christopher Parakilas on July 25, 2018, where he was informed that arresting the Plaintiff could be considered retaliation. (Ex. L p. 21).
46. Defendant Samson also suggested Plaintiff's work be notified about his residency. (Ex. L p. 27).
47. Defendant Samson and Defendant Stebbins contacted Plaintiff's work several times regarding allegation about Plaintiff's residency. (Ex. A pp. 120:14-121:19).
48. Plaintiff has a Massachusetts driver's license. (Ex. A p. 61:9-14).
49. Plaintiff lives in Massachusetts. (Ex. A p. 177:4-7).
50. Plaintiff received a letter from his work stating there had been complaints about his residency due to the Defendants contacting his work. (Ex. Q).
51. On August 7, 2018, Defendant Stebbins followed a vehicle Plaintiff was in and ran the plate through COLLECT database. (Ex. A, p. 129; Ex. H).
52. Later in the day, Defendant Stebbins ran the plate of a vehicle in Plaintiff's driveway through COLLECT database once more. (Ex. H).
53. On September 5, 2018, Defendant Stebbins ran Plaintiff through COLLECT database. (Ex. A, p. 128: 6-15; Ex. H).

54. On September 18, 2018, Defendant Stebbins followed a vehicle leaving Plaintiff's property and ran the plate through the COLLECT database. (Ex. B, p. 163:11-17; Ex. H).
55. On November 12, 2018, Plaintiff went to 49 Foxcroft Road to check on the home because he had people power washing the residence. (Ex. A p. 137:3-13).
56. As he left his residence, Plaintiff was going to go to Brookside Plaza in Enfield to go to Petco and Staples. (Ex. A pp. 137:22-138:6).
57. Plaintiff saw Defendant Stebbins' police cruiser driving by as he was walking to his car. (Ex. A pp. 137:18-21).
58. Defendant had no reason to drive past Plaintiff's property (Ex. C, p. 118:1-6).
59. Defendant had no reason to drive in the direction that he was driving to get home that day. (Ex. C pp. 118:1-6).
60. Defendant claims to have been "in fear" of Plaintiff since May of 2018. (Ex. C pp. 120:9-13).
61. As both vehicles were leaving, both Plaintiff and Defendant Stebbins were forced to leave via Colony Road, due to the road having a no exit street on the right. (Ex. A pp. 140:19-23).
62. Defendant Stebbins pulled over and went behind Plaintiff, as if to pull him over, so Plaintiff pulled to the right. (Ex. A pp. 141:8-17).

63. Defendant Stebbins briefly stopped to run Plaintiff's license plate, then continued past Plaintiff's car again and onto Route 5. (Ex. A pp. 141:18-21, Ex. H).

64. Throughout the of the day of November 12, 2018, Defendant Stebbins ran Plaintiff's license plate eight times. (Ex. H).

65. Plaintiff saw Defendant Stebbins pull into a parking lot and loop back around to come out behind him, so Plaintiff pulled over to call a friend. (Ex. A p. 142:13-17).

66. Plaintiff called Jean Paul, who lived at 49 Foxcroft, because Plaintiff feared Defendant Stebbins was following him and intended to pull him over "possibly at a remote location." (Ex. A pp. 142:23-143:2).

67. Plaintiff saw Defendant Stebbins parked on the dirt shoulder as he continued onto the highway. (Ex. A pp. 144:9-13).

68. On the highway, Plaintiff got concerned, so he pulled over again to call Jean Paul and ask him to stay on the phone with him (Ex. A pp. 144:13-18).

69. Defendant Stebbins yet again drove by Plaintiff while Plaintiff was still pulled over. Defendant Stebbins was in the far most left lane. (Ex. A pp. 147:2-6).

70. As Plaintiff turned on his indicator to get off at the first exit, Defendant Stebbins crossed three lanes of traffic to take the same exit before the Plaintiff could get off. (Ex. A pp. 137:22-138:6).

71. Plaintiff turned into the very first Brookside Plaza entrance where the Staples and Petco were located. (Ex. A pp. 148:3-6).

72. Plaintiff waited in his car because he was waiting for Jean Paul to get to the location. (Ex. A pp. 148:16-18).

73. Defendant Stebbins followed Plaintiff into the parking lot and pulled around to where Plaintiff was sitting in his car as additional police officers began to arrive at the parking lot. (Ex. A pp. 148:12-15; 149:4-8).

74. During the course of following Plaintiff and then pulling over, Defendant Stebbins knowingly turned his cruiser video off when he claims Plaintiff followed him on the highway. (Ex. C pp. 203:10-14).

75. Defendant Stebbins exited his cruiser and spoke to Officer Croteau and other Enfield Police officers on scene (Ex. A pp. 149:9-10, 13-23; Ex. R; Ex. EE).

76. Defendant Samson was also at the scene. (Ex. D pp. 169:20-170:2).

77. Defendant Nolan, a Sergeant (at that time) at Enfield Police Department, arrived on scene because a state trooper made the call. Defendant Nolan explained, "if it's involving an active-duty police officer, we send a supervisor to the scene to take over the scene. So, I was dispatched there to Brookside because there was a state trooper involved." (Ex. E, p. 25:7-14).

78. Plaintiff did not feel comfortable giving the officers on scene his Massachusetts address for fear of retaliation from Defendants. (Ex. E, p. 34:1-13).

79. Plaintiff told officers on scene that Defendants Stebbins and Samson had been harassing him, and he was concerned for his safety. (Ex. FF).
80. Defendant Stebbins was at the scene the entire time Plaintiff was detained, up until he was released with no charges. (Ex. A pp. 157:7-10).
81. Defendant Stebbins was specifically overheard directing an Enfield Police officer not to let Plaintiff leave. (Ex. B, p. 252:8-15; Ex. EE).
82. Defendant Nolan told Plaintiff there would be no criminal charges filed against him on November 12, 2018. (Ex. B pp. 75:14-17).
83. The next day, Defendant Stebbins requested a protective order against Plaintiff because of "stalking." (Ex. S; Ex. T).
84. On November 15, 2018, Defendant Nolan spoke to Plaintiff on the phone briefly, but was disconnected. (Ex. B pp. 217:12-17).
85. Defendant Nolan never asked for a statement from Plaintiff on the phone or in a voicemail. (Ex. B pp. 217:18-22; 220:21-24; 221:9-13).
86. Defendant Nolan claimed that he called Plaintiff on November 19, 2018, but Plaintiff does not recall ever receiving that phone call. (Ex. B pp. 218:18-20).
87. On November 20, 2018, Defendant Nolan was seen walking on Plaintiff's property, inspecting his car, and standing on his grass. (Ex. B pp. 219:10-20; Ex. U; Ex. V; Ex. W).
88. Plaintiff was not home at the time Defendant Nolan was on his property. (Ex. B pp. 219:22-220:7).

89. On November 23, 2018, Defendant Stebbins and Plaintiff had a hearing for the protective order Defendant Stebbins requested. (Ex. X).

90. The judge informed the parties that, "You both - you both independently should think about whether you want to continue to press this" and "I think that a de-escalation is appropriate as opposed to continued cold war" (Ex. X pp 6: 20-22; 7:9-10).

91. On December 5, 2018, Defendant Nolan and Defendant Squires signed an Arrest Warrant Application for the Plaintiff relating to Stalking in the Third Degree (Ex. Y).

92. Defendant Nolan and Defendant Squires omitted material information to the report, including Plaintiff's complaints or statements (Ex. E p. 106:8-16; Ex. B pp. 217:18-22; 220:21-24; 221:9-13; 273:24-274:16; 276:7-22).

93. In addition, the Arrest Warrant Application contained numerous material false statements, including:

    a. Construction forced Defendant Stebbins to drive by Plaintiff's residence. (Ex. E pp. 70:15-23; 176:17-22).

    b. Plaintiff gave 49 Foxcroft Road as his address. (Ex. Y).

    c. All the "false" complaints to the State Police were unfounded. (Ex. L).

    d. Plaintiff followed Defendant Stebbins on Colony Road. (Ex. A pp. 140:19-23).

    e. Defendant Stebbins did not exit his vehicle. (Ex. A pp. 149:9-10, 13-23; Ex. R).

f. Defendant Nolan confirmed construction was ongoing. (Ex. E pp. 176:17-22).

94. Defendant Nolan based his findings primarily on Defendant Stebbins' willingness to provide a statement. (Ex. B pp. 276:7-22; 277:7-25).

95. In establishing Probable Cause, Defendant Nolan did not remember Enfield Police Sergeant Laurino stating about Stebbins and Cameron, "that he felt this complaint was a waste of time. If you got the two together, they could probably work it out" (Ex. E pp. 110:7-12).

96. In establishing Probable Cause, Defendant Nolan did not recall statements by Plaintiff to Sergeant Laurino stating, "I reported the ongoing issue with Trooper Stebbins to the Enfield PD due to the possible chance that he will continuously call them in an attempt to have them investigate me" (Ex. E pp. 109:3-9).

97. Defendant Nolan stated the only reckless action he believed Plaintiff did was "continuously follow" Defendant Stebbins. (Ex. E pp. 46:13-17).

98. Defendant Nolan did not know what Defendant Stebbins fear of Plaintiff was. (Ex. E pp. 50:11-19)

99. Defendant Nolan could not remember ever charging someone with Stalking in the Third Degree. (Ex. E pp. 196:1-9, 167:14-19).

100. Defendant Nolan charged Plaintiff with Stalking in the Third Degree solely for the events that took place on November 12, 2018. (Ex. Y, Ex. E pp. 39:1-12).

101. The entire interaction between Plaintiff and Defendant Stebbins, before police arrived at Brookside Plaza, was less than a half hour. (Ex. E pp. 194:9-196:5).

102. On December 11, 2018, Plaintiff was arrested for Third Degree Stalking. (Ex. Z).

103. During Plaintiff's arrest, he was placed in handcuffs, the police officer on the scene was very overly aggressive, abusive, and pushed him against the car numerous times. (Ex. B pp. 177:18-20).

104. Once Plaintiff was at the Police Department, Defendant Nolan, Defendant Squires, and the arresting officer continued to question Plaintiff about his residency. (Ex. B pp. 177:23-25).

105. They threatened Plaintiff saying, "if I told them that I lived at 49 Foxcroft Road, I would not have a bail but if I said I lived in Massachusetts, then they would give me a bail." (Ex. B pp. 178:1-3).

106. Plaintiff told the officers he was a Massachusetts resident and requested they let him know what the bail was. (Ex. B pp. 178:4-7).

107. Plaintiff then discovered there was no bail set and the judge had ordered Plaintiff to be released with conditions. (Ex. B pp. 178:8-19).

108. The day after Plaintiff's arrest, he was placed on leave from the Massachusetts Probation Office. (Ex. AA).

109. Plaintiff was also placed on paid leave by Holyoke Community College as of December 13, 2018. (Ex. AA).

110. On December 14, 2018, Plaintiff and Defendant Stebbins appeared for the continued protective order hearing. (Ex. BB,).

111. The Judge at the hearing stated, I want everyone to go home. I'm not granting the restraining order. This is not a matter for a restraining order. However, it's certainly two people who have had a misunderstanding. And perhaps we can resolve it that way that you know you've had a misunderstanding and move on. (Ex. BB pp. 29:19-24).

112. The protective order was denied. (Ex. CC).