UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - x

| | |
|---|---|
| MARCUS CAMERON, Plaintiff, | Civil Action No. 3:21cv0165(OAW) |
| vs. | |
| STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE, AND TOWN OF ENFIELD, Defendants. | August 23, 2022 |

- - - - - - - - - x

DEPOSITION OF MARCUS CAMERON

Taken before Cindy J. Carone, CCR 383, a Court Reporter and Notary Public, within and for the State of Connecticut, pursuant to Notice and the Federal Rules of Civil Procedure, at Office of the Attorney General, 165 Capitol Avenue, Hartford, Connecticut, on August 23, 2022, commencing at 9:43 a.m.

Falzarano Court Reporters, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

APPEARANCES:

For the Plaintiff:

MICHELLE S. CRUZ, ESQ.
35 Center Street, Suite 35
Chicopee, Massachusetts 01013
413.592.9400
cruz4law@gmail.com

For the Defendant Steven Stebbins:

STATE OF CONNECTICUT
Office of the Attorney General
165 Capitol Avenue, Suite 5000
Hartford, Connecticut 06106
860.808.5340
laura.vitale@ct.gov
BY: LAURA VITALE, ESQ.
Assistant Attorney General

For the Defendant Stephen Samson:

STATE OF CONNECTICUT
Office of the Attorney General
110 Sherman Street
Hartford, Connecticut 06105
860.808.5540
dennis.mancini@ct.gov
BY: DENNIS MANCINI, ESQ.
Assistant Attorney General

For the Defendants Bryan Nolan, Mark Squires, Enfield Police Department, Town of Enfield:

HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, Connecticut 06114
egerarde@hl-law.com
860.249.1361
BY: ERIC E. GERARDE, ESQ.

S T I P U L A T I O N S

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

T R A N S C R I P T L E G E N D

| | |
|---|---|
| (sic) | - Exactly as said. |
| (Phonetic) | - Exact spelling not provided. |
| ( -- ) | - Break in speech continuity and/or interrupted sentence. |
| (. . .) | - Indicates omission or word[s] when reading OR trailing off and not finishing sentence. |
| (As read) | - When reading, adding, deleting or changing words so as not to be a direct quote from document. |

(Deposition commenced: 9:43 a.m.)

MARCUS CAMERON of P.O. Box 6362, Springfield, Massachusetts having been duly sworn by the Notary Public was examined and testified on his oath, as follows:

DIRECT EXAMINATION

BY MS. VITALE:

Q Good morning again, Mr. Cameron. We met off the record. My name is Laura Vitale. I'm an assistant attorney general. I represent the defendant Steven Stebbins in this lawsuit. Nice to meet you.

A Thank you. Nice to meet you as well.

Q So, you're providing testimony under oath today. Do you understand that?

A I do.

Q Have you ever been deposed before?

A No.

Q Have you ever given testimony under oath before?

A Yes.

Q When did you give testimony under oath?

A I'm currently employed with the Office of the

Commissioner of Probation for the State of Massachusetts so I testify in court almost every day.

Q Have you ever given testimony in a lawsuit?

A No.

Q The only testimony that you've given under oath is through your job as a Massachusetts -- at the Massachusetts probation office?

A I've also testified at the restraining order hearing in regards to this matter before you today.

Q Can you please state your full name for the record?

A My full name is Marcus, M-a-r-c-u-s, middle initial A, last name is Cameron, C-a-m-e-r-o-n.

Q What's your middle name?

A Anthony.

Q And what's your current address?

A My current address . . .

MS. CRUZ: Can he give his p.o. box? He's just concerned for safety matters with giving out his physical address.

MS. VITALE: Can you give me a little more on that please?

MS. CRUZ: I'm mean, state police officers and Enfield police officers. He's just concerned for safety reasons giving out

his private address. I mean, he can give it to you off the record.

MS. VITALE: Okay.

BY MS. VITALE:

Q So let's do a p.o. box on the record and if you could give it to me off the record, then I'll see if I need to kind of hash it out.

A Thank you. P.O. Box 6362, Springfield, Massachusetts 01101.

MS. VITALE: Let's go off the record.

(Discussion off the record.)

MS. VITALE: Let's go back on the record.

BY MS. VITALE:

Q You just gave me your current residential address. How long have you lived there?

A I have owned that property since 2019.

Q So you own it?

A Correct.

Q Do you recall when you purchased it?

A I'm going to say it was possibly August of 2019.

Q Where did you live before August 2019?

A 37 Greentree Circle, Springfield, Massachusetts 01118.
Q Did you own that property?
A No, ma'am.
Q I'm sorry. I just got carried away here with asking questions. I forgot to go through the instructions. We'll come back to that.

There is a court reporter here taking down everything that we say so it's important that you answer all the questions verbally, out loud. You're doing great with that so far. Thank you.

Please do not answer the questions until I've finished the question. That's just important so we have a clear transcript. If you don't understand a question, tell me. I'll try to clarify it for you. If you answer a question, I'm going to assume that you understood it. Okay?

Please let me know if you need a break. You can request a break at any time. The only caveat is if there's a question pending, you need to answer the question before we take a break. Okay?

Please know that although certain questions I may ask may be personal in nature, nothing I ask you is intended to embarrass you. I just have to ask certain questions as part of my job because we're here for this

lawsuit. Okay? Can you please just answer out loud?

A Yes.

Q I know it's hard to do so we'll just do our best and remind you as needed. Okay?

A Thank you.

Q Are you taking any medication today that would affect your ability to answer questions under oath?

A No.

Q Is there anything else that impacts your ability to understand the questions today?

A No, ma'am.

Q Anything that prevents you from thinking clearly and providing truthful responses to the questions today?

A No, ma'am.

MS. CRUZ: Can we get an idea of who else is in the room?

MS. VITALE: Oh, sure.

MS. CRUZ: That might be helpful.

MS. VITALE: I'll have counsel introduce themselves for the record.

MR. MANCINI: Attorney Dennis Mancini, the Attorney General's Office.

MR. GERARDE: Attorney Eric Gerarde. I

represent the Enfield police officers Bryan Nolan, Mark Squires, and the Town of Enfield.

MS. CRUZ: Michelle Cruz for the plaintiff, Marcus Cameron.

BY MS. VITALE:

Q All right; going back to your addresses. So prior to August 2019, you lived at 37 Greentree Circle in Springfield?

A Correct.

Q Did you own that property?

A No, ma'am.

Q Did you rent it?

A No, ma'am. I was just residing there with a friend.

Q Who owned the property?

A Jean, J-e-a-n, Paul, P-a-u-l.

Q Did you pay Jean Paul rent?

A No, ma'am.

Q How long did you live at 37 Greentree Circle?

A I first started -- I moved in in 2016.

Q Did you stay there every night?

A Yes, ma'am -- or pardon me. Yes, in the sense if I didn't stay at my significant other's house. But to say every night that was my residence, correct.

Q So are you currently married?

A No, ma'am.
Q You just mentioned a significant other. Who is that?
A I don't have one. Just if I had a girlfriend at the time, if I stayed at her house.
Q Okay, I got you. Did you have a significant other in 2018 and 2019 where you would stay at their house?
A Yes.
Q Who is that?
A Natesha, N-a-t-e-s-h-a, Bestman, B-e-s-t-m-a-n.
Q When did you date her?
A I wanted to be clear before I respond. I'm just saying maybe 2017 to 2019 or 2020; somewhere along those lines.
Q Where did she live?
A Connecticut.
Q Where in Connecticut?
A I don't remember the address. I believe it was Vernon.
Q In Vernon?
Do you have any children?
A No, ma'am.
Q As far as the Greentree house, did anyone

else live there aside from Jean Paul?
A Not to my knowledge. I want to clarify -- sorry.
Q Sure.
A Ruth Dures was there as well.
Q Would you mind spelling her name?
A Ruth, R-u-t-h, and her last name, I don't know how to spell. I want to say D-u-r-e-s or something like that.
Q Okay. Have you filed any lawsuits other than this pending suit?
A No, ma'am.
Q What did you do -- I don't want to know about any conversations you had with your attorney, okay? What did you do to prepare for your deposition today?
A I just reviewed all of the discovery provided my attorney prior to the suit being filed.
Q Did you speak with anyone in preparation for your deposition?
A No.
Q What documents did you review?
A I reviewed the affidavit for the restraining order. I reviewed the restraining order testimony. I listened to the voicemail that the defendants in this case left by mistake at my employer, and pretty much

all the videos and reports that were provided from either Connecticut State Police after I filed a FOI request and the Enfield Police Department after filing FOI requests.

Q All the documents and videos that you've reviewed have been produced in this case?

A To my knowledge, yes.

Q What videos did you review?

A There was a video on 5-28 of Mr. Stebbins harassing me at my Connecticut address, the Connecticut home that I own.

There was a video from 5-30, all of these of 2018, of an incident where Mr. Stebbins and a friend of his harassed me in the roadway of Foxcroft Road. It was a report reviewed that was produced in regards to that incident with Enfield Police Department.

5-26, a 911 call placed by Mr. Stebbins. I did review that. I reviewed the police report that was written from that incident as well.

I reviewed my original complaint that was submitted in the incident that occurred on 5-22 which started all of -- this case essentially, the complaint that was submitted to Internal Affairs as well as any other superiors within the Connecticut State Police.

I reviewed all email correspondence with the

Connecticut State Police including Major Scott Smith, the head of Internal Affairs; Lieutenant Eric Cooke, who was another officer assigned to Internal Affairs. He sent me email correspondence as well.

There was another email which included Stephen Samson, who was a defendant in this case. There was multiple emails from him. I reviewed an email that I replied back to him and cc'd Eric Cooke, cc'd Major Scott Smith. That was not responded to. I did review that email.

There was -- I reviewed the 911 call that was placed on I believe it was 7-8 of 2018 by Mr. Stebbins again reporting the incident of the woman in front of his home, who I have no relation to.

I did submit a FOI request and obtained a video in regards to that. I did have the opportunity to review that video as well. As previously stated, I reviewed that 911 call.

There was email correspondence again in July of 2018 with the same people already listed, Samson, Cooke, Smith.

I reviewed the call log provided from me via FOI request of Stephen Samson's phone, which shows that he did, in fact, contact my employer multiple dates in regards to whatever his reasoning for doing it was in

retaliation to my complaint against Mr. Stebbins.

I reviewed my call logs throughout this entirety of times as well. I reviewed the 911 call that was also placed on 11-12, which was the incident investigated by Bryan Nolan, Mark Squires, Officer Crouteau, and I believe another officer, Crogen, involved.

I reviewed all dash-cam video. I reviewed videos I obtained by myself via cellphone from that incident.

I reviewed the dash-cam video that was submitted by Steven Stebbins to Enfield Police Department, which was broken up into parts. It was maybe a 20-second clip and another 20-second clip.

That video was submitted for the complaint but through FOI request it was found that Mr. Stebbins did not submit the video in its entirety to the Enfield Police Department. I was able to review that video that was obtained.

I reviewed the affidavit. I reviewed a report that was submitted by Attorney Gerarde on behalf of the Enfield Police Department in regards to the incident on 11-12.

Q Was that a police report?

A That is a police report.

Q Okay.

A I reviewed the Internal Affairs investigation report that was submitted. That was obtained, I want to say, in 2019 after the conclusion of all these matters.

I reviewed significant reports of when license plates were run by any police officer within the State of Connecticut. These reports determined and showed what dates Mr. Stebbins ran said license plates.

I reviewed a secondary call -- sorry to go back -- in July 2019 in regards to that 7-8 incident. Mr. Stebbins was transferred to Mark Squires and they had a separate phone call that was absent of the original 911 call.

11-12, I was able to review video from -- my apologies, 12-11, the arrest date, video from Bryan Nolan's car dash-cam video where the audio was not on, and there's a secondary video with the conversation of him and Sergeant Halt that does have audio that I was able to review.

I also was able to review cellphone audio of my arrest as the lead car from Enfield Police Department. They alleged that the video camera and audio system was not working at the time. They alleged that.

In regards to 11-12, the investigation, I was able to review pictures from the parking lot. I was able to review radio transmissions. I also was able to review Brian Croteau's response video as the 911 call was placed. There's a video of him speeding to the scene in the original investigation.

I was able to review -- I don't know if I said this already -- Bryan Nolan's dash-cam video again at the 11-12 incident speaking with Sergeant Samson. The audio continuously cuts on and off and you can view that on the screen.

I believe that's most of -- there was testimony from -- I think I said that. I was able to review the transcript from the original 11-23 date given for the restraint order hearing that was continued and I reviewed the transcript from that date.

I was also able to review construction road closures for the Town of Enfield for multiple dates throughout May all the way up until somewhere around December, which shows road closures around Foxcroft Road.

I believe that's pretty much everything there that I can remember at the time but I would ask if I do remember something else I'll be able to come back to it.

Q Please.
A Okay, thank you.
Q You just mentioned a lot of audio and video recordings that you have that pertain to the incidents that are issued in this complaint; is that right?
A Yes, ma'am.
MS. VITALE: I'd like to mark the deposition notice as Exhibit 1, and as Exhibit 2 I'd like to mark the Plaintiff's Answers to Interrogatories please.

(Defendants' Exhibits 1 and 2: Marked for Identification.)

BY MS. VITALE:
Q Mr. Cameron, I handed you Exhibit 1. Have you seen that before?
A Yes, ma'am.
Q On the fourth page of Exhibit 1 is Schedule A. Do you see that?
A This says schedule addressed to Plaintiff, Marcus Cameron.
Q Did you bring any documents or electronically-stored information with you today -- I'm sorry. You can't -- you have to answer the question.

A I do.
Q You do?
A Yes, I do.
Q Okay. Do you have copies for me?
A I do not.
Q So you didn't actually bring it with you to the deposition?
A To clarify my answer, you previously asked was everything provided to you. I said, to my knowledge, yes, the discovery you're requesting was provided to counsel. It was believed to her, per my conversation, previously provided to you, anything and everything that was provided.
I also did bring with me as I have my computer with me -- you asked me do I have copies for you. I do not have copies for you as they're placed on my computer but if you want, we can have a flash drive and take it and provide it to you at this time.
Q Did you before your deposition today realize that not all the video and audio recordings had been provided?
A I believe there was an email asking you specifically what information you were requesting. I don't know if there was ever a response, what information you weren't provided. But we don't have --

whatever information, regarding whatever information you're looked for.

Q I'm sorry. I didn't follow you there.

A Okay. So there was a conversation where you were asking for additional and all relevant videos and information. You were asked to specify which specific videos and there was no response in regards.

Q That's your understanding of the conversation?

A Correct.

Q Did you come to learn that not -- so you have video and audio recordings, correct, of the incidents referenced in the complaint and you reviewed those before your deposition today?

A Correct.

Q Do you know whether those were produced?

A I have not -- again, to my knowledge, yes.

Q To your knowledge, they were?

A Correct.

MS. VITALE: They were not.

MS. CRUZ: My understanding is that they were.

MS. VITALE: They were not.

MS. CRUZ: Well, he just offered to provide them.

MS. VITALE: That doesn't work for me.
MS. CRUZ: Okay.
MS. VITALE: I need them before. We'll take a break and figure out where to go from here. Give me five or ten minutes.
Off the record.

(Recess: 10:10 to 10:17 a.m.)

MS. VITALE: Back on the record.
BY MS. VITALE:
Q Mr. Cameron, please look at Exhibit 2. What's Exhibit 2?
A Yes, I have it.
Q What is it?
A Answers to Interrogatories and Request for Production of Documents.
Q Have you seen this before?
A I have.
Q Did you verify the truth and accuracy of this?
A Yes, ma'am.
Q If you could please turn to page 11, interrogatory nine, it says, "Are you aware of any video recordings, audio recordings, or photographs

concerning any of the facts and events or incidents referenced in the complaint."

Did I read that correctly?

A Yes.

Q Then in the answer the last sentence, you say, "The additional photographs, videos and audio recordings have been itemized according to their respective requests and Defendant's request for collection of documents."

Did I read that correctly?

A Yes, ma'am.

Q In the first sentence it says, "See response nine of Plaintiff's response to Defendant's request for production of documents."

Did I read the correctly?

A Yes, ma'am.

Q Okay. Now, Mr. Cameron, you said that you have on your laptop with you today additional video and audio recordings that were not previously produced, right?

A I did not say that.

Q Okay. What do you have on your laptop today?

A I have video and audio recordings of information that I believe to have already been provided to you.

Q Did you verify they were provided to me?
A As far as I know, they were provided to you.
Q Were they just provided to your attorney?
A They were just provided to my attorney, yes.
Q You did not verify whether your attorney provided them to me?
A Again, as far as I know and was informed, you were provided them.
Q Okay. So what videos and audio recordings do you have on your laptop?
A I have video and audio recordings from incidents dating from 5-22 -- I mean, my apologies. Actually, I do have the -- I can't say for certain I have the 911 called placed on 5-22-18 but I do have incidents dating back for sure from 5-26-2018 all the way up until early 2019.
Q Okay. You have your laptop with you?
A I do.
Q Let's get your laptop out and you're going to tell me each video and audio recording that you have.
A All right. So for clarification, this is not on my computer. These are two flash drives here. This is the 911 call from July 8th video with the call from Steve Stebbins to 911 and Mark Squires.
This also has information on it from the

December 11th arrest that I believe is the video from Bryan Nolan's car.

Q Let me stop you there. We're going to do this one at the time. So you have an audio recording of a 911 call on July 8th. What is that audio recording?

A Steve Stebbins called 911, the one referring to a woman he saw taking pictures on the public roadway and a vehicle parked on the public roadway in front his house. He called 911 reporting that I was possibly involved and sent this woman to his house. He reported that to the 911 operator.

There was a call transferred to Lieutenant Mark Squires. On that call, Mark Squires is talking to Steve Stebbins referring to his familiarity with the situation between myself and Mr. Stebbins. He encouraged Mr. Stebbins to make sure that he reported said 911 call to Internal Affairs before I did.

Q When did you obtain that 911 call recording?

A I would have to look at the FOI request that was submitted to Enfield Police Department.

Q Through FOI through Enfield Police Department?

A Correct.

Q Do you know approximately when? Like, what

year?

A I'm going to say it occurred after I was arrested. Because I did not know about that 911 call until I reviewed the arrest police report which referenced that incident and stated that I was possibly involved.

So I went back and submitted a FOI request to obtain that 911 call and video. Originally when I submitted said FOI request, I was only given the original 911 call and not when it was transferred to Lieutenant Mark Squires. I had to submit a separate FOI request requesting the additional phone call between Steve Stebbins and Mark Squires.

Q Did you obtain this recording before you filed the lawsuit?

A Yes.

Q You also said you have a video of the July 8th incident; is that correct?

A I do.

Q Did you also obtain that through FOI?

A Yes, ma'am.

Q Did you obtain that before you commenced this lawsuit?

A Yes.

Q Now you say you also have a video from

October 11th. Was that 2018? I'm sorry, December 11th?

A December 11th.

Q 2018. Is that the video of your arrest you said?

A That video is the third car behind the car stop which was initiated prior to my arrest. It's Bryan Nolan's car camera, which is obstructed by two other Enfield police cruisers as I previously stated.

The first cruiser, Enfield alleged in response to FOI that the video and audio of that vehicle was not operational.

Q Did you also obtain that through FOI?

A Which part?

Q The December 11th video.

A Yes, ma'am.

Q Did you obtain that before you commenced this lawsuit?

A Yes, ma'am.

Q So now going back to the video and audio recordings that you have, what else do you have?

A I have a cellphone recorded video from 5-26-2018. Steve Stebbins on that date called 911 in response to me being in the area of Foxcroft Road. His allegation at that time was that I was speeding around

the neighborhood and he wanted Enfield to come and do some enforcement.

When Enfield Police Department responded, I was still present at the scene in front of the property that I own, 49 Foxcroft Road. There was a guest at that home. When she left 49 Foxcroft Road, the Enfield police officer who was observed talking to Steven Stebbins and produced a report was observed following the guest from that area.

So I followed to make sure I recorded said incident of the Enfield police officer following my friend, and I can inform you that him following my friend from that location was not documented in his police report.

Q So you have a cellphone video from May 26, 2018. Did you personally take that video?

A Yes, ma'am.

Q What else do you have?

A On 5-28, Mr. Stebbins is observed circling in front of 49 Foxcroft Road, the home that I owned. I was seated in front of the home with the person who was residing at that address.

Mr. Stebbins continuously circled the area in his black muscle car until he stopped at the neighbor's house and then went back to his home. At the time he

was observed pointing out the vehicle at us and making hand gestures towards us and faces. Some of it is captured on the cellphone video.

Q Who took the cellphone video?

A I did.

Q Who was the friend you were with?

A Jean Paul.

Q He was residing at 49 Foxcroft Road?

A Yes, ma'am.

Q How long did he reside at 49 Foxcroft Road?

A I don't know for certain.

Q Can you give me a month and year? Beginning and end date?

A I would say -- I could give you rough end date. I can't confirm and I don't want to guess at the time period when he began residing there.

I know he stopped residing there the month around my arrest. I'm going to say January of 2020 -- my apologies, January, 2019.

Q When did you purchase 49 Foxcroft Road?

A 2015.

Q Did Jean Paul pay you rent?

A No, ma'am. There was no rental agreement with Jean Paul.

Q What else do you have?

A A secondary video which identifies Mr. Stebbins as the operator of the car parking it in his driveway at 44 Foxcroft Road right next to his police cruiser.
Q Who took that video?
A I did.
Q On your cellphone?
A Yes, ma'am.
Q What date did you take it?
A Same date, 5-28.
Q What else do you have?
A On 5-30, there's a video of me driving to 49 Foxcroft Road. That video shows Mr. Stebbins as well as a guest, who I believe to be someone named Joseph LaPlant, walk into the roadway in front of my vehicle harassing me.
That incident was also reported to the Enfield Police Department. I reported it to Lieutenant Mark Squires who did write a report but it was omitted from the affidavit for warrant of my arrest.
Q What else do you have?
A Sorry. This is going to jump around a little bit. A video from the 11-12 stop in the parking lot. On this video, there's a conversation with Mark (sic) Nolan. In this conversation, I let him know that --

why I was fearful of providing my address to Enfield Police Department, that the harassment had been ongoing from Sergeant Samson as well as Steve Stebbins about finding my actual physical address.

Also in that conversation I let Mr. Nolan know that I lived in Massachusetts but he produced and wrote in his police report that I told him I lived at 49 Foxcroft Road.

Q How did you obtain that video?

A Cellphone.

Q That is a video that you took on your own?

A I can inform you, this conversation is also partially on the video obtained from the Enfield cruiser but the audio is cut off after the points where I state that I live in Massachusetts. Yes, ma'am.

Q So that was your own cellphone video that you just described from 11-12. Then you also referred to a video from an Enfield police cruiser of that same conversation?

A Yes, ma'am.

Q How did you obtain that?

A FOI.

Q What else do you have?

A A video from my surveillance system at my home that was put up as a result of all of these

incidents and harassment at the Foxcroft address. This video is from again 11-12 of me pulling up to the home and speaking with a contractor who was there completing some work on that home.

Q When did you get the video surveillance system?

A September of 2018.

Q Did you have any cameras on the exterior of your house before that?

A No, ma'am.

Q Where are the cameras located on the house?

A The camera angle that you'll see here is the front of the house facing Foxcroft Road. There's two cameras, both face up to Montano Road. There's also a side camera on that house. I believe that's Dover Road right there in front.

Q Two cameras on the front of the house facing Foxcroft toward Montano Road?

A Correct.

Q And a third camera on the side of the house that faces Dover Road?

A Correct.

Q Any others?

A I believe there was one in the rear of the home.

Q What else do you have?
A That's the first video of me arriving at that address. There's a secondary video here which shows an unobstructed view from the driveway of 49 Foxcroft Road facing Montano Road that can also see the driveway of 44 Foxcroft Road.
Q Where did that video come from?
A Same thing, the surveillance system.
Q So with your surveillance system you could see 44 Foxcroft Road?
A Correct.
Q That's where Steve Stebbins lived, right?
A Correct.
Q When was the video taken?
A 11-12.
Q What else do you have?
A This is just a video showing him, same day, 11-12, leaving 44 Foxcroft Road, driving towards 49 Foxcroft Road.
I'll just say this video was saved this way because Steve Stebbins and Bryan Nolan alleged that road construction in the area was the reason that he drove past me that day. In this video you can see it's unobstructed. There's no construction on Foxcroft Road or Montano Road on said date.

Q Again, is that from your surveillance system?
A Yes, ma'am.
Q Okay, what else?
A There's a video from, as I stated, the third camera on the side of my home facing -- again, I believe this is Dover Road here, which shows me leaving that address again on 11-12, going up Dover Road versus what occurred in the incident as Steve Stebbins drove past my home. He alleged that I followed him but I left and went up Dover Road, and he traveled northbound on Foxcroft Road.
Q So that's video again from 11-12 from your video surveillance system?
A Correct.
Q What else do you have?
A An undated video here showing -- showing a Connecticut state trooper -- my apologies. It doesn't show the Connecticut state trooper vehicle following me. I started recording because the Connecticut state trooper vehicle was behind me and following me.
As I took my camerate out, the trooper went around me and drove past me. This video is undated. Actually, it looks like it's 11-13. It occurred -- this is Route 5 at Foxcroft Road.
Q Okay. So that was a cellphone video that you

took?

A Yes, ma'am.

Q And you took it on November 13th?

A Correct.

Q Do you know who was driving the Connecticut state vehicle?

A I do not, sorry.

Q What else do you have?

A This is going to be video from November 20th of 2018 of Steven Stebbins operating a black Cadillac Escalade coming essentially down Montano Road and then traveling south on Foxcroft Road to his address.

There's a secondary video on that same date of Mr. Stebbins leaving 44 Foxcroft Road, leaving said address and going up Montano Road, again avoiding driving past 49 Foxcroft Road.

Q Who took those videos?

A Captured from my -- let me clarify what those videos are. Those videos were obtained from my surveillance camera system but because I was unaware of what was going on, I never saved these videos. I did. Record them because I knew they would be recorded over?

So I recorded them with my cellphone on the screen of my camera system. My surveillance system was only a gigabyte of data. Any surveillance system, if

you don't save the video, it just records over it.

Q So when did you capture this video from the surveillance camera?

A Those videos were captured the same date, 11-20-2018. These videos are dated.

Q So what you did is you took a video of your surveillance video using your cellphone?

A Yes, ma'am.

Q What's the brand of your surveillance video?

A I do not know; sorry.

Q What else do you have?

A This is the 911 call from 5-26-2018 from Steven Stebbins.

Q A 911 call from Steven Stebbins to who?

A To 911.

Q Oh, right. It's 911. Okay. On May 26, 2018?

A Yes, ma'am.

Q When did you obtain that?

A I can't say for certain. I know I did request it on 5-26 when I responded to the Enfield Police Department. After he followed my friend, I requested it.

I met with Sergeant Laureano and a police officer named Tara Carter who were both at the window

of Enfield Police Department. I made that request to both of them. It should be noted that Tara Carter lives at the corner house of Montano Road and Foxcroft Road.

Q Did you obtain that audio recording before you commenced this lawsuit?

A Yes, ma'am.

Q What else do you have?

A Video from 12-4 of Steven Stebbins leaving Foxcroft Road, again, not traveling past 49 Foxcroft Road.

Q Where was that video taken?

A Surveillance.

Q And you used your cellphone to take a video from your surveillance video?

A Yes, ma'am.

Q Did you do that on 12-4-2018?

A My apologies. It's 12-8-2018.

Q What else do you have?

A From 12-11, audio of my arrest obtained through cellphone, which had the audio of the arrest and car stop initiated by police officer with the first name Brian with the Enfield Police Department prior to my arrest.

Q Who took the cellphone video?

A I turned the recording on and placed it on the dashboard.
Q Do you use your own cellphone to record the conversation?
A Yes, ma'am.
Q What else do you have?
A This is the 911 call placed by Steven Stebbins on 11-12.
Q How did you obtain that?
A FOI.
Q Did you obtain that before you commenced this lawsuit?
A Yes.
Q Okay. What else do you have?
A That one was already provided and discussed.
Q Sorry.
A The recording that just started playing was already discussed. That was the recording from the 911 call place on 11-12.
Q Okay. What else do you have?
A I apologize. I don't recall if I stated, the video from 5-30 with Steven Stebbins is in front of 44 Foxcroft Road and his friend walked in the roadway.
Q Yes.
A Sorry.

MS. CRUZ: Can we go off the record for a minute?

MS. VITALE: Sure.

(Discussion off the record.)

MS. VITALE: We're back on the record.

BY MS. VITALE:

Q So what else do you have?

A This is a picture of a construction sign that was posted 5-30-2018 which shows that Foxcroft Road -- my apologies, Montano Road heading towards Foxcroft Road was closed and there was a one-lane closure.

Q That's just a picture?

A Yes, ma'am.

Q Okay. What else do you have?

A This is a still shot picture from 11-12-2018 when Brian Croteau arrived at Brookside Plaza and spoke to Steven Stebbins. It was on the very northern part of the parking lot as I was parked in the south part of the parking lot.

Q I just want to focus on the video and audio recordings for now. Okay?

A This is a video of a state marshal dropping

the restraining order affidavit at the address of 49 Foxcroft Road. This is being mentioned because it was alleged I was served this restraining order in hand, which was not accurate.

Q Who took that video?

A It's from my surveillance.

Q When did you take it?

A This is 11-15.

Q 2018?

A Yes, ma'am. This is a video from 11-20-2018, again obtained from surveillance set up at 49 Foxcroft Road, which shows officer Bryan Nolan and another officer come onto 49 Foxcroft Road, peer through the vehicle parked in the driveway, and then approach the door. At this point, they observed that there was surveillance cameras at that location.

MS. CRUZ: Off the record.

(Discussion off the record.)

MS. VITALE: Back on the record please.

BY MS. VITALE:

Q Now, 11-20-2018, there's video. You said it was from the surveillance video?

A Yes, ma'am.

Q What else do you have?
A I also have a recording that was left at the Office of Commissioner of Probation, which is officers Stephen Samson, Officer Steve Stebbins, and another unknown officer.
Q Okay. What else do you have?
A There's a precipitating audio recording of Sara Joss preserving the original voicemail through our IT department. Sara Joss at the time was head of Legal for Massachusetts Probation. She is now a sitting judge for the State of Massachusetts. I believe that's all the videos that you requested.
Q What about audio recordings? Any others that we haven't talked about?
A I haven't come across them as I'm going through here, so no, not at this time.
Q Not at this time, okay. So you mentioned earlier saving these to a flash drive for me?
A Yes, if you have one.
Q If I have a flash drive?
A Yes.
Q So we can take care of that later.
Who is Danielle Dubuc?
A Danielle Dubuc was a witness to the 5-22 originating incident between Steven Stebbins and

myself. She was parked in front of the mailbox in front of 49 Foxcroft Road when Steve Stebbins approached the house. His vehicle almost hit the vehicle that was parked in front of the roadway as he pulled into the driveway.

Q How do you spell her last name?

A D-u-b-u-c.

Q Not D-u-b-a-c?

A I'm not sure.

Q You're not sure?

A Correct.

Q Do you know her address?

A I do not.

Q Do you have her phone number?

A I don't recall. I don't think I do.

Q How do you know her?

A She previously worked at Springfield District Court.

(Defendant's Exhibit 3: Marked for Identification.)

BY MS. VITALE:

Q I'm handing you what's been marked Exhibit 3. What is Exhibit 3?

A Exhibit 3 is text messages between myself and Danielle on 5-22 stating do I need a ride to my car. She was meeting me at the address to provide me a ride to the mechanic.
Q I'm going to ask you again her phone number?
A I see in the text message it is redacted. I don't know off the top of my head. If you want me to look in my phone to see if I have it?
Q Yes, please.
A (413)348-1207.
Q (413)348-1207?
A Yes, ma'am.
Q Where does she work?
A I do not know. She used to work for the district attorney's office, Hamden County District Attorney's Office.
Q Hamden County?
A Yes, ma'am.
Q Where did she work in May 2018?
A Hamden County District Attorney's Office.
Q Do you know what town she lived in in May 2018?
A I've never been to her home.
Q Do you know what town she lived in in 2018?
A I do not know.

Q You don't know the town that she lived in?
A That's correct.
Q Did she live in Massachusetts?
A I do not know what town she lived in.
Q Did she live in Massachusetts?
MS. CRUZ: Asked and answered.
MS. VITALE: No. I asked if she lived in the State of Massachusetts. He said he didn't know the town.
BY MS. VITALE:
Q Does she live in the State of Massachusetts?
A I do not know what town or if she lived in the State of Massachusetts. I've never been to her house.
Q Why was she at your house on May 22, 2018?
A To give me a ride to the mechanic.
Q Were you friends?
A Co-workers.
Q Why was she giving you a ride to the mechanic?
A One of my cars needed to get serviced so as I dropped the car off at the mechanic, I needed a ride back.
Q How many cars did you own in May 2018?
A Two.

Q Which cars?
A I had a black Infinity M357X and -- and I had a silver Honda Accord.
Q When did you purchase the black Infinity?
A Probably 2008, 2009.
Q Do you still have that car?
A Yes.
Q When did you purchase the silver Honda Accord?
A Probably early 2018.
Q Do you still have that car?
A No, ma'am.
Q Do you remember when you got rid of it?
A Possibly March of this year.
Q Going back to Exhibit 3, what's the date of those text messages?
A 5-22.
Q Where was she parked at your house?
A In front of the mailbox.
Q Did she ever get out of the car?
A No, ma'am.
Q Does she know there's a lawsuit?
A Yes, ma'am.
Q Have you talked to her about the lawsuit?
A I've told her that I planned on, intended on

filing a lawsuit.

Q Have you talked to her since it was filed?

A Yes, ma'am.

Q Other than telling her you intended to file a lawsuit, have the two of you discussed the lawsuit?

A No.

Q No? Where is the district attorney of Hamden County? That's where she works?

A Yes.

Q Where is that located?

A Hamden County, Massachusetts.

Q Is there a specific town associated?

A Covers the entirety of Hamden County. So Hamden County encompasses probably nine different courthouses.

Q Right. So the specific location where she worked?

A The location of the district attorney's office?

Q Where she worked, where her office is.

A She was working in Springfield District Court so her office was in Springfield District Court.

Q Do you know the address of the Springfield District Court?

A Yes, ma'am. 50, 5-0, State Street,

Springfield, Mass 01101.

MS. CRUZ: I believe it's three.

THE WITNESS: It's three?

BY MS. VITALE:

Q Looking back at Exhibit 3, did you talk to her on the phone after her last text that she sent at 7:37 p.m.?

A Yes.

Q What was the conversation?

A I informed her of the conversation I had with Sergeant Paul Gunn and it was related to me what Steven Stebbins told him the story was and what occurred in front of my driveway -- my apologies, in the driveway, almost in the garage.

Q Did you know if she heard anything?

A I can't say for certain. It mean, she saw but I don't know if she heard anything.

Q Do you know if she took any video?

A To my knowledge, no.

Q Do you know where Jean Paul currently lives?

A 36 Buick Street.

Q Is that in Springfield?

A Yes, ma'am.

Q Do you have his phone number?

A (617)849-4335.

Q Have you talked to him about the lawsuit?
A Yes, ma'am.
Q When was the last time you talked to him about the lawsuit?
A To be specific, Mr. Paul is aware that I came today to give a deposition.
Q Okay. Who is Angela Harrington?
A A past co-worker.
Q Where did she work?
A She used to work in the probation office in Springfield District Court. She's a court officer.
Q Is she currently a court officer?
A Yes, ma'am.
Q Where is she a court officer?
A Worcester District Court.
Q Where is that physically located?
A Worcester, Massachusetts.
Q What's the address?
A I do not know.
Q She's a court officer at Worcester District Court?
A Yes, ma'am.
Q Do you know her phone number?
A (413)348-8054.
Q (413)348-8054?

A Yes, ma'am.

Q Do you know where she lives?

A Somewhere in Worcester. I'm not sure of where.

Q Have you spoken with her about the lawsuit?

A Yes, ma'am.

Q When was the last time you spoke with her about the lawsuit?

A The last time I spoke to her, I made her aware I was being deposed today.

Q If you could please look at Exhibit 2, which is your answers to interrogatories, turn to page six, interrogatory number four. Let me know when you're ready for the question.

A I'm ready.

Q In the answer to interrogatory four, of June 21, 2018, it says, "License plate number AA06089, vehicle followed from 49 Foxcroft Road in Massachusetts, 7:47 a.m. Infinity M35X."

Did I read that correctly?

A Yes, ma'am.

Q Who was driving that car?

A I was.

Q Is that your car?

A Yes, ma'am.

Q The next one, "July 15, 2018, license plate AL61903. Vehicle was parked in a driveway at 49 Foxcroft Road in Enfield, Connecticut, Audi Q5."
Did I read that correctly?
A Yes, ma'am.
Q Who owns that car?
A Natesha Bestman.
Q Do you know where she lives?
A I do not know where she lives currently.
Q When you knew her, she lived in Vernon, Connecticut?
A In Vernon. I've known her when she lived in Vernon, Middletown, and possibly Manchester.
Q Where was she living in July 2018?
A Vernon.
Q Do you have her phone number?
A I do. (860)748-6921.
Q (860)748-6921?
A Yes, ma'am.
Q Next one, "August 7, 2018. License plate number 1ZP839 Massachusetts registration, followed from 49 Foxcroft Road, identified on Montano Road in Enfield Connecticut."
Did I read that correctly?
A Yes, ma'am.

Q Who was driving that car?
A Angela Harrington.
Q Did she own that car too?
A To my knowledge, yes.
Q "September 18, 2018, license plate number AL61903 followed from 49 Foxcroft Road, identified on 91 South, Audi Q5."
Did I read that correctly?
A Yes, ma'am.
Q Who was driving that car?
A Natesha Bestman.
Q Did she own that car?
A To my knowledge, yes.
Q "November 12, 2018, license plate number AA06089 followed from 49 Foxcroft Road identified on Dover Road in Enfield, Connecticut, Infinity M35X."
Did I read that correctly?
A Yes, ma'am.
Q Who was driving that car?
A Marcus Cameron.
Q Did you own that car?
A Yes, ma'am.
Q Who is Diane Fasano?
A Diane Fasano is the first deputy commissioner of Massachusetts probation.

Q Where does she work?
A Office of the Commissioner for Probation for the State of Massachusetts.
Q Where is her physical office address?
A Somewhere in Boston.
Q Do you know the address?
A I do not.
Q Okay. Who is John Scavotto?
A John Scavotto -- if you could show me?
Q Again, looking at Exhibit 2, page 10, response to interrogatory seven.
A Thank you. John Scavotto is a gentleman who owns a home. I believe it's Foxcroft Road. I do not know the address. It's a house that's northbound and blue in color at the corner of I want to say Foxcroft Road and the next street over from Dover. John Scavotto was identified in the Internal Affairs report.
Q So, you have a copy of the Internal Affairs report?
A Yes.
MS. VITALE: And that was not provided to me so I ask that that also be produced as well as any other documents that are responsive to my request for production in

this case.

I need to take another quick break.

(Recess: 11:17 to 11:35 a.m.)

MS. VITALE: Back on the record.

BY MS. VITALE:

Q I'd like to get a little background information, okay? We got a little sidetracked there.

What is your education?

A The highest or entire education?

Q Just all your education please.

A I have a Bachelor's Degree in Psychology and Criminal Justice and I have a Masters's Degree in Education.

Q When did you get the master's in education?

A 2010.

Q What is your work history? Let's start from chronology.

A I'd have to review it. I don't remember everything off the top of my head.

Q Okay.

A Is it in here?

Q I don't think it's in the interrogatories, this exact question. Let's start from graduation from

college. Where did you work?

A I worked in the Springfield public schools from 2009 to 2011. I coached football at American International College 2009 to 2011. I left, worked as a police officer in the City of New York from 2011 to 2013.

Back in Massachusetts, 2014, I worked in Springfield public schools and Department of Youth Services, simultaneously obviously, from 2014 to 2016; and from 2016 to present day, I work for the Massachusetts probation.

Q What's Way Finders?

A So Way Finders is a housing agency that provides emergency homeless shelter to families in critical need, in danger of homeless. It's a nonprofit located in the City of Springfield that provides housing.

Now that you mentioned that, I've also worked as an academic advisor at Holyoke Community College from 2017 to 2019 I believe; and then Springfield Technical Community College, I worked as an academic advisor from 2019 to, like, the middle of the pandemic. I'm going to say about July of 2020.

Q When did you work for Way Finders?

A I still frequently work for Way Finders. I

started there in probably 2017.
Q What do you do for them?
A I'm a residential resource advocate.
Q You said Mass probation. What's the official name of that, of your employer?
A Office of the Commissioner of Probation. It's the trial court of Massachusetts.
Q When you first started working there in 2016 what was your job position?
A I was a probation officer.
Q How long were you a probation officer?
A 2016 to 2020.
Q In 2020, how did your position change?
A I am currently an assistant chief.
Q Probation officer?
A Yes, ma'am.
Q Can you please explain the organizational structure? What is the assistant chief of probation officer?
A Assistant chief of probation officer, each court -- I'll start at the top and say there's the Commissioner of Probation for the State of Massachusetts. From there, there's the first deputy commissioner, and from there I believe there's three or four deputy commissioners.

I worked in the district court so underneath next up would be the regional supervisor. We have I want to say three or four regions would be the regional supervisor of probation. From there, the chief of probation, assistant chief, probation officers, associate probate officers, and then probation case specialists.

Q So was that a promotion in 2020?
A Yes, ma'am.
Q Where do you physically work?
A Springfield District Court.
Q Have you physically worked at the Springfield District Court your entire employment?
A Yes, ma'am.
Q Holyoke Community College, why did your employment end in 2019?
A It was grant funded.
Q What does that mean?
A The grant expired; it wasn't renewed.
Q What did you do at NYPD?
A A police officer.
Q Were you stationed in a particular place?
A Yes, ma'am.
Q Where?
A The 79th Precinct.

Q Did you have a particular job as a police officer?
A Just patrol.
Q Patrol. Do you remember your badge number?
A No.
Q Were you on probationary employment?
A Yes, ma'am.
Q What did that mean?
A That -- I don't know how to explain it. Probationary employment, they basically evaluate you throughout the time you're employed, and at the end there's an evaluation done whether it's extended or not extended.
Q Did you go through training?
A Yes, ma'am.
Q What kind of training?
A I went to the police academy.
Q Did you finish your training?
A Yes, ma'am.
Q Why did your employment end in 201?
A I never had a meeting or reason provided to me.
Q Were you terminated?
A The only letter is probationary employment wasn't extended.

Q How were you told this?
A I received a letter I believe in person from I believe a lieutenant but there was no conversation involved.
Q Did you know it was coming?
A I was not aware.
Q Were you under investigation prior to receiving that letter?
A To some degree I would say yes, but I can inform you it was a ticket that I received that was -- I received a ticket and that ticket turned into being found that -- to not have legal facial sufficiency.
Q What's the ticket? What does that mean?
A Like, a summons.
Q A summons?
A Like a court summons.
Q You received a court summons?
A Yes.
Q From who?
A A police officer.
Q From a police officer?
A Yes.
Q Was it related to your employment?
A No. It was off duty.
Q What was it related to?

A A noise complaint -- or rather, there wasn't a noise complaint. The officer complained of noise.
Q Were you the subject?
A Yes.
Q So an officer complained that you were creating noise?
A Correct.
Q Any complaints of misconduct?
A No, ma'am.
Q What happened? What was the result of that court summons?
A I never went to court. The judge found that it lacked legal facial sufficiency, which means "no pros". In New York they call it -- I can't remember what they call it. I never attended court, never arraigned, never had to submit a response to it.
Q Did you ever ask why your --
A I wasn't entitled.
Q Just let me finish the question.
A Oh, sorry.
Q I know you can probably guess where I'm going but we have to do it for the transcript.
A Sorry.
Q Did you ever ask why your probationary employment wasn't extended?

A I did not.
Q Have you ever tried to find out why?
A No.
Q In 2018, how many jobs were you working?
A In 2018, three.
Q What was your schedule at the Massachusetts probation office?
A I had a modified schedule. Sometimes I was allowed to work from 6:30 to -- or 5:30 to 1:00 p.m. or eight to four.
Q Was it every day?
A It rotated based on my work schedule, based on my other employment schedule.
Q Okay, I got you.
The house on 49 Foxcroft Road, you said Jean Paul lived there for a certain amount of time, right?
A Yes, ma'am.
Q Did anyone else live there while you owned it?
A While I owned it from the beginning, yes.
Q Who else?
A When I first bought it, Elizabeth Ortiz.
Q Anyone else?
A Her daughter.
Q Anyone else?

A That's it.
Q Did they pay you rent?
A We paid bills together. It was my ex-girlfriend at the time.
Q Oh, I got you. What years did she live there?
A 2015, 2016.
Q So she didn't pay you rent. You just split the bills?
A Correct.
Q Did you have a dog while you owned 49 Foxcroft Road?
A I did.
Q What years did you have a dog?
A I still have a dog.
Q Same dog?
A Yes.
Q Did the dog stay at 49 Foxcroft Road?
A Occasionally.
Q Occasionally, okay.
How often would you stay overnight at 49 Foxcroft Road?
A It varied.
Q What did it depend on?
A Let's see. It depended on location, where I

had to be. But I didn't stay there during the week. Sometimes I would travel there from leaving the gym because it's right there.

Q What gym?

A Club Fitness on Enfield Street.

Q You'd go to the gym in Enfield?

A Yes.

Q Okay. How far was 49 Foxcroft Road from your office in Springfield?

A I can't say for certain.

Q Well, how long would it take you to get there? You drove there numerous times.

A Fifteen, 20 minutes.

Q Okay. I know you said you owned two cars?

A Yes, ma'am.

Q In 2-18 where was the black Infinity registered?

A In 2018?

Q Yes.

A The black Infinity was registered to the Connecticut home.

Q And the other car? The silver Honda Accord, in 2018 where was that car registered?

MS. CRUZ: For the record I'm going to object to these questions.

MS. VITALE: Sure.

BY MS. VITALE:

Q Where was it registered?

A Connecticut.

Q In 2018 did you have a Connecticut driver's license?

A No, ma'am.

Q You had a Massachusetts?

A I had a Massachusetts license from 2016 until present day. When I applied for a Massachusetts license, you have to submit your Connecticut license to the RMV for the State of Massachusetts and it is at that point resolved or recalled, whatever you want to call it.

Q So you can't have two driver's licenses?

A As far as I know.

Q Okay, you said you still have your black Infinity, right?

A Yes, ma'am.

Q Where is it registered now?

A Massachusetts.

Q When did you change the registration?

MS. CRUZ: Again, I'm objecting to the questions regarding where he lived and where his cars were registered.

A I can't say for certain. 2019?
Q Why did you change the registration?
A They were no longer being housed in the garage at 49 Foxcroft Road.
Q So did you change the registration after you sold that house?
A Somewhere pretty much along those lines.
Q So before that did you primarily keep them at the house at 49 Foxcroft Road?
A Correct.
Q Let's talk about May 22, 2018. Why don't we start with you telling me what happened?
A Perfect, I appreciate it.
So, on May 22, 2018, I am driving to obviously meet Danielle Dubuc, going to 49 Foxcroft Road. She arrived previous to me. When I got off the highway, I was stuck at the red light at the Exit 49 entrance and Route 5, Enfield Street.
I see a Connecticut state trooper car that is coming from essentially the Longmeadow line traveling towards Foxcroft Road. This vehicle is traveling at a regular rate of speed.
Unobstructed, as I am the first car at the red light, I see the trooper going past, had the cellphone to his right ear, and I clearly see him. He

goes past.

I then make the right to travel down Enfield Street to go to 49 Foxcroft Road. At that point Route 5 is a one-lane road. So I am the first car directly behind this Connecticut state trooper vehicle. The lanes then open up to a two-lane road.

This vehicle, just for the record, at this time is being driven by Steven Stebbins. He merges into the left lane. There is I believe a blue car in front of him. That blue car makes a left down Brainard Road.

I'm in the right lane and I go past -- obviously, it's a travel lane. I go past all the vehicles that are waiting for these cars in the turning lane. Stebbins is stuck behind the blue vehicle waiting to make the left-hand turn.

I approach -- I can't remember the road at this point in time. It's right after the Dollar General in between the Dodge dealership. I make a left down that street. Clearly in front of me there's a school bus.

A little further up the road at the light that is at the corner where there's the Dunkin Donuts, I make a left down that road. I go to the home. There's a stop sign on the way. I stop at the stop

sign, go through two stop signs, stop at both stop signs, go to 49 Foxcroft Road.

At this point, I am parking the vehicle inside the driveway at 49 Foxcroft Road. Again, Danielle Dubuc is parked in the white SUV in front of the mailbox in front of 49 Foxcroft Road.

I'm seated in the driveway. I back the car in the garage and as I go to turn the car off, I see a Connecticut state trooper vehicle come up in excess of 40 to 50 miles per hour. He spins into the driveway, up the driveway, and parks inside the driveway of 49 Foxcroft Road.

So we get to 49 Foxcroft Road. He comes in excess of 40 to 50 miles per hour. Her vehicle is parked in front of the mailbox. He almost hits her, drives in. He hops out of the vehicle in a very aggressive manner. He is dressed in blue jeans, a T-shirt, a baseball hat, firearm on his hip.

When he exits this vehicle, he grabs his firearm, puts his hand on his firearm. He walks up. He again grabs it multiple times as he's walking up. I'm still seated inside my car inside of the garage.

The first words -- he walks up and he says, What the hell are you doing? Or, What the fuck are you doing?

I say, Excuse me? What are you talking about?

He then goes, Who do you think you are?

I don't know who you are.

You were speeding.

I said, I wasn't.

You didn't stop at the stop sign.

Yes, I did.

Then I told him, I said, You are aware that I watched you driving on the cellphone.

He goes, No, I wasn't. I got Bluetooth in my car anyway. Do you want to see my call log?

I said, Actually, I don't. I said, Sir, are you giving me a ticket?

He goes, No.

I say, Are you here to arrest me?

He says, No.

At this point I already knew this was a pretextual stop, had nothing to do with any driving offense that occurred. At this point I asked him those questions in regards to whether it was a summons being issued or whether I was under arrest.

He says, No. Get out the car. I'm here to talk to you man to man.

At this point, I ask him, What does that even

mean?

At this point he kind of retreats so I'm already now exiting. He squares off with me.

He says, What? You want to play like that? All right, I'll be back. I'm going to take care of you. I got something for you.

Like, What?

He walks off.

I'm live, Yo, matter of fact. What's your name?

He refuses to answer.

What's your badge number?

He refuses to answer.

Where do you work?

He refuses to answer.

So at that point, I wrote down the license plate number and then I ended up calling 911. The first phone call I called --

Q Let's stop you there.

A Yes.

MS. VITALE: I'd like to mark Exhibit 4.

(Defendants' Exhibit 4:
Marked for Identification.)

BY MS. VITALE:

Q Handing you what's been marked Exhibit 4, you to know what is?

A Yes, ma'am.

Q What is it?

A A map of the area and around the area of Foxcroft Road in Enfield, Connecticut.

Q If you could please just explained the route you took on May 22, 2018 from the point where you saw Steven Stebbins and went to 49 Foxcroft Road?

I know you couldn't remember the road when explaining. Could you use your pen and draw the route that you took?

A I'm just going to start with my first observation of Mr. Stebbins is not listed on the map but the light that I referred to where he was stuck behind cars traveling left is right here at Brainard Road.

Q So you're putting an X where?

A At Brainard Road and Enfield Street.

Q Okay.

A I traveled down Enfield Street towards Colony Road. I pass Colony Road and I make a left on Freemont Road. From there, I traveled all the way down Freemont Road continuing all the way to Leonard Road.

I veer to the right of that intersection down Leonard Road and down to Foxcroft Road, made a right on Foxcroft Road past Eleanor Road and make a left into 49 Foxcroft Road.

Q And you mentioned two stop signs. Could you please mark the two stop signs that you mentioned that you went through?

A That I stopped at. I stopped at the stop sign on Dover Road and there's also a stop sign I believe at the corner of Leonard Road and Foxcroft Road.

Q You're going to 49 Foxcroft Road. Where were you coming from?

A The state of Massachusetts.

Q Is that the route you usually take?

A If I'm going to 49? I never travel the same route. Sometime I go past and go to Exit 48. Just depends what kind of mood I'm in, if I'm driving around.

Q After you turned onto Freemont Road did you see Mr. Stebbins before he got to your house?

A No.

Q So you saw him on Route 5 and then the next time you saw him was at your house?

A Correct.

Q What car were you driving?

A Honda Accord.

Q I want to make sure I understood the words that you remember him saying as opposed to your interpretation of the word.

So I just want to make sure I'm clear on that. He said words and maybe you interpreted them a certain way. So I want to leave aside interpretation. What are the exact words you remember him saying?

A Again, I'll just start and say the exact words when he first walked up was, What the hell are you doing? Or, What the fuck are you doing? That was his first words.

His next words -- I'm going to go through the whole dialogue, my apologies.

Q Sure, yes.

A What the fuck are you doing? What the hell are you doing?

I said, Excuse me, was my response.

He says, You were speeding.

I said, I wasn't.

He said, You ran the stop sign.

I said, I didn't.

From there, I told him that I saw him driving on the phone.

He said, I was not driving on the phone. Do you want to check my call log? Then he says, Our cars have Bluetooth anyway.

I said, Actually, I don't want to check your call log. I asked him at that point, Are you here to issue me a summons?

He said, No.

I asked him again, Are you here to arrest me?

He says, No, I am only here to talk to you man to man. You can get out the car.

Q Okay. Did you get out of the car?

A Yes.

Q At what point did you get out of the car?

A When he directed me to.

Q When he said, You can get out of the car?

A Yes.

Q Okay. Was the car in the garage?

A Yes, ma'am.

Q Where was he standing?

A He was standing at the crux of the garage door and where the garage door comes down.

Q Then after you got out of the car, where did you walk?

A To the front of my car where he was standing as I was directed.

Q Did you back the car into the garage?
A Yes, ma'am.
Q How far away were you standing from him when you got out?
A That driveway is approximately 20 to 30 yards off the public way. He was standing at the crux of the garage. I was probably standing maybe five to -- three to five feet away.
Q Then what happened once you got out of the car? I'm also asking his exact words.
A Then I told him, You're not here to arrest me. You're not here to issue me a summons. You can leave my property.
He went back and said, What? You want to play like that? I'll take care of you. I got something for. I'll be back.
Q Did he say that as he was walking away?
A No.
Q Are you sure he didn't say, I got you?
A I'm positive he didn't say that. I'm 100 percent certain he did not say that.
Q So then what happened?
A He then left the driveway.
Q Was he talking as he left the driveway?
A Not really. He was kind of, like, running

out the driveway. His back was to me. He was moving in a very fast pace to get back to his vehicle.

Q Where was his vehicle?

A Inside my driveway.

Q He parked his car on your driveway?

A Yes, ma'am.

Q Was it fully on your driveway?

A Not completely. So again, my driveway is probably 20 to 30 yards. He wasn't 15 yards in so he wasn't halfway up my driveway but he was at the very drop dead at the bottom of my driveway.

Q Okay.

A Past the public sidewalk.

Q Did he talk to you as he was going back down your driveway to his car?

A No, he didn't respond to my questions.

Q What happened when he got to his vehicle?

A He got back into the vehicle -- my apologies. As he was getting back into the vehicle and refused to answer the questions in regards to identifying himself, he drove northbound on Foxcroft Road at a very high rate of speed in the opposite direction of where he resides.

Q Then what happened?

A From there, he obviously fled the area and I

ended up calling 911.
Q Why did you call 911?
A Because he threatened me.
Q What did you believe was threatening?
A The statement that he made that was threatening was, I'll be back, as he's broaching his firearm. I got something for you. I'm going to take care of you.
Q Was Danielle in her white SUV the whole time?
A Yes, ma'am.
Q Did she get out of the car?
A No.
Q Did you go over and talk to her after?
A I did.
Q What did you tell her?
A What transpired. She asked, What the hell was that? And we discussed what transpired in the driveway.
Q Then at what point did you call 911?
A As I left the location, I wrote the time down. It's listed in my complaint that I submitted to the Connecticut State Police if you want the absolute time which I wrote as approximate.
Q Did you call 911 from Danielle's car?
A No, ma'am -- I might have. I can't confirm.

Q Why was Danielle there?
A To take me to drop one of my cars off at the mechanic.
Q Did she take you to the mechanic?
A Yes, ma'am.
Q Did you guys leave right after Stebbins left?
A Yes, ma'am.
Q At what point did you call 911?
A Again, I'll just clearly state that if you want me to refer to my phone log from that day or want me to refer to the complaint originally submitted, I can refer and give you the exact time of that 911 call.
Just for the record, that 911 call was also provided and placed in discovery. I did get that from FOI requested as well.
Q Did Danielle drive to the mechanic or did you?
A She did.
Q What time did you go to the mechanic?
A I can't say for certain. I'd have to refer back to the complaint submitted to the Connecticut State Police on 5-23, the day after the incident.
Q Did you wait at the mechanic or did she drive you back to your house?
A I think she just dropped me there, obviously,

again, to pick up the car and bring it back.

Q Right, okay. You ended up filing a complaint with the Connecticut State Police, right?

A Yes, ma'am.

MS. VITALE: I would like to mark Exhibit 5 please.

(Defendant's Exhibit 5: Marked for Identification.)

BY MS. VITALE:

Q Handing you what's been marked Exhibit 5, have you seen this before?

A Yes, ma'am.

Q What is it?

A A complaint I submitted to Connecticut State Police.

Q When did you submit the complaint?

A Originally the complaint was submitted online via electronic portal for complaints on 5-23.

Q Do you have copy of the complaint you submitted online?

A I do not. The complaint I submitted online is this exact same complaint you see before you. What happened was I was contacted by Lieutenant Eric Cooke

who informed me that my initial complaint did not go through the portal and he asked me to email it to him.

He contacted me on 5-24 or maybe 5-25, and you see that was submitted, copied and paste, from whatever was sent in on 5-23 to the portal.

Q So if you could please turn to page two of Exhibit 5, the fourth paragraph down it says, "At 6:33 p.m., I was no longer at the location of the incident but did place a second call to the Connecticut State Police because the same Connecticut state trooper department vehicle was observed driving past the location."

Did I read that correct?

A Yes, ma'am.

Q How did you know that?

A Someone informed me that they had seen a Connecticut state trooper vehicle in front of the house.

Q Who informed you?

A Jean Paul, if I remember correctly. I don't remember. I didn't write who.

Q Was he residing at the 49 Foxcroft Road at the time?

A I can't say for certain. I don't know.

Q But he was there at 6:33 p.m. on May 22,

2018?

A I believe so. Again, I said I don't recall who contacted me and let me know about the vehicle being outside this address.

Q You think it was Jean Paul but you don't know for sure?

A I don't know for certain.

Q Do you remember anything about the conversation with the person who told you that a Connecticut state trooper drove by at 6:33 p.m.?

A Just told me possibly a car in front of your house was the whole conversation.

Q Possibly a car in front of your house?

A Yes.

MS. VITALE: Let's mark the complaint Exhibit 6.

(Defendants' Exhibit 6: Marked for Identification.)

BY MS. VITALE:

Q Handing you what's been marked Exhibit 6, have you seen this before?

A Yes, ma'am.

Q What is it?

A Says, Complaint and Demand for Jury Trial.
Q Did you have a role in drafting this complaint?
A Yes, ma'am.
Q You reviewed it before?
A Yes.
Q What happened on May 26, 2018?
A May 26th, I was at the gym in Enfield, Connecticut and drove to 49 Foxcroft Road. At that time, the roadway had the sign -- it was a dirt road. They were redoing the streets. I had to drive around the loop and drive past.
Steve Stebbins' wife, Jennifer Stebbins, attempted to walk in front of the vehicle similar to the gentleman LaPlant did on the 30th to stop me in the middle of the roadway. At that point, I went to my house avoiding her. Steve Stebbins was not outside or present at that time.
Q On May 26th you drove by the Stebbins house?
A Yes.
Q How many times did you drive by?
A I went to the house once, left. That equals twice.
Q So you drove by twice?
A Yes.

Q The first time you drove by where were you coming from?
A The gym.
Q Where is the gym?
A Enfield Street.
Q Is that Route 5?
A Yes, ma'am.
Q Do you have Exhibit 4 still?
A Yes, ma'am.
Q Do you see the gym on Exhibit 4?
A No, but it is in this plaza right where it says Ballroom Fever Dance Studio. It's right inside of that same plaza essentially.
Q Okay. What route did you take to go from the gym to your home at 49 Foxcroft Road on May 26th?
A I went down Montano Road and made a right on Foxcroft Road.
Q Why did you go that way?
A As previously stated today, I drove multiple ways to get to the address. There were dirt roads, construction all across the area throughout the time from May up to December of -- actually I believe it was from March 2018 until December of 2018.
Q Where was the construction on May 26th?
A Montano Road.

Q The entire length of Montano Road?
A South of I'm going to say -- whatever that is. Probably east of Montano but the whole area was construction.
Q Can you say that again? I don't understand the south and east.
A No, no worries.
Q So where was construction on Montano Road on May 26th?
A Again, the entire area was under construction for a period of March 2018 until approximately December 2018. They repaved the entire area. Certain days there were trucks in the road. Certain days there were signs in the road. Certain days there were people in the road completing construction in that area.
Q On that day on May 26th where was the construction?
A On Montano Road. There was a sign that I informed you about that says one Lane Traffic Ahead and a car in the road so I made the right down Foxcroft Road.
Q So you went from the gym, turned left onto Route 5, right?
A Yes, ma'am.
Q Then turned right onto Montano Road?

A Yes, ma'am.
Q Then right onto Foxcroft Road?
A Yes, ma'am.
Q You turned right onto Foxcroft Road to avoid construction? Is that your testimony?
A That's correct.
Q Was the road closed on Montano Road and Foxcroft?
A As previously stated, there was sign that said One Lane Traffic Ahead and a car in the lane so I made the right.
Q Now, you referred to signs. That was when you were going from the gym the first time. You said you went back. Where were you going when you went the second time?
A Just leaving 49 Foxcroft Road.
Q Where were you going?
A Leaving the area.
Q To go where?
A I can't say for certain where I was going.
Q Where did you go? You left your home and you -- just tell me the route you took.
A I left 49 Foxcroft Road and drove back down Foxcroft Road to leave on Montano Road.
Q Where did you go from there?

A Again, I do not recall. I don't remember where I was going that day.

Q After you got to Route 5, did you turn right or left?

A I do not recall.

MS. VITALE: I'd like to mark Exhibit 7.

(Defendants' Exhibit 7:
Marked for Identification.)

MS. VITALE: If this is taken from a video, I do not have the video.

BY MS. VITALE:

Q What is Exhibit 7?

A The sign that I referred to.

Q Is this taken from a video?

A This is taken from a picture. As you see, the second picture is of -- I'll be clear what I was taking a picture of. This home that you see right past -- it's zoomed in because I was taking a picture of the way they did those lights and it was just a complete random occurrence.

When that house was redone, I actually like the way they aligned the lights in their landscaping. Just coincidentally that same day, you can see as you

zoom in, you see this construction sign and that very convenient picture.

Q Let's back up. I want to make sure this is clear for the record. What is Exhibit 7?

A Exhibit 7 is a construction sign at the corner of Montano and Foxcroft Road.

Q Let me stop you there. Did you take this picture?

A I did.

Q What date did you take the picture?

A I believe it was 5-30.

Q Okay.

A Yes, 5-30.

Q Do you have a picture of how that intersection looked on May 26th?

A I do not.

Q Turning to page two of Exhibit 7, is page two of Exhibit 7 taken from a video?

A No. It's a picture that's zoomed in.

Q Which picture did you zoom in from? Page three of Exhibit 7?

A Page three; yes, ma'am.

Q Okay, I got you. Was page three taken from a video?

A No.

Q Okay. And page one of Exhibit 7, is that also a zoomed-in photo taken from page three of Exhibit 7?

A No. This was taken at nighttime thereafter of that sign.

Q So this was taken on May 30th of the sign. Why did you take the photo that is page one of Exhibit 7?

A To be quite clear with you in saying that I can tell that Mr. Stebbins was going and planned to continuously harass me after he called the police on 5-26 and then when he kept driving past on 5-28, what I wanted to make clear was what transpired and why I drove that way so I took the picture of that sign on 5-30.

Q So when you drove by on May 26th, did you see Jennifer Stebbins outside the home at 44 Foxcroft Road?

A To be clear, I did not know who she was at that time. I was later able to later identify who she was. I seen a white women, blond hair, leaving from 44 Foxcroft Road and tried to walk in the middle of the street in front of my vehicle.

Q Was that the first time you drove by or second time you drove by?

A Second time.

Q Second time. Was she also outside the first time you drove by?
A I didn't see her.
Q Where exactly did she walk?
A She walked from the sidewalk and attempted to wave her hand and walk in front of the roadway.
Q Did she actually step into the road?
A She was at the curb essentially of the street.
Q So she did not step into the road?
A I can tell you she did step in the road. Not in front of the vehicle but as she's walking to the roadway. I went past and I could observe her in the roadway.
Q After you drove by, you saw her in the road?
A Correct.
Q But she did not step into the road in front of your car?
A She was walking towards the roadway at the curb which aligns with the public roadway as I was going past. The only way she would have got in front of the vehicle was if she ran but she was walking at a very fast pace to get to the front of the vehicle. She didn't. I went past.
Again, I don't know who she is at the time.

When I looked in the rearview, I saw her with her arms open making gestures.

Q Was anyone in the car with you?

A I believe on 5-26 Danielle Dubuc was in the car. I can't recall.

Q Why was Danielle Dubuc with you?

A We came from the gym.

Q She went to the gym with you?

A Yes, ma'am.

Q Was she in the car with you when you drove by the second time?

A Both times.

Q Both times, okay. Does that help you remember where you were going now that you know you were with Danielle?

A No.

Q Did either you or Danielle take any video on May 26th?

A Can you clarify your question?

Q Sure. Did you take any video on May 26th?

A That's the same question. Did I take any video at all?

Q When you drove by the Stebbins' on May 26th?

A No.

Q Did Danielle take any video when you drove by

the Stebbins' home on May 26th?
A No.
Q Did you go back to the Enfield police on May 26th?
A I did.
Q Why?
A Because I realized -- I saw the Enfield police respond shortly after Steven Stebbins' wife tried to walk in the roadway. At that point, I saw him talking to the police. I wanted to find out if there was a 911 call placed and what the allegation in said 911 call was.
So when the police officer saw Danielle leaving in her vehicle, that is when Detective Castle followed her leaving 49 Foxcroft Road. At that point in time, you see the video of me making a video of Detective Castle following her.
From there, I went to identify who the officer responding was and if there was a 911 call and what the allegation was. When I responded to Enfield Police Department, as I previously stated, I spoke to Sergeant Laureano and Police Officer Tara Carter.
Q Looking at the complaint, which is Exhibit 6, paragraph 25, it says, "On May 26, 2018, Defendant Stebbins called 911 stating that Plaintiff was driving

over the speed limit."

Did I read that correctly?

A Yes, ma'am.

Q So why do you say Stebbins said you were driving over the speed limit? What is that based on?

A I listened to the 911 call and that's what he stated.

Q Okay.

A He said, to be clear, in the 911 call, Mr. Stebbins said, "He's driving over the speed limit. He's kicking dirt because he's driving faster than he should be going but I just want to make a complaint."

Just to be clear as we're discussing it, I can tell you that in Mr. Stebbins' affidavit for a restraining order, he changed d that allegation to say I was driving past at a slow rate of speed harassing him.

MS. VITALE: I'd like to mark this as Exhibit 8.

(Defendants' Exhibit 8: Marked for Identification.)

BY MS. VITALE:
Q Handing you what's been marked Exhibit 8, what is Exhibit 8?
A Exhibit 8 is a police report that was doctored by Detective Gary Castle on 5-26.
Q How did you obtain this?
A FOI.
Q Why did you say it was doctored?
A He wrote it.
Q So when you said the word "doctored", you just meant that he wrote it?
A Correct.
Q Paragraph 31 of the complaint, Exhibit 6, it says, "Detective Castle of the Enfield Police Department then drafted a police report stating as fact, which he did not personally observe, that Plaintiff was driving at a high speed and I followed Plaintiff's guest."
Did I read that correctly?
A Correct.
Q Is Exhibit 8 the police report that's referred to in paragraph 31?
A Yes.
Q Do you agree that on May 26th, Stebbins did not ask the Enfield police to investigate you?

A I don't see that it says he didn't ask to not investigate me. No, I do not see that.
Q Do you believe that he asked them to investigate you?
A I believe that the exact words are listed here, that Stebbins asked that this be documented only.
Q Okay. You went down to the Enfield Police Department on May 26th; is that right?
A Yes, ma'am.
Q Why did you go there?
A Because as you see in this police report, Mr. Stebbins asked to have no contact or attempts to contact Mr. Cameron per request of Trooper Stebbins. What that is is essentially a very biased report, especially reading this, because it makes again as you read out, observations that he did not personally observe.
I wanted to make it very clear what was transpiring to Enfield Police Department between what Mr. Stebbins was attempting to do and attempting to continuously harass me.
What I also wanted to do was be able to get the 911 phone call to provide Internal Affairs to let them also know that Mr. Stebbins now went from harassing me in my driveway, threatening me with a

firearm on his hip, and then going to file false reports of me driving down the street.

Q You were just looking at Exhibit 8, right?
A Yes, ma'am.
Q When did you acquire Exhibit 8?
A I can't say for certain.
Q Was it pursuant to a FOI request?
A Possibly.
Q When you say "possibly"?
A I don't know for certain if I submitted an actual FOI request to get this complaint. Because my name is listed, I'm pretty sure I also have access to just walk into the police department and request it.

MS. VITALE: I'm marking Exhibit 9.

(Defendants' Exhibit 9: Marked for Identification.)

BY MS. VITALE:

Q Handing what you's been marked Exhibit 9, what is Exhibit 9?
A Exhibit 9 is a supplemental report submitted by Sergeant Laureano, Enfield Police Department.
Q What time did you go down to the Enfield Police Department on May 26th?

A Per this report, it says about 13:20.
Q Why did you believe you needed to go down to the Enfield Police Department at that time?
A Because I do not think the harassment of Mr. Stebbins would stop if I didn't make reports to the Enfield Police Department as well.
Q What harassment?
A The harassment which started from the 5-22 incident in my driveway and then the 5-26 911 call about me driving down the street.
Q Did you know about this 911 call before you went down to the Enfield Police Department?
A I was in front of 49 Foxcroft Road and I observed Detective Castle arrive at 44 Foxcroft Road. Obviously I recall the wife trying to walk in the roadway. I see the police simultaneously essentially come to that address and then thereafter as Danielle left, Detective Castle followed her.
So I wanted to make it clear everything that transpired, because as you see, Detective Castle did not report that he followed the vehicle, and as you see in Sergeant Laureano's report, he said we had a 15-minute conversation in which he gave his version of the events but nothing of what I was reporting did he document.

Q What did you report?
A That Detective Castle -- what transpired with the wife, me owning that home, Detective Castle following her, and I explained that I filed the report on 5-22 about the threatening incident with Steven Stebbins in my driveway.
Q Had you ever gone down to the Enfield Police Department regarding any neighbors before?
A No, ma'am.
Q No? Can you see or could you see the Stebbins house at 44 Foxcroft Road when you were standing outside of the house at 49 Foxcroft Road?
A Yes, ma'am.

(Defendants' Exhibit 10: Marked for Identification.)

BY MS. VITALE:
Q I'm showing you what's been marked Exhibit 10. What is Exhibit 10?
A A text message that I believe I sent myself just to remember the names of everybody I spoke to and who was identified on May 26, 2018. As you see, they said I arrived at -- I mean, just to be clear, I want to point out, that text message was sent at 11:21 p.m.

This report that the written by James Laureano says at about 13:20 and we had a 15-minute conversation. So I just want to be clear, those are the people who I did speak to on this date and time.

Q Going back to Exhibit 10, do you see where it says page seven of 24?

A Exhibit 10, page seven of 24, yes.

Q What does that mean?

A I have no clue. Could possibly be just a screenshot. I don't know.

Q Okay.

A It shows that I was printing. So it was a printed page of the text message. Could have been 24 other documents printed at that time.

(Defendants' Exhibit 11:
Marked for Identification.)

BY MS. VITALE:

Q Handing you what's been marked Exhibit 11, what is Exhibit 11?

A Exhibit 11 is the email communication that I made informing at that time the assigned investigator that I knew of, Eric Cooke, of another incident with Mr. Stebbins where he called 911.

Q Why did you send this email?
A Just to let them know that the harassment was continuing thereafter the 5-22 date.
Q The harassment being what?
A Which stemmed from the 5-22 incident, Stebbins now escalated calling 911 on me for the sole purpose of me driving down the street.
Q Looking back at Exhibit 11, the second paragraph, you say, "The reason I am reporting this is because I observed an Enfield PO engage in conversation with Trooper Stebbins and as my guest and I left the home that I own on this street, the Enfield PO followed us from the area."
Did I read that correctly?
A Correct.
Q So, the guest you're referring to is Danielle Dubuc?
A Yes, ma'am.
Q Were you in the car with her?
A No.
Q Were you in your own car?
A Yes, ma'am.
Q Where were you in relation to Danielle's car and the Enfield police officer's car?
A Danielle was the lead car. Enfield PD drove

right behind her. I drove right behind Enfield PD.

Q Okay. May 28th, 2018, what happened?

A I was sitting in front of 49 Foxcroft Road with Jean Paul. Mr. Stebbins drove around the neighborhood multiple times. I recorded the incident. He was driving a black muscle car. He made hand gestures, stared at us, and as he did all of this, he almost crashed into the nextdoor neighbor's mailbox.

From there, he stopped and had a conversation with John Scavotto in front of John Scavotto's home. At that point in time, Mr. Stebbins got out of his vehicle wearing blue jeans, a t-shirt, baseball hat, firearm on his hip.

When he got out of the car, he raised his shirt, put his shirt down and engaged in conversation in the grass of John Scavotto's, assuming so, his address, his home. From there he drove around again and then drove back to 44 Foxcroft Road.

Q So how many times did he drive by your house?

A We were seated there for a significant amount of time. I'm going to say he drove past probably five to ten times.

Q How much of it do you have on video?

A I only started documenting when I noticed that he was signaling at us. In the video, I wasn't

able to identify him as the car was going past. I only was able to identify him once he got out of the car to speak to Scavotto and returned back to 44 Foxcroft Road.

There's a video of him going past. There's pictures of him standing, talking to John Scavotto, and video of him returning a very short time thereafter and parking in his driveway at 44 Foxcroft Road next to his police cruiser.

Q Did you just testify he drove by five to ten times?

A We didn't notice who was in the car. We weren't paying attention. Cars go past all the time. The black muscle car makes a lot of noise. We recall it going past a bunch of times but did not pay attention to who was occupying the vehicle until we noticed he was gesturing towards us.

Q So which time did he gesture to you?

A The time that I recorded, which was probably the second to the last time because he went back past to go home.

Q So you noticed him gesture to you the time he went and drove to John Scavotto's house?

A Yes, ma'am.

Q And at what point did you realize he was

driving the car?

A Again, so I couldn't easily or readily identify who he was. You'll hear me on the audio of that video saying, I think that's him. Because he was gesturing and making faces and I remember his face.

I identified him again once he got out and spoke to John Scavotto in front of his home and I saw the firearm. Then thereafter, confirmed it and recorded it identifying him going back into his home.

Q What is John Scavotto's address?

A John Scavotto lives at the house at the corner of Leonard Road and Foxcroft Road.

Q Can you see John Scavotto's house from 49 Foxcroft Road?

A Yes, ma'am.

Q So you and Jean Paul were sitting outside. Where were you sitting?

A In the garage.

Q In the garage?

A In front of the garage door so essentially in the driveway.

Q What were you doing?

A Sitting there.

Q Talking?

A Yes.

Q How long were you there?
A Again, I couldn't estimate how long we sat there. We talked, sat there for quite some time.
Q You said he was driving a black car?
A Yes, ma'am.

(Defendants' Exhibit 12:
Marked for Identification.)

BY MS. VITALE:
Q Exhibit 12 is what?
A Exhibit 12 is the picture from the date we're discussing, 5-28, where Mr. Stebbins is driving past the location in a black muscle car as previously identified.
There's three pictures here. The second one is him returning, parking the car next to a Connecticut state police cruiser. The third one, you see the same picture zoomed in with a "play" sign in the middle identifying it as a video.
Q So Exhibit 12 are three photos taken from video, correct?
A Yes, ma'am.
Q This is a video that you recorded on your cellphone?

A Correct.
Q Did Jean Paul also take video?
A No, ma'am.
Q You're going to obviously provide this video to me as we discussed. When did you take those photos off of the video?
A I can tell you the screenshot says it was made on 11-19-2018.
Q When you guys were sitting outside on May 28th by your garage, were you eating or drinking anything?
A No.
Q Were you just sitting there?
A Yes, ma'am.
Q Were you listening to music?
A No.
Q Do you remember what you were talking about?
A No.
Q Was your dog out there?
A No. Do you mind if I respond to a question that you asked?
Q Sure.
A You asked about the screenshot. I want to be clear. The reason why these screenshots were taken on 11-19 and 11-20, which both are indicated, is because

they were going to be submitted in evidence at the restraining order hearing that was originally scheduled for 11-23.

Q Okay, got you.

MS. VITALE: Okay, it's 12:54. We can break for lunch for a half hour.

(Lunch recess: 12:54 to 1:38 p.m.)

BY MS. VITALE:

Q Mr. Cameron, I wanted to check. Have you been recording the deposition?

A No, ma'am.

Q So, May 30, 2018, what happened?

A May 30, 2018, I was driving again down Foxcroft Road and that was when an unidentified friend of Mr. Stebbins walked completely in the middle of the roadway, essentially stopping my vehicle and again harassing me for simply driving down the street that I own a house on.

Q You drove by Stebbins' house at 44 Foxcroft Road on May 30th?

A I drove down Foxcroft Road on that day, 5-30, yes.

Q Where were you coming from when you drove

down Foxcroft Road past his house?

MS. CRUZ: I'm going to object to the inserting "past his house". That wasn't his answer. He said he drove down Foxcroft Road.

BY MS. VITALE:

Q Did you drive by Stebbins' house?

A I drove down Foxcroft Road.

Q Right. Did you drive by his house?

A I didn't drive by his house. I drove down Foxcroft Road.

Q Did you pass his house going down the street?

A There we go. Yes.

Q So when you drove down Foxcroft Road, you passed by Stebbins' house?

A In my route of travel, yes.

Q Okay. Where were you coming from?

A 5-30, I could have possibly been coming from Massachusetts. I'm not sure where.

Q Okay. So you were coming from Massachusetts?

A Yes, ma'am.

Q What route did you take when you were coming from Massachusetts?

A 91 to Route 5. Route 5 five to Montano Road. Montano Road to Foxcroft Road.

Q Why did you choose that route?

A Again, every time I -- I don't have a reason why I drive certain ways.
Q How many times did you pass by Stebbins' house on May 30th?
A Twice.
Q What was the second time?
A The second time was when he walked in the roadway.
Q When who walked in the roadway?
A I don't know his name. I believe his name is Joseph LaPlant. I can't say for certain.
Q So the first time you saw the man who you believe to be Joseph LaPlant is the second time you passed by Stebbins' house?
A The second time I drove on Foxcroft Road, yes.
Q Where you saw Joseph LaPlant, where was he?
A In the middle of the street.
Q Was he in front of Stebbins' house?
A He was in the middle of the street in front of 44 Foxcroft Road.
Q Stebbins' house is at 44 Foxcroft Road, right?
A Correct.
Q When you saw the man you believed to be

Joseph LaPlant, was that the second time you passed by Stebbins' house?
A Correct.
Q What direction were you driving in the second time you passed by Stebbins' house?
A Montano to Foxcroft Road.
Q When you say "Montana to Foxcroft Road", did you take a right off of Montano onto Foxcroft Road?
A Yes, ma'am.
Q Then the second time you drove by Stebbins' house, what route did you take?
A Montano on Foxcroft Road.
Q So the second time you also took a right from Montano Road onto Foxcroft Road?
A Yes.
Q So how did you do the same route twice?
A Because I left in the opposite direction.
Q Okay. Where were you going when you left the opposite direction?
A The store. I can't say for certain. I don't know if I stopped at a store. I left and then come back.
Q You left and came back, okay. So you don't remember if you went to a store?
MS. CRUZ: I'm going to object; asked

and answered. He just said, I don't remember.

BY MS. VITALE:

Q So you don't remember if you went to a store?

MS. CRUZ: Objection. He said, I don't remember. I could have gone to a store.

MS. VITALE: Okay.

MS. CRUZ: So clearly he doesn't remember.

BY MS. VITALE:

Q So is that your testimony, you don't remember?

MS. CRUZ: How many times that you say it.

MS. VITALE: Could you please read back the last answer before council started talking?

(The above-referenced answer was read back by the court reporter.)

BY MS. VITALE:

Q So when you left, which way did you drive?

A I believe that's the -- I'm going to tell you the street.

Q Looking at Exhibit 4?
A Exhibit 4. Again, Eleanor Road.
Q So you left --
A Or Leonard Road. One of those two. I went that direction when I left that time.
Q So when you left your house at 49 Foxcroft Road, you went down Eleanor Road and then you don't recall where you went but then you came back and went Montano Road onto Foxcroft Road?
A Yes, ma'am.
Q How long of a time was it in between the first and second times that you drove past the Stebbins' house?
A Couple of minutes.
Q Now, did you say you took a video on May 30th that showed a man talking to you in the roadway. Did I understand that?
A Yes, ma'am.
Q Why did you take a video?
A Because he was harassing me. I've never seen that person before so I wanted to document. Obviously, as you stated, he was in front of Steve Stebbins' home so I wanted to figure out if it was in relation to Steven Stebbins.
Q At what point did you start filming?

A As I watched him start walking in the street from Steven Stebbins' property.

Q You were using your cellphone?

A Yes, ma'am.

Q And you were driving?

A I was in the car. Yes, I was driving.

Q Was anyone else in the car with you?

A No, ma'am.

Q Do you know why the man you believe to be Joseph LaPlant walked into the road?

A Mr. LaPlant walked in the roadway. I rolled the window down, asked him, May I help you? He shouted obscenities, told me why am I over here on this street, and I drove off after I told him, God bless you.

Q Do Steve Stebbins come over and talk to you?

A Steve Stebbins was standing on the sidewalk adjacent to the home.

Q He was standing on the sidewalk?

A Yes, ma'am.

Q Did Steve Stebbins say anything to you?

A No, ma'am.

Q Do you know if Steve Stebbins said anything to Joseph LaPlant?

A I've never met that person before. I'm going to assume that. I seen him signaling but I didn't hear

anything for him to walk in the roadway, which prompted me to take out my phone and start recording.

Q When you say "signaling" what do you mean? And we have to kind of explain it for the transcript, you know?

A Pointing to the roadway as if, That's him in that car.

Q So who did you see pointing?

A Steve.

Q But you didn't hear any conversation between he and Joseph LaPlant?

A No, ma'am.

Q The incident on May 28th, did you go to the Enfield police after that?

A No, ma'am.

Q Why not?

A I just documented it. From my interaction with the police department on 5-26, it showed me that it wasn't going to do any justice in going to report the 5-26 incident. He was simply riding down the street, harassing me, pointing at me, but again there's no criminality in that.

Q After the May 30th incident did you go to Enfield police?

A I did.

Q Why did you do that?
A Because now there was other people who I was not able to identify. So I wanted the police to assist in identifying them and ask them about filing criminal charges against the gentleman.
Q Against what gentleman?
A The gentleman is the middle of the roadway.
Q Oh, okay.
A Obstructing traffic.

(Defendants' Exhibit 13:
Marked for Identification.)

BY MS. VITALE:
Q Handing you what's been marked Exhibit 13, what is this?
A It shows the text message that was previously discussed and submitted into evidence. At the top of this exhibit centered in the exhibit is my punching in and out of work at Way Finders, my part-time job.
Q There's a note in the middle of this where it says, "This is my work time sheet showing I left work early."
Did I read that correctly?
A Yes, ma'am.

Q So I don't understand this.
A Okay. What do you need clarification on?
Q This is your time sheet from Way Finders?
A Yes, ma'am.
Q And what are your normal hours of work.
A If you go to the last page on 5-30, it shows that I left work at 8:30 on 5-30. On 5-30, I usually work six to ten.
Q 6 p.m. to 10 p.m.?
A Correct.
Q Oh, okay. Why did you leave work early?
A Because I didn't get a response originally when I informed Connecticut State Police about the previous incidents. So this point in time I went to report the incident and provide the video directly to Troop H in Hartford.
Q Which incident were you reporting?
A All of them in its totality but I was directly referencing and showing the video of Mr. Stebbins' friend and Mr. Stebbins again harassing me thereafter 5-22.
Q So if I am following you correctly, you left work early on May 30th so you could go to Troop H and show them the video you took on May 30th?
A Yes, ma'am.

Q Do you have any information that Steve Stebbins made a report to Enfield police on May 30th?

A No.

(Defendants' Exhibit 14: Marked for Identification.)

BY MS. VITALE:

Q Handing you what's been marked Exhibit 14, what is this document?

A This is a Town of Enfield construction report for the date of the Wednesday, 5-30.

Q How did you get this?

A I went to the Town of Enfield.

Q Why did you get this?

A To show that there was no -- me driving past had zero to do with attempting to bother anybody. Solely, the road was obstructed and they were doing construction on said road.

Q What road was obstructed?

A Montano.

Q So the photos of the intersection of Foxcroft Road and Montano Road that we looked at earlier, Exhibit 7 the first page of Exhibit 7 shows "One Lane Road Ahead"?

A Correct.
Q Is it your testimony that the entire road was blocked on Montano Road on May 30th?
A When I came down the sign was there. As I stated earlier, there was a car in the roadway. So it says One Lane Road. There's a car in the roadway. There's only one way to go other than that.
Q Which time? When was there a car in the roadway?
A On 5-30.
Q The entire time? The entire day?
A I wasn't there the entire day. I can't speak for the entire day. I can speak for the second that I drove there.
Q Okay. Every time you drove there?
A Every time I drove there, no.
Q Sorry. Every time you drove there?
A You asked me every time I went there. I said no.
Q No. So the car wasn't blocking the lane every time you drove there on 5-30?
A On 5-30 when I came down the roadway, there was a car in the roadway.
Q Each time you drove down?
A Yes. The two times that I drove past, yes.

Q Got you, okay.
Do you know whose car it was?
A I don't have the ability to know that information.
Q Was it a construction vehicle?
A I couldn't be certain.
Q Did it look like a crane or dump truck?
A As you see in the picture, there's construction materials behind the sign. There it was, just a regular car or truck in the roadway. I can't say it was a forklift or anything like that.
Q So it was a sedan or truck?
A Correct.
Q Was there active construction going on when you drove by?
A There were people there. I don't know if they were still working on whatever they were doing. I can't say for certain.
Q So why do you think the man you saw is Joseph LaPlant?
A Just the name that popped up with the same -- what happened is on social media sometimes if someone is relatively close to you, it pops up as a suggestion. So Joseph LaPlant popped up and looked very similar to the guy that I saw in the roadway.

Q Were you looking at Steve Stebbins' social media?
A I was just on Facebook and it just popped up. I don't know if Steve Stebbins has social media or not. But the page, the name popped up, Joseph LaPlant. It looked similar to the guy in the roadway.
Q You were on your own social media page and Joseph LaPlant popped up as someone you may know?
A The page popped up, suggestions, and looked similar to the guy in the roadway.
Q Do you know who is that is?
A I do not.
Q Do you know if he lives on Foxcroft Road?
A I do not. I can inform you that Steven Samson in an Internal Affairs report said he spoke to the gentleman and was able to identify the person in the roadway.
Q Was he able to?
A Correct. Steve Stebbins was able to identify to Steve Samson who the gentleman in the roadway was but he never provided me that information.
Q On May 30th, the first time you drive by the Stebbins' home, was Steve Stebbins outside?
A I didn't see anybody outside.
Q June 21, 2018, what happened?

A June 21st, I was operating a different car than Mr. Stebbins originally observed me driving. He then saw me leaving 49 Foxcroft Road, followed me on Route 5 for a brief period of time, and I wrote the date down. I later discovered through FOI request he was identified as the person following me and in fact did run my plate on that date.
Q So what car were you driving?
A I was driving the Infinity that date.
Q The black Infinity?
A Yes, ma'am.
Q When you say a different car from what he originally saw me driving, were you referring to the silver Honda Accord?
A Yes, ma'am.
Q So you left 49 Foxcroft Road?
A Yes, ma'am.
Q At what point was Steve Stebbins behind you?
A Going up Montano. So left 49, left up Montano.
Q So you took a left out of your driveway at 49 Foxcroft Road and took a right onto Montano Road?
A Yes, ma'am.
Q You saw Steve Stebbins behind you on Montano Road?

A Yes, ma'am.
Q What car was he driving?
A The same state trooper vehicle, silver four-door sedan that I saw him in on 5-22.
Q At the end of Montano Road, where did you drive?
A I made a right on Route 5.
Q And then where did he drive?
A He made a right onto Route 5.
Q How long was he behind you for?
A All the way past -- I want to say past Brainard Road and then kind of, like, tapered off.
Q What do you mean?
A Kind of fell behind.
Q Did you see him after that?
A No, ma'am.
Q So at that time did you know that he ran your license plate?
A I did not.
Q So you found out only through the FOI request?
A Correct. I could see him behind me typing in his computer. I couldn't be for certain that he was running my license plate.
Q At what point did you see him typing on the

computer?
A Probably on Montano Road.
Q Do you have the video of that incident?
A No, ma'am.
Q Was anyone else in the car with you?
A No, ma'am.
Q What happened on July 8, 2018?
A July 8th, I was not aware of this incident until after I was arrested and was able to obtain the police report through discovery. At that point in time, I was alerted to the July 8th incident.
On July 8th, I wasn't present at the property. I wasn't aware of this incident. He called 911, reported someone in a public roadway taking pictures of his vehicle and his car. He informed them he believed that it had something to do with Marcus Cameron.
Q Did you obtain a video of that woman on July 8, 2018?
A No, I wasn't aware of it until after I was arrested, December 11, 2018.
Q Do you have a copy of that video?
A I do.
Q Have you watched it?
A Yes.

Q Do you know who that woman is?
A I've never seen that women a day in my life.
Q So all you know about the incident with the woman at Steve Stebbins' property on July 8, 2018 is what's in the police report and what's on that video?
A And the two 911 calls.
Q What happened on July 15, 2018?
A July 15th, there was at that point in time a Connecticut state trooper vehicle that was observed on the street, public roadway. There was a vehicle, the Audi SUV parked in the driveway. It looked as if somebody was writing down the license plate of this vehicle parked in the driveway.
Again, I documented it and then confirmed that Mr. Stebbins was the person who ran that plate on that date.
Q How did you learn of that incident?
A I was there.
Q You were there at the house?
A Yes.
Q At 49 Foxcroft Road?
A Yes.
Q How was it that you saw this?
A Through the window.
Q Through the window. You saw the

Connecticut State Police trooper vehicle on the road?

A Yes.

Q Was it directly in front of your house?

A Across the street from my house.

Q Did you see a trooper outside the car?

A I couldn't see who was in the vehicle.

Q Did you see a Connecticut state trooper outside of the vehicle?

A No.

Q Whose Audi SUV was in the driveway?

A Natesha Bestman.

Q How did you learn that someone ran her license plate?

A I wrote the date down when I observed this person in front of my home and then through FOI request, we learned that Mr. Stebbins was the person who ran that license plate.

Q So you learned through FOI that Stebbins ran Natesha's license plate?

A Correct.

Q And you saw a Connecticut state police vehicle on the road across from your house?

A Correct.

Q Did you see Steve Stebbins outside of your house?

A I can tell you that it looked like Mr. Stebbins but I can't be for certain on this date and this time just because of the way and where they were parked. So I can tell you with 90 percent certainly it looked like Mr. Stebbins.

Q Did you see Steve Stebbins outside of the vehicle in front of your house?

A No, ma'am.

Q And Natesha's Audi was parked in the driveway?

A Yes, ma'am.

Q Did Natesha also see this outside the window?

A I did not point it out to her.

Q Now, are you claiming that Steve Stebbins filed a complaint with the Massachusetts probation office that you didn't live in Massachusetts?

A Mr. Stebbins, as well as Mr. Samson contacted Massachusetts Probation Service multiple times on multiple dates and filed an allegation in regards to my address.

Q How do you know that Steve Stebbins did that?

A Steve Stebbins was found on the recording that was left for the head of Legal for Mass Probation by mistake.

Q So aside from that audio recording, do you

have any other information that Steve Stebbins complained to your employer about your residency?

A Mr. Stebbins is on multiple recordings including the 11-12 stop at Brookside Plaza. The first thing he said to Officer Crouteau is just want to make sure you're aware Marcus Cameron is a probation officer in the State of Massachusetts and shouldn't even be residing in Connecticut -- shouldn't even be in Connecticut.

Q So my question is actually complaints directly to your employer. Aside from the recordings of the voicemail that you referenced, do you have any other information that Steve Stebbins made a complaint to your employer about your residency?

A You'd have to elicit that from Mass Probation. I don't have that information.

Q You don't, okay.

(Defendants' Exhibit 15:
Marked for Identification.)

BY MS. VITALE:

Q I'm handing you what's been marked Exhibit 15. Do you know what this is?

A Yes, ma'am.

Q Okay. What is it?

A A letter that I received from the Office of the Commissioner of Probation. I received one copy at my office mailbox as well as a secondary copy sent certified mail to my 37 Green Street Circle address.

Q Looking at the first paragraph of Exhibit 15, it says, "This letter is to inform you that an allegation that you are not a resident of Massachusetts has been brought to this office's attention."

Did I read the correctly?

A Yes, ma'am.

Q Do you have any knowledge of who brought that allegation to their attention?

A So I can tell you that on 7-6 I believe Mr. Steven Samson contacted Springfield District Court multiple times. He in turn had a conversation with my then chief probation officer and informed him essentially of the complaint, informed him of the ongoing events. He also informed him along the lines of what was reflected here.

I can't say for certain that this allegation was brought to Terence O'Neil's attention on that date but I can tell you that after Mr. Samson contacted Terrace O'Neil at Springfield District Court, he came to me and informed me that he instructed him some of

these questions were out of line. He informed me they were trying to get me into trouble with my job, and he informed me that he sent them to contact Legal. That conversation I believe was 7-6.

Q Who is Terence O'Neil?

A The chief probation officer in the Springfield District Court. He's currently the regional supervisor in the region in which I work.

Q What was his job in relation to your job at that time?

A My supervisor.

Q Direct supervisor?

A Direct supervisor of the entire Springfield District Court.

Q What happened after you received that letter, Exhibit 15?

A After I received this letter, I complied with the Office of the Commissioner of Probation and submitted all document requested and required for this letter.

Q What documentation did you provide?

A They requested -- as you see here in the letter, when I first got hired they were aware of 49 Foxcroft Road and my relation to said property, the fact that I owned said property.

What they asked me to do is I had to submit a copy of my license at the time. I submitted to them a temporary license that I had and then I submitted to them.

Then per this request, I had to submit to them a copy of my Massachusetts license and well as other information requested. Like, I used the letter as verification of residency because they sent it certified mail.

Q I want to make sure I followed that. So after you received the letter that's Exhibit 15, you provided your employer a Massachusetts driver's license and then used Exhibit 15 as evidence of Massachusetts residency because they sent the letter certified mail to the Green . . .

A Green Street Circle.

Q The Green Tree Circle address; is that right?

A Yes, ma'am.

Q Then after you provided that documentation what happened?

A Nothing.

Q Who did you provide that documentation to?

A Yvonne Roland.

Q Do you have a copy of what you provided to her?

A I do not.
Q Were you disciplined as a result of Exhibit 15?
A No, ma'am.
Q Did you lose any pay or benefits as a result of Exhibit 15?
A No, ma'am.
Q Were you investigated as a result of Exhibit 15?
A I would say that having to submit documentation of something I've already informed them of is an investigation, yes.
Q Other than that, were you investigated?
A I can't say for certain. I wasn't a part of any investigation or informed of any investigation.

(Defendants' Exhibit 16:
Marked for Identification.)

BY MS. VITALE:
Q I'm handing you what's been marked Exhibit 16. Have you seen this before?
A Yes, ma'am.
Q What is Exhibit 16?
A Exhibit 16 is a jury summons that I began to

receive around the same time of said investigation in regards to and reports from the Connecticut State Police that I did not reside in the state of Massachusetts.

Q Do you remember when you received this Exhibit 16?

A I don't know for certain.

Q Did you speak with one with the jury administrators?

A I did contact the jury administrator.

Q Who did you speak with?

A I don't recall the name.

Q Why did you contact the jury administrator?

A I wanted to figure out how all of a sudden I was getting jury summonses and I'm not, in fact, a resident of the State of Connecticut.

Q What was the conversation?

A He said that they weren't aware and all I needed to do was submit the information back to them saying that I don't reside in the State of Connecticut.

Q Okay. You don't remember who you spoke with?

A I don't.

Q Okay.

A Could have been the jury commissioner herself.

Q Do you know who that is?
A I do not.
Q Do you know why you started receiving those?
A I do not. I can tell you I actually do remember a certain part of the conversation that a warrant could be issued for failing to attend jury duty. So at that time, I did have an assumption that it had something to do with the Connecticut State Police.
Q Why did you have that assumption?
A Because it was randomly inquiring about my address.
Q What was randomly inquiring about your address?
A The multiple reports submitted by Steve Stebbins, Steven Samson, that I was, in fact, not a resident of the State of Massachusetts and I was, in fact, a resident of the State of Connecticut.
They both ran my license, as you are aware, and both indicated that I was in domain and control of a Connecticut state driver's license as well as a Massachusetts state license.
Q Did you have a Connecticut driver's license?
A As previously instructed when I told you earlier, when I changed my license to Massachusetts, I

had to surrender my license. That's the Massachusetts law, that you have to surrender any other state license to the RMV. So I did not have another state license.

Q That was in 2016?

A Yes, ma'am.

Q So what happened on August 7th, 2018?

A Yes. I was leaving 49 Foxcroft Road with Angela Harrington. She was driving me from that address to work.

As we got in the vehicle in the driveway, Mr. Stebbins was observed exiting 44 Foxcroft Road. He hopped in his cruiser, drove from 44 Foxcroft Road towards Montano Road, made a left, and got directly behind the vehicle that I was in with Angela Harrington.

He drove at a fast rate of speed right behind us. I mean, within maybe ten feet. When we got to the end of Montano Road where Enfield Street is, I directed her to go into the Dunkin Donuts to not allow him to follow us. We went into the Dunkin Donuts, bought coffee.

When we left the Dunkin Donuts, Mr. Stebbins was parked at approximately 291 Enfield Street -- it's, like, a factory -- tucked behind some bushes. When we went past, he came out behind us; and then once we got

on 91, he didn't follow us on 91 North.
Q August 7th, you got into a car with Angela Harrington at 49 Foxcroft Road, right?
A Yes.
Q Was she driving?
A Yes.
Q What car was she driving?
A A Toyota Corolla.
Q Was that her car?
A Yes.
Q Did she take a left out of your driveway?
A Yes.
Q And then did she take a right onto Montano Road?
A Yes, ma'am.
Q At what point did Steve Stebbins come drive behind you?
A Steve Stebbins got behind us prior to Dover Road so I want to say in between Foxwoods and Dover.
Q So, I believe you just explained that you took a right onto Montano Road from Foxcroft Road, right?
A Correct.
Q And then you went and you took Montano Road all the way to Route 5, right?

A Yes, ma'am.
Q And then where -- did you turn right or left onto Route 5?
A I went straight to the Dunkin Donuts right across the street.
Q So straight across Route 5. You just testified that Stebbins got behind you at the corner of Foxcroft Road and Dover Road?
A On Montano, in between Dover and Foxcroft.
Q I got you. So that intersection doesn't make sense to me. If you look at Exhibit 4, I see that Dover Road intersects with Montano Road. So when you say he was behind you in between Dover Road and Foxcroft Road.
A On Montano.
Q On Montano?
A Going towards --
Q Oh, I see, okay. When you got to Route 5, you went across to Dunkin Donuts?
A Yes, ma'am.
Q Where did you see Steve Stebbins go?
A He was right behind us at that light. He made a right on Enfield Street heading towards if you're looking at this map, the Dodge dealer.
Q Looking at Exhibit 4, he turned right onto

Route 5 towards the Dodge dealer and did you see him pull over somewhere?

A Yes -- my apologies. I didn't see him pull over. I observed him later on pulled over in the parking lot of 291 Enfield Street.

Q What is located at 291 Enfield Street?

A I don't know what type of building it is but it's a small factory.

Q Is it near the Dodge dealer?

A No, it's further north. It's not on the map here.

Q Oh, it's not on the map, okay.

So you went straight across to Dunkin Donuts and Stebbins took a right onto Route 5. Them after you left Dunkin Donuts, did you take a left onto Route 5?

A Yes, ma'am.

Q Then as you were driving, you saw Stebbins pulled over?

A Correct.

Q And he was in the vicinity of 291 Enfield Street?

A Yes, ma'am.

Q Did you just pass by him?

A When we passed by he came out of the parking lot.

Q And where did he turn?
A Northbound right behind us or relatively behind us.
Q So did he take a right or a left?
A Took a right.
Q Was he directly behind you?
A I can't say he was directly behind me. I can't say there were other cars. I did see him come out the parking lot.
Q So you saw him in the rearview mirror?
A I was turned around looking.
Q Angela Harrington was still driving?
A Yes, ma'am.
Q How long was he behind you driving?
A Right past 291 Enfield street is the entrance for 91 North. So I went on the highway and from there he didn't come on the highway.
Q Did you come to learn that Steve Stebbins ran Angela Harrington's license plate?
A I did.
Q When did you learn that?
A When I submitted the FOI request.
Q Where were you and Angela Harrington headed?
A Springfield, Massachusetts.
Q Were you going to work?

A Yes, ma'am.
Q What time did you have to be at work in the morning?
A 8:00 a.m.
Q 8:00 a.m. Did she work at the same place?
A At the time, yes.
Q Did anything else happen on August 7, 2018?
A Yes, ma'am.
Q What happened?
A In the evening, Mr. Jean Paul went to 49 Foxcroft Road and observed a Connecticut State Trooper vehicle sitting in front of the home. He contacted me and I asked him to try to get the license plate to see who the driver was of the vehicle. As he's approached the vehicle, it took off.
Q So you weren't there for that incident?
A No, ma'am.
Q So anything you know about that, Jean Paul told you?
A Yes, ma'am.
Q Did he tell you where the Connecticut State Police vehicle was parked?
A In front of 49 Foxcroft Road.
Q Same side of the street or across the street?
A I can't say for certain.

Q Okay. What happened on September 18, 2018?
A September 18th, Natesha Bestman was leaving 49 Foxcroft Road. She ended up calling me and letting me know that a Connecticut state trooper was following her from 49 Foxcroft Road to southbound on I-91.
I stayed with her on the phone the entire time as the vehicle was traveling behind her. She wasn't able to get a license plate. She did give me a description. The description did describe Mr. Steven Stebbins.
Q Natesha was driving?
A Correct.
Q Were you with her?
A No, ma'am.
Q What car was she driving?
A The Audi.
Q Is that her car?
A Yes, ma'am.
Q Did she take a right or a left out of 49 Foxcroft Road?
A I do not know.
Q Anything you know about that, she told you?
A Correct.
Q Did you come to learn Stebbins ran Natesha's license plate?

A I did.
Q How did you learn that?
A FOI request.
Q Did Stebbins pull her over?
A No, ma'am.
Q Did Stebbins speak with her?
A To my knowledge, no.

(Defendants' Exhibit 17: Marked for Identification.)

BY MS. VITALE:
Q Handing you Exhibit 1, what is Exhibit 17?
A My call log for 9-18-2018. The call log, the incoming phone calls from Natesha Bestman's phone.
Q Does this show Natesha called you on 9-18?
A Yes.
Q And why did she call you?
A Because she was worried about the police officer harassing her and following her from 49 Foxcroft Road.
Q Did she call you while she believed Stebbins was behind her?
A Yes, ma'am. And that phone call was listed as 40 minutes.

Q Forty minutes?
A Yes. 7:14 a.m. That's her number listed, 748-6921, and I stayed on the phone with her the entire time he drove behind her.
Q How long do you believe he was behind her for? 40 minutes?
A I wasn't there. I can't say for certain. For safety concerns, I stayed on the phone with her.
Q Were you dating at the time?
A Yes, ma'am.
Q November 12, 2018, why don't you start by telling me what happened and I'll stop you?
A I arrived at the 49 Foxcroft Road address as a company was there completing some work at the home. I got to the driveway. I spoke to the guy completing the work. We discussed the job and then I was leaving the residence.
At that point in time, Mr. Stebbins left 44 Foxcroft Road in an unusual fashion -- let me not say that. I'll take that back.
So he drove in a weird fashion. He saw me in front of the home walking to my vehicle and drove past me in front of 49 Foxcroft Road. He went past, all the way up to either Leonard or Freemont Road. I saw him. I left, and I went up Eleanor Road leaving the address.

Q Let me stop you there.
A Yes.
Q So you were at 49 Foxcroft Road on November 12, 2018. There were workers working at your house?
A Correct.
Q What were they doing?
A Pressure washing.
Q Working outside of the house?
A Yes, ma'am.
Q You said you speak with them. Did you speak with them outside of the house?
A Yes, ma'am.
Q Where were you standing?
A The driveway.
Q Did you see Steve Stebbins leave 44 Foxcroft Road?
A I did not see him at the time leaving 44 Foxcroft Road but as I was walking to my car, I saw the Connecticut state trooper vehicle approaching me right at the roadway of 49 Foxcroft Road.
Q So why were you walking to your car?
A To leave the address.
Q Where were you going?
A To the store, plaza, Brookside Plaza.

Q What store?
A Petco, Staples.
Q What were you going to buy?
A I bought something from Staples. I was looking to potentially see what they had in Petco for my dog.
Q What did you get from Staples?
A I don't remember. I do have the receipt. It might have been a gift card because I was -- after being stopped for an hour in the parking lot or so, I was ready to get out of there.
Q What did you buy the gift card for?
A For a baby shower I was going to.
Q Was your dog at 49 Foxcroft Road?
A I do not believe so.
Q As you walked to your car, where was your car parked?
A On the street facing Eleanor Road because the workers from the pressure washing company, their truck was in the driveway.
Q At what point in the walk to your car did you see Steve Stebbins drive by?
A As I was approaching, I was pretty much in the street -- pretty much in the street in front of my mailbox where my car was parked at.

Q Were you next to the car when Steve Stebbins drove by?
A Behind the car.
Q Behind your car. Did you say anything to him as he drove by?
A No, ma'am.
Q So then did you get in your car after he drove by?
A Yes, ma'am.
Q Did you see where he went?
A I saw he continued in -- I'm going to say northbound on Foxcroft Road toward Leonard Road or Freemont Road.
Q Where did you go?
A I went up Eleanor Road.
Q Did you drive down Eleanor Road?
A Yes, ma'am.
Q Then where did you go?
A I made a right on Dover Road.
Q Where did you go from Dover Road?
A When I got to Freemont Road, Freemont Road was blocked off. They were doing construction for the entire Freemont Road, which forced me to continue straight on Dover all the way up until Colony. Sergeant Laureano was working a construction detail at

that corner of Freemont Road.

Q Sergeant Laureneo was working at what corner of Freemont Road?

A The corner of Dover and Freemont Road.

Q So did construction completely prevent you from turning left onto Freemont Road?

A Correct.

Q Now, did you see Steve Stebbins' vehicle?

A Yes.

Q Where did you see him?

A He was in front of me probably about 20, 30 feet.

Q At what point did you see him?

A On Dover Road.

Q On Dover Road. Was it on the part of Dover Road in between Foxcroft Road and Colony Road?

A Yes.

Q Then what happened?

A From there there's a stop sign at the corner of Colony Road and Dover Road. This is a matter. Colony Road actually is a no exit street to the right so we both were forced to obviously make a left on Colony Road.

Q Did he pull over?

A Mr. Stebbins never actually pulled over. He

pulled to the side of the road. I continued traveling, didn't stop. He pulled out directly behind me as if he was going to engage in a traffic stop and I pulled over.

Q Did Stebbins turn left onto Colony Road first?

A Yes.

Q And then did he pull over to side of the Colony Road?

A Yes.

Q Then did you go in front of him?

A Yes.

Q Then did you stop?

A As soon as I went in front of him, he came out directly behind me as if he was going intentionally going to pull me over or something so I pulled to the right.

Q Then what happened?

A He briefly stopped. Per his report, he ran my license plate at that time and then he went past me and traveled to Route 5.

Q So you pulled over in front of him on Colony Road, right?

A He pulled over first.

Q Then you went in front of him and pulled

over, right?

A Yes.

Q Then he went around you and turned right onto Route 5, right?

A Yes, ma'am.

Q Then what did you do?

A We both were traveling north on Enfield Street.

Q After he turned right on Route 5, you also turned right onto Route 5, right?

A Yes, ma'am.

Q Did you see where he went from there?

A He turned into the parking lot on the right-hand side of Enfield Street and then I continued traveling straight. I could see him loop the parking lot as if he was coming back out, and from there I pulled over to call my friend.

Q Where did you pull over?

A There's a parking lot on the left-hand side.

Q Who did you call?

A Jean Paul.

Q Why did you call him?

A Jean Paul is somebody who I know would come if I have an emergency. At that point in time, I was fearful that Mr. Stebbins was following me and his

intention was to pull me over, possibly at a remote location, and do whatever he planned to do.

Q So you saw that Stebbins pulled over into a parking lot on the right on Route 5?

A Yes, ma'am.

Q And then you kept driving?

A Yes, ma'am.

Q How was it that you saw what he was doing in the parking lot?

A I looked.

Q You looked behind you?

A To my right.

Q To your right. Then which parking lot did you pull into on the left?

A The parking lot right before the carwash on the left-hand side.

Q Did you see Steve Stebbins then continue driving down Route 5?

A I did not.

Q Were you able to see the parking lot he pulled over into?

A No, ma'am.

Q How long did you wait in that parking lot?

A I pulled over for maybe a few minutes, called Jean Paul. He didn't answer the phone right away. I

waited. I just said, I don't see him, so I took off.
Q What car were you driving?
A My black Infinity.
Q Do you have a Bluetooth in that car?
A I do.
Q So you then turned left onto Route 5?
A Yes, ma'am.
Q Then what did you do from there?
A When I got to the light at the entrance for the highway, Mr. Stebbins was parked on the dirt patch there. He was again observing traffic. I went on to the highway.
Q Then what did you do?
A I continued travel, and then again, I'm just, like, nervous at this point so I pull over to call Jean Paul and ask him to stay on the phone with me as I was traveling because I don't know what this guy was planning to do.
Q Where did you pull over?
A On the right-hand side of the road.
Q On 91?
A Yes, ma'am.
Q So you pulled over on the side of 91?
A Yes, ma'am.
Q And you called Jean Paul?

A Yes, ma'am.
Q How long did you talk to him?
A I called him on the side of the road on 91 from the time -- pretty much the time the police came to me on Brookside Plaza. Jean Paul at the time was at the gym in West Springfield. I told him, I need you here. It's an emergency. He left the gym in West Springfield and he showed up to the parking lot at Brookside Plaza.
Q Did you tell him where to go?
A As far as?
Q Did you tell him to go to Brookside Plaza?
A I told him what store I was going to.
Q Did you tell him to meet you at Brookside Plaza?
A I told him the store I was going to. I told him, For my safety, I need you to come to this location, meet me at the store.
Q So you told him to meet you at the store at Brookside Plaza?
A I told him where I was going.
Q Which was in Brookside Plaza, right?
A That's correct.
Q Okay.
MS. CRUZ: Just for clarification,

you're asking if he told him to meet him at Brookside Plaza, and he's saying no, he told him to meet him at a store. I just want to make sure that's clear.

MS. VITALE: Right. In Brookside Plaza, that's the store he was telling him to meet him at.

MS. CRUZ: Yes. But he didn't tell him to meet him at Brookside Plaza. He told him to meet him at a store.

MS. VITALE: Okay, I got you.

MS. CRUZ: I just feel like we're going . . .

MS. VITALE: That's fine, and I got it eventually.

BY MS. VITALE:

Q So you told him to meet you at the store at Brookside Plaza?

A That's correct, the pet store.

Q The pet store, all right. How long were you pulled over on 91?

A Briefly. Not that long, just long enough to make sure that I safely dialed his phone number and took back off.

Q Did you see Steve Stebbins drive by you while

you were pulled over?
A I did see him go past me, yes.
Q Did you see him get off the exit?
A Mr. Stebbins was in the left-hand lane on the highway. There was I believe a three- or four-lane highway. He was in the left lane the whole time.
I traveled only in the right lane as I know I was getting off on the first exit. As I turned on my indicator to turn off the highway, Mr. Stebbins came from the third lane of the highway and darted off in front of me on that exit.
Q So he got off the exit in front of you?
A Yes, ma'am.
Q Where did he turn off the exit?
A It's a roundabout so it just goes on to -- what street is that? It's a main road where all the plazas are. I can't think of the name of it right now.
Q It's a roundabout, you said?
A It's a roundabout, and it takes you on a main road full of plazas both on the right- and left-hand side.
Q Did you see where he went?
A I wasn't really paying attention to him at the time. I saw him go across and then I slowed down because again, I don't know what this guy is trying to

do. He went straight. I didn't see him turn. I didn't see anything.

So I turned in the very first entrance of Brookside Plaza where there's a Staples and a pet store. He traveled -- continued traveling on that main road.

So again, I didn't know what his intensions were. I parked, made sure I had an unobstructed view from possibly cameras or any potential witnesses in said parking lot and I'm staying on the phone with Jean, letting him know where I parked at.

Maybe three minutes later, Mr. Stebbins comes from the opposite end of Brookside Plaza, which is probably another quarter mile down the road, so he looped back to where I parked at.

Q How long did you stay in your car once you parked?

A I was waiting for Jean Paul to get there.

Q Do you know when he got there?

A When he got there, I was surrounded by maybe 10 to 15 police officers.

Q Why were you waiting for him to get there?

A For my safety. A male with a gun is following me for numerous times, been harassing me for six to seven months now.

Q Jean Paul was coming from West Springfield?
A Yes, ma'am.
Q When Jean Paul got there, where did he park?
A In the parking lot to the right-hand side of my vehicle. Again, you see it's an unobstructed view where he can see the arrival of each officer and he was able to observe Mr. Stebbins, Mr. Samson, Mr. Nolan, all at that scene, and multiple other officers.
Q Did Steve Stebbins get out of his car?
A Yes, ma'am.
Q How long were you there in total?
A Probably about 40 minutes to an hour.
Q At what point did Steve Stebbins get out of his car?
A He got out of his car -- Officer Crouteau drove up, approached. We had a brief conversation. Mr. Stebbins then pulled behind us, got out of the car, firearm visible, blue dress shirt, slacks, shades on.
Q He got there after . . .
A Croteau.
Q So when Officer Crouteau arrived, Steve Stebbins got out of his car?
A Yes, ma'am.
Q How long was he outside of the car?
A I can't say for certain; maybe a couple of

minutes.

Q Then, did he go back to his car?

A Yes, ma'am.

Q Did he stay in his car for the remainder of the time?

A Yes. Because his car was parked where they were all seated. So his car is right next to where Bryan Nolan, Steve Samson -- they were standing, I believe on the passenger side of his vehicle.

So his windows were down and they were still talking to him at his vehicle right behind him, directly behind him.

Q Did Steve Stebbins talk to you in that plaza?

A No.

Q Did Jean Paul take any video do you know?

A I believe he took maybe still photographs or a video of the incident.

Q Did he give those to you?

A He did not.

Q Did you watch them?

A I did, briefly. It's kind of a long video and you can't hear anything so it wasn't worth watching.

Q What did it show?

A It shows to me Mr. Samson arrive, who had no

investigating authority interest in the case, conspiring with Mr. Nolan at the scene as well as another officer. I don't know his name. He had on a black leather police jacket.

Q Do Jean Paul's videos show Steve Stebbins?

A No. But I have a video that shows Steve Stebbins outside of his vehicle.

Q Did you take that video yourself?

A Yes, ma'am.

Q Using your cellphone?

A Yes, ma'am.

MS. VITALE: Obviously that will have to be one of the videos that are produced.

A I'll just clarify that in reviewing everything that I have, I know for a fact I have a still shot of him outside of the vehicle. I can't say for certain I still have the entire video but I'll look.

Q Okay.

(Defendants' Exhibit 18: Marked for Identification.)

BY MS. VITALE:

Q There are a number of pages to this

Exhibit 18 so I think we should take each page at a time, okay? Looking at page one of Exhibit 18, what is this?

A This is a still frame picture of Steve Stebbins at the time of me being detained by Enfield Police Department outside of his vehicle with his firearm visible.

Q Do you still have the video?

A I have to check. I don't remember watching it last night.

Q When did you take the picture?

A I saved that picture after I had the opportunity to review Bryan Nolan's affidavit for complaint for a warrant in which he indicated that Steve Stebbins never exited his vehicle at the scene.

Q When did you review that?

A After my arrest on 12-11.

Q Was it soon after your arrest on 12-11?

A Yes, ma'am.

Q Page two of Exhibit 18, what is this?

A Foxcroft Road facing Eleanor Road, my surveillance system at my home. This is Mr. Stebbins approaching 49 Foxcroft Road, driving past Eleanor Road.

This picture was saved because Bryan Nolan

alleged, as well as Steve Stebbins alleged that the reason why he drove past my home on that day was because there were road closures in the area.

Q Is page two of Exhibit 18 photo taken from the video?

A Yes, ma'am.

Q Do you still have this video?

A Yes, ma'am.

Q This is from your video surveillance system, right?

A Yes, ma'am.

Q Which camera is this from? Do you know?

A I have a camera -- the camera is in the corner of the garage.

Q It's facing Eleanor Road?

A Yes, ma'am.

Q Turning to page three of Exhibit 18, what is this?

A It is further in the same video. You see that the white SUV is turning perfectly on Eleanor Road. Again I saved this to show that there was no road closure that forced Mr. Stebbins to drive past 49 Foxcroft Road on 11-12-2018.

Q You think this shows Eleanor Road was not closed?

A No, it does show Eleanor Road is not closed.
Q Again, this is taken from video?
A Yes, ma'am.
Q You still have this video?
A Yes, ma'am.
Q What is page four of Exhibit 18?
A Same thing, just further along in the same video.
Q And page five of Exhibit 18?
A Looks like possibly the same exact picture as page four.
Q What is page six of Exhibit 18?
A Page six of Exhibit 18 is the Town of Enfield construction road closure forms for the town submitted for 11-12-2018, which shows Freemont Road at the intersection of Enfield Street is closed to all traffic, and it also shows that Sergeant Laureano was working that detail that date.
Q How did you get this?
A Town of Enfield provided it to me.
Q When did you get it?
A After reading Bryan Nolan's falsified police report which alleged that there was road closures in the area that forced Mr. Stebbins to drive past 49 Foxcroft Road.

Q What is page seven of Exhibit 18?
A Page seven shows people who are pressure washing my home. You see the truck in the driveway. Also, you see in the distance background the trooper vehicle passing by and me briefly in that roadway there.
Q Do you still have this video?
A I do.
Q Page eight of Exhibit 18, what is this?
A Page eight, you see me, the mailbox is there. I'm in front of the mailbox facing my car walking to my vehicle in front of it. You see I have my phone in my hand if you see the picture, the white light.
Q Do you still have this video?
A Yes.
Q The last page of Exhibit 18, page nine, what is this?
A This is me walking down the driveway. It shows Mr. Stebbins as he's leaving his property. It shows an unobstructed view from 49 Foxcroft Road to Eleanor Road and shows no construction in the area.
Q So where was your car parked?
A In front of the mailbox.
Q Is that shown in this picture?
A No, ma'am. The mailbox is not shown in this

picture either.

Q Going back to when you were in Brookside Plaza on November 12, 2018 and the Enfield police were there, what did you do after the police officers left?

A I went inside of the -- approached Jean Paul, had a conversation with him. I walked inside the store, came back out.

We observed another unmarked vehicle which approached Jean Paul's car from the rear, like, looking at him, observing him. I then approached Bryan Nolan. I asked him to identify the officer of that vehicle. He refused and then closed his window and drove off.

Q What store did you go into?

A Staples.

Q Did you speak with Jean Paul before or after you went into Staples?

A I believe both.

Q When you saw the unmarked vehicle, was that before or after you went into Staples?

A I'm going to say it was after.

Q Okay. Where was the unmarked police car?

A The unmarked, it was a gray Taurus. You'll see where the investigation or detainment of myself occurred, this vehicle was parked maybe three rows back from where they were. So they were behind where we

were stopped, which was also behind Jean Paul's car.

Q Was Steve Stebbins in that car?

A No.

Q Did you see when Steve Stebbins left Brookside Plaza?

A I did not.

Q Do you know if he was there the whole time the officers were there?

A He was there the entire time up until I was released without any criminal charges.

Q What did you do after you talked to Jean Paul again after leaving Staples?

A We left.

MS. VITALE: Let's take a quick break. I need coffee.

(Recess: 3:06 to 3:17 p.m.)

MS. VITALE: Back on the record. I'd like to mark this Exhibit 19.

(Defendants' Exhibit 19: Marked for Identification.)

BY MS. VITALE:

Q Exhibit 19, have you seen this before?

A Yes, ma'am.
Q What is it?
A A map that I submitted to my attorney which showed the course of travel on 11-12 of myself and Steven Stebbins. It also shows the road closure on Freemont Road.
Q How do you know the road was closed on Freemont Road?
A Exhibit 18, page six, shows and proves that the road was closed. I also have my own observation from when I was driving on that said date.
MS. VITALE: I'd like to mark this Exhibit 20.

(Defendants' Exhibit 20: Marked for Identification.)

BY MS. VITALE:
Q Handing you Exhibit 20, have you seen this before?
A Yes, ma'am. Exhibit 20 is a text message conversation between myself and Angela Harrington.
Q When did you have this text message conversation?
A This conversation occurred on 11-12 -- my

apologies. It might have been after the fact of 11-12, sorry.

Q So do you not recall when you had the text message conversation with Angela Harrington?

A I do recall having this conversation with Angela Harrington. I can't say for certain per the document if it was 11-12 or a separate date thereafter I was able to review some of the evidence submitted.

Q So the first page of Exhibit 20 starts with the line, "plus following people."

Did read the correctly?

A Yes.

Q Who wrote that?

A Me.

Q What preceded that?

A I would have to look to see if I still have the complete conversation.

Q Why did you save this excerpt of the conversation?

A I believe I have more of the conversation. I would have to look. The excerpt of the conversation was saved just so show that Angela did recollect being followed on 8-7.

As it says, "I don't know if I was ever followed other than that time he was behind us," which

does verify I was in the vehicle with Angela Harrington on 8-7-2018.

Q So now the second page of Exhibit 20, says, "Does it say my name anywhere?"

Do you see that?

A Yes.

Q Who said that? Was that Angela?

A Yes.

Q Did you say, "No"?

A Yes.

Q Then did you say, "Why? Because you see my name all crazy"?

A Yes, ma'am.

Q What are you talking about?

A I believe possibly from the news articles. That's why I said I'm not sure. Just looking at the two documents, these two conversations are not the same. If you look at the battery it says 52 percent and then 82 percent so it's not the same conversation.

Q Okay. So then again on the second page of Exhibit 20, who said, "Yes, that's the day he was behind me"?

A Angela.

Q So what are you guys talking about there?

A We were talking about the discovery that was

found when I ran the FOI request into when he ran the plates.

It says, "Does it say my name anywhere?" She wanted to know on the FOI request does it say she was the owner/operator of the car.

I said "No". I guess this is probably two different conversations occurring here.

She wrote, "Yeah, that's the day he was behind me."

I'd have look at the conversation as a whole. I just know these two text message conversations are not the same.

Q Okay. So page one and page two of Exhibit 20 are not from the same text message conversation?

A Correct.

Q They're both text message conversations with Angela Harrington?

A Correct.

Q You don't know if you have the other parts of those two conversations?

A Correct, I'd have to look.

MS. VITALE: I'd like to mark this Exhibit 21 please.

(Defendants' Exhibit 21: Marked for Identification.)

BY MS. VITALE:

Q Have you seen Exhibit 21 before?

A Yes, ma'am.

Q What is it?

A This is my phone call records from 11-12-2018.

Q Does Exhibit 21 show the phone calls you made with Jean Paul on 11-12-2018?

A It does.

Q Where are those? Can you point those out to me?

A He is the (617)849-4335. So going all the way back to page four of this exhibit are phone calls to Mr. Paul on that date starting at 2:36 p.m.

Q So looking at page four of Exhibit 21, the last entry there has Jean Paul's number (617)849-4335, ten minutes, 2:36 p.m.

Did I read that correctly?

A Yes, ma'am.

Q It has "incoming". Does that mean he called you?

A Yes, ma'am.

Q At 2:55 p.m. did you call him?

A Yes, ma'am.

Q And you spoke for two minutes?
A Yes, ma'am.
Q At 3:00 p.m., did you call him?
A Yes, ma'am -- that's incoming.
Q Sorry. Then he called you at 3:00 p.m. and you spoke for two minutes?
A Yes, ma'am.
Q And he called you again at 3:21 p.m.?
A Yes, ma'am.
Q Then he called you again at 3:31 p.m.?
A Yes, ma'am.
Q Then you called him at 3:32 p.m.?
A Yes, ma'am.
Q Who did speak with at 3:40 p.m.?
A I'd have to look at the phone number unredacted to confirm. I don't have that information available right now.
Q Do you remember talking to anyone at 3:40?
A I've called a lot of people on 11-12-2018.
Q Do you remember where you were at 3:40?
A I don't. I think that's after the incident.
Q Then Jean Paul called you again at 3:41 p.m.?
A Yes, ma'am.
Q Looking at the second page of Exhibit 21, did you call Jean Paul at 2:33 p.m.?

A Again, I think that should be just a matter of point, the second page -- this is kind of out of order. The second page here starts at 2:33 on 11-12. The last page also looks like 11-12 but that looks like it should be the next page.

Those are all screenshots that were printed separately. That should be the next phone call. So 2:33 was me calling him and he didn't pick up; 2:36 was him calling me back.

Q Oh, okay; I see. Do you recall what you talked about?

A Yes. That's around the time I was calling him to let him know that I needed him and it was an emergency.

Q When you called him at 2:33 p.m., he didn't pick up?

A Correct.

Q Then when you called him at 2:55 p.m. did he pick up?

A Yes. Just as a matter of reference, I know you're trying to figure out. I believe this one-minute phone call was the first time I pulled over, called him. He didn't pick up.

The second time was him calling me back. He stayed on the phone that entire time until I was

stopped by Officer Crouteau.

I got off the phone with him I believe at 2:55. Officer Crouteau walked away from the vehicle. I called him and we had dialogue back and forth from there.

Q Okay.

MS. VITALE: I'll mark Exhibit 22.

(Defendants' Exhibit 22:
Marked for Identification.)

BY MS. VITALE:

Q Handing you Exhibit 22, what is Exhibit 22?

A The camera on my side of my home facing Eleanor Road. The first one you see is 2:30:54 p.m. That is me still. My car is parked right beyond this brick fireplace.

The second one -- I'm sorry. So 2:30:54 is me all the way up the street. The bottom one is beforehand at 2:30:44. That's my black Infinity leaving up Eleanor Road versus following Mr. Stebbins as he alluded to that he was followed on Foxcroft Road.

Q So are these photos in Exhibit 22 taken from video?

A Yes, ma'am.

Q Do you still have the video?
A Yes.

(Defendants' Exhibit 23:
Marked for Identification.)

BY MS. VITALE:
Q I'll hand you Exhibit 23. What is Exhibit 23?
A Exhibit 23 was submitted to show that Colony Road is a dead end street if you make a right from Dover.
In Bryan Nolan's report, he indicated that Mr. Stebbins was followed up Colony Road but that was the only direction of travel to leave that area. I could not make a right at that street to avoid Mr. Stebbins. So I took a picture of that being a dead end street going the opposite way.
Q When did you take the picture?
A Sometime thereafter receiving the arrest report.
Q What arrest report?
A The arrest report submitted by Bryan Nolan signed by Mark Squires, which led to my arrest on 12-11.

(Defendants' Exhibit 24:
Marked for Identification.)

BY MS. VITALE:
Q Handing you Exhibit 24, have you seen Exhibit 24 before?
A I have.
Q What is it?
A A picture of the stop with Enfield Police Department. The first picture shows, as I previously stated, Bryan Nolan conspiring with Stephen Samson as well as another officer in a black leather coat behind both state trooper vehicles. Brian Croteau's car is kind of perpendicular to my vehicle. You see Brian Crouteau approaching my vehicle again.
Q The first page, do you see Steve Stebbins anywhere in this picture?
A No, ma'am.
Q Is this picture take came from video?
A Yes, ma'am.
Q Do you still have the video?
A I've never had this video. This is the video that I've seen from Jean Paul's phone and I just took these screenshot.

Q Did you personally take the screenshots from Jean Paul's video?
A I believe he took them and texted them to me.
Q Did he provide you any other photos?
A No, I think this second photo here is from the same video.
Q Aside from the photos that are page one and page two of Exhibit 24, did Jean Paul provide you with any other photos?
A Not to my knowledge.
Q Did Jean Paul take the video that these photos are taken from while he was sitting in his car?
A I believe he was seated in his car.
Q Did you see Jean Paul leave his car at any point?
A No. To talk to me in the parking lot after I was released but not during the investigation.
Q Did you talk to him on the phone during this?
A Yes.
Q Did you call him or did he call you?
A We called each other back and forth.
Q Do you remember what you talked about?
A I made sure to tell him don't stop recording. He told me, This looks crazy. I'm glad you called me. Stuff along those lines, making sure that I was safe.

Q What is page two?

A Page two was the identified vehicle that I previously stated was another police officer, unmarked vehicle, later found to be Detective Castle.

That was the car that -- after I left the store, Bryan Nolan was still in the parking lot. I asked him to identify the officer that was driving that car and he refused.

Q The white car in front of that one. There's a photocopy of a Post It note on page two of Exhibit 24. So the white car that the Post It note is partially covering, do you know whose car that is?

A I do not.

Q What happened after the November 12, 2018 incident?

A I contacted Enfield Police Department numerous times. Although Bryan Nolan in his report says I refused to cooperate with the investigation, I called. One time Police Officer Therian hung up the phone on me.

I went to the police department and I spoke to Captain Golden on one occasion. I spoke to numerous people in regards to these incidents requesting the 911 call, requesting the video, et cetera, from the 11-12 date. Each time they told me it was still under

investigation. I asked them what they were investigating. He couldn't tell me at the time.

So each time I spoke to them -- I know Jean Paul called the police department one time after Bryan Nolan came to 49 Foxcroft Road trying to make inquiry into why Mr. Nolan as well as other police officers were at 49 Foxcroft Road. Sergeant Hell picked up the phone and told him, We're too busy to come back and figure out what he was there for.

Q Figure out what who was there for?

A Bryan Nolan. I just want to share that, again, Bryan Nolan wrote in the report that he recognized my voice from this phone call. It was, in fact, not me. It was Jean Paul. So I just want to point that out. It was another point of Mr. Nolan falsely writing something in the report.

Q Now, did Steve Stebbins file an application for a civil protection order?

A He did.

Q Did you contest it?

A I did.

Q Why?

A Because most of the allegations in the complaint were false, misleading, and he omitted a lot of information that would have not allowed that

restraining order to be granted ex parte.

Q Why didn't you just agree to stay away from him?

A Can you ask that question in a different form?

Q I mean, why did you just say, hey, I'll just stay away from you? I'll stay far away from you? That's no problem.

A Well, I've never been next to him so that's really the real confusion of your question. I've never been within five feet of him other than the very first time.

So for me to allow an order to issue doesn't make any sense. Especially given the fact that we did have a hearing. He testified, I testified, and it was denied, which means he didn't have enough basis for the complaint to ever actually issue.

(Defendant's Exhibit 25: Marked for Identification.)

BY MS. VITALE:

Q Handing you Exhibit 25, have you seen this before?

A I have.

Q Do you see at the bottom of the first page of Exhibit 25 where it says Terms and Conditions of Protection?
A Yes.
Q There are four boxes checked off there, right?
A Yes, ma'am.
Q Do you see where at the very bottom it's signed by Judge Sheridan?
A I do.
Q On November 13, 2018?
A I do.
Q And do you see where it says, "This order remains in effect until 11-23-2018"?
A Yes, ma'am.
Q Okay. So going back to the terms and condition of protection, do you see where it says, "Stay 100 yards away from the protected person"?
A Yes, ma'am.
Q I mean, was that a problem?
MS. CRUZ: I'm going to object to that questioning.
MS. VITALE: On what basis?
MS. CRUZ: I'm just not clear. I mean, it assumes a lot of things. So you can't

just agree to a restraining order without other ramifications, if that's what you're asking.

MS. VITALE: No, I'm just asking.

BY MS. VITALE:

Q So you can go ahead and answer.

MS. CRUZ: I guess I need to be clear. Are you asking him why didn't you agree to the restraining order? Or separately, why didn't you agree to stay away from him? It's not clear from your question. You asked it twice.

BY MS. VITALE:

Q Do you understand the question?

A No.

Q So you contested the civil protection order, correct?

MS. CRUZ: Objection; asked and answered.

MS. VITALE: Not really.

MS. CRUZ: Yes, he did.

A I did.

Q Yes, you did, right.

Since everyone is confused, I'm laying the groundwork to remind you. So you contested this. I'm

asking you why you contested it. So it says, Stay 100 yards away from the contested person. Was that a problem?

A Are you intending that people should not contest restraining orders when they're filed?

Q I'm wondering why you did it.

MS. CRUZ: And I'm going to object.

MS. VITALE: Is there a claim of privilege?

MS. CRUZ: No.

MS. VITALE: You cannot coach him. Are you instructing him not to answer?

MS. CRUZ: No, I'm objecting.

MS. VITALE: Okay; your objection is noted.

MS. CRUZ: You're not letting me finish with my reason for the objection. The objection is you already asked him why he didn't agree to the restraining order and he answered.

MS. VITALE: He did not answer because you started talking.

I'm sorry. Would you mind reading back my question?

THE REPORTER: Which one?

MS. VITALE: Right.

BY MS. VITALE:

Q My question was why was it a problem for you to stay 100 yards away from Steve Stebbins?

A There was no problem for me to stay away from anybody. There was no problems with any of these conditions. There was problems with the fact that this order was issued with omissions, falsifications, and, in fact, perjury in the complaint affidavit by Mr. Stebbins.

Q Did Steve Stebbins convey that his wife was afraid?

A His wife never filed a complaint. She would have to do that on her own.

Q Did Mr. Stebbins ever tell you his children were afraid?

A I've never spoken to Mr. Stebbins about his kids. His kids would also have to file their own complaint and also testify on those same grounds, as far as I know.

And I just want to point out, nothing about his kids is listed in the restraining order application. And I do not also believe if you want to give me time to review, I don't recall anything about his wife being afraid as well. That is his words

versus theirs. They both had the opportunity to come testified at the restraining order and they both refused.

Q Who refused?

A The wife and kids.

Q After the initial order of protection was signed on November 13, 2018, was there then a hearing?

A There was.

Q And you contested the entry of the civil protection order at the hearing?

MS. CRUZ: Objection; asked and answered.

A I did. I told you it was denied.

Q Right. So you contested it?

MS. CRUZ: Objection; asked and answered.

MS. VITALE: I don't know that he answered that.

A Numerous times.

MS. VITALE: Okay, well if you're instructed him not to answer.

MS. CRUZ: I'm not instructing him not to answer.

BY MS. VITALE:

Q Okay, then go ahead and answer please.

A I've answered this question already.

Q Okay, so what's the answer?

A I have contested it. There was a hearing already and it was denied. Neither the wife nor children presented themselves to testify in regards to what Mr. Stebbins alleged.

Q Were you eventually arrested?

A Yes.

Q Were you arrested on December 11, 2018?

A I was.

Q Who arrested you?

A Enfield Police Department.

Q Was Steve Stebbins there?

A No.

Q What happened after you were arrested?

A Well, after I was placed in handcuffs, the police officer on the scene was very overly aggressive, abusive, pushed me against the car numerous times.

Enfield Police Department alleged the front vehicle of this arrest was inoperable at that time. We got to the police station. Mr. Nolan, Mr. Squires, and the officer who arrested me continued to question me about my residency. They also proffered me and told me

that if I told them that I lived at 49 Foxcroft Road, I would not have a bail but if I said I lived in Massachusetts, then they would give me a bail.

I instructed them that's fine. I'm a resident and I live in Massachusetts so let me know how much the bail is and I'll have someone come down and provide it.

Q Did you pay the bail?
A There was never a bail.
Q Were you just released?
A Correct.
Q Then after you were released, were you ever incarcerated?
A I just want to clarify.
Q Sure.
A To my knowledge, those questions about my address by Nolan and Squires was kind of pointless because the judge already ordered me to be released with conditions.

So them lying, saying that if I told them that I lived in Connecticut was solely another part of them trying to prove that the information they provided in the police report saying that I told them I lived at 49 Foxcroft Road was true even though they were lying.

Was I ever incarcerated? Yes, I was placed

in a cell when I arrived at Enfield Police Department.

Q So you were arrested on December 11, 2018. Was that at your house?

A No.

Q Where were you?

A Enfield Street.

Q Then you were taken to where?

A Enfield Police Department.

Q Then were you released to go home from there?

A Yes, ma'am.

Q Did you have to go to court for a hearing?

A No, not the following day.

Q At any point, did you have to go to court for a hearing?

A Yes.

Q When was the hearing?

A My first scheduled date -- let me be clear. The restraining order was heard again after my arrest.

Q Okay.

A And denied on 12-14. Then I believe my arrangement was 12-18.

Q After you were released from the Enfield police station, then the next thing that happened in the criminal case was arraignment?

A Yes, ma'am.

Q What date was the arraignment?
A 12-18.
Q Were you represented by an attorney?
A Attorney Tim Manion.
Q At what point did you retain Tim Manion?
A Mr. Manion represented me for the restraining order hearing. He was retained previous to the first date, 11-23, for the restraining order hearing.
I asked for a continuance on that date because I was contacted by Mass. probation that they wanted to provide me some evidence, that voicemail that was provided after they had the opportunity to review the restraining order application which had numerous omissions.
Q So you had an arraignment on 12-18. What happened at the arraignment?
A It got continued.
Q To what date?
A I want to say January maybe 14th; somewhere along those lines.
Q Were you incarcerated between 12-18 and January 14th?
A No, ma'am.
Q What happened January 14th?
A It got continued for about ten days.

Q Then what happened?

A On that date, I had a meeting with my attorney and Chris Parakilas.

Q What happened?

A In this meeting Mr. Parakilas informed me that Mr. Stebbins and his attorney had contacted his office and was not looking to go forward with the case but Steve Samson had contacted him numerous times asking him to aggressively pursue the case.

Because of whatever reason, he told me that he informed Mr. Samson that you probably should back off because if this does go left, it's all going to fall on Steven Stebbins and not Stephen Samson.

In this same meeting, he attempted to offer me AR for ten days and he actually said, You can take the ten-day AR or we can null it today.

I said, I'll take the null.

Then he attempted to let me know, Well, the null stays open for a year and at that point in time, we can decide to bring the case back to prosecute it before the court.

At this point in time, I said, That's fine. I'll do that.

So we didn't have any agreements on that day and we went back before the court. We went before

Judge Sheila Pratts. When we got before the court, she asked, Is there any reason that we're not getting rid of this today or something along those lines. And she said, Matter of fact, don't tell me. I'm just going to give you the continuance date.

Q Chris Parakilas, he's an assistant state's attorney?

A Yes, ma'am.

Q He offered you AR. Is that accelerated rehabilitation?

A Yes, ma'am.

Q For ten days or to null it today?

A Yes, ma'am.

Q Why was it not?

A Once I told him I wanted to do the null, he said no, because they were afraid and worried about me going through this process here.

Q The process of filing a lawsuit like this one?

A Correct.

Q Who was worried about that?

A That was stated by Chris Parakilas. I believe that the person he was referred to being worried about it was Steve Stebbins and his attorney, George Schrober.

Q Then you went in front of the judge and she continued it?
A Correct.
Q What did she continue it to?
A I believe it with 2-9.
Q February 9th?
A Something along those lines.
Q What happened February 9th?
A I ended up just doing the AR for 30 days. The reason behind it there was no admission of probable cause, no admission of involvement in any case, and I was informed by my attorney at that time --
Q Oh, you know what, I don't want to know privilege.
A All right.
Q Now, the accelerated rehabilitation for 30 days, were there any conditions attached to that?
A No.
Q Did a judge grant that to you?
A Yes, ma'am.
Q Which judge?
A Sheila Pratts.
Q Was there a hearing?
A No.
Q How did that come about?

A What do you mean?
Q Did you have to fill out an application?
A Yes, ma'am.
Q Do you still have the application?
A I don't.
Q Do you know if Attorney Manion has it?
A I do not. I haven't had contact with Mr. Manion.
Q So you just don't know if he has it?
A Correct.
Q Do you remember anything about the application?
A Not really.
Q You didn't have a hearing associated with the accelerated rehabilitation?
A Correct. I can tell you that Attorney George Schrober did attend that date and said in open court that he was hopeful that this resolution would ensure that he and his client did not see me in this court or any other court in the future.
Q What hearing did he say that at?
A When the AR was granted.
Q So there was a hearing?
A It was the next court date. I don't know if you call that a hearing. There was no actual -- it was

just another court date. It was continued to that date.

Q So what date was that?

A I think 2-8 or 2-9.

Q So that was the February 9th date?

A Correct.

Q I'm so sorry. I just don't know. So February 9th you went into court. What happened in court?

A I filled out the application. It was submitted. It wasn't contested. Steve Stebbins didn't show up but George Schrober was there and made the statement which I indicated just now.

Q Was the judge there?

A Yes.

Q Then did the judge accept the application?

A Yes.

Q Did the judge issue an order?

A What do you mean?

Q Did she issue an order in connection with that hearing?

A Not to my knowledge.

Q How did you know that you were accepted for accelerated rehabilitation?

A She made the ruling that it was allowed.

Q Got you, okay. Then how long was accelerated rehabilitation for?
A I believe until 3-8.
Q You said there were no other conditions associate with it?
A Correct.
Q What did you have to do for that?
A Nothing.
Q Nothing. Okay, what happened on 3-8?
A It was dismissed and sealed to my knowledge.
Q Did you have to go back to court for it to be dismissed?
A No.
Q Did you receive any notice it was dismissed?
A My presence was waived for the next hearing by the judge on 2-9 just saying I didn't have to come back and they can do it administratively without me being present.
Q Did Attorney Manion have to go for you?
A I don't know for certain.
Q Did you ever receive any document that confirmed matter dismissed?
A No.
Q Do you know if your attorney did?
A I do not know.

Q So you mentioned previously the audio recording from a voicemail that you received from a Massachusetts probation office?
A Yes, ma'am.
Q How did you come to get that audio recording?
A So after Mr. Stebbins filed the civil order of protection, anything that happened like that with my employer, we have to submit it and they have to inquire.
So I submitted this application. It was my assumption it was turned over to our legal department. On November 21st, Wednesday, the day before Thanksgiving, I was contacted by the chief probation officer, Terence O'Neil, and he asked me could I give him a call.
Once I called him, he informed me that our legal department was in possession of a recording that would help me at my hearing and should be submitted into evidence but they didn't have it readily available as Thursday was Thanksgiving. It was scheduled for 11-23, that Friday.
Q What do you think that audio recording says?
A What do I think it says? I can hear it word for word. I don't know what you mean by that.
Q What do you hear?

A What do I hear? A group of Connecticut State Police conspiring to make my complaint invalid solely for the purpose because I'm a black male.

Also on that recording you have Steven Stebbins making a threat that he was going to ram his car into the vehicle of a female.

You have Sergeant Steven Samson on that voicemail stating that he was only calling to -- I'm trying to remember word for word what he said but I'm pretty sure he said, "That's my in," which is them alluding to the fact that he's not really investigating.

At this point in time, there is an investigation going on. It is him with the subject of the investigation stating they are finding reasons and ways to invalidate my complaint, the subject of the complaint.

You also hear another individual mocking black people when they pull them over when they make claims of discrimination, racism, systematic racism. You have on this phone call Steven Stebbins mocking and calling Arab people "mutts".

What else is on that recording? You have them trying to call my job to figure out who the witness of the original incident was.

You also have them on there threatening, saying, "I'm going to let them know I'm going to meet with the prosecutor," a statement that Mr. Samson made to me previously threatening me with criminal charges if I was lying in my complaint.

You heard Steven Stebbins stating, "Now that you called his boss, I bet that changed his tune. Call him back, see if he's changed his story now".

You heard them trying to meet with the mail lady for some allegation that Steven Stebbins says that he called me "he's a fucking asshole", "he's a prick."

You hear Stephen Samson stating, "I only called that asshole to figure out who Danielle was."

You heard Steven Stebbins and the unidentified state trooper stating that they want to go do a signal 12, which is pull a car over, and in the same incident, they're referencing, the person did not conduct any motor vehicle violations that would have led to them being pulled over.

Q Do you know what person they were talking about?

A They were referring to the woman in front of Steven Stebbins home on 7-8-2018. Said, "I should have rammed her through her back door."

A lot of conversations that is the totality

of a group of white police officers and Connecticut State Police strongly stating their viewpoints about black people and claims that they make that are about racism, discrimination, anything along those lines; and how they would always invalidate them because we always play the race card.

Q As far as who was present during that conversation, you thought it might be someone named Todd Gauvin?

A We believe so. We can't confirm.

Q Who is Todd Gauvin?

A Another state trooper.

Q How did you get his name?

A It was delivered to my attorney.

Q It was delivered to your attorney?

A Correct.

Q By who?

A I do not know.

Q So your attorney got the name Todd Gauvin?

A Yes.

Q And you don't know where that came from?

A No.

MS. VITALE: Before I go on, it's 4:05. I have a flash drive for you to put the --

MS. CRUZ: Can we go off the record for

a minute?

MS. VITALE: Sure.

(Discussion off the record.)

MS. VITALE: Back on the record please. So we just had discussions off the record about our ongoing discovery issues.

Counsel for Plaintiff is going to confirm that we receive all responsive documents, video, and audio recordings that are responsive to our discovery requests in this case.

That is not limited to video and audio records but also documents such as Internal Affairs documents that may be in his possession, custody, or control.

We're going to receive that information, reschedule a continuation of the Plaintiff's deposition after we receive all the responsive documents.

I don't know if co-defendants' counsel have anything to add. Should we say two weeks to receive responsive documents?

MR. MANCINI: I'd like to have the

opportunity to review and we'll reschedule continuation of the deposition. Do you have anything to add?

MS. CRUZ: No. So September 6th, that's two weeks?

MR. GERARDE: The Tuesday after Labor Day.

MS. CRUZ: Yes.

MS. VITALE: Okay; thank you for your time today.

THE WITNESS: Thank you.

(Deposition suspended: 4:19 p.m.)

STATE OF CONNECTICUT

I, CINDY J. CARONE, CCR 383, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me on the 23rd day of August, 2022, the following named person, to wit: MARCUS CAMERON, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 14th day of September, 2022.

/s/ Cindy J. Carone

CINDY J. CARONE, CCR 383
Certified Shorthand Reporter

My Commission expires: May 31, 2023

INDEX


| WITNESS | | PAGE |
|---|---|---|
| MARCUS CAMERON | | |
| | Direct Examination by Ms. Vitale | 4 |


DEFENDANTS' EXHIBITS
(For Identification)


| EXHIBIT | | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 17 |
| 2 | Plaintiff's Answers to Interrogatories | 17 |
| 3 | Text messages | 40 |
| 4 | Map around Foxcroft Road | 66 |
| 5 | Complaint, online | 75 |
| 6 | Complaint and Demand for Jury Trial | 77 |
| 7 | Sign photo | 82 |
| 8 | Police report, Castle | 88 |
| 9 | Police report, supplemental, Laureano | 91 |
| 10 | Text messages | 93 |
| 11 | Email, Cameron to Cooke | 94 |
| 12 | Photo | 99 |
| 13 | Text messages | 109 |
| 14 | Construction report | 111 |
| 15 | Letter, Springfield Probation to Cameron | 121 |
| 16 | Jury summons | 125 |
| 17 | Cameron call log, 9-18-18 | 135 |

| | | |
|---|---|---|
| 18 | Photographs | 151 |
| 19 | Map | 157 |
| 20 | Text messages | 158 |
| 21 | Cameron call log, 11-12 | 162 |
| 22 | Surveillance system photos | 165 |
| 23 | Photo, dead end street | 166 |
| 24 | Photos | 167 |
| 25 | Protective order | 171 |

Reporter's note: Exhibits retained by Attorney Vitale.

JURAT

With the addition of the changes, if any, indicated on the attached errata sheet, the foregoing is a true and accurate transcript of my testimony given in the above-entitled action on August 23, 2022.

____________________________________

Marcus Cameron

Subscribed and sworn to before me, the undersigned authority, on this, the ________ day of _________________, 2022.

__________________________________

Notary Public

My Commission expires:

cjc

ERRATA SHEET

The ORIGINAL JURAT and ERRATA SHEET must be notarized (even if there are no corrections) and returned within 30 days of receipt to the attorney who took the DIRECT EXAMINATION. All other counsel of record must be sent a COPY, along with a COPY to our office for our records.

Page Line From To

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_____________________ ___________________________

Date Marcus Cameron

Sworn to before me this _______day of _________________________, 2022.

___________________________

Notary Public

My Commission expires: ________________________

cjc