UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - x

MARCUS CAMERON,
Plaintiff,

vs.

STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE and TOWN OF ENFIELD,
Defendants.

Civil Action No.: 3:21-cv-0165(OAW)

March 16, 2023

- - - - - - - - - x

CONTINUED DEPOSITION OF MARCUS CAMERON

Taken before Mary C. Mayhew, RPR, CSR #477, a Court Reporter and Notary Public, within and for the State of Connecticut, pursuant to Rules 26, 30 and 34 of the Federal Rules of Civil Procedure, at the Office of the Attorney General, 165 Capitol Avenue, Hartford, Connecticut, on March 16, 2023, commencing at 9:06 a.m.

FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

APPEARANCES:

For Marcus Cameron:

McLANE & McLANE LAW FIRM
269 South Westfield Street
Feeding Hills, MA 01030
413.789.7771
ryan@mclanelaw.com
By: RYAN P. McLANE, ESQ.

For Lieutenant Samson:

OFFICE OF THE ATTORNEY GENERAL
110 Sherman Avenue
Hartford, CT 06105
860.808.5450
dennis.mancini@ct.gov
By: DENNIS V. MANCINI, ESQ.

For Town of Enfield, Bryan Nolan and Mark Squires:

HOWD & LUDORF, LLC
100 Great Meadow Road
Suite 201
Wethersfield, CT 06109
860.249.1361
egerarde@hl-law.com
By: ERIC E. GERARDE, ESQ.

For State of Connecticut:

STATE OF CONNECTICUT
OFFICE OF THE ATTORNEY GENERAL
165 Capitol Avenue
Suite 5000
Hartford, CT 06106
860.808.5340
laura.vitale@ct.gov
By: LAURA VITALE, ESQ.

Also Present:

Stephen Samson, Defendant
Steven Stebbins, Defendant

S T I P U L A T I O N S

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

T R A N S C R I P T L E G E N D

| | |
|---|---|
| (sic) | - Exactly as said. |
| (Phonetic) | - Exact spelling not provided. |
| ( -- ) | - Break in speech continuity and/or interrupted sentence. |
| (. . .) | - Indicates omission of word[s] when reading or trailing off and not finishing a sentence. |
| (As read) | - When reading, adding, deleting or changing words so as not to be a direct quote from document. |

(Deposition commenced: 9:06 a.m.)

MARCUS CAMERON, Deponent, of P.O. Box 6362, Springfield, Massachusetts, 01101, being first duly sworn by the Notary Public, was examined and testified, on his oath, as follows:

CONTINUED DIRECT EXAMINATION

BY MS. VITALE:

Q Good morning, Mr. Cameron.
A Good morning.
Q Thank you for being here today.
A Thank you.
Q So, this is a continuation of your deposition today. So, I know that we went over the ground rules last time, but I'll just repeat them just, you know, to make sure.
So, as you know, you're under oath today. So, you have to answer the questions truthfully. Do you understand that?
A I do.
Q Is there anything that prevents you from

telling the truth today?

A No, ma'am.

Q Okay. Is there anything that prevents from understanding the questions today?

A No, ma'am.

Q If you don't understand a question, please let me know and I'll clarify it for you. If you answer a question, I'll assume that you understood it. Okay?

A Yes, ma'am.

Q Okay. I don't want you to guess or speculate. So, if you don't know, just tell me, I don't know. That's fine.

And if you need to take a break at any time, just let me know. The only caveat to that is if I have a question pending, I'd just ask that you answer the question before you take the break. Okay?

A Yes, ma'am.

Q Okay, all right. So, what is 649 Prospect Street?

A 649 Prospect Street.

Q In Chicopee, Massachusetts?

A It's a previous address that I resided at.

Q Okay. When did you live there?

A I don't want to speculate. I'm going to say 2014 to probably 2016.

Q Is that an apartment?
A It is. It's an apartment complex.
Q Did you rent the apartment yourself?
A No, ma'am.
Q Who rented the apartment?
A A friend of mine.
Q Which friend?
A Jean, or John -- depending on how it's pronounced -- Paul.
Q Okay. And do you know how long Jean Paul rented that apartment?
A I do not.
Q Okay. Did you pay rent toward that apartment?
A No, ma'am.
MS. VITALE: Okay. So, I believe I figured out how to play videos up on that screen over -- let's see, where did we leave off last time? Okay. So, we left off at Exhibit 25. So, I'm going to make this Exhibit 26.

(Defendants' Exhibit 26: Marked for Identification.)

MS. VITALE: So, it pops up right like that. All right. So, I'm going to make Exhibit 26 the video that is Bates numbered Cameron 0000081.

BY MS. VITALE:

Q Okay. Now, I'm just going to play this video for you all the way through and then I'm going to ask you some questions. Okay?

A Yes, ma'am.

Q Okay. So, let's see.

(A videotape was played.)

BY MS. VITALE:

Q Okay. Now, Mr. Cameron I just played the video that is Bates numbered Cameron 81; is that right?

A I'm unsure of the Bates number, but you did play a video.

Q Okay, all right. So, I'm making that exhibit 26, like I said. And now, you testified in your deposition last time that, "There was a video on 5/28 of Mr. Stebbins harassing me at my Connecticut address, the Connecticut home that I own."

Do you recall saying that?

A I did.

Q Okay. Now, is this video that I just played you the video that you were referring to?
A Correct.
Q Okay. Now, in that -- now, this video, did you take that with your cell phone?
A I did.
Q Okay. During that video, can you actually see inside of his car?
A From the video that you watched?
Q Correct.
A I could see as I'm sitting in the street from the garage of my house that I seen Steven Stebbins driving the vehicle, if that's your question.
Q No. So, my question was: In the video, can you see inside of the car?
A I can, yes.
Q You can?
A Yes.
Q Okay. Now, I'm going to play the video again. So, I'm going to show you what was marked as Exhibit 12 at your deposition last time.
A Thank you.
Q Okay. Now, is Exhibit 12 -- is the photograph that was marked as Exhibit 12 at your deposition, is that photograph taken from the video you

just watched that I marked as Exhibit 26?

A Yes.

Q Okay. Now, is that a zoomed-in, a picture that you took after zooming in on to that video that is marked on Exhibit 26?

A I don't recall.

Q You don't recall?

A No.

Q So, I'm going to play the video again and I'm going to tell you tell me to stop at the point where you took the picture, okay?

(A videotape was played.)

THE WITNESS: Approximately, somewhere around there.

BY MS. VITALE:

Q Okay. Let's start that again. So, I'm going to replay the video and I just want you to tell me stop, okay, when -- at the point where you took the picture.

A Uh-hum.

(A videotape was played.)

THE WITNESS: If you want to stop it right there, that's fine.

BY MS. VITALE:

Q Okay. Now, so, I just stopped the video. Can you see inside his --

MS. VITALE: Now, and for the record, I stopped the video at :04.

BY MS. VITALE:

Q Okay. Now, can you see inside of the car at :04 in this video that's Exhibit 26?

A Not completely clear in the video, no.

Q Okay. So, is it fair to say then, in order to take the picture that is marked as Exhibit 12, you zoomed in on the video to capture that picture?

A I can't say that for certain. So, I won't want say that on the record.

Q Now, the frame that is captured at :04 of the video, does that look exactly like the picture that is marked as Exhibit 12?

A I'm not an expert. So, I can't say that.

Q Okay. Now, I'm going to replay the video again. Now, do you believe that this video that is marked as Exhibit 26 shows Steve Stebbins gesturing at you in some way?

A Well, just to be clear, the last time I was

here, you asked how many times?

And I told you he drove past approximately five to 10 times. So, by the time I turned this video on, it possibly -- in this video, I can't confirm right here is when he's gesturing, but he drove past five to 10 times. We didn't know who it was. And at the time, we couldn't confirm, because we couldn't completely see, but we did see him pointing and directing, driving slow. You'll also see in this video, he almost hits the mailbox, because he's -- again, I can't say for certain, but he almost drives into the mailbox.

Furthermore, if you go back to his memo to Sergeant Samson, he said the reason why he drove past slowly was because he didn't want to create any dust, due to the dirt road. As you can clearly see, there is no dirt road in this video.

Q All right. So, my question was --

A Thank you.

Q -- in this video, do you believe that this shows Steven Stebbins gesturing at you?

A I believe so, yes.

Q Okay. So, I'm going to play this video again and I want you to tell me at what point you see Steve Stebbins gesturing at you. Okay? So, I'm playing Exhibit 26 again and tell me to stop.

A Uh-hum.

(A videotape was played.)

THE WITNESS: You can, as I stated, right there --

MS. VITALE: Uh-hum.

THE WITNESS: -- but you'll see he's looking over at us. So . . .

BY MS. VITALE:

Q Okay. So, again, I paused the video at :05, okay. So, you believe that exhibit -- the video that I marked as Exhibit 26 paused at :05 shows that Steven Stebbins was gesturing at you?

A I'm going to again state I can't confirm, but I'm going to say from the moment the video starts until this moment, yes, Mr. Stebbins looked over and is pointing at us and in our direction.

Q Okay. So, from the moment that the video starts until :05 --

A Yeah.

Q -- you believe that he's point -- he's looking over at you?

A Correct. And in between the other five to 10 times he drove past, yes.

Q Now, you also mentioned that you -- that you believe this video shows that Steve Stebbins almost hit a neighbor's mailbox. Did I understand that correctly?
A Yes, ma'am.
Q So, I'm going to play that video again.
A Uh-hum.
Q And I want you to show me at what point in the video you see Steven Stebbins almost hit a neighbor's mailbox.
A Will do.
Q So, I'm restarting Exhibit 26. And we're going to play and just tell me to stop at the point, okay?

(A videotape was played.)

THE WITNESS: You can stop it right there. As you see, he was in the middle of the road. As you see, his car is diverting. There's a white mailbox -- white picket sticking up and there's a black mailbox on it.

He was originally in the middle of the road. And as you see, he's driving towards the curb at that point. When you push play

again, he's going to redirect his car to the center of the road.

BY MS. VITALE:

Q So, I just paused the video at :12, okay. So, now, in this frame that's at :12 of the video, do you see there's construction in the road with cones?

A I do.

Q Okay. So, do you see that he's driving to avoid the construction with the cones?

A No, I don't see that.

Q Okay. Now, is the road at that point down to one lane?

A There's no lanes on that street. There's no clearly marked lanes on that street.

Q Uh-hum.

A I just also want to be clear, again as I stated, there's not a dirt road, as indicated by Mr. Stebbins as well.

Q And I'm going to go back to that. Did you testify that you believe he referred to a dirt road on May 28, 2018 in the internal affairs memorandum?

A Yes, that's correct. No, it's not. In his memo to Sergeant Samson.

Q Okay. Now, I'm going to start the video again. Now, if I understood correctly, you think that

after this point the video shows him almost hit the --
A It shows --
Q -- mailbox?
THE REPORTER: I'm sorry, I need one at a time. It shows him almost?
MS. VITALE: Hit the mailbox.
THE WITNESS: Correct. His car is driving towards the mailbox.
MS. VITALE: Uh-hum.
THE WITNESS: And he's going to redirect from going diagonal towards the mailbox to the center of the road.
BY MS. VITALE:
Q Okay. Now, before I start the video, so, is there a space there for two cars to pass each other in the road right now with the construction?
A Not necessarily, no.
Q Right. It looks like there's only space for one car to drive?
A It's plenty space for Mr. Stebbins to not be going towards the mailbox.
Q And which house number is that mailbox for?
A I do not know.
Q Okay. That was -- is that your next door neighbor on the left-hand side, if you're facing your

house?

A So, to be clear, it's hard to tell because all of the mailboxes from the side of the street you're referring to are on that side of the street as well. So, the entire street, the mailboxes are on one side of the street.

Q I understand, okay. All right. So, I'm going to play the video again. So, again, it's currently paused at :12 and I'm going to start the video again.

MR. McLANE: Do you want this back or are we going to start to use it? I just don't want to get your exhibits out of order here.

MS. VITALE: Oh, they will still get out of order, believe me.

BY MS. VITALE:

Q Okay. I'm going to start Exhibit 26 again, starting at :12. I want you to tell me to pause when you see Steve Stebbins almost hit the mailbox, okay?

(A videotape was played.)

THE WITNESS: You asked me to stop it at the same time point when he almost hit the

mailbox. It's the same question from when you first had it stopped, correct?

BY MS. VITALE:

Q So, I suppose I misunderstood you. So, I thought you said when you had me stop the video that it showed him almost hitting the mailbox and then the video would show it happening.

So, when I originally stopped the video at :12, is that the point when that you believe it shows Steve Stebbins almost hitting the mailbox?

A Originally, you said stopping when he's going towards the mailbox. The video stopped as he's going towards the mailbox. When you push play, again you'll see he's turning his wheel from to this way to back -- his car is turning back from going towards the sidewalk, to the center of the road.

Q No, that wasn't my question.

My question was asking you to just tell me where in the video it shows Steve Stebbins almost hit the mailbox?

A He's driving towards the mailbox.

Q So, he's driving toward the mailbox and you think that's the same thing as almost hitting the mailbox?

A Your interpretation can be different.

Q I'm just asking you. I just --
A Thank you.
Q I just want to, okay.
So, when you say, "driving toward the mailbox," do you mean almost hit the mailbox? Are those two things the same thing to you?
A He's driving towards the mailbox. And if he did not turn his vehicle from going towards the mailbox, he would have hit the mailbox.
Q Okay. I think I follow what you're saying.
So, why did you stop filming at that point?
MR. McLANE: Objection.
THE WITNESS: I don't have a reason. The car was going past. You'll see I believe I provided still shots of when Mr. Stebbins parked his vehicle further up the road. What he did was he walked into a backyard with the gentleman who lives in the blue house at that corner.
The gentleman was in the backyard working on some lawn stuff. Mr. Stebbins walked into the backyard and turned. They had a conversation. Him and that gentleman appeared from that backyard in the front yard and were now facing myself, my apologies --

my friend and myself, and were pointing in our direction up the road towards where we were sitting.

Mr. Stebbins then got back in his vehicle, continued to circle the area and then proceeded to go back home.

BY MS. VITALE:

Q So, I'm going to play Exhibit 26 again. Okay. And then I'm going to pause it at a certain point.

(A videotape was played.)

BY MS. VITALE:

Q So, I just played Exhibit 26 again. And did you hear someone say, "That same car was just in his driveway"?

A Yes, ma'am.

Q Who said that?

A That was me.

Q Okay. And so, before you started taking this video, Steve Stebbins's car was in his driveway, right?

A The car was in the driveway, correct.

Q Okay.

A At some point throughout the day, yes. Not

directly before I turned the video on.

Q Well, let's just listen to this again. So, I'm going to play Exhibit 26 again from the beginning. Here we go.

(A videotape was played.)

BY MS. VITALE:

Q Now, you said, "The same car was just in his driveway," did I hear that correctly?

A You are correct.

Q Okay. So, when you said the same car was just in his driveway, that means it was just in his driveway before you started videoing, right?

A That's not necessarily what I mean, but that's what you probably are inferring at this point. But again, the car was driving around in the area with Mr. Stebbins driving it. We didn't know who it was originally. We could intermittently tell who it was and then we've seen it in the driveway in 44 Foxcroft Road.

Just to be clear again, Mr. Stebbins stated he was fearful. So, he would have had no reason to keep driving past this date.

THE REPORTER: This state?

THE WITNESS: This date, I'm sorry.

BY MS. VITALE:

Q All right. So, when you said -- so, when you said, "It was just in his driveway," what did you mean by that?

A That we just seen it in his driveway sometime during that day.

Q Sometime during that day, interesting.

So, now, I'm going to start playing this video again. So, I'm starting the video at -- I had paused it at :01 and I'm going to start playing the video again.

(A videotape was played.)

BY MS. VITALE:

Q Now, someone just said, "That's him, I hope it is." Did I hear that correctly?

A You did.

Q Okay. Now, who said that's him?

A That was me who stated that, ma'am.

Q Who said, "I hope it is"?

A That was me who stated that.

Q Why did you hope that it was Steve Stebbins driving by your house?

A Because I was hoping that Mr. Stebbins was not having different people drive past my house at that point in time.
Q What does that mean?
A I don't understand your question.
Q I'm just asking you: What do you mean by you --
MS. VITALE: I'm so sorry, could you please read back his answer?

(The last question was read back by the Court Reporter.)

BY MS. VITALE:
Q What do you mean by that?
A I don't understand your question. What do you mean by --
MS. VITALE: I'm so sorry. Could you read it back again?

(The last question was read back by the Court Reporter.)

BY MS. VITALE:
Q What do you mean by you were hoping that he

wasn't going to have different people driving by your house?

A Well, as stated, Mr. Stebbins had, throughout the time, I was hoping that he wasn't involving other people and having them drive past 49 Foxcroft Road at that point in time.

Q Why would you be hoping that?

A Why would --

Q Why were you hoping that? I should say.

A I was hoping that he wasn't having other people drive past?

Q Correct. Why were you hoping that?

A Because Mr. Stebbins originally came to my house and threatened me. He said -- hold on, I'm sorry.

His statement -- 5/22, this is 5/28. His statement on 5/22 was, I'll be back. I'm going to take care of you. So, I was hoping that at that point he was not directing other people or he was going to follow up on that threat from that date.

Q So, you were -- so, you wanted him to drive by your house instead of someone else?

A Did you hear me state that?

Q That's how I understand it. So, is that wrong?

A That's not what I stated.
Q Okay. So, you -- didn't you say, I hope that that's him?
A I hope that's Steve Stebbins and not other people, correct.
Q Right. So, you were hoping it was Steve Stebbins and not someone else?
A I was hoping it was Steve Stebbins and not someone else, correct.
Q Okay. So, you preferred to have Steve Stebbins drive by your house instead of someone else, right?
A I was hopeful, as I'm documenting this, that it's Mr. Stebbins. And I was going to provide the video to the assigned investigator, Mr. Samson to provide more evidence that Mr. Stebbins is now continuously harassing and driving past my house.
So, I didn't want to provide a video of someone else. I couldn't tell it was Mr. Stebbins until he got out of the vehicle.
Q Okay. So, you couldn't tell until he got out of the vehicle, right.
THE REPORTER: I'm sorry, is there an answer to that?
THE WITNESS: That's a question?

MR. McLANE: Did you ask a question? She said "right," as in statement in --

MS. VITALE: It wasn't a question. My apologies for the confusion.

THE WITNESS: Okay.

MS. VITALE: All right. So, now, let's see, okay. So, I'm going to mark this next video Exhibit 27. The video it's Bates numbered 000082, Cameron 00082.

(Defendants' Exhibit 27: Marked for Identification.)

BY MS. VITALE:

Q All right. Now, I'm going to just play this video once for you and then I'll ask you some questions, okay?

A Yes, ma'am.

MS. VITALE: All right. So, I'm playing Exhibit 27 now.

(A videotape was played.)

BY MS. VITALE:

Q So, why did you take that video?

A To confirm that I 100 percent ID'd Mr. Stebbins as being the person who was operating that vehicle in the video, which you showed that was the exhibit prior to this one.
Q So, where was that -- where was Steve Stebbins when you took that video that's Exhibit 27?
A My apologies. This video, 27?
Q Correct.
A Mr. Stebbins was parking at 44 Foxcroft Road.
Q So, that was him parking at his home?
A Correct.
Q Okay. So, you took a video of him parking at his home?
A After he drove past my house, yes, for my safety.
Q So, did you take that -- so, did you take Exhibit 27 the video that is Exhibit 27 using your cell phone?
A I believe so, yes.
Q And did you take the video that is Exhibit 27 after you took the video that is Exhibit 26?
A I believe so, yes.
Q Okay. Do you know how far apart the videos -- how far apart did you take the videos that are Exhibit 26 and Exhibit 27?

MR. McLANE: Objection.

THE WITNESS: So, the -- I just -- I can answer it to the extent of the amount of time. It was probably within a 20-minute -- 15-minute window. And the five to 10 times he looped the area, it was probably maybe three minutes after he left the gentleman parked at the blue house on the corner further up the road.

BY MS. VITALE:

Q So, the gentleman you just referred to, is that John Scavato?

A That's who I believe I said his name was, but we learned I don't believe that's his name. I'm uncertain for sure if that's his name.

THE REPORTER: Can you spell that last name?

THE WITNESS: I don't --

THE REPORTER: Can you say it again.

MS. VITALE: Scavato, I think it's S-c-a-v-a-t-o.

THE WITNESS: Thank you.

BY MS. VITALE:

Q So, now, so, you saw Stebbins go to a neighbor's house; is that right?

A Correct.
Q Okay. And then did you see him leave the neighbor's house?
A Correct.
Q And where did he go from there?
A I don't know for certain. I wasn't paying attention. I seen the car pull off.
Q Okay. So, did he drive back in front of your house after he left the neighbor's?
A No.
MS. VITALE: Okay. Now, I'm going to -- let me see, I'm sorry. It just automatically starts playing when I pop it up. So, I'm going to mark as Exhibit -- so, I'm sorry.
BY MS. VITALE:
Q So, going back to Exhibit 27, so, how did you know when Steve Stebbins returned to his house, so that you could take that video that's Exhibit 27?
A Well, we're sitting in front of my house.
Q Okay. So, you were watching his house to see when he got back?
MR. McLANE: Objection.
THE WITNESS: The question is not a question I can answer. I'm not watching anybody. We're sitting outside. We don't

watch anybody where I live at, not at 49 Foxcroft Road anyway.

BY MS. VITALE:

Q But you noticed when he got back to his house; is that right, because you took the video?

A I seen the same car that looped the area five to 10 times going back to 44 Foxcroft Road.

MS. VITALE: So, I'm going to mark as Exhibit 28, the video that is Bates numbered 000083, so, Cameron 00083. And I'm just going to play the video and then I'll ask you some questions, okay? So, I'm playing Exhibit 28 now.

(Defendants' Exhibit 28: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, what is that video that's Exhibit 28 that I just played?

A So, I believe it's -- that's 28. So, 26, you see him driving past, you asked about the video stopping. The video was stopped. Mr. Stebbins went

into the backyard.

We only noticed them because John Scavato and Steven Stebbins appeared from the backyard and started pointing towards us at 49 Foxcroft Road. So, at that point, that was where you see Mr. Stebbins leaving where I took the phone back out and recorded again him being at that location. 100 percent being able to identify him and then getting back in the same vehicle that has already been identified as looping past my house five to 10 times.

Q So, Exhibit 28, it shows -- that's again a video you took with your cell phone?

A Correct, I believe so.

Q And were you taking a video from your driveway at 49 Foxcroft Road?

A Yes, ma'am.

Q Okay. And did you take Exhibit 28 at the point that Stebbins left John Scavato's house?

A Yes.

Q Okay. And why did you stop filming?

A I don't -- all I need is enough to identify the person to inform them of this gentleman, who is continuously driving past my house. At that point in time, I didn't have a complete reason to continuously film anybody, but I did need to be able to provide the

Connecticut State Police and the alleged assigned investigator, Mr. Samson.

Q Now, at any -- do you have any video -- strike that.

Now, during your deposition on August 23rd, you said that Mr. Stebbins got out of his vehicle -- well, let me back up, my apologies.

So, during your deposition on August 23rd, you said that Mr. Stebbins stopped and had a conversation with John Scavato in front of John Scavato's home. At that point in time, Mr. Stebbins got out of his vehicle wearing blue jeans, a T-shirt, baseball hat, firearm on his hip. Do you remember testifying to that?

A I believe so, yes.

Q Okay. Do you have any video that shows Mr. Stebbins with a firearm on his hip on May 28, 2018?

A It looked like a firearm. I can't be for certain.

Q You can't be for certain he had a firearm on his hip?

A It looked like a firearm. There's different factors into confirming whether it's an actual firearm or not.

Q Can you explain to me?

A You need to know that it has a firing pin, for one.

Q Could you explain that a little more for me, please?

A That's the best explanation I have at this time.

Q Okay. So, in any of the -- so, in either of the videos that are marked as Exhibit 26, 27 or 28, do you contend that any of those videos show that Mr. Stebbins had a firearm on his hip?

A I -- you'd have to play it -- can you play the last one for me one more time?

Q Sure.

A Thank you.

Q Okay. So, I am playing the video that is marked as Exhibit 28. And so, I'll play it for you once and then I'll play it again and have you pause it, if you believe it shows that, okay?

A Thank you.

Q So, here, I'm playing it now.

(A videotape was played.)

THE WITNESS: Can you play it again?

MS. VITALE: Okay. So, now I'm

replaying Exhibit 28, if I can get it back there let's see. Here we go. Okay. I'm playing Exhibit 28.

(A videotape was played.)

THE WITNESS: So, when -- I can't see it in this video, but it looks like from what I can see something black right here on his front right-hand side. I can't say for certain, but that's what it appeared to me from where I was sitting.

BY MS. VITALE:

Q Okay. So, you think you saw something black on his right-hand side?

A It appears that way, yes.

Q But you don't know for sure if it was a firearm; you can't tell?

A I didn't stop him or do any investigation of whether it was a firearm or not, but it looked to be a firearm.

Q On May 28th, did Stebbins speak to you?

A No, ma'am.

Q Did he stop at your house?

A No, ma'am.

Q Whose baby shower did you go to?
MR. McLANE: Objection.
THE WITNESS: What date are you referring to?
BY MS. VITALE:
Q In 2018, whose baby shower did you go to?
A I probably went to a lot of baby showers in 2018.
Q Oh, wow. So, whose baby shower did you go to toward the end of 2018?
A Towards the end of 2018?
Q Uh-hum.
A Again, I can't confirm. I don't recall.
Q You don't recall?
A Do you have a special date in mind?
Q No, I'm just wondering. So, you had a lot of people you knew who had -- women you knew who had babies in 2018?
A I could have known men who were having babies --
THE REPORTER: I'm sorry, did you object?
MR. McLANE: Yes.
BY MS. VITALE:
Q Did any of your male friends have baby

showers?

A I believe so.

Q You did, oh, wow. So, whose baby showers did you go to in 2018?

A I -- I think you asked me that already and I'll say that a lot of baby showers in 2018. I don't remember completely whose baby shower.

Q Do you remember any of them?

A Not off the top of my head, I'm sorry.

Q You don't, off the top of your head, remember the name of any person you went to a baby shower in 2018?

A Not off the top of my head, I'm sorry.

Q Okay. And just I'm showing you -- I'm going to mark this as Exhibit 29. So, it's a photograph that's Bates numbered Cameron 000085.

(Defendants' Exhibit 29: Marked for Identification.)

BY MS. VITALE:

Q Sir, do you recognize this photograph --

A Yes.

Q -- that's Exhibit 29?

A My apologies. Yes, ma'am.

Q Is this photograph -- what is this photograph?

A It's a still shot from, I believe, it's 28.

Q Okay. So, it's a still photograph that you took from a cell phone video?

A Correct.

Q Okay. And it's a still photograph that you took from one of the cell phone videos that we've marked as an exhibit, so you think it's Exhibit 28?

A Whatever -- my apologies. I don't remember what exhibit that you introduced as this video, but yes. That would be a still shot from that video.

Q Okay. And what does this -- what is depicted in this photograph?

A The same black vehicle in which I already stated was driving past five to 10 times. You see Mr. Stebbins exiting that vehicle at 44 Foxcroft Road.

Q Okay.

A I do also want to state: On this date in regards to myself and the gentleman who was sitting in front of the house, the reference from Mr. Stebbins that several black males were milling around in front of 49 Foxcroft Road. That's from his memo to Sergeant Samson.

Q Okay. And do you believe that's not true?

A Several, if we go by the definition, it wouldn't be two.

Q Okay. So, to you, several does not mean two?

A Not to me. I believe the definition of several wouldn't suggest two.

Q Okay, all right. So, but you and Jean Paul were outside of your house on May 28th, right?

A Correct.

Q Okay. And is Jean Paul a black male?

A Yes, ma'am.

MS. VITALE: Okay. So, I'm going to make this Exhibit 30, please.

(Defendants' Exhibit 30: Marked for Identification.)

BY MS. VITALE:

Q Okay. So, Mr. Cameron, I just handed you what's been marked as --

MR. McLANE: We can share.

MS. VITALE: I'll hand you the official one.

BY MS. VITALE:

Q -- what's been marked as Exhibit 30. Do you -- what is Exhibit 30?

A It's an aerial view of the area, Foxcroft Road and Montano Road in the Enfield, Connecticut.

Q Okay. Does Exhibit -- is Exhibit 30 a true and accurate depiction of the area of Foxcroft Road and Montano Road in May 2018?

A Correct. Yes, ma'am.

MS. VITALE: Okay. Now, I'm going to mark as Exhibit 31 --

MR. McLANE: Are we still going to be using 30?

MS. VITALE: Yeah, you can keep that there, thank you. All right. So, I'm marking as Exhibit 31.

(Defendants' Exhibit 31: Marked for Identification.)

(A videotape was played.)

MS. VITALE: That is Bates numbered Stebbins 3. I'm going to leave out the zeros, but it's Stebbins 3 Bates number.

BY MS. VITALE:

Q And I'm going to play it for you first, Mr. Cameron, and then I'm going to ask you some

questions, okay?

A Yes, ma'am.

Q So, I'm playing the video that is Exhibit 31 right now.

(A videotape was played.)

BY MS. VITALE:

Q All right. Do you recognize the video that's Exhibit 31?

A Yes, ma'am.

Q Okay. What is it?

A It is a part of a video, a part of a video.

Q Okay. And is it a video that you took using your cell phone?

A I believe, yes.

Q You believe so. Is it -- do you think it may not have been?

A I had different cameras in the car. So, I wouldn't say for certain, but I believe it was a cell phone.

Q Okay. In any event, it was a video that you, yourself, took, right?

A Correct.

Q Okay. Now, you took -- so, you took a video

-- you took a video of an incident that occurred on May 30, 2018, right?

A Correct.

Q Okay. And did you break that video down into four parts?

A At one point. The video was a complete video. Sergeant Samson, who was the alleged assigned investigator of State Police, asked me to forward him the video. Upon trying to send it to him, I had too much data. So, I had to shorten the video in order to send it to him.

Q When you say, "shorten the video," what do you mean?

A It wouldn't allow me to send in its entirety.

Q So, did you send the video in four different parts to Sergeant Samson?

A Yes, ma'am.

Q Okay. And so, did you shorten the video or did you just break it up into smaller pieces?

A I believe I had to break it up into smaller pieces in order for the data to fit in, like, the email.

Q When you said you had to shorten the video, did you delete any part of the video?

A No. Not to my knowledge, no.

Q Okay. So, you just broke the video up into four different parts?

A Correct.

Q Okay. Now, the video that I just played that's Exhibit 31, is that part 1 of that video that you took on May 30, 2018?

A I don't know for certain if it's the part 1, but I'm going to say it's a part of a video. So, I would say yes.

MS. VITALE: Okay. Now, I'm going to start the video again from the beginning and then pause it.

MR. McLANE: I think you really like the song, Lauren.

MS. VITALE: I'm sorry, I'm not getting it at the beginning. I'm trying to not dance.

MR. McLANE: We know what you're up to.

MS. VITALE: No one wants to see that.

Okay. So, now I'm truly starting from the beginning. So, I'm starting the video that's Exhibit 31 from the beginning now I'm going to pause it.

(A videotape was played.)

BY MS. VITALE:

Q Well, let me do this: So, at the very beginning of this video --

MS. VITALE: Oh, technology. I'm trying to be all fancy here. Let's see. I'm sorry, guys. I don't know why it's so hard to get this to start from the beginning.

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, I just paused Exhibit 31 at :02. And Mr. Cameron, do you see in this frame at :02 of the video that's Exhibit 31, do you see there's two white houses in the --

A Yes, ma'am.

Q -- in the screen?

A I'm sorry. Yes, ma'am.

Q Now, the house that is on the left-hand side of this frame, what is the house number of that house?

A The left-hand side?

Q Correct.

A That's going to be 48.

Q Okay. And then the house that's on the

right-hand side of this frame, is that -- what house number is that?

A 46.

Q Okay. So, in this frame of Exhibit 31 paused at :02, we see the houses 48 Foxcroft Road and 46 Foxcroft Road; is that right?

A Yes, ma'am.

Q Okay. And you started filming this video that's Exhibit 31, you know, at some point before you started passing 48 Foxcroft Road, right?

A 48?

Q Correct.

A No. I believe the video came on somewhere -- you first see that tree that's right there, which was in front of 46. That tree right there is in front of 46. The tree to the left-hand side of the frame in which you have it paused, that tree is in front of 46 Foxcroft.

Q Okay. So, you decided that you wanted to take a video, right, as you were driving?

A Did I decide to? I believe that at that point in time, I seen someone walking towards the street. So, yeah, I decided to pull out my phone and turn it on.

Q So, where did you see the person walking in

the street?

A The gentleman was in the middle of the road.

Q Where?

A The middle of the road. The middle of Foxcroft Road -- probably -- so, yeah. Directly from 44 Foxcroft Road towards the end. So, near the driveway.

Q Okay. So, there was a person walking in the road in front of 44 Foxcroft Road?

A Yes, ma'am.

Q Okay. At what point did you see that person walking in the road in front of 44 Foxcroft Road?

A When I turned the video on.

Q So, you turned the video on -- let me go back to the beginning here, okay.

(A videotape was played.)

BY MS. VITALE:

Q Now, which house is this that you're passing in this frame? I just paused the video at :01. What house is that in that frame?

A The car is directly in front of 46 Foxcroft Road.

Q And which house is it that we see in this

frame at :01?

A In the frame to the left, you see 48 Foxcroft Road.

Q Okay. So, now, I'm going to keep going here, I'm going to press play again on Exhibit 31.

(A videotape was played.)

BY MS. VITALE:

Q So, now at :02 of Exhibit 31, what house do you see in the frame?

A I'm still in front of 46 Foxcroft Road.

Q Okay. So, now you see 46 Foxcroft Road more in the frame, correct?

A More in the frame? Now, yes.

Q Okay. So, now 46 Foxcroft Road appears in the frame, correct?

A I was still in -- yes, it's in the frame.

Q At :02 of the video, correct?

A Correct. At 01, I'm still in front of 46 Foxcroft Road.

Q Now, so, you started filming while you were driving, correct?

A Correct.

Q Okay. And in order to start filming, what

did you have to do? You had to pick up your cell phone, right?

A Yes.

Q Okay. You had to go to the video function, right?

A No, ma'am.

Q No?

A Cell phones, today's technology, you have to tap one button on your phone and it opens directly to your camera.

Q Okay. So, you tapped a button on your phone to open the camera, right?

A Yes, ma'am.

Q Did you pull over to do that?

A No, ma'am.

Q Okay. So, you did that while you were driving, right?

A Yes, ma'am.

Q And so, is it your testimony that as you were in between 48 Foxcroft Road and 46 Foxcroft Road, that you could see someone standing in front of 44 Foxcroft Road?

A Nowhere in this testimony have I stated that I was in front of -- in front of 48 Foxcroft Road when this video started.

Q Were you in between 48 Foxcroft Road and 46 Foxcroft Road? Because we can see both houses in the video, right?
A I just stated on the record and I'll reiterate that when the video came on, I was in front of 46 Foxcroft Road. The tree in which you see is in front of 46 Foxcroft Road.
And you'll see that I'm in front of the driveway of 46 Foxcroft Road. And yes, it is my testimony that you are able to see someone in the middle of the road further up the street.
Q I'm going to play Exhibit 30 once again, start playing it again. And so, I'm starting from :02.

(A videotape was played.)

BY MS. VITALE:
Q Now, I just paused the video at :06. So, I just paused Exhibit 31 at :06. Now, you just -- the video showed the side of 46 Foxcroft Road, correct, as you rounded the corner?
A The front of 46 Foxcroft Road.
Q Okay. I'm going to go back a little bit here. So, I'm going to replay the video.

(A videotape was played.)

BY MS. VITALE:

Q Now, I just paused the video at :06 again. Now, this time do you see in the frame the side of 46 Foxcroft Road?

A Yes, ma'am.

Q Okay. Now, so, is it your testimony that you could see someone -- so, at :06 of the video that is Exhibit 31, you're rounding the corner of Foxcroft Road, correct?

A Yes.

Q Okay. And is it your testimony that before you rounded the corner of Foxcroft Road, before you were on the side of 46 Foxcroft Road, that you could see someone in front of 44 Foxcroft Road?

MR. McLANE: Objection.

THE WITNESS: In regards to your question, you stated in front of 44 Foxcroft Road, I never stated that I told you I can see someone in the middle of the road.

BY MS. VITALE:

Q You never said that --

A I said -- I'm sorry.

MS. VITALE: I'm so sorry, would you

read that back again?

(The last question and answer was read back by the Court Reporter.)

BY MS. VITALE:

Q So, I'm sorry, I don't understand that.

So, is it -- so, is it your testimony that you before you rounded the corner of Foxcroft Road, so before you passed the side of 46 Foxcroft Road, when you rounded the corner that you could see someone in the road in front of 44 Foxcroft Road?

MR. McLANE: Same objection.

THE WITNESS: Yes, ma'am. He's in front of -- he's in the middle of the street in front of 44 Foxcroft Road.

MS. VITALE: Okay. I'm going to keep playing the video that's Exhibit 31.

(A videotape was played.)

MS. VITALE: Now, I'm going to just play the video again actually from the beginning. So, I'm playing Exhibit 31 from the beginning.

(A videotape was played.)

BY MS. VITALE:

Q Now, sir, so, Exhibit 30 -- the video that's Exhibit 31, did you have your window down?

A Yes.

Q Okay. And you're playing music?

A Yes.

Q Okay. And why were you taking that video?

A I don't understand the question.

Q Why were you taking the video?

A That's the same question. I still don't understand the question.

Q You don't understand? Okay. So, I'm asking you why you took that video that's Exhibit 31.

A A gentleman was walking in front of the road towards my vehicle.

Q Okay.

A That I've never seen before as well, I'm sorry.

Q So, why did you feel the need to take a video of this?

A A strange person walking in the middle of the road towards your vehicle, I think that's worth making

a video of.

Q Okay. Have you taken other video of people walking in the road?

A I've never --

MR. McLANE: Objection.

THE WITNESS: -- seen anybody -- I'm sorry. I've never seen anybody walk in front of my vehicle before, ever in my life.

MS. VITALE: All right. So, I am going to mark as Exhibit -- I'm going to mark as Exhibit 32 --

MR. McLANE: You all set with 30? Can I give it to the court reporter?

MS. VITALE: Yes, thank you.

THE REPORTER: Just keep it, I'm sorry.

MS. VITALE: All right. So, I'm going to mark as Exhibit 2 (sic) a video that is Bates number Stebbins 4. So, again, I'm just going to play this for you.

(Defendants' Exhibit 32: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:
Q Okay. So, I just played the video that's Exhibit 32. So, is this -- what is Exhibit 32?
A It's another clip of a video in which I shared to the assigned investigator, Mr. Samson, which was shared with Mr. Stebbins during the -- with Mr. Stebbins, I'm sorry.
Q So, Exhibit 32, is that again a video that you took yourself?
A Correct, yes. It's the same video that you played prior.
Q So, is it part 2 of the video that you took on May 30, 2018?
A Yes, ma'am.
Q Okay. And I'm just going to play again one more time.

(A videotape was played.)

BY MS. VITALE:
Q Now, I've paused the video at -- I paused the video at :04, okay? So, I've paused Exhibit 32 at :04. Now, at this point in the video, first of all, do you know who this man is that's in this frame?
A I do not.

Q Okay. So, at this point in Exhibit 32, :04 seconds, the man that's in the road, he's behind your car; is that right?
A At the moment that it's -- you have it at right now, he is to the side of my vehicle.
Q Okay. So, he's to the side of your vehicle?
A Correct, the driver's side window.
Q Okay.
A With his hands in his pocket.
Q Sure. So, I'm going to click play again.

(A videotape was played.)

BY MS. VITALE:
Q Now, I had just paused the video at -- I just paused Exhibit 32 at :05 seconds. Now, do you see a man in this frame?
A I do.
Q And do you know who that is?
A Steve Stebbins.
Q And where is he standing?
A He's standing in his driveway of 44 Foxcroft Road.
Q And he's at the top of his driveway, right?
A Middle. The top of the driveway would be the

back of the car.

Q Okay. So, he's standing toward the back of his car, right?

A Middle of the car.

Q And his car is parked right in front of his garage, right?

A Correct.

Q Okay. I'm going to press play again.

(A videotape was played.)

BY MS. VITALE:

Q Now, I just paused the video again at :06. So, I just paused Exhibit 32 at :06 seconds. Now, at this point, the man in the road is behind your car, right?

A Yes, ma'am.

Q Okay. I'm going to continue the video.

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, at the end of the video, so you stopped your car at that point, right?

A Yes, ma'am.

Q Okay. Why did you stop your car instead of keep driving?

A There was a gentleman in the middle of the road with his hands in his pocket asking me if I was lost. I wanted to know -- have it on video to determine, one, if to confirm that this is Mr. Stebbins' friend, who is asking me am I lost. I've never seen the gentleman in the road. I never interacted with the gentleman in the road. So, he would have no reason to suggest or ask me am I lost.

Q And at that point, at the end of Exhibit 32, you stopped your car and at that point, the man in the road is behind your car, right?

A Yes. He was walking -- well, he's back -- by the end of the video, he's back at the window.

Q Because you had stopped your car, right?

A Correct.

Q And you stopped your car in front of 44 Foxcroft Road?

A Yes, ma'am.

MS. VITALE: Okay. Now, I'm going to mark as Exhibit 33 the video that is Stebbins 5. So, again, I'm going to play it for you first.

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, I just played the video that's Exhibit 33, which is Bates numbered Stebbins 5. And now, is this part 3 of the video that you personally took on May 30, 2018?

A Yes, ma'am.

Q Okay. Now, why did you -- so, did you speak with the man in the road?

A I believe I asked him -- can you play it again, please?

Q Absolutely.

MS. VITALE: Okay. So, I'm playing Exhibit 33 again from the beginning.

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, you talked to the man in the road, right?

A Yes, ma'am. I asked him do I know him, and why is he is in the street and that was -- I think that was pretty much every statement I made.

Q So, why did you stop to speak with him

instead of just continuing driving?

A The gentleman is -- I wanted to know why is he walking in front of my vehicle.

Q And at that point, he wasn't in front of your vehicle, right?

A At the beginning of the video, he was in front the vehicle.

Q At the beginning of the video, he was in front of your vehicle, yes, and then he moved to the side of your vehicle, right?

A Yes.

Q And then he was behind your vehicle, right?

A Yes.

Q Okay.

A And then he was back at the window direct.

Q After you stopped your car?

A Yes.

MS. VITALE: Now, I'm going to make Exhibit 34 the video that is Bates numbered Cameron 87.

(Defendants' Exhibit 34: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, I just played the video that's been marked as Exhibit 34, which is Bates number Cameron 87. Now, again is -- that video that's Exhibit 34, is that a video that you took yourself?

A Yes, ma'am.

Q Okay. Is that the last part -- does that video include the last part of the video that you took on May 30, 2018?

A Yes, ma'am.

Q Okay. So, now, Exhibits 31, 32, 33 and 34 that we just watched, is that the entirety of the video that you took on May 30, 2018?

A Yes, ma'am.

Q Now, in your deposition on August 23rd, you said there was a video from 5/30 of an incident where Mr. Stebbins and a friend of his harassed me in the roadway of Foxcroft Road. Do you remember testifying to that?

A Yes, ma'am.

Q Okay. Now, the video that we just watched, that's Exhibits 31 through 34, is that the video that you were referring to?

A Yes, ma'am.

Q Okay. Now, does that video show Stebbins at any point speaking with you?
A No, ma'am.
Q Does that video show at any point Mr. Stebbins approaching your car?
A He -- so, if you play the video again, as you identified, he's at the side of his vehicle. By the end the video, he's in closer to the sidewalk. So, yes. He's approaching the vehicle.
Q So, you believe the video shows that?
A Yes, ma'am.
Q Okay. Is that the last video that we played?
A The third -- if you play the third one.
Q The third one.
A You'll see where you originally pointed out where Mr. Stebbins was standing on the side of the car, he was not in that spot by the end of the video. So, if you asked if he's approaching, yes, approaching means walking, going towards.
Q Did he come close to your car?
A Close is subjective. So, to my interpretation, he came towards my car.
Q How far down his driveway did he walk?
A I can't say for certain. I can't tell the distance.

Q Was it -- well, let me do this.

(A videotape was played.)

BY MS. VITALE:

Q So, my apologies. So, I'm going to play Exhibit 33 again, which is the video that's Bates numbered Stebbins 5. I'm going to tell you to -- ask you to tell me to pause it where you see Stebbins, okay?

A Yes, ma'am.

Q So, I'm going to start from the beginning and I'm playing the video now.

(A videotape was played.)

THE WITNESS: Can you play the last part, please? I'm sorry.

MS. VITALE: Uh-hum.

THE WITNESS: I think it's 34.

MS. VITALE: Okay. I'm playing 33 again, Exhibit 33 again.

(A videotape was played.)

THE WITNESS: 34, please.

MS. VITALE: Okay. So, I'm going to play Exhibit 34 instead, which is the video that's Bates numbered Cameron 37. I'm sorry, it's Bates number Cameron 87.

(A videotape was played.)

THE WITNESS: Can you pause it there, please? So, at the original part of the video you see at this point, Mr. Stebbins, if you go back maybe a second and a half? Can you take it back a second, please?

MS. VITALE: Sure. And just for the record, just so we're, you know, know what we're looking at here. So, for the record, I just paused it at :05 and now I'm going back to the beginning of Exhibit 34.

(A videotape was played.)

THE WITNESS: Can you pause it right there.

MS. VITALE: Uh-hum.

THE WITNESS: So, as you see, briefly

before this frame, I can't see where we stopped at here, Mr. Stebbins is where you interpreted at first is the top of his driveway. He's at the back of his vehicle. You asked if he approached.

By the end of this video, Mr. Stebbins is no longer at the back of this vehicle as he's here. If you went you push, you can go play and I'll go tell you as he's approaching.

MS. VITALE: Okay. And for the record, I just paused the video at :04 seconds and I'm pressing play again.

(A videotape was played.)

THE WITNESS: I'm sorry, you're going to have to go back a little bit.

(A videotape was played.)

THE WITNESS: You've got to go back a little bit, I'm sorry. Pause. It's right before this.

MS. VITALE: It's hard to capture.

THE WITNESS: No, I know. One more time.

BY MS. VITALE:

Q Okay. In any event, I just paused it, the video at :0 --

A 11.

Q I'm sorry at .13 seconds. And you believe right before this point, it shows Stebbins doing what?

A Walking from the rear of the vehicle towards the street.

Q Do you know how close he came to your vehicle?

A I don't know for certain. If you continue to push play, we'll see where he ends up at.

(A videotape was played.)

THE WITNESS: You couldn't see where he ended up at by the end the video, but you asked if he approached, the very beginning the video he's at the top of the driveway as you indicated, which was behind the car. You see him walking towards at the :13, I believe that was what you identified as.

You see him walking from the back of the

vehicle towards the street where I was having a conversation with the gentleman in the middle of the road.

BY MS. VITALE:

Q And you're not able to tell me at what point, where on his driveway, he stopped?

A He was in front of the state trooper vehicle in his driveway by the end of that interaction.

Q Okay. Now, why did you provide this video, the video that is Exhibits 31, 32, 33 and 34? Why did you provide that video to Sergeant Samson?

A Thank you. Mr. Samson asked for it. I believe we met on June 25th at 49 Foxcroft Road. At that time, he asked about all of the interactions in which myself, Mr. Stebbins or any acquaintances had. So, I showed him that video.

I had previously reported to Enfield Police Department on 5/30, after this incident occurred, to an attempt to get the person identified. Mr. Stebbins already stated to me on the very first interaction, I'll be back. I'm going to take care of you. You asked me about the hope question in which I was hopeful that Mr. Stebbins was not involving other people.

Now, in this event, you see that he is involving someone. One of his friends is approaching

me in a very aggressive manner asking me am I lost. And he told me none of my fucking business. So, I don't really believe that he was worried if I was lost and if I was going to get to any destination okay.

Okay. So, at that point, I reported to Enfield Police Department. I spoke to Lieutenant Squires, I showed him the video, had a conversation with him about it and alerted him to the interactions. Mr. Squires did not seem to genuinely care or want to do anything or take a statement or anything at that point.

So, I would end up going to work, due to, you know, some having anxiety and some stress about these situations and the constant harassment from these gentlemen. I reported to Troop H in Hartford, Connecticut. I spoke to, I believe it was a master sergeant. I believe his last name is Fedigan, reported, showed him the incident and made him aware who I've had interactions with at that point. That was 5/30.

So, Mr. Samson, at this point in time, was not aware. So, I had showed Fedigan the video, had made a report to him. And on June 25th, Sergeant Samson -- my apologies, I'm going to back up a little bit.

June 19th, I got an email from Sergeant Samson stating he was the assigned investigator. On June 25th, I met with him and he asked me to send the videos to him.

MR. McLANE: Can we take a quick bathroom break?

MS. VITALE: Sure.

(Recess: 10:21 to 10:28.)

MS. VITALE: Back on the record.

BY MS. VITALE:

Q Okay. Now, Mr. Cameron, did -- on May 30th, 2018, did Stebbins pull you over for using a handheld device while driving?

A No, ma'am.

Q On -- did Stebbins report you to the Enfield police for using a handheld device while driving on May 30th?

A I wouldn't know that information.

Q As far as you know, he didn't?

A I can't say for certain.

Q You don't have any information that he did?

A No, ma'am.

MS. VITALE: I'm going to mark

Exhibit 35 a video that is Bates numbered Cameron 6.

(Defendants' Exhibit 35: Marked for Identification.)

MS. VITALE: And I'm just going to play it for you first.

(A videotape was played.)

BY MS. VITALE:

Q Now, what is -- so, I just played the video that I've marked as Exhibit 35, which is a video that's Bates numbered Cameron 6. What is that video?

A That video is from November 12th of 2018. I stated at the time, at 2:28 p.m. That is me arriving at 49 Foxcroft Road.

Q Okay. So, why did you go to 49 Foxcroft Road at 2:28 p.m. on November 12th?

A There was workers at the house.

Q So, what was the reason why you went?

A In the video, you see two workers at the house. I was going to say hello.

Q Okay. And is that it? You just said hello

to them?

A Yes, ma'am.

Q Okay. Now, when -- so, Exhibit 35, that we just watched, now that is a video, is that a cell phone video that you took of your security camera video on November 12th?

A Yes, ma'am.

Q When did you take that cell phone video?

A I believe it was the -- after I was stopped at Brookside Plaza when I got -- I went to pull up the camera system on a like a computer and I just recorded it from there.

Q So, what date did you record the cell phone video, Exhibit 35?

A To the best of my knowledge, it was November 12, 2018.

Q Do you remember the time of day on November 12, 2018 that you took that cell phone video that's Exhibit 35?

A I do not.

Q Okay. It was sometime after the incident in Brookside Plaza?

A Yes, ma'am.

Q Okay. And why did you take that cell phone video?

A Well, at the time -- after I was unreasonably stopped in Brookside Plaza, I was aware -- made aware that there was some form of a 9-1-1 call. And what I wanted to do is be able to preserve, you know, some parts of the video in which could be provided in case something happened thereafter.

Even though at the scene on 11/12, Sergeant Nolan made me aware that there was no criminal involvement, no criminal anything. There was no need for a follow-up. I did want to preserve some parts of the video just in case.

Q Okay. When you say, "preserve some parts of the video," so you did not preserve the entire video from November 12, 2018, right?

A I didn't have the ability to. Obviously, you've seen there's probably five different camera angles. It was also over a 30-minute period. The device in which I have didn't have enough memory to store or house that level of data.

Q So, when you took -- so, you took a -- well, let me do this. So, I'm going to start playing Exhibit 35 again, okay?

(A videotape was played.)

BY MS. VITALE:

Q Now, the video starts at on -- the date stamp on this video that's Exhibit 35 is November 12, 2018 at 2:28:16 p.m., correct?

A Yes, ma'am.

Q Okay. Now, I'm going to hit play.

(A videotape was played.)

BY MS. VITALE:

Q Now, I just paused the video that's Exhibit 35 at --

A It looks like 48.

Q Oh, there it is. I lost it for a second at 58 seconds. Now, the timestamp on this frame shows 2:29:48 p.m. Did I read that correctly?

A Yes, ma'am.

Q Okay. Now, I'm going to rewind a second here. So, I'm restarting Exhibit 35 now. I have paused the video at :58 seconds again. So, I've paused Exhibit 35 again at 58 seconds. Now, here the time stamp says 2:29:02 p.m., correct?

A Yes, ma'am.

Q Okay. And so, Exhibit 35 skips from 2:29:02 p.m. right to 2:29:48 p.m.; is that right?

A Yes, ma'am.
Q Okay. Why?
A So, to the best of my recollection, the way these cameras were set up at the time, they're kind of like motion sensored and only for a certain period of time. So, the interpretation here is you see that there's no movement. The gentleman was no longer in the driveway. He is in the grass. That's the only interpretation that I would have of the jump from the video there.
Q Uh-hum.
A There's no lag in the video or anything like that. So, it's just showing remotely as the video is playing on the screen, I'm recording it on the screen and that is the next frame that pops up.
Q So, you did not -- when you were taking the cell phone video -- because Exhibit 35 is a cell phone video of -- that you took of your security camera video, correct?
A Yes, ma'am.
Q Okay. And so, in taking the cell phone video, is it your testimony you did not fast-forward the security camera video?
A At this point, no.
Q At this point, no. Okay.

So, what did you -- do you remember what you did in between the time 2:29:02 p.m. and 2:29:48 p.m.?
A I do not. I know -- we had a brief conversation here in the driveway and then I was leaving the location. I wasn't going there to stay or anything like that.
Q Well, did you go inside your house after you said hello to the worker?
A No, ma'am.
Q No. So, are you -- so, again, I've paused Exhibit 35 at 58 seconds here and the timestamp is 2:29:49 p.m. on the video, right?
A Yes, ma'am.
Q Okay. Are you shown in this frame?
A No, ma'am.
Q Where are you?
A 2:29:49, I could possibly be seated in the vehicle in which you see me drive up in already.
Q When you say, "possibly," are you just guessing?
A No, I don't recall. You'll see if you -- there's another video that you were provided where you see me leaving the location, which is timestamped as well. So, it'll show when I walked to the vehicle.
Q So, what vehicle did you drive to your house

at 49 Foxcroft Road at 2:28 p.m.?
A I was driving a black Infiniti in this video here.
Q And does your black Infiniti -- is your black Infiniti shown in this video that's Exhibit 35?
A It was shown, but not in the clip that you have it paused at. No.
Q Okay. Where did you park the Infiniti?
A Right in -- you see two mailboxes there, the vehicle is right in front of the frame, right in front of the mailbox.
Q Okay. So, I'm understanding you correctly, you arrived at your house at 49 Foxcroft Road at 2:28 p.m. on November 12th, right?
A Yes, ma'am.
Q And you said hi to the workers at your house, right?
A Yes, ma'am.
Q Okay. And then you did not go inside of your house; you instead left?
A Yes, ma'am.
MS. VITALE: Okay. So, I'm going to make Exhibit 36, a video that's Bates numbered Cameron 796.

(Defendants' Exhibit 36:
Marked for Identification.)

BY MS. VITALE:
Q Okay. I'm going to play it for you first. That's better. Okay. I'm just going it play it one more time, okay?
A Yes, ma'am.
Q So, I'm playing Exhibit 36. It's the video Bates number Cameron 796.

(A videotape was played.)

BY MS. VITALE:
Q All right. So, what is this video that's Exhibit 36?
A This video is the same date, 11/12. You see me standing in the driveway. I'm just zooming in to be able to clearly identify the Connecticut State Police-operated vehicle coming from the direction of 44 Foxcroft Road towards Montano Road. It's kind of -- I believe this is paused with me just zooming in on the vehicle.
Q Okay. So, do you know what the -- so, you took a cell phone video of a paused -- of your paused

security camera footage; is that accurate?
A Yes, ma'am.
Q Okay. Now, do you have the underlying security camera footage in this video still?
A I believe I provided -- myself and Attorney McLane, I looked through my entire computer. I don't have the full video in which you see.
Q Why not?
A I don't have it.
Q Why don't you have it?
MR. McLANE: Objection.
THE WITNESS: I don't really have an answer, but I'll give you the fact that on 11/12/2018, Bryan Nolan informed me that there was going to be no criminal charges. So, I didn't necessarily believe that I needed to preserve the entire incident.
If I was informed that there was going to be some criminal investigation, I would have made myself aware. I would have saved the entire video in its entirety. These clips are just saved, more importantly, just for myself, my safety, my job, as I was already aware that these gentlemen were calling my job to file complaints against me.

BY MS. VITALE:
Q So, you preserved the video that you thought was helpful to you, right?
MR. McLANE: Objection.
THE WITNESS: No. I preserved the video in which I could show to someone in case that I was asked for whatever reason.
BY MS. VITALE:
Q Because you thought it was helpful for you to do that, right?
A I didn't need anything that was helpful at that point, ma'am.
Q So, why not just preserve the entire video?
A I didn't have the ability to, as you previously asked me. I didn't have the memory capability. I didn't have data in order to house this documentation anywhere.
Q Well, you had the ability to take a video using your cell phone, right, because you did that?
A Yes, and cell phones have data as well.
Q Uh-hum.
A And they wouldn't have enough to save the entire clip of the entire incident.
Q Well, okay. So, you took -- now, is it your contention that this cell phone video that's

Exhibit 36, that the police cruiser that you see that you zoomed in on in this video, is that -- do you believe that to be Trooper Stebbins?
A I'm 100 percent aware that that is Trooper Stebbins operating that vehicle.
Q Okay. Did -- now, what is the date stamp on this video? Can you see that?
A Yes, ma'am. 11/12/2018.
Q At what time?
A I believe that says 2:29:09 p.m.
Q And so, now, did Trooper Stebbins drive by your house at around that time?
A Yes, ma'am.
Q Okay. And so, your security camera would have captured him driving by your house at that time, right?
A No. So, these cameras, as I indicated earlier, they're not continuously recording. They're only set up to record on motion and certain motions. It's a -- you can obviously adjust the sensitivity of them. In certain instances, it may record. In certain instances, it doesn't.
So, to be quite clear, I actually looked for -- because I do have a camera facing the front of my house. But due to the continuous motion of the

people in front, it didn't completely record him going all the way past.

Q Okay. So, your security camera filmed him leaving his house down the street, right?

A The security camera is recording at this point because you see where I'm standing in the driveway, it will pick up my motion of me walking in that driveway, but it wouldn't pick up his motion of him driving up the road that way.

So, there are settings. I've learned that you can adjust them to have them continuously record. At this point in time, I was very, very new with this system. I've never had security cameras outside of any property that I've had or any place I've lived.

So, I didn't know whether it automatically recorded continuous or was set up to motion. So, I learned thereafter that you can set them to continuously record.

Q Okay. So, now, this video, Exhibit 36, shows you standing in your driveway; is that right?

A Yes, ma'am.

Q Okay. And what were you doing standing in your driveway?

A You see me facing the direction of the workers that are at the house. I don't have a true

answer. I don't like to guess. But me looking in that general direction is meaning that there's a conversation going on with me and the people who are working at the house.

Q Okay. So, at this point at 2:29 p.m. you were still talking to the workers outside of your house?

A At this very second, it appears that way. But again, I can't be for certain, because there isn't a full dialogue or a full video with audio. So . . .

Q Now, if this security camera was activated because you were standing in the driveway, it would have continued to be activated as long as you were in the driveway?

A No, ma'am.

Q No, why not?

A Again, as -- you asked me the same question, I'm just going to say it again. So, it will only record for a certain amount of time while you have motion. So, me standing there after say 20 seconds or so, if there's no motion, or if I'm walking away or whatever the case may be, it's going to cut off. So, it only picks up certain movement.

Q Now, did you at some point start walking toward your car?

A I believe -- yes, ma'am.
Q Okay. So, as you were walking toward your car, would your security camera have been activated because you're moving in your driveway again?
A Again, I wouldn't say -- I don't know that for certain. Again, due to the continuous motion of the people working at the house, the cameras are going to intermittently cut on and off. Just based on the continuous movement. It's not going to record continuous.
Q So, when you -- so, when you took this cell phone video that's Exhibit 36, later in the day on November 12th after the incident in Brookside Plaza, did you save on your cell phone video the entirety of the security camera footage from November 12, 2018 from 2:28 p.m. onward?
A No, ma'am.
Q No, okay. And how -- and did you save the entirety of the security camera footage that was recorded on November 12, 2018 -- I'm sorry, let me start that again.
A Of course.
Q Did you save the entirety of the security camera footage that was recorded by your security camera starting at 2:28 p.m. through 2:35 p.m.?

A There's either five or six cameras at this location.
Q Okay.
A So, no.
Q Okay. Do you have -- how many security cameras do you have that show Foxcroft Road at the point of your driveway and your mailbox?
A I believe there's three cameras facing this direction. The mailbox itself? My apologies.
Q The area of your driveway and your mailbox.
A I believe -- thank you. I believe there's three cameras that were facing the front of this house.
Q Oh, I'm sorry. So, there are three cameras that show the area of your driveway and your mailbox?
A It's either two or three. So, it's this camera angle that you see here and the one where you see the workers in front of the house. There's also a side of the house. So, I don't think it captured the actual driveway, but it captures -- you asked originally Foxcroft Road, it captures Foxcroft Road. I'm sorry.
Q Okay. So, when Trooper Stebbins drove by your house on November 12, 2018, did you shout something to him?
A No, ma'am.

Q Okay. Now, do you agree that -- well, and you don't have any -- you did not -- there's no security camera that shows the moment that he drove by your house; is that right?

A Its interpretation is subjective when you say he drove past the house. You were provided a video where you see him go past Montano and is in front of 44 -- my apologies -- 49 Foxcroft Road.

Q Which video is that?

A I don't know the number.

Q So, you think there's a video that shows Trooper Stebbins on November 12, 2018 driving in front of your house on 49 Foxcroft Road?

A Yes, ma'am.

Q When did you provide this video?

A Myself and Attorney McLane, I believe it was provided to you yesterday when you asked for -- I believe you sent an email within the last day or so requesting a video for a follow-up.

As you see, you asked for a number of items. And the only one where we actually found a video for was the one that you -- one or two that you were provided. The other things you asked for, there was no video. They were just the still shots that were provided.

Q Okay. So, last night you gave me this video, which is Exhibit 36. It's Bates number Cameron 796. And I'm just going to play it one more time and you stop me at the point that it shows Trooper Stebbins drive by 49 Foxcroft Road, okay?

A It's not in this video.

MS. VITALE: Okay. Well, that saves me some time there. So, now, I'm going to make Exhibit 37, which is Bates numbered Cameron 797, I'm just going to play it.

(Defendants' Exhibit 37: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. Now, which security camera was this video taken from that's Exhibit 37?

A It's the one that's from the driveway.

Q Okay. Now, there were at least two security cameras that show the area of your driveway and your mailbox, correct?

A Yes, ma'am.

Q Okay. So, Exhibit 37 is taken from one of

those cameras; is that right?

A Yes, ma'am.

Q Okay. And this camera was obviously activated at the point that Trooper Stebbins drove by your house; is that right?

A Yes, ma'am.

Q Okay. Now, you -- but this Exhibit 37 does not show your driveway, correct?

A Correct.

Q Okay. Now, the other security camera, where is the footage from that at this time?

A Again, I stated this I think twice. I'm just going to reiterate it. The cameras don't -- they don't automatically record continuous. There's no on and off. So, the front camera of the house wasn't activated due to the fact of the continuous motion with the front of the house. So, it would cut on and cut off.

Q Okay. So, it's your testimony that this security camera was activated when Trooper Stebbins drove by your house, but the other security camera in front of your house was not activated?

MR. McLANE: Objection.

THE WITNESS: To the best of my knowledge, yes. I don't -- my apologies. If

I may?

MS. VITALE: Uh-hum.

THE WITNESS: I don't -- again, this is a brand new camera system. At this point, I think I've had it for 40 days at this point. I didn't understand how to set it up and turn it on and turn it off when it comes to setting it up for continuous motion, I mean continuous recording versus motion recording. And then there's a secondary. There's two secondary options of setting it how to record off of motion.

BY MS. VITALE:

Q Okay. But in any event, so we just watched -- okay. So, Exhibits 36 and Exhibit 37, are the two -- are the only two videos that you have from -- so, well, strike that.

So, Exhibit 37 is the only video that you have of Trooper Stebbins driving by your house on November 12th; is that right?

A To the best of my knowledge, yes, ma'am.

Q Okay. And you are not shown in this video at all; is that right?

A In this -- my apologies, are you referring to the video that's on the screen now?

Q So, in Exhibit 37, you are not in that video at all, correct?
A No, ma'am.
Q Okay. And so, you do not have any video -- so, do you have any video that shows where you are at the point that Trooper Stebbins drives by your house on November 12th?
A No, ma'am.
Q Okay. And did you ever have a video that showed where you were at the point that Trooper Stebbins drove by your house on November 12th?
A I provided every video that I was able to find.
Q Okay. Did you -- so, we talked about how you used your cell phone to preserve video from your security camera footage on November 12th, right?
A Yes, ma'am.
Q Okay. So, on November 12, 2018, did you have a video that showed where you were at the time that Trooper Stebbins drove by your house on November 12th?
MR. McLANE: Objection.
THE WITNESS: To the best of my knowledge, no. I think -- everything I provided -- I've never gotten rid of anything. I think everything I provided was

everything I was able to capture when I -- when the -- I think the first thing I got was the restraining order.

So, this may -- actually, I'm sorry not to confuse anything. This may actually be like November 15th or something like that, but in any event -- when I'm saving it from the system to the phone.

So, in any event, I'm not completely certain which days these are recorded, but for the most part I think the interpretation of why I did it from this angle was solely to show that Mr. Stebbins did have the option to, A, drive the other way on Foxcroft Road, and B, to drive down Montano.

As you see, he slowed down at Montano and then continued to proceed and accelerate forward. I think at that point, there was some guesstimation of -- there was construction in the area. I believe Bryan Nolan asserted that at the scene of the stop in Brookside Plaza.

BY MS. VITALE:

Q So, if I understood correctly, so, you do not know the date that you took the cell phone videos of

the security camera footage that was taken November 12, 2018?

A I don't know for certain which specific date. Obviously, it's there after 11/12. I know it could have been the 13th or it could have been sometime after I received the restraining order affidavit in the mail.

MS. VITALE: Okay. Now, I'm going to mark as Exhibit 38, the video that's Bates numbered Cameron 5. I'm just playing this video first.

(Defendants' Exhibit 38: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. What is Exhibit 38?

A Exhibit 38 is a video of me leaving 49 Foxcroft Road on 11/12/2018. I apologize, is it possible I could just look at a map. I just want to state the street that I'm driving down.

Q Sure, yeah. You can look at --

A It's not on that one. The big protection of the entire area.

Q You know what, I think I have that somewhere.
A I think it's an exhibit already, too.
Q Yeah, okay. I'm handing you Exhibit 4.
A Thank you.
Q Now, what did you need to refresh your memory on?
A I just wanted to refer to the street. So, in that video you see me leaving 49 Foxcroft Road. The first road that you see me travel down is Eleanor Road.
Q Okay. I'll take that back.
A Just to reference, thank you.
Q Uh-hum. So, now, so Exhibit 38 is again a cell phone video you took from of your security camera?
A Yes, ma'am.
Q Okay. And do you know the date that you took that video?
A I don't know for certain which date.
Q Okay. And is that a security camera on the side of your house?
A Yes, ma'am.
Q Okay. And so, that camera was activated by your car driving by on the street, correct?
A Yes, ma'am.
Q Okay. And the three security cameras that you have on your house, are they all the same brand?

A Yes, ma'am.

Q Okay. And why did you choose to take a cell phone video of that footage?

A So, I saved that video, to the best of my recollection, because again the assumption was that I followed him from the neighborhood. So, as you see, I drove down Eleanor Road. Mr. Stebbins did not drive down Eleanor Road. Mr. Stebbins, I believe, took Leonard Road or probably continued on Foxcroft. That's the only other two ways to get out of that area going in that direction.

So, I saved that video to be able to show the time I pulled off in the car and the speed in which I pulled off in that car.

Q So, now, you filed an internal affairs complaint against Trooper Stebbins, right?

A Yes, ma'am.

Q What did you hope would happen with that internal affairs complaint?

A The original report, obviously, I had to call 9-1-1. The hope was for Mr. Stebbins to be held accountable. It was a criminal element to the report as well. I reported it via 911. And the hope was that he will be held accountable, whatever that looked like to the people investigating.

Q Okay. What do you mean by "hold accountable"?

A Well, the gentleman came to my house, essentially invited me out of the vehicle to a man-to-man interaction. Where culturally, that's offensive to black people. It's an assessment that -- man-to-man is like fighting words.

So, I asked him, What do you mean by that?

And then we continued on. He obviously is in possession of a firearm. He's getting out of a cop car. He made the statement. I see him in possession of a firearm, him telling me, I'll be back, I'm going to take care of you. I don't know what that means.

And if there is no report of the incident, then there is no one to hold accountable. And if something did happen to me, i.e. Mr. Stebbins coming back and utilizing that firearm or having a friend come back and harass me or assault me for whatever means, I needed to make sure that Mr. Stebbins was held accountable, that people where it was reported to, not only 911, not only to an operator, not only to whatever supervisor was at the State Police, Enfield police. I just needed to make sure that everyone was aware for the safety of anybody at 49 Foxcroft Road.

Q Were you hoping that Trooper Stebbins would

be disciplined?
A As a part of the investigation, disciplined and held accountable, yes, or arrested and charged for threatening, yes.
Q Okay. So, you just said something new here. So, you said -- so, you do you agree that he -- so, you agree that Trooper Stebbins said he wanted to talk to you man to man, right?
A Yes, ma'am.
Q Okay. Now, do you know whether to a white man those are considered fighting words?
A The interpretation and the way that it -- it doesn't matter the way you interpret it. It's the way you say it to someone. So, when you tell someone, You can get out the car, I want to talk to you man to man, well, I don't know what getting out the car. Why do I need to get out the car to talk man to man? I can sit here. So, the suggestion to get out the car sounds like he's going to do something to me.
Q So, if I understood you correctly, you said, like, culturally speaking --
A Yes, ma'am.
Q -- you believed those were fighting words?
A Those are approaching to being assaultive words. Yes, ma'am.

Q Approaching to being assaultive words?
A Yes, ma'am.
Q So, do you know whether culturally speaking for a white man, those would be words that they would use, you know, if they're as fighting words?
A So, I've interacted and dealt with plenty of white people my entire life. I've never heard them say, in any interaction, that they wanted to talk man to man to anyone, especially, not in a sense of having a regular, civil conversation.
Usually, it's, Hey, can we have a conversation? Hey, can I talk to you? Not, Get out the car, I want to talk to you man to man.
Q So, you were a police officer for the NYPD for a little bit, right?
A Yes, ma'am.
Q Okay. Did you as part -- as a police officer, did you give people tickets for speeding?
A Yes, ma'am.
Q Okay. Did you ever give someone a break and not give them a ticket, but just give them a warning?
A They don't have warnings in New York City.
Q Okay. So, did you ever give someone a break and not give them a ticket?
A I can't recall a time that I did. I've

just -- I'm sorry if I'm just answering your question. I've also never interacted with someone off duty for the way that they're operating a motor vehicle.

MS. VITALE: So, I'm going to make this Exhibit 39.

(Defendants' Exhibit 39: Marked for Identification.)

BY MS. VITALE:

Q Okay. So, do you recognize Exhibit 39?

A Yes, ma'am.

Q What is it?

A This is a transcript from the 12/14/2018 restraining order hearing Stebbins v. Cameron.

Q Now, I'd like to direct you to page 16 of Exhibit 39, lines 16 through 19, on page 16. Now, you were represented by an attorney at this hearing; is that right?

A Yes, ma'am.

Q Okay. Now, on page 16 of Exhibit 39, line 16 through 19, your attorney says "It's fair to say, sir, looking back on these events that are six-months old now, had you given Mr. Cameron for a moving violation, this -- we probably wouldn't be here in court. Is that

fair to say?"

Did I read that correctly?

A Yes, ma'am.

Q Okay. Do you agree with that statement by your attorney?

A It's an assumption-based question. I can't say whether I agree or whether I know. It would infer -- make me assume what Mr. Stebbins's actions would have been over a period of six months. Had he given me a citation that day, he could have still done everything that happened thereafter.

Q Would you have preferred that Mr. Stebbins just give you a ticket instead of trying to talk to you informally?

MR. McLANE: Objection.

THE WITNESS: Well, the first part is I was never speeding, nor did I ever run a stop sign. So, based on that, I would prefer that Mr. Stebbins never had come to 49 Foxcroft Road, never threatened me and never violated his department policy refusing to tell me who he was and why he was at the location or -- who he was, I'm sorry.

BY MS. VITALE:

Q Have you ever been given a speeding ticket?

A In my life?
Q Yes.
A Yes, ma'am.
Q Have you ever had a police officer just give you a warning without giving you a ticket? Like, Hey, just slow down, you're going too fast; something along those lines?
A I can't be for certain, but I don't recall a time where I was given just a warning.
Q Are you aware of that happening, in general, police officers doing that sometimes to give people a break?
A Yes.
Q Okay. And do you think that's nice of them to give people a break instead of giving them a ticket?
A I don't have an opinion of whether I think it's nice or not. Also, just answering a little further: I've never heard of someone pulling someone over, off duty, for speeding.
Q So, you've never heard of it, right?
A Yes, I've never heard of it. I'm sorry.
Q You never heard of it yourself, but do you have any information that says it isn't possible?
A That's an assumption-based question as well. So, I can't really assume that something happens that

I've never heard or seen happen.

Q Okay. So, do you have any -- so, I'm not asking you to assume. I'm actually just asking you: Do you have any information that says a police officer who's off duty and sees someone speeding can't pull them over to address that violation?

A No. You can clearly enforce the laws off duty. It is quote/unquote -- I don't want to say quote/unquote -- but it is something that you're advised not to do frequently. It is also something that generally, when it comes to those violations, therefore something that is significantly drastic.

In this situation, the allegation was speeding. There was no -- my apologies -- like radar, so to say, utilized. It is an assumption by Mr. Stebbins that I was speeding based on a very quick interaction.

I also know based on those things that often my minorities, similar to myself, are pulled over for these infractions under pretextual stops where someone is making an assumption of what they're pulling someone over for.

Q So, when you were -- did you receive training as a police officer on estimating speed?

A Yes.

Q Okay. So, you know it's possible for police officers to estimate speed without using radar, correct?
A I'm aware that they are able to write and assert the estimation, but it's also still just a guess.
Q But they're able to make that estimation, correct?
A You can make the estimation. It doesn't assert whether it's factually based or not.
Q But you can give someone a ticket based on the police officer's estimation, correct?
A Yes. I've also seen in court when people contest those tickets, they're thrown out.
Q How many times have you seen that in court?
A I've seen it in court quite frequently.
Q In Massachusetts?
A Massachusetts and New York, I'm sorry.
Q Massachusetts and New York?
A Yes, ma'am.
Q Was that when you were a police officer?
A Yes, ma'am.
Q Okay. So, did you give people tickets as a police officer based on your estimation of their speeds?

A Never. Not one time.
Q Not one time?
A Never.
Q Okay. Now, how many tickets did you give for speeding?
A I can't say for certain. I don't know that for a fact.
Q Was it less than five?
A Probably, most likely.
Q So, you just didn't give many tickets for speeding?
A No.
Q Okay. What was your -- so, you said last time you did patrol?
A Yes, ma'am.
Q Is that right?
Okay. So, what does patrol involve?
A Just you're assigned to a station house and you are assigned to like sectors within the precinct.
Q Does patrol mean -- I'm sorry, I'm a layperson -- but does patrol mean generally you're walking around the neighborhoods?
A You could be on foot or you could be in car.
Q Were you primarily on foot?
A In changed every day.

MR. McLANE: Can we fold this back up or are we --

MS. VITALE: Yes, I'm sorry. You can put that away. I'll take it.

BY MS. VITALE:

Q So, you said something about -- you said something about minorities being pulled over. Did I understand that correctly?

A Yes, ma'am.

Q Okay. So, I mean -- so, if a police officer pulled over a minority to address their speeding and decided to let them go without giving them a ticket, isn't that a good thing?

A Again, you asked that. I don't assume whether something is good or bad based on whether they didn't give somebody a ticket or not. In that assumption, I prefer that if they don't have any factual allegations, that people are not pulled over.

Q So, but if the police officer believes that, you know, a person is speeding and they could give them a ticket and then they choose not to give them a ticket, isn't that preferrable from the driver -- motorist perspective?

A I can't assume someone's opinion.

Q No, okay. So, you think there are people who

would prefer to get a ticket than being given a warning?
A I don't have an assumption one way or the other.
Q Okay. Would you be rather be given a ticket than be given a warning?
A I'd rather not be pulled over.
Q Well, if you're pulled over because the police officer wants to address your driving, would you rather be given a ticket or given a warning?
A The times when I was speeding and I received a ticket, I took accountability for it.
Q Okay. That was when the police officer chose to give you a ticket, correct?
A Correct.
Q Okay. Would you have preferred that the police officer just let you go with a warning?
A I was the person speeding at that point in time. I was held accountable for my action and that's what I believe was the right thing to do at the time. I don't have an assumption of whether I prefer to get a warning or not.
Q Okay. So, you don't want to say that you would have preferred to be given a warning?
MR. McLANE: Objection.

THE WITNESS: I don't really have a preference.

MS. VITALE: You don't have a preference, okay. I see.

BY MS. VITALE:

Q Now, and -- so, you agree that an off-duty police officer can be called to duty at any time, correct?

A Yes, ma'am.

Q Okay. Now, when you were a police officer, did you have a firearm?

A Yes, ma'am.

Q Did you carry the firearm on your hip?

A Yes, ma'am.

Q Did you also work with other police officers who had their firearms on their hip?

A Yes, ma'am.

Q As a probation officer, do you encounter police officers during your work?

A Yes, ma'am.

Q Do those police officers have their firearms on their hip?

A Yes, ma'am.

Q Okay. As a police officer, did you ever -- when you had your firearm on your hip, did you ever

like rest your hands on your hips?
A I can't recall.
Q Have you ever seen police officers do that, they just rest their hands on their hips?
A On their hips?
Q Uh-hum.
A Like, you'd have to -- I'm not being trying to be funny, but I need to know what you mean by that. I don't really know what you mean by resting it on your hip.
Q Okay. So, people have hips, right?
A Yes, ma'am.
Q Okay. So, have you seen police officers just in general rest their arms -- hands on their hips?
A Again, I'm not asking or saying this to be funny or anything like that. I just want to be clear on what you mean by on their hips. Regular people without firearms rest their hands on their hips. So, if that's what you're referring to, then yes.
Q Okay. So, have you seen police officers, while wearing their firearm on their hip, also just rest their hands on their hip?
A On their hips, I can't say for certain.
Q You can't say for certain?
A No.

Q Okay. During the internal affairs investigation, did you ever provide Danielle's last name?
A No, ma'am.
Q Why?
A Because Mr. Samson did not seem trustworthy. He did not seem like somebody who was doing an accurate investigation. When I was alerted by my employer about the phone calls and the allegations of what was stated in the phone calls and the context of those phone calls, they told me to be careful.
And knowing that information, I didn't feel comfortable with Mr. Samson. I didn't feel comfortable with our interactions. Furthermore, you know, I sent Mr. Samson an email, which he never responded to. So, he wasn't really receptive to our conversations. He often refused to provide information.
At one point, I asked him, Has this been provided to Mr. Stebbins?
And he said, Yes.
So, I didn't feel comfortable that if I provided Mr. Samson Danielle's last name, that Mr. Stebbins would not thereafter, you know, do anything to this woman. She just happened to be someone who was at the scene of the incident.

So, in order to preserve and protect victims or witnesses of a crime, it's usually in the best interest not to provide it to people who are not -- people who are going to ensure their safety.

Q So, are you asserting today that Steve Stebbins committed a crime on May 22, 2018?

A That was what I stated, that he threatened me, yes. And that is a crime.

Q Do you know what section of the criminal statutes you're referring to?

A No, ma'am.

Q And -- okay. So, did you ever ask Danielle if she would be willing to, you know, be a witness during the internal affairs investigation?

A What you are referring to with Samson?

Q During the internal affairs investigation, did you ever ask Danielle if she would be willing to be a witness for that?

A Thank you. I don't really understand the question in regards -- if you're referring to talking to it with Samson, no. I've never suggested that she -- asked her if she would talk to Samson.

Q Okay. So, you never asked Danielle if she would talk to Sergeant Samson?

A No, ma'am.

Q Okay. Now, okay. So, the NYPD, they terminated your employment, right?
A Yes, ma'am.
Q Okay. Now, did you try to work as a police officer again after that?
A No, ma'am.
Q How did you feel when the NYPD terminated your employment?
A I didn't have any feeling.
Q You had no feelings?
A Not at that time.
Q So, why didn't you try to be a police officer again?
A I don't have response to that.
Q So, you get fired from your job as a police officer and then you had to obviously decide what to do next for employment, correct?
A Yes, ma'am.
Q Okay. So, did you consider finding a job as a police officer elsewhere?
A I don't really think -- I don't know for certain if I did or if I didn't.
Q Well, would you still want to be a police officer?
A I don't have any opinion whether I would want

to or not. I don't have any bad feelings about police officers. I talk to them every day.

Q Okay. Now, so, the NYPD, as your employer, they found you had an off-duty confrontation with on-duty MTA officers; is that right?

A In the documentation you provided, that's what I've learned.

Q Okay. And the NYPD, as your employer, found you were verbally abusive to those on-duty MTA officers, right?

A That was what was asserted, I believe, from what you provided.

Q Okay. So, did you have negative feelings toward those MTA officers?

A No, ma'am.

Q No. So, you said in on August 23rd that there was a noise complaint?

A Yes, ma'am.

Q So, can you please explain that to me?

A The only thing -- again, the documentation in which you provided, I've never seen before, I never heard before. I received a summons for unreasonable noise.

Q Are you sure it didn't say, "disorderly conduct"?

108

A Disorderly conduct -- unreasonable noise is a subsection. So, in New York, you have to write the subsection in which you're citing someone.

Q So, there's a subsection of disorderly conduct that says what?

A I believe there's seven subsections of disorderly conduct.

Q Okay. So, which one did the summons have?

A Unreasonable noise.

Q Okay. And so, you were accused of being loud to the on-duty MTA officers; is that right?

A I don't know what the allegation was.

Q Okay.

A There was no report or anything ever written, to my knowledge.

MS. VITALE: Okay, all right. So, let's see, what time is it?

MR. McLANE: 11:30.

MS. VITALE: Do you want to take a quick five-minute -- does anyone want to take a break or we can keep going until 12:00 and break for lunch.

THE WITNESS: Do you mind if I grab something out of my bag, though? It's just a piece of candy.

(Recess: 11:32 to 11:38.)

MS. VITALE: Okay. So, we can go back on the record, if we haven't already. And I'm really sorry. I actually forget where we left off. Would you mind reading back?

(The last question and answer was read back by the Court Reporter.)

BY MS. VITALE:

Q When you say there was no report that was ever written to your knowledge, what kind of report are you talking about?

A I've never received any paperwork from anybody. So, the only thing that I got was a letter in the mail signed by a judge. I want to say it stated there was no probable cause.

Q No probable cause for what?

A For the summons for the ticket.

Q Do you still have that document?

A I don't. I did search for it, though.

MS. VITALE: Okay. So, I am going to mark as Exhibit 40 a video that is Bates

numbered Cameron 20.

(Defendants' Exhibit 26:
Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, I just played the video that's Exhibit 40, which is the video that's Bates numbered Cameron 20. What is that video?

A That video was recorded on November 13th of 2018, sometime in the evening. I was being -- I was driving. It was a Connecticut State trooper vehicle following me. I believe that was on Route 5 in Enfield, Connecticut, for a decent amount of time.

At that point in time, again, I had no idea who it was. So, I just recorded it because this officer was tracking my vehicle at this point in time.

Q So, okay. So, Exhibit 40 is a video that you took yourself; is that right?

A Yes, ma'am.

Q Were you using your cell phone?

A Yes, ma'am.

Q And at what point did you notice the

Connecticut State trooper behind your car?

A I'm going to say previous to Brainard Road, Brainard Road and Enfield Street. There is a firehouse right there, if that's the intersection. That is at the light where the Dunkin' Donuts is, is at Montano and Enfield Street.

Q So, at what point did you see the Connecticut State trooper?

A Brainard Road.

Q The corner -- the intersection of Brainard Road and --

A Yes, ma'am. That's Enfield Street.

Q Okay. And then you took -- where is the point that you took that video that's Exhibit 40?

A I believe that's at the light. As you see, the camera is facing down. So, we're at a red light. So, I opened my phone, turned the camera on. So, that was at Montano Road and Enfield Street.

Q Do you have any information that Steve Stebbins was driving that Connecticut State Police cruiser?

A I do not have any information that Steve Stebbins was driving that vehicle. I couldn't see a license plate and I couldn't see in the vehicle when I attempted to.

Q Are you aware of any State troopers that lived in that neighborhood?
A I've never seen another State trooper in that area.
Q You never seen a State trooper live in that area?
A Yes, ma'am -- my apologies. Per your question, yes. You asked me did I ever -- do I know of any other State troopers from that area. And I said I've never seen or known any other State trooper to be in that area.
Q To live in that area.
A To live in that area, I'm sorry.
Q Okay. So, you just aren't aware of any other State troopers who live in that area?
A Correct.
Q So, after -- so, Exhibit 40 shows the State trooper passing your car; is that right?
A Yes, ma'am.
Q And after that, did you see that State trooper again?
A No, ma'am.
Q Okay. Did you say there was a fire station at the corner of Brainard Road and Route 5?
A Yes, ma'am.

Q Okay. So, did the State trooper pull out of that fire station?

A No.

Q So, did you just happen -- so, how was it -- when did you notice the State trooper behind your car?

A At Brainard Road and Enfield street.

Q So, you just happened to --

A To look in the --

Q -- look in --

A I'm sorry, yes, ma'am.

Q You just happened to look in the rearview mirror?

A Yes, ma'am.

MS. VITALE: Okay, all right. Now, I'm going to make Exhibit 41 the video. It's Bates numbered Cameron 21. So, I'm going to start by playing it first.

(Defendants' Exhibit 41: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Did you take that? So, I just showed you the

video was marked as Exhibit 41. And did you take that video?

A Yes, ma'am.

Q And what is that video?

A That video is Steve Stebbins operating a Cadillac Escalade approaching the corner of Foxcroft Road and Montano Road making a right, going to 44 Foxcroft Road.

At that corner, there is a stop sign. In that video, you clearly see the vehicle not completely stop at the stop sign.

Q So, why did you take this video?

A Well, this is after 11/12/2018, that incident. Mr. Stebbins has never been observed not going down Montano Road and going past my -- the 49 Foxcroft Road, my house.

So, providing information to show the court because I believe at this time I had access to the restraining order that this is not his regular course of travel. So, he is operating coming down Montano and there is a secondary video -- I'm sure you're probably going to play it next -- that showed him again leaving 44 Foxcroft Road and not going past 44 Foxcroft Road.

MS. VITALE: All right. I'm going to play Exhibit 41 again here.

(A videotape was played.)

BY MS. VITALE:

Q So, what is the -- do you know what -- so, again, this is a cell phone video that you took of your security camera video, correct?

A Yes, ma'am.

Q Okay. What is the date of the security camera footage that you were recording using your cell phone?

A In this video?

Q Correct.

A 11/20/2018.

Q Okay. So, you took a video using your cell phone of security camera footage from November 20, 2018?

A Yes, ma'am.

Q All right. And this video shows Trooper Stebbins coming down Montano Road and then turning right onto Foxcroft Road toward his house, correct?

A Yes, ma'am.

Q Okay. Now, how was it that you came to view this footage.

A I don't recall why, but I think after 11/12,

that incident I became aware of how to navigate the system to turn certain cameras on to continuous recording.

So, when I came to this video, I just saved it because it clearly shows Mr. Stebbins running through a stop sign. And you know, the start of all these -- allegations started with an allegation of me running a stop sign.

So, if we are here, I think it's important, if you're going to be stopping people or for or what is perceived of running stop signs, you need to be operating vehicles and holding yourself accountable to the same motor vehicle laws and infractions.

Q So, you believe as of November 20, 2018, your security cameras were operating on continuous footage; is that right?

A I believe possibly. So, I've learned how -- I can't say for certain, but I did learn to make adjustments to the system, how to turn cameras to continuously recording.

The problem with it is: There's six cameras and the amount of data that's on there, you would need -- I would need a bigger memory system in order for it to save for long periods of time. So, that's why you see me still using the cell phone for short periods of

time.

Q Okay. So, at what point were you taking the video using your cell phone?

A I don't recall the date.

Q Okay. So, you don't recall if it was on November 20, 2018?

A I do not.

Q Okay. So, and -- so, by 11/20 -- November 20, 2018, you had adjusted your security cameras to do continuous footage; is that what you're testifying to?

A Possibly, yes. Certain cameras.

Q Possibly?

A Yeah, I can't say for certain.

Q So, if your security cameras were operating on continuous footage as of November 20, 2018, I mean, didn't you have to watch hours and hours and hours of footage to find this moment that Trooper Stebbins came down Montano Road and took a right onto Foxcroft Road?

MR. McLANE: Objection.

THE WITNESS: No, ma'am.

BY MS. VITALE:

Q No. So, how was it that you found this moment?

A I do not recall.

Q You don't recall?
A But I didn't have to watch hours of footage, no.
Q Okay. Well, I'm just confused because how is it that this security camera was activated by -- so, either the security camera was operating on continuous footage or it was still activated by motion, right?
A Yes, ma'am.
Q Okay. So, if it was on continuous footage, then wouldn't you have had to review a lot of footage to find this moment?
MR. McLANE: Objection.
THE WITNESS: Not really. I don't really know. Again, you asked a similar question. So, I can't say for certain whether it's on continuous or whether it's not. And no, I did not have to watch hours of footage to find this moment.
BY MS. VITALE:
Q Well how was it that you found this moment?
A I don't recall.
Q You don't recall?
A No, ma'am.
Q And so, if your security camera was not operating under continuous footage on November 20,

2018, then it would have been activated by the motion of Trooper Stebbins's car down the street; is that right?

A Possibly -- I'm sorry. Possibly.

MS. VITALE: Okay. Now, I'm going to make, as Exhibit 42, the video that is Bates number Cameron 22.

(Defendants' Exhibit 42: Marked for Identification.)

MS. VITALE: I'm playing the video now.

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, we just watched the video that's marked as Exhibit 42. Do you recognize that video?

A Yes, ma'am.

Q And what is it?

A That's a video from the same date approximately an hour later of the same vehicle. Mr. Stebbins operating, leaving 44 Foxcroft Road and going down Montano Road to leave the area.

Q And again, you took that video using your

120

cell phone?

A Yes, ma'am.

Q And do you recall when you took that video with your cell phone?

A I do not.

Q And why did you take that video?

A So, previously, I think at this point, I possibly could have had some information of Mr. Stebbins suggesting the construction in the area as well as him driving multiple ways to leave the area.

This video is clearly showing him use the same route to come into the area and the same route to leave the area and also, not driving past 49 Foxcroft Road on this date and time.

Q Okay. And again, that's November 20, 2018?

A Yes, ma'am.

Q Okay. And how is it that you came to see that moment on your security camera?

A I don't recall.

MS. VITALE: Okay. I'm going to make, as Exhibit 43, the video that is Bates numbered Cameron 76.

(Defendants' Exhibit 43: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. So, what is Exhibit 43?

A It's another video. I can't see the date, my apologies. It's another video of Mr. Stebbins operating a black Escalade, coming down Montano Road, not stopping for the stop sign, making a right going to 44 Foxcroft Road.

MS. VITALE: And I'm going to play the video again, so that we find the date stamp here.

(A videotape was played.)

BY MS. VITALE:

Q So, I just paused the video at 10 seconds. So, does the time and date -- does the date stamp on this show December 8, 2018?

A That's what it looks like. It's hard to tell, but I believe it's 12/8.

Q Okay. Do you know when you took -- so, again, this is a cell phone video taken of your security camera footage; is that right?

A Yes, ma'am.

Q Okay. And do you know when you took this cell phone video?

A I don't recall.

Q Why did you take this video?

A The same thing. Mr. Stebbins asserted that he drives multiple ways to leave the area. This is showing Mr. Stebbins driving the same route on two separate dates. Again, this started with an assertion of someone not completely stopping for a stop sign.

It clearly shows Mr. Stebbins not stopping for a stop sign, but it also shows that Mr. Stebbins has never drove past 49 Foxcroft Road as he did on 11/12/2018.

Q Well, so, I'm curious about that. So, were you watching your security camera every day to see if he drove by your house?

A No, ma'am.

Q So, how do you know that?

A Well, I've never seen him. None of my observations have ever seen Mr. Stebbins drive past 49 Foxcroft Road.

Q So, how is it that you came to view this moment on your security camera on December 8, 2018?

A I don't recall.

Q Okay. And so -- so, you can't possibly know how often -- so, you can't possibly know how often Trooper Stebbins went to that house on 44 Foxcroft Road after November 12, 2018, right?

A No.

Q Okay. And you can't possibly know all the different routes that he took to get to 44 Foxcroft Road after November 12, 2018, right?

A Thank you. Yes, that assumption is true, but Mr. Stebbins asserted in a previous written statement that he drives multiple ways to get to the area. And that -- and he also asserted that he's never seen me drive past 44 Foxcroft Road.

So, based on those -- both of those are assumptions. No one actually truly knows how often someone is driving past a home. But if the allegations were solely against me and I was the sole person charged and asserted that I couldn't, Marcus Cameron, couldn't drive that direction, as Enfield Police Department and as the complaint -- the report written by Sergeant Samson asserted that I had multiple ways to get in and out the area, that's -- we both have multiple ways to get in and out the area.

Q So, the statement that you referred to that Stebbins made about taking multiple ways, that was when

124

he still lived at 44 Foxcroft Road, right?

A Yes.

MS. VITALE: Okay. And now, I'm going to mark again Exhibit 44, which is a video Bates numbered Cameron 77.

(Defendants' Exhibit 44: Marked for Identification.)

THE WITNESS: It's the same one.

MS. VITALE: Strike that. You know what, I'll just preserve it, okay.

BY MS. VITALE:

Q So, Exhibit 44, which is the video, Bates numbered Cameron 77 is a duplicate of Exhibit 43, which is Cameron 76; is that right?

A It looks that way. Yes, ma'am.

MS. VITALE: Okay. Why don't we, so it's 12:00 o'clock. Why don't we take a break for lunch and do 45 minutes.

(Recess: 12:01 to 12:55.)

AFTERNOON SESSION

12:55 o'clock p.m.

MARCUS CAMERON, resumed testifying further on his oath as follows:

MS. VITALE: So, back on the record.

BY MS. VITALE:

Q So, Mr. Cameron, the cell phone videos that we saw from November 20, 2018 and December 8, 2018 -- I apologize.

The cell phone videos that we saw of the security camera footage from November 20, 2018 and December 8, 2018, so, did you say that was a black Escalade?

A Yes, ma'am.

Q Okay. How do you know it was Stebbins driving that car?

A So, on one of the dates, I observed Stebbins earlier in the day driving that vehicle.

Q Which date was that?

A I believe that was the 12/8 date.

Q December 8th?

A Yes, ma'am.

Q So, you saw him drive that vehicle in person?

A Yes, ma'am.
Q And where was he?
A In -- on Foxcroft Road, Enfield.
Q So, were you at your house on 49 Foxcroft Road?
A Presumably so. Yes, ma'am.
Q Well, you said you saw him driving the black Escalade?
A In --
Q So, where were you?
A In Enfield. I can't say for certain where I observed him at.
Q It was just somewhere in Enfield?
A Yes, ma'am.
Q Okay. Do you remember where in Enfield?
A I don't recall at this time.
Q Okay. And what time of day was it on December 8, 2018?
A I want to say it was earlier. It was previous to the video. I don't know for certain.
Q Before the video?
A Yeah.
Q But you don't know if it was him driving the Escalade in the video, right? It could have been his wife or --

A It's an assumption, but I don't -- that I've seen Mr. Stebbins operating a vehicle.
Q Okay. So, you've seen Mr. Stebbins operating a black Escalade at some point in the past?
A Correct.
Q But you don't know if this was him driving it in the videos on November 20th or December 8th, right?
A I seen him on December 8th operating a vehicle.
Q Earlier in the day, right?
A Yes, ma'am.
Q Okay. But you don't know if it was him driving the black Escalade in the video on 12/8/2018, right?
A I wouldn't say no.
Q But you don't know that it's him driving it right?
A I wouldn't say no.
Q I don't know what that means.
A I wouldn't say that I don't know that.
Q You wouldn't say that you don't know that?
A No, ma'am.
Q But you don't know it, right? You don't know that was him driving it on December 8th, right?
MR. McLANE: Objection.

THE WITNESS: I've seen him operating it earlier in the day.

BY MS. VITALE:

Q Okay. So, my question is really simple. So, in the video from December 8, 2018, can you see that it's him driving that black Escalade in that video?

A In the video, no.

Q Okay. When you saw --

A Go ahead.

Q When you saw Steve Stebbins earlier in the day on December 8, 2018, did he say anything to you?

A No, ma'am.

MR. McLANE: Did you need to take a break.

THE WITNESS: I do want to respond to what you're referring to just in general. I have also, after the arraignment date of 12/18/2018, there was a secondary date of the court cases in Enfield court.

Mr. Stebbins was observed driving the Cadillac Escalade. After court he was observed going to 44 Foxcroft Road. He was observed coming down Montano, did make the right and did go to 44 Foxcroft Road and leave the same way.

BY MS. VITALE:
Q So, that was on December 18th?
A No, ma'am, 12/18 for certain. And I just have to -- I don't recall the date off the top of my head, but there was another date after court appearance where Mr. Stebbins went to the Foxcroft address.
Q So, sometime after December 18, 2018, you also saw him --
A Yes, ma'am.
Q -- go to the 44 Foxcroft Road address?
A Yes, ma'am.
Q Okay. Did you see him on your surveillance camera?
A I don't recall if I ever looked.
Q So, you saw him --
A Personally.
Q -- physically?
A Yes, ma'am.
Q And were you at 49 Foxcroft Road when you saw him?
A Yes, ma'am.
Q Okay. And did you see him come down Montano Road and turn a right onto Foxcroft Road?
A Yes, ma'am.
Q And you could see that was him driving the

car from that distance?
A Yes, ma'am.
Q Okay. What were you doing outside of your house?
A I'm not understanding the question. Why was I outside?
Q Yes, at that moment.
A Just happened to be outside.
Q You just happened to be outside?
A No reason, no.
Q And did you also say you also saw him leave his house?
A Yes, ma'am.
Q Okay. And what were you doing outside at that time?
A Again, I don't -- just outside.
Q And this was in December?
A Yes, ma'am.
Q And again, did Steve Stebbins say anything to you on that date?
A No, ma'am. So, just to clear that part up. I've never even had a conversation. I don't think we've even said two words to each other after the 5/22/18 incident. We've never even spoken.
Q Now, during your deposition on August 23,

2022, you said that Steve Stebbins when he was standing in your driveway on May 22, 2018, said either, What the fuck are you doing or what the hell are you doing?

Which is it? Which one of those phrases did he say?

A For certain I'm going to say what the fuck are you doing?

Q Okay. So, it's your testimony that he said, What the fuck are you doing?

A If you're asking me to -- which phrase of those two do I recall most, it would be that one.

Q What does that mean, "recall most"?

A As you stated I said "or." So, I wasn't certain. I'm not 100 percent certain the exact words that were stated. But if you're asking me to pick between the two which I recall, refreshing my memory back to 5/22/2018, that's the one I'm going to say that I heard.

Q Okay. But you don't know for sure what he said?

A Correct.

Q Okay.

A My apologies. In reference to the incident, I did write a report which would state the exact words. If you want me to go to that, I'll gladly go back to

that to just show you exactly what I recall him stating.

Q Okay, sure. Why don't you tell me which report it is that has his exact words?

A It is the 5/23 email sent to internal affairs through an inquiry complaint.

MS. VITALE: Okay. So, I'm going to mark this as Exhibit 45. And it is Bates numbered Cameron 702.

(Defendants' Exhibit 45: Marked for Identification.)

BY MS. VITALE:

Q So, Mr. Cameron, looking at Exhibit 45 -- I want to hand you the official one here. Is this the complaint that you submitted to the Connecticut State Police on May 23, 2018?

A Yes, ma'am.

Q Okay. And does Exhibit 45 most accurately reflect what happened on May 22, 2018, between you and Trooper Stebbins from your perspective?

MR. McLANE: You can take a minute and read it.

THE WITNESS: And I believe this is

missing some information, just so you know.

BY MS. VITALE:

Q What information do you believe it's missing?

A I would need to refer to the second email sent on 5/25.

Q Okay. So, I'm handing you what's been marked as Exhibit 5. Now, is that the email that you sent on May 25, 2018?

A Yes, ma'am.

Q Okay. So, now, what information is missing from your May 23, 2018 complaint?

A So, just to be clear, it looks like the actual statements are actually missing from here. If you go to page 2 of the one sent on 5/25, the quoted statements are listed there. And as you see in this first email, you don't see that information.

Just so you're aware, that Eric Cooke contacted me on 7/25 via phone and informed me that, did I submit a complaint?

I said, Yes.

He says, Send it from your personal email because it doesn't look like the full complaint came through.

Now, having the opportunity to look at this in comparison, it's not the full complaint that went

through.

Q So, you said 7/25, I think you meant May 25?

A Yes, ma'am. I'm sorry.

Q And let me see what's the -- I'm sorry. I don't have my copy with me. So, let me just pull this up. There you are. Thank you.

A Okay.

Q All right. So, how could Eric Cooke tell you that -- how could Eric Cooke tell that your full complaint didn't go through?

A You'd have to ask Eric Cooke that. He called me on 7/25.

Q And so --

THE REPORTER: Did you say 7/25?

THE WITNESS: My apologies, 5/25.

BY MS. VITALE:

Q Now, the information that you did not include in the May 23, 2018 complaint, it's sort of in the middle of your email, right?

A Yes.

Q That was sent on May 25, 2018?

A Yes, ma'am.

Q Okay. And so, I'm just a little confused. Did you just forget to include that information in your May 23, 2018 complaint or is it your testimony that it

somehow was extracted from your complaint?

THE WITNESS: Can you read back the question in its entirety, please?

(The last question was read back by the Court Reporter.)

THE WITNESS: So, I'll start with the part where you said, did I forget to include. I'm not in charge of the inquiry system from the Connecticut State Police. If there was an issue with the way it went through, you'd have to inquire with them.

I've never wrote a secondary statement. So, this entire -- this statement in its entirety is what I recall submitting on 5/23 as well as 5/25.

BY MS. VITALE:

Q Okay. So, does 5 -- so, does the email that you sent on May 25, 2018 most accurately reflect the statements that Trooper Stebbins said to you on May 22, 2018 from your perspective?

A Yes, ma'am.

Q Okay. Now, did you take -- following your May 22, 2018 interaction with Trooper Stebbins, did you

kind of take contemporaneous notes of what happened?

A In regards -- I don't understand what you mean.

Q Sure. So, on -- so, after your interaction with Trooper Stebbins on May 22, 2018, did you take any notes immediately after the incident?

A Take notes, like, write it on a pad?

Q Or in a text message or social media or electronically?

A No, no. Mental notes.

Q Okay. And May 23, 2018 would be the first time that you kind of wrote down what happened, your recollection of what happened on May 22, 2018 between you and Trooper Stebbins?

A No, ma'am.

Q No? So, you wrote it down earlier than May 23rd?

A Correct. So, this was submitted on May 23rd. It looks like it went through at 2:37 p.m. per this message here. I can't confirm that this time is accurate. To my recollection, it was sent in the morning on May 23rd.

Q Okay. So, but in any event, so, when you sent in your complaint on May 23rd to the Connecticut State Police, was that the first time that you wrote

down your recollection of what happened on May 22, 2018 between you and Trooper Stebbins?

A No. I believe I wrote it down as soon as I got -- once I didn't get anywhere with calling and speaking with Sergeant Gun, I believe I wrote it down after that.

Q Okay. So, you -- so, where did you write it down?

A I don't remember.

Q You don't remember?

A No, ma'am.

Q Well, was it electronic?

A I believe so.

Q So, wouldn't you still have a copy of that?

A It's provided here (indicating).

Q Okay. So, was there a delay between you writing down your complaint and sending it in?

A I don't believe so.

Q Okay. Can I please have that exhibit?

A Yes.

MR. McLANE: Do you want 45 as well?

MS. VITALE: Sure, thanks.

BY MS. VITALE:

Q So, do you recall telling Sergeant Samson that you did your own fake investigation?

A I believe I did state that.

Q What did you mean by that?

A Just looking at having an inquiry and looking into who I spoke to. There's nothing they can do other than write down names, see who they are; stuff like that.

Q What do you mean?

A So, Sergeant -- so, investigation in regards to -- I think I tried to obtain the 9-1-1 call. I believe I tried to obtain the secondary 9-1-1 call. So, there was a call where I spoke to the dispatcher, which has been provided.

There's a secondary call of 9-1-1 when I actually spoke to Trooper Stankowski. So, I think I tried to obtain that at the time. I don't recall at the time completely.

Q So, do you recall saying that you did your own fake investigation to find out who the man was in the road?

A I do.

Q On May 30, 2018?

A Yes, ma'am.

Q Okay. so, can you please tell me about that investigation?

A Yeah. So, the gentleman had a shirt on. So,

I -- at first, I thought he was a State trooper, but he had a shirt on. I forgot what it said on there. So, I looked up that company to see if I can find out him listed on their website.

Q Okay. So, you came up with the name Joseph LaPlante?

A Uh-hum.

Q And you determined he was friends with Stebbins on Facebook, right?

A So, I took -- it came up as a friend suggestion, if I remember correctly. This is back 2018. So, the name popped up for some reason, odd reason, whatever the case may be. When I clicked on it, I was able to tell he was friends with Mr. Stebbins.

Q Okay. And you just did that through Google?

A No, through Facebook. It popped up as a friend suggestion on Facebook.

Q A friend suggestion? So, do you get friend suggestions when you're not friends -- so, for example, are you and Trooper Stebbins friends on Facebook?

A Unfortunately, no.

Q So, I mean -- so, would you get a friend suggestion for someone connected to him if you're not Facebook friends?

A My apologies. Sometimes it will pop up like someone that's relatively close to you in the area. So, like, right now in Hartford, Connecticut, it may pop up with someone who else is utilizing Facebook at the time in your relative area.
Q But do you know where Joseph LaPlante lives?
A I do not.
Q So, you were trying to determine who the man in the road was on Facebook?
A Well, it showed -- I tried to see if the guy in the video looked like the guy that popped up in the friend suggestion.
Q So, in the -- so, in the course of you trying to figure out who the man was in the roadway, you checked Facebook?
A No.
MR. McLANE: Objection.
BY MS. VITALE:
Q So, all you did was Google him?
A No, I never Googled him.
Q You never tried -- so, how did you -- so, how did you try to figure out who he was if you didn't use Google?
A So, if you look at it -- I didn't -- you asked me did I Google him. I told you I Googled the

logo on his shirt.

Q Okay, right. I'm sorry, you're right. I misspoke there.

So, you used Google to try to figure out who the man was in the roadway, right?

A Uh-hum.

Q Okay.

A My apologies, yes, ma'am.

Q Yes, okay. So, I'm going to hand you what was previously marked as Exhibit 21. And again, I have to find my copy, so I'm so sorry. I should have scanned these exhibits in before. Okay. So, I'm handing you Exhibit 21?

A Thank you.

Q Now, at -- so, again, Exhibit 21 is your own personal phone records from November 12, 2018; is that right?

A Yes, ma'am.

Q Okay. And so, if you turn to the last page of Exhibit 21, do you see the very last entry has an incoming call (617)849-4335; do you see that?

A Yes, ma'am.

Q And was that Jean Paul?

A Yes, ma'am.

Q Okay. So, did Jean Paul call you at

2:36 p.m. on November 12, 2018?
A Yes, ma'am.
Q And you spoke for 10 minutes?
A Yes, ma'am.
Q Okay. Now, did Jean Paul call you around the time that you pulled over on the side of 91?
A Yes.
Q Okay. And you were on the phone with him for 10 minutes, right?
A Yes, ma'am.
Q Do you know at what point during that phone call did you tell him where you were going?
A As soon as he called me back.
Q So, as soon as you answered the phone at 2:36 p.m.?
A Yes, ma'am.
Q And why did you stay on the phone with him?
A For my safety.
Q So, why didn't you call the Enfield police?
A To state -- I'll answer your question. So, Enfield has been notified. I didn't get anywhere when I spoke to them on 5/20 -- 5/30. On 5/26, the Enfield officer followed my friend. So, I didn't believe that they had -- were going to do anything helpful to me at that point in time.

Mr. Paul, and given the certain circumstances of America today, right, we have Mr. Paul who is somebody that I rely on for my safety every day of my life. So, I know that if I call Jean Paul at 2:36 p.m., and I tell him that the police officer who has been harassing me driving past the house, calling my job, et cetera, is now attempting to what looks like pull me over and follow me on the highway, throughout Enfield, and I need him to come.

Where are you going?

I'm telling him exactly where I'm going because I know he's somebody that's going to get there in a very timely manner and to make sure if I am killed by these officers, given the state of society today, given the fact that Enfield has already asserted that they believe that I was the person harassing Mr. Stebbins.

So, if I called them, what were they going to do? They were going to come to the scene. And my interpretation is probably do the same thing in which they did. So, in any event, called Mr. Paul, because I knew he was somebody who could get to the scene. And, A, make sure that he's recording everything that he sees and he can document anything and everything that he observes.

Q So, as far as what Jean Paul was going to do, you wanted him to record?

A Yes, ma'am. I needed a witness at the scene, who was reliable and honest. I didn't need anybody -- obviously, this gentleman, I'm sorry, Mr. Stebbins was following me. I don't know what his intentions were. I know for a fact he's in the middle -- he's driving a police vehicle. I know that he has the ability to pull me over. He can make whatever assertion that he wants. So, I needed someone independently, who can come to the scene and have the ability to record.

Luckily, Mr. Paul did get to the scene. He was able to provide some videos -- not videos -- like he was able to capture screenshots that show Mr. Samson arrive at the scene, Mr. Samson talking to Bryan Nolan. I believe it's Officer Chagnon, Officer Croteau at the scene.

Given the nature of the previous internal investigation, the direction of that internal investigation, the intimidation tactics by Mr. Samson and Mr. Stebbins, the constant harassment, I knew for a fact that having someone there that would have the ability to provide a secondary witness, so to say, to the incident that occurred.

Q So, you called Jean Paul -- so, at the time

145

you called Jean Paul, you wanted him to be a witness, but how did you know there was something to witness at the store?

A Which part.

Q At the store you were going to? How did you know there was going to be something to witness at the store?

A Well, the first interaction that you see that Mr. Stebbins provided on video, you see Mr. Stebbins pulled to the side of the road allowing me to drive past. His very next step was to pull out directly behind me. There's no delay once my vehicle went past him.

So, at that point in time, I believe he was going to initiate a car stop for whatever reason. And that's why you me -- you see that I stopped. It's unknown what his intentions were. But based on the fact that I knew for a fact in past interactions that he wasn't going to be honest and truthful.

So, I knew for a fact that I needed someone to get to the scene that was going to get there in a timely manner, in order to protect myself.

Q So, you expected Trooper Stebbins to be at the store you were going to?

A No, ma'am. I told --

Q So, you and Trooper Stebbins essentially took the same route from Colony Road to Brookside Plaza; is that right?
A The same route, essentially, yes.
Q Okay. And you felt like he was following you; is that right?
A I didn't know for a fact if he was following me. I seen him pull over twice or three times. And each time he came up behind me.
Q And so, then why wouldn't he feel like you're following him?
MR. McLANE: Objection.
THE WITNESS: So, if Mr. Stebbins believed that I was following him and that's what he's asserted in his statement, I believe that Mr. Stebbins had the opportunity at the bank, he seen that I continued on Enfield street towards 91, he had the opportunity to turn back the opposite direction.
BY MS. VITALE:
Q So, who got to 91 first; it was Trooper Stebbins, correct?
A Incorrect, I did.
Q Well, you passed Trooper Stebbins on your --

on the entrance ramp to 91, right? So, he got there first?

A He wasn't on 91. That's a ramp that encapsulates into 91.

Q Correct.

A I was the first person on 91.

Q Right. Because you -- so, once you're on the entrance ramp, you can't turn around, because it's a one-way street, correct?

A I can't. Mr. Stebbins could.

Q Drive the wrong way on an entrance ramp?

A He -- what do you mean?

Q Well, I'm confused.

A He wasn't completely on the ramp.

Q Yeah. He pulled off on the side of the ramp, right?

A At the very top of the ramp that's on Enfield Street.

Q Okay. So, let me find this video.

MR. McLANE: I think it's Stebbins 494.

MS. VITALE: Thank you.

MR. McLANE: 492 is, I think, the first one. 493 is the rear camera. And 494 should be --

MS. VITALE: Thank you.

MR. McLANE: Or could I be making you go on a wild goose chase.

MS. VITALE: All right. So, I'm going to mark this as Exhibit 46. The video that is Stebbins Bates numbered Stebbins 495.

(A videotape was played.)

BY MS. VITALE:

Q Do you recognize this to be Trooper Stebbins' rear -- the rear camera on his cruiser?

A Yes, ma'am.

Q Okay. And so, he's parked on the side of the entrance ramp to 91; is that right?

A That's correct.

Q Okay. And so, he's not at the beginning of the entrance ramp to 91, right?

A It's pretty -- that's pretty much the beginning of the ramp, ma'am. It's relatively close to the corner. There's a light right there.

Q So, you think that Trooper Stebbins could have just turned around and driven the wrong way on this ramp; is that your testimony?

A Yes, he's in an emergency vehicle. If he has the ability to turn his lights on, he does have the

ability to go back, especially if he believes his life is in danger.

Q At any point, did Stebbins point his firearm at you?

A No, ma'am.

Q At any point, did you see Stebbins remove his firearm from its holster?

A No, ma'am.

Q Did Stebbins ever issue a ticket?

A Mr. Stebbins has never had the -- never pulled me over to issue me a ticket.

Q Now, when you were pulled over on the side of 91 with your hazard lights on, he could have stopped, right?

A I don't -- anybody can stop, yes.

Q But he didn't, right?

A Correct, he did not stop.

Q Okay. When you were at Brookside Plaza, did you go into the pet store?

A I went into Staples. And I'll just back-track, I'm sorry. I just want to mention in reference to the highway, Mr. Stebbins was in the left lane of three and I was operating a right lane of three. I was closest to the exit lane.

Mr. Stebbins started to cross the highway

from the left lane to get off in front of me in the right lane. He indicated -- and there is the indication of him being in the left lane. I believe it's in the police report written by Bryan Nolan.

Q So, how far in front of you is he when he got off the exit?

A Well, I believe he was the next car.

Q So, he -- there was no cars in between you and him when he got off the exit?

A To the best of my recollection, no.

Q When you say, "to the best of your recollection," do you remember either way?

A Yes.

Q You do?

A I don't recall any other vehicles being in between us at that point in time.

Q Uh-hum. So, your testimony is he went all -- how many lanes are there?

A There's three lanes.

Q There's three lanes. So, he was in the left-most lane?

A Yes, ma'am.

Q And your testimony is that he went from the left-most lane all the way directly in front of you?

A Yes, ma'am.

Q To get off the exit?
A Yes, ma'am.
Q And why did you also get off the exit?
A Well, I already was getting off the exit. My turn signal was already on.
Q So, you say your turn signal was already on, but why did you still get off the exit?
A Because I was going to Brookside Plaza.
Q But you could have kept going, right, instead of getting off the exit?
MR. McLANE: Objection.
THE WITNESS: Instead of going to Brookside Plaza?
MS. VITALE: Well, I mean, just starting with you didn't have to get off the exit right, right, when you saw the trooper get off?
THE WITNESS: Are you suggesting --
MS. VITALE: You could have kept going?
THE WITNESS: Are you suggesting that if I'm going to Brookside Plaza that I shouldn't go to Brookside Plaza anymore?
BY MS. VITALE:
Q I'm saying you didn't have to go to Brookside Plaza still when you saw him get off the highway; is

that right?

MR. McLANE: Objection.

THE WITNESS: I don't understand your question.

BY MS. VITALE:

Q So, my question is: Why didn't you -- so, is the answer that you just wanted to go to Brookside Plaza, so that's why you kept getting off the highway?

A No, I was going to Brookside Plaza.

Q Okay. And you still wanted to go to Brookside Plaza after the trooper got off the highway in front of you?

A It had no relation to me where he was going.

Q Okay. So, you weren't afraid at that point?

MR. McLANE: Objection.

THE WITNESS: So, when you asked me if I was afraid at that point, Mr. Stebbins is in front of me. He's no -- he's operating his vehicle in front of me. I had already turned into Brookside Plaza. So, there's no -- when you talk about afraid of, is there a natural fear of me in this situation? Yes, of course.

You obviously have an interaction with an unarmed black man, who has been called on

numerous times by police by Mr. Stebbins. So, naturally at this point, yes. There's a fear, but it doesn't change the course of your day solely because you believe that Mr. Stebbins potentially could have a plan.

I'm still going to the store. I already alerted my friend, who I'm sitting on the phone with, so he can hear any conversation. He can hear any interaction and I'm already aware that he's on his way to the location.

I also know that Brookside Plaza is full of cameras. So, when you see where I stopped at, I made sure I stopped in an area where if there is any cameras in Brookside Plaza, it's going to be a clear view of any interaction that goes on in that plaza.

BY MS. VITALE:

Q Okay. Do you have any information that Stebbins gave information to the media?

A Do I have any information that Stebbins gave -- his statements were utilized in the media.

Q But do you have information that Stebbins gave those statements to the media?

A Not at this time.

Q Okay. Do you have any information that

Stebbins was ever interviewed by the media?

A I don't have any information in regards to that.

Q Okay.

A I will say that Mr. Stebbins had access to the police report prior to it being released in the media.

Q Did you also have access to the police report --

A No.

Q -- before it was released to the media?

A My apologies, no. I asked Bryan Nolan before leaving the Enfield Police Department on 12/11/2018. He told me that it was not releasable and I would have to do a request to the Enfield Police Department records -- I believe it's records at that point in time, because now the investigation was closed.

I previously did ask for all reports from the incident. They kept telling me no. But there is the obviously that Mr. Stebbins had access to it prior to it being released in the media.

Q And did you have a copy of the arrest warrant at any point?

A No, ma'am.

Q No, you were never given a copy of the arrest

warrant?

A I think I left there with a court slip and like a property paper as far as I remember. I wasn't given any other documentation.

Q Well, at any point, though, did you receive the arrest warrant?

A No.

Q At no point during --

A I think -- my apologies. I believe there's a document that says, "Arrest warrant," that's in our obviously provided discovery. That's the only -- I don't recall if I ever was provided a copy of that form.

Not from Enfield Police Department. I believe I may have requested it. I don't recall if I got it from FOIA request or from my attorney or from the court. So, I can't for -- I know for a fact I didn't get it from Bryan Nolan on 12/11/2018.

Q Okay. But --

A Or Mark Squires.

Q -- at a certain point you did receive a copy of your arrest warrant, right?

A I don't know what is actually the arrest warrant. So, there's a paperwork that says, "Arrest warrant," and then I believe the affidavit also says

"Arrest warrant" at the top.

Q Oh, I gotcha.

A So, I don't really know what is the actual warrant.

Q When did you receive either of those documents?

A I have -- I didn't receive anything until court. So, I didn't have access to the police report until, I believe, 12/18/2018. At the arraignment, I know I made numerous requests to get it, but I don't recall ever receiving it prior to the arraignment date or maybe I did. I just don't recall for certain.

Q Now, at your deposition, you said on August 23, 2022, you said, "Through FOI request, it was found that Mr. Stebbins did not submit the video in its entirety to the Enfield Police Department. I was able to review that video that was obtained."

A Yes, ma'am.

Q What are you referring to there?

A So, when I originally submitted the Freedom of Information request, the only videos that were provided to me as the two videos we've seen provided from the dash, the 22nd one on Colony and Dover and then the other one that's at the -- present of the highway.

I submitted a FOIA request to Connecticut State Police for the entire timeframe and they provided me the video in which you see Mr. Stebbins talk about turn -- he turned the audio off. So, that video, when I first obtained it, it wasn't from Enfield Police Department.

Q Okay. So, the video that you're referring to, when you said that, "It was found that Mr. Stebbins did not submit the video in its entirety to the Enfield Police Department," you're referring to a video from Brookside Plaza; is that right?

A Correct.

Q Okay. So, as far as you know, Mr. Stebbins provided the entirety of his cruiser video leading up to Brookside Plaza to the Enfield?

A The only video I'm aware that he provided is the two 10-second clips that are shown. I believe it's the one you showed, front and back, of this video, the last exhibit, as well as the video from Dover Road and Colony Road.

Q Okay. I want to talk about damages. Now --

THE WITNESS: One second, I'm sorry.

MS. VITALE: Oh, sure.

MR. McLANE: Yeah, is it okay if we take a five-minute break?

(Recess: 1:44 to 1:51.)

BY MS. VITALE:

Q Okay. So, I'd like to talk to you about damages. So, did you actually -- are you claiming that you lost wages in this lawsuit?

A So, I don't know. I have to consult, but I believe there was some loss of wages due to my suspension. I don't recall for certain if it's direct lost wages or I had to use time while I was out of one of the jobs. So, I don't really recall that off the top of my head.

Q Because you were placed on a paid administrative leave from the probation office, right?

A Yes, ma'am.

Q Okay. So, paid administrative leave means you don't lose any salary, right?

A That's correct.

Q And then from WayFinders, too, you were also paid during the time you were out; is that right?

A I believe so. I don't recall for certain.

Q Okay, all right. So, did you have to use sick time as part of -- did you have to use sick time as -- are you claiming that you had to use sick time

because of Stebbins?

A I don't recall off the top of my head. I do need to look at Holyoke Community College, if I was paid during the time that I was out on leave. I'm aware of, obviously, paid administrative leave from S Probation Service.

And in regards to WayFinders, I think I was out for two days. I just don't recall for certain what day they allowed me to come back and if I had to use my time or if they just paid me to not be at work those days.

Q Okay.

A I'd have to verify, I'm sorry.

MS. VITALE: Yeah. So, if you guys could please verify that for me, just, you know, so I know.

MR. McLANE: The total wages?

MS. VITALE: Yeah.

MR. McLANE: I'm going to highlight it for you.

BY MS. VITALE:

Q So, it sounds like as far as your deposition today, you can't really tell me about what days you used sick time, why you used it; you need to look up that information?

A Yes, ma'am.

Q Okay, okay. Now, you submitted a bunch of -- or you produced a bunch -- a number of receipts, right?

A Yes, ma'am.

Q Are you seeking reimbursement of costs from the receipts that you produced?

A Yes, ma'am. So, just going off the top of my head, the camera system. I never had a camera system. I only installed it, due to being -- the ability of wanting to document anything that happened on Foxcroft Road that was related to me and the claims that I've made and follow-up harassment at that location, people being followed, et cetera.

MS. VITALE: Okay. So, I'm going to make as Exhibit 47 --

(Defendants' Exhibit 47: Marked for Identification.)

MS. VITALE: It was a supplemental production on November 7th.

MR. McLANE: November 7th.

MS. VITALE: You know what, they're Bates numbered in the title, but not in the document.

MR. McLANE: Where did you print these off? Did you print them off from -- what platform did you print them off? Because when I do it from like Google, like, it actually cuts off the Bates number.

MS. VITALE: Well, I'm looking at it, so here's an example --

MR. McLANE: Or sometimes Logikcull, if you print it off on the platform, sometimes it will, like -- I don't know the function, but like it will actually remove the Bates number from the document.

MS. VITALE: Oh, maybe that's what happened. Yes.

MR. McLANE: By November, I was Bates stamping. If not, I'm sorry. Do you guys need a copy?

MR. GERARDE: Sure.

BY MS. VITALE:

Q Now, okay. So, we're looking at --

MS. VITALE: So, I'm sorry, guys.

BY MS. VITALE:

Q So, we're looking at Exhibit 47, what is this?

A These were receipts for the camera system

that was installed at 49 Foxcroft Road.
Q Okay. So, the first two pages, now, when do they say that camera system was delivered?
A These first two pages, it says purchased on December 16, 2018.
Q And was that purchased for 49 Foxcroft Road?
A Yes, ma'am.
Q Okay. And the third page, when does that say it was delivered?
A This is delivered September 20th of 2018.
Q And was that also for 49 Foxcroft Road?
A Yes, ma'am.
Q So, why did you purchase security cameras in September 2018?
A In September 2018, I believe on -- this was determined on that date. I'd have to look at what date I ordered it. But in any instance, my friend was going to come install it. I want to say he came up that Saturday to install it on -- I believe it's -- without looking, I believe it's 9/18, Mr. Stebbins followed a woman leaving 49 Foxcroft Road from 49 Foxcroft Road onto I-91 south and ran her license plate. When she -- she called me. We sat on the phone for about 40 minutes. I made sure she got to her location.
And based on that and once I had that,

163

another instance where someone is alleging to me that they're being followed from 49 Foxcroft Road. It made me want to go buy a camera system. So, when these instances happen, at least I have on my camera system the car leaving and you probably would also see Mr. Stebbins, as you've seen in other videos, leaving 44 Foxcroft Road.

Q So, but on September 18, 2018, you didn't know if he actually ran the license plate, right, on that date?

A The person told me that the person was behind him and it looked like they are writing in the computer. I can't say for certain because I don't have access to that information on September 18th, but, you know, if a cop is behind you, and they're typing information into their computer database, you can reasonably assume that the plates are being run.

Q And so, you were not in the car at that time, right, on September 18th?

A No, ma'am.

Q Okay. So, any information you have about that was told but by someone else, right?

A Yes, ma'am.

Q And that was Natesha?

A Yes, ma'am.

THE REPORTER: Can you say the name again?

MS. VITALE: Natesha Bestman, N-a-t-e-s-h-a B-e-s-t-m-a-n.

BY MS. VITALE:

Q And why did you buy the security camera on December 20th -- I'm sorry, on December 16th?

A So, I don't remember. I believe I just wanted another angle of the house. Obviously, I said I think there was like four or five, let's see here -- four cameras, four and then I added an extra one. I believe either one of the ones I had previously purchased had went down or I just wanted to have another angle in front of -- in or around 49 Foxcroft Road.

Q Now, are you --

MS. VITALE: So, let me make this exhibit.

(Defendants' Exhibit 48: Marked for Identification.)

BY MS. VITALE:

Q And what is Exhibit 48?

A Exhibit 48 is a handwritten notation about

some of the purchases that I had inquired due to all of the events with Mr. Stebbins.

Q Okay. So, it says $15,000 house loss; is that right?

A Yes, ma'am.

Q What are you referring to there?

A So, obviously, I had to sell the 49 Foxcroft Road address due to the constant police activity, constant driving past. There was another situation where I was in front of the house and a woman called the police on me for literally just being on the street after it obviously was on the news.

In any event, thereafter I understood that, you know, none of the people in my family were safe at this location. No one who, as long as I owned that property, there was going to be police activity at that location. We obviously seen that there was a memo sent out across the Connecticut State Police about paying close attention to 49 Foxcroft Road.

So, when it comes to loss that you see there, what -- I had to do a quick sell of this home. I didn't want to sit on it any longer. As you are aware, there's no issues with me actually owning the property per my job as they were already informed that I owned that property.

But it was too significant or problematic to keep that property and live and maintain a healthy mental state and healthy, free life.

Q So, are you claiming that you had to sell your house because of Stebbins?

A One hundred percent, the entirety of Enfield Police Department and Connecticut State Police, yes.

Q But are you claiming that you had to sell your house specifically because of Stebbins?

A Yes, ma'am.

Q So, when did you sell your house?

A I think it -- officially sold June of 2018. -- my apologies, June 2019.

Q Okay. By June 2019, Stebbins had already sold his house on Foxcroft Road, right?

A Yes, ma'am.

Q So, you didn't actually have to move from 49 Foxcroft Road because of him, right?

MR. McLANE: Objection.

THE WITNESS: Incorrect. So, when you state "move," I had to sell the property again, every car that was leaving this location was followed, harassed by Enfield Police Department, Connecticut State Police. And obviously, again there was a memo sent

out per Sergeant Samson to pay close attention to this location.

So, when you ask why did I sell my home in June of 2019, you also missed the fact that it went on the market I believe in February of 2019.

BY MS. VITALE:

Q It went on -- you put your house on the market after Steve Stebbins had already sold 44 Foxcroft Road, right?

A I don't even know when he sold 44 Foxcroft Road.

Q Okay. So, the memo that you're referring to -- well, let me ask you this: So, after December 11, 2018, what evidence do you have about Stebbins following people from 49 Foxcroft Road?

A After 12/11?

Q Yes.

A I don't have anything after 12/11, ma'am.

Q Okay. So, you referred to an email about a Connecticut State Police email about 49 -- about driving by 49 Foxcroft Road. Did I understand that correctly?

A In the email, I think if you pay close attention to -- I believe it's a redacted address as

far as I remember. And it says, Marcus Cameron is known to frequent, something along those lines, I don't know.

Q So, I'm going to have to print this after and mark it. I don't want to waste the time now. I'll do it during a break. But is this the email that you're referring to? So, I have an email that's Bates numbered Stebbins 58?

A Yes, ma'am.

Q This is the email you're referring to?

A Yes, ma'am.

Q Okay. And you see in the subject, Stebbins residence patrol checks?

A Yes, ma'am.

Q Did I read that correctly?

A Yes, ma'am.

Q And it's an email from Sean Mahar --

A Yes.

Q -- at the Connecticut State Police?

A Yes, ma'am.

Q And it says, "Please conduct patrol checks of Stebbins's residence at," redacted, "to ensure the safety of his family and property." Did I read that correctly?

A Yes, ma'am.

169

Q Okay. And it simply states in the first paragraph that, "Stebbins is currently the victim of a stalking incident involving a Massachusetts probation officer, Marcus Cameron, date of birth, 6/15/86 of 49 Foxcroft Road in Enfield." Did I read that correctly?
A Yes, ma'am.
Q Okay. And so, the email refers to patrol check of Stebbins's personal residence, correct?
A It also has my known cars that I drive and a known address for myself.
Q Okay. This email does not direct the Connecticut State Police to do patrol checks of your address at 49 Foxcroft Road, right?
MR. McLANE: Objection. I don't know what it suggests. It says to do -- "Please conduct patrol checks of Stebbins's residence," yes. But it also shares information related to myself, that if any police officer gets, they're going to also do checks of that area, too.
BY MS. VITALE:
Q And again, this was Sean Mahar that sent this email, correct?
A Yes and it says, "Per Sergeant Samson."

Q Okay. So, what is the basis of your saying there was a $15,000 loss on your house?

A So, I had -- I sell -- my apologies -- sold it below market value just because I just wanted it to sell fast. And the first person I believe who offered I believe I just accepted it. Just because again, right, my safety, my friends' safety, my family's safety, this was a house that was bought by myself, but it's the first home that anybody in my family was able to buy.

So, it is something that was significant to myself and my family. So, that is a reason. It was a property that I never intended to sell at all. So . . .

Q When you say your family, who are you referring to?

A My mother, brothers, cousins, et cetera.

Q Are they from Connecticut?

A No, ma'am.

Q Okay. So, did you -- how much did you buy your house at 49 Foxcroft Road for?

A I want to say 205.

Q And how much did you sell it for?

A 230, 220; one of those. 230.

Q So, when you say you sold it for below market

value, what do you believe was the market value?
A I think we -- originally, it was 245. I don't know what the actual appraisal of the property at that time was.
Q Gotcha. So, who is -- what is your basis for saying what the market value is? Like, how did you arrive at that number?
A Whatever they listed -- the listed price.
Q Okay. So, you're saying you sold it below the listed price?
A Yes, ma'am.
Q Gotcha. Now, you have a $1,600 moving fee here?
A Yes, ma'am.
Q And what was it that you were moving from 49 Foxcroft Road?
A We had extensive furniture still at that location. So, a lot of that furniture I had to move it from that location to storage when that house sold.
Q And you are -- you have attorney's fees listed. So, there's $1,500 for an attorney. What attorney does that refer to?
A The attorney who represented me at the restraining order hearing as well as the Enfield criminal case.

Q And what about the $750?

A That's from, I believe, the 1,500 was the criminal case. I believe the 750 was the restraining order.

Q Okay. And $181.67, it says, "discovery." What's that for?

A So, that is pretty much almost -- and I could be missing some stuff there -- anything that I can recall in which I had to pay to get documents from the Enfield Police Department as well as the Connecticut State Police department.

Q And are those costs you incurred before you filed a lawsuit -- this lawsuit?

A Yes, ma'am.

Q Okay. So, here on this sheet, you have nine weeks out, HCC. I'm guessing that refers to Holyoke Community College?

A Yes, ma'am.

Q And so, again, you think you were paid for that time?

A I'd have to check. I don't know for certain. It's quite possible. I've had probably three or four meetings with the HR department at Holyoke Community College after the arrest went to the media.

So, I had a meeting. And they didn't allow

me to come back until the case was resolved. So, I don't recall if I was paid on those weeks out or not. I'd have to check to confirm.

Q And what's the 352.65 day pay?

A I don't recall off the top of my head. I think that may be what I was making a day at one of the employers. I don't recall. I'd have to look.

Q Okay, okay. Now, you have some Home Depot receipts --

A Yes, ma'am.

Q -- here?

What reimbursement -- what are you claiming for these Home Depot receipts?

A In a regards to those Home Depots receipts, that's all things I had to purchase in preparation to sell the home.

Q Okay. Now, are you claiming emotional distress?

A Yes, ma'am.

Q Okay. So, tell me about that.

A All right. So, talk about emotional distress. The first part I'll talk about is just socially having this incident broadcast to the media, obviously, significantly impacted my personal life. It significantly deteriorated my relationship at the time,

which caused a lot of undue stress within my life.

I think, I believe, I did provide you some text messages exchanged between myself and my girlfriend at the time where, you know, there was a party and events that I was unable to attend due to some public embarrassment. And the idea that some of these people may feel some type of way that I'm in their home during Christmas parties, et cetera.

So, you have that part about social I can tell you thereafter in just interacting with people, meeting new people, obviously these documents and these articles are still online to this date. So, I do still have to answer questions about these events to new people that I interact with, new personal life matters as well. Some community involvement with some of the agencies that I work with as well.

When you talk about professionally, being somebody, you know, obviously, I was a probation officer at the time, someone who is obligated to not -- obviously, not be involved in criminal history; things of that nature. We look at the impact that that had on me professionally, you know, being able -- having to walk back into the courthouse when I was reinstated, you know, dealing with attorneys or dealing with defendants.

So, I've had numerous interactions with people on probation, who ask me, Oh, aren't you that guy from that article? And, you know, now it's a different conversation that has to be had because for me, obviously I keep my conversations professional with any other defendants in our courthouse, but I don't want anyone to believe that someone who is disingenuous and not purposeful and not honest and wouldn't deal with their cases, deal with their supervision, in a professional manner.

Furthermore, as a part of the professional emotional stress, we talk about me being a part of public safety committees within the City of Springfield. There's two committees specifically, one that works directly with the Hampden County District Attorney's Office, where we're establishing a young adults court. So, I was on the advisory committee and had to be removed.

I was also on another community committee in which I had to be removed from this community committee consisted of Springfield Police Department, Baystate and a ton of other mental health and social -- mental health and substance abuse agencies.

So, again, having to have these conversations and still try to meet with these partners and Stebbins

establish relationships, it creates a true mental, you know, a thought process in seeing how people view you and seeing how people think of you thereafter.

Obviously, there's some people who believe the story and there's some people who don't believe the story. And then obviously, having to have interactions completely with some of the people at our Springfield Police Department, those interactions are still, you know, obviously a little different. Anybody who works in the building, obviously, obtained a different view point of me and that created a lot of emotional stress, anxiety, at some points depression.

We talk about some of these instances in today's society, you talk about post traumatic stress disorder. And we talk about post traumatic stress disorder, there's also a component called linked fate.

When you talk about linked fate, it's something that predominantly established amongst minorities, specifically black people, where they look at these stops that are baseless stops that lead to the death of people, you know, more specifically you talk about the incidents of Tyre Nichols, Walter Scott, Philando Castile. These events are significant.

And when you talked about linked fate, we all stuck and we watched similarly some of these videos and

what actually transpired. And when it comes to linked fate, it's something that you think of. You know, to this day, I don't feel comfortable driving through the state of Connecticut. I don't feel comfortable being in the room sometimes with Mr. Stebbins, whether you understand it or not. These gentlemen are in possession of firearms. I don't know what their intention is.

So, I do have to think and mentally process those things. So, we talk about the emotional stress, those impacts will go on forever. Those are things that I can't change, because, you know, ultimately, any time I get pulled over, they are going to run my name.

When we talk about being pulled over, I was pulled over again by Enfield Police Department after the incident, and the officer in Enfield is on camera saying, Isn't that that probation officer that had that incident with that State trooper?

So, when I look at that video, you know, I'm looking at understanding, like, what could have happened had any of these gentlemen completely took it another level. There's another incident where Brandon Cares pulled up to me and he's on the radio thereafter saying that it's Marcus Cameron and he doesn't care for police, you know.

That's super suggestive to state openly to another group of police officers when I actually don't have a problem with any of them. The interactions and the direction of the problems were only directed with myself and Mr. Stebbins and then a bunch of other people got themselves involved.

So, when you talk about the emotional stress of dealing with and understanding how compounded these issues are to this day, you know. Obviously, you see the emails, but it's suggestive. I don't know if that's the only email that went out. I was able to learn that Mr. Stebbins also sent -- he had different conversations with multiple State troopers, who may not have been listed on that email.

So, I never know when I'm actually safe, because I'll forever have to be stuck with, when I'm driving through the state of Connecticut to see my family in New York, I could get pulled over. And one of the things that I know for a fact is going to happen is my name will be run. So, that's the emotional stress that I deal with every single day. I think that was it.

Q So, did you -- you mentioned anxiety, depression, PTSD --

A Yes, ma'am.

Q -- have you received a diagnosis for any of those?

A No, ma'am, I haven't. So, what I did do, though, I did go to -- I never -- there's a stigma within the black community where a lot of people don't like to actually go to doctors when that comes to mental health issues.

Obviously, I sit in every day on, you know, I refer people to services and I talk to them about the benefits of going, too, but that doesn't change my own personal belief that unfortunately, when it comes to mental health, it's also going to and being diagnosed by someone you feel comfortable with.

There's not a lot of black mental health professionals in the area. I have reached out to some, but I did join a kind of a self-help group, which was a large group of black men across the state of Massachusetts. And we met weekly, initially, then we end up meeting biweekly. And it's kind of just talking about some of the cultural issues and some of our personal issues that went on within our lives throughout the day throughout our past and how we interact and how we interpret things that we go through in our futures.

Q So, this self-help group, when did you start

that?

A I'd have to check to confirm, but it was after these incidents.

Q How long after?

A I'm going to say 20 -- the end of 2019, possibly. Maybe early 2020.

Q Was it before you filed this lawsuit?

A Yes.

Q And so, this self-help group, did you only discuss the incidents that are at issue in this lawsuit or did you talk about all kinds of things about life?

A We just talked about life, in general. I don't think I ever specifically stated any direct details about the lawsuit.

Q Okay.

A I just talked about, you know, in general, like, you know, personal life traumas and stress, anxiety; stuff like that.

Q Yeah. So, the significant other you mentioned?

A Yes, ma'am.

Q Was that Natesha Bestman?

A Yes, ma'am.

Q So, when did you break up with her?

A I don't remember a date specific, but it was

after these incidents.

Q Who broke up with who?

A I think it was kind of more mutual, back-and-forth decision.

Q Okay. And was that stressful for you?

A Very much so. We -- I'm just going to ask my attorney one question.

Q Oh, yeah, go ahead.

(Pause.)

A All right. So, in regards to that, you know, also, so, Mr. Stebbins, we talked about Natesha -- when we talk about Natesha, you know, I still have to deal with some of the emotional issues that came from that, because of 9/18/2018 when Mr. Stebbins followed Natesha, she was actually pregnant. She ended up losing the child thereafter.

So, it's something that intermittently a lot of stress and anxiety built up within our relationship from dealing with that, the loss of a child. Something I still will deal with to this day. I don't have any child to this day. So, it is something, obviously, a burden, whether I can sit here and say how I deal with it, it's kind of -- it's a difficult situation.

Do I know for a fact that if these -- the emotional stress dealing with losing a child and then

you know having to deal with a restraining order and then having to deal with being arrested, those are things that don't go away. We sit here and I'm able to tell you dates, times, locations off the top of my head because these things are still fresh in my mind to this day.

Q I'm very sorry about the baby?

A Thank you.

Q Do you know when that happened?

A The loss?

Q I don't want to pry.

A No, I understand. October.

Q It was October?

A Yes, ma'am.

Q Do you know how far along she was?

A I don't recall off the top of my head.

Q So, and you don't know -- do you know why that happened; like, was it a miscarriage?

A I would say it was a miscarriage. I don't know for certain of any medical diagnosis in that regards.

Q So, do you remember, did you and Natesha break up like in 2018?

A No, it was further along through possibly late 2019.

Q Okay. So, it was late 2019, you think?
A Yes, ma'am. There was some stress around the house sale and stuff like that.
Q Okay. And have you had any other significant others since then?
A Directly, say, girlfriend-wise, no.
Q Okay. Yes, that's my question. I don't want to know anything else. So, have you had any negative comments about the stalking arrest from your friends, like, anyone who, you know, did you lose any friends because of it?
A I can't say anybody for certain, you know. Obviously, I had a bunch of people reach out to me throughout the state of Massachusetts, throughout the state of Connecticut, throughout the state of New York, in regards to it.
Q Did they reach out in support of you?
A Just making sure I was all right, seeing what was going on, if I was safe, you know. My family members, when they found out about it, which I didn't tell them about it, sometimes -- even my own mother, I never told my mother. She found out probably Googling my name online trying to find my address.
Q Okay.
A So, it's not something that I completely feel

comfortable calling, telling my family about. It's something that I sat through and dealt with by myself.

Q And at work, did you deal with any negative comments about your stalking or arrest at work?

A Yes.

Q What kind of comments?

A As I just referred to, you know, dealing with probationers, people on probation making comments about the arrest, you know. If you look online, you see comments from people who were obviously WayFinders, I'll just be a little more direct.

WayFinders is a temporary housing organization we provide homeless -- they do multi services. But the department I work in is emergency homeless shelter program. So, I had to deal with the families at the shelter making comments.

Obviously, I seen some comments online by some of the families that were there. And it was just obviously interpretation of the conversations with the leadership, the vice president of WayFinders.

And just going back, you know, I've dealt with numerous conversations about it from probationers, court officers. I've obviously had to have conversations with the leadership team within Mass probation. So, it's a -- not an easy conversation all

the time because when all the details, all these videos are completely out there, people don't know what to believe and what really transpired, you know, even just having the person in charge of the legal department, for Massachusetts probation service have to turn over a video recording during the discovery of a restraining order because obviously they were aware that some things were going on. So, you know, I've had a multitude of conversations with people.

Q So, what kind of comments did you get from probationers?

A That I'm a stalker, that's the guy who got arrested, et cetera.

Q And what kind of comments would you get from people at WayFinders?

A Oh, the same thing. I think one of the comments, like, Oh, my gosh. I can't believe it's him. He's always so quiet or he's always so nice. Those are the crazy guys. The guys are always so nice, those end up being the crazy ones. Those are some of the comments that I've heard.

Q And what about at the probation office, what kind of comments did you get there?

A The same. I think you just asked that.

Q I'm sorry. I think I asked about WayFinders.

A So, I mentioned WayFinders. The other one is Holyoke Community College?

Q Yes.

A I'm sorry. So, Holyoke Community College, I obviously have to meet with the HR department. My employment there was as an advisor for adult basic education students, who were working through an adult ed program.

I don't think I've had any of my students actually have a conversation with me. But obviously some of the teachers and advisors and other people that I worked with throughout that program did have conversations with me about it.

Q And how did those conversations go?

A Similar, pretty much, you know, what's going on, what happened, are you okay, et cetera.

Q Okay. So, supportive?

A Some.

MS. VITALE: Okay. So, I'm making this Exhibit 48.

(Defendants' Exhibit 48: Marked for Identification.)

BY MS. VITALE:

Q So, I'm handing you what's been marked as Exhibit 49. What is this?

A This is a text message that I received directing me to report to the executive office at WayFinders at 12:15 for a hearing essentially to talk about whether I was going to continue my employment, is kind of the conversation that me and Mr. Santiago had thereafter.

You see his text, I hope you fucking sue the department.

Yeah, man. That's my plan is to do everything I have to do at this point.

And he said, You have my support, good luck.

And I wrote, I appreciate it.

From there what you see is me going in and meeting with the executive team at WayFinders. I believe there was the vice president and executive vice president as well as the program manager present at that meeting.

At that point in time when I met with them, I had to -- obviously, they wanted to know what was going on. They wanted to know some details about the case as it's obviously public information, you know.

I -- obviously, this went out as a WWLP text message alert, an event and arrest within the state of

Massachusetts. So, everyone in the area got the message. So, when I went in, obviously, I had all of the videos that I had saved. I also had at that point in time the voicemail that was provided from the Massachusetts probation legal department.

So, I did have to, in order to, you know, preserve my job at this point, I had to sit here and show them some of the discovery and some of the information. I had to point out some inaccuracies within the police report written by Bryan Nolan, which included, you know, he mentioned -- and I want to just put this out there -- that I never spoke to and refused to talk to anybody from the Enfield Police Department as they were conducting an investigation. That's not -- that's completely inaccurate. So, those are things that I had to sit and talk to about with the executive team at WayFinders.

Q All right. So, who is Mr. Santiago?

A He's a program manager at WayFinders.

Q So, this is a text message -- so, Exhibit 49 is a text message exchange with Mr. Santiago -- I'm sorry. What's his full name?

A Rick, Rick Santiago.

Q Okay. So, Exhibit 49 is a text message exchange between you and Rick Santiago, right?

A Yes, ma'am.
Q So, you had a meeting at what time?
A So, he sent this to say, I'm here. So, 12:15.
Q And what date was this sent?
A I don't remember. I think this was the day -- either the same day of the arrest or the day after.
Q Okay. So, it was around shortly after your arrest?
A Yes, ma'am.
Q Okay. And then so, Rick Santiago says, I hope you sue the fucking department?
A Yes, ma'am.
Q And do you know what department he was referring to?
A Connecticut State Police, specifically.
Q Okay. And then you respond and say, Yeah, man, my plan is to do everything I have to at this point; is that right?
A Yes. Yes, ma'am.
Q Okay. So, as of the time of this text message exchange, you were planning to sue the Connecticut State Police?
A No, that's not what I said. I said, Yeah

190

man, my plan is to do everything I have to at this point.

Q And what did you mean by that?

A So, by that, you know, everything to clear my name. In this life, we all are given pretty much one name. And I've worked very hard throughout my 36 years of life educationally, within professional environments to become who I am today.

So, when I'm sitting here and I'm dealing with a lot of lies, omissions, you know, false statements by individuals, yeah, I plan to do everything that I have to do to clear my name. And if that includes me filing a lawsuit, then that is absolutely what I plan to do.

Q And at what point, did you think that you should file a lawsuit?

A I mean, I don't know for certain. I can't say a date specific.

Q Do you have like a month?

A I mean, I don't know for certain, you know. Obviously, I'm not a lawyer. So, I would have to meet with lawyers and they can tell me if you have a claim or if you don't have a claim.

Q When did you start meeting with lawyers?

A Obviously, I had an attorney at this point.

(indicating).
Q Okay. So, do you know at what point -- I don't want to ask you about privileged conversations with Attorney Mannion, but do you know at what point you contacted an attorney about potentially filing a lawsuit? I'm asking for a day or time.
A I don't know specific date certain.
Q Was it in 2018?
A Yes. It had to be -- yeah. Obviously, this is December. So, obviously December '18, January '19; somewhere along those lines.
Q Okay. As a probation officer in 2018 and 2019, were you covered by a collective bargaining agreement?
A I don't know for certain.
Q You don't know?
A I don't.
Q Are you in a union?
A We are, but we are out of contract up and down. So, I don't know for certain.
Q Okay. So, in 2018, 2019, you were a union employee, right?
A I believe so, yeah, yes. I paid union dues, but I don't know if we were under contract at that point in time.

Q Okay. Do you know what the name of your bargaining unit is -- was in 2019?
A I don't.
Q At what point did you start trying to build a case against Stebbins?
MR. McLANE: Objection.
THE WITNESS: "Build a case," please clarify.
BY MS. VITALE:
Q Well, did you try to build a case against Stebbins at some point?
MR. McLANE: Objection.
THE WITNESS: What kind of case are you referring to?
BY MS. VITALE:
Q Well, we're here for a lawsuit, so . . .
A I don't completely understand the question.
Q Well, at a certain point, did you start to try to build a case against Stebbins for purposes of a lawsuit?
A No. I think throughout the time I was just putting together a bunch of evidence that I seen was not presented, whether that was towards the lawsuit or just a part of my defense for the criminal charges or a part of my defense against the restraining order that

was dismissed. Obviously, I had to put together evidence prior to the restraining order hearing. And that evidence is also evidence that I've submitted as part of this claim.

Q Now, you received a promotion to assistant chief probation officer?

A Yes, ma'am.

Q So, are you claiming your reputation with your employer suffered with the -- are you claiming that your reputation with the Commission of Probation suffered as a result of Trooper Stebbins?

A I believe it's part of it, yes.

Q So, how is it that your reputation with the Commission of Probation suffered?

A Well, obviously, there was the allegation after the phone call from Sergeant Samson with Sarah Joss in regards to the residency claim, the residency issue. So, obviously, that's something that is, you know, that's there forever. Obviously, there was an investigation into whether I resided in the state of Massachusetts.

Q So, we talked about that the first day. So, I don't want to rehash that, okay?

But did you -- so, have you -- do you have any documents that show there was an investigation into

you?

A Just the letter.

Q Just the letter?

A The letter.

Q Okay. And then in response to that letter, you provided them information, right?

A Yes, ma'am. I provided documents. I'm sorry, I provided them documents.

Q Okay. We talked about that the first day of your deposition, right?

A Yes, ma'am.

Q Okay. You don't have any new information to provide about that situation?

A Not directly. I think anything that will be offered would just be testimony from the people who Mr. Samson spoke to.

MS. VITALE: All right. So, let me make this exhibit.

(Defendants' Exhibit 50: Marked for Identification.)

BY MS. VITALE:

Q Okay. So, what is Exhibit 50?

A Exhibit 50 is a conversation between my

195

barber and myself.

Q And now, why -- so, is this a text message conversation?

A This is Instagram.

Q Instagram. So, I don't know why you produced this.

A So, I'll answer that.

Q Okay.

A So, at the first date you inquired where I was going on specific dates. At the time, I couldn't remember where I was going. So, on 5/26 was the incident with the Enfield Police Department.

I think you had asked me something along the lines of what time it had happened and why did I go to Enfield at this point in time, something along those lines.

So, I just wanted to provide some more information where I actually went when I left and why obviously I'm in the town of Enfield.

Q Okay. So, on May 22nd at 9:19 a.m. --

A Uh-hum.

Q -- did you message your barber and say, will you definitely have a spot for me Saturday? If not, I'm also available Friday after 1:00 p.m.?

A Yes, ma'am.

Q And then on May 26th at 7:49 a.m. did you message your barber, Don't forget about me?
A Yes, ma'am.
Q And then did he respond on May 26th at 10:35 a.m. and he said, I can shape you up at 12:30, but that's all I got. I can't do a cut?
A Yes, ma'am.
Q And you said, That's cool?
A Yes, ma'am.
Q So, are you saying you went to the barber at 12:30?
A Yes, ma'am.
Q Where is the barber located?
A Enfield.
Q Where in Enfield?
A I don't know the street. It's in one of the plazas.
Q Well, okay. Is it on Route 5?
A No. Past Brookside Plaza on the left-hand side, I want to say it's like a Dodge Dealer in the area or something like that.
Q So, did you go to the barber for 12:30 on May 26th --
A Yes, ma'am.
Q -- 2019?

And what's the difference between shape -- he says, I can shape you up, but I can't do a cut. What does that mean?

A So --

MR. McLANE: Now we're getting into the real evidence.

A So, yeah. Usually, a lot of people can just get a haircut. And the way to say it suggestively, is like black people get like a line up of their beard, like a direct line and a direct line here (indicating). Whereas other people sometimes can just go without getting the shape, like being it straight.

Q So, how long does it take to get a shape up?

A It depends. I can't say for certain, 30, 40 -- it depends if they're talking and stuff like that.

Q Do you know how long it took on May 26th?

A I don't know for certain. I know after I left there, I believe I went straight to the Enfield Police Department. That was when I spoke with Sergeant Lorigno, PO Carter.

Q Gotcha.

A Yes, ma'am.

Q And then you messaged him again on May 28th at 9:09 a.m.?

A I believe so, yeah.
Q Do you know what that was about?
A I didn't look. It wasn't about me getting a haircut. We talk regularly.
Q Okay. And what's the name of the barber shop?
A At the time, I believe it was Flint's Barber Shop. Now, it's call Son's Barber Shop.
MS. VITALE: I'm going to make this Exhibit 51.

(Defendants' Exhibit 51: Marked for Identification.)

BY MS. VITALE:
Q So, what is Exhibit 51?
A Exhibit 51 is a conversation between Angela Harrington and myself.
Q Did you ever date Angela Harrington?
A No.
Q So, it starts with, at the very top -- do you know what the date of this --
A I don't recall the date.
Q And I'm sorry, was this a text message or Instagram?

A Instagram.
Q And you don't know what the date was?
A No, ma'am.
Q And so, is that you who starts at the top with, "No big deal"?
A Yes, ma'am.
Q And then you say, "I'm glad you didn't so you weren't scared."
A Yes, ma'am.
Q Do you have what preceded the, "no big deal"?
A I can look, but I think I looked before. I think our conversation was gone.
Q Why was it gone?
A This conversation was in 2018. So, as the case was going on, I don't have reason. I don't recall keep a million different conversations in there.
Q So, why did you choose to keep this part of the conversation and not the preceding part?
A For two reasons. We were having a conversation about when he -- my apologies. When Mr. Stebbins followed her vehicle leaving 49 Foxcroft Road. I was present that date. I was physically in the car. So, it was another date just to prove that on 8/7/2018, when I alleged that Mr. Stebbins followed this vehicle to the Dunkin' Donuts and then turned and

200

then waited for us to come up the road, I wanted to be able to provide proof that obviously the person that was operating the vehicle was there.

Q So, do you recall what conversation you were having to which you said, "No big deal. I'm glad you didn't so you weren't scared"?

A I don't recall.

Q When did you capture this Exhibit 51?

A I don't recall a specific date.

Q So, how does Instagram work as far as keeping messages? Do they just stick around unless you delete them?

A If you delete the conversation, I would believe it just disappears. There is obviously another part of the application where you can just talk and everything stays, but --

Q So, do messages on Instagram just remain unless you choose to delete them?

A That's my interpretation of it.

Q Okay.

A And it also depends on my interpretation is the other person can delete it and it's gone.

Q So, and was there a conversation after the part where you say, "All State trooper cars are like that in Connecticut"?

A I don't recall.
Q Now, have you collected to see if you still have the conversation that precedes the "no big deal"?
A Yes, ma'am.
Q You've checked?
A Yes, ma'am.
Q And you don't have it?
A I don't.

(Defendants' Exhibit 52:
Marked for Identification.)

BY MS. VITALE:
Q Now, what is Exhibit 52?
A 52 is some notes that I took after -- I don't know if this -- I think this might have been the arraignment date.
Q Some notes you took on what?
A On like a notepad, like a phone notepad.
Q Okay. And it was -- was this notes of a conversation with someone?
A These are notes from a conversation between me, myself -- my apologies -- that's the same person -- between Attorney Mannion, Assistant State's Attorney Parakilas and myself.

Q Okay. What was the date of the conversation?
A I believe this one is 12/18.
Q So, are you taking notes of -- now, you say here, "The prosecutor admitted that in his career he's never signed a warrant application for stalking third because it's so minimal." Did I read that correctly?
A Yes, ma'am.
Q So, are you taking notes of a conversation -- of what Assistant State's Attorney Parakilas said to you?
A Yes. I believe this is from conversation that Mannion, Parakilas and myself were having.
Q And so, who -- what do you recall Assistant State's Attorney Parakilas saying?
A Exactly what you see. He said he's never signed a warrant -- an application for stalking third because it's so minimal.
Q Okay.
A I -- my apologies. He also mentioned that Sergeant Samson contacted him to pursue the matter harder.
Q Who said -- did someone say, It will all fall back on Stebbins, eventually?
A Yes, ma'am. That was from Mr. Parakilas.
Q And what exactly did he say?

203

A Again, these are notes from the conversation. I didn't take any quoted notes, but these are pretty much paraphrases from the conversation.

Q Okay. It was your sort of takeaways?

A Notes from the actual conversation, yes.

MS. VITALE: And then this is Exhibit 52, please.

THE REPORTER: 53.

MS. VITALE: 53.

(Defendants' Exhibit 53: Marked for Identification.)

BY MS. VITALE:

Q And what's Exhibit 53?

A This is another part of another conversation. I believe this is from the separate date in conversation between Mannion and Parakilas and myself.

So, on this date, you'll see in the part the top part is a conversation just between my attorney and I. So, that's why you see it starts where it started at. And they mention bringing up Connecticut State Police are still bringing out wanting to file charges for having multiple licenses.

I can sit here today and say we've also --

we've seen emails in evidence that these conversations are -- had been had. So, this is a conversation Parakilas said that date. The report written by Sergeant Samson that was 34 pages also shows that this is -- has -- was a previous conversation that Sergeant Samson was looking to file criminal charges against me for having multiple licenses, even obviously I've never had multiple licenses.

And that's what you see. And it says, I surrendered it. I have submitted documentation from the RMV showing that when I did change over to Massachusetts, it was surrendered. I don't know if that's a Massachusetts RMV rule or law. But in order for me to get the Massachusetts license, I had to surrender my Connecticut one.

Q So, who brought up that the CPS are still bringing up wanting to file charges for having multiple licenses?

A Mr. Parakilas.

Q Okay. And what exactly did he say?

A That was pretty much it. They kept mentioning the fact they want to file charges on you for the multiple licenses.

Q So, anything you know about that, you heard from Parakilas?

A Yes, ma'am.
Q Okay. Now, you say at the bottom here, I responded to their offer with requesting it simply dismissed?
A Yes, ma'am.
Q What was the offer?
A That's a --
MR. McLANE: Can we just take five minutes? I want to chat with him. He believes it might be a privileged conversation.

(Recess: 2:56 to 3:00.)

MR. McLANE: I did discuss with Marcus on the break, obviously, he just disclosed a note that he was referring to with respect to an offer. This was based on a conversation that he did have with his lawyer. He's going to answer that specific question, but we're not going to waive any objections to further claims of privilege, if the questioning goes further than just responding to this immediate question.
MS. VITALE: Yeah, okay. I gotcha. So,

I'm sorry, would you mind reading back the question?

(The last question was read back by the Court Reporter.)

THE WITNESS: So, Mr. Parakilas, we talked about it being completely just nulled, but he said there was obviously concerns from Attorney Schrober, I believe his name, who was present, about this possibly leading to a lawsuit if it was nulled.

BY MS. VITALE:

Q Okay. And again, Exhibit 53 are notes that you took based on conversations that you had with other people, right?

A Yes, ma'am.

Q So, it's notes of things that other people told you?

A That I was present for.

Q That you were present for?

A Yes, ma'am.

MS. VITALE: Okay. And so, before I let one of my other co-defendants go here, with the understanding I'll come back if I -- at

the end.

BY MS. VITALE:

Q There was one license plate I wanted to ask you about. You know what, that's okay. I'll find it. I don't want to waste time here. So, I'll find it while other people are going and then I'll just come back at the end. All right. Thank you very much.

A Thank you.

MS. VITALE: So, do you want to switch?

CROSS EXAMINATION

BY MR. GERARDE:

Q Good afternoon.

A Good afternoon.

Q Mr. Cameron, my name is Eric Gerarde and I represent the Town of Enfield -- the Town of Enfield, Mark Squires and Bryan Nolan in this lawsuit.

Now, I would like to go back to the May 30, 2018 incident. Now, on that date, there is this video that you took from your vehicle of being -- you driving on Foxcroft Road and you were approached in the street by an individual, correct?

A Yes, sir.

Q And then after that -- excuse me.

And was that the first time on May 30, 2018 that you had driven past or you had driven on Foxcroft Road?

A No.

Q Okay. So, at least one other time you're driving on Foxcroft Road on May 30, 2018?

A Yes, sir.

Q Okay. And then after this incident with the individual in the road, you go to Enfield Police Department?

A Yes.

Q And did you go to Enfield PD on May 30th?

A Yes.

Q Okay. And when you were at Enfield PD, you showed -- I'm sorry.

Who did you speak to when you went to Enfield PD on May 30th?

A On May 30th, I spoke with Lieutenant Mark Squires.

Q Okay. And did you show him that video?

A Yes, sir.

Q Now, when you were speaking with Lieutenant Squires, did he ask you for your name?

A I don't recall if he ever asked me for my name.

Q Okay. Did you provide your name to him at any point?

A I told him my name was Marc, if I remember correctly.

Q Now, is there any reason in particular you didn't provide your full name to Lieutenant Squires that day, May 30?

A I don't recall him ever asking me for my full name in regards to the incident.

Q Okay. And what was the -- what was your intent when you went to the Enfield PD on May 30 and showed the video to Lieutenant Squires?

A I had a conversation with Lieutenant Squires about me being harassed. I told him about the investigation where I filed a complaint. He asked me about the gentleman being in the road. We had a conversation about that. He asked me is it my intent that I would want this person criminally charged? There was a conversation about that.

I said, Yeah. I don't know the laws of Connecticut, but he is obviously obstructing traffic at the minimum, in the middle of the road.

Q Okay.

A Part of that conversation, he tried to minimize the interaction where, you know, he stated

well, he's not technically blocking the road or whatever the case may be.

Q Okay. Now, at that point when you're speaking with Enfield Police Department, Lieutenant Squires, May 30, 2018, did you feel as though you were a victim?

A Yes.

Q Now, as a victim, why wouldn't you give your full name to the Enfield Police Department?

A Well, again, Mr. Squires already minimized the whole interaction by stating, Well, why didn't you just drive around him or whatever the case may be. As I gave him the context and the background of the events. So, that's May 30th.

I told him about 5/22, I told him about 5/26, I told him about 5/28 and I told him about obviously about 5/30. Obviously, from his report, you see that there's no documentation about any of the conversation and me relaying any of those events to him in regards.

Q Okay. Now, after this event when was the next time you had any contact with Lieutenant Squires or Bryan Nolan of Enfield Police Department?

A The next interaction with either of those two was 11/12 of 2018. And that was only Bryan Nolan.

Q Okay. Have you had any interactions with

Enfield PD in general from May 30, 2018 through November 12, 2018?

A To the best of my knowledge, no.

Q Okay. Now, on 11/20, or -- excuse me.

November 12, 2018, you end up in the Brookside -- Brookside or Brookfield?

A Brookside.

Q -- Brookside Plaza in Enfield with it's yourself, it's Mr. Stebbins and various members from the Enfield Police Department?

A Yes, and Sergeant Samson.

Q Yes, and Sergeant Samson. Now, at that point, did you speak with Bryan Nolan?

A I spoke with Bryan Nolan in that parking lot, yes.

Q Now, did you see Mr. Nolan speaking with Mr. Stebbins at any point?

A He was standing next to the car. I can't say for certain if they actually spoke. I don't recall the recording in which I hear. I can't tell if it's Steve Stebbins talking directly to Bryan Nolan or someone else.

Q Okay. Now, you were you involved in any conversation with Steve Stebbins and Bryan Nolan on 11/12/2018?

A My apologies. Can you clarify if you're referring to all three of us talking together?
Q Yes.
A No.
Q Okay. So, Bryan Nolan and Steve Stebbins could have talked, could have communicated at some point in the plaza on 11/12 and you don't know what they said to each other on that day as of that day?
A As of that day, no.
Q Okay. Now, when you were speaking with Bryan Nolan, were you ever told that you were not free to leave the Brookside Plaza?
A It wasn't Bryan Nolan who told me. It was Officer Brian Croteau.
Q And what was that interaction?
A He was pretty much when he asked me for my license, I asked him am I being arrested or being detained. I think I asked if am I being arrested.
And he said, No, but you are being detained or something along those lines.
Q Okay. Were you -- are you aware of any recordings detailing that interaction between the two of you?
A Yes.
Q Is it something that you were recording on

your end or something from Enfield PD?

A We provided it as well as the Enfield Police Department had a car camera running that day that was Brian Croteau's car.

Q Okay. Now, after this 11/12/2018 interaction, Bryan Nolan tells you or at the end of this, the culmination of this interaction, Bryan Nolan tells you that you're free to go, correct?

A Yes, sir.

Q Now, did Mr. Nolan try to communicate with you at any point in the days following this 11/12 interaction?

A I'll start with November 12th. After I came out of the store, I seen Bryan Nolan was still the only police officer on scene. So, I did approach his vehicle to have a conversation with him about the stop in general. When I -- the first question, I asked he rolled his window up and drove off and told me to have a good day.

Q Okay.

A He said, You're free to leave, have a good day or something along those lines. I don't remember the exact quote, but he did roll the window up and drive off, as we did have that conversation during booking, which I know you were able to see.

Q And then do you speak with Mr. Nolan on November 15, 2018?
A In regards to all of the context, I did put a note in my phone in reference to every single date I contacted Enfield Police Department after 11/12. Do you mind if I open and take a look?
Q Yeah, go for it.
MS. VITALE: If that hasn't been produced, I'd ask --
MR. McLANE: Is this just something you did in preparation for today's depo?
THE WITNESS: Yeah, pretty much, not anything specific.
MS. VITALE: Oh, I thought he was doing it like contemporaneously, like, keeping a log.
MR. McLANE: No. I think he it did in preparation for the deposition.
MS. VITALE: Okay.
MR. McLANE: I'll have him send it to me afterwards.
THE WITNESS: All right. So, you asked me about 11/15?
BY MR. GERARDE:
Q Yes.

A Did I have a conversation with Bryan Nolan? Bryan Nolan, in regards to that conversation, it was a conversation that I initiated. I called the Enfield Police Department. I believe on that date I was trying to have a conversation Officer Therrien and picked up the phone.

Prior to engaging in this conversation, I wanted to get permission to record the conversation. He was very abrasive and ended up hanging up the phone. So, you see in the police report Bryan Nolan suggests that he heard me on the phone and he recognized my voice.

He would have also heard that PO Therrien hung up the phone, which is not written in the police report. I can tell you on 11/13, I contacted the Enfield Police Department --

Q I'm sorry, can we just keep --

A Yes.

Q So, you're saying on 11/15, you call Enfield, Enfield Police Department, trying to get a record, record of the police report, you speak with Officer Therrien?

A Therrien, yes, sir.

Q Therrien. And then Officer Therrien hangs the phone up after you requested to record it?

A Yes, sir.

Q So, in -- so, you're saying you never -- you didn't speak with Bryan Nolan on 11/15 when you called the police department?

A I believe Bryan Nolan, after the phone was disconnected, ended up calling me back.

Q Okay.

A We spoke briefly. I don't know if he hung up the phone, but the call disconnected. I know that I didn't disconnect the phone call.

Q Okay. So, in Bryan Nolan's arrest warrant, it's Bate stamped Cameron 342. He -- it's paragraph or bullet point 15. It reads, "That on 11/15/18 at approximately 18:30 hours, Cameron called the front desk of the PD wanting to get a copy of any police report with his name it. When I heard that Cameron was on the phone, I had the front desk officer transfer the call to me.

"I spoke with Cameron and informed him that I needed to speak with him further in regards to the incident on 11/12. The phone call was then disconnected abruptly. I immediately tried calling back three times," he includes the phone number. However, there was no answer. I left a voicemail for Cameron to call me back. He did not."

So, are you saying that interaction of you speaking with Nolan on 11/15, the phone call getting transferred to him and then him trying to call you back with no answer, is that untrue?

A Whether the phone call got transferred, I don't believe that's accurate at all. PO Therrien picked up the phone and hung up. He may have been able to hear it. I can't state whether he heard it or not. But I do know that Therrien was a person who I spoke to first.

He made a complaint because I kept asking, Do I have permission to record? At that point, Mr. Therrien hung up the phone. And then I believe possibly thereafter Bryan Nolan made a phone call. We spoke briefly again. I don't know if he hung up the phone. But the call was disconnected, but it wasn't disconnected by me.

Whether he could -- he did leave me a voicemail at one point in time. I just don't know if it was 11/15 or not. But in that voicemail, he never asserted that he was looking to get a statement from me.

Q Okay. So, excuse me, the instance where you were speaking with Officer Therrien and then that call gets disconnected, then you're saying Bryan Nolan calls

you back after -- calls you after the Therrien call disconnected and then that call with Nolan gets disconnected?

A Yes, sir.

Q Okay. And then Nolan called you back after that, leaving a voicemail?

A I don't know. I never got a phone call like opened up on my phone, but I did have a voicemail at one point in time from Bryan Nolan. I can't confirm that it was on that specific date.

Q Okay. Now, I'm going to continue reading from the arrest warrant. This is picking up where we left off in paragraph 15. Nolan writes, "I left a voicemail for Cameron to call me back. He did not. On 11/19/18, I called Cameron and again left him a voicemail informing him that I needed to speak to him about the incident. He did not return my call."

Do you recall getting this phone call on 11/18 or excuse me, 11/19?

A I do not.

Q Okay. Continuing, "On 11/20/2018 at approximately 1905 hours, I went to Cameron's residence at 49 Foxcroft Road. Although, there was a vehicle in the driveway and lights were on in the residence, nobody answered the door."

Were you aware of Officer Nolan coming to the 49 Foxcroft Road property on 11/20?

A On 11/20, I believe I spoke to Jean Paul, who referenced the -- I didn't -- I didn't see them when they were physically there, if that's your question.

Q Okay. But were you made aware at all that, whether it was Bryan Nolan or someone from Enfield PD, on 11/20, came by your property or by the 49 Foxcroft Road?

A Yes, sir. So, I believe that video was also provided. It was Bryan Nolan and another officer. You see them approach the vehicle. There's a vehicle in the driveway. You see they're using their flashlights to search or look through the vehicle, whatever you want to interpret it as.

And then you see them leaving. They proceed to look around the vehicle again. They look like they did something behind the car. And then they kind of pulled up to the corner of Eleanor Road and then they parked and had a conversation, which you can see.

Q Okay. I'm going to skip down a couple lines.

A Can I just further respond? So, on 11/20, I do want to also reference that the Enfield Police Department was, in fact, called back. The reference to John calling on 11/20, that phone call actually did

happen. I believe he spoke to Sergeant Held.

Sergeant Held was informed that he wasn't at the location when they came out. He's there now. If you do want to speak to me, you can come back to the location. Sergeant Held says, It's too busy in Enfield right now. So, I don't know what you want to do or something along those lines.

Q Okay. Now, on 11 -- I'm going to finish the last two sentences of this paragraph.

A Okay.

Q So, "On 11/26/2019 at approximately 16:34 hours, I again called Cameron and left a voicemail. It should be noted that the voicemail message states that it is, in fact, Cameron's voicemail. He did not return my call."

Do you recall this November 26, 2018 phone call?

A No.

Q Do you recall a voicemail from that date from Bryan Nolan?

A I've only heard one voicemail left by Bryan Nolan and again in that voicemail, he never mentioned anything about needing to contact me about getting a statement.

Q Did he mention the 11/12/2018 incident at

all?

A No.

Q So, when he says that, "I left him" -- this is going back to 11/19 -- "left him a voicemail informing him that I needed to speak to him about the incident," are you saying that that at least in this 11/19 voicemail, there was nothing mentioned about the incident in 11/12?

A I can't confirm what date the voicemail was left. I know that I did have one voicemail from Bryan Nolan. But in that voicemail, there was no conversation or -- stating, Hey, I want to get in contact with you to get a statement about 11/12.

The last conversation I had with him at that point was just him at the plaza pretty much -- I mean, him at the plaza just stating I was all set. There was no need for a follow-up or anything like that.

Q Okay. Now, have you had issues in the past of your phone not taking or accepting voicemail messages or missed calls?

A Not to my knowledge.

Q Okay. Did you ever try to reach out to Enfield Police Department or Sergeant Nolan about the 11/12 incident after it happened?

A Yes.

Q And when was that?
A So, on 11/13, I spoke to Officer Pigliotti. It was no conversation. I asked him about reports. I asked pretty much if there's any need to get in contact with me. They said, No, nothing, I don't see anything.
I said, Okay.
I called back. I spoke to the desk officer on 11/14, same thing.
11/19, I went to Enfield Police Department in person and spoke to the desk officer. No one asked me about wanting to get a statement from me. On 11/20, that's when Sergeant Held was called and Nolan refused or Sergeant Held refused to send him back to that location.
On 12/1, I spoke to Sergeant Lorigno and PO Levine.
On 12/3, I went to Enfield Police Department in person.
On 12/7, I spoke with the desk officer.
On 12/9, I spoke with Captain Golden.
And on 12/11, I spoke with Captain Hall.
Q Okay. Now, on the date of your arrest, you were arrested 12/14/2018?
A 12/11.
Q 12/11?

A 2018.
Q I'm sorry, 12/11/2018, okay. Do you recall who the arresting officer was; who physically put the handcuffs on you?
A Yes, Brian -- Brandon Cares, Brian Cares, one of those.
Q And that's of Enfield PD?
A Yes, sir.
Q Do you recall who was on scene at the time of your arrest?
A There was -- I believe it was sergeant -- I can't confirm who it was. I believe it was Sergeant Held, Sergeant Bryan Nolan. It was a female officer who had on a black leather jacket, and Mr. Cares. There might have possibly been one more person. I can't remember.
Q Okay. And can you describe the -- I guess the process of your arrest once you were pulled over?
A Absolutely. So, pretty much I left, I'm driving down Enfield Street. I see two Enfield police cruisers do a U-turn right behind me. I don't think anything of it. I'm in the left lane. I just was at the light of -- it's Enfield Street and where Enfield Town Hall is. So, I was pretty much right past that light.

I see probably three or four cars light up behind me. So, I move from the left lane, I pull over to the right lane. I pull over obviously in the right lane at the right-hand side of the road. At that point in time, I turned on my interior dome lights. I think I threw my keys on the dashboard. And Mr. Cares approached from the left-hand side of the vehicle.

At that point -- prior to Mr. Cares walking up, obviously, no interactions with the Enfield Police Department. Even in that day, I actually spoke to, I believe it was Captain Hall, I stated, earlier that date. So, I didn't know any information.

I don't have any problem or warrant being issued. So, I seen him pull up. I see all the lights light up behind me. Due to it being so many cars, I turned on my cell phone, placed it down so obviously not to have anything in my hand as these gentlemen are approaching.

Rolled all of the windows down of the vehicle. He walks up. He asked me for a license and registration. I hand him my license. He asked me about getting my registration. He asked me multiple times, you know, just in a condescending manner, like you don't know where your registration is?

And I'm like, No.

To be quite honest, given the state of the time of date, my fear of being pulled over in this instance and the heightened awareness of knowing who I am at that point in time, I didn't feel comfortable opening my center console. I didn't feel comfortable opening the -- well, I don't know what the other thing is called on the other side.

Q Glove box?

A The glove box, I'm sorry. So, I didn't feel comfortable to reach for anything. So, at that point, I told him I don't know where it is. Obviously, from there, he asked me to step out of the vehicle. He had my license at that point in time, you know.

I think at that point, I think he asked me to turn around, put my hands behind my back, which I completely 100 percent complied with. He puts the handcuffs on me. And at that point, he becomes super aggressive and he's like pushing me up against the car and you hear the exchange between myself and Mr. Cares.

And I'm like, Are you all right? Did I do something to do?

And he was like, I got to search you.

I'm like, Yeah, but you don't have to keep pushing me so hard up against the car. I think my very next comment was I respect it. I said, All right, I

respect it.

And I was still completely compliant. I could hear the interaction a little bit between Mr. Nolan and Natesha where he's asking her for her license. Obviously, she's super compliant. She's somebody who's never even been -- seen these interactions. So, she was horrified the whole time.

So, they took me into custody. You hear me -- I think the last thing I told her, Get Jean to the precinct right now. Again, obviously, I know Jean is somebody who is always going to show up when he has the ability to. So, I told her to get Jean to the precinct.

She told me she don't have his number. So, I just said, Just go to the house. And at that point, I think I was escorted away from the vehicle. I told her -- I think I told her somewhere along the lines, Drive the car home. From there, I was placed in the vehicle.

Q Okay. Now, did you suffer any injuries during this, during the course of this arrest?

A Physical injuries?

Q Physical injuries.

A Not necessarily. Obviously, I believe the handcuffs were super tight and I had obviously the

227

striations from the handcuffs on my hands.

Q Did you ever seek or receive any -- two-part question.

Did you ever seek any medical treatment for any of the injuries from the arrest?

A No, sir.

Q Did you ever receive any medical treatment for the injuries from the arrest?

A No. I don't think that the impact and the striations from the handcuffs on my hands had me in a position where I need to go to the hospital.

Q Now, during -- excuse me.

Have you ever had any sort of physical contact with Mark Squires?

A Can you elaborate on the idea of "physical"?

Q Anything that you wouldn't expect in like a normal, daily interaction, like I'm not asking about a handshake or a pat on the back or anything but any sort of --

A Touching.

Q Yeah, any sort of physical touching?

A No, sir.

Q And the same question for Bryan Nolan.

A Physical touching from Bryan Nolan, I'm going to say, no.

Q Okay. I want to go back to the phone calls for a moment, the attempts of Bryan Nolan trying to reach out to you. Even though you said you only had one of the voicemails from the multiple times these phone calls happened, are you disputing that these phone calls ever happened from Bryan Nolan to your cell phone number?

A Yeah, 100 percent. I don't believe he actually called.

Q Okay. So, you're saying -- so, on 11/15/2018, he called -- I'm going to read this phone number, (516)301-0441. You're saying that you did not receive three calls from an Enfield Police Department number on that line?

A No, sir. Not to my knowledge.

Q And then on 11/19/2018, you didn't receive a phone call from Bryan Nolan on that 516 number?

A No, sir. Not to my knowledge. Again, I can confirm that I did speak to him one time on the phone and I don't know which date. So, as I'm saying no, I just want to be clear that I did have one phone call. We did speak on the phone one time.

Q And you're saying you don't remember what date that was?

A Correct.

Q And do you know what date the voicemail is from?

A I don't recall. I'm pretty sure that it's the same date, yeah. I don't know what date it is. I'm sorry.

Q Is it there any way to look up if you still have the same phone, what date the voicemail would be from?

A I'll tell you, I actually did try to get the voicemail. It's telling me that my -- it says visual voicemail, your account has expired.

Q Okay.

A I don't recall ever deleting it, but I haven't been able to get into my phone to extract the voicemail. And I just want to be clear, I've tried -- I never received those voicemails. The one voicemail I've heard, I had access at that time to my voicemail. But when I looked, I want to say since the discovery process, I did try to look and try to get access to it.

Q Were you present when Stebbins gave the Enfield Police Department or Bryan Nolan his written statement?

A No, sir.

Q So, at the time of when Stebbins gave the statement, you weren't aware of anything that was in

his written statement?

A No, sir.

Q Okay. Could you please tell me what you know about the hiring practices of the Enfield Police Department over the past 20 years, 10, 20 years?

MR. McLANE: Objection.

THE WITNESS: I have no knowledge of the hiring process of the Enfield Police Department.

BY MR. GERARDE:

Q Do you have any specific knowledge or information about, there at the Enfield Police Department, hiring practices of police officers?

A I have no knowledge personally of any information in regards to it.

Q Do you have any specific knowledge about the training that the Enfield police officers go through when they're hired and attend the academy?

A Specific to Enfield Police Department?

Q Yes.

A I -- no.

Q Do you have any specific knowledge about the type of field training program the Enfield police officers go through after they complete the academy and are sworn in?

A Specific to whatever Enfield Police Department's policy is?
Q Yes.
A I can't say for certain.
Q Do you have any personal or specific knowledge about the required recertifications that the Enfield police officers or anyone sworn in as an officer, has to go through?
A I have read up on POST certification, but I can't say for certain. Like, I can't sit here and recite what's required to be done to be recertified.
Q I'm going to your post-arrest, your arraignment, did you enter any sort of pretrial diversion program?
A Are you referring to, like -- what is it -- accelerated rehabilitation, is that?
Q Or any sort of program or whether, yeah, whether it's either the accelerated rehab or getting community service; anything along the lines of that?
A It was in the accelerated rehabilitation, but I didn't have to attend like an actual program or rehab or anything like that. I didn't have to admit to probable cause or anything along those lines.
Q Okay, thank you.
MR. GERARDE: I have no further

questions.

MR. MANCINI: Can we have a break for a minute? I don't have too much.

CROSS EXAMINATION

BY MR. MANCINI:

Q Good afternoon, Mr. Cameron. My name is Attorney Dennis Mancini. I'm the attorney for Lieutenant Stephen Samson.

A Okay.

Q I just got a couple of questions for you.

A Yes, sir.

Q I know you know, but --

A Yes, sir.

Q -- but just a couple questions.

Okay. So, going all the way back to May of 2018, you made a complaint to the Connecticut State Police?

A Yes, sir.

Q Okay. And following that, that's when you first had contact with Lieutenant Samson; is that correct?

A Yes, sir.

Q Okay. You had some conversations with him

and he did -- did he ask you if you had any witnesses?

A He asked me was anybody present during the interactions. So, yes, sir.

Q Okay, all right. And did you provide him a name of any individuals that were present?

A I provided him the name of Danielle.

Q Okay. Did he ask you for a last name?

A He did.

Q Okay. Did you ever provide him with a last name?

A No.

Q Okay. And you've never provided that last name to this day, right?

A Yes, I have.

Q Okay. But, I mean, to -- with respect to the investigation, that was after the investigation was completed?

A Yes, sir.

Q Okay, all right. So, I guess a better way to say that is: During the course of that investigation, you never provided that last name?

A Well, the course of the investigation would be from 5/22/2018 until sometime in October of 2018. I did send an email to Sergeant Samson on 7/25/2018. That email was cc'd to Major Scott Smith and Lieutenant

Eric Cooke. Mr. Samson, who was still the assigned investigator at that point in time, he ceased all contact with me; never contacted me again after 7/25/2018.

So, I believe I had previously called and essentially filed a complaint about the direction and the way that Mr. Samson was speaking to me on 7/20/2018. I believe I spoke to Eric Cooke on the phone that date. I spoke to Major Scott Smith on the phone that date and another sergeant whose name I can't remember at this time.

Q So, is that a no?

A He's never asked me after 7/25. So, from 7/25 until the end of whatever date the investigation end, there was no contact with Mr. Samson. So, I was unable to provide a name.

Q Okay. But you never did provide a name?

A I never had contact with him afterwards.

Q Okay. So, no?

A Correct.

Q All right. And there was some discussion about --

A My apologies, I just want to add further.

Q That's okay.

A That I did call Mr. Samson numerous times and

he ignored every single phone call. I believe at one point I did leave him a voicemail. That voicemail also never returned.

BY MR. MANCINI:

Q Okay, all right. And at some point you said that after the call to probation, you felt that Samson wasn't trustworthy; is that correct?

A I had a little inkling about just his interaction in general, but I didn't find out about the call to probation until I think 7/9 of 2018. I was away on vacation, out the country, for probably about four days the week before.

I got an email. I came home. I had two emails from Samson, but when I got to work that day, I was informed that he actually called, which I thought was interesting because he didn't call me. And the conversation with the people in probation, Mr. Samson did not ask to speak to me.

Q Okay, all right. But that was -- there was a period before that, right, between the -- so, do you remember the first time you talked to him? Was that in June?

A 6/25 was the first time we spoke in person.

Q And then phone call to probation was sometime in July?

A July 6th, I believe, is the day he called my office. July 5th or July 6th was the first date he called the Springfield District Court Probation.

Q All right. So, between that June 25th and the July 6th, approximately?

A Yes, sir.

Q At that point, you never provided that name?

A Correct.

Q Okay, all right.

A And I -- I believe I told him I would get back to him with the name. I believe that was a conversation on June 25th. So, by the time -- I think I sent him an email the following day, which was the videos, four videos.

Q Okay. All right. And -- but you never spoke to Danielle about talking to Samson?

A I don't remember directly having a conversation with her about it. I can't say for certain.

Q Well, I thought that's what you said?

A Yeah, I don't recall the actual conversation saying, Hey, do you want to speak to Sergeant Samson about the investigation.

Q Okay, all right. And you indicated that Sergeant Samson had told the State Police to pay close

attention to Steve Stebbins's location; is that correct?

A The email was shown on the screen. It talked about residence checks, but it also included my address and the two known vehicles that they had listed to me.

Q Right. But that email came from Sean Mahar, right?

A It said -- yes. It came from Sean Mahar, but it started with per Sergeant Samson.

Q Right. But was that -- I mean, okay. I'll just leave that.

I mean, Sergeant Samson could have sent an email to the State Police himself, right?

A Yes, but he also could have directed an officer that he supervised to send an email.

Q He could have?

A It looks like he did per the email. It just says "per." So, it's my belief that the person was directed per Sergeant Samson.

Q Okay.

A As the person wrote.

Q I just to be clear, that's your belief? I'm just asking.

A I would have to ask Sean Mahar how.

Q I'm just asking.

A Yeah, no. I understand.
Q We can ask Sean, but he's not here. So, I'm just --
A No --
Q That's your --
A -- it's --
THE REPORTER: I'm sorry, I really need one at a time.
MR. MANCINI: I'm sorry.
THE REPORTER: That's okay.
BY MR. MANCINI:
Q Okay. And you also said that when you got to court, I just wanted to be clear that I understand. You went to court for the stalking charge --
A Yes, sir.
Q Correct?
Okay. And there's some notes -- and I apologize, because I don't remember which -- oh, they're right here. I wasn't sure which --
MR. McLANE: 52 and 53.
MR. MANCINI: Okay, thank you.
BY MR. MANCINI:
Q And these were contemporaneous notes that you took?
A Yes, sir.

239

Q Okay, all right. Looking at Exhibit 52, you said, "Stebbins hired a lawyer, which is weird. Even my attorney scoffed at it. Sergeant Samson has contacted the prosecutor in attempts to pursue the matter harder and was questioned why he is pursuing this so hard. Was told he is only making it worse and will all fall back on Stebbins eventually."

Now, was Stebbins's attorney at court at that time; if you know?

A I believe he was.

Q Okay, all right. But he wasn't part of those conversations?

A No.

Q Okay. So, there was a conversation between Assistant Attorney General -- I'm sorry -- Assistant Attorney -- Assistant State's Attorney Parakilas, your attorney and you, and you were all together having a conversation?

A Yes, sir. Now, one of the dates we had a sitdown conversation in Mr. Parakilas's office and we had a conversation about the details.

Q All right. And so, Attorney Parakilas told you that Sergeant Samson had contacted him?

A Yes, sir.

Q Okay, all right. And he said that he had

never signed a warrant for stalking in the third degree?

A That was part of the conversation, yes.

Q But he signed your warrant, right?

A Correct.

Q And that was for stalking in the third degree?

A The conversation was about prior, so the one he signed for me.

Q All right. That's what he said?

A Correct.

Q All right. And you had an attorney for that case, right?

A Yes, sir.

Q Okay. And you -- you said that you had applied for the accelerated rehabilitation program, correct?

A Correct.

Q Okay. And if you know, that's -- if you know, that's a diversionary program offered by the State of Connecticut, correct?

A Essentially, I was -- to my knowledge, yes.

Q There's no admission to guilt?

A Correct.

Q Okay, all right. And you weren't asking to

do anything other than the case was continued for some period of time?

A Correct. For I think it was like 20 days or 30 days.

Q Some period of time?

A Yes, sir.

Q Okay. And did you have to go back to court for the dismissal or was the case dismissed in your absence?

A In my absence.

Q Okay, all right. And did you ever challenge probable cause with that criminal charge?

MR. McLANE: Give me one minute. Let's go off the record.

(Recess: 3:45 to 3:46.)

MR. McLANE: Again, Mr. Cameron will answer the question with some context regarding a decision, a trial decision ultimately made by his attorney, but any, I guess any further inquiry into the decision made as to challenging probable cause, we'll probably object to privilege. So, just with respect to this answer, we'll allow him to

242

answer it.

THE WITNESS: So, yes. So, I talked to the attorney about filing a motion to dismiss based on lack of probable cause and he refused. At that point in time, I also had a conversation about him no longer being my attorney, but the court wasn't inclined to allow it, per him.

BY MR. MANCINI:

Q Okay. So, I guess my question was: Did you ever challenge probable cause?

A It was my intent to have it challenged, but my attorney was representing me and he made that he wasn't going to do it.

Q Okay. So, no?

A My intent was to.

Q I understand.

A Yes.

Q But you never actually challenged probable cause?

A My attorney never challenged probable cause, correct.

Q Okay, all right. And you talked about -- while we're talking about probable cause. I just wanted to take a step back. You talked about you were

told that the ticket -- you got a ticket in New York for disorderly conduct or whatever. I know there was some confusion about the details there, but you got a ticket in New York for -- effectively for disorderly conduct?

MR. McLANE: Objection.

THE WITNESS: For unreasonable noise, which is a subsection of disorderly conduct.

BY MR. MANCINI:

Q Unreasonable noise, I stand corrected.

And you said that there was no PC for that ticket?

A Correct.

Q That's what you were told, okay.

Did you ever file a lawsuit with respect to that?

A No.

Q Okay, all right. Were you surprised to find out that you were discharged from your position in New York?

A I don't know what you mean by "surprised." I was -- I didn't have any information. I wasn't even able to meet with anybody. So, I didn't receive any documentation or any meeting to confirm.

Q I mean, one day you were employed?

A Correct.
Q And then something happened and then you were no longer employed?
A Correct.
Q So, did you just get a letter or --
A I believe I -- I don't really recall.
Q Okay.
A What actually transpired from that.
Q Were you surprised to find out that you were no longer employed?
A I don't -- surprised, I don't know. I don't know how to say yes or no.
Q I mean, were you aware that you would no longer be employed?
A No.
Q Okay. So, that you were not expecting to no longer be employed?
A I've never had any conversations with anyone about any of the decisions. So, I never had the opportunity to meet with anybody.
Q Okay. But I guess my point is that you were not expecting that? You were not expecting to be terminated? I mean, however, you know, we don't have to grieve the termination, you were not expecting to no longer be employed by the New York Police Department?

A I didn't have an expectation one way or the other.

Q Well, I mean, you weren't expecting to be continued your continued employment you just --

A I --

Q You left work one day, you weren't sure you were going to be working the next day or not working the next day?

A Correct.

Q I don't understand. Did you have a schedule?

A At that point in time, I don't know if I did or not.

Q Okay. I don't understand. Did you just show up for assignments or you just like told them that you worked a certain day or?

MR. McLANE: Objection.

THE WITNESS: I don't --

MR. MANCINI: I'm not understanding how that works.

THE WITNESS: Yeah, I don't recall if I had a set schedule at that point in time or not.

BY MR. MANCINI:

Q Okay. I'm a little confused. You were employed by the New York Police Department?

A Yes, sir.
Q Okay. And but you don't know if you had a set schedule or --
A At that point in time, I'm not -- I don't recall if I had a set schedule or not.
Q Okay. I'll move on. You said when -- you talked about the date that you were arrested?
A Yes, sir.
Q And you said that there was somebody with you and you asked -- and I apologize because I don't remember the name -- but you asked that that individual to, you said, Go back to the house to get the phone number.
A I said -- I told them to go to the house and get Jean.
Q Go to the house and get Jean, okay, all right. And what house was that?
A 49 Foxcroft Road.
Q Okay. And knew that Jean was there?
A Yes.
Q Okay. How did you know that he was there?
A Well, we were at that residence prior to the stop.
Q Okay.
A We were at that residence prior to the stop.

Enfield police officers kept circling the neighborhood. We were unaware of what they were doing that for, but when we end up leaving that location, that was when the car was pulled over.

Q Did you ever live in Connecticut?

A Ever?

Q Yes.

A Yes.

Q When did you live in Connecticut?

A I can't say for certain. Prior to being employed with Mass Probation. So, I'm going to say prior to March of 2016.

Q Okay. And in March of 2016, you took up residence in Massachusetts?

A Correct.

Q Okay. But you don't know the dates for sure.

A I don't know for certain.

Q Okay, all right.

A I'm going to say prior to March 2016.

Q All right. Were you ever placed under arrest by Lieutenant Samson?

A No.

Q Okay. Was -- were you ever seized by Lieutenant Samson?

A I can't state who was, you know, he was a

248

part of seizure at 11/12/2018.

Q Explain that.

A He was present at the scene of where I was not allowed to leave.

Q Okay. Did he tell you that you couldn't leave?

A No.

Q Okay. Did he ever have any conversation with you?

A No.

Q Okay. I'm not sure I understand how his presence led to his -- led to your seizure.

A So, a part of what was alleged, you hear them talking, Bryan Nolan and Sergeant Samson about the investigation. So, part of that conversation is probably -- is I'm going to say probably -- would prolong the amount of time I was held in the parking lot.

Officer Brian Croteau would have had the opportunity to release me at that scene. So, the original seizure ideally would be Brian Croteau. Bryan Nolan showed up, still held at that location. Bryan Nolan stopped and had conversations with Sergeant Samson.

So, whether they had -- if Sergeant Samson

249

never had the conversation with Bryan Nolan, I would have been let go a lot earlier.

Q You believe?

A Yes.

Q Okay. And but you were never placed under arrest on that date?

A No, sir.

Q Okay, all right. And then did Sergeant Samson ever use any force against you?

A Physical force, no.

Q Okay. What force did he use against you?

A Again, he was present at a scene that I wasn't allowed to leave from.

Q So, his presence at a scene that you were not allowed to leave from was force?

A To me, yes.

Q Okay, all right, I just wanted to clarify.

MR. MANCINI: I just -- I think that's all I've got. If I could just have maybe one minute just to go -- and then I'll hand it back to Laura.

MS. VITALE: Sure.

MR. MANCINI: Actually, maybe we take five minutes? Take a break.

(Recess: 3:54 to 3:59.)

BY MS. VITALE:

Q All right, Mr. Cameron, thank you so much. I just have a couple minutes here.

MS. VITALE: Are we all set?

THE REPORTER: Yes.

BY MS. VITALE:

Q Did Stebbins ever physically touch you?

A No.

Q Okay. And did you see Stebbins speak to Nolan on November 12, 2018?

A Mr. Nolan was standing next to Steve Stebbins's vehicle. I can't confirm -- I've heard conversations between all of the officers as a culmination of all of the conversations. So, if Mr. Stebbins spoke to the female officer, Officer Chagnon or Brian Croteau, that was a part of the reason for why I was held and stopped at that location.

Q So, I'm not sure I followed you there. So, did you personally observe Stebbins speak to Bryan Nolan on November 12, 2018?

A I personally seen Bryan Nolan standing next to Stebbins's vehicle in the parking lot.

Q Okay. So, other than seeing Bryan Nolan standing next to Steven Stebbins's vehicle in the parking lot, you did not actually see Stebbins speak to Bryan Nolan; is that right?

A I can't interpret -- I can't hear from where I was at. Obviously, you hear conversations on the car camera. But from where I was, it does look like they had conversations. Due to the fact that Bryan Nolan cut the audio or Bryan Nolan cut the audio on and off, I can't say for certain based on the audio. But it did look that way from where I was seated.

Q What audio are you referring?

A The car camera from Brian Croteau, I believe it was.

Q Brian Croteau?

A Yes, ma'am.

Q And so, again, the answer is no; you did not actually see Stebbins speak to Nolan on November 12, 2018, right?

MR. McLANE: Objection.

THE WITNESS: If you're asking me about what I seen what looks like them talking, then, yes. I can't hear them, but obviously it does look like they're having a conversation. He's standing next to the

window. Mr. Stebbins's window is down and to me, that is me that I do see them having a conversation.

BY MS. VITALE:

Q Okay. And but you do not have any audio of a conversation between Stebbins and Nolan on November 12, 2018?

A Mr. Nolan, there's multiple -- between Bryan Nolan, I can't say for certain who is speaking. I don't know their voices. It would appear that the officer at the scene who did not let me leave. The conversation by Stebbins was, Do not let him leave. I have my sergeant on the way up here. So, based on that, yes. I believe that that was a part of conversation where I was not allowed to leave.

Q Do you know the audio that you just referred to where you think he said, Do not let them leave, I have my sergeant coming up here?

A Yes, ma'am.

Q What audio is that?

A That's from his -- Steven Stebbins's cruiser cam.

Q And do you know who he was talking to when you say he made that statement?

A He made that statement to the first officers

on scene.

Q When you say, "the first officers on scene," who are you talking about?

A Brian Croteau, and a female officer I don't remember the name that she was identified as. I'll also offer when I parked in a spot, there was a conversation between Steven Stebbins and Brian Croteau, where he says, He's over there, he's in the black Infiniti.

Q So, you think Stebbins tells Officer Croteau, He's over there, he's in the black Infiniti?

A Yes, ma'am.

(Defendants' Exhibit 54:
Marked for Identification.)

BY MS. VITALE:

Q Okay. So, whose license plate is on this Exhibit 54?

A That license plate is Jean Paul's.

Q Okay, okay. I'm going to show you I think this is the last video, okay?

A That's fine.

MS. VITALE: Okay. So, I'm sorry. So, I'm making this exhibit 55, it's a video it's

Bates numbered Cameron 78. I'm going to play it first.

(Defendants' Exhibit 55: Marked for Identification.)

(A videotape was played.)

BY MS. VITALE:

Q Okay. Now, do you recognize this video that's Exhibit 55?

A I do.

Q What is it?

A It's a video from 5/26 of 2018.

Q And why did you take this video?

A So, on that date and time, Danielle Dubuque had left 49 Foxcroft Road. I seen from my location Mr. Stebbins speaking with the same officer who was operating that vehicle. When Ms. Dubuque left that same vehicle, decided to follow her leaving the area. So, I got in my car to make sure that to follow her to make sure she was okay to leave the area.

Q Okay. So, you got in your car and you followed the Enfield police cruiser, right?

A I followed her leaving the area, which was

being followed by an Enfield cruiser, yes.
Q So, you were immediately behind the Enfield police cruiser, right?
A Yes, ma'am.
Q And you were taking a video with your cell phone?
A Yes, ma'am.
Q You were taking a video why your cell phone as you were driving?
A Yes, ma'am.
Q Okay. Now, how is it that you -- why do you believe that that was anything by a coincidence that the Enfield police cruiser ended up behind Danielle's car?
A Well, as soon as she went past the Enfield car, the car pulled off behind her.
Q And it left the Stebbins residence?
A Yes, ma'am.
Q Okay. And how do you know they just weren't leaving the Stebbins residence at that time?
A I don't know.
Q Okay.
A But obviously, there would clearly be no reason for a gentleman to drive right behind her. So, I wanted to make sure she was safe leaving the area.

At that point in time, all I knew was that an Enfield police cruiser had responded to 44 Foxcroft Road after Mr. Stebbins's wife tied to walk in front of the vehicle.

Q Okay. So, how long did you follow the Enfield police cruiser?

A Only to --

MR. McLANE: Objection.

THE WITNESS: I didn't follow the cruiser. I followed her leaving the area. We went up to Enfield Street. At that point in time, she made a right. The officer made a right behind her. So, he was following her at that point in time. And I think he left her somewhere possibly near the cleaners, which is about two blocks up.

BY MS. VITALE:

Q So, did you follow the Enfield -- did you follow behind the Enfield police cruiser up until the cleaners?

A Yes, ma'am.

Q Okay.

A I followed behind the officer who was following Danielle.

Q Okay.

A On that date.
Q And did you -- why did you stop taking a video?
A I didn't because he turned into the parking lot.
Q Well, let me play this again. So, I'm going to play Exhibit 55 again, okay?
A Yes, ma'am.

(A videotape was played.)

BY MS. VITALE:
Q Okay. I'm going to play it again. And I want you to tell me at what point do you see the Enfield police cruiser pull into the cleaners parking lot?
A It's not on this video.
Q Okay. So, you stop taking the video before that happened, right?
A Yes, ma'am.
Q Okay. So, why did you stop taking the video?
A Because I don't need much information to show that he's following. This video clearly shows that he's following her leaving the area.
Q Okay. It also shows that you're following

the police cruiser, right?

MR. McLANE: Objection.

THE WITNESS: No, it actually shows me following her. The police cruiser just happened to be in between us.

BY MS. VITALE:

Q Okay. Just like -- okay. So, why -- so, did you think that the Enfield police were at the Stebbins residence on May 26th because of you?

A I had no clue what they were there for. That's why I responded to the Enfield Police Department to find out.

Q Okay. So, why did you feel the need to go down to the Enfield Police Department to find out?

A Well, clearly, his wife, who I've never seen before, tried to walk in front of my vehicle. I had never seen her before. I never had any interactions with her. So, it would be strange to me four days after an incident, a woman in front of 44 Foxcroft Road or adjacent to it is trying to walk in front of a vehicle that I'm operating.

And then shortly thereafter, probably 10 minutes after, an Enfield police officer responds directly to 44 Foxcroft Road. I further want to put out there that the report that was written states some

assertations from I believe it's Detective Castle of things that he didn't observe. And also in Mr. Stebbins's report, he wrote that we followed or that Danielle or I don't recall, that the officer called him and told him that he was followed out of the area, which clearly you see is not true.

Q You were driving behind the police cruiser, correct?

A I was driving behind her.

Q But the police cruiser was in between your car and her car, right?

A Yeah, and I also don't understand why he would call Mr. Stebbins to tell him that.

Q Now, what are you basing that on, that he called Mr. Stebbins to tell him that?

A I believe Mr. Stebbins wrote that in his to/from memo to Sergeant Samson that he submitted on 7/23.

Q Okay. So, anything you know about that conversation, which may or may not have occurred, would be from something that Stebbins wrote?

MR. McLANE: Objection.

THE WITNESS: I personally don't want to say whether Mr. Stebbins, if he wrote that in his report, then I would hope that it was

true.

BY MS. VITALE:

Q So, now, I'm going to play this Exhibit 55 again and I want you to tell me the point where you see Danielle's car in the video, okay?

(A videotape was played.)

THE WITNESS: It's not in the video. It's directly in front of the Enfield cruiser.

BY MS. VITALE:

Q Okay. Well, if you couldn't see her, how did you know where she was?

A I was there.

Q Okay. Well, the video shows what you can see, right?

A No.

MR. McLANE: Objection.

MS. VITALE: No?

THE WITNESS: No, because if the video is actually from here (indicating), my eyesight is here and I'm outside of the -- I can see outside. I can stick my head out the window. I can do any of those things to be

able to see still her vehicle is 100 percent physically in front of the Enfield police cruiser that's in this video.

BY MS. VITALE:

Q Okay. Now, you took various videos, some of which that we've watch today, right?

A Yes, ma'am.

Q Did you ever post any of those on the Internet?

A No, ma'am.

Q Did you ever post any of them on social media?

A No, ma'am.

Q Now, okay. So, in your deposition on August 23, 2022, page 65 of your deposition, you said, you were talking about the May 22, 2018 incident, okay? You say, "At this point, I already knew this was a pretextual stop."

A Yeah.

Q Do you recall saying that?

A Yes, ma'am.

Q What did you mean by a, "pretextual stop"?

A Pretextual stop, it's a car stop initiated by a police officer that he doesn't necessarily have to observe any motor vehicle infractions. He, you know --

he sees the -- identifies the driver by race, ethnicity, color, and he decides that I want to pull this vehicle over.

Q So, you think that -- so, I'm trying to understand. You think Stebbins went to your driveway on May 22, 2018 and that it was pretext for what?

A He may have wanted to initiate a stop, I don't know. Pretext solely -- it doesn't have to be any known information by the officer. It's just they see that there is an operator who's operating the area. They may have some concern for personal reasons.

And at that point, they initiate a stop. They don't actually have to see any speeding or running a stop sign, but those are the common things that are utilized to initiate or failure to change lanes; something along those lines.

Q And what is your basis for believing that it was a pretextual stop on May 22, 2018?

A Because I was not speeding nor did I run a stop sign.

Q Any other basis for your belief that there was a pretextual stop on May 22nd?

A That was a conversation that was had. Based on that conversation on 5/22/2018, those were the two allegations and both -- neither one of those were true.

263

Q Okay. Were the windows tinted on the car you were driving May 22, 2018?

A They're legally tinted, legally tinted. So, you can still see through them. You can observe my color. You can see that I have a beard. You can see those things.

Q But yes, your windows were tinted, right?

A Lightly. You can see through them.

MS. VITALE: Okay, all right. I think those are all the questions I have. If I can just have a minute, does anyone have any follow-up questions?

MR. GERARDE: No.

MR. McLANE: You need a minute and I'm going to take a minute. I'm going to ask --

MS. VITALE: I'm sorry, I forgot all about you.

MR. McLANE: I'll let you finish yours.

(Recess: 4:18 to 4:19.)

MS. VITALE: Okay. I'm all set. So, we'll just -- do you want to sit here?

MR. McLANE: I'm good here.

CROSS EXAMINATION

BY MR. McLANE:

Q All right. Marcus, I just want to ask you a few questions. You were asked about the seizure on November 12, 2018. One of your statements you made you had watched a video of Mr. Stebbins telling a female officer not to let you leave and that he has a sergeant on the way up here.

What significance did you put in the statement that Stebbins didn't want her to let you leave?

MS. VITALE: Objection to form.

THE WITNESS: I'm sorry, can you state that again.

BY MR. McLANE:

Q So, what significance did you put on the statement that Stebbins didn't want the officer to let you leave?

MS. VITALE: Objection to form.

MR. MANCINI: Objection.

THE WITNESS: The significance behind it is the fact that at that point in time there was numerous information shared with the Enfield Police Department of statements that

were not actually true.

So, anything that he was sharing at that point in time with the Enfield Police Department wasn't factually based or factually proven or any information that was, I'd say, that was confirmed by the Connecticut State Police.

BY MS. VITALE:

Q Part of what you had mentioned he said was, Don't let him leave, I have my sergeant on the way up here. What significance do you place on the statement that -- what significance do you place on the statement that he wanted her to wait because his sergeant was on the way up here?

MS. VITALE: Objection to form.

THE WITNESS: Sorry. So, in regards to that, the significance behind the sergeant being on the way, it's -- it was alarming, to say the least, because I know for a fact his sergeant being on the way, you know, looking back and knowing the information that I know, Mr. Samson who was his direct sergeant, refused to contact me. And at that point in time he was the assigned investigator.

I know from previous interactions with

Mr. Samson that he was not honest, he was not truthful and I was not truly investigating the claim from 5/22/2018, nor did he have any intention of completely communicating with me.

Further, you know -- I'll further state that a lot of the information that I knew up until that date about Mr. Samson was that he was not being completely honest in his approach in communicating with myself.

BY MR. McLANE:

Q So, you weren't able to hear any conversations between Samson and Nolan and Stebbins on November 12th of 2018; is that accurate?

A Correct.

MS. VITALE: Objection to form.

BY MR. McLANE:

Q So, were you allowed to leave your vehicle?

A No.

Q So, is it even possible that you would have overheard conversations between the three --

MS. VITALE: Objection.

THE WITNESS: No.

THE REPORTER: I'm sorry. That you wouldn't have heard?

BY MR. McLANE:

Q Is it even possible that you would have heard conversations between the three of them?

A No.

Q All right. So, you were present for Bryan Nolan's deposition, correct?

A Yes, sir.

Q And after being present at that deposition, did you come to learn that they did have a conversation between the three of them?

A Yes, sir.

MS. VITALE: Objection to form.

BY MR. McLANE:

Q With respect to Sergeant Samson's conversation that you believe happened with Sergeant Nolan, what significance is the fact that he had a conversation with respect to your being seized on November 12, 2018?

MS. VITALE: Objection to form.

MR. MANCINI: Objection.

THE WITNESS: I think the importance of the seizure and related to Sergeant Nolan not allowing me to leave, he arrived at a scene, at that point in time there was -- he had the ability to listen to information. He didn't

268

have any significant information that any probable cause existed.

He further communicated with Mr. Stebbins and Mr. Samson. And a lot of the information that was communicated was, in fact, not true. Further, there's also email communication between the two where -- or the three where you see Mr. Stebbins obtaining unofficial information from the Connecticut State Police.

It's still, to this day, not known if the Connecticut State Police are aware that these documents were provided to the Enfield Police Department as a part of the investigation.

Further, within those documents, there is a lot of information that's provided that is again factually not true. So, based on the fact that that information not factually being true, it was written down by Sergeant Samson. And it was in turn at that point in time provided to Steve Stebbins, who was also aware of all the false statements in there.

BY MR. McLANE:

Q Okay. You don't think the Enfield Police

Department just showed up to the Brookside Plaza to arrest you on their own that day?

A No.

THE REPORTER: Wait a minute.

(The last question was read back by the Court Reporter.)

THE REPORTER: And who objected?

MS. VITALE: I think we all did.

BY MR. McLANE:

Q Let me rephrase. You don't think the Enfield Police just showed up to arrest you on November 12th of 2018, correct?

MS. VITALE: Objection.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

BY MR. McLANE:

Q Okay. Why did they show up?

A They were --

MS. VITALE: Objection.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

THE WITNESS: They were called -- dispatched to the location.

BY MR. McLANE:

Q By whom?

A A 9-1-1 call, which was initiated by Steven Stebbins, which he was directed to do by Sergeant Samson. I'll further put out there that he said that he was notifying the lieutenant about this interaction. We still haven't seen anything that shows that Mr. Samson alerted the lieutenant of this actual interaction.

Q So, what role do you think Stebbins and Samson played in your seizure on November 12, 2018?

A It's my belief that they both 100 percent conspired, not only about my seizure on 11/12, the arrest on 12/11, and they've also conspired throughout the internal investigation, which Mr. Samson was assigned to.

That conspiracy was a part, you know, looking at some other things is to intimidate, harass me as a victim, who reported a crime to the police department. Mr. Samson tried to initiate some fake criminal charges against me. Mr. Stebbins, at that point in time, was aware of that as well. He did not report it. So, he was aware of that.

Mr. Samson also accompanied -- and this is after 12/11 -- but Mr. Samson accompanied Mr. Stebbins

to both restraining orders. If somebody who is completely a non-biased, impartial investigation, he has no stake in the game. He would have had no reason to show up at Brookside Plaza. He would have had no reason to be contacted by Mr. Stebbins. Mr. Stebbins wanted Samson to appear, so he can help direct Enfield Police Department based on a lot of false information.

Q Well, what role do you think they played with your arrest on December 11th of and 2018?

A Well, a lot. I think they played a lot of role of the arrest on 12/11/2018. Look at all of the emails, all of the false communications, you know. They provided unofficial documents that are not State documents, you know. Whether this information has been confirmed by superiors, these documents have never been submitted, per my knowledge and per any FOIA request have these documents been provided as official Enfield Police Department information.

Further Mr. -- I'm unsure who it was, but in regards to the videos provided on 5/30, you see that they only provided some videos. You also see that they communicated and Mr. Samson told -- directed Mr. Stebbins not to give this report to the Enfield Police Department because I might get a copy of it.

So, based on that, you know, at that point

this time, that report was still was unofficial and it was known that it was unofficial when it was provided to Bryan Nolan through email as well as some of the other videos, the actual recording from 6/25.

Again, something that is not in the official internal affairs report and I don't think the transcript of the 9-1-1 call was in the initial internal affairs report as well. So, I do believe they conspired to continue to harass and intimidate me.

Q All right. Do you think the seizure on November 12/20/18 was reasonable?

MS. VITALE: Objection to form.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

THE WITNESS: I'm sorry?

BY MR. McLANE:

Q On November 12th of 2018?

A No.

MS. VITALE: Objection.

BY MR. McLANE:

Q Why?

A Obviously, at this point in time, we're looking at a -- I left 49 Foxcroft Road at 2:30 p.m. Mr. Nolan already testified that he did not believe that any following occurred until the highway, which

the last video from the cruiser cam I believe is at 2:36 p.m. The first cruiser arrived at Brookside Plaza at 2:44 p.m.

Based on that, the charge of stalking would mean that it would have to be continuous and on multiple occasions. Based on that information, that point in time, there was no probable cause. And it would not have been reasonable to detain me at Brookside Plaza. And it would not have been reasonable to hold me there as long as they did at Brookside Plaza.

And again, the only reason that that information -- my apologies. The only reason I was held there so long is because Mr. Stebbins directed Enfield to not to let me leave and to wait for his sergeant, who got there. And all of his communication was directly with Bryan Nolan, who is the highest ranking officer from the Town of Enfield at the scene.

Q Okay. Do you believe that the seizure and arrest on December 11th of 2018 was reasonable?

MS. VITALE: Objection.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

THE WITNESS: 100 percent unreasonable.

Just based on the fact of everything. Again,

you have a lot of strategic omissions from Mr. Stebbins. You have a lot of false information, unofficial reports provided to the Enfield Police Department. The Enfield Police Department did have the opportunity and was directed to obtain all of the official documents from the State of Connecticut, Connecticut State Police.

There's no proof that they have ever obtained official documents. So, they relied on a bunch of unofficial and false information in order to detain me and arrest me on 12/11 to initiate, which was initiated from an application for a warrant, which was signed under -- by Mark Squires and Bryan Nolan.

BY MR. McLANE:

Q So, one of last questions you got was were your windows tinted. I believe you answered a few ways in which you could still see through the windows.

Do you know whether Stebbins could see through your windows?

MS. VITALE: Objection.

THE WITNESS: Steven Stebbins has already testified and right in and I believe

in during his deposition that he was able to see me using a cell phone on multiple occasions while driving the car.

Based on that information, I clearly know that he was able to see through the windows and he was able to see on 5/22/2018 that I was a male and I was black.

BY MR. McLANE:

Q Without being aware of any Enfield hiring procedures or specific training sessions, what do you think that the Enfield police officers in this case did that was a violation of the law?

MS. VITALE: Objection.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

THE WITNESS: So, a lot of the things that the Enfield Police Department did that was against the law, Bryan Nolan, I believe he perjured himself in his application. He stated that there was construction in the area that would have caused Mr. Stebbins to leave 44 Foxcroft Road and go past my residence.

I would just further put out there the interesting thing is that was not written in

Mr. Stebbins's written statement. So, he also never -- he stated they never spoke on the phone. We haven't seen anything provided that would suggest that that statement was actually made by Steven Stebbins. That's one of the things that I can point out.

Furthermore, you know, they talked about doing a complete investigation. Complete investigation based on my experience and what I know, it would mean that you spoke to more than just Mr. Stebbins and Mr. Samson. They had the opportunity to reach out to Eric Cooke. They didn't. They had the opportunity to speak to Sergeant Loringo, who he already previous stated that it was a complete waste of time. He had direct contact with myself and he had contact with Detective Castle. So, he was made aware of all of details and he made his independent determination, which I do believe it was reasonable, that everything was a complete waste of time.

I would also further go into stating that a lot of the information that's provided Mr. Nolan was here. He could not talk about

any of his bias or racial profiling training and he was dealing with a situation where a black male had already asserted to him that he was being harassed based on a complaint that he filed to the Connecticut State Police.

Mr. Nolan nowhere in his report ever write that he had actually investigated that claim. Mr. Nolan nowhere in there did he write that he was impartial in trying to find out information. He never -- he put in there multiple ways for me to go, but he also didn't write that Steven Stebbins had multiple ways he would have went.

He further wrote in there, along the lines of why I told him I was going, which was Brookside Plaza, the location where we ended that. But he never wrote in there or said he asked Steven Stebbins where he was going on that date. So, I do think a lot of the things that the Enfield Police Department, I think they did violate procedures. We're looking at the audio turning off and on. I would consider that tampering with evidence.

I think they got into a situation where they just furthered the scheme, which was perpetuated by Mr. Samson and Mr. Stebbins to continuously harass and intimidate and stalk me.

MR. McLANE: Okay, that's all I got.

THE WITNESS: Thank you.

MR. GERARDE: You're there, you can go.

MS. VITALE: Okay.

REDIRECT EXAMINATION

BY MS. VITALE:

Q What evidence do you have that Stebbins and Samson conspired for the incident on November 12th?

A So, for November 12th?

Q Uh-hum.

A Well, the phone call that was placed, the first phone call was not to 9-1-1. Nowhere on the phone call did Steven Stebbins ever state -- the 9-1-1 call, he never stated he was in fear. He actually was on that call laughing.

Further, Mr. Stebbins's first phone call was to Sergeant Samson, not to 9-1-1. I'll go back further and state the 7/17 phone call between Stebbins, Marty

Perof (phonetic) and Stephen Samson. That is all part of a conspiracy. You hear them on there stating very clear that now that you called this job, I bet he'll change his tune.

You also heard multiple derogatory conversations about minorities, derogatory conversations about when black people say that they're being harassed or pulled over for just simply being black.

You also heard Mr. Samson state clearly that this was his end, which is his plan, a part of a statement, it's a statement that suggest that he has an alternative plan in contacting my job versus actually calling and trying to find out actual information.

Between that, between the email threads that have been provided, all of that information was provided previous to an investigation being closed, which would suggest that they were working together. Mr. Stebbins already stated that the name, Danielle, was provided to him and he Google searched her.

Again, more information that would suggest that they were working together. I'll stop there. All of that precipitating information led up to the complete, the stop of 11/12. So, all of that information would state that that stop was all a part

of them two conspiring together.

Q Now, as far as the audio, that you claim you've heard where you claim Stebbins said something like, Do not let them leave. I have my sergeant coming up here, did you obtain that audio recording through FOIA?

A Yes, ma'am.

Q Okay. So, you did not hear that on 11/12/2018, right?

A No, ma'am.

Q Okay.

A I wasn't allowed to get out the car. So, I couldn't hear much of the conversation. I could only hear any conversation that was directly related to me.

MS. VITALE: Okay, that's it. Do you want to switch?

MR. MANCINI: I just have a couple of quick questions.

RECROSS EXAMINATION

BY MR. MANCINI:

Q Just, chronologically speaking, do you know when the investigation by Sergeant Samson regarding Trooper Stebbins completed? Do you know when that --

the date of that?

A No. So, in there, in the arrest affidavit again Bryan Nolan asserted that I received a letter from the Connecticut State Police that the investigation was closed. I believe it was October 11th of 2018.

I can confirm that I've never received that letter. I've only received the internal affairs investigation in its entirety after a FOIA request that I submitted I believe in March of 2019, if I'm correct.

Q Okay. So, October 11, 2018?

A I believe -- to the best of my knowledge, I believe that is when it was closed.

Q All right. And then your -- the alleged seizure was on November 12, 2018?

A Yes, sir.

Q Okay. So --

MR. McLANE: Objection.

BY MR. MANCINI:

Q So, a month and a day after the investigation had concluded?

A So, just to be clear, I wasn't aware that the investigation was over.

Q That's not what I asked.

A Yep.

Q I'm just asking: Chronologically, that was a month and a day after the investigation occurred?
A The seizure occurred on 11/12/2018.
Q Okay. And then your arrest was on December 11th?
A Yes, sir.
Q Okay. And you indicated that that was an arrest pursuant to an active arrest warrant?
A Yes, the arrest warrant had a lot of false information.
Q Okay.
A And omissions of information.
Q Okay. But it was an active arrest warrant?
A To the best of my knowledge, yes.
Q You were served with it, right?
A I don't believe I ever got a copy of it, but . . .
Q So, they took you into custody on account of an active arrest warrant, right?
A Yes, sir.
Q Okay. Which was signed by a judge?
A Yes.
Q Signed by a prosecutor?
A Yes.
Q And signed by a trooper or an officer from

the Enfield Police Department?

A Yes, but I do also want to put out there that the prosecutor who signed directed Sergeant Samson in July of 2018 to have a different department do it, so it didn't seem like retaliation.

So, I believe that that would be part of the reason that Mr. Samson showed up to the scene on 11/12 of 2018 to direct Enfield to do it.

Q So, you're saying that the prosecuting authority told Lieutenant Samson in July to have a different department arrest you?

A Yes.

Q So, you're saying that, something that from July, they waited until November to effectuate or ultimately December to effectuate the arrest?

MR. McLANE: Objection.

THE WITNESS: They tried to effectuate an arrest in July. The prosecutor told them based on the fact that it was coming from Samson -- this is per Samson's report -- that he didn't want to -- he didn't believe that they had enough to charge the crime and have -- he also, I believe he stated something like tell Massachusetts State Police to do it or something along those

lines.

BY MR. MANCINI:

Q So, I just want to be clear. So, you're saying that the prosecutor in July told them to have a different department do it and that's why you were arrested in December?

MR. McLANE: Objection.

THE WITNESS: I can't say -- I'll say yes. That he was directed to have a different department do it. It was documented by Sergeant Samson in his report that it would seem like retaliation if the Connecticut State Police filed those charges.

BY MR. MANCINI:

Q Okay. So, it's your testimony today right now that on account of that in July, the Connecticut State Police conspired with Enfield Police Department to arrest you five months later?

MR. McLANE: Objection.

THE WITNESS: Yes. The seizure occurred based on the stop, which was initiated by Stebbins calling 9-1-1. Stebbins was told by Sergeant Samson to call 9-1-1 and Sergeant -- and Stebbins told Enfield PD to not let me leave.

BY MR. MANCINI:

Q Okay. But they didn't arrest you that day?

A Correct.

Q All right. They applied for an arrest warrant to a prosecutor, right?

A Yes.

Q And to a judge?

A Yes.

Q Okay. Which was never challenged?

A So, I just want to respond a little bit there. Just because you stated that the arrest warrant was signed by a judge and a prosecutor, it was. But the information that was provided to the Enfield Police Department was not official information. It stated that all of the allegations were false by Marcus Cameron, which per anything you've seen is not true. It also said all of the allegations were unfounded, which is again not true.

So, even though they signed it, they went based on the fact that these gentlemen were reporting factual information. Although, we're sitting here and we all know that that's not true.

Q Okay. But that warrant was never challenged?

A I didn't have the ability to challenge it.

Q Well, you had an attorney?

A Okay, yes.
Q And that warrant was never challenged?
A I instructed my attorney to do it.
Q You could have found another attorney?
A Again, the attorney -- the attorney presented it to the court, the same judge who signed the warrant and she didn't allow it, per my attorney.
Q So, the warrant -- so, you're saying the warrant was challenged and the court didn't allow the challenge?
A No. You asked me about getting a different attorney. So, I presented that option to my attorney and he told me that the judge wasn't going to allow it.
Q So, you're telling me that the judge told your attorney that if you went and hired another attorney, she wasn't going to allow you to hire your own private attorney?
A Yes, sir. That's what was reported by my attorney.
Q Okay. I just want to make sure I understand that correctly. You were informed that you did not have the right to hire the attorney of your choice?
A I was informed by my attorney when I represented that I wanted to file a motion to dismiss based on lack of probable cause. He told me he'll

present it. He said he presented it. They had a meeting, a conference with Judge Prats. His information that was relayed to me thereafter was that she wasn't going to allow me to have a different attorney.

Q Well, those are two different things. Now, you just said that he -- I just want to -- I'm sorry to -- this is my last question, but I really want to nail this down.

You're saying -- you said that your attorney went to the judge to talk to her about challenging the probable cause for that warrant and then when he came back to you, he said that you couldn't get another attorney?

A I don't know if he went to -- I don't know what the actual conversation was. The conversation with him and I was the fact that I wanted him to file a motion to dismiss based on lack of probable cause.

And then when he refused to do it, I had a conversation with him about getting a different attorney. He said he'll present the idea to the judge. Per the information that was relayed to me, Parakilas, Judge Prats, Mr. Mannion met and I was informed that she's not going to allow him to recuse himself and I have to go forward with an attorney.

288

Q Okay. I think I'm still a little bit confused, but did you attempt to hire your own -- another attorney?

A In what regard do you mean?

Q So, you had Attorney Mannion?

A Yes, sir.

Q At any point, did you say, I want to talk to somebody other than attorney -- another attorney other than Attorney Mannion?

A Did I have that conversation with Attorney Mannion?

Q Did you on your own decide? Did you go and try to talk to another attorney? Did you try to get a second opinion?

A I believe I -- I mean, I believe I did.

Q Okay. So, you talked to two attorneys and you still didn't challenge the warrant?

A That's incorrect.

Q The attorney -- show me tell me what I'm -- tell me what I'm -- explain it to me.

A Okay. So, I'm going to explain the exact same way I explained it before. So, I talked to Attorney Mannion about filing a --

THE REPORTER: Okay. Can you slow down? This has been a very long day and I need to

be able to read this back. Thank you.

A So, I spoke to Attorney Mannion about filing a motion to dismiss. I actually crafted the motion to dismiss, presented it to Attorney Mannion. He told me he'll talk to the -- he wasn't -- he refused to do it.

So, I asked him about him -- having him removed. He says, I will present it to the judge and see what they say. He said, Per that conversation, he wasn't going to be allowed to be recused from the case.

Q Okay. But how about you just said that you talked to another attorney?

A I said I possibly did. I don't remember for certain.

Q Well, I -- as you sit here today, do you remember talking to another attorney?

A In regards to whether I could have a new attorney represent me, I mean, I probably had, you know, conversations about attorneys in general with multiple people. I work in a courthouse. I know a million attorneys.

So, can I sit here today on the record and state, I spoke to this attorney on this date about him representing me, I can't say for certain, because I don't recall if I have any -- knew any attorneys who were licensed in the state of Connecticut.

Q Is that a no?

MR. McLANE: I think he answered it. I'm going to object.

MR. MANCINI: I'm just trying to understand. I'm going to -- I'm just going to stop right here. I'll give it to Eric. I think I've got everything that I -- I think I got all the answers that I was looking for. Thank you.

RECROSS EXAMINATION

BY MR. GERARDE:

Q Hello, Mr. Cameron.

A How are you doing?

Q I'm back again. Now, I want to try to clarify a couple things you said about Officer Nolan on scene on 11/12/2018. Now, you initially spoke with Officer Croteau of Enfield PD, correct?

A Yes, sir.

Q Now, within that conversation, you stated Croteau said that you can't leave the scene?

A Yes, sir.

Q Now, did Officer Nolan ever tell you that you were never free to go?

A I can't assume that I was free to go. They had a -- actually had my -- I believe he had my license at that point. I don't recall for certain.

Q Okay. So, after he returned your license, did -- were you placed under arrest?

A No, sir.

Q Were you told not to leave the scene?

A When I got my license back, obviously I'm detained at this point. I can't -- I was not allowed to get out the car. I can't infer that I was allowed to leave the scene after I already asked one time am I allowed to leave, he said no. And I asked for a supervisor from Enfield to show up to the scene. And at that point in time, Bryan Nolan showed up.

Q Who told you that you couldn't leave your car?

A Brian Croteau.

Q When did you say you can't leave your car?

A He told me I couldn't leave.

Q Did you ever try to get out of your vehicle?

A I don't think that would be a safe thing to try to do.

Q Okay. So, no, no, you didn't try to get out of your vehicle?

A I wanted to.

Q I'd just like to show a brief video or a snippet of a video of a recording between you and Officer Nolan that -- on 11/12, 2018, that appears to be a video from your phone. This is Bates stamped as Cameron 4.

MS. VITALE: Do you want me to put it up?

MR. GERARDE: Oh, yeah, sure. I don't know if it's been introduced into --

MS. VITALE: You said 4?

MR. GERARDE: Yes.

MS. VITALE: Do you want me to just play the whole thing first?

MR. GERARDE: Oh, it's a snippet around the 1:20 mark.

MS. VITALE: 1:20. Okay. So, I'm going to play.

(A videotape was played.)

MR. McLANE: What time period did you want to play or do you want to play the whole video?

MR. GERARDE: It's going to be the 1:20 mark.

MS. VITALE: So, let me move it down here. Okay. So, I'll start it at 1:18. Is that okay?

MR. GERARDE: Yeah, thank you.

MS. VITALE: Okay. So, starting at 1 minute, 18 seconds.

A videotape was played.)

MR. GERARDE: That's all right. You can pause this. I had a wrong. I had a wrong note. Do you mind if I take a minute?

MS. VITALE: No. Can I ask a question or do you want to take that, because you just need to concentrate?

MR. GERARDE: There's just a brief interaction I need to locate that. I wrote it down wrong, inaccurately.

(Recess: 4:53 to 4:55.)

MR. GERARDE: All right. So, I'm -- which one am I playing back up here?

MR. GERARDE: So, it's going to be Bates stamped 11.

MS. VITALE: Is there a particular point?

MR. GERARDE: I'm sorry, Cameron 11. And then going up to about that 1:20 mark.

MS. VITALE: Okay, all right. I'm going to play.

(A videotape was played.)

MR. GERARDE: That's it.

BY MR. GERARDE:

Q So, Mr. Cameron, do you recall taking this video?

A I do.

Q Is that your voice asking, Am I under arrest?

A Yes, sir.

Q And then the response was, Absolutely not. Was that from Officer Croteau?

A Yes, sir.

Q Thank you. That's all I have.

A I do want to respond. Just in this video, he never told me, you know, obviously, my car is --

Q There's no -- there was no pending question. Thank you.

MS. VITALE: Is that it?

MR. GERARDE: Yes.

MS. VITALE: So, I'm sorry. I just have to follow up with one thing.

FURTHER REDIRECT EXAMINATION

BY MS. VITALE:

Q So, Mr. Cameron, did you say -- did I understand you correctly to say that Stebbins laughed on the phone to the Enfield Police when he was calling them about concerns about you following him?

A Yes, ma'am.

Q Okay. And that's based on what?

A The 9-1-1 call.

Q An audio recording that you received?

A Yes, ma'am.

Q Okay. I'm going to play the audio recording and you're going to tell me when you hear him laugh, okay?

A Absolutely.

MS. VITALE: Okay. So, this is Exhibit 56. And it's Cameron -- Bates number -- it's a video, Bates numbered Cameron 16. I'm going to fast-forward because there's a call that's not really

relevant here.

(Defendants' Exhibit 56:
Marked for Identification.)

(An audiotape was played.)

MS. VITALE: Okay. So, now I'm playing Exhibit 56 starting at one minute and two seconds.

(An audiotape was played.)

BY MS. VITALE:

Q If I can get it up here. I supposed it doesn't matter. You can hear it, right?

(An audiotape was played.)

BY MS. VITALE:

Q Okay. So, at three minutes and 14 seconds --

A Yes, ma'am.

Q -- you think you hear a laugh?

A Yes, ma'am.

Q After he says he's in his State Police car?

A Yes, ma'am.
Q Okay, all right.

FURTHER RECROSS EXAMINATION

BY MR. McLANE:

Q So, Marcus, with respect to the stop on 11/12/18, how many police would you say were present when you were stopped in the Brookside Plaza?

A There was Officer Croteau, which is one, a female officer, which is two, a gentleman in a black leather coat, three, Bryan Nolan, 4. Five is Stebbins. Six is Samson. Seven is a Detective Castle, who was also present.

Q All right. So, seven officers there, how many came up and questioned you?

A I'm going to say my car was approached by Croteau, the female officer walked up. She walked up to the vehicle. The gentleman in the black leather coat walked up to the vehicle. Bryan Nolan walked up to the vehicle.

Q And why didn't you feel like you could just drive away?

A For one, you know, I asked if I was -- for one, they're all in police cars. My car is surrounded. They're in uniform. He told me that he was out doing a part of an investigation. And he further asked me for my name. I believe he asked for my name.

And I asked him, Is there a reason why I am required to by law to provide it? He stated a case. And at that point, I don't know that case, I'm not familiar with that case.

Q Who is "he"?

A Croteau stated it and then Bryan Nolan stated it. At that point in time, based on that information based on the fact that they're in uniform in police cars, there is the -- I am detained at that point in time.

Q Okay. So, you -- you asked him if you were under arrest and he said, Absolutely not why.

Did you -- well, let me ask you this. You asked him if you were under arrest, he said absolutely not. Did he have your license in his hand at that point?

A No.

Q Why did you feel like you couldn't leave at that point?

A My car is still surrounded by the officers. And the supervisor was coming and I was, he said, my officer told me. So, at that point in time, this officer had already asserted it's part of an investigation. If they're doing an investigation, I'm not allowed to get out the car and just walk freely to

go into the store.

Q What about when Sergeant Nolan was talking to you, did you feel free to leave when he started talking to you?

A No.

Q Why not drive off?

A I've seen instances throughout my life and, you know, we all have media. So, we've all seen these instances where people are driving off on police officers and they all have -- they all end in fatalities, for the most part.

And I wouldn't want to put myself in predicament where I'm just driving off away from seven to 10 officers and then being engaged in a some form of a chase.

Q Okay. Have you told everybody -- have you told all the attorneys everything that you feel like you need to tell them today?

A I'll just go, you know, further, you know. None of these interactions were necessary. None of the stops were reasonable. The arrest wasn't reasonable, you know. As a part of these interactions, they've obviously caused a lot of undue stress, a lot of harm.

Some of the effects, we probably won't know. We don't see it today. But the reality of all these

situations, you know, I obviously was someone who, you know, owned a property in the town of Enfield, legally. I owned every vehicle legally. Every car was registered legally, you know.

The investigation or alleged investigation into my license at that point this time, I'll also state that in one of Mr. Samson's reports, he wrote that the Connecticut license was issued in 2016. He clearly can see based on his going into the database, he can see that the license was issued in 2015.

So, he clearly knew that that was a lie. A lot of the things that you've seen in paperwork was completely some gentlemen who were helping hell-bent on retaliating, retribution for my filing of a complaint with the Connecticut State Police.

Further, the Enfield Police Department had the opportunity to obtain all proper information and they furthered, those same allegations of harassment, and perpetuating against myself for me filing the complaint.

Q Okay, thank you.

MS. VITALE: All righty.

(Deposition adjourned: 5:07 p.m.)

STATE OF CONNECTICUT

I, MARY C. MAYHEW, RPR, CSR #477, a Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice there came before me on the 16th day of March 2023, he following named person, to wit: MARCUS CAMERON, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 10th day of April 2023.

Mary C. Mayhew, RPR, CSR #477
Notary Public

# INDEX


| WITNESS | PAGE |
|---|---|
| Marcus Cameron | |
| Continued Direct Examination by Ms. Vitale | 4 |
| Cross Examination by Mr. Gerarde | 207 |
| Cross Examination by Mr. Mancini | 232 |
| Cross Examination by Mr. McLane | 264 |
| Redirect Examination by Ms. Vitale | 278 |
| Recross Examination by Mr. Mancini | 280 |
| Recross Examination by Mr. Gerarde | 290 |
| Further Redirect Examination by Ms. Vitale | 295 |
| Further Recross Examination by Mr. McLane | 298 |


## EXHIBITS


| EXHIBITS | | |
|---|---|---|
| 26 | Video clip -- Cameron 81 | 6 |
| 27 | Video clip -- Cameron 82 | 25 |
| 28 | Video clip -- Cameron 83 | 29 |
| 29 | Photograph -- Cameron 85 | 35 |
| 30 | Google Maps | 37 |
| 31 | Video clip -- *Stebbins 3 | 38 |
| 32 | Video clip -- Stebbins 4 | 51 |
| 33 | Video clip -- Stebbins 5 | 56 |
| 34 | Video clip -- Cameron 87 | 57 |
| 35 | Video clip -- Cameron 6 | 67 |
| 36 | Video clip -- Cameron 796 | 74 |
| 37 | Video clip -- Cameron 797 | 83 |
| 38 | Video clip -- Cameron 5 | 88 |

| | | |
|---|---|---|
| 39 | Transcript -- 12.14.18 | 94 |
| 40 | Video clip -- Cameron 20 | 110 |
| 41 | Video clip -- Cameron 21 | 113 |
| 42 | Video clip -- Cameron 22 | 119 |
| 43 | Video clip -- Cameron 76 | 120 |
| 44 | Video clip -- Cameron 77 | 124 |
| 45 | Video clip -- Cameron 702 | 132 |
| 46 | Video clip -- Stebbins 495 | 148 |
| 47 | Receipts | 160 |
| 48 | Handwritten Notes | 164 |
| 49 | Text Messages | 188 |
| 50 | Text Messages | 194 |
| 51 | Text Messages | 190 |
| 52 | Photograph | 201 |
| 53 | Photograph | 203 |
| 54 | Photograph | 253 |
| 55 | Cameron 78 | 254 |
| 56 | Cameron 16 | 295 |


Reporter's Note:
Exhibits retained by
Attorney Vitale

JURAT

| | |
|---|---|
| MARCUS CAMERON,<br>Plaintiff,<br><br>vs.<br><br>STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE and TOWN OF ENFIELD,<br>Defendants. | Civil Action No.:<br>3:21-cv-0165(OAW)<br><br>March 16, 2023 |

With the addition of the changes, if any, indicated on the attached errata sheet, the foregoing is a true and accurate transcript of my testimony given in the above-entitled action on March 16, 2023.

________________________________

Marcus Cameron

Subscribed and sworn to before me, the undersigned authority, on this the ____day of __________________2023.

______________________________

Notary Public

My Commission Expires:

mcm

ERRATA SHEET

Please note any corrections on this sheet.
Do not mark up the transcript.

The ORIGINAL JURAT and ERRATA SHEETS must be NOTARIZED (even if there are no corrections) and returned within 30 days of receipt to the attorney who took the DIRECT EXAMINATION. All other counsel of record must be sent a COPY, along with a COPY to our office for our records.

| Page | Line | From | To |
| --- | --- | --- | --- |
| | | | |

________________ ________________

Date Marcus Cameron

Sworn to before me this _____day of ______________ .

mcm