Volume: I
Pages 1-220
Exhibits: 24

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:21CV00165(OAW)

- - - - - - - - - - - - - - - - - x

MARCUS CAMERON,

Plaintiff

V.

STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE, AND TOWN OF ENFIELD,

Defendants

- - - - - - - - - - - - - - - - - x

DEPOSITION of STEVEN STEBBINS, called on behalf of the Plaintiff, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michele DeCoste, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at McLane & Mclane, LLC, 269 South Westfield Street, Feeding Hills, MA, on Tuesday, March 7, 2023, commencing at 9:54 a.m.

------------

A P P E A R A N C E S

RYAN MCLANE, ATTORNEY
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
Counsel for the Plaintiff

LAURA VITALE, ATTORNEY
Attorney General Office State of Connecticut
165 Capital Avenue, Suite 500
Hartford, CT 06106
(860) 808-5340
Counsel for Steven Stebbins

ERIC E. GERARDE, ATTORNEY
Howd & Ludorf, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
(860) 707-6029
Counsel for Bryan Nolan, Mark Squires & Town of Enfield

DENNIS V. MANCINI, ATTORNEY
Attorney General Office State of Connecticut
110 Sherman Street
Hartford, CT 06105
(860) 808-5450
Counsel for Stephen Samson

ALSO PRESENT:
Marcus Cameron
Stephen Samson

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEVEN STEBBINS | | | | |
| (By Mr. McLane) | 5 | | | |
| (By Ms. Vitale) | | 214 | | |
| (By Mr. Mancini) | | 216 | | |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Texts | 18 |

| | | |
|---|---|---|
| 2A | Traffic Stop Procedures | 35 |
| 2B | Reporting Traffic Stops | 36 |
| 3 | Documents Bates Stamped 128 to 134 | 42 |
| 4 | Documents Bates Stamped 539 to 544 | 49 |
| 5 | Memorandum | 53 |
| 6 | Notice of Complaint Against Personnel | 56 |
| 7 | Email | 59 |
| 8 | Email | 66 |
| 9 | Email | 69 |
| 10 | Audio, Bates 506 | 77 |
| 11 | Email | 110 |
| 12 | Email | 112 |


E X H I B I T S (CONT.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 13 | Letter | 112 |
| 14 | Google Map | 117 |
| 15 | Arrest and Booking Report | 148 |
| 16 | Original Restraining Order | 149 |
| 17 | Transcript | 177 |
| 18 | Statute of Stalking In The Third Degree | 181 |
| 19 | Audio, Cameron 80 | 187 |
| 20 | Email | 188 |
| 21 | Video, Stebbins 496 | 199 |
| 22 | Request for Production | 203 |
| 23 | Answers to Interrogatories | 204 |

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent shall have thirty (30) days in which to read and sign the deposition transcript, after which time it shall be deemed to have been signed, and that the filing and sealing of the deposition transcript are waived.

It is further stipulated and agreed that all objections, except objections as to the form of the question, and all motions to strike, shall be reserved to the time of trial.

STEVEN STEBBINS, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testifies as follows:

DIRECT EXAMINATION

BY MR. MCLANE:

Q Good morning, Mr. Stebbins. My records say you're a trooper first class. Are you still a trooper first class?

A Correct.

Q All right. And when referring to you, do people say "trooper first class" or "trooper"?

A Trooper.

Q So I will do my best to call you "Trooper Stebbins" throughout the course of the deposition.

MR. MCLANE: So we have Laura, Dennis and Eric here. So are we going with the normal stipulation, that we're reserving objections other than to form or question til the time of trial.

MS. VITALE: Great.

MR. MCLANE: All right. Are we waving formal notice of notary requirement?

MS. VITALE: We are going to read and sign.

MR. MCLANE: What do you need, 30 days?

MS. VITALE: That should be fine.

MR. MCLANE: Yes, okay, I guess we'll talk later about the motion schedule or anything like that because we're running out of time.

MS. VITALE: That would be great.
Q Okay, so Trooper Stebbins, have you ever been deposed before?
A Yes.
Q Okay. In what context were you deposed?
A Protective hearing.
Q I'm sorry?
A Protective hearing.
Q Protective hearing. What does that mean?
MS. VITALE: I'm not sure he knows what you meant by "deposed."
A Deposed like this, when the court reporter -
Q Oh, I'm sorry, no I have not. I've given testimony, but I haven't been deposed.
Q Okay. So much like the testimony in court, the testimony you give here is taken down by a court reporter. It is under oath. So it's the same oath you take as you do in court, just tell the truth, the whole truth, nothing but the truth.
The way these things go, I'm going to ask questions. You'll provide the answer. Your lawyer can object. Everything we have is written down in a transcript.

Everything here is reduced to a transcript that the court reporter will produce.

So that being said, within the course of a normal conversation, sometimes we say "mm-hmm" or shake our head or give, you know, non-verbal answers to things. Unfortunately, with a deposition, we need a verbal response to every question. So the nodding of the head can't be taken down. As good of a job as Michele does, she can't verbalize for you if you don't verbalize yourself. So I'm going to need a responsive answer. And if say, "Hey, I need an actual answer," I'm not, you know, being rude. I'm trying to get an accurate record of today's procedure onto the transcript.

Additionally, if you don't understand the question I ask, please ask me to rephrase it. Let me know you don't understand. Part of this is, to get the accurate record, an accurate transcript, so we don't have to come back later if something was confusing or if you thought I was asking a different question. Be sure to ask. I'll

rephrase it.

Another thing I think we do in conversation is, you know, I might interject if I think I know where you're going with a question -- or you might answer if you think you know where I'm going with a question. I just need you to let me finish the question. And likewise, you know, I think my record is 30 seconds into questioning before I interrupted somebody. I'm going to do my best to let you finish the answer because, again, we need everything to be written down. We need a full answer question-and-answer for the transcript.

If you need a break at any time, let me know. If you need to use the bathroom or anything, generally what I ask is that you finish the question -- you answer the questions before we take the break. There may be times where, you know, if your lawyer needs wants to take a break or you want to take a break, there may be, like, two or three more questions in a certain line of questioning. But for the most part, just let

me know if you need to use the bathroom or you just feel tired or you want a drink of water or anything. I have waters here.

I think what we're going to try to do for lunch is same -- my goal here is to try to limit the time that we take for lunch because, you know, I want to try to not hopefully be here all day and I certainly don't want to have to go to another day. So what we're going to do is -- my firm is buying Subway just like we did last time. There will be sandwiches out there and we'll do that for lunch. We can take a shorter period of time with the breaks, but if you ever need a break, we're going to probably break for lunch around, like, 12:30, 1:00. Just let me know -- I break frequently, anyways. I drink a ton of caffeine and water, so we'll probably break every 60 to 90 minutes regardless.

I'm going to use the phrase "complaint" a lot today. So if I'm referring to the Internal Affairs complaint, the allegations that Marcus made, I'll say "IA

Complaint," but if I'm talking about the complaint that was filed, a lawsuit complaint, I'll use the phrase just "complaint." Do you understand that, Mr. Stebbins?
A Yes, I do.
Q Okay. Is there any other -- I guess as time goes on, I don't have any notes here, but if there's other lingo that, you know, there's acronyms or abbreviations, I may just stop and ask if that's okay if we use that terminology moving forward when referring to something.
So have you understood everything I've said?
A Yes, sir.
Q Okay. So what did you do to prepare for today's deposition?
A I met Laura. We went over documents that --
MS. VITALE: Don't talk about converations we had.
THE WITNESS: Okay.
A I reviewed documents.
Q Okay. So about how long do you think you

spent preparing for deposition?
A Possibly, maybe six hours.
Q Okay, what documents did you review?
A The original complaint, my statements, audio/video files.
Q Okay. Did you speak with anyone other than your attorney in preparation for today?
A No.
Q All right. Didn't speak about the deposition at all with anybody?
A No.
Q So you spent about six hours, you said, reviewing all this information?
A Correct.
Q What is your current position with the Connecticut State Police?
A My current position?
Q Yes.
A I'm currently in the Governor's Security Unit.
Q So when did you start that job?
A May 2019.
Q So May of 2019 you started with the Governor's Security Unit?

A Correct.

Q All right. I've been referring to it as "the governor's detail." Is that an inaccurate -- is it the same thing?

A That's fine.

Q Okay. If I refer to it as "Governor's detail," you'll be able --

A Yes, sir.

Q Prior to May of 2019, what was your job with the Connecticut State Police?

A My last assignment was court officer.

Q Okay. What is the role of the court officer? What do they do?

A Well, I do both the court officer and I did evidence. I would prepare documents for troopers.

Q What does that mean?

A I would bring papers to court, transmit papers to court for court cases, you know, for hearings.

Q Okay, so if, like, a trooper had to testify, you would help prepare that trooper?

A No, I would not.

Q Okay, so I'm -- what were the documents that

you'd be bringing to court?
A I'd bring arrest warrants. I would basically bring any kind of paperwork that needed to be transmitted to court for Troop H. It could be arrest warrants, you know.
Q I see. And you said something about the other side was an evidence portion of it. What does that mean?
A I was in charge of documenting and preserving evidence in cases.
Q Okay. What are the functions of the governor's detail job that you have?
MS. VITALE: Just there's security concerns as far as the amount of detail that he can provide. I just --
Q How about general description? Can you give a general description?
MS. VITALE: Whatever you are permitted to --
A I was in charge of security for the Governor and Lieutenant Governor.
Q Okay, all right. It's not the be all, end all. I wont go down there.
So prior to being the court

officer, how long were you the court officer for Troop H?
A Approximately two years.
Q Okay. So were you the court officer in May of 2018?
A I was.
Q Okay. What did you do before that job?
A I was a road trooper.
Q Did you do highways? What did you do?
A Highways. Yes, mostly, highways.
Q I think it's fair to say, as a state trooper, you have jurisdiction all over the state to make arrests?
A Correct.
Q Were you able to make arrests in your role as the court officer for Troop H?
A What do you mean?
Q Let me rephrase that for you.
Did you have authority to make arrests?
A I did.
Q Okay. What kind of training did you have to do to be a court officer?
A On-the-job training.

Q Okay. Who trained you?
A Another trooper.
Q What was his name or her name?
A Paul DeCruz.
Q What kind of training did you have to do to be a patrol trooper?
A I had to go to the academy for six months.
Q Is there any -- did you do any other -- I guess that's what you needed to do become the trooper. Did you have any other training like drug recognition or anything like that?
A I did not.
Q Okay. So in May of 2018, it's fair to say you had been to the academy and you had received on-the-job training for your role as the court officer?
A Correct.
Q Were there any other trainings that you had conducted?
A No.
Q Does the state police require any sort of EO or EEO training like Equal Opportunity training or any racial bias training or anything like that?

A Yes.
Q Okay. What are the trainings required by the Connecticut State Police?
A Online training, modules.
Q Okay, so about how many hours are each module supposed to be?
A I could not guess.
Q Now, are these trainings things that you need to be certified in, or is it something like a refresher that you have to do on a yearly basis?
A I believe it's all state police.
Q Okay. And is it a yearly basis, or is it --
A I don't know.
Q Okay, when is the last time you took it?
A I don't recall.
Q Okay. May 22, 2018, do you remember your encounter with Mr. Cameron?
A I do.
Q All right, let me back up a little bit. I want to show you a document really quick. Maybe not really quick.

MR. MCLANE: Michele will mark this as Exhibit 1.

(Exhibit Number 1, Texts, was Marked for Identification.)

MR. MCLANE: So we're going to mark these. I don't know how you did it for Marcus. I'm going to mark these as "Stebbins 1," and then when we depose Lieutenant Samson, they will be "Samson 1" and "Nolan 1." I'll do it by last name.

Q Have you seen these before, Trooper Stebbins?

A I have.

Q Okay. I got these from Lieutenant Samson's lawyer. Is there a reason that you didn't turn these over?

A Yes.

Q Why?

A Because I delete my phone, a lot of messages, emails -- excuse me, messages and emails.

Q Did you delete these before after you got to litigation hold in this case?

A After.

Q Okay. Well, let me ask you, you deleted them after you got a litigation --

A Inadvertently, yes.

Q Okay. When you're looking at these -- and I'll let you take a minute to look through -- is it fair to say that your text messages are the lighter color gray. These are black and white because that's all I have for printing. And Lieutenant Samson's would be the darker color blue. It should be blue.

A That's correct.

Q Okay, so it is you who said, (Reading):

"Guy's a clown. I think he's trying to get your Mustang"?

A Correct.

Q All right. And this was sent on or about March of 2021?

A I don't see a time stamp.

Q Well, you're discussing the complaint, right?

A Yes, sir.

Q I think the complaint was filed around February of March of 2021. Is that about -- I'll pull it up here and I won't offer it as an exhibit, but I will --that's another thing I probably should have said at the beginning

with respect to the conduct of the deposition, I fumble with exhibits. So you're just going to have to be patient with me.

MS. VITALE: You're not alone on that.

MR. MCLANE: What's that?

MS. VITALE: You're not alone on that.

Q So it looks like the complaint was filed on February 9th of 2021. I'll represent to you that it was filed on February 9th of 2021. So would you say these text messages were sent between February 9th of 2021 and some point in the first timestamp that we have on these, which is March 14th of 2021, which is on 506. And what I will do is I will also say that on the bottom, right-hand corner of each of these documents, we have each Bates stamped. So documents themselves come with their own page numbers, and so sometimes lawyers, when they exchange troves of documents, in an effort to alleviate confusion, we will number them ourselves. So

on things that I may turn over to your lawyer to produces, it will say "Stebbins" and then a number. Things that I produce it will say "Cameron" and a number. I believe Samson's -- it won't say "Samson" and a number, it will just say the number. He's the only -- I think you're the one with the blank.

Okay. So on page -- what did I say -- 506, we do have a timestamp of March 14th of 2021. So is it fair to say that you sent these text messages between February 9th of 2021 and March 14th of 2021?

MS. VITALE: Objection.

Q She objected, but --

MS. VITALE: You can answer. I m just preserving an objection.

A This is fair.

Q And you think Marcus is a clown?

A That is what I put.

Q Did you believe that? You think he is a clown?

MS. VITALE: Objection to form.

Q I need a verbal response.

A What's the question?

Q You think he's a clown?
MS. VITALE: Objection to form.
A I texted him. That's what I texted to Samson.
Q I do see that, but I'm asking you, you texted that.
A Yes.
Q Is that because you believe that Marcus is a clown?
MS. VITALE: Objection to form.
A True.
Q Okay, did you hold that view of him before you sent that text message?
A Yes.
Q So you believed that he was a clown between May of 2018 and March of 2021?
MS. VITALE: Objection to form.
A No.
Q When did you form the opinion that Marcus was a clown?
A Sometime between May 22nd and this text.
Q Okay. Where did you get the photo of Marcus that was sent to him?
A Facebook.

Q Okay. You have a Facebook account?
A I do.
Q Did you communicate about Marcus on that Facebook account?
A I did not.
Q Let me ask you another question. This was sent in February. Did you send other communications to Sergeant Samson about Marcus before February of 2021?
MS. VITALE: Objection to form.
A Not that I recall.
Q So on this particular phone, this is the first time you've ever sent a text to Lieutenant Samson about Marcus Cameron?
MS. VITALE: Objection to form.
A No.
Q Okay, when did you send text messages about Marcus Cameron prior?
A I don't recall.
Q You don't recall, but it was between May 22nd of 2018 and this text message -- the time of this text message?
A I would say so.
Q Okay, when did you start texting Lieutenant

Samson on this phone about Marcus Cameron?
A Probably on or about -- probably -- sorry, I would guess sometime in May.
Q Okay. Would you text Lieutenant Samson about the ongoing investigation on this phone?
MS. VITALE: Objection to form.
A I don't recall.
Q Would you text Lieutenant Samson about Marcus -- your allegations against Marcus on this phone?
MS. VITALE: Objection to form.
A I don't recall.
Q So on 499, on the bottom here at 499, the same exhibit, you said, (Reading):

"Read the very first line.
Tell me what you think.
Already a lie."

You see that?
A I do.
Q On the next page, which is 500, the first line says, (Reading):

"Plaintiff, Marcus Cameron of Springfield, Massachusetts, is and was a resident of the Commonwealth of Massachusetts in the United States of America at all times referred to in this complaint."

What is a lie about that?
A He was not a resident of Connecticut -- Massachusetts, I'm sorry.
Q Okay and how did you perform that opinion?
A Through my interactions with him.
Q Okay. So in your interactions with him he said he was not a resident of Massachusetts?
A No.
Q Okay. So how did you come to form the opinion that he was not a resident of Massachusetts?
A During the course of contact with him.
Q Explain.
A He has two cars registered in Connecticut. He has a license in Connecticut.
Q He currently does?

A He did.
Q So he had a Connecticut license. How did you find that out?
A From running his registration.
Q Okay, how many times did you run his registration?
A I don't recall.
Q More than one?
A Possibly.
Q More than two?
A I would say no.
Q So you only ran his registration twice?
A I believe so.
Q Did you ever look him up in the firearms database?
A No.
Q Did you look at his criminal history?
A No.
Q Turn to 513 for me if you don't mind.
A Okay.
Q Do you see at the top where it says, (Reading):

"GM, did you receive a

litigation hold notice from legal"?

A I do.

Q You said, (Reading):

"No. And you said, "You free for a 33."

I would imagine that's a call, right? Is that code for call?

A Yes.

Q All right. And then you'll see he responded yes, and there are two timestamps there. One is March 23rd at 9:45. The other is March 23, 2021, at 10:46 -- excuse me, the first one is March 23, 2021, at 9:45. And then he said, "Yes," and then the next timestamp is March 23, 2021, at 10:46 a.m. He then responds, (Reading):

"I got one, too. Can you talk."

Did you have a call between the time you texted and the time he texted "I got one, too"?
A I don't recall.
Q So I'm also -- I want to get into you said you received a litigation hold on this, right?
A Yes.
Q And did you understand your duties with the litigation, once you received the litigation hold, to preserve evidence?
A I did.
Q Do you understand that evidence necessary in a lawsuit and that destruction of evidence could potentially prejudice a different party, can that be agreed?
A Yes.
Q All right. And it's your testimony that you inadvertently deleted evidence?
A Yes.
MS. VITALE: Objection.
Q Did you tell anybody you deleted that evidence?
MS. VITALE: Objection.

A I don't recall.
Q Okay. What steps did you take to recover that evidence?
MS. VITALE: Objection.
A Which evidence, sir?
Q The text message you inadvertently deleted.
A What's your question?
Q I'll rephrase it.
Did you take any steps to recover any of these text messages?
A No.
Q Why not?
A Because I didn't.
Q Did you tell anybody that you deleted them?
MS. VITALE: Objection. As long as you're not asking about conversations he had with his attorney.
Q So why don't we just put on the record, anytime I ask you a question, I want to avoid in your answer is you telling me conversations that you had. And I don't mean that if you saw her at Stop and Shop and said "Hello," but I mean, if you sought legal advice from Laura, and she provided that

advice, and she provided advice, that's attorney/client privilege, and I'm not entitled to it. For certain situations, which we'll get to later, but so other than other than discussions with Laura, did you notify anybody that you deleted these?

A I did not.

MS. VITALE: Objection to the form.

Q What phone number did you use to text these from?

A My personal cell.

Q Okay, and what's that number?

A (413) 237-5109.

Q Okay, so turn to 519 with me real quick. It should be the last page. Do you see the second text that you sent says, (Reading):

"Nothing since October. I just emailed my attorney for an update." Then you said, "I'd imagine if, slash, when they received the discovery phase or when they reached the discovery phase, all the

evidence against him, both
sides would laugh it off."

What do you mean by "all the evidence against him?
A Whatever was produced.
Q Okay, what evidence did you think would cause everybody to laugh it off?
A Inaccuracies.
Q What would be the inaccuracies?
A Some of the claims.
Q What would be inaccurate about some of these claims?
A Well, the first one, on May 22nd.
Q What was inaccurate about claims that he made?
A He claimed I threatened him.
Q All right. And you didn't threaten him?
A Correct.
Q Tell me what happened on May 27th.
A I approached Mr. Cameron to speak to him about his driving habits.
Q What do you mean by "driving habits"?
A The way he was driving that day.

Q Where did you observe him driving?
A Route 5, Enfield, on a side street off of Route 5.
Q What was that side street?
A I'm sorry?
Q What was that side street?
A I don't recall.
Q So you observed him driving on Route 5 and a side street. What time of day was this?
A In the afternoon.
Q Okay. Once you observed him driving, what was it about his driving --
A The way he was driving.
Q What was it about the way he was driving that caused the need to approach ihim?
A He was speeding on Route 5 and he rolled through a stop sign at an intersection on the side street.
Q Okay. Had you been following him down the side street at that point in time?
A No.
Q Okay. What did you do after you observed this?
A I went to his house.

Q Okay, so this was a -- I guess, after you observed him, you immediately then went to his house?
A Right.
Q You didn't go somewhere else first and come back later --
A Correct.
Q -- and approach him?
A right.
Q What car were you in?
A It was an interceptor.
Q Okay, was that assigned to you?
A It was.
Q If I'm not mistaken, in the Connecticut Police, don't you guys get cars assigned to you?
A Yes.
Q Okay, so that's essentially your car to take home?
A Yes.
Q And once you've observed it, you went to his house. Were you going that direction anyways, or did you follow him?
A I was going south on Route 5.

Q Were you going back towards his house?
A I was not.
Q Okay. Where were you going?
A I was going to the gun store.
Q What was the name of the gun store, do you recall?
A I don't recall.
Q What were you doing at the gun store?
A I was buying ammunition.
Q Was this for a service pistol, or was this for your personal firearm?
A Service.
Q All right. Does the state police require you to purchase your own ammo?
A It does not.
Q Okay. Would they have provided you ammo if you had made a request?
A They would have.
Q Do you get reimbursed?
A No.
Q Okay, so the ammo, did you buy it out of your own pocket or...?
A Yes.
Q If I'm not mistaken, you said you were going

to go practice at the shooting range that day?
A I went shooting.
Q You did go shooting?
A Yes.
Q Was it just for practice?
A Yes.
Q Was this at East Haven? Or where do you guys go?
A Simsbury.
Q What's the name of the range?
A Metacomet.
Q Okay. Do you know who runs that range?
A I do not.
Q Do you know who the instructors are?
A No.
Q All right. Okay, I'm going to give you two documents.
MR. MCLANE: Michele, I'll have them be Stebbins 2A and 2B.

(Exhibit Number 2A, Traffic Stop Procedures, was Marked for Identification.)

(Exhibit Number 2B, Traffic Stop Report, was Marked for Identification.)

MS. VITALE: Do you know which is which?

MR. MCLANE: So 2B would start at Stebbins 300, and 2B will begin on Stebbins 308.

Q So these are the traffic stop procedures, which would be Stebbins 2A, and then the reporting traffic stop, which would be labeled Exhibit 2B Stebbins.

After you followed Marcus to his house, what do you do from there?

A I parked my car on the street and approached him as he was driving away.

Q Okay, did you follow the traffic stop procedures that were provided to me as part of your --

A I did not.

Q Okay. Did you report the traffic stop in accordance with the reporting procedures?

A I did not.
Q Why?
A At the time, I didn't consider it a traffic stop.
Q Why?
A Because he lives on my street and I wanted to go talk to him.
Q Did you have your service pistol on your hip?
A I did.
Q Were you in a uniform?
A I was not.
Q But you were driving your intercept?
A Yes, sir.
Q Did it have the lights on?
A I don't recall.
Q What did you do from there?
A I had a conversation with Marcus.
Q What how did that conversation?
A I asked him to -- I wanted to talk to him man to man.
A Why did you need to talk to him man to man?
A I mean just guy to guy.
Q Okay. Where was he when you approached him?
A I believe he was just getting out of his

vehicle.
Q Was his vehicle in a driveway? Was it in a garage?
A It was backed up to his garage.
Q It was backed up to his garage or in his garage?
A To his garage.
Q All right, so he was getting out of his vehicle. You approached him?
A Yes, sir.
Q You said, "Let's talk man to man"?
A I said, "Can I talk to you man to man."
Q Okay, what did he say?
A "What is this about."
Q Did he ever ask you if you're a police officer?
A He did.
Q What did you tell him?
A I didn't respond to him.
Q Why?
A Because immediately when I approached him, he had an attitude.
Q Okay, so because he had an attitude, you didn't tell him you were a police officer?

A I felt if I spoke to him more, it would be an issue.
Q What would be the issue?
A I realized when I first approached him, that there was no talking to him.
Q Why?
A He was clearly up set with me.
Q Why was he upset with you?
A You'd have to ask him.
Q Well, it's your testimony that you said he was clearly upset with you. What was your perception as to why he was upset with you?
MS. VITALE: Objection to form.
A What was the question?
Q Yes, let me see if I can rephrase. I don't need her to read it back.
So your testimony was that he was clearly upset with me. I'm asking what was your impression or what was your perception as to why he was upset with you?
MS. VITALE: Objection to form.
A Because I asked him to talk to me man to man and he immediately had attitude. Immediately.

Q Do you ever approach anyone else like this and ask them to talk man to man?
A I have.
Q All right. Who?
A Depends on what situation you're talking about.
Q Okay. So then you said there was no talking to him and you didn't identify yourself as a police officer?
A Correct.
Q What do you do after that?
A I left. I pulled in his driveway and backed out and went north.
Q Okay. What was the next encounter you had with him?
A The next incident?
Q Yes.
A May 26th.
Q Well, you said incident and I said yes. So May 26th, did you have any encounters with him between May 22nd and May 26th?
A No.
Q And when we're talking about these dates, we're talking about 2018, is that accurate?

A Yes.
Q So May 26th, what was the encounter on that date?
A I was outside my residence and he proceeded to drive by us three times.
Q He drove by three times?
A Yes.
Q How long over a period of time was this that he drove by?
A Approximately five minutes.
Q So he drove by your house three times in five minutes?
A Yes.
Q Was it all in the same direction?
A No.
Q Was it sort of back and forth, you're saying?
A Correct.
Q Okay, how did you observe this? Were you outside?
A Yes, sir.
Q What were you doing?
A I believe I was loading my truck up.
Q What time of day was this?
A Must have been mid morning.

Q I'm showing you another document.

MR. MCLANE: Michele, if you could mark this as Exhibit 3, please.

(Exhibit Number 3, Documents Bates Stamped 128 to 134, was Marked for Identification.)

Q I'm showing you know what I marked as Exhibit 3. This was provided to me by Lieutenant Samson's attorney, Greg Mancini. On the first page, you'll see in a lot of these productions, what happens sometimes is when producing documents, parties will send them to their lawyer. They'll email them to the lawyer, and so we might get a stamp up here of the client sending it to the lawyer. I'm not necessarily focused on those dates as much as I am the dates of the actual email. Do you see the difference here?

A The top date here (indicating)?

Q Yes, the top date is essentially the production date from Lieutenant Samson to his lawyer. What I'm looking for is -- what I'm

going to be speaking about are the dates of the actual email itself, and so what's numbered as 128, it seems to be an email that says, "From Stebbins Steven to Samson Stephen on Monday, July 23, 2018," it says, "at 7:07 a.m. Do you recall sending that email?
A I don't.
Q Up above, it says, "The attachments." It says, "Memo to Sergeant Samson." Do you recall sending a memo to Sergeant Samson in July of 2018?
A I do.
Q Now, if we continue on to page 129, where it begins with, "Sir, I'm writing this memo in response to the request," is that the memo you recall sending to him in July?
A Correct.
Q Okay. Is that the -- let me ask a different question. Did you -- I mean, how many versions of this memo did you draft?
A One.
Q Okay. And you sent this in July of 2018?
A Correct.
Q Okay. And you're referring to "Sir" would

now be Lieutenant Samson?
A Correct.
Q So he had been promoted at the point of time that you sent this?
A Correct. I'm sorry, what was that?
Q So he had been promoted? You wouldn't call him "sir" if he wasn't your Sergeant anymore, right? Had he been promoted to --
A I'd call him "sir."
Q Okay, so let me ask you a question. I don't know why I'm looking to you. Let me ask you a question. You call your Sergeant "sir" as well?
A Yes.
Q Oh, so you don't call him "Sergeant"?
A I call him "sir" or "Sergeant."
Q Interesting. Oh, my rank knowledge is a little different than I thought.
So you call him "sir" regardless of whether he's a lieutenant or sergeant?
A Correct.
Q Okay. And then sometimes I see in some of these emails, I would see the word "Sarge," that's just slang for "Sergeant," right?

A Correct.
Q Okay. Had he been promoted to Lieutenant by the time you sen this email?
A What was that?
Q Had Lieutenant Samson been promoted at that point in time that you sent this memo?
A I don't know.
Q You don't recall?
A No.
Q Okay. So this is the only memo that you did send?
A Right, back in July, yes.
Q July of 2018?
A Yes, 2018.
Q So I want to go to 129. About midway through the first paragraph, get to the point, if you can with me, that says, "As we approached the intersection of Brainard Road."
A Okay.
Q This is where you start discussing your observations of Marcus traveling on Route 5, is that accurate?
A Correct.
Q All right. And then if we skip a few

sentences, it says, (Reading):

"Due to my training and experience."

Are you with me there?
A Yes.
Q (Reading):

"I estimated this vehicle to traveling close to 50 miles an hour."

Did you ever use radar or lidar or --
A No.
Q Okay, so this was just your estimation of how he's driving?
A Yes.
Q And then you said, in another sentence here, (Reading):

"Utilizing my MDT, I entered the Connecticut registration."

What is MDT?
A It's a mobile dispatch terminal.
Q Okay, so is that the COLLECT database?
A Computer in a car.
Q What does the MDT allow you to look up on somebody?
A Registrations, history, insurance.
Q Okay, so let's turn to 130.
A Okay.
Q Start with the sentence about four lines down. It says, (Reading):

"As I arrived at 49 Foxcroft Road."

Do you see where I'm at?
A 130, you said, sir?
Q Yes. On 130, it says on the fifth line, (Reading):

As I arrived at 49 Foxcroft Road"?

A Correct.

Q (Reading):

"I observed a Honda Accord
backing up on the left side of
the driveway."

Where in this memo did you say that you were going to speak to him man to man?
A I'd have to read it. I don't see that.
MS. VITALE: Make sure you take the time to read it.
THE WITNESS: Okay.
A I'm done.
Q Is there anything inaccurate in this memorandum that you sent to Lieutenant Samson?
A Not to my knowledge.
Q You mentioned it here you said to him, "I got you." Do you normally say "I got you" when you are telling someone that you understand them?
A Sometimes.
Q Okay. Do you see where saying "I got you" might be interpreted as a threat?

A No.
Q You've never heard somebody say "I got you" with respect to a veiled threat of any kind?
A Correct.
Q I'm going to put this one aside for now.
MR. MCLANE: Let's mark this as Stebbins 4.

(Exhibit Number 4, Documents Bates Stamped 539 to 544, was Marked for Identification.)

Q I've placed in front of you now Exhibit Stebbins 4. It was also produced to me by Lieutenant Samson. I'm not sure if you produced it or not, but I know it was definitely produced by him.
It starts on Samson 539. Up at the top, there's a "To, From" heading. It says, "To Sergeant Samson, Number 297" and the From says, "Trooper First Class Stebbins, Number 1111." The date up top says, "6/29/2018."
A Okay.

Q Is there a reason that you sent a memo dated 6/29/2018 on July 23, 2018?
A I'm sorry, the question again?
Q Is there a reason why this is dated nearly a month earlier than it was sent?
MS. VITALE: Objection to form.
A I don't recall.
Q You don't recall?
A No.
Q Let me ask you, do you recall listening to a voicemail recording in this -- well, in this case or at any point in time with respect to a phone call that was made originally by Lieutenant Samson to Marcus's employer?
A Yes.
Q So it's fair to say you turned your memorandum over to Lieutenant Samson after that phone call was made, is that accurate?
MS. VITALE: Objection to form.
A I don't know the date of the call.
Q So after May 26th, what was your next encounter with Marcus?
A I believe it was May 30th.
Q What happened on May 30th?

A He drove by the house three times again.
Q Three times?
A In different directions, yes, sir.
Q Okay. What time of the day was this?
A This was early evening.
Q Now, let me ask you a question: He had mentioned multiple times that you drove by his residence.
MS. VITALE: Objection to form.
Q Is that an accurate statement?
MS. VITALE: Objection to form.
A That is not accurate.
Q Okay. Well, wasn't there construction that caused you to drive by his residence at some point in time?
A It didn't cause me to, no.
Q So you have May 26th you said he drove by your residence three times. May 30th, you said he drove by your residence three times. Did you call the police at any point in time --
A Which -
Q about this incidence?
A Which one?

Q Either one.
A Yes.
Q Okay. When did you call the police?
A I called them on the morning of May 26th.
Q What was the purpose of calling them May 26th?
A To document it.
Q What do you mean by document it?
A Due to the fact that he has an issue with me on May 22nd.
Q What did you think his issue was with you from May 22nd?
A He didn't like me.
Q Okay, you thought he didn't like you and you called the police to document that he drove by your house?
A Correct.
Q Okay. Did you call them after May 30th?
A No.
Q After May 30th, what was the next interaction you had with Marcus?
A I don't recall the date.
Q Okay, so you -- I think in Connecticut you call them protective orders, not restraining

orders, is that accurate?
A Yes.
Q Okay. So you sought a protective order at some point in time against Marcus?
A Correct.
Q Let me ask, after a hearing that protective order wasn't awarded, was it?
A No, it was not.
Q Okay. After May 30th, what was the next interaction you had with Marcus?
A I don't recall.
Q I'm not going to go through all these pages, though.
Can you mark this as the next exhibit, Number 5?

(Exhibit Number 5, Memorandum, was Marked for Identification.)

Q So what I'm showing you was provided to me by Lieutenant Samson's attorney for discovery. It's a memorandum to Lieutenant Daniel Loughman. Do you know Lieutenant Daniel

Loughman? Was he your commanding officer for Troop H at the time this was written?
A He was.
Q Have you ever read this memorandum before?
A Yes.
Q So can you turn to me the second page, Page 275? If you go around mid page, the first line says, "On June 8, 2018"
A Yes.
Q It says, (Reading):

> "On June 8, 2018, at approximately 1130 hours, I notified Trooper First Class Stebbins of the file complaint made against him by Marcus Cameron and I'm requesting a To/From explaining the alleged incident that occurred on May 22, 2018, in the town of Enfield."

Do you recall being notified by Lieutenant Samson --

A I do.

Q -- that the complaint was made against you.

Was that the first time you had heard about this?

A I don't recall.

Q Now, if he asked for a To/From Memo on June 8th of 2018, may I ask, why did you wait until July 23rd to send him the memo?

MS. VITALE: Objection to form.

A I have no response.

Q You have no response?

A I don't recall why.

Q You don't recall why?

A No, sir.

Q While you're holding onto that, I don't want you to put it away just yet.

I'm not 100% done with that just yet, but I want to show you in another document -- well, you can put away. We'll come back to it. I'll show you another document that was produced to me by Lieutenant Samson's attorney.

MR. MCLANE: This will be Stebbins 6.

(Exhibit Number 6, Notice of Complaint Against Personnel, was Marked for Identification.)

Q Do you recognize Exhibit 6?
A Yes.
Q Did you produce a copy of this in your discovery?
A I don't recall.
Q Looking at this page, this is Samson 11, Exhibit 6. It's a one-page exhibit.
Do you see in the bottom there's a paragraph in bold? It says, "Further"?
A Yes.
Q It says, (Reading):

"Further, except as provided in the A and O Manual, Section 8.1.1C3, you are hereby ordered not to discuss this investigation with any other persons other than your union or legal representation or an

uninvolved peer support person."

Did you follow those instructions?

MS. VITALE: Objection to form.

A Yes.

Q Okay, so you didn't discuss it with anyone other than union, legal, or uninvolved peer support person?

MS. VITALE: Objection to form.

A I don't recall.

Q Did you discuss the investigation with a peer support person?

A I did.

Q Who was your peer support person?

A Sergeant Samson.

Q So the man investigating Marcus's allegations against you was your peer support person?

A He was -- I was the subject of investigation. Yes, investigation -- I was subject of that investigation, so yes.

Q So he's conducting the investigation and he's also acting as your peer support person?

A He is my Sergeant, yes, sir.

Q Well, is every Sergeant a peer support person on the Connecticut State Police?

MS. VITALE: Objection.

A Define "peer support person."

Q Well, peer support, that is part of a STOP program in the Connecticut State Police, is it not?

MS. VITALE: Objection.

A Okay.

Q Do you know what the STOP program is?

A Yes.

Q Well, why don't you tell me what your understanding of the STOP program is?

A My understanding is it's a program troopers can use to utilize if they have issues with personal issues or problems.

Q Right, and that's my understanding, too, based on what I read online. I'm not a police officer, but my question here is, is every Sergeant in a troop an automatic peer support person?

A No.

Q But you're telling me Lieutenant Samson, Sergeant Samson at the time, was acting as

both the investigating officer and your peer support person?

MS. VITALE: Objection to form.

A No.

Q Okay. When did he become your peer support person?

A Never.

Q Okay. So what you had just stated prior that he was your peer support person is inaccurate?

A Inaccurate.

Q Okay. So he was the investigating officer, not your peer support person?

A Correct.

Q Okay. Did you speak with anyone else about this investigation other than Sergeant Samson?

A I don't recall.

Q Okay. Let me show you another document.

MR. MCLANE: Let's mark this as Stebbins 7.

(Exhibit Number 7, Email, was Marked for Identification.)

Q This was provided to me, I believe, February 27th. "Sab Stebbins," where it says S-a-b, is that a nickname you go by?
A No.
Q Okay. Who is Sab Stebbins?
A It's my account.
Q Okay, but Sab Stebbins is you, right?
A Yes.
Q Okay. So there's no other person named Sab Stebbins that --
A No.
Q Okay. You forwarded a message that you had sent to someone else to Lieutenant Samson. Who were you sending that other message to?
A I don't recall.
Q Well, it's redacted here.
A Right.
Q You would have seen who it was.
A Right.
Q You don't recall?
A I don't recall. I remember -- I'd like to see the actual document.
MR. MCLANE: Well, I think what I'll do is make a note here. I'd like a

formal -- I don't know if there's a -- there hasn't been a search and privilege. I think we will run the same issue, that if there is one there, I think it's been waived with a disclosure of a third party, but let me make a note here. I'm going to ask a formal request for an unredacted copy of this because I want to be able to ask him about it.

Q So you don't remember sending this message to -- or sending this email to Lieutenant Samson on December 12, 2018?

A I don't.

Q Up at the top, there seems to be a PDF attachment. Do you remember what the PDF attachment would be?

A I don't.

Q Okay. So it says in the subject, "Forward message from RNP 002673B03150. What are RNP numbers? Does that mean anything to you? Is that like a --

A I have no idea.

Q You have no idea?

A No.

MR. MCLANE: So, Dennis, I'm going to ask for an unredacted copy of this. Were you claiming a privilege on this?

MR. MANCINI: I don't recall what it was. I'm happy to take a look at it when we...

MS. VITALE: We will discuss once we know what it is.

MR. MANCINI: Yes.

Q So it's your testimony under oath that you didn't speak about -- let me ask again because I don't want to mischaracterize.

Did you have any discussions about this investigation between the time you received that letter and the conclusion of the investigation with anyone other than Lieutenant Samson?

MS. VITALE: Objection to form.

A I don't recall.

Q You don't recall?

A No, sir.

Q You didn't mention to your wife that you're under investigation?

MS. VITALE: Well, hold on. We

can't -- those are privileged. It's marital communications privilege, spousal privilege. It's not --

MR. MCLANE: That's for a crime.

MS. VITALE: No, it applies in civil litigation.

MR. MCLANE: That's totally irrelevant.

MS. VITALE: No, it applies to civil litigation.

MR. MCLANE: No.

MS. VITALE: Yes, it does.

MR. MCLANE: A spousal privilege --

MS. VITALE: Absolutely.

MR. MCLANE: -- does not compel his wife to testify. I have not subpoenaed his wife to testify. I'm asking --

MS. VITALE: You're asking him about communications that he may have had with his wife about an issue. That's confidential and privileged.

Q You didn't mention it to a friend? I believe a friend of yours approached Marcus one day on when he was driving by your house,

correct?
A What day was that, sir?
Q I don't recall. Let me see here. Let's go back, actually.
Well, do you recall a time that a friend of yours was at the house and had a confrontation with Marcus?
A I do.
MS. VITALE: Objection to form.
Q Did that friend of yours know about the investigation based on Marcus's allegations?
MS. VITALE: Objection to form.
A I don't recall.
Q Did you ever discuss this with Marty Pirog?
MS. VITALE: Objection to form.
A I don't recall.
Q Did you ever discuss the investigation with Marty Pirog?
A Not that I'm aware of.
Q He was in the room with you guys when the phone call was made to Marcus's employer, was he not?
MS. VITALE: Objection to form.
A I don't know.

Q Would it surprise you to hear that in Lieutenant Samson's Answers to Interrogatories that he stated that Marty Pirog was in the room?

MS. VITALE: Objection to form.

A No.

Q Would you have any reason to believe that Marty Pirog was not in the room during that phone call?

MS. VITALE: It depends on in the room at what time, at what point. I think you guys are missing each other a little.

Q Would it surprise you -- or would you have any reason to believe that Marty Pirog was not in the room when Lieutenant Samson was making a phone call to Marcus's employer on July 17th?

MS. VITALE: Again, objection to form.

MR. MCLANE: But he can answer.

A I wouldn't know.

Q You wouldn't know because -- are you saying you didn't have any discussions with Marty Pirog after Lieutenant Samson made the phone

call to Marcus's employer?
A I don't recall if we did.
Q Okay, you have no memory of having any discussions about the investigation or any allegations you had against Marcus after Lieutenant Samson made a phone call to Marcus's employer on July 17th?
A I don't recall.
Q You don't recall? Okay.
A If we did or not.
Q So I'm going to give you --
MR. MCLANE: This will be Stebbins 8.

(Exhibit Number 8, Email, was Marked for Identification.)

Q All right, so this is an email from July 27, 2018, from Lieutenant Samson to you. What is this a rough draft of? What is he sending you a rough draft of?
A Is there an attachment to this?
Q There seems to be a number of them. I just -- I don't know that we got all of them and I

don't know what would be responsive to this. So I'm asking if you recall what was --
A I don't recall. There's no attachments.
Q What would he be sending you a rough draft of with respect to the "C" number? One of the attachments, you'll agree with me, has a "C" number attached to it?
A Correct.
Q And that's the "C" investigation. The "C" number is the "C" investigation that's assigned to the troop?
A Correct.
Q And if I'm not mistaken, correct me if I'm wrong, with Internal Affairs investigations, it can either be conducted by Internal Affairs or they can be assigned a "C" number and sent to the troop for investigation, is that correct?
MS. VITALE: Objection to form.
A Correct.
Q Okay. So the investigation into Marcus's allegations were assigned a "C" number?
A Correct.
Q Did you have any other "C" numbers that you

discussed with Lieutenant Samson during the time of the investigation into Marcus's complaints against ytou?
A No.
Q Okay, so what rough draft would Lieutenant Samson be sending you regarding any "C" numbers in July of 2018?
A Can I take a guess? I don't know.
Q Why would Lieutenant Samson or your Sergeant Samson at the time be sending you information about "C" investigations?
MS. VITALE: Objection to form.
A I'm the subject of investigation.
Q So if he sent you a rough draft -- and you don't remember what he sent you a rough draft of?
A I don't.
Q Okay. So I guess if you're the subject of the investigation, why would he be sending you documents?
MS. VITALE: Objection to form.
A I don't recall. I don't know.
Q Did he involve you in investigations of Marcus?

A I was the subject of the investigation, so...
Q Well, my question was, did he involve you in any investigations with Marcus?
MS. VITALE: Objection.
A Not that I'm aware of.
Q Okay, so you didn't Google Marcus and provide any information to --
A No, I didn't.
Q Okay. So what is your understanding of being a subject of an investigation?
A The "C" number is punched, and I was the subject of an investigation of a complaint made against me.
MR. MCLANE: Let's mark this. What are we on?
THE COURT REPORTER: Exhibit 9.

(Exhibit Number 9, Email, was Marked for Identification.)

Q We've marked Samson 141. This is an email from you to Stephen Samson, Sergeant Samson at the time. It's dated July 17, 2018, at 8:24 a.m.

A Correct.
Q And you write, (Reading):

"Sarge, the following information is for the Mass. Probation Legal Unit."

Why would you be sending Sergeant Samson information for the Mass. Probation Legal Unit?
A Because I thought it would help with my investigation.
Q Okay, so you're the subject to the investigation and you're providing the investigating officer information on the Mass. Probation Legal Unit?
A To provide details to question his character.
Q Okay. Is it your understanding that Marcus was afforded the same opportunity in direct line of communication to question your character to Sergeant Samson?
A Yes.
Q So why did you think the Mass. Probation Legal Unit's number would impugn Marcus's

character?
A It may provide some information.
Q What information did you think it would provide?
A I believe to check on the residency issue.
Q Why did Marcus's residency have anything to do with his allegations of you making threats of him on May 22, 2018?
A To question his character veracity.
Q So if Marcus lives in a different state, he's less truthful?
A He's lying about it, yes.
Q He's lying about it. What made you think he was lying about it?
A He owns a house in Connecticut, two vehicles registered and insured, and his license.
Q Okay, so all of this investigation was done by you? You found the vehicles?
A I'm sorry?
Q You investigated that he had two vehicles, a house and --
A On May 22nd, yes.
Q Okay.
A Two vehicles, yes.

Q What about his registration? What about his license? How did you find out about his license?
A Same day.
Q Would it surprise you to know that he applied for a change of residency license?
A Would it surprise me?
Q Right.
A Yes.
Q So, again, help me understand. So if you think he's lying, you saw that he had cars registered in Connecticut. He had a house in Connecticut. Isn't there a possibility that he could own property in another state?
A It's possible.
Q I mean, say that he was lying about living in Massachusetts, how would that make his allegations of your interaction on May 22, 2018, less truthful?
A Deceptive, deceiving his work to the state of Massachusetts.
Q Okay. So you believe that if a lie was told in a different context, it could also make his statements in that context less truthful?

A Correct.
Q All right. What other investigation did you do of Marcus in pursuit of the investigation?
MS. VITALE: Objection to form.
A I search him online.
Q Okay. What did you find online?
A That he owned the house in Enfield.
Q Okay. How many -- you said -- I think I might have asked. Do you recall how many times you ran his license plate?
A I don't recall.
Q You think it was around two?
A I don't know.
Q Did you run the license plates of any of his friends that were visiting?
A Not that I recall.
MS. VITALE: Objection to form.
Q So when he made statements stating that you followed his friends and ran their license plates in the complaint, that would be inaccurate?
A Correct.
Q Okay. So if we did a FOIA request for the COLLECT system, it would show that there were

no times that you ran any of his friends' license plates?

MS. VITALE: Objection.

A I would not know who his friends are.

Q Okay. So if somebody was parked at his house and was leaving in the period of between May and, let's say, November of 2018 you at no point during May 22nd of 2018 through November 12th of 2018, did you follow any guests that were leaving his house or run their license plates through the COLLECT system?

MS. VITALE: Objection.

A Not that I recall.

Q You looked him up online. You looked at his Facebook page?

A I did.

Q You looked up his LinkedIn page?

A Correct.

Q What else did you find that you thought would show that he was lying?

A I looked up his LinkedIn page and it showed that he was a probation officer in Massachusetts.

Q That's fine. What else did you find in the course of your investigation that would show that Marcus was untruthful?

MS. VITALE: Objection.

A Nothing in my investigation -- or my search online.

Q All right. So you searched him online. We know you ran him through the COLLECT database, right?

A Right.

Q You found out he worked at the probation office?

A Right.

Q Did you participate in the call that Lieutenant Samson made to the probation department on July 17th?

A I was present.

Q Okay. And looking at Stebbins number nine, it looks like would you say that this email was sent close to or immediately following that phone call?

A What day is the phone call?

Q July 17th. And this email was sent Tuesday July 17th at 8:24 a.m.

A Yes.
Q All right, so you would say it was after?
A What time was the phone call? I'm sorry.

MR. MCLANE: Oh, well, I guess we can probably listen to it. If I put it up there, it might be louder. The voicemail has a lot of fuzziness. So what I'm going to do is try to put it up there and it will just probably be louder. Here is kind of --

MS. VITALE: How can we make this an exhibit just so the record is clear as to what you are playing?

MR. VITALE: I guess I could send Michele the mp3. I could use the Bates number that I think was provided. So when I put everything to the database, it assigned a Bates number regardless with a blank page.

MS. VITALE: Yes.

MR. MCLANE: So I could do that.

Michele, I'll just have to email you after this. So if you want to just block it off, this will be Exhibit 10.

(Exhibit Number 10, Audio, Bates 506, was Marked for Identification.)

MR. MANCINI: Do you know the Bates number? If not, we can come back to it.

MS. MCLANE: It's 7000506.

(Whereupon, Mr. McLane played audio.)

Q Okay, I'm going to stop there.
Would you agree with me that he said, "Today is Tuesday the 17th at approximately 0900 hours"?
A Yes.
Q All right. So looking back at Stebbins 9, you had sent this email at 8:24 a.m., meaning you sent him the Mass. Probation Legal Unit information prior to his making that call?
A Correct.
Q Okay. So when he started the call, just now,

were you there presently?
A I walked in halfway through it
Q Okay. So I'll continue to play.

(Whereupon, Mr. McLane played audio.)

Q So your opinion is the reason that he's making this phone call is to determine whether Marcus is telling the truth about this statement?
A You'd have to ask him.
Q Okay. He didn't tell you?
A I don't believe so.
Q So you sent him just half an hour before the information for Mass. Probation Legal Unit and then --
A I did.
Q -- at 9:00 he's calling them?
A I didn't prompt him to call.

(Whereupon, Mr. McLane played audio.)

Q Is that you now? Are you entering the conversation?
A I am, yes.
Q Do you know who he is referring to when he says, "the other asshole"?
A I don't.
Q Okay, did you ever discuss anyone that he should be calling other than the Mass. Probation Unit?
A I did not.
Q Do you know, did he refer to any other individuals in the Mass. Probation Legal Unit?
A No.
Q Or at Mass probation in general?
A I don't recall.
Q So you don't know who he's referring to when he says "the other asshole"?
A I don't

(Whereupon, Mr. McLane played audio.)

Q Okay. I'm going to stop right there.

Did you hear the same that I just did when he said "There's no one in that office named Danielle"?
A Which office?
Q The probation office.
A I heard him say that, yes.
Q Did you look at anyone named Danielle Dubuque?
A I did not.
Q Okay. You didn't run Danielle Dubuque's license plate through COLLECT?
A I don't believe so.
Q Okay, did you look up Danielle Dubuque online?
A I don't think so.
Q Did you look to see whether she was an employee and work with Marcus?
A I may have.
Q Okay. What do you mean by "I may have"?
A I Googled her name.
Q Okay. What did your search turn up?
A I don't recall.
Q Did you find out where she worked?
A I don't believe so.

Q Did you find a LinkedIn or Facebook profile?
A I don't believe so.

(Whereupon, Mr. McLane played audio.)

Q Okay, the guy who just said "diminishing," is that Marty Pirog?
MS. VITALE: Objection to form.
A I don't know. I didn't hear that.
Q You don't recognize the voice?
A I didn't hear that.
MR. MCLANE: All right, I'm going to see -- if it gets worse, what I might do -- I think what I'll do here is I'll connect to the AirPlay, and we'll play it up there and it will really blast the sound.
Why don't we just take five? Let's take a short break.

(Short break.)

MR. MCLANE: Back on the record.
Q I'm going to try to play this.

(Whereupon, Mr. McLane played audio.)

Q Do you recognize the voice of that person?
A I do.
Q Who is that?
A Marty Pirog.
Q So would you agree with me that you had a discussion with Marty Pirog about the ongoing investigation that you were a subject of?
A Yes, sir.
Q Does this jog your memory as any other individuals you might have had a discussion with about this investigation?
A Probably other troopers.
Q Okay. Why did you have these discussions with these troopers and Marty Pirog after receiving a letter that instructed you not to?
MS. VITALE: Objection to form.
A What letter? Dated when?
Q Stebbins 6, Bates stamp 11.
You have it in front of you?

A Right.
Q Can you read what it says in bold?
Am I my accurate that it says, (Reading):

"Further, do not discuss this investigation with anyone other than union, legal, or" --

A Yes.
MS. VITALE: Objection to form.
Q So why did you discuss it with Marty Pirog and other members of the -- or other troopers after you received a letter telling you not to?
A I discussed just basics.
Q Why, knowing -- did you not understand that you were not supposed to discuss this?
MS. VITALE: Objection to form.
A I did not.
Q So when you received the letter, you didn't understand --
A I don't recall.

Q When you received the letter saying, "You are hereby ordered not to discuss this investigation with any other person other than your union or legal representation or uninvolved peer support person," you were confused as to that order?
MS. VITALE: Objection to form.
A Yes.
Q Okay. You'd agree with me that this was signed by Lieutenant Eric Cook?
A Yes, sir.
Q Did you seek any clarification from Lieutenant Cook as to who you could and could not discuss this with?
A I did not.
Q Did you seek clarification from Sergeant Samson or Lieutenant Samson as to who you could and couldn't discuss this with?
A I did not.
Q Is there a penalty for violating A and O Manual sections?
MS. VITALE: Objection to form.
A I am not aware.
Q Okay, what is an A and O Manual?

A An operations manual for State Police.
Q So is it administrative --
A Yes.
Q property of --
A Yes, sir.
MS. VITALE: Just wait until he finishes his question so you aren't talking over each other.
THE WITNESS: Okay.
Q Do you know the names of any other troopers that you discussed the investigation with?
A I don't.
MR. MCLANE: Let's go off the record for a few seconds, Michele.

(Whereupon, a brief discussion was held off the record.)

MR. MCLANE: Back on the record.

(Whereupon, Mr. McLane played audio.)

Q When Lieutenant Samson says "I'm going on

Danielle, that's my in," what do you think he meant?

MS. VITALE: Objection.

A That's his witness.

Q Okay, and this would be Danielle Dubuque?

MS. VITALE: Objection.

A Yes.

Q His witness for what?

A For the May 22nd incident.

Q Okay, but you'd agree with me that it seems like a lot of effort -- okay, hold on.

So Danielle was there on May 22nd?

A She was not.

Q Okay, so why would he have a witness for May 22nd?

A He said he had a witness.

Q He did. So Marcus said he had a witness?

A Correct.

Q Okay, so you didn't see Danielle there on May 22nd?

A She wasn't there.

Q She wasn't?

A No.

Q You don't know if she might have been inside?

A I didn't see anybody else.

Q It was your view of the vehicle. You approached Marcus, you told me. You said that you asked to speak to him man to man and he was standoffish and at that point you left.

MS. VITALE: Objection.

Q Did you look inside his vehicle?

MS. VITALE: Objection.

A No.

Q So when you were talking to him on May 22, 2018, you didn't look inside the vehicle?

A I did not.

Q How would you know if he was present?

A I would have saw her.

Q From where?

A From what he submitted, what he provided.

Q Okay, so I think we might be talking about two different things.

So from what he submitted was what he said, which would be documents he submitted with respect to the investigation, right?

A Yes.

Q Okay. But when you approached him on May 22nd, how would you have known if she was in the car?
A I wouldn't.
Q You wouldn't?
A No.
Q But you're certain here today that she wasn't there?
A Correct.
Q Okay, and that is based on what?
A I didn't see anybody else.
Q So because you didn't see her, you drew the conclusion she wasn't there?
A Yes.

(Whereupon, Mr. McLane played audio.)

Q Who do you believe that Marcus sent to your house?
MS. VITALE: Objection.
A I don't believe. I assumed.
Q Okay, so why did you assume the Marcus -- well, what's the difference between assuming

he sent someone to your house and believing that he sent someone to your house?
A I was just assuming that he sent someone. I had no interaction for probably I don't know how long before this incident and all of a sudden someone shows up at my house, so I assumed it was maybe someone he knew.
Q Who showed up your house?
A A female.
Q All right. You don't know what she was doing?
A She was taking pictures of my cruiser, trying to enter in my cruiser, taking videos and pictures on my house and personal vehicles, walked up my driveway.
Q You don't know who this woman was?
A I do not.
Q Did you get her license plate?
A I did not.
Q So you drew the conclusion that Marcus sent her to your house. Why couldn't --
MS. VITALE: Objection.
Q -- he just get your license plate himself? Why couldn't he take pictures of your license

plate by himself? Like, why would he need to send a woman there to take pictures of your license plate?

MS. VITALE: Objection.

A He did take pictures of my license plate.

Q Oh. If he did, then why would he send a woman to take more pictures?

A Of my house?

Q Of your house.

A And my personal vehicles?

Q Yes.

MS. VITALE: Objection.

A I have no idea.

Q Okay, so if you already know that -- you're saying that he took a picture of your police cruiser's license plate, correct?

A Yes.

Q But at the same time you assume that he sent a woman to take pictures of your personal vehicle license plates?

A Coincidental, yes.

Q Okay. It was coincidental?

A Yes.

(Whereupon, Mr. McLane played audio.)

Q Is that you who just said you don't have proof?
A I don't know. Can you rewind it.

(Whereupon, Mr. McLane played audio.)

A Yes.
Q So you didn't have proof that it was him, but you assumed it was him?
A Correct.

(Whereupon, Mr. McLane played audio.)

Q Is that Marty Pirog suggesting a Signal 12?
A Yes.
Q And you understand a Signal 12 to be a traffic stop, is that correct?
A Correct.

Q Why would Marty Pirog in that period of time be suggesting a Signal 12?

MS. VITALE: Objection.

A The time of the woman in my property?

Q Well, the time --

A Suggesting I would stop that woman.

Q Okay, so this Signal 12 was stopping that woman, but you just told me you don't know who she is?

A I don't.

Q How would you conduct a Signal 12 on someone --

A Talking about if you caught her, if I caught her in the act, if I happened to catch her in the act.

Q You had testified that it was coincidental that a woman came and took photos of your cars the same time you're under -- I guess in dealing with Marcus.

MS. VITALE: Objection.

Q Would it also be coincidental that you're on record discussing a Signal 12 just months before actually conducting a Signal 12 on Marcus?

MS. VITALE: Objection.
A Can you repeat the question?
Q So you don't think it's coincidental that you're discussing a Signal 12 in this recording and that you and the Enfield Police ended up conducting a Signal 12 on Marcus?
MS. VITALE: Objection.
A I do not.

(Whereupon, Mr. McLane played audio.)

Q what did he mean by "changing his tune"?
MS. VITALE: Objection.
A I don't know.
Q Did you mean change his statement?
MS. VITALE: Objection.
A No.
Q So at no point during this discussion did you think that, you know, any efforts that you could undertake would be geared towards Marcus changing his statement?
A No.

(Whereupon, Mr. McLane played audio.)

Q After Lieutenant Samson said with this guy there's going to be a lawsuit was that you or Marty who said "Yes"?
A Can you rewind that? It's hard to hear.
Q If you want to stand close to the TV, please do because it's coming from the TV.

(Whereupon, Mr. McLane played audio.)

Q You don't know?
A I don't know.
Q When Lieutenant Samson said "This guy is going to sue because he's black," did you agree at that point in time that Marcus would sue claiming racial discrimination?
MS. VITALE: Objection.
A Possibly.
Q Okay. Why did you think that Marcus would claim racial discrimination?
A All of the actions leading up to that day.

Q Describe what his actions leading up to that date have to do with him claiming racial discrimination?
A Fabricating himself.
Q Okay, so in your opinion, because he fabricated things, he would claim racial discrimination?
A Possibly.
Q Because he is black?
A Possibly.

(Whereupon, Mr. McLane played audio.)

Q What mail person is Lieutenant Samson referring to?
A My mail carrier.
Q Okay, so it's your mail carrier. What conversations have you had with her prior to this phone call about Marcus?
A I spoke to her. I'm not sure if it was before or after the phone call.
Q Why did you talk to the mail carrier about Marcus?

A For a character witness.
Q Character witness? How would she be a character witness? Did she know Marcus?
A Possibly.
Q Okay. What did she say to you when you spoke to her?
A She delivered mail to his house daily. I asked if he was a resident and she said that he definitely lived there.
Q And she had that basis of knowledge from delivering mail to his house?
A Correct.
Q Okay, so how would she vouch for -- whose character was she going to vouch for as a character witness? Was she going to vouch for your character, or was she going to speak against Marcus's character?
A Against Marcus.
Q Okay. What is your understanding of her personal knowledge of Marcus?
A She may have had interactions with him.
Q Okay. Did she mention any to you?
A I believe so. I don't remember what she said.

(Whereupon, Mr. McLane played audio.)

Q Okay, do you know what asshole neighbor down the street they were referring to?
A I don't.

(Whereupon, Mr. McLane played audio.)

Q Who were they talking about when they said she would turn around and say that he's playing that racial card?
MS. VITALE: Objection to form.
A Who said that?
Q I'm asking who you're referring to is saying that Marcus is playing the racial card?
MS. VITALE: Objection to form.
A Who said that?

(Whereupon, Mr. McLane played audio.)

Q Do you know who Marty is referring to when

he's talking about somebody who called Marcus a "fucking asshole"?

MS. VITALE: Objection to form.

(Whereupon, Mr. McLane played audio.)

Q So it's Lieutenant Samson who said, "She turned around and said he's playing that racial card"?

MS. VITALE: Objection to form.

A He said what? What did he say?

(Whereupon, Mr. McLane played audio.)

Q "He's playing that racial card." Who would be saying that Marcus is playing that racial card?

A You'd have to ask him.

Q Okay, so you don't know who he was referring to?

A Correct.

Q Were you still in the room at this point in

time?
A Correct.
Q Okay, so you heard him say it?
A Yes, sir.
Q Do you think Marcus is playing the racial card?
MS. VITALE: Objection.
A Possibly.
Q Okay, what do you mean by "possibly"?
A Possibly an angle for a lawsuit.
Q An angle for a lawsuit, okay.
What does the racial card mean to you?
A Someone that claims bias against themselves. Someone that claims that they're pulled over because they are black or a different group.
Q Okay, and you think that there is no merit to Marcus's claim that he was treated differently because he was black?
MS. VITALE: Objection.
A No merit to it.
Q Okay, in any way, shape or form?
A No.

Q Did the mail lady end up telling you or anyone know that you know about that Marcus was playing that racial card?

A I don't recall what she said.

(Whereupon, Mr. McLane played audio.)

Q That is the end of it.

MR. MCLANE: So this is Stebbins 506.

Michele, did we block this off for Exhibit 10?

THE COURT REPORTER: We did.

Q So what prompted you to send, you know, right before that meeting, the Mass. Probation Legal department's number to Lieutenant Samson?

MS. VITALE: Objection.

A To determine if he actually worked in Massachusetts.

Q So Lieutenant Samson didn't ask for that information?

A No.

Q Okay. So you on your own were conducting an informal investigation into Marcus's background?
MS. VITALE: Objection.
A Just getting some background information. I don't know.
Q Did you ever look at his criminal history?
A I did not.
Q Okay. I was provided, by your lawyer, Marcus's work history from New York. Did you ever see that, as a police officer?
A I did not.
Q You didn't see those documents?
A I saw --
MS. VITALE: That's a different question.
Q Did you see the documents regarding Marcus Cameron's New York police officer work history that were produced to me by your lawyer?
A I did.
Q Did you provide them to her?
A I did not.
Q Do you know who did?

A I don't.
Q Okay. Did you look into his work history in New York?
A I did not.
Q Why do you think Marcus's claims that he was treated differently because he was black do not have merit?
MS. VITALE: Objection. Those aren't the claims. So I'm just putting that on the record that I do not agree. You can ask him questions, but those are not the claims in the case.
MR. MCLANE: He certainly has alleged facts sufficient, so I'll stand on the record, so --
MS. VITALE: It's not in the complaint. What is your legal claim?
MR. MCLANE: What are you talking about? It's an unreasonable search and seizure.
MS. VITALE: Based on what? You're saying based on his race now? That's not --
MR. MCLANE: It's in the context of the complaint.

MS. VITALE: I don't understand what you're saying. Is that what your claim is?

MR. MCLANE: How about this? We just listened to a voicemail where one person in the voicemail was using black sense to describe pullovers of minorities. The other person talked about getting a mail lady to say he was playing that racial card. I just asked him a question whether Marcus was playing the race card, and he said possibly. I asked him the question whether or not Marcus's claims that he was treated differently because he's black had any merit and he said no. I'm exploring --

MS. VITALE: And I objected because I said --

MR. MCLANE: You can have your objection and I can have my answer.

MS. VITALE: -- I don't understand what you mean by "claim." So I'm just noting for the record that to the extent that you're going to assert going forward in this lawsuit on summary judgment, for example, that you

are making a legal claims in this case --

MR. MCLANE: Certainly, the basis --

MS. VITALE: -- then we are going to have to talk about that.

MR. MCLANE: -- for which --

MS. VITALE: Please let me finish. I'm trying not to interrupt you.

So to the extent that you are asserting now that you are making a cause of action against my client based -- I don't even understand what your cause of action is that you're claiming. So you're saying an unreasonable seizure now and you're saying it's because of his race.

MR. MCLANE: So we have, as per the complaint, count one against everything is a violation of Section 93, which includes 4th Amendment and a 14th Amendment violation, unreasonable search and seizure and a violation of due process. The unreasonableness of this is based on all the facts, the mindset, right, of any search and seizure, right, is based on what the officer

has, all the information available to the officer at the time. So all of the intent, all of the mindset of these people, moving forward, with respect to the way they conducted the eventual seizure, we already have one that we argue was a seizure on May 22nd, and then the Nov 12th seizure, and then the December 5th seizure, all of these people played into effect. So the mindset, that information about whether he was treated differently because he's black, definitely a due process violation.

MS. VITALE: There's no due process claim in your complaint.

MR. MCLANE: So if you look at count one, it says violations of the 14th amendment, which is the due process clause, and the 4th Amendment right, for the unreasonable search and seizure.

If you want, we'll explore this. We can suspend. I'll file a motion to amend my complaint.

MS. VITALE: You can't do that now.

MR. MCLANE: I can do it up through

the time of trial.

MS. VITALE: Not without permission.

MR. MCLANE: If evidence comes forward, through which --

MS. VITALE: You've had this information.

MR. MCLANE: unequal protection clause.

MS. VITALE: You've had this information two years -- how many years have you had this information?

MR. MCLANE: Then you you're welcome to object. So I am 100% entitled to this line of questioning right now, especially just because we opened the subject matter up, so...

MS. VITALE: He's been answering your questions.

MR. MCLANE: Right. You're preventing him from answering this one.

MS. VITALE: I'm putting on the record that I'm not waiving any object I may have that this is completely irrelevant

because you're not actually making that claim. So as long as that is clear, you can spend your time however you want.

MR. MCLANE: Well, thank you for that.

MS. VITALE: If you want to ask questions on this, then you can do that, you know, within the bounds, obviously. If you want to choose to ask questions on that, that is fine if that is how you want to use your time.

Q If markets were to assert that he was treated differently because he was black, you would say that there's no merit to that?

A Yes.

Q Okay, why?

A Because on May 22nd --

MS. VITALE: Objection. Asserted differently how? I mean, that is -- you know, treated differently how, by who, when?

MR. MCLANE: So he was about to answer the question, so I don't know -- if you want to object to the form, you can object to the form. He was about to answer

the question, so he clearly understood it. You can have your objection and I can have my answer.

MS. VITALE: Okay, go ahead.

A The question again, please?

Q Let me move on.

All right, so did you look into -- one of the requests that I'd sent -- or interrogatories rather, I asked about, you know, previous stops on Foxcroft Road if I can bring it up real quick because I don't have a copy of it here.

Let's go back to your answer, then, Marcus is possibly playing a racial card with his complaint that he filed against you. You read that complaint, correct?

A Correct.

Q What in that complaint did you interpret as Marcus is playing the racial card?

A My personal opinion.

Q Okay, but it is based on what?

A I didn't know his race when I ran the plate the first day. I didn't know his race or who was driving the vehicle when I ran the plate.

I didn't know his race or any details until I approached him on May 22nd.

Q Okay. And then from that point on -- well, let me ask you, so that's May 22nd. So you'd say that's your opinion as to why he's wrong about the claim that he played the racial card, correct?

Let me go back to my last question. So I said, based on that complaint, you said it's possible that he's playing the racial card. What in the complaint leads you to believe that he is playing the racial card?

MS. VITALE: Objection to form.

A Nothing in the complaint.

Q Okay. So then why do you think it's still possible that he's playing the racial card?

A Any possibility.

Q Okay, so anyone who's black could possibly play the racial card?

A Possibly, yes.

Q Can people who are white play the racial card?

A Possibly.

Q Let me show you another document here.
MR. MCLANE: Michele, can you mark this, please?

(Exhibit Number 11, Email, was Marked for Identification.)

Q I'm showing you a document from -- it's an email from Stephen Samson to you on September 10th of 2018. It says, "Updated version." The attachment has a "C" number. It says, "C-18-086, TFC Stebbins report revised." What was this revised report?
A It was the second. There's two copies.
Q But you told me there's only one version, correct?
MS. VITALE: Objection.
Q Is this the same memo that I showed you in Stebbins 3?
MS. VITALE: Objection.
Q IS the TFC Stebbins report contained in that email the same as contained in your email to Sergeant Samson in Exhibit 3?
MS. VITALE: Objection.

A Updated version of what? I don't know what the version of what.
Q Well, okay, so what is the TFC Stebbins revised?
A It's a "C" number, so I'm assuming it's the investigation.
Q Okay, so that's his investigation of your report?
A Correct.
Q And he's sending that to you on September 10th of 2018?
A Correct.
Q Okay. When did this investigation actually close?
A I don't recall that date.
Q How many versions of the investigation report did you see?
A Two.
Q Would this one that says "Revised" be the second version?
A Possibly.
Q Okay. Did Lieutenant Samson ask for your feedback on the contents of that report?
A No.

Q So why do he send them to you?
A For my record.
MR. MCLANE: Let's mark these as to separate exhibits.
The first will be an email and the second will be the letter.

(Exhibit Number 12, Email, was Marked for Identification.)

(Exhibit Number 13, Letter, was Marked for Identification.)

MS. VITALE: I'm sorry, which is which?
MR. MCLANE: The email will be 12 and the letter will be 13.
Q So on 1/27, which is 12, it looks like you are inquiring as to the status of the complaint investigation, right? And that is on October 1, 2018?
A Correct.
Q All right. And it looks like the Exhibit 13

which is Bates number 59, was a letter that was sent out to Mr. Cameron on October 11, 2018, notifying of the finding, is that accurate?
A It appears so.
Q Have you seen that before?
A I have.
Q Okay. When did you find out the results of the investigation?
A Sometime after October 11th.
Q Okay, so you found out about it afterwards?
A Yes sir.
Q Okay, but let me -- so when Lieutenant Samson sent you a revised version of the report, was that not final in your eyes?
A Not in my eyes.
Q Okay. Why?
A It was understood that he was told to shorten his report.
Q Okay. He was told to shorten his report?
A I believe so, yes, sir.
Q And that would be by Lieutenant Daniel Loughman?
A I don't know who it was that told him that.

Q Okay. With the C investigations, if I'm not mistaken, aren't the lieutenants assigned the "C" investigation? Did you know that?
A I don't know that.
Q Do you think any part of your conversation during the July 17, 2018, phone call was inappropriate?
A I don't.
Q You don't think it's inappropriate that the subject of an investigation is in the same room as the investigating officer calling the claim complainant's employer?
A I don't.
Q You don't think anybody could perceive it as inappropriate?
A I don't know.
Q You don't think Marty Pirog use of black sense was inappropriate when discussing minorities he pulls over?
A You'd have to ask Marty.
Q Okay, but you were in the room?
A Correct.
Q You didn't say anything to him?
A No.

Q You don't think discussing potential investigations into the mail lady or anything against Marcus at that point was inappropriate given the fact that you are the subject in the investigation?
A No.
Q Would you agree with me that an Internal Affairs investigation should be fair?
A What kind of investigation is it? Is it criminal?
Q Well, I guess any investigation. Are there any Internal Affairs investigations that you think a citizen does not have a right to a fair investigation?
A No.
Q Okay, so we can agree that a citizen has a right to a fair internal investigation?
A Yes.
Q All right. So we know as of October 11th of 2018 Marcus had been mailed out the findings of the Internal Affairs investigation?
A According to the documents, yes.
Q Okay. So what was your next encounter with Marcus after that?

A I believe it was November 12th.
Q Okay. Tell me what happened on November 12th.
A I went to one of my residences to check on my heating unit. As I was leaving my residence on Foxcroft, I saw Marcus Cameron's residence, his house. And he was, at that point, coming down the driveway, I believe. And then as I went by him, he shouted something. I couldn't tell what he said. And then I observed him hop in his vehicle in my rearview mirror.
Q Why do you drive by his house?
A That's the way I decided to go.
Q Okay. No particular reason?
A Well, to avoid some construction in the area.
Q Okay. Where was the construction in the area?
A I believe, at that time, it was on Montano Road.
MR. MCLANE: Let's mark this as 14.

(Exhibit Number 14, Google
Maps, was Marked for
Identification.)

Q It's a two-paged exhibit. These are maps that we've provided -- were provided by Marcus, and they're Bates stamped Cameron 345 and Cameron 346.
So when we're looking at this map, it's a little small. He had marked this up prior to submission, so he submitted as is. Is that an accurate representation of where his property is where he says "My property" and your property where he says "His property"?
A Yes.
Q Okay, so you could have taken Foxcroft to Montano and left that way, correct, or are you saying that you couldn't because of construction?
MS. VITALE: Objection to form.
A I'm saying I decided to go the way I went to avoid construction.
Q Okay, so to avoid construction, you went the

way you went. And you drove by his house,
but it wasn't necessary to do so?
A I assume so.
Q You assumed it was necessary to drive by his house due to construction?
A I can go down any street I want to.
Q You can, but I know eventually Mr. Cameron was charged with stalking in the third degree, is that correct?
A Yes, sir.
Q And as a trooper, is it your understanding that part of the stalking charge requires a reasonable fear of the person for the defendant to charged?
MS. VITALE: Objection.
A The question is what?
Q Is it your understanding that the charge of stalking in third degree requires the alleged victim of that stalking to have a reasonable fear of the defendant?
MS. VITALE: Objection.
A I do.
Q Okay. And so you're saying as of November 12th, you had a reasonable fear of Marcus

Cameron?
A I do.
Q Okay. And you decided to drive by his property instead of taking alternate route?
A I had no issues with him prior to that date. Let me back up. I mean, there were no issues since the last interaction, so I didn't think it was an issue.
Q Okay, but at this point in time you'd called the Enfield police at least once on him, right?
A What date?
Q I believe you called them May 26th, is that accurate?
A I did call May 26th.
Q I believe that either a friend or family member had called, right, that was with you at one point in time?
A I don't recall that.
Q Okay. Did you call any other times other than May 26th?
A I called on this date here.
Q Okay, you called on November 12th. You also are clearly aware that he filed an Internal

Affairs complaint against me?
A Yes.
Q And so having all that knowledge and you were not in reasonable fear until November 12th?
A No. Incorrect.
Q Okay. I thought that was your previous testimony. Please correct me.
MS. VITALE: Objection.
Q When were you in reasonable fear of Marcus Cameron?
A May 26th.
Q So reasonable fear was May 26th?
A Correct.
Q And being in fear of him you decided to drive by his property on November 12th instead of taking an alternate route?
A Correct.
Q Okay. And then we left off with you saying that he shouted something. What did he shout?
A I did not hear it. I mean, I did not hear what he said. I just heard him yell.
Q All right. And then what happened?
A I approached -- at some point he was

following me.
Q I don't need the map anymore. I was just using it as a reference to show Montano Road. Are you able to see Montano Road there from where he's marked?
A Yes.
Q Okay. So go back. I said what happened after that. And I'm done with that exhibit. I'm not going to ask any more questions on it.
Q What happened after he yelled?
A Yes, what happened? You said he yelled at you. You didn't know what he said. What happened from there?
A I kept driving.
Q All right. That was the end of the interaction on November 12th?
A No, at some point he got behind me.
Q Were you pulled over on the side of the road at that point?
A I was not.
Q Where were you when you saw him get behind you?
A Can I reference the map?

Q Oh, yes, certainly.
A Wherever this is here, I can't read this.
Q Do you remember just the street name?
A I don't.
Q Was it on Route 5?
A No.
Q Was it in the neighborhood?
A It was.
Q Okay. While I'm here, why don't I just pull it up on my map and maybe I could just get an accurate? Was it Eleanor Road?
MR. MCLANE: Why don't we do this? I'm not going to mark this as an exhibit. Let me I turn my computer around. It might be better that way.
A No, I believe it was Dover.
Q Okay. So you saw him behind you on Dover Road?
A Correct.
Q So he was outside when you drove by his house, right?
A Correct.
Q Okay, so not inconceivable he might have been leaving as well?

A Correct.
Q Okay. So what happened from there?
A I believe I came to a stop sign. I don't remember what street that is. Can I see the map?
Q Yes.
A The stop sign at Colony Road. He was behind me.
Q All right. What happened at that point?
A I took a left.
Q And you took a left onto Enfield Street?
A I took a left onto Colony Road.
Q And eventually you ended up on Enfield Street?
A Correct.
Q Hopefully we don't need to map.
What happened on Enfield Street?
A I drove north on Enfield Street.
Q Going where? Where were you headed?
A To my new residence.
Q Okay. How long have you had this new residence?
A Since October 9th.
Q So October 9th, you got a new residence. So

why were you at your old residence? Why were you leaving from Foxcroft Road? Why were you not at your new residence?
A I was checking on my heating system there.
Q Checking on your heating system?
A Correct.
Q And you're heading back to new residence. So what happened from there when you were on Route 5?
A He was behind me probably two or three cars back.
Q Okay.
A I wasn't sure if he was following me, so I pulled into the 360 Credit Union, took a right.
Q What made you think he was falling you, just because he was behind you?
A I wasn't sure. Possibly.
Q Okay, so possibly. He yelled at you. You saw him behind you. You thought he might have been following you?
A I stand corrected. I believe -- he was -- before I took a left on Colony, I saw his phone out like he was taking pictures of my

cruiser behind me.
Q Okay, would that be unlawful for him to do?
A Unlawful to drive with a handheld device, yes.
Q It wouldn't be unlawful for him to film you?
A No.
Q So you saw him two or three car lengths back. You weren't sure, but you thought he might have been following you?
A Correct.
Q Okay. What did you do from there?
A I entered Route 5 --took a right onto Route 5 northbound and continued north on Route 5 and observed him sitting in a parking lot to the left.
Q I'm sorry, you pulled out --
A I pulled out of the bank, took a right out of the bank, up Route 5. I looked to the left and I saw him sitting in the attorney's parking lot.
Q What attorney?
A I don't know the name.
Q Okay. It caused you alarm that he was parked in an attorney's office?

A I was thinking he was maybe waiting for me.
Q Had he ever been violent towards you in the past?
A No.
Q Okay. You knew he was a probation officer, right, at that point in time?
A Right.
Q Wouldn't you have assumed that he would have had to have had a clean criminal record at that point in time? To be a probation officer, wouldn't he have needed to have a clean criminal record?
A I don't know.
Q Do you have any probation officer friends in Connecticut?
A I don't.
Q Let me ask you, members of the State Police, are they allowed to have criminal records?
A No.
Q Okay. What law enforcement do you know of that allows its members to have criminal records?
A I don't know of any.
Q Okay, so at that point in time I think it's

safe to assume he didn't have a criminal record?

A Yes.

Q Okay. So what was the fear there?

A Everything from May 22nd to this date.

Q What did you think that he was going to do to you?

A I didn't know.

Q Okay. But you didn't know of any sort of articulable threat, right?

MS. VITALE: Objection.

A No.

Q Okay, so what did you do when he was at the attorney's office?

A I kept driving.

Q All right. Where did you go?

A I entered the Exit 49 onramp.

Q Is the end of it or what?

A No.

Q What happened next?

A I pulled over onto the dirt area of that ramp, and I believe I called Sergeant Samson.

Q Okay, was that on your business phone, or was that on that cell phone that we discussed

earlier?
A My personal phone.
Q Was it different than the 413...?
A No.
Q And what did Sergeant Samson say to you?
A I believe he told me that if I felt like he was following me, then to call Enfield PD to report it.
Q So we already discussed that you have jurisdiction to arrest someone anywhere in the state of Connecticut.
A Correct.
Q What do you need to call Enfield PD for?
A Due to those past circumstances and all the events with him, I didn't feel it was right to pull him over.
Q Okay, you didn't feel it was right to pull him over?
A By myself, right. Correct.
Q Okay. Why?
A Due to our history. I know he doesn't like me, so what's the point of trying to?
Q Okay, but you stated you were in reasonable fear of this gentleman since May 26th.

A Right.
Q You could have just pulled him over --
A Could have.
Q -- but you're saying due to your past history you just didn't think it was right?
A Yes, I just didn't feel comfortable.
Q Okay. So maybe we can agree that because he made an Internal Affairs complaint, you might think it would be biased if you pulled him over?
A Could have.
MS. VITALE: Objection.
Q You can answer.
A Correct.
Q But going back, you don't think that anybody would think it would be biased that the subject of an Internal Affairs complaint was calling his employer with the investigating officer?
MS. VITALE: Objection.
A No.
Q Okay. So we can say an objective viewer of the two scenarios. If someone was watching you in the room with Lieutenant Samson and

Marty Pirog as Lieutenant Samson was calling Marcus's employer, do you think an objective third party would say that that was not a biased investigation?

MS. VITALE: Objection.

A Correct.

Q All right, but you do think an objective third party -- when you state that you were fear and were being followed, you'd think an objective third party would think it would be biased if you conducted the stop?

A If I did it on my own, yes.

Q Okay, so Sergeant Samson advised you to call the Enfield PD. Did you do so?

A Yes.

Q Who did you call?

A I called the routine dispatch.

Q What is it called?

A Routine line.

Q What did they tell you to do?

A I gave them information as to what was going on. I believe I gave them background information of what led to that day.

Q So hold on. So the last place you saw him

was at an attorney's office. You then left and pulled over onto the side of the road, you said?
A Correct.
Q And then just called them because he was at an attorney's office
A I called them after -- after I felt like he was following me, I called them, yes.
Q Okay. Did he pass you on the dirt road at some point?
A At some point he did.
Q Okay, so he passed you. He continued on?
A Yes.
Q Did you think the threat was eliminated at that time?
A I wasn't sure.
Q What happened from there?
A As I was driving south on 91, I observed a vehicle on the right hand in the shoulder with his flashers on. Then I realized it was his far, and I figured he's trying to follow me.
Q All right, because he had his flashers on?
A Correct.

Q All right. What about having his flashers on on 91 would cause you to believe he was following you?
A Well, any person would think why would he keep stopping.
Q Well, his car was ahead of the yours, right?
A Correct.
Q Okay. How far back were you?
A It couldn't have been far.
Q So why were you on 91 at this point?
A I was going to my other residence.
Q Okay, so it required you to go to Route 91 to that residence?
A It's the route I picked, sir.
Q All right. Was there a quicker route?
A Possibly, yes.
Q So then why pick that route? You just called the cops, right?
A Right.
Q You said you're in fear?
A Right
Q You know he went that direction?
A Right.
Q And yet why not turn around and go in a

different direction?
A I decided to go on 91.
Q Well, if you're afraid of him, you don't want him to know your address, right?
A Right.
Q So wouldn't there be a risk of him following you further?
A Yes.
Q If you got on 91?
A Possibly.
Q I guess I'm not understanding the mindset of continuing down a road that, if you think you're being followed, would allow a person who just passed you to continue following you. You'd agree with me that you being back on that road might allow him to see you again and gain visibility?
A Possibly, yes.
Q Okay. So he had his flashers on. Then what did you do?
A I continued on on 91 South. I exited using Exit 48 Eastbound.
Q You got off the exit on 48 Eastbound?
A Prior to that, after I passed him, that is

when he merged back onto the highway.
Q Do you give any credence to the fact that maybe he thought you were following him?
A No.
Q Okay. Why?
A Because he was behind me, videotaping me.
Q Okay, and then he was on 91, and then he sees you behind him, correct?
A Correct.
Q You gathered that because of his flashers?
A Right.
Q And given your history, you don't think he thought maybe you were following him?
A You'd have to ask him.
Q Okay. So from there you got off Exit 48?
A Yes.
Q And then what happened?
A He followed me off the exit, and then I continued on Route 190 Eastbound. I was on the phone with Enfield.
Q Route 90 Eastbound?
A 190 Eastbound.
Q Okay.
A I continued to see him behind me, and I

decided to pull him into --
Q So you were using a handheld device?
A No.
Q Talk to text or talk to speak?
A No, Bluetooth Ear. Cell phone call.
Q Okay, yes.
A I pulled into the parking lot off of 190.
Q What parking lot was that?
A It was right behind McDonald's. Brookside Plaza possibly.
Q Okay.
A There's two huge parking lots there.
Q And he arrived later?
A As I pulled in, I parked in the parking lot. And I didn't see him immediately. And then a few minutes later or whatever, I looked to my left and I saw him parked outside a parking lot.
Q Okay, you don't know if he had business in the Brookside Plaza that day?
A No.
Q You don't know if he did or he didn't?
A I had no idea if he had business or not.
Q Okay. Why did you pull over to the Brookside

Plaza, though, if you thought he was
following you?
A To wait for Enfield PD.
Q Okay. They told you to do that?
A I decided I was going to do that.
Q Okay. You decided you were going to do that.
Why did you decide to do that?
A I wanted to speak at Enfield PD about it.
Q Okay, but you were in fear of Marcus at this
point in time?
A Yes.
Q All right. You pulled over and you came to a
stop?
A Correct.
Q You saw him there?
A Correct.
Q You didn't leave?
A No.
Q Okay. How long did Enfield PD say they were
going to be?
A A few minutes.
Q What did you do til then?
A Waited for them.
Q Who showed up on the scene for Enfield PD?

A I don't know names. I don't recall who was there.
Q Did you have any conversations with them?
A At the scene?
Q Yes.
A I did.
Q What did you tell them?
A I spoke to a female officer. I gave her background of what happened
Q What was her name?
A I don't recall her name. I don't have her name.
Q Was your body cam working at the time?
A Yes.
Q Was it on?
A I don't believe my body came was on, no.
Q Was the audio on?
A I believe my cruiser was on.
Q Cruiser?
A Yes, the camera was on.
Q Okay. There is an acronym for the body cam. What are they called, DVR or D-?
A BWC.
Q What is it called?

A BWC.
Q So if we say "BWC," we're talking about the body camera?
A Yes, on your body.
Q To my understanding, don't these things automatically turn off and on, or do you have to manually do it?
A You have to manually do it.
Q When you turn on the cruiser, doesn't it also turn your body cam on or no?
A No.
Q So you have to manually turn your own body camera on?
A Yes.
Q Did you do that on this particular time?
A Yes.
Q So you did turn the body camera on?
A No, I'm sorry. I turned my cruiser camera on.
Q Okay, why not the body cam?
A I'm trying to think if I had a body camera.
I don't recall if I had a body camera at that time.
Q So the cruiser camera, do you remember what

that picked up?
A I didn't until recently.
Q What did you discover recently?
A Just myself turning the camera on and observing the scene.
Q What were your interactions with the other Enfield PD officers at the scene? What did you guys discuss?
A I didn't discuss anything but that one female officer.
Q And what did you tell her?
A Just gave her background information, what the issue was.
Q What did they ultimately decide to do at the scene?
A I don't recall.
Q Was Marcus placed under arrest?
A He was not.
Q Okay, but you stayed the entire time?
A Yes.
Q Did Lieutenant Samson show up?
A He did.
Q Why if the Enfield PD was there?
A Just to notify him what was going on.

Q You notified him what was going on. He had advised you previously to call Enfield PC?
A Correct.
Q You did?
A Correct.
Q They showed up, so why did he need to show up?
A He's my supervisor. I should let him know what was going on.
Q Okay, so he came -- where's Troop H?
A Hartford.
Q Okay, so he came all the way from Hartford to Enfield?
A I don't know where he was.
Q Okay. So he showed up on the scene. What did he tell you?
A I don't recall talking to him.
Q Did you overhear him talking to any of the Enfield PD?
A I didn't.
Q And Marcus was not arrested. How long was the traffic stop?
A I'd have to look at the camera.
Q Okay, to the best of your recollection, how

long was this traffic stop?
A Five, ten minutes.
Q And then they let them go?
A Yes.
Q Why didn't they charge him with stalking in the third degree?
MS. VITALE: Objection.
A Why didn't they charge him?
Q Yes.
MS. VITALE: Objection.
Q At that particular stop.
A You'd have to ask them.
Q Okay. When did he end up getting charged?
A I believe it was December.
Q Okay. So between that November 12, 2018, traffic stop and December, at some point in December when he was actually charged, did you have any other contact with anybody at the Enfield PD?
A Yes.
Q Who do you talk to?
A Sergeant Nolan.
Q Why did you call Sergeant Nolan or why did you talk to him?

MS. VITALE: Objection to form.
A He wanted some information about that day.
Q So who Sergeant Nolan to you?
A Enfield Police.
Q Was he at the scene on November 12th?
A I believe he was.
Q Okay, so he was one of the people that was on the scene November 12th?
A Yes.
Q Okay, so he called you afterwards?
A I don't know remember who called who. We didn't discuss it.
Q I mean, it's a little important, right, if they decided not to arrest him on November 12th and he called you it means he was probably continuing an investigation, correct?
A Correct.
Q But if you called him, it means you're trying to pursue charges against Marcus?
MS. VITALE: Objection.
Q I think it's fair to say.
MS. VITALE: Objection.
Q Were you not trying to pursue charges against

Marcus?

MS. VITALE: Objection.

Q After November 12th, you're telling me that you were not trying to pursue stalking charges --

A I was pursuing.

Q Right. So I think it would matter who called who, don't you agree?

MS. VITALE: Objection.

A I do.

Q Okay. And you don't recall who called who?

A I don't.

Q Is it your opinion that the Enfield PD had sort of dropped the matter after November 12th?

MS. VITALE: Objection.

A No.

Q So when you called Bryan Nolan, did you call him on his office line or his personal cell?

MS. VITALE: Objection.

A I believe I called the department.

Q Okay. Did you ever contact him on his personal cell?

A I don't believe so.

Q You don't believe so?
A No.
Q Okay. Every text him?
A I don't recall.
Q When you delete texts, do you do that as part of a routine document retention plan?
A To free up space, storage space.
Q Okay. What size iPhone is it?
A I don't know.
Q You don't know how many gigabytes you've got?
A No.
Q Okay. So you thought that they didn't drop the matter after November 12th? We're talking about the Enfield Police.
A Not sure. I don't think so.
Q Okay. When you spoke to Bryan Nolan, how long after the November 12th traffic stop was that?
A Possibly, the next day.
Q Okay. So let me ask you, they ended up letting Marcus go that day. What did the Enfield PD tell you that they were going to do?
A I believe get his side of the story,

investigate it further.
Q Okay. Did they not get his side of the scene?
A I don't know.
Q Okay, investigated further. So nobody on the ground, either the female officer or Bryan Nolan, told you what steps they were going to take after releasing Marcus?
A No.
Q So you had no idea?
A No.
Q You had no idea if you'd be eventually charged? On November 12th you had no idea he would be eventually charged?
A I didn't know if he would be charged or not.
Q Okay. The next day you applied for a protective order, is that accurate?
A Yes.
Q Okay. Why?
A To protect myself and my family.
Q What did you think the basis of the protective order would be at that point?
A Due to all the circumstances surrounding everything, I figured I would protect myself.

I'm not sure what he's going to do.
Q So the Enfield Police let him go November 12th. Did you disagree with that decision?
A At that point, I wasn't sure.
Q Well, I mean, what is your understanding of probable cause?
A I wasn't sure if they were still going to -- if they had some steps to take. Like, I wasn't sure what steps they --
Q Well, if they needed to conduct further investigation, I think we could agree that they didn't have probable cause to arrest him on November 12th, right?

MS. VITALE: Objection.
A No.
Q "No," no meaning you don't agree with me?
MS. VITALE: Objection.
A I'm not sure what they had as far as evidence.
Q Okay, so I guess my question where I'm going is, if they didn't arrest him on November 12th, why did you think you'd be awarded a protective order on November 13th?

A I wasn't sure if I would be or not.
Q I mean, why the day after? Like, you were in fear on May 26th, as you already testified. Why wait till November 13th?
A Because I thought after October or so when everything else was done, I would never see him again.
Q But you drove by his house?
A Correct.
Q All right, so what was the -- on November 13th, did you have a hearing that day, or did you just apply for the protective order?
A I applied?.
Q You may hear me just refer to this as a re- -- in Massachusetts, we call them restraining orders. I may let it slip. Feel free to correct me, but just know that I'm talking about a protective order.
So on November 13th, you applied for the protective order?
A I believe so.
Q But you didn't have a hearing on it?
A No, I don't think so.
Q When did you have your first hearing?

A I don't remember.
Q Actually, let me see what I have here.
I have another question here. I guess we're skipping ahead and I'm going to go back to protect order.
MR. MCLANE: Let's mark this as 15.

(Exhibit Number 15, Arrest and Booking Report, was Marked for Identification.)

Q This is what was provided to me as the Enfield police arrest and booking report. Was this ever provided to you?
A No.
Q Okay. You never saw this before discovery in this case?
A I don't believe so.
Q Okay. Well, then I think we're done with that.
Is there any possibility that you did? I know you said you don't believe so.
A Possibly, but I don't remember. I don't

recall seeing that.

Q Okay, I think the first restraining order hearing might have been on November 23rd of 2018. Does that sound right?

A Sounds right.

MR. MCLANE: Let's go off the record.

(Whereupon, a brief discussion was held off the record.

(Short break.)

MR. MCLANE: Back on the record.

Q I'm going to show you another document.

MR. MCLANE: What are we up to now?

THE COURT REPORTER: Exhibit 16.

(Exhibit Number 16, Original Restraining Order, was Marked for Identification.)

Q All right. So is that the original restraining order -- excuse me, protective

order that you sough your application and
subsequent hearing transcript?
A Can I review it?
Q Yes, please do. Take a moment because I'm
still trying to log into my Apple TV.
MS. VITALE: I'm just going to
object to the form.
A Yes.
Q Okay. So additionally, they entered a
temporary protective order, correct, that
went into effect until November 23rd?
A Correct.
Q Okay. And then on November 23rd, you had
your initial hearing in front of a judge,
correct?
A Correct.
Q Where did this take place?
A In Hartford.
Q So in the Stebbins 479 statement of
conditions for what you seek relief, is
everything that you stated in there accurate?
A What page?
Q 479. Take a minute.
A Yes, sir.

Q Okay. So under the statement of conditions, it says, (Reading):

"I, the person signing below, say under oath that I am the applicant for this civil protection order. I state that I've been the victim of sexual abuse, sexual assault or stalking, defined as two or willful acts performed in a threatening, predatory, disturbing manner of harassing following lying in wait, surveilling, monitoring or sending unwanted gifts or messages to another person etcetera."

Did you have any, I guess, doubt in your mind when you filled this out that you were stating this under oath

MS. VITALE: Objection to form.

A I don't recall.

Q You don't recall?
A I was not.
Q You don't recall what?
A What page are you on, sir?
Q 479. Right under where it says, "Statement of conditions for which you seek relief."
A Yes.
Q After reading that portion, what was written under that statement of conditions for use which you seek relief, is there any question in your mind when you filled this out what you were filling out was under oath?
MS. VITALE: Objection to form.
A Yes.
Q Okay, there was a question?
A I'm sorry, no there wasn't.
Q Okay. So everything you stated here, you understood was under oath?
A Yes.
Q And it was true, to the best of your knowledge?
A Yes.
Q Okay. So on the next page, Stebbins 480, there's a continuation of the statement of

conditions for which you seek relief. Do you see that?
A Yes, sir.
Q It said, (Reading):

"Continued between May 22, 2018, and yesterday, 11/11/2018, several neighbors and my wife and I have witnessed Marcus Cameron go out of his way to drive past my residence."

Who were those several neighbors?
A One was Alex.
Q Alex who?
A Volchenko.
Q Is that the gentleman in the video that you sent me?
A Yes, sir.
Q Asking Mr. Cameron if he was lost?
A Yes, sir.
Q Who else?
A I believe Joe Bernabucci.

Q Can you spell that?
A I believe I would hack it up.
Q Okay, so "several" meaning two?
A Correct.
Q Okay. So you understand "several" to mean "two"?
A I'm sorry?
Q You understand the word "several" to mean "two"?
A Probably two or more.
Q Then it says in the next sentence, (Reading):

"It should be noted that after our first interaction I have moved my family out of that neighborhood as a result of the actions of Marcus Cameron."

The first interaction being what you wrote on page 479 is May 22, 2018?
A Correct.
Q So after you approached him on May 22, 2018, you moved your family out of the neighborhood

because of that?

A Yes, October 9th of 2018.

Q But I'm looking at the sentence that says, "It should be noted that after our first interaction." That first interaction that you're referring to is May 22, 2018?

A Due to our first interaction, subsequently afterwards.

Q So which interaction are we referring to?

A All of them.

Q But in context of that sentence, where it says, "It should be noted that after our first interaction I have moved my family out of that neighborhood as the result of the actions of Marcus Cameron" --

MS. VITALE: Objection to form.

Q -- what is the first interaction you're referring to?

A May 2022.

Q Okay, so you just said "May 2022," but are you saying May 22 2018?

A I'm sorry, May 22, 2018.

Q Okay, so what about the May 22, 2018, encounter caused you to need to move your

family out of the neighborhood?
A It started May 22, 2018.
Q Okay, so when you write "It should be noted that after our first interaction," what you mean is your entire series of interactions?
MS. VITALE: Objection to form.
A Well, the first interaction was on May 22, 2018. I moved in in October, after that date.
Q Yes, but I'm still focused on what you wrote here under oath, where it says, "It should be noted that after our first interaction I have moved my family out of that neighborhood as a result of the actions of Marcus Cameron." I know that you did end up moving in October. My question is, when you're referring to the first interaction there, are you saying that you're -- by "first interaction," you mean the entire series of interactions?
A De to the first interaction, yes, and everything following. That's I meant.
Q It doesn't say "everything following," does it?
MS. VITALE: Objection to form.

A It does not.
Q Okay. I think you put your house on the market in September, is that accurate?
A Yes, sir.
Q So had you sought criminal charges prior to September against Marcus Cameron?
A No.
Q Okay, but you your testimony today was you were in fear starting on May 26th, is that accurate?
A Yes, sir.
Q Okay, but yet the first interaction was on May 22nd?
A Right.
Q So you needed to move your family out beginning May 22nd, continuing on through November?
MS. VITALE: Objection to form.
Q I'm just trying to lock this down because as it reads, it says, "It should be noted that after our first interaction," which we've agreed is May 22nd of 2018 -- "I have moved my family out of that neighborhood as a result of the actions of Marcus Cameron."

We've agreed that it doesn't read "the following interactions" in that statement, right?

MS. VITALE: Objection.

Q We just agreed to it, right?

MS. VITALE: Objection.

Q You said nowhere in there in that statement does it say "in the following interactions"?

MS. VITALE: Objection.

A It says I moved after the first interaction.

Q Right. So what about the May 22nd interaction caused you to need to move your family?

A After the first interaction and everything subsequent after that, leading up to October.

Q Okay. So if you were in fear on May 26th, why did you put your house on the market in September? Why did you go nearly -- so May June, July, August, September, it's the end of May, so let's just say four months. Why did you go four months before putting the house on the market if you were in fear on May 26th?

A Because that is the position I was in at the

time.
Q Okay. My understanding is that your new residence cost a significant amount more. And I've agreed with your lawyer, that I'm not going to ask you state your residence on the record. We're not going to publish it. But I'm going to ask some context surrounding the move. So it's my understanding that your new residence cost a significant amount more than your previous residence?
MS. VITALE: Objection to form.
A Yes.
Q Am I accurate that you bought the residence at Foxcroft -- I'm okay to talk about Foxcroft because you no longer live there, right?
A Yes.
Q Okay. You bought the residence at Foxcroft for about 240,000, is that accurate?
A Sounds accurate.
Q And you bought the new residence for about 360,000?
A Sounds accurate.
Q Okay, what caused -- if the need was to get

out because of fear, why not just get a comparable residence somewhere else?

MS. VITALE: Objection.

A Repeat the question.

Q All right. So May 26, you stated, today was when you started to reasonably fear, in your words, Marcus Cameron. My question is, I just asked why it took you four months to put your house on the market if you were in fear for you and your family. You stated that's the situation you're in. My question is, you know, why the need to buy a house that cost a significant amount more than the one you previously owned?

A We just decided to do it. It was our decision.

Q Did this not coincide with your new job with the Governor's Detail?

A It did not.

Q So you're not making more on the governor's detail than you did in court? Let me ask you, did your pay increase when you took that job with the governor's detail?

A Due to my working overtime, yes. Not base

salary, no.
Q So base salary is the same for trooper first class --
A Yes.
Q -- whether on the governor detail or --
A Yes.
Q Were there more overtime opportunities with the governor's detail?
A About the same.
Q Okay, with respect to the -- let's turn to the transcript, right, Stebbins 484. It starts the transcript, we have a cover page. So you were on November 23rd, before Kevin Dubay, who is a Superior Court judge. Does that sound right?
A Yes.
Q And both you and Marcus were self-represented? Neither one of you had a lawyer
A Yes, sir.
Q Can you to 486. Before I start, everything that you stated -- well, we will turn back even further. Have you reviewed this transcript before today's deposition?
A Yes.

Q Was anything in this transcript inaccurate as it pertains to statements that you made in this hearing?
A I don't recall.
Q Do you remember being sworn under oath at this hearing?
A I did.
Q Okay, so you were under oath when you made these statements?
A Yes.
Q Were any of these statements not an accurate representation of statements that you made that day?
MS. VITALE: Objection.
A I don't recall.
Q But you have no reason to believe that you would have said something under oath that day that was not true?
MS. VITALE: Objection.
A Correct.
Q So we're looking at Stebbins 486. The court says on Line 7 that you had some issues with what you consider Mr. Cameron's operation of his motor vehicle in the neighborhood, and

you said, "Yes, sir." And the court said, "And you guys immediately got into a bit of an F-U contest over who was operating recklessly." Is that accurate?
A Yes.
Q All right. So the court did refer to this as more of an F-U contest between the two of you?
A Correct.
Q Okay. At this same hearing, Marcus attempted to continue the hearing so that he could bring witnesses, do you recall that?
A I do.
Q Okay. The court allowed that, right? He allowed the continuance?
A Yes, sir.
Q Okay. So the hearing was continued until December 14th of 2018, is that accurate?
A If that's what the document shows.
Q Okay, so look at Stebbins 487. If you look at line six, the court again refers to this as an F-U contest, is that accurate?
A Yes.
Q Okay, so on line 20, the judge says,

(Reading):

"So there's really no reason for you, any one of you, to have anything to do with the other"?

A Right.

Q Did you agree with the court?

A So 26, (Reading):

"Yes, there is no reason for him to follow me or to contact me or contact my department."

Q So that's the answer you gave the court, but was there a reason at that point in time for you to have anything to do with -- because I know you answered, "There's no reason for him to follow me or contact me," but was there at that point in time any reason for you to have any business with Marcus Cameron?

A No.

Q Okay. Turn to Stebbins 489 for me up at the top. We are looking at line four.
The court says, the judge says, (Reading):

"I think you guys are making this a bigger deal than it needs to be, but your motion for continuance."

And then it was cut off. Would you agree that the judge seemed to indicate that the restraining order -- excuse me, the protective order wasn't really necessary at this time?
MS. VITALE: Objection.
A That's his opinion, right.
Q You were in the hearing that day. Did you perceive the judge to believe that the protective order didn't need to be issued?
MS. VITALE: Objection.
A I don't know what he was thinking.
Q So when we look at line 19, the judge says, (Reading):

"I'm going to grant a motion
for continuance is granted.
You both independently should
think about whether you want
to continue to press this."
And then he continues on in
number 24, "Because I don't
need to know anything else, I
granted your motion for
continuance. Some other judge
is going to hear it or perhaps
I will be hearing it."

So we continue on to Stebbins 490. He continues this to the 14th. And then on line nine says, (Reading):

"I think that a de-escalation
is appropriate as opposed to
continued Cold War."

So do you, from the best of your recollection, believe that the judge thought that this protective order shouldn't have

been granted?
MS. VITALE: Objection.
A I can't speak for him.
Q And his statements from the bench and his demeanor, none of it indicated to you whether he leaned one way or the other?
MS. VITALE: Objection.
A No.
Q Okay. So this was this was on November 23rd, this hearing, correct?
A Yes.
Q So it was continued to December 14th. At this point, Marcus still hadn't been placed under arrest, right?
A What day was it?
Q November 23, 2018.
A Correct.
Q Okay. And you are saying today that you at the time -- well, at the time, did you believe that the judge would order a protective order when you came back on November 23rd?
A I didn't know.
Q But Marcus -- so we got the arrest -- or the

traffic stop happened on November 12th. I want to get the timeline right with you.
The traffic stop happened on November 12, 2018, right, at the Enfield Brookfield Plaza?
A The Enfield traffic stop, yes.
Q The next day you apply for a protective order?
A Right.
Q Okay. Then on the 23rd you have a hearing for the protective order?
A Right.
Q Marcus still hasn't been arrested yet?
A No.
Q Okay. That gets continued to the 14th, the protective order?
A Right.
Q Then in between then, Marcus gets arrested on what, December 5, 2018?
MS. VITALE: Objection.
A I'm not aware of the date.
Q Did you have between -- I think we have an exhibit here. Let's go back to the 15th - excuse me, Stebbins 15.

It might be December 11th. Okay, the date of the report, 12/11/18. If you look on page two of the document 493 of the Bates number on Stebbins 15, where it says Dated of the Report at the top and then goes into the narrative, it says, (Reading):

"On 12/11/18 I was checking the area of Route 5 and Montano Road near Foxcroft and Enfield for wanted person, Marcus Cameron. The warrant was signed on 12/10."

So would you have any reason to believe that he wasn't arrested on December 11 of 2018?
A I wasn't aware of he was arrested.
Q Okay. So going into the December 14th hearing, you're telling me that you were not aware of the date of Marcus's arrest?
MS. VITALE: Objection.
A I'm sorry, rephrase that.
Q Were you aware --
A On what date?

Q On December 14th, were you aware of the date of Marcus Cameron's arrest?
A Yes.
Q Okay. Who told you about it?
A Enfield PD.
Q Did they reach out to you or did you reach out to them?
A I don't recall which reached out. I can't recall.
Q Okay. So we have a hearing for a protective order, civil protective order on November 23rd of 2018 that's been continued till December 14th of 2018. Between November 23rd and December 14th, had you spoken to anybody in the Enfield Police Department?
A I'm sorry, what dates?
Q November 23rd of 2018 through December 14th of 2018.
A I'm not sure.
Q But we do know that somebody notified you that Marcus had been arrested prior to the December 14th?
A Yes, sir.
Q And you don't know if you called them or they

called you?

A I don't recall.

Q Okay. You don't recall whether it was on your work device or on your cell phone?

MS. VITALE: Objection.

A I don't recall.

Q Let me go back here. I don't know if we've had a chance on the break, but I'll look here. This may be it, Stebbins 7 here. This is a December 12, 2018, email. Remember it said "Stebbins to" and it looks like it's redacted.

A Right.

Q Will this be the criminal complaint or -- excuse me, the police report that was provided from what we know as Stebbins 15?

MS. VITALE: Objection.

A Not that I'm aware of. I don't know.

Q And you don't remember calling anybody or communicating with anybody via email about this?

A I don't.

MR. MCLANE: Dennis, did we check over the break as to who this was and whether

there's any privilege?

MR. MANCINI: I did not.

MR. MCLANE: Okay, I'll follow up.

Q So this was dated December 12th. Could this possibly have been a communication from you to another individual requesting the status of Marcus's arrest?

MS. VITALE: Objection.

A In that email?

Q Yes.

A I don't believe so.

Q Okay, so you don't remember who told you from Enfield that Marcus had been arrested?

MS. VITALE: Objection.

A I don't.

Q Did you talk to anybody else between November 23, 2018, and December 14, 2018, about Marcus's arrest?

A Possibly, yes.

Q Other than your lawyer or anyone else that --

A My lawyer.

MS. VITALE: You're not going to talk about conversations with your lawyer.

THE WITNESS: Okay.

Q So you went into the December 14th restraining or protective order hearing. Who was with you?

A I believe my wife.

Q Okay.

A And Sergeant Samson.

Q Why was Sergeant Samson with you at your protective order hearing on December 14, 2018?

A Just to support me.

Q Was he at the November 23, 2018, hearing?

A No.

Q Was your wife?

A I don't recall if she was there at the first one.

Q Okay, but Sergeant Samson, or Lieutenant Samson now, was not the first one?

A No.

Q But he was at the second one?

A Yes.

Q So why didn't you support you at the first one?

A I have no idea.

Q Did you request that he come to the second

protective order hearing?
A I did not.
Q How did he know about it?
A I advised him of it.
Q Did you advise him of the first one?
A I believe so.
Q So in no way, shape or form did you ever convey that you thought the judge might not allow the restraining order after the first hearing?
MS. VITALE: Objection.
A There's no way of me knowing that.
Q Well, you spent time on the road, right? Did you ever look at people's demeanor, their body language, nonverbal communication?
MS. VITALE: Objection.
A And your question is asking for the judge?
Q Yes.
A I couldn't tell you that.
Q Well, I mean, I think you testified earlier that upon your first interaction with Marcus, you made the determination very quickly there was no talking to this guy, right?
A That's correct.

Q Right. So obviously, you judged his demeanor, is that accurate?

A Yes.

Q And you were able to, within just a few seconds, be able to tell there was no talking to him?

A Correct.

Q But with respect to the judge, you made no such conclusion?

A No.

Q So where you have nobody in the first hearing, now you have both your wife and your sergeant at the second hearing?

MS. VITALE: Objection.

A Correct.

Q Okay. Did anyone else give testimony at that hearing?

A No.

Q Just you and I believe -- did Marcus provide testimony?

A Yes.

Q So we provided to you -- the is the only transcript we had. Was there anything -- let me ask you, before you testified in this

hearing, you took an oath, correct?
A Correct.
Q All right. You know, to tell the truth, the whole truth, nothing but the truth?
A Correct.
Q Did you have a chance to review this transcript?
A I've seen it before, yes, before today.
Q Okay. Did you review it when you received it before?
A Yes.
Q Okay. Did the transcript adequately transcribe your testimony from that day?
MS. VITALE: Objection.
A I believe so.
Q When you took the oath, there's nothing in here that would be untrue, is that accurate?
MS. VITALE: Objection.
A I don't believe so.
Q Okay, but you did review this at some point in time?
A Sometime after December 14th.
Q And if you reviewed and you saw something that was untrue, you would have done

something about it, right?

MS. VITALE: Objection.

Q Would you have taken steps to correct something that you saw was untrue?

MS. VITALE: Objection.

A I don't know.

Q You don't know that you would have?

A I don't recall.

Q So if something was untrue, you wouldn't have taken steps to correct it?

MS. VITALE: Objection.

A Possibly, yes. Possibly.

Q Okay, possibly.

So the judge, this is Honorable Constance Epstein, right, the first page, 441. So obviously this is a different judge than the last judge?

A Are you asking me?

Q Yes.

A Yes.

(Exhibit Number 17, Transcript, was Marked for Identification.)

Q Let's go to Cameron 468, the third-to-last page. If you look down on line 16. This is Judge Constance Epstein. She says, (Reading):

"All right. That's how the two of you, all right. I want everyone to go home. I'm not granting the restraining order. This is not a matter for a restraining order; however, it is certainly two people who have had a misunderstanding. Perhaps we can resolve it that way, that you know you've had misunderstanding and move on. It's we have a troubled world as you both know, very troubled world, and it's best not make more trouble. Take care all of you."

What do you think she meant by "this is not a

matter for restraining order"?
MS. VITALE: Objection.
A You would have to ask her.
Q Well, let me ask you, if the judge says "This is a misunderstanding" and said "Perhaps we can resolve it in a way that you've had a misunderstanding and move on," after hearing that did you continue to seek criminal charges against Marcus?
A What date was it? I'm sorry.
Q December 14, 2018.
A No.
Q You didn't?
A No.
Q Okay. At what point were the criminal charges against Marcus concluded?
A I don't know.
Q Okay. My point is, if two judges, right -- well, if one judge did not grant a restraining order and made a statement that this was a misunderstanding, what do you think, in your opinion, was the basis for stalking in the third degree charge?
MS. VITALE: Objection.

A I don't have an opinion.
Q Okay, so do you not think that Marcus committed stalking to the third degree?
MS. VITALE: Objection.
A Did he not commit it?
Q Yes.
A I believe he was following me.
Q Okay, so what did the Enfield Police know that the superior court judge doesn't know with respect to a reasonable fear of safety?
MS. VITALE: Objection.
A I don't know. You'd have to ask them. I don't know.
Q Did you ever contact the prosecutor in Marcus's criminal case?
A I have.
Q Do you know if Lieutenant Samson ever contacted the prosecutor in Marcus's case?
A I believe, from the documents, yes.
Q From the documents? That's it?
A Yes.
MR. MCLANE: Let's just put this on the record as an exhibit.

(Exhibit Number 18, Statute for Stalking in The Third Degree, was Marked for Identification.)

Q So I've printed out the statute for stalking in the third degree, Class B misdemeanor. Do you see where in Paragraph A, it says, (Reading):

"A person is guilty of stalking in the third degree when such person recklessly causes another person to reasonably, one, fear for his or her physical safety or, two, suffer emotional distress as defined in Section 53A-181D by willfully and repeatedly falling or lying in wait for other such persons."

So having the statute in front of you, knowing what you know now and after having

both of these restraining order hearings, do you think Marcus Cameron violated Connecticut General Statute Section 53A-181E?

MS. VITALE: Objection.

A I provided all my documents to Enfield PD.

Q But I'm asking your opinion.

MS. VITALE: Objection.

A I have no opinion.

Q You don't have an opinion, okay.

So if you didn't have an opinion, why call?

MS. VITALE: Objection.

A I don't recall.

Q You don't recall?

So you thought he was following you, right?

A Right.

Q You said you were in reasonable fear of your safety since May 26th of 2018?

A Right.

Q So, obviously, we -- let me put it another way. So you don't recall why you called the Enfield PD?

MS. VITALE: Objection.

A What date, sir?
Q On November 12, 2018.
A Yes, I recall.
Q So my point is, after all this, you haven't formed an opinion as to whether you think he violated that statute?
MS. VITALE: Objection.
A You're asking my personal opinion?
Q Yes.
A Well, it's not --
Q Well, I mean, you've committed arrests before?
MS. VITALE: He's not a lawyer.
MR. MCLANE: Well, he's a cop. He's arrested people.
MS. VITALE: Has he ever arrested someone for stalking in the third degree?
MR. MCLANE: I don't know.
Q Have you ever heard the statute before?
A I've heard of it.
MS. VITALE: Objection.
Q Right. So I mean, have you never arrested anyone for stalking in the third degree?
A I don't recall.

Q So when you make an arrest, do you only arrest people based on statutes that you have memorized and know exist?

MS. VITALE: Objection.

Q Well, let me --

MS. VITALE: I have no idea what the relevance of the last 20 minutes is, but you can go ahead if that's how you want to spend your time.

MR. MCLANE: Well, let's see. Marcus was arrested based on his statements, right, to the Enfield Police Department, right? So I'm asking if he agrees with the charges. He pursued this, right?

Q So I'm asking, I said you have an opinion and I'd like to know.

MS. VITALE: Objection.

Q You're in law enforcement, right?

MS. VITALE: Objection.

A Yes.

Q Okay. When you make an arrest, do you have to have probable cause?

A Correct.

Q All right. So do you think Enfield PD had

probable cause to arrest Marcus for this?
A You'd have to ask them. I provided them all the information they needed.
Q All right, but as a trooper who has arrested people in the past and has formulated probable cause, I'm guessing based on evidence in other cases, do you think Enfield PD had enough from you?
A Apparently, they did.
Q What was reckless about the way Marcus put you in fear for your safety? What reckless conduct did he commit?
MS. VITALE: Objection.
A Where is that?
MS. VITALE: Objection.
Q Let's go back to the statute. So (Reading):

"A person is guilty of stalking in the third degree when such person recklessly causes another person to reasonably fear his or her physical safety and suffer emotional distress."

Do you think any of Marcus's conduct in all your interactions with him was reckless?

MS. VITALE: Objection.

A I don't know.

Q Did you discuss -- well, prior to the December 14, 2018, protective order hearing, you said that you notified Lieutenant Samson of the hearing. Did you discuss anything about the hearing prior to it with Lieutenant Samson?

A I don't recall if I did.

Q Did Lieutenant Samson advise you to seek a protective order?

A No.

Q Did he suggest it?

A No.

Q What caused you to seek a protective order?

A I was trying to protect myself and my family as best I could.

Q Okay, but how did you draw the conclusion that it should be via protective order?

A How else would you do it?

Q So you just thought about it yourself?

A Yes, sir.

Q I'm going to bring up some audio again. The bates number of this will be Cameron 80.

Michele, I will send to you via email as well. What are we on right now for exhibits?

THE COURT REPORTER: Exhibit 19.

(Exhibit Number 19, Audio, Cameron 80, was Marked for Identification.)

(Whereupon, Mr. McLane played audio.)

Q When you refer to "kicking dirt," what does that mean?

A Due to construction, dust.

Q This recording, Cameron 80, that was on 26th of May, is that, to your understanding, the only call you made to the Enfield PD --

MS. VITALE: Objection.

Q -- on Marcus Cameron between May 22nd and November 12th?

A I don't recall.

Q All right. So we know you called the police on May 26th. We know you called on November 12th. You can't recall any other time?
A Unless you have a document to prove it. I don't know.
Q I'm asking for your memory.
A I don't remember.
MR. MCLANE: Mark this as Exhibit 20.

(Exhibit Number 20, Email, was Marked for Identification.)

Q This is an email you originally sent to your criminal law attorney who was I guess representing you -- well, let me ask, was somebody named George representing you in the context of Marcus's criminal case?
A Yes.
Q What was the capacity of his representation?
A Can you define "capacity"? What do you mean?
Q So you weren't being charged with anything. Was he -- how was he representing --
A Just I wanted assistance, legal ways.

Q So in this email, you state, (Reading):

"Also, after thinking and reviewing and conversing with Jen and others, we came to the same conclusion, the CSP "C" Number investigation has nothing to do with Enfield PD investigation and arrest. The "C" investigation was closed prior to the stalking incident, so Cameron should be held accountable for his actions on 11/12/18 when he stalked me."

Why did you share this with Lieutenant Samson?
A I don't recall why I did. I did it here, obviously. I don't recall why.
Q In January of 2019, I mean, at that point what purpose was there for you to send him an email that you sent to your lawyer?
A I don't recall sending it. Did I

inadvertently send it? I don't know. I have no answer for that.

Q So you inadvertently sent to him --

A I don't recall sending the email, sir, but I obviously did.

Q What do you mean by "watered-down version"? The second phrase is "I originally gave you a copy, but in here you'll find a watered down version." What does the watered down version mean?

A Referring to the original first report, investigating report.

Q Let me ask you something. I think we can agree that stalking requires more than one incidents of following, right?

MS. VITALE: Objection.

A I don't know.

Q So if we know that the investigation concluded in October with a letter that was sent to Mr. Cameron on October 11th, right, and the November 12th interaction was your next interaction with Marcus, why would the investigation have nothing to do with the criminal charges against him?

A I believe once he received the letter, that we were done, that was it. And I'd never see him again and never have an issue with him again after that last letter.
Q But your statement here says, (Reading):

"The "C" number investigation has nothing to do with the Enfield PD investigation and arrest."

Did you tell anyone at Enfield PD about the previous interactions that you had with Marcus?
A When I called on, yes, May 26th.
Q So you called them on May 26th. What about on November 12th? I think you said you pulled off and you sort of gave them the background information, didn't you, when you called Enfield PC?
A When I called them, yes.
Q So how would the context of this investigation not have anything to do with their investigation and arrest?

MS. VITALE: Objection.

A I was trying to prove the point of, all incidences leading up to this event, why would he follow me? After receiving the letter and everything was done, why would you still follow me?

Q So you think this is a totally new incident, November 12th, totally different from the interactions you had with him before?

A I wouldn't say different, totally different, no.

Q Okay. So you, earlier, mentioned looked up Danielle Dubuque online. You Googled her, I believe, right?

MS. VITALE: Objection.

A I believe I did.

Q How did you get her name?

MS. VITALE: Objection.

A From documents, I believe.

Q what you

A What documents?

A Investigative document. I don't know. I don't recall what they were.

Q But Marcus never told you anything about

Danielle Dubuque, did he?
A No.
Q All right. So who would have told you about her?
A I would assume Sergeant Samson.
Q When you were on the highway on November 12th of 2018, did you turn off your dash cam at all?
MS. VITALE: Objection.
A Yes.
Q Why?
A I didn't know if he was following me or not. I wasn't sure if I need to keep it on.
Q Well, you called the police, you told me, because you thought he was following you?
A I wasn't sure if he was following me.
Q All right. You weren't sure --
A At that point, right.
Q You weren't sure -- hold on.
When you were at the bank, you said you called Sergeant Samson, who advised you to call Enfield PD?
MS. VITALE: Objection.
A I don't recall what time at -- I don't recall

where I was when I called him
Q Wouldn't you want the dashcam to be on and collecting all of the video if he was following you?
A I would, yes.
Q Then I guess I'm having a hard time understanding. Then why turn it off?
A I had no reason.
Q I know that you said it would be inaccurate if Marcus were to say you followed him. I think you had to at some point to run his license plates, no?
MS. VITALE: Objection.
A Yes.
Q So what were the reasons that you followed him on those occasions?
MS. VITALE: Objection.
A Which occasions, sir?
Q When you followed him and ran his license places?
MS. VITALE: Objection.
A I don't recall running his plates. What dates? Are you talking about November?
Q I guess between May -- well, have you run his

license plate at any time after November 12, 2018?
A Any documents I can see?
Q No, I'm asking you if you recall.
A Yes.
Q Okay, when?
A I couldn't tell you dates off the top of my head.
Q I mean, what was the most recent time?
A What is the what?
Q What is the most recent time you ran his place through the COLLECT system?
MS. VITALE: You're asking November 12, 2018?
MR. MCLANE: Yes.
A I don't believe I ran it after the 12th, that date.
Q So you don't know if you have?
A I can't recall.
Q And, you know, part of the thing that we're sort of trying to find here is getting the accurate COLLECT information. What is the process for you to obtain COLLECT information on license plates that you run?

A Do you mean --
Q Like, how do you find them? How do you find that information out? You, as a trooper. If you wanted to get a log of everybody's license plate and you say "Okay, I've got license plate 16- whatever out there, that Jeep --
A Yes.
Q I'm not going to read it onto the record, but if you I want to get a log of all the times that I've run that, what's the process for you to do?
A I don't know. I've never done it.
Q Never done it?
A Never requested it.
Q Okay. Have you ever tried?
A No.
Q Interesting. Okay.
Why not? Because we asked for COLLECT information. Did you not understand your obligations under --
MS. VITALE: Objection. Obviously, that is not an appropriate question to ask him.

MR. MCLANE: IT's a totally appropriate questions. Well, he didn't even bother looking.

MS. VITALE: I objected, as his attorney, to the request, so I'm not sure why you're asking him.

MR. MCLANE: In your representation, was it too difficult for him to get them, and you're saying he hasn't even tried.

MS. VITALE: No, my representation that you were asking for confidential protected information is completely --

MR. MCLANE: That's public record?

MS. VITALE: It's not public record.

MR. MCLANE: Marcus got a bunch of it.

MS. VITALE: Yes, through FOIA.

MR. MCLANE: Right, because it's public record.

MS. VITALE: The question is, what is he allowed to do as a state trooper for the purposes of his job versus for purposes

of disclosing to you. You went about the appropriate way, which is going through FOIA. That is a completely different question.

MR. MCLANE: He didn't even try. How do you know?

MS. VITALE: Why would he need to try?

MR. MCLANE: Because I requested it from him.

MS. VITALE: You already have it.

MR. MCLANE: Not all of it. No, I don't.

MS. VITALE: Well, you don't know that there's more.

MR. MCLANE: That's the whole point of discovery here.

MS. VITALE: I objected. Go ahead and you can continue asking, but this is not an appropriate question for him.

MR. MCLANE: Boy this is -- this is - all right.

Give me about 15 minutes, maybe 20 minutes to go over my notes, and then I'm

going to ask my final questions here.

(Short break.)

Q Trooper Stebbins, this was provided as Stebbins 496. You can see with my cursor, I've pulled it up on the screen there.

MR. MCLANE: Michele, what are we on for exhibits?

THE COURT REPORTER: 21.

MR. MCLANE: I may need to make a drive folder because I don't think this is going to be able to be emailed to you.

(Exhibit Number 21, Video, Stebbins 496, was Marked for Identification.)

Q So this will be Stebbins 21. You can see where my cursor is. This is Stebbins 496. I'm going to start -- I'm not going to play the whole five minutes, but I'm going to start at about 40 seconds. But before I do, do you recognize -- have you seen this video

before? It was produced to me under Stebbins 496?

A Yes, sir.

Q Is this the scene on November 12, 2018, during the traffic stop at the Brookside Plaza?

A Yes, sir.

Q And this view that I'm looking at, is this the view from your dash cam?

A Yes, sir.

(Whereupon, Mr. McLane played audio.)

Q I'm going to stop it right there. So is that the female Enfield police officer that you mentioned before that you interacted with?

A Yes, sir.

Q And the one walking back to the Enfield police cruiser?

A Correct.

(Whereupon, Mr. McLane played

audio.)

Q Why did you tell her not to let him go?

A I don't recall saying that til I watched the video. I don't remember what the reason was. I think just to let her know that Sergeant Samson was coming that way.

Q You mentioned he was coming to help. What did he need to help with?

A Just to explain the whole story, back story.

Q I want you to listen carefully for the next seven seconds or so, seven to ten seconds.

(Whereupon, Mr. McLane played audio.)

Q So when you asked her if her mic was on and she said "No" and she said "Yours is," do you agree with me now that you the audio was completely cut from this?

MS. VITALE: Objection to form.

A Can you play it?

Q Let me get as close as I can to it.

(Whereupon, Mr. McLane played audio.)

Q Do you see what she says "No, I'm not, but yours is" --

MS. VITALE: Objection.

Q -- and then the audio goes out. Do you remember why you cut your microphone?

A I do not remember why.

Q Okay. Would there be a particularly -- well, would there be a procedural reason why you'd do so?

A This isn't my traffic stop, so...

Q Well, why did you ask her if her mic was on?

A I was just curious if it was on.

Q All right, well, she answered "No," and said "But yours is." You turned yours off. Why turn yours off?

A I didn't think it was needed.

Q Wouldn't you want to document the stop?

MS. VITALE: Objection.

A It's not my stop.

Q Well, you're the alleged victim in this particular situation, right?

A Correct.
Q So you have an opportunity to video and audio tape the proceeding?
A It's not my traffic stop, though.
Q Okay, but you're saying you wouldn't want any audio evidence of this stop?
A Yes, through them, I would, yes.
Q But she had just told you hers was off?
A Right.
Q And so then you turned yours off?
A Right.
Q So why not leave yours on if you wanted audio evidence?
A I didn't think it was needed.
Q But you left the video on?
A Okay.
Q Why did you leave the video on?
A I have no reason. No reason why I didn't.
Q Okay. I want to return to -- well, let me go through here. I want to go through -- I've got your interrogatories and your request for production as they were provided to me.
MR. MCLANE: What was that audio record?

THE COURT REPORTER: That was 21.

MR. MCLANE: What we will do is we will have the request for production be 22 and the interrogatories will be 23.

(Exhibit Number 22, Request for Production, was Marked for Identification.)

(Exhibit Number 23, Answers to Interrogatories, was Marked for Identification.)

Q So the request will be pretty quick. I know you said you spent approximately six hours prepping for today. Other than what was specifically objected to by your lawyer, which some of the items are being litigated, have you turned over all responsive documents that need to be turned over to this date --

MS. VITALE: I have to...

MR. MCLANE: Yes?

MS. VITALE: I didn't meant to cut

you off.

MR. MCLANE: Yes, no problem.

MS. VITALE: I just object because you're asking him what would be considered responsive. I have objections, so, you know.

MR. MCLANE: We'll go from there.

Q So we'll go to have you turned over all documents in your possession? And we'll go to document number one, document request number one, which is on page five.

Do you have any other documents that you haven't turned over to this point that support the basis of your defenses in this action?

MS. VITALE: I'm just going object because, you know, there's legal reasons for -- I mean, you can it answer it, I guess -- you know, who decides what supports his defenses. I don't want to, you know...

Q Do you believe that you've turned over all relevant documents in this case in your possession?

A I believe so.

Q Do you have any cell phone communications or

text or anything else with members of the Enfield Police Department?
A I do not.
Q Okay. Is the only member of the Enfield police department that you had correspondence with Bryan Nolan?
A No.
Q Who else did you have correspondence with on the Enfield Police Department?
A Detective Castle.
Q What did you and Detective Castle discuss?
A The May 26th incident.
Q Okay. What do you tell Detective Castle?
A I explained to him what the situation was, what happened on May 22nd.
Q Okay.
A I explained to him, basically, if he filed a complaint against me, why would he start driving by my house.
Q Okay.
A And asked him to document that only.
Q Did he document that?
A I believe he did.
Q Let's turn to your interrogatories. So the

first page provided to me was a verification page, where it says, (Reading):

"I have reviewed defendant Steve Stebbins objections and answers to plaintiff's first set of interrogatories served on September 28, 2022. I declare under oath that those answers are true and correct to the best of my knowledge."

Is that your signature?
A Yes, sir.
Q So as of November 28, 2022, all the answers that you provided or all answers that were written on here were true to the best of your knowledge?
A To the best of my knowledge.
Q Have you reviewed this since November 28, 2022?
A Briefly.
Q Okay, were there any answers that were provided here that you feel that you needed

to correct?

A I don't recall if there were.

Q Let me draw your attention back to Stebbins 4 for a second.

Okay, so I want to bring you to page three of the document, Bates numbered 541. The second paragraph from the bottom, it says, (Reading):

"On May 26, 2018, around mid morning, I was doing errands around the outside of my residence as I do frequently. I then observed Cameron operating his Honda Accord south on Foxcroft and traveling faster than 25 miles am hour. As he passed my residence, I observed, through his tinted windows, that it was, indeed, Cameron operating the vehicle." It says, "It should be noted that our neighborhood roads are

currently under construction; therefore, the roadway has some sections of pavement that is removed, with dirt as its primary roadway surface; therefore, vehicles should lower their speed more than usual. When Cameron drove by, it created a large amount of dust."

So you're saying on May 26th that when Cameron drove by your house, he was driving at a high rate of speed?

A High rate of speed and should have been, in my opinion.

Q Okay, let's go back to Stebbins 17. Well, let's start with Stebbins 16. It should be the first restraining order hearing.

Go to Stebbins 46, line two. It says you have witnesses for -- it says, (Reading):

"Mr. Stebbins, I have

witnesses present."

I'd like to clear that up. Was anybody present with you? Who are the witnesses present -- let me rephrase. Who were the witnesses present at the November 23, 2018, hearing?

A I believe it was my wife and Samson.

Q Okay, so they were at both hearings?

A At what hearings? I'm sorry, I'm confused on dates.

Q So this is the November 23, 2018 --

A The first hearing or second hearing?

Q This is the first one.

A Okay.

Q So were your wife and Sergeant Samson at both hearings?

A No, that's an error on my part.

Q So they were at the first hearing?

A No.

Q Okay, so who were the witnesses on --

A I misspoke, sir. I probably meant witnesses that observed the complaint.

Q Well, on the line two it says, "I have

witnesses present"?
A Yes.
Q So nobody was there?
A I misspoke, yes, sir.
Q Okay, so you misspoke when you told the court you had witnesses present with you?
A Correct.
Q Let's go to Stebbins 479.
On your application for the civil protective order, go down to the third sentence. (Reading):

"On May 26, 2018, Marcus Cameron went out of his way to drive slowly by my residence while my wife and I were in the front yard in attempts to harass us."

So in Stebbins 5, I think, we just read. And I just asked you questions. You said that he was driving at a faster rate of speed than he should have been and he kicked up dust. Here in your application you're saying that he's

driving -- that he went out of his way to drive slowly by your residence in an attempt to harass you. So was he driving fast or was he driving slow?
A Driving both.
Q So you have a problem with him driving both fast and slow in your neighborhood?
MS. VITALE: Objection.
A I don't know.
Q Well, I mean, you called the police, right?
A Right.
Q And said he was driving faster than he should have and kicking up dirt. You wrote that in your memorandum. But also in your restraining order, protective order application, you say that he's driving slow. Now I'm asking you, you're saying well, he's driving both.
A He drove by three times, so yes.
Q Okay. So my question was, do you have a problem with him driving fast and driving slow past your house?
MS. VITALE: Objection.
A Yes.

Q Let's go to Stebbins 17 real quick.
A Okay.
Q Let's go to line 8. This was, again, under oath, right, at a hearing, a protective order hearing. Line 8 says, (Reading):

"Mr. Stebbins, I was outside in the driveway, ma'am, and several neighbors were outside also. He drove by slowly one time, turned around and came back slowly again, and the third time drove by slowly again. I have witnesses to that. And it's kind of alarming at first, so I just let it go. I called them -- like I said, I called Enfield PD to document. I called my department to let them know I didn't initiate any action or anything with this gentleman and make sure I called myself."

So then that was May 26th, a Saturday. So where in this statement did you mention he was driving both fast and slow?

A I don't see "fast" in there.

Q That's all the questions I have.

MS. VITALE: I just need a couple minutes. I have maybe one or two questions.

MR. MCLANE: Do or you want us to all leave or do you want to --

MS. VITALE: We can leave.

(Short break.)

CROSS EXAMINATION

By Ms. Vitale:

Q Okay, Trooper Stebbins, I'm going to hand you what has been marked as Exhibit 16 to this deposition and specifically point you to Bates number page Stebbins 479. I apologize, these are out of order.

Okay, so starting again, looking at Exhibit 16 to this deposition, specifically, pages Bates numbered Stebbins 479 through 481 did you sign those pages in

this exhibit?
A I did not.
Q Now, you were asked the question about the interrogatories that you signed in this case on November 28, 2022. Do you recall that?
A Yes.
Q So looking at interrogatory number six, the question itself is open to interpretation. It says, (Reading):

"List and describe all interactions you have initiated with any driver on Foxcroft Road in Enfield, Connecticut."

Did I read that correctly?
A Correct.
Q Okay, so is there another instance that you can think of today where you had another interaction with another person in your neighborhood where you intended to address the driver's rate of speed or another perceived violation of the driving rules or

regulations?

MR. MCLANE: Objection.

You can answer. I just objected to the form.

A Yes.

Q Okay, can you please explain what happened?

A Do you want days or times? I don't know what dates or time or what. I had issue with a neighbor's daughter's boyfriend was always driving a little faster than usual. I saw him several times driving on Montano. And then at one point when I was outside, I approached him and spoke to him about it.

Q Do you recall that individual's demographic information?

A It's a young white male.

Q All right, that's it

CROSS EXAMINATION

By Mr. Mancini:

Q Just really quick, do you know what the standard of proof for a protective order is?

A I do not.

Q That's the only question I have.

MR. GERARDE: I have no questions.
Thank you.

(Whereupon, the deposition was concluded at 3:11 p.m.)

ERRATA SHEET

CASE: Marcus Cameron v. Steven Stebbins, et. al.

REMOTE/ZOOM DEPOSITION OF: Steven Stebbins

PAGE LINE PRESENTLY READS SHOULD READ

I, Steven Stebbins, do hereby certify that I have read the foregoing transcript of my testimony given in the aforementioned matter, and further certify that said transcript is a true, accurate and complete record of said testimony.

Signed under the pains and penalties of perjury

this day of

2023.

Steven Stebbins

C E R T I F I C A T E P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, Michele C. DeCoste, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of Steven Stebbins was taken before me on March 7, 2023. The said witness was duly sworn before the commencement of his testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

In witness whereof, I have hereunto set my hand and Notary Seal this 1st day of April 2023.

Michele DeCoste

______________________________

Michele C. DeCoste, Notary Public

My Commission Expires: June 30, 2028

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.