Volume: I
Pages 1-202
Exhibits: 27

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:21CV00165(OAW)

- - - - - - - - - - - - - - - - x

MARCUS CAMERON,

Plaintiff

V.

STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE, AND TOWN OF ENFIELD,

Defendants

- - - - - - - - - - - - - - - - x

DEPOSITION of STEPHEN SAMSON, called on behalf of the Plaintiff, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michele DeCoste, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at McLane & Mclane, LLC, 269 South Westfield Street, Feeding Hills, MA, on Tuesday, March 7, 2023, commencing at 11:38 a.m.

------------

A P P E A R A N C E S

RYAN MCLANE, ATTORNEY
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
Counsel for the Plaintiff

DENNIS V. MANCINI, ATTORNEY
Attorney General Office State of Connecticut
110 Sherman Street
Hartford, CT 06105
(860) 808-5450
Counsel for Stephen Samson

ERIC E. GERARDE, ATTORNEY
Howd & Ludorf, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
(860) 707-6029
Counsel for Bryan Nolan, Mark Squires & Town of Enfield

LAURA VITALE, ATTORNEY (Via Zoom)
Attorney General Office State of Connecticut
165 Capital Avenue, Suite 500
Hartford, CT 06106
(860) 808-5340

Counsel for Steven Stebbins

ALSO PRESENT:

Steven Stebbins

Marcus Cameron

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEPHEN SAMSON | | | | |
| (By Mr. McLane) | 5 | | | |
| (By Mr. Mancini) | | 192 | | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Email | 12 |
| 2 | Call Detail Report | 18 |
| 3 | Email | 19 |
| 4 | Request for Admissions | 19 |
| 5 | Notice of Complaint Against Personnel | 40 |
| 6 | Texts | 50 |
| 7 | Complaint and Jury Demand | 56 |
| 8 | RMV Paperwork | 67 |
| 9 | Memorandum | 88 |
| 10 | Memorandum | 88 |
| 11 | Memorandum | 88 |
| 12 | Uniform Civilian Complaint Record | 103 |
| 13 | Email with Attached NCIC Off-Line Search | 107 |
| 14 | Email | 114 |

E X H I B I T S (CONT.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | Email | 114 |
| 16 | Bates Documents 000001 to 00010 | 118 |
| 17 | Bates Documents 000076 to 000081 | 122 |
| 18 | Email | 123 |
| 19 | Email | 125 |
| 20 | Email | 126 |
| 21 | Email Chain | 129 |
| 22 | Audio, Stebbins 506 | 164 |
| 23 | Email | 164 |
| 24 | Email | 166 |
| 25 | Bates Documents 000113 to 000116 | 171 |
| 26 | Journal Article | 174 |
| 27 | Bates Documents 000058 to 000059 | 174 |

P R O C E E D I N G S

MR. MCLANE: So are we doing the usual stipulations of reserving all objections other than the form of question until the time of trial, waiving any deficiency in the notice depo, waiving any objection of the notary requirement, and 30-day reading?

MR. MANCINI: Yes.

MS. VITALE: Yes.

MR. GERARDE: Yes, and also one objection is for all defense counsel.

MR. MCLANE: Okay, we've been doing that?

MR. GERARDE: That has been my understanding.

MR. MCLANE: Okay, fine.

STEPHEN SAMSON, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testifies as follows:

DIRECT EXAMINATION

BY MR. MCLANE:

Q Good morning, Lieutenant Samson now.

A Good morning, sir.
Q I might here and there just refer, based on the documents, to you as "Sergeant." And I will try to make sure to refer to you as "Lieutenant Samson." That's your current rank, correct?
A Yes, it is.
Q Have you ever been deposed before?
A Yes, sir.
Q How many times?
A I don't have a number off the top of my head, sir. I have been deposed for witnesses per se through my career, as well as I did sue the department for something. I was deposed for that.
Q What did you sue the department for?
A Racial discrimination, sir.
Q When was that?
A I don't recall. I know it was 2000. I'm not sure of the exact date.
Q So this was almost 20 years ago -- or over 20 years ago?
A It probably is, sir. I don't have a date in my mind.

Q Do you think it was more than ten years ago?
A Yes, it was, sir.
Q Do you think there's a problem with racial discrimination --
MS. VITALE: Objection.
Q -- in the Connecticut Police Department?
MR. MANCINI: Objection.
A I'm sorry, sir. Can you say it again?
Q Do you think the Connecticut State Police has a problem with racial discrimination?
MR. MANCINI: Objection.
A I think with --
MS. VITALE: Objection.
A I think with, like, anything else, with other agencies, I can't speak for all agencies, but I think state police, some might have some issues with racial discrimination.
Q Is that the only time you've been deposed? You had said something else. You said you'd been deposed as a witness per se?
A Yes, a per se and also for another one just recently. It was Hunter versus Alberty.
Q All right. That's the one regarding the Peter Pan bus, right?

A That is correct.
Q So what's going on in that case? What's that one about?
A That's where we responded to a 911 phone call regarding the bus driver closing the door on a passenger that went underneath the bus and then driving off with her underneath it.
Q Okay, what are you being sued for?
A From my understanding, because it was nolled.
Q So you're getting sued because -- okay, so there were criminal charges filed as a result of this driver closing the door on the passenger?
A Yes, sir.
Q And nolled would mean the prosecutor decided not to prosecute the charges against the driver?
A Yes, sir.
Q All right. And so you're getting sued because of that?
A That's what I was told, sir.
Q They would have had to file a complaint. Did they list any specific allegations against you specifically?

A If they did, sir, I don't recall.
Q When did you do your deposition in that case?
A I don't want to speculate. I can't recall, sir.
Q What is a witness per se?
A It's basically someone under the influence of alcohol and/or drugs going through the headquarters and Wethersfield and testifying and --
Q So more testimony. Would it be a deposition like this, or is it more testimony under oath at somebody's hearing?
A I always look at it's kind of like the same thing in my opinion, sir.
Q All right, so then you understand -- obviously, you've done this before -- that everything you said -- you just swore under oath. Everything you've said here is -- you've represented you're going to tell the truth, the whole truth and nothing but the truth. I've noticed -- you've been at some of these. You know how the deposition is going to go. You can take frequent bathroom

breaks if you need to. Just let your -- if you want to talk to your lawyer or want to use the bathroom, let me know. Just answer the question before you if I ask one before you take the break. So if I ask a question and you need to take a break, just answer that question and say you need to take a break and I'll be happy to give it to you.

Other than that, you know, I try to be as specific as I can with phrases. Sometimes things with police, because there's a lot of lingo or acronyms or very specific phrases, so like an IA complaint, I'll try to specify it's an IA complaint versus the complaint that was filed in the civil case. Does that make sense?

A Yes.

Q So if I want to refer a complaint, I'll do my best if I'm talking about the Internal Affairs complaint, I guess this is step one, can we agree that "IA" means "Internal Affairs," short for Internal Affairs? Is that what you understand "IA" to be?

A Yes, sir.

Q Do you have any questions about the conduct of the deposition?
A No, sir.
Q Okay, you don't have to keep calling me "Sir."
A It's a force of habit. You're probably going to say that to me about a couple more times, but it's just a force of habit.
Q All right.
MS. VITALE: Can you guys move the iPad closer? Is that possible? I'm having a little trouble hearing.
MR. MCLANE: Sure.
Let's go off the record.

(Whereupon, a brief discussion was held off the record.)

MR. MCLANE: Let's go back on.
Q Did you have any other questions for the conduct of the deposition or anything moving forward?
A No.
Q Okay, who is Myles Ginley?

A He is a retired trooper now. I believe he retired as a sergeant.
Q When did he retire?
A I don't know, sir.
Q My question is, was he assigned to your IA investigation of Trooper Stebbins?
A That, I don't know, sir.
Q Okay. Why was he reaching out to Massachusetts Probation?
A That, I don't know, sir.
Q I'm just going to show you what we will mark as Exhibit 1.

(Exhibit Number 1, Email, was Marked for Identification.)

Q I'm showing you an email that we got from FOIA I think it was, like, last week. It's from Ginley Myles to Samson to you, Stephen Samson. This is from July 31, 2018. It seems like Myles Ginley forwarded you an email from someone named Karen Sullivan. Do you know who Karen Sullivan is?
A I don't recall, sir.

Q All right. So if you read along with me in the email, it says, (Reading):

"Hi, Myles. Your dad called and indicated that you're interested in finding out if there's a residency requirement to be a probation officer. There is. I've attached the portion of the policy manual that addresses it. I attached the whole section, but it's addressed in the first section 4.100 under General Requirements."

Did you ask Myles Ginley to reach out to the Massachusetts Probation Office?
A I don't recall, sir. It was such a long time ago.
Q Who was Myles's dad?
A I don't know, sir.
Q Do you know the man?
A No.

Q It seems really coincidental, thought, that in July of 2018 that Myles Ginley would be forwarded an email about a residency requirement for Massachusetts probation officers. Do you think that's a coincidence, or do you think that you asked Myles Ginley to reach out to the Massachusetts Probation office?

MR. MANCINI: Objection.

A Again, sir, I can't recall.

Q So you don't know?

A No, sir, because it was such a long time ago, sir.

Q Are you still in touch with Myles Ginley getting?

A No, sir.

Q Let me ask, when you gathered documents, when we sent over a request for documents and you gathered them, what steps did you take to gather the documents?

A What do you mean by that term?

Q So if we ask for certain email correspondence regarding Marcus Cameron, what did you do to gather documents responsive to that request?

A I opened up every- -- when I met with my attorney, I just opened up everything.
Q Okay, regardless of what you told him or what he directed you to do, did you conduct some sort of keyword search in your emails?
A No, sir, I did not.
Q Okay. So how would you know what's responsive -- how would you know that you're turning over all the documents that are responsive to our requests if you didn't do a keyword search?
A Again, I'm not computer savvy by any means. I thought by just opening up whatever I had under my emails or anything like that to show if there was anything deleted anything sent, just exposing all that. That's what I did, sir.
Q So you've never spoken to someone named Karen Sullivan before?
A I don't recall, sir.
Q Do you think there's any other documents that may have been relevant to this case that you haven't produced to us?
A My understanding is I gave everything that I

had, sir.
Q Let me ask you, did you ask Myles -- let me phrase this another way.
We got a correspondence from your lawyer saying that you had never run Marcus Cameron's name and date of birth to the COLLECT system nor number of license plates that we've provided. Did you ever ask anyone else to run Marcus Cameron through the COLLECT database?
A Normally what I'll do is I'll ask the dispatchers to do something like that.
Q Okay, who was the dispatcher in 2018 at Troop H?
A There's quite a few of them. The only ones that come to mind are Paula Freeman, Darlene Newman. I'm trying to think who else. Laurie. What is her last name? Those are the only ones that are coming to mind for me, sir.
Q And so most of the time, you're not running the license plates through the system, you're asking Dispatch to do it?
A Correct.

Q Did you ask Dispatch in 2018 to run -- anyone in Dispatch to run Marcus Cameron's license plate through the COLLECT system?
A I probably did, sir.
Q What about Danielle Dubuque? Did you ask anyone to run her license plate or name through the COLLECT system?
A I didn't know her full name, sir.
Q What about the license plate?
A License plate?
Q Did you have a license plate for Danielle Dubuque at any point in time?
A I didn't really have a name, so I didn't know what license I would associate with that.
Q Okay, did you ever discover her full name?
A No, sir.
Q Obviously, from this lawsuit.
What about Nateesha Bessman? Did you ever ask anybody from Dispatch to run her through the COLLECT system?
A I don't recall that name either, sir.
MR. MCLANE: This is going to be Exhibit 2, Michele.

(Exhibit Number 2, Call Detail Report, was Marked for Identification.)

MR. MCLANE: These were FOIA. These were produced --

Laura, these are Cameron 478 to 485 of the call logs.

Q If we look at the second page, which would be 479, on July 3rd at 2:22 p.m., and we're looking at the ninth entry down, there's a phone call -- there's a phone number from 413-237-5109. Would you recognize that as Steven Stebbins' number?

A No. I know he has a 413, but...

Q But do you have any idea why he would start calling you at that number on July 3rd of 2018?

A Again, I'm a supervisor, sir. It could be for any reason.

Q So if you go down to 7/16 of 2018 at 7:17 a.m., that same number calls you again. It lasts for 14 and a half minutes. Prior to July, that number doesn't appear on this call

to you. Did you ever communicate to Steven Stebbins on a different number than your official number that's subject to FOIA?

A I don't recall, sir.

Q Do you recall speaking to Steven Stebbins for 14 and a half minutes on July 16th of 2018?

A I don't recall, sir.

Q Did you ever ask Steven Stebbins to try to track down Danielle and find out who she was?

A I don't believe so, sir.

Q Did he ever mention that he was trying to track her down?

A I don't recall him ever mentioning that.

MR. MCLANE: This will be Exhibit 3 and 4, Michele. Exhibit 3 will Bates Number 158, and 4 will be Request for admission.

(Exhibit Number 3, Email, was Marked for Identification.)

(Exhibit Number 4, Request for Admission, was Marked for Identification.)

Q Looking at what's marked, and I didn't give this sort of explanation, the bottom, right-hand corner of most pages that are produced in discovery, they have what's called Bates numbers. So documents in and of themselves may have their own page numbering. Like, when you have page three of an email, when they're produced in mass in response to requests for production of documents, attorneys, will Bates number them so that it's easier to identify them when they do something like this. So this will say "158" on the bottom. So do you see what's Bates number 158?
A I don't have that.
MR. MANCINI: We only got the RFAs.
MR. MCLANE: Oh, that's because I gave you the whole thing, Michele.
Q I'm sorry.
Do you see what's marked 158 in front of you now? It is Exhibit 3 and Bates numbered 158.
A Yes, I do.
Q Do you recognize this document?

A If I can read it. It's been so long.
Q Yes, take your time and read it.
A Okay, yes.
Q So it looks like you provided this to your attorney on February 22nd for the purpose of this. And this is an email from Tuesday, June 29th of 2018.
If you look in the body of the email, the second sentence says, (Reading):

"I have been assigned to investigate your complaint you have made against Trooper First Class Stebbins."

Did I read that correctly?
A You did, sir.
Q All right. Do you recall sending this email?
A I don't recall, but obviously, I did because it has all my information and everything on there. I did it a while ago, so...
Q Well, we can agree that you were assigned to investigate the complaints that Marcus made against Trooper Stebbins?

A Yes, sir.
Q Tell me how that investigation -- how does the assigning of Internal Affairs investigations work?
A Whoever fills out a complaint, let's say, it goes to the intake officer, let's say, down in Meriden, and the lieutenant would -- the lieutenant for this particular case was Lieutenant Cooke, I believe it was. Lieutenant Cooke is the one that would determine. Like, okay, if this is a criminal matter, then it goes to Major Crime. If it's a complaint, then it goes to the barracks, and once it goes to the barracks, it's given to the barracks commander and it's the barracks commander that determines what Sergeant gets it.
Q Let me ask a question. So other than crimes, does Internal Affairs handle any investigations themselves, or do they assign them to the troops?
A The only ones that get assigned to the troops, my understanding that I have heard, is it is just people that are not in

compliance with department policy. Those are the only ones.

Q And they'll assign non-compliance with policy to the troops?

A Yes, sir.

Q Okay. And so at that point, your troop commander would then generally assign it to a sergeant?

A Yes. He has two options. Either he could do it himself or he's too busy and just delegates it.

Q Okay. In this case, he delegated that to you?

A Yes, sir.

Q Okay. So let's look at your request for admissions that you produced here. Can you turn with me to the second-to-last page, Page five? These are not Bates numbered because they're not documents produced in response to a request.

The second-to-last page is a verification that says, (Reading):

"I declare, under the penalty

of perjury of the laws of the
United States of America, that
the foregoing is true and
correct, to the best of my
knowledge and belief."

And you signed this on December 20th of 2022, is that accurate?
A Yes, I did, sir.
Q Okay, and this is where I'm sort of confused. So we'll go back to the first page. Number three it says you were assigned an investigation into your subordinate Steven Stebbins based off of allegations made by the plaintiff, and you denied that. What was the basis for the denial?
A I'm trying to remember why that was put like that.
Q Other than what you discussed with your lawyer, why would you deny that that's the truth of that statement?
A The only thing I could think of, sir, is basically the plaintiff going -- I was assigned with the -- from what I understand,

this is the way I interpreted it, from just reading it.

Q So what's confusing --

A No, no, I'm just going to try to explain my reasoning behind it, sir.

Q Okay.

A Basically, allegations made by the plaintiff, some of the allegations were found, in my opinion, were not -- were false. The only accusation that I believe, the reason why I put "deny" is the only thing he did is violate department policy. That was my reason why I put "deny" on there. All the allegations that he put in there in his initial complaint, the only one that I saw that I felt was regarding him not identifying himself, so that's reason why I put that in there.

Q So let me read the question. It says, (Reading):

"You were assigned an investigation into your subordinate, Steven Stebbins,

based off allegations made by the plaintiff."

And you're denying that you were assigned an investigation --
A No, I was assigned, but it says, "Based off allegations," and my thing is that there was only one allegation, and that was him violating department policy, so that's the reason why I put "deny," sir.
Q So you're saying, "Based off allegations." You're saying that Marcus didn't make any allegations against Mr. Stebbins?
A He did make allegations, but I proved that those allegations were not correct.
Q We'll get to that, but where in this question did I ask whether the allegations were correct?
A Well, again, sir, I interpreted my interpretation of allegation by looking at this with only an allegation. That's why.
Q All right. So are you denying that Marcus made multiple allegations against Steven Stebbins?

A Am I denying he made multiple allegations? No, he made multiple allegations. I'm just saying that once I concluded my investigation that I only found that there was only one allegation.

Q Okay. So you found that there was only one allegation or you found that you believed the truth of only one allegation?

A I believe there's only one allegation.

Q So after you conducted your investigation, you believe that he never actually made any other allegations into Trooper Stebbins?

A I'm just going by what was sent to me regarding what Marcus sent, regarding what the allegations were, and I'm just saying that the reason why I put that the way it is is that I believe that there was just one allegation, not allegations.

Q Let's go to page two. Number four says, (Reading):

"You, Steven Stebbins, and a third party were in the room together on July 17, 2018,

when you called plaintiff's
employer."

You denied that as well. Were you, Steven Stebbins and Marty Pirog not in the same room when you called plaintiff's employer on July 17, 2018?
A The only reason I said "deny" on that is because it was actually another person the a room. It was actually Gerard -- I believe it was Gerard Joyle.
Q Okay, well, how long was Gerard Joyle there during this phone call?
A I believe he was there then when they all walked into my office.
Q Okay. And so when they all walked into your office -- were they all -- was anyone else other than Gerard Joyle in the room?
A It was just those three that came in.
Q Okay, those three, so a total of four people. You, Gerard Joyle, Trooper Stebbins, and Marty Pirog?
A Correct.
Q Okay. Did Gerard Joyle participate in any

conversation with respect to Marcus or your investigation into Trooper Stebbins?
A I don't recall, sir.
Q So he sat by and listened?
A I believe so, sir.
Q You've been present for some of these depositions. The voicemail that I've played, did Trooper Joyle -- was he a trooper?
A Yes.
Q So can Trooper Joyle be heard on that voicemail at all?
A I don't think he said anything.
Q Okay. Number six, over objection, you said, (Reading):

> "Subject to and without waiving the previous objection, I can't admit or deny as I do not have an opinion regarding the residency of the plaintiff."

So as you're standing here today, you don't have an opinion as to where he resided in

2018?

A Mere speculation on my part during the investigation, sir.

Q Speculation? What were you speculating?

A I'm not sure if he lived in Connecticut or if you lived in Mass. It appeared to look like he lived in Connecticut.

Q Okay. So with respect to whether he lived in Mass. or Connecticut, would that have any bearing on the allegations he made against Steven Stebbins?

A No, it doesn't. The only thing that adds to my opinion, sir, is, again, just putting everything together, painting a picture of everything, the truthfulness of both parties.

Q Okay. Number seven, with respect to the protective order, you never advised Steven Stebbins to seek a protective order against Marcus?

A No, I don't recall ever doing that.

Q Have you ever discussed the protective order with Steven Stebbins?

A I don't believe so, sir.

Q Why did you show up -- if you didn't discuss

it, why were you present at the hearings?
A I only went to one of them. I know there was two. I know Marcus said I went to both. I know Steve said I went to one with his wife. I only went to one of them. I believe it was the first one I went to. It was with -- he just asked me to come along because he felt that Mr. Cameron was going to bring some friends and he asked if I would go and I said I'll go with you.
Q What do you mean he was going to bring some friends? Did he mean as witnesses or that he thought he needed protection or --
A I don't know, sir. That's how he worded it.
Q He said, "Marcus is going to bring some friends" and "Will you come to the hearing"?
A Yes, sir.
Q Okay. So you didn't speak about -- I mean, did you ask him "What's this hearing about"?
A No, I kind of knew. I kind of speculated on my opinion. I know those two weren't getting along, so I just put two and two together.
Q You know, going into some of these, it's -- you know, when we go to page three, right, I

ask in question number nine, it says,
(Reading):

"Do you have any opinion that it would be improper for an investigating officer to investigate the complainant rather than the subject of the investigation with the assistance of the subject of the investigation."

Did you think that there was anything improper with having Steven Stebbins participate in you trying to find out information from Marcus Cameron's employer?
A No, sir.
Q You don't?
MS. VITALE: Objection.
Q Even though he's the subject of the investigation?
A It's a complaint, sir. It's not a criminal matter.
Q What do you mean by that?

A I can talk to him as much as I want. He can go with me. It's not like it's a criminal matter which that's something totally different.
Q Right. So if it's a criminal matter, right, obviously, he has Fifth Amendment privileges and things like that. But my question was, essentially, is it improper? You don't think it's improper?
A No.
MS. VITALE: Objection.
Q What about unfair? Do you think it's unfair?
MS. VITALE: Objection.
MR. MANCINI: Objection.
Q Do you agree with me that -- or can we agree that citizens who make Internal Affairs complaints should -- let me -- do you agree that citizens who make Internal Affairs complaints are entitled to a fair investigation?
A I believe they are.
Q Would you say that they have a right to a fair investigation?
A They should, yes.

MS. VITALE: Objection.
Q You know, I got yesterday -- I don't have them here as an exhibit. I got, yesterday, all of the transcripts from Marcus's criminal hearings provided from your lawyer. Did you order those?
A No, sir.
Q Okay.
A There's a cost to that, right? I'm just wondering.
Q I don't know. I really don't know.
A Do you mean I ordered through Dennis?
Q I don't know if you did. Just have you ever seen those transcripts before?
A No. I never ordered them, no.
Q When you met with Marcus, do you recall meeting with him on June 25th of 2018?
A Parts, yes, I do.
Q Okay. What device were you using to record your conversation?
A I'm not sure what department device or whatever I had, sir, because I know my camera was not -- I think I had a low battery on my camera? I don't recall what device it was,

sir.
Q Well, let me ask you, if you had a low -- is there any other time that you arrived -- well, were you planning to record him with your department-issued device?
A Yes, I was, sir.
Q Okay. And you don't recall what device you used to record it?
A No, I don't, sir.
Q Well, I think we have -- we were sent the recording if I'm not mistaken. Where did you get it?
A Again, sir, more likely, if anything, I probably had a phone on me and I probably utilized that, but my body camera that I wanted to use the battery would not last.
Q Okay. Where was the device when you were recording your conversation with Marcus?
A I believe I had it in my pocket.
Q And you don't remember what it was?
A Again, I'm assuming it probably was my cell phone. I don't think I had a department cell phone back then.
Q You had to get the audio to provide it to us.

Where did you get the audio?
A Whatever was that recording of. The device I used --
Q So this was provided to me yesterday, so where did you get the audio to provide to us? Was it saved on your phone? It had to have been saved on the device. The discovery is not that old in this case.
A No, I -- whatever I -- and I'm saying maybe I did use my phone, but I downloaded it onto something because I turned everything in.
Q Okay. Why didn't you record any conversations or statements from Trooper Stebbins?
A It was in my office or basically just he's given me everything with a To/From. I'm asking him for a To/From.
Q Why not record the conversation with the mailwoman that you included in your report?
A I did it via through a phone.
Q You did record her?
A No, no, I say I did it through the phone.
Q Why not record her through the phone?
A Maybe just time, made it was time, didn't

have time to meet up with her.
Q Was anyone else recorded? Was your conversation with anyone else investigated in this report?
A I don't recall, sir. I think the only one is maybe this one here.
Q Okay. Is there a reason for that, why you only recorded him?
A Again, sir, I would have used my body camera, but again...
Q Let me ask you, in that Alberty case, because I looked that up, wasn't your body camera battery low in that case, too?
A Yes, it was, sir.
Q Did you record with your phone in that case, or any other device?
A I don't believe I did, sir.
Q Okay.
A And the reason why, sir, is because other officers had their body cameras on. When I met with Mr. Cameron, it was just me by myself.
Q What is the significance of what you just told me?

A Well, it's just having another officer. I knew his body camera was on. I didn't have to worry about putting any type of device on or anything like that.

Q Well, my point I guess I'm getting back to is, like, you wanted to really make sure -- you said other officers would have would have been able to record your conversations within the Alberty case, but here, you only recorded Marcus and didn't record anyone else. Did someone else record Trooper Stebbins' statement or the mailwoman's statement or anything like that?

A No. Just I asked the To/From memo, which we normally do in a normal course, and I just call the mail lady and wrote everything down she was telling me.

Q Who is Joy Hunter?

A I think she was a clerk at Troop H at one time. I believe she also is married to -- yes, she is. She's married to Rob Hunter.

Q Okay, who's Rob?

A He's the one that is listed in the Alberty case.

Q Okay, so he's a defendant in the Alberty case?
A Yes, sir.
Q Okay. With respect to this investigation, based on Marcus's -- the IA investigation based on Marcus's allegations, do you have any idea why Trooper Stebbins would be emailing Joy Hunter about the investigation?
MR. MANCINI: Objection.
MS. VITALE: Objection.
Q Who is Brett Atmore?
A Brett Atmore is -- I believe he is another trooper that was at Troop H at the time. I believe, if I recall correctly.
Q Were either Joy Hunter or Brett Atmore involved in the investigation, the AI investigation in Trooper Stebbins?
A No, I don't recall, sir. No.
Q Do you have any idea why Trooper Stebbins would be sharing the information with Brett Atmore about the investigation?
MR. MANCINI: Objection.
A No, sir.
Q Okay. Was Marty Pirog assigned to the

investigation in any way?
A I gave him some -- I was working on something and I had him double-check something, I think an address for me or something like that, if I recall correctly.
Q Okay, what about Joyle?
A I think he went with him.
MR. MCLANE: Let's mark this as Exhibit 5.

(Exhibit Number 5, Notice of Complaint Against Personnel, was Marked for Identification.)

Q So this is Bates Number 11. So generally there's a last name. The only one without a last name is yours. So if it's 11, I'm just calling sometime Samson 11. I just know the one with no name, no prefix I think they call it in front of the Bates number is yours.
Do you recognize this?
A A standard complaint form.
Q So you've seen -- you said this is standard.

You've seen these before?
A Yes, sir.
Q Okay, let's go to the last paragraph that's written in bold.
A Yes, sir.
Q It says, (Reading):

"Further, except as provided in the A and O Manual, Section 8.1.1C3, you're hereby ordered not to discuss this investigation with any other persons other than your union or legal representation or uninvolved peer support person."

This was addressed to Trooper Stebbins, correct?
A Yes.
Q Okay, so explain the A and O Manual to me.
A A and O is just an administrative office manual that we just basically use to assist and guide us in our daily operation.

Q Okay, and Section 8, does that deal with Internal Affairs investigation?
A That's not my -- I don't know, sir. Sorry.
Q Is a manual publicly available?
A I believe you can get parts of it, sir. Again, I'm not 100% sure on that.
Q When it says "uninvolved peer support person," what do they mean by that?
A Probably someone that is not part of STOPS or anything like that.
Q What is STOPS?
A State troopers offering peer support.
Q And it's for any sort of support, right? It doesn't have to be -- not, like, addiction counseling? This is any sort of peer support needed for the job, right?
A Yes.
Q Family support, things like that?
A Yes, sir.
Q Are you aware of whether Marty Pirog was Trooper Stebbins' peer support person?
MR. MANCINI: Objection.
A That, I don't know, sir.
Q Do you know if Joy Hunter was Trooper

Stebbins' peer support person?
A That, I don't know.
Q Well, if you sent Marty Pirog up to check an address, we can agree that he would not be uninvolved if he was, in fact, a peer support person, correct?
A Correct.
Q You were in the room with Trooper Stebbins as he was discussing the investigation on July 17, 2018. Would you agree that that's a violation?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A The A and O Manual is only, like I mentioned before, in the early parts of A and O, it says, "To assist and guide." What I mean by that is it doesn't say, "You shall." For example, Chapter 12 talks about overtime. It says, "You shall not do any overtime if you do not have prior approval or email sent up," but that's impossible because when we go to, like, a critical incident scene there's no way I could stop the operation, like, "Hey, you're in violation of the A and O." Again,

as it was put to me, that that was expressed to me is that the A and O is only there to assist and guide. It's not like you have to definitely abide. That was the example that was given to me, the A and O for Chapter 12. It's just --

Q That makes sense. Let's read it. So it says, (Reading):

"Except as provided in the A and O Manual, you are hereby ordered not to discuss this investigation with any other persons other than your union or legal representation or an uninvolved peer support person."

This is signed by Lieutenant Cooke, right?

A For Stebbins, yes. Not for anybody else.

Q Right. So it's pretty clear that this is -- Lieutenant Cooke was your boss, too?

A No, he's not.

Q He was at the time, no?

A No, he wasn't.
Q Well, he outranked you at the time?
A Yes, he did.
Q Okay. Did he have the authority to order Steven Stebbins not to discuss this matter or the investigation with any other persons?
MR. MANCINI: Objection.
MS. VITALE: Objection.
A He's a lieutenant. I guess so. I guess he can.
Q Okay. Is it expected when people receive this that they follow the orders that are written on the letter?
MR. MANCINI: Objection.
MS. VITALE: Objection.
A This form is basically -- I'm trying to explain it the best I can. It's a generic form that they've been using kind of like forever with the internal IA process. It's more for internally if you're dealing with two troopers and so forth, they don't talk to another witness and so forth. That's how it was explained to me and so forth. But they said -- under a complaint, they said it's

slightly different. It's a generic letter form that they utilize for everything.
Q Who told you it's a generic form?
A I don't recall, sir.
Q Well, so let me ask you, what other forms are out there that purport to order troopers to do certain things that are not to be taken serious?
MR. MANCINI: Objection.
MS. VITALE: Objection.
Q I guess what I'm saying is, are you telling me that a trooper receiving a letter like this from a lieutenant can disregard the order that's written in bold?
A Like, the way it was expressed to me a long time ago, sir, because this is a complaint. It's not a criminal number. This is something -- it's not -- most complaints, internal complaints have to deal with two troopers that are inside a barracks or inside a unit and so forth. They don't want them talking to other people that could possibly be witnesses. That's how it was expressed to me.

Q Well, you're a lieutenant now?
A Yes, sir.
Q If you sent a letter out to somebody in bold and ordered them to do something, you'd expect that it would get done, right?
MR. MANCINI: Objection.
A If I gave them directions to do something, yes, I would expect them to follow.
Q So if you sent out a letter to a trooper and you said "You are hereby ordered not to discuss this investigation with any other person other than union or legal representation or uninvolved peer support person," you would expect them not to discuss the investigation with anyone other than those identified, right?
A If I was in IA and I was a lieutenant and it -- again, this is a C number. It's not a criminal number. It wouldn't bother me because it's a complaint number if they talked. It wouldn't bother because it's only a complaint.
Q So what are the orders that are given out wouldn't bother you if somebody didn't regard

them?
A The only one that comes to mind is --
MR. MANCINI: Objection.
MS. VITALE: Objection.
A -- for example, the A and O talks about motor vehicle accidents.
Q Okay.
A I believe -- again, it's been a while, but motor vehicle accidents, anything less than 2500 were not investigated, but we investigate them anyway. I'm just showing you there's inconsistencies on some of these things that the A and O is only there to assist and guide.
Q So, I guess, are there understandings amongst the troopers in the Connecticut State Police that they can disregard certain written orders by officers?
MR. MANCINI: Objection.
Q Let me rephrase this. Is it pretty much understood by any trooper under investigation that they can disregard an order like this in a standard letter that they received?
MR. MANCINI: Objection.

A In all my times I've never seen anyone get jammed up for filing that for a complaint. For an IA for a criminal matter, oh, yes. But outside of that, I've never seen one in my career.

Q Well, they don't get jammed up, but you didn't report Trooper Stebbins, right?

MS. VITALE: Objection.

MR. MANCINI: Objection.

A No, but again, I've been around. I've seen a lot of complaints, especially in Troop H, that comes through and I -- no, I see people talk about their complaints all the time openly: Sergeants, lieutenants --

Q Okay, so is it sort of an unwritten policy that within the Connecticut State Police that regardless of this order, troopers are allowed to discuss the investigation with other people other than the union or legal representative or uninvolved peer support persons?

MR. MANCINI: Objection.

A I think, sir, if it's more -- if it's for, like, a criminal matter, we all understand

that we cannot talk, but because it's a complaint, it's the lowest form of Internal Affairs, that's why we probably -- I guess, in a sense, maybe some troopers don't take it or supervisors don't take it seriously.

Q And you're saying you don't take it seriously?

MR. MANCINI: Objection.

A For a complaint? No, sir, I don't.

Q Is that why you didn't report Trooper Stebbins for discussing this with Marty Pirog and Trooper Joyle?

MS. VITALE: Objection.

A Possibly.

MR. MANCINI: Objection.

MR. MCLANE: Let's mark this as Exhibit 6.

(Exhibit Number 6, Text Messages, was Marked for Identification.)

MR. MCLANE: Laura, this is starting at 495. This is text messaging.

Q So do you recall providing these to your attorney in response to the request for production of documents that we sent?
A I do, sir, yes.
Q Okay. You were here during Steven Stebbins' deposition, is that correct?
A Yes, sir.
Q He had stated that he inadvertently deleted his text messages of the same. Do you recall whether there were any messages before this with respect to Marcus Cameron?
A I don't delete myself, so whatever was on there, I showed it to my attorney.
Q Okay. Well, regardless of what you said or showed your attorney, when you looked for text messages regarding Marcus Cameron, did you find any prior to Steven Stebbins' text to you that said, "Guy's a clown. I think he's trying to get your Mustang"?
A No, sir. Whatever was on my phone wherever I had, I showed him everything.
Q Is that the first time Steven Stebbins texted you with this number?
A No, I'm pretty sure he texted me more. Why

there's nothing beyond that, I'm not a good computer guy, so I can't explain that, but I do not delete any of my stuff on my phone or my emails.

Q So on this particular phone, you don't believe that you communicated with Steven Stebbins via text regarding Marcus Cameron's allegations against him prior to what you sent him?

A No, I don't recall.

Q You don't recall or you don't believe there is any?

A I don't recall us ever -- I'm sorry, can you say the question again?

Q Let me ask you, prior to Steven Stebbins sending you this text message that says, "Guy's a clown. I think he's trying to get your Mustang," do you recall ever exchanging any text messages with Steven Stebbins about Marcus Cameron or his allegations against Steven Stebbins?

A I don't believe I did, no.

Q Okay, and did you check your phone to make sure that there was?

A Again, I just showed my attorney everything that was on there. And, again --
Q Let's stop there.
Did you conduct your own independent review of your phone and scroll up and down? You obviously know how to text, right? You don't have to be savvy. You can use the phone. Did you scroll up to find any others with Steven -- this is just you and Steven Stebbins. Did you scroll up to see if there's more?
A I scrolled up as far up as it will go, sir.
Q Okay. And then you just handed your phone over to your lawyer and then --
A No. Again, I showed my attorney that -- I showed him everything, that that's as far as it goes. But again, is it possible if I got another phone, that information to get transferred? I don't know. That information, I don't know.
Q Okay, what is the phone number that you received these texts messages on?
A Oh, that's my personal cell phone.
Q Is that --

A The 748-6715.
Q Okay. Let's turn to page 498 at the bottom.
At the middle of the page, it says,
(Reading):

"LOL, also you move due to him
harassing you."

Now these are in black and white. I think
it's fair to say that anyone who owns an
iPhone knows that -- the darker background
would be blue and the lighter background
would be gray -- your messages are the ones
in blue, right, in the darker background?
A Yes, sir.
Q What harassment, in your opinion, occurred
that caused Steven Stebbins to move?
A The only thing that is coming to mind --
MS. VITALE: Objection.
A The only thing that is coming to mind is him
driving around his house.
Q And you believe that Marcus driving around
Steven Stebbins' house caused him to move?
A Well, you asked me if that's considered

harassing, and I do.
Q Okay. And you have no other messages prior to this about that harassment?
A I do not believe so, sir, no.
Q Let's go to 501.
It says, (Reading):

"Lie right out of the gate. He will have to explain this, too."

First, what was the lie right out of the gate? I guess we can go back to 500 if you need to refer -- or 500 and 499 if you need to refer. So 499 actually encapsulates, I think, a little bit more of the conversation.
A Just with that information, I don't know what to go off of, so...
Q Okay, so let's actually go to 499. So 499 is a collection of some text messages and an image that looks like you've provided a number "500," an enlarged image, right, the image itself, which is the first page of the complaint. Can we agree on that?

A I'm trying to remember. What is this? What is this?
Q So 500, you don't recall?
A No, sir, I don't.
MR. MCLANE: If we want to take a break, I can print off the operative complaint. So let's just take two minutes.

(Short break.)

(Exhibit Number 7, Complaint and Jury Demand, was Marked for Identification.)

Q So what I've put in front of you is Exhibit 7, the operative complaint in this case. If you flip down toward the second page of the complaint, it say, (Reading):

"Number one, Plaintiff Marcus Cameron of Springfield, Massachusetts, is and was a resident of the Commonwealth of Massachusetts, the United

States of America at all times
referred to in this
complaint."

And now refer to Page 500 on Exhibit 6. Well, take a look at page two of the complaint and let me know if it looks to be the same. The first six paragraphs appear to be the same as the image that was sent in number 500 of Exhibit 6?
A Yes.
Q And you recall receiving this complaint or at least reviewing it once you realized you were getting sued?
A Yes.
Q Were you ever served with a complaint?
A I must have been, yes, I did.
Q Do you have any reason to believe that isn't the operative complaint in this case?
A Not at all, sir.
Q Okay. So let's go back, then, to number 500. You agree that it was sent to you as an image of the first six paragraphs of the operative complaint?

A On 500, yes.
Q Now, on 499, Steven Stebbins says, (Reading):

"Do you read the very first line? Tell me what you think. Already a lie."

A What I mean by that is --
Q And then you say, (Reading):

"Lie right out of the gate. He will have to explain this, too."

Now, I thought you had no opinion as to his residence?
A Well, I guess here I had -- again, I'm speculating that is what I mean.
Q Well, you said you had no opinion in your request for admissions, and then you said that you were just speculating. And you said you didn't know, but you had reason to believe he lived in Connecticut, but here you're saying that he is lying and will have

to explain this. So are you saying that you believe he does not live in Massachusetts?

A I believe there is a discrepancy of him either living in Connecticut and Massachusetts.

Q Well, you didn't text Steven Stebbins that it was a discrepancy, you said he lied right out of the gate?

A Again, maybe that is what I'm talking about here.

Q And the next text from Steven Stebbins says, (Reading):

"Should be charged with perjury," and you said, "Yes."

Do you charge people with perjury over discrepancies?

A Again --

MR. MANCINI: Objection.

A -- with that, sir, yes, if you commit perjury, you should get jammed up for that, but this is what I mean by that first paragraph. Then I say, "Yes," then that is

correct.
Q So we've gone to you don't have an opinion about his address, to you're speculating, to now you think you should be charged with perjury for lying about his address?
MR. MANCINI: Objection.
A Again, this could have been just bantering, us going back and forth and so forth. I don't recall my emotions or what I was doing at the time he was sending this to me and me responding to it.
Q Okay. So let's go to 502, where you text Steven Stebbins, (Reading):

"You could also possible go after that department for not addressing this issue and only exacerbating the issue by giving him the recording."

What issue was not address?
A I don't recall, sir.
Q Was it his residency issue?
A Again, I don't recall, sir.

Q Did you ever contact the Massachusetts Department of Probation regarding his address?
A I think I inquired about it, yes.
Q Was it you who inquired, or did you ask someone else?
A I think I did.
Q Did you tell anyone at Massachusetts Probation Department that Marcus Cameron didn't live in Massachusetts?
A No, I did not.
Q What did you mean by "exacerbating the issue by giving him the recording"?
A I'm not going to speculate, sir. I don't know.
Q And you don't think that was regarding the voice mail that they provided him?
A It might be, sir.
Q Why would that be exacerbating the issue if it was the voicemail recording?
A Not addressing it. Like I said, not addressing this.
Q Why should they not have given him the voicemail recording?

A My view of it?
Q Yes.
A The Connecticut State Police, there should have been an Internal Affairs investigation generated. I know that would probably happen on my part. Did it happen on his part? I don't know. That is him and his department. But again, that is just me saying that.
Q Well, to be fair, you were with three other troopers when you made that call to his department. You don't think it's fair that they shared with him --
MS. VITALE: Objection.
Q - the voicemail?
MR. MANCINI: Objection.
A They weren't in the room when I made that phone call.
Q Well, they were in the room when you were discussing it afterwards, right?
A Yes, sir.
Q But you don't think it's fair that Probation shared that with him?
MR. MANCINI: Objection.
A Again, whoever emails in his department, they

share with them. That is just my opinion.
Q So 503 and 504 are taken together. The image was paragraphs 37 t0 42 of the operative complaint, and Steven Stebbins texts you and says, (Reading):

> "Here's the VM." And then you said, "More for him to explain. Wow, he exaggerates."

What was an exaggeration in Page Number 504? What was exaggerated?
A Okay. This looks slightly different, but...
Q Okay, so what you were sent is different than the operative complaint?
A Well, because on this one it shows like whatever that is, but there's no numbers on it and this one shows continuous numbers running down it.
Q Are you looking at 504?
A No, 503.
Q Well, 504 has an enlarged version.
A Oh, sorry about that.

Q No problem.
So 504 and 505 actually continue on.
A Okay.
Q So what was the exaggeration?
A Regarding me wanting him to change -- encouraging him to change his substantive plan. I really didn't care. I was assigned the investigation. Whatever he had, I ran with it.
Q Well, I'm correct that you sent him some emails trying to get him to write a signed statement, correct?
A Mm-hmm.
Q Why would you need that if you already recorded him?
A I just thought it would add a little bit more to put with my investigation. That's it.
Q But you discussed him providing a false statement to police with Attorney Parakilas?
A Yes.
Q So if you didn't care, why were you discussing charging him with false statements to police?

MR. MANCINI: Objection.
A I don't know. I don't know what my reason was. It was a while ago, sir.
Q If I'm not mistaken, during that discussion, one of the reasons you couldn't charge him with making false statements is that he didn't sign a statement, right?
A Correct, a written statement.
MS. VITALE: Objection.
Q So again, you didn't care. You asked him for a written statement. He didn't sign one. Now you can't charge him with a crime. So do you think he's exaggerating --
MS. VITALE: Objection.
Q - in the complaint still or no?
MR. MANCINI: Objection.
A I wasn't going to charge him with giving a false because Chris Parakilas said that it had to be a written statement.
Q But if he had taken you up on your offer and signed a statement and all the facts were the same, would you have charged him with a crime?
MR. MANCINI: Objection.

A After speaking with Chris Parakilas, if he said "Yes, go ahead," then I would have.
Q Why even speak to Chris Parakilas? What were you looking to get out of this?
A I --
Q Because you're investigating Steven Stebbins, right?
A Correct. I always do that. Any investigation I normally do, I usually like to bounce off what I have with the prosecutor. Like, "Hey, this is what I have. What do you think? Which direction." It was just more for advice on how to handle things.
Q But if you're investigating Steven Stebbins, why are you asking him what to charge Marcus Cameron with?
MS. VITALE: Objection.
A Because I uncovered that he had two active licenses, as well as just basically coming forth with everything that I have, like, "Hey, where should I go with this." I was just looking for guidance. That's all it was.
Q I want to show this exhibit here. You

provided in discovery some RMV docs, and for some reason --

MR. MCLANE: Laura, I don't have a Bates number on this one. I do know that this was the second production from the RMV docs that we provided. I printed off, but for some reason it didn't have the Bates number on it, but it is in what I've provided you.

This will be Exhibit 8.

(Exhibit Number 8, RMV Documents, was Marked for Identification.)

Q Hold on to Exhibit 7.

A Close this or keep it open?

Q You can keep it open.

I just want to talk about it because you said that you discovered he had two active licenses. How did you discover that he had two active license?

A Having someone run him in Connecticut and talking to the Mass.

Q Who ran him in Connecticut?
A I don't recall.
Q And by "running," you mean running through the COLLECT database?
A Yes, sir.
Q So you don't recall who did, but somebody told you that he had two activev licenses?
A Yes, sir.
Q Who did you have run his license in Massachusetts?
A It was a Massachusetts trooper.
Q Who?
A I don't recall, sir.
Q Okay.
A I believe it's in my report.
Q So you called a Massachusetts trooper. Why would you feel the need to call a Massachusetts Trooper to find out if he had an active Massachusetts driver's license?
A I don't recall, sir. I just wanted to verify if he had an active license up there.
Q Well, if you asked somebody look them up in the COLLECT database in Connecticut and it says he lives in Connecticut, wouldn't that

just stop the inquiry?
A Well, no. Again, just going to a step above and beyond having him run in Mass., and I had a place to call up there.
Q But this would have nothing to do with you searching for a residency requirement in the Probation Department?
A I can't recall. I can't recall if it's going to find out if he had two active licenses.
Q But I guess my question is, did you ever point blank ask him where he lived?
A I believe I did.
Q When?
A If I recall correctly, when I initially met up with him, I believe. Again, I'm not -- it's such a long time ago.
Q Okay, well we can, I guess, go with that. But if he told you where he lived, where did he tell you where he lived?
A I never got that.
Q Okay, you never gotten the information. If you look this up in Connecticut and you had somebody look up his address in Connecticut, and they said he has an active Connecticut

license, I guess why not ask somebody in Ohio to run to check if he has an active license in Ohio?
A Because he's working out of Mass.
Q Okay, so you did already know that he's a probation officer in Massachusetts?
A The only way I knew that was from, I think, my meeting with one of the officers from Enfield when I went there. They think he was in Probation out of Mass.
Q So wait, you met with Enfield officers before November 12th of 2018?
A Yes
Q When did you meet with Enfield police officers?
A I don't recall, sir. It was something that Marcus said. He said he went and made a complaint to the Enfield PD, and I just followed up on it.
Q How would they know if he has a license out of Massachusetts?
A That, I don't know, sir. All I know is that one of the officers that I was talking with believed that he worked --

Q That he worked in Massachusetts?
A That he worked in Massachusetts.
Q Okay, but finding out somebody works -- plenty of people in Connecticut work in Massachusetts, right?
A Mm-hmm.
Q Why would finding out if he worked in Massachusetts prompt you to need to find out if he had a Massachusetts driver's license?
A Well, first off, it's deceiving. If he was working in Mass., he has a -- if, in fact, there's a requirement that he has to work in Mass., he should have a Mass. residency.
Q How did you kniow there was a reidency requirement?
A I think I put everything together.
Q So if I work in McDonald's at Suffield and I go there to -- Suffield is a nice town. I know there's a McDonald's in Enfield. If I go to McDonald's in Enfield and I work there, are you going to look up to see whether I have a Connecticut driver's license because I work in Enfield?
A No, I just put -- yes, getting all the facts

and putting it in my report.

Q Well, you're not getting all the facts, right, because that would be impossible?

A Or try to get as many facts as I can.

Q That you felt was relevant?

A I put everything together regardless if it was Stebbins or Marcus Cameron. I was given an assignment. I investigated it the way I investigated it.

Q I mean, why -- this is what I can't wrap my head around. Marcus Cameron made allegations against Steven Stebbins claiming that he threatened him in his driveway. What is Marcus Cameron's address or whether he has a Connecticut or Massachusetts driver's license have to do with any of that?

A To show that he's being deceitful.

Q Okay, so you're looking for evidence to show that Marcus was being deceitful?

MR. MANCINI: Objection.

A If Stebbins did the same thing, I would reveal that he was being deceitful as well.

Q But how would you know? Didn't you involve him in the investigation into Marcus's

residency requirements?

MR. MANCINI: Objection.

MS. VITALE: Objection.

A Everything that I ever asked for Stebbins, a To/From, I followed up on that. Whatever Marcus said, "Hey, I went to Enfield Police Department," I went there and looked into that.

Q Why not invite Marcus into your office when you called the Probation Department?

A He could have came in there. I had no problem with that.

Q You wouldn't have had a problem with it?

A No, but he had a problem with me.

Q Why do you think that?

A Raising his -- I couldn't -- he was talking over me. I couldn't get a word in.

Q When did you talk over you?

A I don't remember the dates. I'd have to look in my report.

Q Okay, real quick. So I sent you -- I provided you with --

MR. MCLANE: Is it Exhibit 7, Michele, the RMV ones that we did?

THE COURT REPORTER: The RMV docs is 8.

MR. MCLANE: Thank you.

Q The RMV docs that I gave you, Exhibit 8, we provided this discovery. This is an application for a Massachusetts driver's license. Do you see at the bottom in Section D where it says, (Reading):

"Out-of-state license, slash, permit conversion to be completed by applicants converting an out-of-state license or permit"?

A For Mass., yes.

Q Well, this is actually a Connecticut driver's license that he put in there to convert his Connecticut driver's license to a Massachusetts driver's license, right?

A Okay.

Q It says the expiration date of that would be June 15th of 2022 and that his issue date of his Connecticut driver's license was August

28th of 2015, okay?
A Okay.
Q So if he filled this out, and it looks like he signed this on -- let's see here --
A In 2016.
Q Right, in 2016.
So is it possible -- so if he filled this out and had to surrender his Connecticut driver's license and convert it to a Massachusetts, why would you still conclude that he had two active driver's licenses?
A Because his vehicles were registered -- he had two vehicles registered to him. This was 2018 when the investigation started. He is violating Connecticut law. He's not supposed to have -- living in Massachusetts, he's claiming, and he has two vehicles registered to him in Connecticut. I think maybe that's why I called Mass. to see if they could run anything, if he had any Mass. vehicles registered.
Q Interesting.
Okay, so now we're on to the

registration. So he's applied in 2016, which was before the 2018 incident. He applied for conversion to a Massachusetts driver's license.

A Mm-hmm.

Q Would you agree that he doesn't have an active Massachusetts driver's license after seeing this, or didn't at the time? Would you agree that in 2018 that he didn't have an active Massachusetts driver's license?

A I don't know, sir.

Q What is your knowledge about each state's Department of Transportation, whether they allow you to have two driver's licenses?

MR. MANCINI: Objection.

A I'm just going by what, basically Attorney Parakilas said. He said that was a violation of Connecticut law, and then the --

Q But where's the evidence?

MS. VITALE: Objection.

Q Well, where's the evidence that he violated Connecticut law?

A But the thing is, I never did anything with it. I never arrested him for it. I never did

anything with it.
Q But you asked the DA whether you could, right?
A No, he --
MS. VITALE: Objection.
MR. MANCINI: Objection.
A I can't recall our conversation.
Q How did Chris Parakilas find out that he had two driver's licenses?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A It had to come from me because that was the first time I ever met with Parakilas regarding this.
Q So why tell him that if it doesn't matter to you?
A Even if, whatever where he told me the direction to go, nothing was followed up on it. There was nothing that was -- I just put it in my report. I didn't do anything with it. I never followed up on it.
Q Okay. So would Marcus Cameron having a Massachusetts and Connecticut driver's license have any bearing on whether Steven

Stebbins threatened him in his driveway on May 22nd of 2018?

A I'm looking at from my standpoint when this was all coming about, when I wrote that is the fact that, to me, there was, like, a little deception going on here.

Q So that would be that he had two driver's licenses, in your mind, and that he --

A Had two vehicles registered in Connecticut.

Q Two vehicles registered in Connecticut?

A Yes, sir.

Q So what was the problem?

A Well, if you're not truthful --

MS. VITALE: Objection.

A If you're not truthful from there, then how else do I know you're telling the truth in everything else.

Q So you took that to be him not being truthful and, therefore, his statements about Steven Stebbins were likely false?

A No, because I did find Stebbins in violation of department policy.

Q What punishment did he receive?

MR. MANCINI: Objection.

A The only punishment that I saw that he received was that by, I believe, Sergeant Gunn. If he was already counseled, then you can't get two slices of the apple. He's already verbally counseled, I believe.

Q Okay.

A I only give recommendations. IA can either add more to it or they could just let it -- again, that's not my decision. That's Internal Affairs' decision how they want to handle discipline.

Q Okay, so he violated department policy and got a verbal counseling from Sergeant Gunn?

A I don't know whatever happened after that, though, sir. That, I don't know.

Q Okay. To the best of your knowledge, was any other punishment handed out other than the verbal?

A I never followed up with it, sir.

Q Okay, but I guess I'm just wrapping my head around, you wrote him up for that -- I won't even go down that road.

THE WITNESS: Can we take a break?

MR. MCLANE: Yes, let's take five.

(Short break.)

Q All right. If you can turn to page 507 on Exhibit 6.
A Okay.
Q At the bottom, it says, (Reading):

"My report and audio recordings will have him doing a lot of explaining."

What audio recordings were you referring to?
A Whatever I turned in with my reports.
Q Well, I think there was only one recording that was turned in, right?
A I thought there was more than that.
Q How many audio recordings did you share?
A No, what I mean by that, sir, it's like wherever was on the NCIC system anything like that, I thought I submitted that as well.
Q Well, you text here that your report and audio recordings, plural, will have him doing a lot of explaining. I know that you didn't record the first conversation on the NCIC

system. You used another device, right?
A Mm-hmm.
Q What other recordings do you have?
A That's what I probably mean by that.
Q Okay, so when you say "recordings," plural, you actually meant the one recording that you had?
A And whatever I submitted with my report.
Q Okay, was there any other audio recordings that you submitted in your report other than things like 911 calls?
A I can't recall. I just know I turned in some other stuff, sir.
Q What would have him doing a lot of explaining? Well, let me rephrase that question because you said you say you're recording audio recordings. Why would your report and audio recordings have him doing a lot of explaining?
A Whatever questions that might come up.
Q Well, what do you mean by that? What questions would come up?
A Whoever sits down and puts us all together. If they look at it, there's just going to be

- that's just me saying that there's going to be some questions.

Q Okay, but what questions would he need to answer?

MS. VITALE: Objection.

Q Well, what questions do you still have?

MS. VITALE: Objection.

A Whatever is in my report, sir. Whatever it is, kind of, like, whatever it is that's been exposed

Q If you could turn to page 513.

A Okay.

Q Did you end up getting a litigation hold notice from Legal? Is that what you meant by "Got one, too. Can you talk" at the bottom?

A What is it?

Q So at the top, it says, (Reading):

"Good morning. Did you receive the litigation hold notice from Legal." You then responded, "No." You then text, "You free for a 33."

I think we discussed with him he interpreted that to mean a phone call?
A Yes, sir.
Q Or a call?
A Yes.
Q And then you said, "Yes." And then it looks like half an hour later, you said, (Reading):

"I got one, too. Can you talk."

So did you receive a litigation hold from Legal?
A I probably got something from Legal, then.
Q Did you delete any records, emails, documents, recordings, anything related to this case after receiving that litigation hold?
A I don't believe so, no.
Q Turn to page 517.
A Yes.
Q Do you see at the bottom of 517 it says November 30, 2021, at 10:29 a.m.,

(Reading):

"Call you back in a few, sir."

Did you call Steven Stebbins on November 30, 2021?

A I don't recall, sir. I imagine could have been calling him for something. I mean, I use my phone for work as well. I mean, this could have been anything. It could be work related. It could be anything, sir.

Q Well, if I'm not mistaken, he was no longer in Troop H in 2021, right?

A No, but he's with Governor's Security, and sometimes there's things that we need to find out with Governor's Security.

Q Okay, do you believe that in November of 2021 you were reaching out to him regarding something having to do with Governor's security?

A I don't recall, sir. Again, that's just me saying it could be anything related, sir. I don't know. I mean, that's 2021. It's a

long time ago.
Q On the last page, page 519, when you say "The truth shall be revealed," what truth was going to be revealed?
A Everything, collectively, for this entire thing.
Q Well, give me one truth that is going to be revealed collectively?
MR. MANCINI: Objection.
A Again, just whoever reviews everything, and then let them put their own, how they want to believe what the truth is.
Q But what do you think the truth is?
MS. VITALE: Objection.
A The truth is that I investigated. The complaint was against department policy, and I found that Mr. Stebbins was in violation of it. And that's the truth. And whatever else that's in there.
Q What did you do to prepare for today's deposition?
A I met with my attorney
Q Without telling me -- I've told you a million times, but I'll just reiterate maybe as a

general policy, any legal questions you ask your attorney and any legal information that he's provided to you, I don't want you to answer those. Obviously, if you saw him at Stop and Shop and you said hello, that is not attorney-client privilege, but anytime you asked him for legal advice or if you're working with him preparing for something, those are things that I don't -- the specifics of which I don't want to know.
With respect to meeting with your attorney, how long did you meet with him in preparation for today's deposition?
A Our time together, working a lot, I'm going to say three or four hours, total, but that's also in conjunction with the interrogatories and stuff like that.
Q So all together with discovery and preparation for today's deposition, maybe probably three or four hours?
A Yes.
Q Okay. Did you review any documents, any discovery before today's deposition?
A Yes, I did, sir.

Q What did you review?
A I asked my attorney for a report that I wrote.
Q What report was that?
A My original report.
Q The original report?
A Yes.
Q If I'm not mistaken, there were like three or four different versions of that?
A Three versions.
Q Okay. Why were there three different versions?
A Well, I turned mine in and I turned it -- when you're done with your complaint, with your investigation, you turn in to your barracks commander.
Q Okay.
A And for some reason, he wanted it changed.
Q Okay, let me pull this out. I want to get on the record -- I'm not going to go through every page of each report, but I would like to at least mark as an exhibit the three different reports that we have.

(Exhibit Number 9, Memorandum, was Marked for Identification.)

(Exhibit Number 10, Memorandum, was Marked for Identification.)

(Exhibit Number 11, Memorandum, was Marked for Identification.)

Q These are 9, 10, and 11.
So with respect to some of the changes -- and I don't know if I want to go line by line on every change, but what do you recall specifically? You said your -- I'm sorry, explain again, why were there three separate reports?
A My initial, which I turned in to Lieutenant Loughman, he wanted it shortened. He wanted it changed and shortened.
Q What did he want changed and why did he want it changed?

A Without looking at both of them, but I imagined it where I might have said, like I called so-and-so on such-and-such a date negative contact. I'm speculating that he probably said, "Do you really need that in there. Remove it." The final version of it, he put that together. He -- now mind you, everything that I've always sent him, that we do with all our complaints, it's on a Microsoft Word document.

Q Okay.

A So I sent everything to him on Microsoft Word document. That final version, that's him cutting and pasting. I had nothing to do with that.

Q Okay, so when we look at the -- so version one, we've marked as Exhibit 9 and that begins at Stebbins 320. Version two, we've marked as Exhibit 10, which begins at Stebbins 261. And then version three, we've marked as Exhibit 11, and it starts at Stebbins 103. So you're saying that Stebbins 103 you have nothing to do with?

A No.

Q Okay. So if we look at Stebbins 261, for example, and that would be Exhibit 10.
Hold on one sec.
All right, so number three is -- I'm sorry, you said that Lieutenant Loughman is -- is it pronounced Loughman?
A Yes. It's L-o-u- --
Q All right, so if I've been saying Loughman, I've been mispronouncing his name.
A People do it all the time.
Q Okay. So you're saying version number three, which is Stebbins 103, that's Lieutenant Loughman. He wrote that?
A He cut and pasted.
Q Did you sign it?
A Yes.
Q Okay. Did you agree with everything he cut and pasted?
A Again, he just said, "Sign it. It's an order," so I signed it.
Q Well, okay, so did you -- my question is, did you agree with what he had you sign?
A I told him I prefer to keep the original, and obviously he didn't want it.

Q What was his reasoning for not keeping the original?

MR. MANCINI: Objection.

A You're going to have to ask him, sir. I don't know.

Q He didn't tell you?

A Not really, no.

Q Okay, so he told you to sign it, and you said "I prefer to keep the original." Did he ask you why?

A I don't recall, sir. That was a long time ago.

MS. VITALE: Objection.

Q Okay. With respect to the second version, which starts with Stebbins 261, a number of things were changed in this. Were they based on Lieutenant Loughman's suggestions? Because even if we look at page 321 of Exhibit 9 and 262 of Exhibit 10, it looks like a number of things were added in, right, on that particular page, right? So we have -- or, actually, removed. It looks like a couple of the items from 262 somebody added in, right? So version one is Stebbins 320.

Version two is 262. It looks like a number of things were added into 262 were moved, is that accurate?

A Again, sir --

MS. VITALE: Objection.

A Again, sir, it was such a long time ago, I'm not sure he wants this. Again, it was such a long time ago, sir.

Q At any point do you recall any specific instruction or specific orders given by Lieutenant Loughman to change something on your report?

MR. MANCINI: Objection.

A Again, sir, I don't recall.

Q All right. Did he ever explain to you why he wanted something changed?

A No, I don't think he ever said, really, why.

Q Did you ask him why?

A He's my boss. I don't think I -- I just said I'd like to keep the original. That's all, sir.

Q Okay. So it seems like, from what we talked about before, when we look at Samson 11, there's a letter to Steven Stebbins, telling

him not to discuss the investigation with anyone, right? We're looking at --

MS. VITALE: Objection.

MR. MCLANE: What exhibit is this, Michele?

THE COURT REPORTER: Exhibit 5.

Q We are looking at Exhibit 5. You discussed before that you said people don't really take that order seriously even though it's coming from a Lieutenant?

MS. VITALE: Objection.

A Yes, sir.

Q Right. I mean, why, then, sign something you don't believe is accurate --

MR. MANCINI: Objection.

Q -- just because your --

MS. VITALE: Objection.

Q -- lieutenant told you to?

MS. VITALE: Objection.

A He told me to sign it, so I signed it.

Q Okay, but if he told you to do something that was a lie and you signed something that was not true --

A Well, that's a different circumstances. Of

course --

MS. VITALE: Objection.

A -- I wouldn't.

THE WITNESS: I'm sorry. I heard her say something.

MS. VITALE: Sorry.

THE WITNESS: No, no, that's all right.

A No, of course, you're not going to do anything that's going to be in conflict of an unlawful order.

Q Okay. So you thought it was a lawful order for him to make you change what you didn't want to change?

A Again, I'm not sure -- this happened such a long time ago, I'm not sure if he said, "Steve, I just cut and paste all the information here. Gotta get to IA. Sign it." Again, this happened such a long time ago, I don't recall what the substance of that conversation was.

Q Okay. If you don't recall the substance of the conversation, what did you want -- why was it important to you to keep the report as

it stood?

A That's a lot of work and effort I put into it. It's just me. I think in any investigation you do, you put that time and effort into it, so you think it would stand on its own. That's all. I was just basically just prior to doing a report.

Q You don't believe that his changes that he had you sign put you in a position of signing something that was not true?

MS. VITALE: Objection.

MR. MANCINI: Objection.

A I trust my boss. If he said "Just sign it," I know that -- his job is -- from me being a lieutenant, your job is to take care of your people, not put them in a situation they're going to have to -- put them in an awkward situation. I don't think Lieutenant Daniel Loughman would do that to me.

Q What other documents did you review for today's deposition?

A That was it, sir.

Q So when we're sitting here today and I asked you about prior text messages, I know you

said you said you sat and showed your lawyer.
Are you aware if there are any text messages between Steven Stebbins and you about Marcus Cameron and that investigation prior to what you submitted as documents number 495 through 519?
A Not that I'm aware of, sir.
Q Would you commit to checking again after this deposition?
A I have no problem with that.
Q Your current position -- I know you're a lieutenant, but what is your actual position with Connecticut State Police?
A I am the -- you know something? I just got transferred. I don't even know what my title is in my new position.
Q When did you get transferred to this mysterious position?
A The 24th. In the Connecticut State Police, the entire command staff got reshuffled.
Q That's fair. That was very recent.
So you don't know what you're going to be doing?
A I know I'm in research and planning in CAD.

But outside of that, I'm not sure if I'm the commanding officer or executive officer or whatever my stance is on that.
Q What do you do right before you got promoted on the 24th -- or you got moved on the 24th?
A What assignment did I have before?
Q Yes.
A I was at Troop C as a barracks commander.
Q Maybe this will make this quicker: What other positions have you had since being the sergeant at Troop H in 2018 to now?
A I'll start from there that will probably be the easiest.
Q Yes.
A From Troop H, I went to Troop C as a sergeant, got promoted to the executive officer, Master Sergeant. Then I got promoted to Lieutenant. I became the barracks commander out of Troop K. Then sent to Troop H as the barracks commander. At Troop H, they wanted me at the academy as a commandant, so I was a commandant for the 132nd. I requested to go back to the field. They sent me to Troop C as a barracks

commander. And from Troop C, I'm hopefully going to make captain. And they have me down at headquarters right now.

Q So you put in for Captain?

A Yes, sir.

Q Why did you move as a sergeant from Troop H to Troop C?

A I requested it, sir.

Q Why?

A I was there for over ten years.

Q At Troop H?

A Yes.

Q Or you were at Troop C for over ten years?

A No, no, I was at Troop H for -- and they're doing command staff reshuffling and stuff like that. I just said, you know, maybe it's time for me to try something different.

Q Okay, so it wasn't a promotion. You're still a sergeant. You just went to Troop C?

A Yes, sir.

Q But then why go back to Troop H?

A As a Lieutenant?

Q Yes.

A Once you become a barracks commander, you --

I have no say where I go.
Q Okay, they just assign you?
A They just assign me.
Q So you do have to say where you go as a sergeant?
A Really, no on that matter, too. You can request it. It's not like they're really going to grant it. I requested Troop C as a sergeant. I thought would be very interesting because that's where I started as a trooper, to go back as a sergeant. I thought that would be neat. I knew that I wanted to get promoted to Lieutenant, so at least I wanted to go back to say, hey, I went back as a sergeant, and then hopefully -- which I think is kind of neat. I became a trooper, sergeant, master sergeant, and Lieutenant -- sorry, I'm talking too fast -- at Troop C.
Q You said that you sued the Connecticut State Police over racial discrimination. Where were you stationed when you sued them over racial discrimination?
A I was in the emergency service aviation unit.

I was a pilot
Q Do you still maintain your pilot's license?
A I still have I have. To answer your question, no. Just flying up and down the interstate in a car.
Q Where did you get your pilot's license?
A Ellington, at Northeast Helicopter. I finished up there. And Bell Helicopter School in Fort Worth, Texas.
Q Okay, so you were in the military?
A I was in the military, yes.
Q How long?
A 20 years.
Q Are you still in?
A No, honorable discharge.
Q When did you get out?
A 2016, 2017, I think. I don't know the date. I don't care.
Q Was it obviously Reserve, then, or Guard?
A I went into the Army National Guard. I was a full-time guardsmen for ten years, working for the feds. And then I became a trooper, but I still continued with the Army National Guard.

Q Got it. So you were AGR?
A You had two paths. You can go AGR or you can go the technician side of it.
Q You were a technician?
A Yes.
Q All right. So you were a technician and then you went full time for the Connecticut State Police?
A Yes.
Q And then switched over?
A Yes.
Q You retired. What's the highest rank you got?
A Staff Sergeant.
Q When did you start at the Connecticut State Police? Do you remember what year?
A Yes. February 14, 1997.
Q Okay, so it's been 26 years, a little over 26 years. You just celebrated your 26th anniversary last month?
A Yes, sir.
Q All right. How long did you spend -- well, when did you start -- I want to ask you about the Internal Affairs investigations. When

did you start doing them? Was it when you became a sergeant, or did you have to go to some special training for that?
A No specialized training. It is just basically when you're a sergeant, the lieutenancy can just turn around and just say, "Hey, you're doing an investigation."
Q How many have you done?
A I don't recall, sir.
Q Okay, more than ten?
A I don't know, sir.
Q How many have you done, you think, by 2018 when you investigated Steven Stebbins?
A I don't know, sir. I can't recall.
Q I mean, is it you don't know because it's a lot or you don't know because it's a few?
A I think it's a lot.
Q How many of your investigations resulted in I guess what we would say is serious punishment to an officer --
MR. MANCINI: Objection.
Q - or a trooper?
MS. VITALE: Objection.
MR. MANCINI: Objection.

A The only level that I see because they're complaints because I'm not in IA, the most that they're probably going to get is probably a written recommend, possibly. But again, whatever I would probably recommend, it's IA is the one that makes the final decision on it.

Q How many have you recommended a trooper be punished?

A I can't recall. I have recommended some, but I can't recall how many, sir.

MR. MCLANE: Let's mark this as 12.

(Exhibit Number 12, Uniform Civilian Complaint Report, was Marked for Identification.)

Q Do you recognize this document?

A 678? Yes.

Q What do you mean, what is 678? What is that significance to you? I see it's the document number in the bottom, but can you explain that?

A It's just a slang word that we have, like, that there's a complaint form.
Q Okay, so you have, I'm guessing much, like the military standard forms that -- so you would be familiar with, like, a 4856 in the military. Everybody understands that to be a counseling form, right?
A When I was in, it was a DD214.
Q So much like the Connecticut State Police, you'd have standard forms and this was, the DPS 678C-1, that's an Internal Affairs complaint form?
A Yes, sir.
Q Okay. And this would be the standard form that people file their complaints on?
A Yes. There's actually -- let me clarify this, too, sir. There's actually two types. You have the civilian where they can actually file it themselves. And you have the one where someone comes in the barracks and says, "I want to make a complaint," and the sergeant could just turn around and he could submit the form.
Q Got it.

But it would be signed by that Sergeant if it was signed at all?
A It should be.
Q Is it the same form that's used?
A It's basically the same form.
Q Is it a different form number?
A I want to say there's some variation. I'm not sure if it's like -- this is C1. I'm not sure if it's, like, C2 or something like that.
Q Okay. When did you first get a copy of this complaint?
A I don't recall, sir.
Q Okay. When did you get assigned to investigate it?
A I don't recall the date on it, sir.
Q I think we have an internal email, and I'll ask you some questions. Let me just get the exhibit number.
MR. MCLANE: Was it Exhibit 1?
THE COURT REPORTER: Exhibit 3.
Q We're looking at Exhibit Number 3, 158. We know that you emailed Marcus on June 19th of 2018 to let him know that you'd be

investigating the complaint or the allegations or -- what is it -- the complaint that you have made against Trooper First Class Stebbins. We know, looking at the DPS678 Form, that it was received on May 26th of 2018. So do you recall how long or -- excuse me, between May 26th of 2018 and June 19, 2018, you don't remember when you actually received notice or assignment that you'd be working on this investigation?

A I don't recall, sir.

Q Okay. It also says - there's another the attachment for this.

MR. MCLANE: Let me take two minutes. I'm sorry, I've got to make a copy. I have an email, but it's missing the attachment. I just want to make some copies. It's 335, and the date is July 23rd.

Let's go off the record.

(Short break.)

MR. MCLANE: Let's go back on the record.

(Exhibit Number 13, Email With Attached NCIC Off-Line Search, was Marked for Identification.)

Q So this is Exhibit 13.

MR. MANCINI: These are both Exhibit 13?

MR. MCLANE: Yes.

Q So looking at Exhibit 13, it looks like July 23, 2018, Brenda Zaprzalka. Is that how you pronounce her name?

A I guess so.

Q She had sent you -- it says, (Reading):

"Please see attached off-line search request on behalf of CT State Police Troop H Barracks in Hartford. Thank you in advance for any assistance you can provide regarding attached. Most appreciated."

She sent it to ioau@leo.gov Who is

ioau@leo.gov?
A I don't know, sir.
Q What is leo.gov?
A I don't know, sir.
Q All right. She CC'ed you and included what was called an NCIC off-line search. It's the document and written in Comic Sans font. What is an NCIC off-line search?
A I'm going to say that it is probably, like, looked like -- using my name, for example, see if Stephen Samson ran anything, give, I guess, a time parameter, and see what comes up on it.
Q So it said, "Type of search," and it says, "Please provide query results for CT registration plate numbers," and there are four separate plate numbers. It says from May 1, 2018, to present day. Where did you get those plate numbers?
A I don't recall, sir.
Q Well, it says the requester here is Sergeant Stephen Samson?
A Yes, sir. I mean, that's going back some time, sir. I don't recall.

Q Okay, but I think we had discussed earlier you didn't know who any of these people were and you hadn't heard their name and I asked about their license plate numbers. Do you believe now that you had their license plate numbers to run a query in July of 2018?

MS. VITALE: Objection.

A I don't recall sir.

Q What was the purpose of running a query for these four license plate numbers?

A I don't recall.

Q And what would -- when you asked for -- what is a query result?

A Basically, whatever they come up with.

Q Okay, so if they run -- where are they running these license plate numbers?

A COLLECT, I believe.

Q Okay.

A Again, I'm guessing at that.

Q What is an ORI, where it says "ORI CTS CP 0900"?

A I believe the "ORI" stands for, like, the designation where the troop is at.

Q Did you ever get any results?

A I don't recall, sir.
Q Any reason why they wouldn't be attached to this email, the results?
A I don't recall, sir.
Q Okay. Because we have the request. Did she ever send you the results?
A I don't recall, sir.
Q Because we had sent the -- we got an email from your attorney when we had asked about COLLECT information you ran, they gave him confirmation they didn't have any. Did they give you any confirmation that, no, these plates had never been run before?
A I don't recall, sir.
Q But what would the query provide you? So if you ran that license plate number, what would it provide you?
A It would probably show -- when you do something like that, it would show, like, who ran it, who was the person requesting for it, I guess.
Q Okay, why would you need that information with those four license plate numbers?
A I don't recall, sir.

Q Well, we know that it's got a C number attached to it, and that C number is the C number assigned to your investigation of Trooper Stebbins. So what was the point of running a search for those four license plate numbers?

A I don't recall, sir.

Q I mean, why would you care who ran them if you're doing an Internal Affairs investigation?

A I can't recall, sir, why I did that.

Q Did Mr. Cameron accuse Mr. Stebbins of running his license plate number multiple times by that point in time?

A I don't know, sir. I don't recall.

Q Okay. What other information do you get when you run somebody's license plate number?

A The person requesting, and I think whatever your request was. If it was a vehicle, they would probably give you all the vehicle information.

Q Do they give you the person's driver's license information?

A I believe so, yes.

Q And you don't remember ever getting anything back?
A I don't recall, sir.
Q So June 19th, we have an email, Exhibit 5. That was the first time you reached out to Mr. Cameron?
A I believe so.
Q At that point in time, what did you discuss about the investigation with Steven Stebbins?
MR. MANCINI: Objection.
A I don't recall, sir.
Q Okay. Do you remember having discussions with him prior to meeting with Marcus?
A I don't recall, sir.
Q So after you notified him, so we have June 19th you sent him that email. You met with him on June 25th of 2018, is that accurate?
A With Stebbins?
Q With Marcus?
A Yes.
Q Okay. Between June 19th of 2018 and June 25th of 2018, have you had any discussions with Mr. Stebbins about the investigation?
A I don't recall, sir.

Q Had you discussed it with anyone else?
A I don't recall, sir.
Q So after meeting with Marcus, what investigating -- let me ask this. What information did you look up on Marcus after you met with him?
MR. MANCINI: Objection.
A I don't recall.
Q So we know you looked up the residency requirement, right?
A Yes, sir.
Q All right. We know you inquired about his licenses?
A Mm-hmm.
Q We know you inquired about his registrations on his vehicles?
A Mm-hmm.
Q We know you inquired about Danielle who worked with him, right?
A Mm-hmm.
Q You called his employer?
A Mm-hmm.
Q What else were you looking up about Marcus?
A I don't recall, sir.

Q Okay. I'm going to show you two separate exhibits. So 143 will be the next one, which is 14. Then 142 will be 15.

MR. MCLANE: Laura, Samson 143 will be 14 and Samson 142 will be 15.

(Exhibit Number 14, Email, was Marked for Identification.)

(Exhibit Number 15, Email, was Marked for Identification.)

Q So 142 is dated July 6th, but 143 is July 5th. I'm just going to go date order rather than Bates order.

So if we're looking Bates number 143, you sent an email to Marcus on July 5, 2018, that says, (Reading):

"Good afternoon, Marcus. I've compiled all my facts for this investigation, and as I explained to you on June 25th, if you will still give me a

written statement with your signature validating your complaint. Thank you, and please let me know what is a good date and time for me to obtain your written statement."

So you mentioned getting a written statement from him twice in that email.

A Mm-hmm.

Q Why was it so important for you to get a written statement from him?

A That's part of the process. They ask us to try to get a written statement from someone. If they say "No, we're not giving it to you," then you move on.

Q Okay. Had you already spoken to Chris Parakilas?

A I don't know what the timeline is on that, sir.

Q So this was written on July 5, 2018, at 2 in the afternoon. I'm asking, have you spoken to Chris Parakilas before that about Marcus's

charges with respect to lying to a police officer or having multiple driver's licenses or having registered vehicles in the state of Connecticut?

A Whatever the date is that --

MS. VITALE: Objection.

A -- I met with Parakilas. I don't know what the date of that was, but that was the only time I ever spoke with Parakilas. So where this fall in the timeline, I don't know. I don't know where it does.

Q I have another question. If you're writing to Marcus and saying you've compiled all your facts for the investigation, why did you call this employer 12 days later?

A I don't recall, sir.

Q But if you have all your facts, why would you need to call his employer?

A Again, my rational thinking, I don't recall, sir.

Q Now, Exhibit 15, which is Bates numbered 142, this is, again, to Marcus. This is the next day at 7:28 a.m. It says, (Reading):

"Good morning, Marcus. I'm looking for the complete name and contact information for your co-worker, so I can obtain a written statement for this investigation."

This is the co-worker that you said is a witness on June 25th. So you're, again, trying to seek a written statement, right? What is the meaning of "I'm looking for the complete name contact information for your co-worker, so I obtain a written statement for this investigation"? Are you referring to trying to get a written statement from Danielle or from Marcus?

A I don't recall if I'm looking at her getting a statement from or -- I don't recall, sir.

Q Okay, but it would indicate that the very next day, if you're looking to obtain a written statement from Danielle, that you would not have compiled all your facts with the investigation, is that accurate?

A Yes. But again, I don't know where

everything fell in. I don't know if I was, like, a loose end, like -- like I said, I have to try to get a written statement. I haven't really confirmed that I got no from anybody, I believe, if I recall correctly. At least now I could say -- if my boss asked me how come I didn't get a written statement, I can actually tell him they didn't say "Yes, I'm going to give you one.

(Exhibit Number 16, Bates Documents 000001 through 000010, was Marked for Identification.)

Q I'm going to show you Exhibit 16 now. This was Bates numbers -1 through -10. Do you recognize this?
A I don't recall, sir.
Q So it looks at the top that it's from Lieutenant Daniel Loughman --
A Yes.
Q -- from Major Scott Smith regarding the C18-086 investigation, right? The top seems

to be the official report that Lieutenant Loughman sent to Major Scott Smith, which includes the letter he sent to Marcus, and that's Bates numbered Samson -3, and your final memorandum, starting at Bates Number -4 and ending up with Bates Number -10. Have you seen these documents before?

A I don't recall, sir.

Q Okay, then let me ask another question.

Was a formal investigation into Marcus's driver's licenses ever conducted?

MR. MANCINI: Objection.

MS. VITALE: Objection.

A What do you mean?

Q So was a formal investigation to charge Marcus with the crime for having two different driver's license ever conducted?

A I believe, no.

Q What about with respect to him having cars that were registered to Connecticut? Was a formal investigation ever conducted?

A No.

Q Other than the mass state trooper, what sources did you use to investigate Marcus's

driver's licenses?
MS. VITALE: Objection.
A No. The only one I recall is that Mass. Trooper, sir.
Q Okay. Did you look up any database in Massachusetts?
A I don't recall. I don't think so, but I don't recall.
Q Now, to get the confirmation for his Connecticut driver's license, did you look at the or did you use the COLLECT database?
A Whatever I possibly gave, I believe, to the dispatchers.
Q Did you ever call Marcus and confirm either that he had two driver's licenses or that you had suspicion as to his address?
A I don't recall, sir, if I did or not.
Q Would there be a reason you wouldn't call him if you came upon that information to confirm that? Let me ask this: If you suspect that he had two driver's licenses and that was against the law, why wouldn't you call him and ask?
MS. VITALE: Objection.

A I don't know. I never followed up. I never called him about it, about his two driver's licenses.

Q But you thought it was important enough to talk to Chris Parakilas about it?

A Yes.

Q But why not confirm with him whether he had two active driver's licenses?

A Again, I can't recall the whole thing put together, sir. I'm not sure, did the Mass. trooper confirm it, did I confirm it there. I didn't show the two active licenses. I'm not sure.

Q But Chris Parakilas would necessarily be relying on what you tell him in his decision on whether or not to file charges, right?

MR. MANCINI: Objection.

A Yes, but --

MS. VITALE: Objection.

A -- there were no charges filed.

Q I think I want to stay on that for a second because you had said that you were trying to get as much information as possible. You called his employer. You asked the Mass.

state trooper about it. Why not just pick up the phone and call him before you go to Chris Parakilas that you have all the information?

A I don't recall what the relationship was that we had at that time, so I can't answer that to its full extent, sir.

Q When did you feel like you didn't have a good relationship with Marcus?

A I don't recall, sir.

MR. MCLANE: I'm going to pause here because I said at 2:00 I have to take a half hour break. Let's come back here at 2:30.

(Short break.)

MR. MCLANE: Back on the record. Let's mark this as Exhibit 17.

(Exhibit Number 17, Bates Documents 000076 through 000081, was Marked for Identification.)

MR. MCLANE: Laura, this is Samson -76 to -81.

Q Lieutenant Samson, do you recognize this as the memorandum sent to you by Trooper Stebbins with respect to the Internal Affairs investigation? You can take a look at it if you need to.

A I believe it is, sir.

Q I mean, you recognize that? You've seen this before?

A Yes.

Q In the top, right-hand corner, you can see that it's dated June 29th of 2018, is that accurate?

A Yes, it is.

Q So I'm going to show you another document.

MR. MCLANE: Let's mark this as Exhibit 18.

(Exhibit Number 18, Email, was Marked for Identification.)

Q It is Bates number Stebbins 451. The date on this email from Steven Stebbins to you -- the

attachments say "Memo to Sergeant Samson is July 23, 2018. Now, I'll represent to you that I have no documents or correspondence that show that Steven Stebbins sent you a memo before July 23rd. Is there a reason why the memo he sent was dated on June 29th but sent to you on July 23rd?

MS. VITALE: Objection.

A Again, I can't speak for the attachment on there because it -- unless you're saying this came with this, but I know when we usually put the date -- I mean, I do this all the time. And I think a lot of us do it, unfortunately, is we'll put the date down, but sometimes we don't turn that in until down the road times later.

Q All right. So let me ask you, do you have any memory of receiving this memo dated 6/29/2018 before July 23, 2018?

A I don't recall, sir. Sorry.

Q Do you believe that an email would exist if you did receive it before July 23, 2018?

A I don't know, sir.

MR. MCLANE: Is this 20?

THE COURT REPORTER: 19.

(Exhibit Number 19, Email, was Marked for Identification.)

Q I'm showing you what is marked as Exhibit 19. This is Stebbins 14. This is from Steven Stebbins to you. It says "Updated version" in the subject line. The email is dated September 10th of 2018. What was he sending you the updated version of?

A I don't recall, sir.

Q Okay. Have we been provided all of the different versions that he might have written with respect to any memos to you?

MS. VITALE: Objection.

A Whatever I had I turned in. I can't speak for Mr. Stebbins on what he might have turned in.

Q How many different drafts of memos did he send you?

MS. VITALE: Objection.

A I don't know, sir.

MR. MCLANE: Let's mark this,

please.

(Exhibit Number 20, Email, was Marked for Identification.)

MR. MCLANE: This is B55, Laura.

MS. VITALE: That's Enfield, right?

MR. MCLANE: Yes.

Q So this is an email from Steven Stebbins to Bryan Nolan that was exchanged in this case. And this was on Thursday, November 15, 2018. This would be after Marcus was arrested, is that accurate?

A I'm not sure. When was he arrested? What is the date on it?

Q So if I told you it was November 12th of 2018, would that seem accurate to you?

A Well, this is before his arrest, then, yes, by the date on it.

Q So so if I told you Marcus Cameron was arrested on November 12, 2018, this would have been sent after the --

A Oh, I'm sorry, yes.

MS. VITALE: Objection.

Q One of the attachments says, "C-18-086 TFC Stebbins Report Revised." Have you ever received a file called "TFC Stebbins Report Revised"?
A I might have. When it's revised, that could be the revised version of the three that are out there. That's what I'm speculating on.
Q Okay. Why would it be sent in a word doc format?
MR. MANCINI: Objection.
A I don't know, sir.
Q Would these have been signed? When you sign them, do they get scanned or what?
A Basically, I send it, like, put it all together and I give it to the lieutenant.
Q Well, how did Stebbins get it?
A Because I have it on Word document, so I probably -- again, that's me because I have to type it up, the incident, so...
Q So was Stebbins receiving different versions of this report prior your final determination?
MS. VITALE: Objection.
Q Prior to the final report, was Trooper

Stebbbins receiving multiple versions of
this?
MR. MANCINI: Objection.
A I don't recall, sir.
Q Okay. Did you show Trooper Stebbins the
final memorandum before you showed Marcus the
final memorandum?
MS. VITALE: Objection.
A I don't recall, sir.
Q Were you in contact with the Enfield Police
Department after Marcus was arrested on
November 12, 2018?
MS. VITALE: Objection.
A I don't recall if it was. They were probably
asking me for something. Other than that, I
don't recall.
Q Well, do you remember them asking you for
anything?
MS. VITALE: Objection.
A Off the top of my head, no.
Q What about Sergeant Nolan? Did he ask you
for anything after Marcus was arrested?
MS. VITALE: Objection.
MR. MANCINI: Objection.

A I don't recall, sir. He might have. I don't know.

(Exhibit Number 21, Email Chain, was Marked for Identification.)

Q I'm showing you what is marked as Exhibit 21.

MS. VITALE: What is this one?

MR. MCLANE: It's Samson 136 and 137.

Q So the bottom of 136, there's an email from Paul Gunn to you on July 18, 2018. It says, "Memo, slash, TFC Stebbins complaint." This is Sergeant Paul Gunn, Number 126 in his signature block. It says, (Reading):

"Steve, attached is a rough draft of my memo. Could you please furnish me with some names and dates that are missing so I can complete the memo? My notes were lost when the computer crashed. Sorry.

I'm back in for eves today,
Wednesday, July 19th."

Looks like six hours later, you emailed Master Sergeant Fedigan. It looks like it was forwarded. And you said, (Reading):

"Can I get a memo regarding
the Stebbins complaint? I
need to wrap this up Friday.
Thank you."

Did they ever provide these to you in an email?
A I don't recall, sir.
Q Okay. Did you email Paul Gunn with the names and dates that were missing?
A I don't recall, sir.
Q Did you provide the rough draft that was attached to this?
A I can't recall, sir.
MR. MCLANE: So Dennis, I don't think we got it. I'm just going to double-check afterwards, but I'll send a

request if we don't have it.

MR. MANCINI: Okay.

Q Did you call Sergeant Gunn after receiving this to help him write his report?

A I don't recall, sir.

Q But you end up getting information from him to help you write your report?

A Yes.

Q What about Todd Fedigan? What information are you looking for from Todd Fedigan?

A If I recall correctly, I think it was Mr. Fedigan -- or Master Fedigan, my apologies, and Sergeant Gunn. They both had interactions with Mr. Cameron and I was just putting that in my report if I recall correctly.

Q Did you get a written statement from the mailwoman? I think her name was Candice. I can look.

A No.

Q Why not?

A I did it via the phone.

Q But why not get a written statement?

A I didn't get a lot of written statements for

some of the others.
Q Did she make it into the final report?
A Yes. Well, the final...?
Q The final version.
A That, I don't know.
Q Let me see. She was at least in the second version, right, which we have as Exhibit 10? Actually, let's go to Exhibit 9, which begins on page Stebbins 320. I'm going to look at Stebbins 340, if you don't mind.
Are you with me on page 340?
A Yes, sir.
Q The last paragraph says, (Reading):

"July 2018, I was able to obtain information regarding Massachusetts Adult Probation residency requirements. Some of these requirements list from being arrested to residence requirements as employee." It says, "General Requirements Section 4.100 Part A." Then in bold, you

write, "Only persons who are residents of the Commonwealth of Massachusetts may serve as officers in or as employee of the judicial branch."

Does this maybe refresh your recollection as to whether you had Myles Ginley obtain this information for you?
A No, it doesn't, sir.
Q So you agree with me that you submitted this report that you did obtain that information?
A Well, I did get the report, but I don't know how I obtained it, sir.
Q Why in the world would Myles Ginley in July 18th be forwarding you this aside from you asking him?
A Again, I don't recall how it came about, sir.
Q WE will come back to it.
So I think you've testified before, but I want to confirm, when you sent in the COLLECT queries regarding those license plates, I know that you said that it would show who ran the license plates. Did

you ever discover that Trooper Stebbins was running any of those license plate numbers?

MR. MANCINI: Objection.

MS. VITALE: Objection to form.

A I don't recall, sir.

Q So how did you go about scheduling a meeting with Chris Parikelis on July 25, 2018?

A I don't know. I don't know if I called him or emailed him. I don't recall, sir.

Q Okay, so I've found it. Let's look at Stebbins 335 on Exhibit 9. Go to the last paragraph that says, (Reading):

"On July 19, 2018, at approximately 1400 hours, I made contact the federal postal worker Candace Ciplolla via phone." And then you list her number. "I explained the reason for my call and if she delivers mail on Foxcroft Road in the town of Enfield. I also asked how long that she has been employed by the

postal office. Cipolla explained to me that she had been employed as a mail carrier for over 20 years and that she does deliver mail to residents on Foxcroft Road. I asked Cipolla if she knows Marcus Cameron at 49 Foxcroft Road and if he lives there. Cipolla explained to me that she does know Marcus Cameron and he definitely lives there because she delivers his mail and packages to his home." It goes on to say, "I asked Cipolla if she had any issues or problems with Marcus Cameron. Cipolla stated, This past June, I was delivering mail before to 49 Foxcroft, the Marcus Cameron residence. And it was on a Saturday.'"

You're quoting this. Did you record this?
A No. What I normally do is I put this phone on speaker and I write as they are speaking.
Q And you believe that you wrote every single thing accurately when you put her on speaker?
A I believe I did.
Q So it continues, (Reading):

"I noticed that he was having a party due to all the cars parking in front of his house and people standing outside. Because of the vehicles parked in front of his mailbox, I had overshot it slightly and started to get out to put his mail in the mailbox. As I stepped out of my vehicle, I could immediately smell the odor of marijuana coming from the area of Cameron's residence where some people were standing with him."

Did you ask, at any point in time, Ms. Cipolla how she knew it was the odor of marijuana coming from the area of Cameron's residence?

A Again, I'm not sure if she's just going right down the line of explaining everything. I don't know how the question went about and so forth, so I don't recall.

Q And you're telling me that she said those exact words, "From the area of Cameron's residence"?

A Yes.

Q Okay. She said, (Reading):

"Where some people were standing with him. As I walked up to his mailbox, Marcus Cameron started to yell and belittle me in front of his guests, at one point, calling me a, quote, lazy asshole.'"

Did you ask her how she knew it was Marcus

Cameron on if a bunch of people were outside?
A No, I didn't.
Q Would you know how she would know it was Marcus Cameron if a bunch of people were outside?
A Again, that's something you'd have to ask her.
Q Well, you put it in your report, right?
A Well, she's a mail person. I imagine -- I know when my mail person seese me, they know exactly who I am. And if she's been delivering there for quite a while, she probably knows who lives at what address and what they look like.
Q Well, I mean, you called the Massachusetts State Police to verify whether Marcus Cameron had a Massachusetts license because you wanted to get all the information. I'm asking, why not ask this lady how she confirmed that it was Marcus Cameron outside rather than just guessing because she's a mail woman?
MR. MANCINI: Objection.
A Again, sir, I don't recall how we even

discussed this.
Q (Reading):

"It appeared he was showing off in front of his friends by treating me this way and I felt that he is racially against white people. This is not the first time he treated me unfairly for no apparent reason."

Did you follow up why you thought he was racially against white people?
A No.
Q Okay. I think going back, you said you had called her on July 19th. That was two days after you left a voicemail with Marcus Cameron's employer, correct?
A Yes.
Q Okay, so --
A I'm sorry, can you say it again, sir?
Q You reached out to Ms. Cipolla on July 19th?
A Yes. I'm sorry, yes.

Q So this was two days after you left the voicemail with Marcus Cameron's employer, is that accurate?
A Yes.
Q Okay. When you left that voicemail, do you recall saying it would be great if the mail lady said that he was playing the racial card?
MS. VITALE: Objection.
A I don't recall, sir. I don't recall how the context of that came about.
Q Well, we've played it, like, 12 times before. What's another time?
MS. VITALE: Objection.
MR. MCLANE: It wasn't a question, Laura. Jokes by Counsel. They're not objectionable.
Okay, I'm going to play this.

(Whereupon, Mr. McLane played audio.)

Q When you say "I'm going on Danielle. That's my in," what did you mean by that?

A I believe, I'm basically looking who the witness is. That's what I'm going with.

Q What does "That's my in" mean?

A I don't recall, sir. I mean, it happened a couple of years ago. It just must mean, to me, that that was my in, trying to get information.

Q I don't understand because on July 5th you emailed Marcus Cameron, saying you've compiled all the facts and you just needed his written statement. What in would you be looking for 12 days later with his employer?

A I don't recall, sir.

(Whereupon, Mr. McLane played audio.)

Q Okay, who was the other asshole that you called?

A I don't recall, sir.

(Whereupon, Mr. McLane played audio.)

Q Okay, you spoke with a supervisor and they said there's no one in that office name Danielle. It that Marcus's supervisor?
A I believe so, sir.
Q Okay. I think it was referred to in the memorandum if you do need to take a look, I believe, on page 335 at the top.
A I see it.
Q So by "that other asshole," would you be referring to Marcus Cameron --
A I don't know.
Q -- if your next sentence was that you reached out to a supervisor about another employee named Danielle?
A I don't know, sir.

(Whereupon, Mr. McLane played audio.)

Q What were the mounds of paperwork that diminished Marcus's complaint?
A I don't recall, sir. Maybe it's everything I was putting together for this, sir.
Q Did you produce all that paperwork in

discovery that would have diminished Marcus's complaint?
A I turned in everything to my supervisor once I completed this.
Q How would his complaint be diminished by him having a Massachusetts and Connecticut driver's license and having a registered vehicle in Connecticut if he lived in Massachusetts? How would his complaint against Trooper Stebbins be diminished?
A Again, mounds of paperwork. Like I said, I'm not -- you're going off one thing, and maybe I'm talking about the totality of everything is what I'm speculating, but that's where I think I'm going off of.
Q And so sitting here today, you can't remember anything other than what you've provided to us that would constitute the mound of paperwork?
A I turned in everything, sir. I didn't hold anything. If I did, then --
Q And that's, I guess, what I'm getting at. I just want to make sure that there's nothing that's going to show up later and say I have

this also to support. You may not remember here today, but you're confident that you haven't turned -- there's nothing else that would support the claim that Marcus's complaint was diminished that you haven't turned over by today?

MS. VITALE: Objection.

A No. I believe that I turned everything in.

(Whereupon, Mr. McLane played audio.)

Q So you said, "I'm going to tell him I'm meeting with the prosecutor in regards to the investigation." Did you ever tell Marcus you were going to meet with the prosecutor?

A I don't recall if I did, sir, or not.

Q Why would you be meeting with the prosecutor on July -- why would you be making plans to meet with the prosecutor on July 17, 2018, about the investigation?

A Like I said earlier, I always meet with them, give all the facts, any guidance that they can give in the investigation.

(Whereupon, Mr. McLane played audio.)

Q When Marcus [sic] says "Now that you're talking to boss and he will change his tune now," was that the intent of calling the employer?

MR. MANCINI: Objection.

Q -- to get Marcus to change his tune?

MR. MANCINI: Objection.

MS. VITALE: Objection.

A No, I don't think it was, sir.

(Whereupon, Mr. McLane played audio.)

Q You claim that Marcus sent someone to Stebbins' house. What was the evidence that you had of that?

MS. VITALE: Objection.

A I don't recall, sir.

Q Okay. Did you ever discover who that person was?

A I don't recall, sir.

Q Did you ever find evidence that Marcus sent someone to --
A I don't recall, sir.

(Whereupon, Mr. McLane played audio.)

Q Why would it be a problem that he would be recording if you called him? You said, "I'm not calling, you know, because, you know, he's recording."
MS. VITALE: Objection.
MR. MANCINI: Objection.
Q Why not have him -- you recorded him, right?
A I don't know why. I don't recall, sir.
Q In general, I guess, why would you not want somebody to record the call if you're doing an investigation?
MS. VITALE: Objection.
A I don't recall how that all came about, sir. I mean, I don't know.
Q Okay, so sitting here now, do you have a general concern that people are going to record you if you call them on official

business?

A I mean, if people record me, they record me. I mean, I've pulled over cars and they've recorded me.

Q So what would be -- I mean, what would cause you to say, "I'm not calling him because he's going to record"?

A I don't know, sir.

(Whereupon, Mr. McLane played audio.)

Q Okay, so when you say with this guy, there's going to be a lawsuit and this guy's going to sue saying that he's black and we're being discriminative, why did you draw that conclusion?

A Just the way his mannerism. That's just my opinion of it.

Q You had met Marcus one time before this date, correct?

A Yes.

Q So after meeting him one time you felt that he was going to sue you on a claim he was

being discriminated against?

MS. VITALE: Objection.

MR. MANCINI: Objection.

A I believe there were phone calls in between that, too. Isn't there? I'm not sure.

Q I don't know.

A It's been such a long time, sir. I don't know.

Q Okay, but within meeting him one time and however many phone calls in between June 25th of 2018 and July 17th of 2018, you have formed the conclusion that, not only is Marcus going to record you, but that he's going to try to sue you and say that he's black and is being discriminated against?

MR. MANCINI: Objection.

MS. VITALE: Objection.

A My opinion, yes.

Q I mean, what other -- I mean, what information has been provided? If you provided us everything with respect to the investigation, what evidence is there that he was going to claim that he was being discriminated against?

MS. VITALE: Objection.
A Again, that's just my opinion, me collecting the information.
Q Because you haven't talked with the mail woman at this point?
A I don't believe I did, no.
Q Like, what evidence other than him being black could there be that he would make a discrimination claim?
MR. MANCINI: Objection.
A I don't recall sir. At the heat of the moment talking. I don't recall, sir.

(Whereupon, Mr. McLane played audio.)

Q You said, "It's going to go against this because I'm a minority." Are you a minority?
A Yes, I am, sir.
Q What are you - I don't know if we say "What do you identify as"? What is your racial status?
A Pacific Islander.
Q Okay, and that was the basis of your lawsuit

when you were in the Aviation Unit?
A Yes.
Q Okay, I guess I'll ask you about that after I play the audio.

(Whereupon, Mr. McLane played audio.)

Q Did you feel it was appropriate that Marty Pirog was using black sense in talking about his experiences with pulling over minorities?
MR MANCINI: Objection.
MS. VITALE: Objection.
A Marty Pirog is a minority, and I mean, that is how H is. That's how personnel are. That's all I can say to that, sir.
Q Okay, so this was common that people would talk like this?
MS. VITALE: Objection.
A Not all. You know, some people that are out there. Like I said, Marty is a minority and that's how Marty talks.
Q Okay, so is Marty black?
A No, he's -- I'm not sure what type of -- he

might be Polish, I believe, or something like that. But he claims that he's a minority.

Q All right, so Marty claims that he's a minority, and so it's, therefore, acceptable in Troop H for minorities to discuss their interactions with other minorities. So for instance, he's Polish, it's acceptable, and this is what Troop H does? It's common that they would use blacks sense to describe their interactions with minorities when they pulled them over?

MR. MANCINI: Objection.

A I don't understand the question, sir.

Q So you said that's just how Troop H is Marty is a minority because he is Polish --

A He's just describing them as black. What else -- I don't understand.

Q So it's the way in which he was speaking. And I refer to this as black sense, what people use as a stereotypical sort of voice to mimic black people.

A My best friend in the world, who is like my brother, is black. And if he was here right now, I would say that and it wouldn't bother

him at all, so I -- because he's like a family member. I mean, he's like an uncle to my kids. So, I mean, I don't...

Q But Marty is referring to people who he's pulling over, not his family members who may be comfortable with this. And I guess more so is he's using this in front of three other people. In fact, we've discovered today that there were four people there. Were you Marty's direct supervisor?

A Am I Marty's direct --

Q Were you at the time during this?

A I don't recall if I was.

Q We have a sergeant in the room and at least three troopers, and nobody seems to be -- you know, everybody seems to be comfortable with Marty talking this way, so are you saying that this is common interface that people spoke this way?

MR. MANCINI: Objection.

A It might be, sir.

(Whereupon, Mr. McLane played audio.)

Q Why doesn't it count?
A Well, that's what he said.
Q That's what he said?
A Yes, that's what he said.
Q Do you know why he said that?
MR. MANCINI: Objection.
A Yes, sir, because he said I was law enforcement.
Q Okay, so what he's saying is it doesn't account for if you're a minority because you're law enforcement?

(Whereupon, Mr. McLane played audio.)

Q Did you speak to any of the other neighbors on the street?
A I believe I did. I don't recall who they were, sir.
Q Were they in your report?
A I believe they were, sir.
Q Okay, how did you -- when you're talking about the mail woman here, how did you -- I mean, how did you come to know who she was?

A Me just assuming, okay, there's got to be a mail person, that was just me coming up with that idea. I believe, if I recall correctly, I think I got that information possibly from Trooper Stebbins.

Q Okay. Because you said, "What's her name," so you seem to know that she was a female, so you believe that Trooper Stebbins, prior to this, identified the mail woman as somebody who had discoverable information?

A I don't recall. I could have seen her when I went over there or something like that the first time. I don't know. Sorry. I can't recall.

Q How did you find out who she was?

A I just know there was a mail carrier. I don't recall. I mean, just that was me thinking, like, hey, outside the box on the mail carrier.

Q It says, (Reading):

"I made contact with federal postal worker, Candace Cipolla, via phone," and you

list a phone number.

How did you find out her name and how did you find out her phone number?

A I don't recall, sir.

Q Di Trooper Stebbins do that for me?

A I don't recall, sir. I mean, you can call her, and she could probably tell you how it happened.

Q I might. But I guess I'm asking, did you run a COLLECT on this woman?

A No, sir.

(Whereupon, Mr. McLane played audio.)

Q When you say "it would be safe to say that you turn around and play that racial card and you would love to get that in, how would you have any basis to believe that she was going to say he was playing a racial card?

A I don't, sir.

MS. VITALE: Objection.

Q So why would you love to get that in at that

point?

A I don't recall, sir.

Q When you sued -- you mentioned that you sued for racial discrimination. What is it that -- I mean, if we're talking here today and you have friends that are comfortable with this type of conversation, you're saying this is how Troop H is, what did you sue the Connecticut State Police for?

MS. VITALE: Objection.

A They threatened to shoot me.

Q Who threatened to shoot you?

A Troopers did.

Q Because of your nationality?

A Nationality. I mean, that's just the tip of the iceberg. They were taking my overtime out. They were --

Q What do you mean they were taking your overtime out?

A They wouldn't enter my overtime for years. I don't know how much, thousands of dollars I probably lost. I never keep track of how much overtime I do. I let my wife manage that. But anyway, there was that. There was

safety of flights. They weren't telling me about the safety of flights. The biggest thing with them, to me, which was the icing on the cake, was when I was becoming a pilot, they said, "Hey, you need 1000 hours." I got my 1000 hours of flight time, and then they turned around said, "Well, no, you need 1200 hours." I go and get my 1200 hours. After I got my 1200 hours, they said, "No, you need to go to Bell school." I went to Bell School and I came back and said, "Hey, I went to Bell school. I got 1200 hours," then they turned around and said, "Well, now we want to evaluate and you need additional 40 hours." As they were saying that, a new pilot came in. It was a white guy. He comes in. Right in front of me, they turn around and say, "Hey, you only have 140 flight hours. We are going to put you in as a pilot starting tomorrow." I'm like, "Whoa, whoa, whoa, wait a minute. I spent a lot of my own money on this and I did all the jumping through the hoop and you made me do all this and this guy just comes in." And he was white, and then I

kind of was, like, okay, just there's something going on here.
Q Was anybody fired as a result?
A One was told to leave.
Q Okay.
A He had over 20 years. They told them "I think it's in your best interest to leave."
Q What was the result of your lawsuit?
MR. MANCINI: Objection. I just don't know if there's any -- I'm not sure if there's any --
Q I mean, was there a verdict, or did you settle?
A We settled.
Q Is there any sort of confidentiality clause that you're not allowed to discuss?
A I don't know, sir.
Q Okay, you were able to settle the claims?
A Yes, sir.
Q You don't have -- I guess I'll ask general questions. Was it a financial settlement?
A Yes.
Q Were you made a pilot after? Were you given the position that you were seeking after

that?

A Yes, I was made a pilot.

Q Let me ask you, so did you move units after that? Did you -- I mean, did you have to -- if you're receiving discriminatory treatment in this unit, did they move you or did you go back to the same unit?

A No, what they actually did is, they knew that the court process was going through and they activated themselves for active duty, so they left.

Q Who is they?

A Two of the guys I was having problems with as pilots. But in that time, just before that, my commanding officer comes up and goes, "By the way, you're unfit for flying. We're removing your flight status." I'm like, "I'm unfit for flying," and he goes, "Yes." And then I'm like, "Okay, you're the boss. Surely after they received their notices, they knew they were going to be gone -- because they deactivate themselves, they're going to be gone for at least 18 months. I would have been the only pilot. My boss

comes up to me shortly after and put his arm around me and says, "Guess what? You really are a good pilot. We're going to put you back up here on flight status," and I'm like, "Well, that's crazy. Just this morning, you told me I was off flight and I wasn't fit for it." And I managed that unit all by myself for 18 months. When they came back, the very day they started, my supervisor came up to me and said, "You're an unfit pilot. You're off flight status." And I'm like, wow, after 18 months of managing it by myself, I'm unfit? And then he does that. They turn around and say, "We're disbanding the unit."

Q Right.

A So they disbanded the unit and they transferred me, and they said you have to apply for the position again. I'm like, okay, so I applied for the position again. They said, "Guess what, you know, you don't qualify to be a pilot here, but we are going to bring the other pilots back."

Q This is before you sued, right?

A Yes, that was part of my complaint. I'm just

thinking why and so forth.
Q Let me ask another question. So you quit your job. Active duty, does that you mean you went to the military?
A Yes, the Army National Guard. We wee all guardsmen together, but --
Q Did -
A -- they also -- because they are threatening to shoot me and they said, "Hey, we're going to pull you in. We're going to be. No one is going to know. We're going to hit you where no one sees bruises." So I told my boss, "Hey, they're threatening me." He says, "Okay, guess what, we're going to readjust your schedule," because he admitted and he said, "This is a hostile work environment. They have openly said they want to kill you," and I'm like, "Wow," and they didn't do anything. They basically -- I had to work a different schedule than they did. It was just mounds and mounds of different things that they were putting me through. It was a living hell.
Q So let me ask you, so they said they were

going to kill you. You said it was, like, three individuals?
A There was a total of five individuals.
Q How did you identify that it was because you're a Pacific Islander that they were doing this? I know you said that one guy got a job right away who was white and didn't have all the qualifications you had. How did you identify that it was because you're a Pacific Islander that they wanted to kill you and were doing this?
A I was the only one that was a minority and I was the only one where they would make comments like, "You're not smart enough to do what we're doing." So it's, like, "Okay." Aad they would say, "Hey, you, go get the luggage. You gotta take the luggage to the aircraft," and I was like, "Okay."
Q Were you, like, low on the totem pole, or were you higher up?
A No, I was fairly new to the unit, but still, I mean, you don't treat people like that. That's not right.
Q If you look at Exhibit 2. So on July 19th at

1:56 p.m., there's an incoming call that lasted 20.8 minutes from a 413-348-8546. Do you see that?

A Yes, I do.

Q That is the only call that came in around 2 p.m. Obviously, I'll represent to you that we've looked it up and that's Candace Cipolla's number, but also, records indicate that was the only call in and around that time that you indicated that you spoke to her in the report. I don't see anywhere that an outgoing call to that number on these records all the way back to May of 2018, so why would she know to call this number and speak with you on July 19th of 2018?

A I don't recall, sir. I don't remember.

Q Did you call her first?

A Again, sir, I don't recall.

Q Did you know if Trooper Stebbins asked her to call you?

A I don't recall, sir.

Q This phone call lasted 20 minutes. What else did you talk to her about?

A I don't recall, sir.

MR. MCLANE: I want to mark that audio, Stebbins 506. That will be 22, then.

(Exhibit Number 22, Audio, Stebbins 506, was Marked for Identification.)

(Exhibit Number 23, Email, was Marked for Identification.)

Q This is Exhibit 23. It's been numbered Samson 141. And it's from Steven Stebbins to you on July 17th at 8:24 in the morning. It says, (Reading):

"Mass. Probation Legal Department." It says, "Sarge, the following information is for the Mass Probation Legal Unit. Sara, with a 617 number."

Why on July 17 of 2018 would Steven Stebbins be sending you information on the Mass.

Probation Legal Unit?
A I don't recall, sir.
Q Had you discussed with Steven Stebbins Marcus's employment prior to the phone call on July 17, 2018?
A I don't recall, sir.
Q Well, if you're investigating Steven Stebbins, wouldn't you think it odd that he's giving you information about Marcus Cameron?
MS. VITALE: Objection.
A That he's giving me information about it?
Q Yes.
A Again, I don't recall that.
Q Why would the subject of an investigation be sharing the complainant's employment information with the investigating officer?
MS. VITALE: Objection.
A I don't recall what my motive was. It was a long time ago, sir.
THE WITNESS: Can we take a break?
MR. MCLANE: Sure, no problem.

(Short break.)

MR. MCLANE: Back on.

Let's mark as Exhibit 24 Samson 337.

(Exhibit Number 24, Email, was Marked for Identification.)

Q This is an email from you to Steve Stebbins, and the subject is "Rough draft of the complaint." And, here, we have the attachment, C-18-086 TFC Stebbins Report dot doc.

Let me ask the question, so it says, (Reading):

"Steve, this is a rough draft that I sent the LT. I would not give this to Enfield PD due to they might give it to him."

Why would you be sending this to the Enfield Police Department at all?

A I don't recall, sir.

Q What would the reason be at any point in time in July -- or what would the reason be by July 27, 2018, to give this to the Enfield Police Department?
A I don't recall, sir.
Q So were you aware of the complaints that both Trooper Stebbins and Marcus were making against each other to the Enfield Police at this time?
A Yes, I was aware.
MS. VITALE: Objection.
Q What would be the problem be with Enfield PD giving it to him?
A I don't recall. I'm not sure. Is it completed? I can't get --
Q Well, the subject says, "Rough draft of complaint." And we know from a previous email that there was a TFC Stebbins Report revised that Trooper Stebbins sent to Bryan Nolan. My question, I guess, is, like, what would be the problem with giving it to him?
MS. VITALE: Objection.
A Again, sir, I don't recall giving it to Enfield PC or -- I don't recall it.

Q But I mean, you do normally send the subject of the investigation the rough draft of the reports?

A If I have some questions on something, yes, I do.

Q We discussed before that, you know, complainants are entitled to a fair investigation. Is it fair to share the draft with the subject of the investigation and not the complainant?

MS. VITALE: Objection.

MR. MANCINI: Objection.

A Again, I don't know the circumstances for me to respond to this and why I sent it. I don't know, sir. I don't recall.

Q Well, I mean, we have no record of you sending Marcus a rough draft of the complaint. Do you recall doing that, a rough draft of the report?

A I don't recall, sir, if I did or not.

Q Let me ask you, you were present on November 12, 2018, when Marcus was -- well, when Trooper Stebbins called the police on Marcus, when you showed up to the Brookside Plaza.

Why?
A I remember -- if I recall correctly, my lieutenant because I called him and I was the only closest unit. I was the only trooper in Troop H to respond to that.
Q Okay.
A Because I normally -- sometimes I'll go home off Exit 45, so it would be on the Enfield/East Windsor line. I was the closest unit.
Q Okay. Were you at Troop H --
A Yes.
Q -- when he called?
A Well, I was probably heading home.
Q But if he was calling -- if I'm not mistaken, well, I'm not mistaken. He testified that you instructed him to call the Enfield PD?
A I did, sir.
Q Okay, then why did you need to show up?
A Because what I did is I called -- I told Stebbins, after he called me, I said call Enfield PD because it happened in their town. And I would call my supervisor, which was, at that time now, that was Lieutenant Pendleton,

I believe. And Lieutenant Pendleton directed me to, go out there. And because I was the closest unit. How busy H is, sometimes we just don't have the personnel to send to all the calls.
Q Why not instruct him to pull Marcus over himself?
A Again, I don't know the circumstances of what's going on in there. I mean, that's --
Q But he had to have told you, right, for you to instruct him to tell the Enfield PD?
A I don't recall the complete conversation. All I know he said "He's following me, and I said, "Just call Enfield PD." And that was it.
Q And yo did speak to Bryan Nolan when you were on the scene, correct?
A I don't recall who I spoke to when I was out there. I'm pretty sure it was on camera who I was talking to.
Q After November 12th, were you in contact with Bryan Nolan?
A I don't recall if Nolan was reaching out to me or something. He was looking for

something. Maybe that was the reason why, but other than that, I don't recall.

MR. MCLANE: Let's mark this as Exhibit 25.

(Exhibit Number 25, Bates Documents 000113 through 000116, was Marked for Identification.)

Q If you look at what I think was provided to me in discovery. It's an image of the screenshot, so it's a little small, but if you look closely, you can read it. The reason I'm using this one as opposed to the one Enfield gave me is because we had discovered during Bryan Nolan's deposition that he accidentally had it double-sided, but he only scanned it single-sided.

So it looks like on November 20th of 2018 you emailed Bryan Nolan, forwarding an email from Marcus Cameron. Do you see that in the middle the page?

A Yes, I do.

Q Okay. You said it was not provided by any defendant an email from Bryan Nolan, requesting this information. So I guess, why would you be sending this on November 20th to Sergeant Nolan?
A Just looking at the dates, it looks like he's doing to an investigation and maybe he -- again, maybe he's calling me, like, "Hey, do you have any information that I'm looking at." I don't know what the call is. I don't recall. And, again, that's just me saying that.
Q Okay.
A I mean, I would do that with - I mean, I asked Enfield for their reports and he's probably asking something from me, I guess.
Q Why didn't you ever answer that July 25th email? So you forwarded it to Bryan Nolan with the attachments or with the images. I don't know if they were attached or embedded. Why didn't you ever answer that email?
A I don't recall, sir.
Q But I mean you were in the process -- we know this from the previous exhibit. You were in

the process. And this was Exhibit 23 from Samson 337. On July 27th, actually, two days later, you actually sent Steven Stebbins the rough draft of your report and a number of attachments. So one of the attachments you sent to him -- let's go back to it -- was a 911 call. It says, "Transcript 911 call dot docx, right? We have a 625 audio transcript for that, a docx, it looks like of the report. So two days after Marcus emailed you asking questions, you had finished your report and send it to Trooper Stebbins. Why didn't you ever respond to Marcus Cameron?
A I don't recall, sir.
MS. VITALE: Objection.
Q Wouldn't information from Marcus Cameron be important in completing the report?
A Again, sir, I'm not certain because I don't know how all the pieces came, so I can't give you a direct answer on that.
Q But you did forward that email to Trooper Stebbins, is that right?
MR. MANCINI: Objection.
Q The July 25th email?

A It shows it, so I must have, yes. I don't recall the circumstances surrounding it.
Q So let me ask you another question. Why send this to Bryan Nolan and why not have him go through the Connecticut State Police Legal Department?
A I don't recall, sir.
Q Is that normal protocol?
A I've done that and departments have done that for me when I'm asking for stuff, so...
Q I want to go into after the arrest.
MR. MCLANE: Michele, let's mark the next two exhibits together. Let's have the news article be 6 and the email be 7.

(Exhibit Number 26, Journal Article, was Marked for Identification.)

(Exhibit Number 27, Email, was Marked for Identification.)

Q So this was a news article that was published and it had Marcus's mug shot. That's Exhibit

26. If I send you to Exhibit 27, on December 13th of 2018, an email was sent out by Sean Mahar and it says, (Reading):

"Troop H: Per Sergeant Samson, TFC Stebbins is currently the victim of a stalking incident involving a Massachusetts probation officer, Marcus Cameron, at 49 Foxcroft Road in Enfield. Cameron is known to drive a 2009 silver Honda Accord Coupe, bearing CT registration AK77728 or a 2007 Black Infinity, bearing CT registration," and that registration number. "Please conduct patrol checks of Stebbins' residence at blank to ensure the safety of his family and his property. Enfield Police is also going to be conducting patrol checks

to the residence."

Then it gives Cameron's court date and a photograph, which is the same mugshot that was sent to the journal Inquirer. Did you send out the information to the journal Inquirer?

A No, sir.

MS. VITALE: Objection.

Q Okay, who sends out the information regarding arrests to the news?

MS. VITALE: Objection.

A Normally, when we make an arrest, we have to do a news release wherever the arresting body is, and I know -- I can't speak for Enfield PD, but I know for the Connecticut State Police we do have, like, an email place they can go to, which is not working correctly, but most of the times the reporters will come in and if there's anything newsworthy they go to our news release books and so forth.

Q So who at Troop H at this point in time will be producing the news release information?

MR. MANCINI: Objection.

A I have no idea who would do that.
Q But you definitely didn't put it together?
A No, sir.
Q Okay, Sean Mahar?
A Sean Mahar, yes.
Q Why did you direct Sean Mahar to send this email?
A Because I believe I was directed by Lieutenant Pendleton to put something on.
MR. MCLANE: Guys, I'm going to take about 20 minutes, if you don't mind, to go over my notes and talk with my client, and I'm going to wrap up. I just have a handful of questions to wrap up.

(Short break.)

MR. MCLANE: All right, we're back on the record.
Q So we were provided documents regarding -- they were from Trooper Stebbins' lawyer regarding Marcus's New York employment. Did you obtain those?
A I don't recall, sir.

Q From the NYPD?
A I don't recall, sir.
Q You mentioned -- let's go back to Exhibit 9, if you don't mind.
It's your first version of your report, on Stebbins 339 -- 338, excuse me, wrong one. The second paragraph on Stebbins 338 says, (Reading):

"On July 23, 2018, I contacted New York Police Department, spoke with a female regarding if Marcus Cameron had worked for the department."

Where did you get information that he worked for the New York Police Department?
A That's a hunch. Basically, with his area -- I forgot what it was. Like, mine was 518 and his was 51- -- I forget where it was. I don't recall the whole thing. That's just me on a hunch. That's it.
Q So on a hunch you decided that he worked for the NYPD?

A Yes.

Q What supported your hunch that he worked for the NYPD?

A Because he claimed he worked in law enforcement before.

Q Okay. When did he make that claim?

A I don't recall, sir.

Q All right. So if we go back to page 2, the call log. So from the first page, if you go down to January 20th, that seems to be when you start calling the NYPD. Do you see there was a handful of entries between 8:47 and 9:39 a.m. to New York?

A Where are we looking, sir? I'm sorry.

Q The call log on page one. It's on July 20th of 2018, the first page.

A You said July?

Q Yes.

A I'm sorry, sir, the question again?

Q On July 20th of 2018, it looks like that's when you start calling the NYPD, is that correct?

MS. VITALE: Objection.

MR. MANCINI: Objection.

A I don't recall, sir.
Q You hadn't called New York or those numbers prior to July or January 8 -- July 21, 2018 let me rephrase the question.
You hadn't called either of those numbers between May and July 20, 2018?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A Yes.
Q So you put in your report that you did call them on July 23rd, right? We have that reflected here on 479, right?
A Okay.
MS. VITALE: Objection.
Q But I'm asking, why did you call them one, two, three, four times on the 20th?
A I don't recall, sir.
Q So did your hunch begin after you made the phone call to Marcus's employer?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A I don't recall, sir.
Q And you don't recall obtaining any documents from his employment from NYPD?

A No, sir, I don't recall any of that.
Q Let's go to Stebbins 334, Exhibit 9, the fourth paragraph. It says, (Reading):

"On July 5, 2018, at approximately 1405 hours, I ran Marcus Cameron in COLLECT. The reason I ran Marcus Cameron is to find out his exact residency. COLLECT query results showed Marcus Cameron had two vehicles registered in Connecticut, Connecticut driver's license number," and then you put the number, "with everything reflecting 49 Foxcroft Road in the town of Enfield as Marcus Cameron's primary residence." Then it says, "See COLLECT query results."

We were not provided with any query results.
A Whatever I put in here in parentheses, sir,

is everything I turned in to my lieutenant.
Q Okay. Who did you direct to run this COLLECT inquiry?
A I don't recall, sir.
Q Is the COLLECT query a part -- let me ask you, you submitted this. If we look to the last page where you have all of your second - so 341. If you look at 341, you list the exhibits that you submitted with the report?
A Yes.
Q So would did you submit this report to?
A Lieuenant Loughman.
Q All right. So at some point or in some way, shape or form Lieutenant Loughman received this report with all these exhibits?
A Yes, sir.
Q Okay, so his office should still have this report and the3se exhibits, correct?
MS. VITALE: Objection.
A That, I don't know, sir.
Q Okay, because right now we look at Exhibit 12. It says, "COLLECT information on Marcus Cameron," which we haven't received. And we know, from reading the report just a moment

ago, that you're saying that it came back with specific information, including Marcus's residence, and we don't have that. And 17 and 18 looks like other COLLECT queries were made. Again, we didn't receive those either.

Looking at 19, we didn't receive the Massachusetts query showing Marcus Cameron having an active driver's license, nor the Connecticut query. I guess if I'm going to make one last request, not for -- you to go to COLLECT, but see if you can find from the Troop H or whomever would have this record to provide these exhibits to us because these are supporting the report, and we don't have it.

Q I'm not going to be able to obtain that, sir. I gave everything to my commanding officer, so whatever he did with him. I don't know what he did, sir.

Q Okay. Who's the commanding officer that troop now?

A That's William Judomark (phonetic).

Q Okay, how are the records kept over there?

A It's IA.

Q So IA would have these records?
A They should have some, sir. I would call IA, sir.
Q Stebbins 337, the last paragraph says, (Reading):

"Shortly after this phone conversation, Marcus Cameron called approximately three times in a row my office phone number, which I did not answer. The reason I did not answer this phone call was due to his attitude, tone, talking over me, and the fact that he only wanted me to answer his questions but would not answer mine. The caller ID did not show on my office phone, but I was speculating it was him."

So how did you know that it was him other than just speculation?
A Just pure speculation. After talking with

him and I think before that, I think. Again, that is just me speculating.

Q Then you said, (Reading):

"Immediately after those phone calls, the troop dispatch paged me for a phone call. I called the desk trooper and told them to have Marcus Cameron leave a message for me. A talking into the voice message for Marcus Cameron, it said this voice message has been archived on my phone to show Marcus Cameron's tone and demanding attitude."

We haven't received that voicemail either.

A When I say "my phone," that's on my office phone.

Q Okay.

A So I recorded that and that was all submitted as well, sir, so again, I don't know --

Q Submitted to whom?

A Well, when I turn that report in, that's part of it.

Q Go to 339, please.

A Okay.

Q So the first paragraph, you mention you spoke to the desk trooper Joel Baust from Massachusetts State Police. Is that the only state police officer that you spoke to from Massachusetts regarding Marcus Cameron?

A I don't recall, sir.

Q You said you notified the Massachusetts State Police to see if Marcus Cameron had any weapons listed. The Connecticut query showed that he did not. Why were you looking to see if he had a firearm?

A That's a basic investigation. We do that all the time.

Q On Internal Affairs investigations, you look to the complainant to see if they have firearms?

A That's a standard thing we do, sir.

Q Is this part of a written policy somewhere?

A It's just that they teach us that you look at everything, like, if they have any weapons or

anything like that. That's just something that they teach in investigation. That's something I've always done.

Q Who taught you that?

A In the academy.

Q Which Academy?

A State police.

Q So in the State Police Academy, they teach you to --

A Do inquiries, yes.

Q Okay. So is that a standard practice for people doing IA investigations to run firearms?

MR. MANCINI: Objection.

A Well, I'm not in IA. That's just something that I do. I can't speak for IA what they do.

Q Okay. Did Massachusetts come back with firearms? Oh, never mind. It says he did not. All right, that's fine.

On 341, I think this is what we mentioned we talked about before we had sent -- not 341, 339, same page. If you go below, where it says, (Reading):

"On July 24, 2018, I sent Trooper First Class Marty Pirog and Trooper First Class Gerard Joyle to the address the Massachusetts State Police gave, utilizing Marcus Cameron's Massachusetts driver's license, of 649 Prospect Street, Apartment D1."

Later, you go on to say that two white women lived at the office based on the investigation -- or lived in the apartment based on the investigation that they had conducted. Did you ever ask Marcus or anyone else or did they ask or tell you whether Marcus lived with two white women at that address?
A No, I did not, sir.
Q Turn to Stebbins 345, please.
A Okay.
Q Last paragraph, 11, it says, (Reading):

"This investigation also revealed that Marcus Cameron illegally has two active driver's licenses from the state of Massachusetts and Connecticut, both issued the same year of Marcus Cameron's employment to the Massachusetts Adult Probation."

Based on what I've shown you today, would you agree with that statement?

A On what you showed me today, I'm going to say no.

Q Okay, so what information revealed that he had illegally had two active driver's licenses?

A I'm going to answer I don't recall. Was it me running it in -- having it run in Mass. Or run in Connecticut, sir, I don't recall.

Q And the last page, which is 346, your recommendation, you said, (Reading):

"I recommend, at a very minimum, that Marcus Cameron's employer be notified of these findings so that they can conduct their own investigation. This is only a recommendation."

Why make the recommendation that they be notified of these findings?

A That's just a common thing. If that was anything with any other department, we should put a recommendation. That's just...

Q So at the end of your --

A Now -- I'm sorry, sir.

Q Go ahead.

A I want to say, in regard to recommendation, I never follow up on it. That's on IA. If they want to drive on with it, they can do whatever they want. I didn't really care is my point. I did my investigation.

Q So you never told Massachusetts Probation that he lived in Connecticut? Did you ever tell anyone from Massachusetts Probation?

A That he lived in Connecticut? I don't believe I did.

Q Well, how do you -- I mean, again, like, as to whether or not Trooper First Class Stebbins threatened Marcus on May 22, 2018, what does it matter? Like, what purpose does it serve to recommend that Marcus's employer be contacted about driver's licenses and registered vehicles in Connecticut?

A I think it's maybe the totality of everything.

Q Okay. What policy are you basing this on to just tell his employer that you believe that he lives in Connecticut and --

A I don't think I ever told --

Q Well, the recommendation. You want somebody to tell them to conduct an investigation. What purpose is this?

A But again, I don't think anyone did, so...

Q They didn't, but you recommended they did?

A I recommended it, but that doesn't mean they're going to do it.

Q Well, then why make the recommendation in the first place?

A If that was any other department that was Corrections here, I would still put a recommendation down.

Q So after the protective order was dismissed in December, you contacted Enfield Police, is that accurate?

A I don't recall.

MS. VITALE: Objection.

Q Okay, you don't know why you would have if you did?

A Exactly.

Q I don't have anything else.

CROSS EXAMINATION

By Mr. Mancini:

Q I have a couple of questions. Going back to -- Trooper Samson, thanks for bearing with us today.

Attorney McLane asked you some questions about Exhibit 4. This was your request for admissions. Do you recall that? Do you recall that he asked you some questions about this exhibit?

A Yes.

Q Specifically, he asked you about your response to number four. And the question was, you, Steven Stebbins and a third party were in the room together on July 19 -- I'm sorry, withdrawn.

You, Steven Stebbins and the third party were in the room together on July 17, 2018, when you called plaintiff's employer? That's correct? That's what that says, correct?

A Yes, sir.

Q Okay, and your response was denied, right?

A Correct.

Q Okay. And just so we're clear, when you actually made the call to Marcus Cameron's employer, was there anyone else in the room?

A There was no one in the room.

Q Okay. Nothing? There was nobody else in the room?

A No, there was nobody else.

Q There was a question about -- I'm going to bring your attention to Exhibit 6. There was a journal Inquirer news article. Did you effectuate an arrest on Mr. Marcus Cameron?

A No. It's none of my business. That was strictly Enfield.
Q All right.
A Whatever they did, that's on them.
Q All right, so this was an Enfield arrest that was discussed in this newspaper article?
A Correct.
Q Okay. Did you ever arrest Mr. Marcus Cameron?
A No, sir.
Q Okay.
A I just did the investigation.
Q All right. Did you ever make a suggestion for anybody else to place Mr. Cameron under arrest?
A No, sir.
Q Okay. And you had nothing to do with the publication of this article?
A Where did this come from?

THE WITNESS: You said this came from H, sir, Troop H?

MR. MCLANE: I asked. I thought that -- my understanding was that a press release was generally issued from the State

Police in these news articles.

THE WITNESS: No, local police departments do their own news releases and so forth.

A I mean, again, what I mean, that's Enfield. To me, that was their investigation and that was their arrest.

Q I just want to clarify something. If there's an arrest effectuated by Troop H or another troop, then that particular troop would have information available for press releases?

A They have to. They're supposed to do it before the end of their shift and they are supposed to put the arresting officer and the supervisor has to sign off on it.

Q But that would only be for arrests that they themselves effectuated?

A In that troop, that's correct.

Q Right. So they would have nothing to do with an arrest for any municipality?

A No, sir.

Q Okay, I just wanted to clarify one point. Exhibit 14 was an email from you to Mr. Cameron, is that correct?

A Okay.
Q And in this email, it looks like you were asking for a written statement, is that correct?
A Yes, sir.
Q Is a written statement something that you normally ask for in an any police investigation that you conduct?
A Yes.
Q And that was on July 5th, correct?
A Yes, sir.
Q Based on the email?
A Yes.
Q Okay. And there was also some questions about conversations that you may have had with Attorney Parakilas. Do you remember having multiple conversations with Attorney Parakilas, or do you only remember having one conversation with Attorney Parakilas? If you remember.
A I don't recall.
Q In your -- you did discuss, if I can go back to -- I'm going to go to Exhibit 9, which is a copy of your memorandum. You indicated

that on July 25th you spoke with GA-13 Prosecutor Christopher Parakilas at his office, is that correct?
A Yes, sir.
Q Based on your report?
A Yes.
Q Okay. Do you recall any other -- if you can just look quickly at your report, I don't want to take up too much time. If you can just quickly look at your report and see if there was any other -- if you ever made any other notations of your having spoken to Attorney Parakilas?
A I do not see any notation.
Q All right. So the only notation you have regarding a conversation with Attorney Parakilas was at that July 25th, if I'm not mistaken?
A Yes, sir.
Q I just want to make sure I get that date right. July 25 at 815 hours?
A Yes, sir.
Q Okay. I also wanted to ask you, there was some discussion in Exhibit 2, some phone

records, and Attorney McLane asked you about some phone numbers. Do you recognize any of the phone numbers listed in this report? Just looking at it. Well, let me withdraw that.

He asked you specifically about some phone numbers, some New York phone numbers. Do you have any independent recollection of where those phone numbers go?

A No, sir.

Q Okay, you don't have any reason to doubt what he said those phone numbers belong to?

A No, sir.

Q Okay, but there's no indicat- -- it's just a phone number on this?

A Yes, sir.

Q Okay. So you don't know -- you have no idea?

A No, sir.

Q I don't have any other questions.

MR. MCLANE: Laura or Eric?

MR. GERARDE: No questions. Thank you.

MS. VITALE: I don't have any

questions.

(Whereupon, the deposition was concluded at 4:38 p.m.)

ERRATA SHEET

CASE: Marcus Cameron v. Steven Stebbins, et. al.

DEPOSITION OF: Stephen Samson

PAGE LINE PRESENTLY READS SHOULD READ

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

I, Stephen Samson, do hereby certify that I have read the foregoing transcript of my testimony given in the aforementioned matter, and further certify that said transcript is a true, accurate and complete record of said testimony.

Signed under the pains and penalties of perjury

this day of

2023.

Stephen Samson

C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, Michele C. DeCoste, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of Stephen Samson was taken before me on March 28, 2023. The said witness was duly sworn before the commencement of his testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

In witness whereof, I have hereunto set my hand and Notary Seal this 5th day of April 2023.

Michele C. DeCoste, Notary Public

My Commission Expires: June 30, 2028

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

Electronically signed by Michele DeCoste (101-098-978-9052) 3c81973d-34b7-413e-911b-7e47772f3883