Volume: I
Pages 1-218
Exhibits: 22

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:21CV00165(OAW)

- - - - - - - - - - - - - - - - - x

MARCUS CAMERON,

Plaintiff

V.

STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE, AND TOWN OF ENFIELD,

Defendants

- - - - - - - - - - - - - - - - - x

DEPOSITION of BRYAN NOLAN, called on behalf of the Plaintiff, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michele DeCoste, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at 165 Capital Ave., Hartford, CT, on Wednesday, March 8, 2023, commencing at 10:07 a.m.

------------

APPEARANCES

RYAN MCLANE, ATTORNEY
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
Counsel for the Plaintiff

ERIC E. GERARDE, ATTORNEY
Howd & Ludorf, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
(860) 707-6029
Counsel for Bryan Nolan, Mark Squires & Town of Enfield

LAURA VITALE, ATTORNEY
Attorney General Office State of Connecticut
165 Capital Avenue, Suite 500
Hartford, CT 06106
(860) 808-5340
Counsel for Steven Stebbins

DENNIS V. MANCINI, ATTORNEY
Attorney General Office State of Connecticut
110 Sherman Street
Hartford, CT 06105
(860) 808-5450
Counsel for Stephen Samson

ALSO PRESENT:

Marcus Cameron

Steven Stebbins

Michelle Cruz

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRYAN NOLAN | | | | |
| (By Mr. McLane) | 6 | | | |
| (By Ms. Vitale) | | 213 | | |
| (By Mr. Mancini) | | 214 | | |

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Bates Documents 000463 to 000494 | 16 |
| 2 | Email | 21 |
| 3 | Video | 31 |
| 4 | Westlaw Statute 53A-181E | 44 |
| 5 | Bates Document D53 | 53 |
| 6 | Email | 54 |
| 7 | Bates Document D00055 | 55 |
| 8 | Bates Document 00056 | 55 |
| 9 | Bates Documents D00057 to D00059 | 59 |
| 10 | Bates Documents 000113 to 000116 | 59 |
| 11 | Email | 74 |
| 12 | 5/26/18 Enfield PD Incident Report | 78 |
| 13 | 5/30/18 Enfield PD Incident Report | 78 |
| 14 | Stebbins000148 to Stebbins000182 | 122 |
| 15 | Google Map | 145 |
| 16 | Video/492 | 146 |
| 17 | Video/493 | 146 |

E X H I B I T S (CONT.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 18 | Video/494 | 146 |
| 19 | Video/Cameron34 | 177 |
| 20 | Booking Video | 182 |
| 21 | Request for Production of Documents | 203 |
| 22 | Answers to Interrogatories | 208 |

P R O C E E D I N G S

MR. MCLANE: Okay, so we're on the record with the deposition of Lieutenant Nolan. Lieutenant Nolan, we are going to actually have Attorney Gerarde -- we are located in Connecticut for this deposition, and we're going to have Attorney Gerarde, as a commissioner of the Superior Court, swear his client under oath for the deposition.

BRYAN NOLAN, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testifies as follows:

MR. MCLANE: So I'm on the record now with Counsel. I think we're going to continue -- I'll confirm with you that we want to continue with the normal or the usual stipulations what we've been agreeing to, that we'll reserve all objections other than the form of the question until the time of trial. We're waiving any defects in the notices. We're waiving the notary

requirement. I think we're doing a 30-day read and sign. Is everybody in agreement?

MR. GERARDE: Agreed.

MS. VITALE: Yes.

MR. MANCINI: Agree.

DIRECT EXAMINATION

BY MR. MCLANE:

Q Lieutenant Nolan, have you ever had your deposition taken before?

A I have never.

Q Okay. You understand that you were just sworn in or under oath and that your testimony today is essentially the same as it would be in court and that you did swear under oath to tell the truth, the whole truth and nothing but the truth?

A Yes.

Q Okay. Since you've never been deposed, I want to go over to some of the conduct of the deposition here. I'm going to be asking questions needing a verbal answer from you. Michele here, on my left, your right, is the court reporter. She is taking everything

that we say down on the record, and this quite literally means we get a record or a transcript of the proceeding here today.

That being said, we need to make sure the record is clean. So if I do ask you a question -- sometimes in the course of our conversations, we might nod our head or "mm-hmm," "uh-huh." We actually need a verbal answer. So if the answer is yes, sometimes, naturally, it might be common for me or you to nod in answer to that question. We may need to remind you and you can do your best to give an actual verbal answer to each question.

At the same time, when people talk to each other, sometimes we inadvertently interrupt. Do your best to wait till I finish the question before answering. You may think you know where I'm going with a question and try to answer right off the bat. In the same vein, I'm going to do my best to pause and make sure that you're finished with your answer so we have a complete answer.

Aside from that, there may be times

during this deposition where certain acronyms or slang or lingo is used in the course of, you know, like, for instance, "Internal Affairs, I may refer to "IA." What I'll do is I'll ask you if you understand "IA" to mean "Internal Affairs," and if you're okay with me using the term "IA" moving forward, and that your understanding of that term equates to "IA." That's just an example.

Lastly, if you need a break, let me know. You can take a break at any time, you know, the bathroom, if you're hungry, you just need to take a minute, you can say I need a break. You can ask your lawyer and he can ask for a break. And the only thing I ask is that you answer the question that's pending before we do go on break. So if I've asked a question and you say you need a break, if you can just answer that question for me, and then we can take a break. Whatever -- I mean, we can all decide, I guess, later when a good time for lunch break is and how long it will take, but I'll go and then, I guess, depending, at a decent time to

break for break.
I think that's about it. I don't think I've missed anything. Do you have any questions as to any of the ground rules that I've sort of laid out?
A No, I don't.
Q Did you understand everything?
A Yes.
Q So in preparation for today's deposition -- or I should say did you prepare for today's deposition?
A I looked over the case report and arrest warrant.
Q What do you mean by "case report"?
A The incident report that was written by myself.
Q Okay. And then you said also the arrest warrant?
A Correct.
Q Okay. Did you meet with your lawyer? Don't tell me what you said with them, but did you meet with your lawyer?
A Over the phone, yes.
Q And I think I should say, anytime -- so if I

asked you if you talk to your lawyer, that's not a violation of attorney-client privilege to say yes, you did, but I never want you to tell me what you and him talked about, all right? So none of my questions am I ever trying to elicit nor do you need to answer what you ever said to your lawyer in search of legal advice, do you understand?
A Yes, I do.
Q So about how long did you spend preparing for the deposition today?
A Preparing for the deposition?
Q Yes, reviewing the documents you said you reviewed and speaking with your lawyer.
A I spoke with Thomas Gerarde for, I believe, maybe an hour, hour and a half two days ago. And other than that, I just read over the case report and arrest warrant affidavit.
Q Were there any other documents that you reviewed in preparation for your deposition?
A Whatever was on our case file that I got from our Records Department. So again, that's the arrest warrant affidavit, the case report, statements. I think that's about the extent

of it.
Q So about an hour and a half with your lawyer. And how long with the case report and arrest warrant affidavit?
A I don' think more than 20 minutes reading.
Q Did you speak with anyone else other than your lawyer about the deposition today?
A About the deposition?
Q Yes.
A No.
Q So I see that you're a lieutenant and no longer a sergeant. What is your current position?
A Currently, I'm the day shift patrol commander, so I'm in charge of the day shift.
Q And we're still in Enfield Police Department?
A Correct.
Q So the day shift patrol commander in the Enfield Police Department, when did you start that job?
A Prior to attending -- and to be honest, I'm not positive. I think it was about two years ago, I would say. I'd have to look, to be honest with you.

Q What kind of -- did you have to take a lieutenants exam?

A Correct.

Q Okay, what did that consist of?

A So promotional exams are a written test, an oral board panel, a review of your evaluations throughout the years. That's pretty much what it consists of.

Q So these evaluations, are they just yearly performance evaluations?

A Yes, exactly.

Q Was there any additional training that you were required to undertake?

A Not that you're required, no.

Q Okay. Did you take any courses?

A I have taken many of these courses.

Q What are these courses?

A I mean, there's been many. I don't know.

Q Well, I guess since you've become a lieutenant. When did you become a lieutenant?

A Again, I'm not positive. I think it was about two years ago.

Q Two years ago?

A Roughly. It might have been a little more.
Q Since you've become a lieutenant in the past two years, do you recall any additional training?
A We have our yearly recertifications that we take. We have -- I'm trying to think of anything specific as far as lieutenant training, but nothing I can think of.
Q As part of the annual recertifications, do you have to do things like racial bias training or --
A Yes.
Q -- equal opportunity?
A Yes.
Q So what are those?
A Those consist of during your POST recertification classes on those topics.
Q What do you mean by "POST recertification"?
A So every three years, in order to stay certified through the state, you've got to take a recertification through POST, the Police Officer Standards and Training Council. So those are required for every police officer throughout the state of

Connecticut.
Q Okay, and what is the racial bias training called?
A I don't know its exact name.
Q What does it consist of?
A I mean, the racial bias training as far as -- I mean, I don't know the set schedule of --
Q What are some of the content of it? Like, what are the types of things you had to learn and be certified on to -- let me rephrase the question.
What are some of the things you had to know and learn in order to obtain the certification every three years?
A I guess I don't quite understand.
Q Well, you don't know what it's called. I just want to see, like, what was some of the content that you had to learn to be certified? In order to be certified, you had to at least -- did you have to take a test?
A No, there is not a test.
Q Was it a PowerPoint?
A I believe it would be a PowerPoint and/or a presentation by an instructor.

Q Okay. The last one that you conducted, was it a presentation by an instructor?
A I don't remember, to be honest.
Q You don't remember any of the content of it?
A Well, I'm not saying I don't remember the content, but I don't remember exactly what the -- to play back what the layout of the class was.
Q Okay. What was some of the content? What do they teach you in this class?
A Again, I don't recall exactly what.
Q Okay. Going back to 2018 -- well, let me ask you another question, then. I know you had said roughly two years ago that you became a lieutenant. Were you a sergeant -- is there any rank in between?
A No.
Q Okay. And did you do any -- in May of 2018 you were a sergeant?
A Correct.
Q And what was your position with Enfield Police Department in May of --
A At that time, I would have been a patrol sergeant.

Q Did you have any other positions between patrol sergeant and lieutenant of the day shift?
A I don't believe I did between those two.
Q So I'm going to show you a document to start. It's been redacted. This was actually what we were sort of discussing off the record.
MR. MCLANE: Let's mark this as Nolan 1. I'm going to continue on with the last names.

(Exhibit Number 1, Bates Documents 000463 to 000494, was Marked for Identification.)

Q So one of the questions because I didn't know who these redacted emails were on this. Let me stop before I get into this.
In the bottom, right-hand corner you'll see the number here, right? Do you see where it says "463"?
A Yes.

Q So when we produce documents in discovery, we do something called Bates stamping. Are you familiar with Bates stamping?
A I am not.
Q Okay, so documents in and of themselves might have page numbers. And so when lawyers turn over large numbers of documents, we need to organize those documents in a way that's easy to organize and easy for us to draw up. And so what we do is we number them with our own page numbers. Your lawyer produced Bates numbers with a "D" and then a number. Lieutenant Samson's attorney produced just numbers. Stebbins would be Stebbins, and then a number. And then for me it would be "Cameron" and then a number. All it is is an identifier to identify a page on a document.
With that being said, today I am just going to run through it. My printer was having issues. I had to print from a different platform. So there's no issue -- the "Stebbins" is cut off just a little bit on the, the one we get to exchanging documents, the Stebbins Bates number is just

cut off a little bit at the bottom. I'm going to have to go by page number in the exhibit instead of the Bates number, so that's just an aside.

So here what I have is page 463. This is an email, an email thread. So originally, you'll see at the bottom it says from Steven Stebbins, dated December 12, 2018, and it's to two recipients who have been since redacted. It includes, as you scroll through here, as we flip through, the first page of the attachment would be 465. Do you see that? It's the --

A Yes.

Q What is page 465? Do you recognize that?

A Yes, that would be the arrest warrant affidavit.

Q I'm just -- I guess I'm curious. We now know that, I mean, those emails are redacted. But we know that this was sent to Steven Stebbins's wife and Lieutenant Samson on December 12, 2018. Am I correct that Marcus was arrested by you on December 11, 2018?

A He was not arrested by me personally.

Q Who arrested him?
A I have the supplement in my report if I could refer to that.
Q Absolutely. If you need to take a look at the document, it's fine. I just asked to take a look at it.
A Of course.
Q I don't think it's anything I don't have. Actually, it may be in this packet.
A I was going to say it probably is. But it would be Officer Caires.
Q Okay. Were you on the scene with Officer Caires?
A I was.
Q And that was on December 11th. About what time of day did you arrest Marcus Cameron?
A He was arrested around 2045.
Q Okay, so within 24 hours, Steven Stebbins had all of the information here, the arrest warrant application, the police report -- the incident report rather. I'm just wondering how Steven Stebbins got this within 24 hours.
A I don't know.
Q You don't know?

A No.
Q Did you send it to him?
A Not that I know of.
Q Okay. Do you know if anybody else from the Enfield Police Department sent it to him?
A I don't know.
Q These contain people's social security numbers, do they not?
A I don't believe our case reports or are sworn affidavits do. I'm not 100% positive, but I don't believe they do.
Q And you have no idea how he got this --
A I do not.
Q We're going to hold on to this only because for efficiency sake. These documents have been shared a few times. There's different -- there's duplicates throughout the production of discovery, but the documents I'm going to be referring to are contained in the attachment.
A Okay.
Q But for ease, we'll go back to this for now. But for now, that's Nolan number one.
The other thing I'm going to tell

you, Lieutenant, is that you may be subject to frequent pauses for me as I fumble through exhibits, so just --

A Not a problem.

Q -- I try to change and there's no rehabilitating me in that regard.

MR. MCLANE: Okay, so we'll mark this one as Exhibit Nolan number 2.

(Exhibit Number 2, Email, was Marked for Identification.)

Q And this is exactly why you'll see in the bottom right, obviously. You'll what I was talking about. This wouldn't be Bates stamped. It was produced to me as Stebbins 000593, but obviously, that's been cut off.

So looking at Exhibit 2 here, this is an email from stevedmi@hotmail.com. You know that to be Steven Stebbins?

A I don't, but if you tell me that is, yes.

Q Okay, well --

A He signed it as such.

Q Okay. So do you have any reason to believe

that it would not be --

A No.

Q - Steven Stebbins?

And it says sent from his iPhone. The subject was CSP investigation, INV, number C-18-086. What does that mean to you?

A The CSP investigation?

Q Yes.

A That would be their case number.

Q Okay. The email says, (Reading):

"Sir, I requested all reports, etcetera, from our IA Unit and the LT there said to have you send him a request for all reports and materials for case number C-18-086 on your PD letterhead. He will run it through Legal to get it released to you."

And then he gave you a contact, a Lieutenant Eric Cooke, is that accurate?

A Yes.

Q Now, I never received anything nor could I ever find any request on an Enfield PD letterhead for IA documents. Did you ever send one?

A I do not know. I don't know.

Q Okay, you don't know if you did. Did you --

A I assumed I would have if I received that information. I don't see why I would not have.

Q Well, I think we'll talk about the information you did receive. But I just don't know if you went through -- it seems to me that he is a -- Mr. Stebbins is indicating that you have to run it through CSP Legal, is that accurate?

A Yes.

Q Would you agree that --

A Yes.

Q And I'm just wondering if you ever did request it through Connecticut State Police Legal Department?

A I don't see why I would not have.

Q Did you have -- let me ask you, did you search for any documents that would show --

for production of documents that would show that you did request these?
A I did a search of my email on any of the names and I produced everything that came up with, but I don't remember anything having to do with requesting those materials.
Q Okay, in the email search that you conducted, what were the names? Was Marcus Cameron one of the names?
A I believe I searched Cameron, Stebbins, and Samson.
Q Do you believe that if you did request investigative material from Connecticut State Police Legal, you would have mentioned one of those names in the request?
A Yes.
Q Okay. And you're saying that your search produced none of those?
A Correct.
Q We can set that aside for now.
Eventually, we'll be down to, like, three exhibits, and I won't have to do this.
What was your first interaction

with Marcus?
A That would have been on the date of the incident, November 12th.
Q And November 12th of 2018?
A Correct.
Q Describe your first interaction.
A I was called to the scene at Brookside Plaza due to an active duty police officer being involved. Because in our department, if it's involving an active duty police officer, we send a supervisor to the scene to take over the scene. So I was dispatched there to Brookside because there was a state trooper involved.
Q Involved in what?
A The incident.
Q So what was your understanding at the time you received the call of what was going on?
A That there was a state trooper being followed by someone.
Q Followed, all right.
And when did you get on scene, what time?
A I don't believe it was many minutes after it

was called in.
Q Okay, and when you got on scene, who did you speak to first?
A I know there was two officers already on scene, Officer Croteau and, I believe, Chagnon.
Q Okay, is Chagnon the female officer that was on scene?
A No.
Q Okay, was there a female officer on scene?
A I don't recall if there was a female officer on scene.
Q I'm going to bring something up here. I'm not going to offer this into evidence. I just want to -- because I don't have a color printer, but I just want to see -- I have a photo. This will be Bates stamped Cameron 15. Again, I don't want to offer the exhibit, but there was a photo that was provided of a female officer on the scene.
A That looks like Officer Magagnoli.
Q Was Officer Magagnoli on the scene that day?
A If that was a picture from the scene, then yes, but I don't remember.

Q You don't recall, right?
A Yes.
Q What was Officer Magagnoli' -- what was her role? Let me rephrase the question better.
What was her position in 2018 on the Enfield Police Department?
A She's a patrol officer.
Q So she's still with you at the Enfield Police Department?
A Yes.
Q She's still a patrol officer?
A Yes.
Q So you said Officer Croteau?
A Correct.
Q Officer -- who was the other officer?
A Chagnon.
Q What did you do when you got on the scene?
A I believe I spoke with one of the officers and got an update on what was going on.
Q What was your understanding of what was going on?
A That the state trooper had called his supervisor who had recommended calling the Enfield Police because there was someone who

was following him?
Q Did you speak to those two individuals?
A The two --
Q Did you speak to the Connecticut State Police officer and his supervisor when you got on scene?
A Yes, I would have. I don't know which order I did.
Q And who are those two individuals?
A That would have been Trooper Stebbins, and I believe Samson was the sergeant at the time.
Q Okay.
A Possibly.
Q Would did Trooper Stebbins tell you?
A According to my report, he had given me a rundown of essentially what had happened, that he was leaving his house and that he suspected that one of his neighbors had been following him, and while he was on the highway, he called his supervisor, who then advised him to call Enfield Police. He got off the highway and went to Brookside Plaza and I guess informed our dispatcher that's where he would be. And that's where we went.

Q And is that all he told you when you spoke to him?
A I don't know the entire conversation of what was said. I don't know what information was gleaned that day or through a written statement, but...
Q What about Sergeant Samson? What did he tell you?
A I don't recall exactly what he said.
Q Do you know why he was there?
A I think because he was his immediate supervisor.
Q Okay. Is that normal protocol, to just call your immediate supervisor?
A I don't think it's abnormal.
MR. MCLANE: Is there a way for me to show a video here? Do you guys have Apple Tv or anything?
We can go off the record.

(Whereupon, a brief discussion was held off the record.)

MR. MCLANE: All right, so we'll go

back on the record.
Q While you were on scene, walk me through this. So you first spoke to whom, another Enfield police officer or Trooper Stebbins?
A I don't know the exact order in which I spoke to someone, but I would assume that the first person I would speak to would be the first officer that had been on scene or that was initially investigating.
Q Okay, but I think it's fair to say that you did speak to Marcus eventually, right?
A Correct.
Q All right. It's fair to say you spoke to both the Enfield Police on the scene and the Connecticut State Police troopers on the scene and Sergeant before you spoke to Marcus?
A Correct.
Q I want to play a video that we've produced in this case. It's Bates stamped number Cameron 4.
MR. MCLANE: Michele, I can email this to you. This will be Exhibit 3.

(Exhibit Number 3, Video, was Marked for Identification.)

Q It's about four minutes long. I'm going to walk over and put it in front of you, if that is okay.
A Yes, of course.

(Whereupon, Mr. McLane played video.)

Q I'm going to stop it.
At this point in time, did Marcus appear nervous to you?
A Nervous?
Q Yes.
A Not overly nervous.

(Whereupon, Mr. McLane played video.)

Q So at that point in time, was that a true statement when you told him you didn't know the supervisor's name?

A I don't know. I'd never met that supervisor, so I don't know whether I had spoken with him prior to talking with Mr. Cameron or if it was after, so...

Q Well, it's my understanding you just said that you did speak to Enfield PD and the Connecticut State Police on the ground prior to speaking to Marcus?

A Yes, I don't know in what order.

Q Okay.

(Whereupon, Mr. McLane played video.)

Q So when you say "I haven't even talked to him yet," was that a true statement?

A I don't know.

Q Okay.

A I don't know the exact order in which I spoke with all the parties on scene, whether the Enfield police officers or the Connecticut troopers or Mr. Cameron. I don't know the exact order it was in.

(Whereupon, Mr. McLane played video.)

Q So do you think at that point Marcus is being polite when asking if he had to give you his name?
A He was being polite about it.
Q Was he being overly combative?
A Combative? No, I wouldn't use the word "combative."

(Whereupon, Mr. McLane played video.)

Q Okay, at that point in time -- I think we're done with this video -- you agree with me that you asked for Marcus's address and he then asked you if he had to give it to you?
A Correct.
Q And you said that he did?
A Correct.
Q And you said that it was Connecticut law, right?
A Correct.

Q And then he tried to explain to you why he didn't want to give you his address?
A Correct.
Q And then you left?
A Mm-hmm.
Q At any point in time did he flatly refuse to give you his address?
A I didn't see on the video him flatly refusing, but obviously, he did not want to.
Q Okay, would you agree with me there's a different between not wanting to and refusing?
A Yes.
Q Can you grab Exhibit 1? We're going to go through them. I want to read through the Incident Report. It begins on 479 and ends on 484.
A Mm-hmm.
Q Is this a document that you reviewed in preparation for today? Is this part of the incident report in the case file?
A Yes.
Q Is everything you've put in this accurate?
A Yes.

Q Okay. So you're here today after having reviewed what you wrote five years ago, is there anything that you saw when you reviewed this document that stuck out at you as not being accurate?
A No.
Q So I'll bring you to page 483. It's five of nine at the top, you see that?
A Yes.
Q The page starts with (Reading):

"He stated that I feel uncomfortable being around him' and said that he was just letting him," Stebbins, "go around him. When questioned as to why he had stopped on Route 5, he stated it was to use his phone. When I asked Cameron to provide his name, he stated, Do I have to tell you.' I informed him that he did and Cameron gave me his name and date of birth, but

when I asked for his address, he stated that he lives in Massachusetts but did not want to give me his address. He eventually provided an address on Foxcroft Road in Enfield."

I want to finish the video, actually.
A Mm-hmm.

(Whereupon, Mr. McLane played video.)

Q We're at the spot we left off last time. The video keeps disappearing.

(Whereupon, Mr. McLane played audio.)

Q Video is complete. At what point in time did he give you his Foxcroft Road?
A I'm not sure. Maybe after that. I know, in my report, he approached us afterwards at

some point. I don't know if it was then. I don't know.

Q So when we're looking at the report, it says, (Reading):

> "When I asked Cameron to provide his name, he said Do I have to tell you.' I informed him that he did, and Cameron gave his name and date of birth, but when I asked for his address, he states he lived in Massachusetts but did not want to give me his address. He eventually provided an address on Foxcroft Road in Enfield."

When was this?

A I don't know at what point.

Q Okay, so you think it was after he stopped recording?

A It had to have been after that, yes, or when he approached me after that.

Q Okay. If you can flip to 485, please.
A Okay.
Q The last paragraph says, (Reading):

"I will be requesting that a warrant be issued charging Marcus Cameron in violation of CGS53A-181E stalking in the third degree."

What was the basis of you requesting that warrant? In your own words.
A Through the investigation, I believe that that charge, what was being recorded or reported by the complainant and through his written statement or his dash cam video, I believed I had probable cause for that arrest.
Q Okay, what does probable cause mean to you?
A It's believing that a crime, essentially 51% of belief that a crime could have been committed there.
Q Now, let me ask you another question.
A Mm-hmm.

Q In reading your report, my question is, did you base your probable cause solely on the events of November 12, 2018, or on the entirety of --
A No, on the events of November 12th.
Q Okay, specifically in the events --
MR. GERARDE: Just let him finish his questions first.
THE WITNESS: Okay.
Q So specifically in the events of November 12, 2018?
A Correct.
Q All right, so everything that happened beforehand really didn't have much to do with it, in your mind?
That's not a fair question. Everything that happened before that didn't contribute to the charge of stalking in the third degree?
A Correct, I think it gave context of their history, but...
Q Okay, turn to 484 for me. The last paragraph, 11/15/18.
A Mm-hmm.

Q So midway through, do you see the sentence that starts with "Although there was a vehicle in the driveway"?

A Yes.

Q It says, (Reading):

"Although there was a vehicle in the driveway and lights on in the residence, nobody answered the door. A short time later, an individual who identified himself as John' called the headquarters commander's office where Sergeant Held was working. He wanted to know why I had been on his property. Sergeant Held informed John' that I needed to speak to him. John' refused to give Sergeant Held a callback number."

And this is you writing, correct, where you

say, (Reading):

"I later listened to the phone audio log recording and noticed that the individual who identified himself as John' sounded like Cameron"?

A Yes.
Q Okay. Is there any possible way this person would have been named Gene?
A I don't know.
Q Okay, so would it surprise you -- I won't ask that question.

Let's go back to the video.

Mr. Cameron said he owned a home in Connecticut but lived in Massachusetts, correct?
A Correct.
Q All right. So if someone owns a home in Connecticut, they can rent the house out, right?
A Correct.
Q If Mr. Cameron had a tenant named Jean, would

it be odd for Jean to have called the Enfield Police --
A No.
Q -- and wondered why people are on his property?
A No.
Q Just in your view that this person that you believed whose name is John sounded like Mr. Cameron --
A Correct.
Q -- you thought it was Mr. Cameron?
A Correct.
Q Go to 485 again.
A Mm-hmm.
Q On the civil protection order, when you talked about that, what is your understanding of the civil protection order process? How does someone -- how does it work? Does someone applying for a civil protective order right with the court?
A Correct.
Q All right. How often, in your experience, are these granted ex parte until a hearing?
MS. VITALE: Objection to form.

A I don't know.
Q You don't know?
A No, I'm not involved in them.
Q So you're now a Lieutenant in the police and you don't have -- I mean, how much experience do you have with people getting protective order?
A None, zero. We don't -- the police department doesn't deal with them. The course --
Q Do you recommend that domestic abuse victims go seek civil protection orders
A No. In Connecticut, automatically, an order is issued through the courts when an arrest is made if there is a domestic abuse situation.
Q Okay, how about --
A Anytime we make an arrest, it would be conditioned to release on top of an order that is already initiated.
Q Interesting.
What about stalking in the third degree? Are conditions of release automatically imposed in those cases?

A I don't know if they are automatically.

Q But at the time of this report, it was dated at the bottom here, 12/5/18. Is that accurate?

A Yes.

Q All right. I'd like to show you another document.

(Exhibit Number 4, Westlaw Statute 53A-181E, was Marked for Identification.)

Q I'm showing you what I printed off the handy dandy Westlaw, which is Connecticut General Statute Section 53A-181E, stalking in the third degree. Would you agree that this is the statute that you charged Marcus Cameron with?

A Correct.

Q So reading here, it says, (Reading):

"A person is guilty of stalking in the third degree when such person recklessly

causes another person to reasonably, one, fear his or her physical safety or, two, suffer emotional distress as defined in Section 53A-181E by willfully and repeatedly following or lying in wait for such other person." And then, "B, stalking in the third degree is a class B misdemeanor."

What, in your view, did Marcus do that was
reckless?
A That was reckless?
MS. VITALE: Objection to form.
Q Right. What in your view did he do that
recklessly caused Steven Stebbins to either
reasonably fear for his physical safety or
suffer emotional distress?
A Well, through the investigation I developed
probable cause that he, in fact, did
repeatedly follow or lie in wait, and the
complainant, victim stated that that caused

the person fear or to suffer emotional distress.

Q But you'd agree that the statute requires the person to recklessly cause another reasonable fear, emotional distress?

MS. VITALE: Objection to form.

A I'm sorry.

Q You'd agree with me that the statute says that he has to recklessly cause another person fear or emotional distress in order to be charged with stalking --

A That's what the statute says.

Q Okay, I'm asking you now, what, in your view, did Marcus do that recklessly caused Steven Stebbins fear or emotional distress?

MS. VITALE: Objection to form.

A He continuously followed him.

Q Okay. By continuously following, you mean that morning of November 12, 2018?

A Yes.

Q How many times did he follow him?

A From what I recall, there was several instances where from through the neighborhood, and then there was a time when

they headed north on Route 5, where Trooper Stebbins pulled into a bank because he thought Mr. Cameron was following him. Mr. Cameron continued on and pulled off at a business just north of that, at which time Trooper Stebbins pulled out. Again, Mr. Cameron pulled out and followed him and then onto the highway. From what I recall, Trooper Stebbins pulled over on the highway to see if Mr. Cameron was going to follow him there, which happened. Then they passed Exit 48, Exit 47W, Exit 47E, where they both exited again with Trooper Stebbins in front of him. And then both pulled into the same shopping plaza. In that area, there are several shopping plazas. So I think there's multiple when it appeared there was probable cause, I believed, that he was following him. There wasn't a justifiable reason for taking that route to Brookside Plaza.

Q Okay. Was there a justifiable reason for Mr. Stebbins to be taken that route to his house?

MS. VITALE: Objection to form..

A I'm sorry?
Q Was there a justifiable reason for Mr. Stebbins or Trooper Stebbins to be taking that route to his house?
MS. VITALE: Objection to form.
A I don't believe he was going to his house.
Q Oh, you don't? Where was he going?
A I don't know.
Q Where did he tell you he was going?
A I don't know.
Q So you don't know? Did you bother to ask?
A I don't know if I did.
Q You don't know if you asked?
A No.
Q So what you're saying is it mattered where Marcus was going, but it didn't matter where Stebbins was going?
A If the victim is complaining that someone is following them and then they take different routes to see if that person continues to follow them, yes, I think it does matter.
Q Okay, but why not arrest Marcus on the spot?
A Because I thought more of an investigation should be completed. And also that there is

a police officer involved, I know that brings
on more scrutiny to try to prevent probably
the reason we're here today.
Q Did you ask Trooper Stebbins why he didn't
just arrest him himself?
A No, I didn't. But - no.
Q You were going to say something.
A That wouldn't -- I don't think that's the way
it will play out nor should it play out.
Q Why?
A A victim of a crime typically wouldn't make
their own arrest.
Q Even if that victim has the authority to
arrest someone?
A Correct, for obvious reasons.
Q What are the obvious reasons?
A There's a bit of a conflict when the victim
is the arresting officer.
Q What about resisting arrest situations?
A Well, I think that's a little bit of a
different situation, but...
Q What did you see -- I mean, in your mind,
what was the reasonableness of Steven
Stebbins' fear of Marcus Cameron?

A Well, there was a long history, obviously, between them, but the fact that there was ongoing problems, and that he was concerned enough that he was pulling over and contacting his supervisor and, in turn, contacting the police, that obviously for some reason, there was some worry there.
Q And the fear has to be reasonable, you would agree?
A Correct.
Q What do you think Marcus was going to do to the guy?
A You would have to ask him. I don't know.
Q What did he tell you he thought Marcus was going to do him?
MS. VITALE: Objection to form.
A I don't know.
Q You don't know?
A I don't.
Q Well, I mean, Marcus was arrested?
A Correct.
Q And this was based on your view, your standard of 51%, you know, probable cause that Steven Stebbins was in reasonable fear

of Marcus Cameron?

A Correct.

Q And today, you can't articulate what that fear is?

MS. VITALE: Objection to form.

A He gave statement of his fear.

Q But not on that day, right?

A No. And that's why there wasn't an arrest that day.

Q But I think you just told me that the arrest was based solely from the events of November 12th, right?

A Correct. But you have to have context of why you have the fear. The actions of that day of November 12th are why the probable cause was developed. However, you have to play into account everything that the victim...

Q You're saying "victim." Didn't Marcus tell you that Steven Stebbins was harassing him?

MS. VITALE: Objection.

A I'm referring to the "victim" as in how it's referred in my case report.

Q Okay. Well, you charged Marcus. You didn't believe Marcus that --

A I didn't have a chance to further speak with Marcus. That's also why it took so long for the arrest warrant to be applied for because I wanted to give him his opportunity to give his side of the story.
Q I believe you put in the report somewhere -- and maybe we'll just go off your memory. Didn't Marcus come back out and try to speak to you on the scene after he had gone to the store?
A On the scene, yes, but further investigation needed to be done in the following days. Right then, we weren't going to figure out what was going on. And no, I don't believe he was there to speak to me more about the incident. He was there to question who another officer on the scene was.
Q Okay. Did you tell him?
A I don't know if I did.
Q You got information as part of your investigation, I think relatively quickly, so let me get some of the documents here.
I have one I want to show you. This will be Nolan 5. Let's start with this

one. This is Bates stamped D53.

(Exhibit Number 5, Bates Document D53, was Marked for Identification.)

Q This seems to be a response from you to Steven Stebbins, stating that you had to run the request through Legal.

A Mm-hmm.

Q You wrote, (Reading):

"Sounds good. I'll send the request"?

A Correct.

Q That's on November 14, 2018. So you did acknowledge that you sent this?

A Yes. Yes, I printed this out.

MR. MCLANE: The next one will be Nolan 6.

(Exhibit Number 6, Email, was Marked for Identification.)

Q I'm showing you what has been marked as Nolan 6. This is from Sav Stebbins. Did you know that to be Steven Stebbins?
A Yes, he signed it "Steven." Yes.
Q It says, (Reading):

"Sarge, please see the attached temp civil protection order. Can you add, slash, include this in your investigation, please."

So at the time of November 14, 2018, you understood the protective order was temporary?
A Mm-hmm.
Q Did you understand at the time that a court hearing was to be held on whether a protective order should be granted?
A I don't know.
Q Did you come to find out later, after Marcus was arrested, that the judge did not award the protective order?
A I did not know that.

MR. MCLANE: Let's mark these as two separate exhibits, so we'll do 7 and 8, Michele.

THE COURT REPORTER: Sure.

MR. MCLANE: So 7 will be 55 and 8 will be 56 to keep them in order.

(Exhibit Number 7, Bates Document D00055, was Marked for Identification.)

(Exhibit Number 8, Bates Document 00056, was Marked for Identification.)

Q Okay, so these are two emails from Steven Stebbins. Now we're back -- and this is his government email. It looks like he emailed you a number of things on November 15th -- and we're looking at Exhibit 7 -- at 2:13 including a 911 call. And it looks like he sent you a TFC Stebbins report revised dot doc. Is that accurate?

A Yes.

Q Okay. At this point in time, that would be his version of his report from the investigation?

MS. VITALE: Objection to form.

A I don't understand.

Q So I guess let's go back. He had told you previously that you needed to go through Connecticut Legal Department, right?

A I think for -- if I read that email correctly, for an Internal Affairs investigation.

Q Okay. So what was this C-18-086 TFC Stebbins report revised document?

A I don't know.

Q So that C-18-086, you would not understand that to be an Internal Affairs investigation report?

A I mean, possibly. I don't know what the Connecticut State Police uses for --

Q The reason I'm asking is we have an email that says you need to go through Connecticut State Police Legal to get Internal Affairs reports.

A Mm-hmm.

Q We also seem to have emails from, right now, Steven Stebbins where he seems to be sending you his own version of a report. I don't have the document.
MS. VITALE: Objection.
A So I'm wondering, the information in the documents you were given, were you ever given official IA reports from the state of Connecticut, or did you get them --
A I'm not sure.
Q -- from Steven Stebbins and Lieutenant Samson?
A I don't know.
MS. VITALE: Objection to form.
Q Okay, we'll go there later.
All right, so the second one I have is Nolan 8, which is D56 on the bottom. It says, "Cameron video, one of two." Were you ever given additional videos? The reason I ask is --
A I don't know what that video is.
Q -- I didn't see anything in the production that there was another -- I didn't see another email where there would be other

videos attached.

A Yes, I don't know.

Q Okay, so you don't know if you ever did follow up and sent you additional --

A I don't know.

MR. MCLANE: These ones are going to go together again. I'll mark them as two separate exhibits only because I think what was produced was incomplete and I want to get the complete file admitted.

Q So I'm just going to represent to you I think what was produced to me from you was a double-sided document that was not scanned double-sided, so these two documents that I'm referencing, I'm going to mark them as two separate exhibits. We will do the one that was produced from Bryan Nolan as Exhibit 9 and the one that was produced from Stephen Samson as Exhibit 10. They are two separate exhibits, but what I'm going to be referencing is the same material.

(Exhibit Number 9, Bates Documents D00057 to D00059, was Marked for Identification.)

(Exhibit Number 10, Bates Documents 000113 to 000116, was Marked for Identification.)

Q If you flip through where it says D57 and then 58 and 59. And if you look at the page numbers on the bottom, not the Bates numbers, but the page numbers. So if you go, you see it says one three and five?

A Yes.

Q It appears that this was just scanned with -- it was a double-sided document that was scanned single sided, but so I want to confirm that on November 20, 2018, Stephen Samson did send you an email from Marcus Cameron?

A Yes.

Q Okay. And so the content of that email, did

you find that content to be significant?
A I don't remember what the content is without reading it right here.
Q Yes, take a look. And this is why I gave it to you. It's a little harder to read on 113.
A Okay.
Q And then you attach some photos as well. Those are photos that --
A I attached photos?
Q No, photos that were included.
A Oh, okay. They appear to be of a cruiser parked in the neighborhood.
Q So what was the significance of this information?
A I don't know.
Q Did you request this information?
A Not that I remember.
Q Did you discuss any of this information with Stephen Samson?
A Not that I remember.
Q Did you have any phone calls with either Steven Stebbins or Stephen Samson after November 12, 2018, and before December 11th?
A I don't know.

Q So you never called up Steven Stebbins afterwards as part of the investigation?
A I'm sure I would, but I don't know times, dates, location.
Q Did any other officers assist you with this investigation?
A I don't believe so.
MS. VITALE: IS now a good time for a break?
MR. MCLANE: Yes, that would be great.

(Short break.)

MR. MCLANE: Back on.
Q Back to Exhibit 1, we're looking at Bates number 492 to 494. Do you see at the bottom of 492 there is a URL, the last three pages of this?
A Yes.
Q All right. What is CJIS?
A The Connecticut Justice Information System.
Q So in order to obtain this booking report, would somebody have to log into the

Connecticut Justice Information System?
A No, this URL I think was our -- at the time. We don't have it anymore, but it was our incident reporting system, so I believe that would be our in-house web-based reporting system. I believe.
Q So you don't know who gave this to Steven Stebbins --
A No, I don't.
Q -- 24 hours after Marcus was arrested?
A No, I don't.
Q Would you be able to find that out by looking at your web-based --
A I would have to find out. I don't know. Again, this is -- we no longer use this.
Q Do you have to log in for this information?
A Yes.
Q Okay. So somebody would have had to have logged in?
A Correct.
Q And somebody would have had to send it to him?
A Correct.
Q And you don't know who that was?

A No.
Q You can see at the top that these there are social security numbers. It looks like this one is redacted. Do you see that?
A Yes.
Q All right, there's other sorts of personal information like cell phone.
A Mm-hmm.
Q Do you think it's appropriate that somebody sent this to Steven Stebbins within 24 hours of Marcus --
A I don't know what the context was.
Q Do you send these to victims of stalking crimes? Do you send these to them?
A I don't, no, but again, I don't know the context.
Q Well, is it Enfield's protocol to do so?
MR. GERARDE: Objection to form.
A No.
Q Well, is it your understanding that Enfield Police Department allows officers -- let me rephrase it.
Was it your understanding in 2018 that the Enfield Police Department allowed

its police officers to send incident reports, booking reports, applications for arrest warrants to victims of crimes?

MR. GERARDE: Objection to form.

A Again, I don't know the context of when it was sent.

Q What are the -- well, what context are you allowed to send these?

A I am not 100% up on FOIA law of what is allowed to be released and what isn't allowed to be released. I know the arrest warrant affidavit is public information, but I don't know enough to answer the rest of it.

Q Okay. Who answered in 2018 FOIA requests?

A I would believe the Records Division.

Q Okay, was there a particular custodian in charge of the Records Division?

A There are several people.

Q Do they usually respond within 24 hours?

A I don't know. I would hope so.

Q Well, let me ask you, do they usually produce the records within the 24 hours?

A I don't know.

Q Okay, turn to Page 494, please.

A Okay.
Q Last paragraph, (Reading):

> "I should note that Cameron was not entirely cooperative throughout this investigation. At times he refused to provide basic information such as his residential address."

To whom did he refuse to provide his residential address?
A I would assume the investigating officer that wrote this report.
Q Which was who?
A Officer Caires.
Q Okay. Did you speak to Officer Caires about this?
A I don't know.
Q When did Officer Caires speak with Marcus?
A December 11th.
Q So this was just during his arrest?
A Correct.
Q And it goes on to say, (Reading):

"I should further note that Cameron has two valid forms of identification, one for Mass. and one for CT."

How did Officer Caires find this out?

A Probably a search through CJIS.

Q So at the time, if we look at the second paragraph on the page, it says, (Reading):

"On approaching the vehicle, I positively identified Cameron as the driver, based on his CT OLN."

What is "OLN"?

A Operator's license number.

Q (Reading):

"I asked Cameron for license, registration, proof of insurance. He only provided me with his Mass. license."

So I guess the only way that this person would have known is by looking him up on the CT database?

A Correct.

Q Okay, so is that database always up to date?

A It should be.

Q Is there ever lag in -- well, that is not going to be a very good question.

Is there ever a delay in information provided to the database?

A That would have to be asked through the DMV, their files.

Q So for instance, have you ever experienced where somebody applies for a license in a new state -- say he applied for a license in Massachusetts, have you ever experienced something like that where the Connecticut database wasn't updated for a period of time?

A I don't know. Not that I remember.

Q Did your officer discuss this with you about Marcus having two -- what he thought Marcus having two active licenses?

A I don't remember any discussion about it.

Q Is there anything that would suggest that

that officer checked whether or not he had two active licenses other than what he just saw --

A Well, automatically --

Q -- when --

A Oh, sorry.

Q That's okay. Go ahead.

A Automatically, when he ran his name, it's going to give you the information if they have a Connecticut operator's license.

Q Why did he not charge Marcus with Connecticut General Statute 14-43, then?

A I don't know.

Q What was Officer Caires -- is it a he or a she?

A He.

Q Was he a patrol officer?

A Correct.

Q As part of your investigation, did you actually look into the protective order application that was submitted by Steven Stebbins to the court?

A Did I look into it?

Q Yes, did you review it?

A I don't know.
Q Well, I know as part of your report you mentioned the temporary orders.
A Then I was --
Q Did you ever review the application?
A Not that I know of, but I don't know.
Q Did you review any 911 calls or anything like that?
A I'm not positive.
Q What do you remember reviewing as part of your investigation between November 12th and December 11th of 2018?
A I would have reviewed any available video footage, statements. It wasn't very complex, I don't believe. You know, whatever information is provided is what I would have looked at or included in the arrest warrant affidavit.
Q Okay, this is 479 to 485. Okay, so page 484 at the top says, (Reading):

A Google Maps search for 49 Foxcroft Road to Brookside Plaza shows at least three

different routes that are quicker than the route traveled by Cameron following Stebbins. Stebbins has also stated that due to construction in the neighborhood he was forced to drive by Cameron's house that day. I did confirm that at the time there was, in fact, road construction with detours occurring in the neighborhood."

When did Stebbins state that due to construction in the neighborhood he was forced to drive by Cameron's house to you?
A When? I don't know.
Q I mean, you can review 479 through 484. I didn't see it anywhere in his statement, did you? I could be wrong. I don't -- I'm just wondering how it got in your report.
A Yes, I'm not sure.
Q I guess that's what I'm asking. How many

times did you converse with the guy, Steven Stebbins, between November 12, 2018, and December 11th when Marcus was arrested? I don't see this in his written statement.

A Right, I don't know.

Q Was it in reviewing the documents that he sent you via email?

A Again, I don't know. Perhaps.

Q Let me ask you, in investigating crime, would you want an official Connecticut State Police document?

MS. VITALE: Objection to the form.

A I'm sorry?

Q If you're receiving documents from Steven Stebbins and Stephen Samson and you know that you can access the official documents from the Connecticut State police through the Legal Department, wouldn't you prefer going through the Legal Department to get those documents?

A I guess I'm a little confused because I don't know that that would be a document in saying that there was construction in the neighborhood.

Q Okay, well --
A So I guess --
Q I --
A Sorry.
Q Yes, I was moving on. Maybe I did a bad job with a segue, right.
So if you saw it in the documents, so say you saw this in the documents that were provided to you via email, right? Because I think you said you don't recall how many times you spoke to the guy.
MR. MANCINI: Objection.
A Right.
Q You don't recall when he said that?
A Right.
MS. VITALE: Objection to the form.
Q If you saw this in one of the documents, wouldn't you want these documents to be official from the state of Connecticut rather than what these gentlemen are sending?
MR. MANCINI: Objection.
MS. VITALE: Objection to form.
A But I don't know that I saw it in a document.

Q Well, in general, take this aside. These guys are sending you documents, obviously. We've seen emails. They're sending you things.
A Mm-hmm.
Q You also have an email that says you can get the official report from Internal Affairs -- from the Legal Department. Wouldn't you want the official report as opposed to their documents that they're sending you?
A I am not sure on the relevance for the incident that occurred on that day.
Q Well, I would say the relevance is you spent several pages talking about the context of the relationship between these two gentleman.
A Right.
Q Right. And you have an email saying for the official report you can go through the Connecticut State Legal Department, but at the same time you have two gentlemen sending you their documents. Why not go and get the official report from the Connecticut State Police?
A I don't know that I didn't.

Q Okay, but we have no record?
A Right.
Q In your view, what would be more reliable, the documents they're sending you or what you received from the --
A I would say the official.
Q -- Connecticut Legal Department?
A Correct.
MR. MCLANE: This is Nolan 11.

(Exhibit Number 11, Email, was Marked for Identification.)

Q I'm showing you another email. So this is an email from Steven Stebbins to you. It says, in the subject, "Forward rough draft of complaint." This was on 20 November 2018. It says, "Attachments: 1 of 4 mp4." I'm not sure what that is. We may have received something, we may have not. But the body of the email says, (Reading):

"Sarge, here's one of two videos that Cameron recorded

them 5-30-2018. This is the day he drove by my residence three times and Alex confronted him on his third time by."

And then below that, you see -- this was obviously forwarded. You see there's an email from Samson Stephen to Steven Stebbins, and it says, (Reading):

"Steve, this is the rough draft I sent the LP. I would not give this to Enfield PD due to they might give it to him. Take care, Stephen."

Do you know what documents they're talking about?

A I don't.

Q Did you have any discussions with them about avoiding the turning over of any sort of rough draft --

A No.

Q -- to prevent Marcus from accessing?
A No.
Q Is this normal practice within police departments to, I guess, not turn over rough drafts of documents to avoid --
MS. VITALE: Objection to form.
A I can't speak for them. I don't know what they're talking about.
Q When you got this email, did you inquire as to that portion of the body of the email, the message from Samson to Stebbins? Did you say what is this? What are you talking about?
A Not that I know of.
Q It didn't concern you at all to read --
A Well, that's what I'm trying -- I'm wondering if that was included in the attachment because --
Q This was provided to me as Stebbins number 52. You can't really read it at the bottom. This was a forwarded email.
A Right, but that doesn't make sense why they would forward something to me, saying not to give me something. So I was wondering if this is the email and then this was a forward

after that.
Q Yes, it was a forward of --
A So I wouldn't have seen the bottom section.
Q Well, if it was forwarded to you, you would see the bottom section, would you not?
MS. VITALE: Objection to form.
Q This is the email that was provided to me, and it's the complete email.
A Right. I didn't know if this was a response -- if this line here is a separate email.
Q No.
A Then no, I don't know.
Q Upon looking at this right now, what do you think they're talking about?
MS. VITALE: Objection to form.
A I don't know.
Q Did you ever communicate with Steven Stebbins or Stephen Samson on any medium other than your official email or phone?
A Not that I know of, but I'm not 100% sure.
Q Okay, you never use your personal phone?
A Not that I know, but I'm not 100% sure.
Q What about personal email accounts?
A No, I don't use personal emails.

Q Did they ever send you a draft of any
complaint that you're aware of?
A Not that I remember.
MR. MCLANE: Let's mark this as
12.
Q This is Stebbins 692. It's hard to read at
the bottom. Do you recognize this?
A This is a supplemental report.
Q Actually, these are two documents, actually.
Well, I think --
MR. MCLANE: Michele, can we mark
them separately? It's actually two separate
documents. It's three separate documents,
Let's mark them as 12, 13, 14.

(Exhibit Number 12, 5/26/18
Incident Report, was Marked
for Identification.)

(Exhibit Number 13, 5/30/18
Incident Report, was Marked
for Identification.)

MR. MCLANE: Let me just clarify.

So page one of one, 692, is Exhibit 12.
Exhibit 13 is page one of one, and there's a Date Time reported of 5/30/18, 693. And then the last one, which is page one of two, the two pages will be Exhibit 14.

Q Do any of these look familiar to you? There are three documents.

A I recognize them as incident and supplement reports.

Q Okay. Did you review these in investigating --

A I don't know. I don't know if I reviewed them.

Q Let's take a look at them right now.

A Yes.

Q So the first one, Exhibit 12, (Reading):

> "At about 1320 on May 26, 2018, Cameron came to EPD to find out what officer was involved in this investigation and if in fact EPD had received a complaint, number 44. I advised Cameron that

Castle was the officer and a complaint did come in. I spoke with him about this incident for 15 minutes in which he gave his version of the events. I asked him numerous times if he wanted to speak with Castle and he declined. He was just concerned that these complaints were going to continue and that he had his version also."

Is there any reason why they wouldn't take down his version of events or write it down in a supplemental report?

A I don't know.

Q Look at Exhibit 13. It says, (Reading):

"On 5/30/2018, a black male with a beard and short hair was present in the lobby of the police department. He

refused to identify himself, stated to me that he owns a home on Foxcroft Road and had a problem with a neighbor last Tuesday, who he identified as Steven Stebbins. The male showed me a recording that he claimed to have occurred at 5/30/18. The video shows the black male sitting in his vehicle while driving down the street. A white male is walking well within the travel portion of the road, approaching the vehicle. The vehicle slows, and the white male states something to the effect of "Are you lost." The black male responds and drives away. The black male stated the male in the road was not Stebbins, but the incident occurred in front of Stebbins' home. Documentation purposes

only."

Did you review this in investigating the charges --
A I don't remember.
Q Okay, did you review the video that he provided?
A I don't remember that.
Q Okay, did you ever get the video from Steven Stebbins that showed his friend walking well within the travel portion of the road?
MS. VITALE: Objection to form.
A I'm not sure if that's one of the attachments.
Q Okay, but had you reviewed this now, do you think there's more to the story than just Marcus following Steven?
MS. VITALE: Objection to form.
A I guess my answer would be that's why I gave Mr. Cameron several opportunities to give his side of the story, which he refused to do.
Q So I guess my question to that would be, if, you know, the accused does not speak, right and does not provide his version of the

events, do you automatically charge them?
A Definitely not, but that plays into -- obviously, I have to go with what I'm given at the scene. You know, obviously, an investigation was conducted. I had statements and video and such, and I wanted to give Mr. Cameron his side of the story. Would that have changed if there was probable cause or not? I don't know. But it would have at least been included in the affidavit.
Q I mean, my thing is, I just -- in your mind at the time and then throughout the -- the time being November 12, 2018, and then nearly a month afterwards, you formulated the opinion that Steven Stebbins was reasonably in fear of Marcus Cameron?
MS. VITALE: Objection to form.
A Is that the question?
Q Yes.
A Yes.
Q So what is that actually based on? What threat did you think Marcus posed?
MS. VITALE: Objection to form.

A That was based on the statement from the victim.

Q But what statement did the victim make that showed that Marcus was some sort of a threat that could cause him fear?

MS. VITALE: Objection to form.

A That's not for me to answer.

Q Well, it is if you're charging someone with a crime, is it not?

A Well, I'm basing it off of the probable cause, again, based on the statement from the victim, based on the video evidence, and, again, an attempt to contact the suspect in the case to get his version of events.

Q Okay, so we'll go over the video -- and even even just taking the video as true. And I'm just -- because if Marcus was charged with the misdemeanor, the stalking in the third degree, right, so even if we want to take the video as true just for the purposes of the following portion that's required to be proven under the statute, I guess I'm asking for the two things that you found - and we'll start with the demonstration that

Steven Stebbins had a reasonable fear,
right?
MS. VITALE: Objection to form.
Q What statements did he make that -- I mean, we know Marcus didn't talk to him, right, other than what he --
A Correct.
Q The encounters that you did have with him, he didn't throughout the month provide any additional statement. And you just told me that doesn't automatically mean you're going to charge somebody just because an accused exercises their right not to speak?
A Absolutely.
Q You'd agree with me that system had it right?
A Absolutely.
Q And there's no requirement that an accused --
A Absolutely.
MS. VITALE: Objection to form.
Q So my question here is, in nearly a month-long period of time, what can we articulate from what Mr. Stebbins said or provided you that would cause you to believe that he was in some sort of fear of Marcus

Cameron?

MS. VITALE: Objection to form.

A I believed his sworn statement, and, again, based on what I had, I believe I had probable cause. I submitted an arrest warrant affidavit. A prosecutor and a judge agreed. And that's where we ended up.

Q So it's on them?

A That's not what I'm saying. I'm saying that I developed probable cause based on what I had. I submitted an arrest warrant affidavit. I didn't arrest him. I submitted an arrest warrant affidavit, believing there was probable cause, and a prosecutor and a judge agreed.

Q But they are relying on your objective opinion based on what you present to them as the facts and evidence, correct?

MS. VITALE: Objection to form.

A Correct, and I present what the information that I had.

Q And under oath today, you thought this was more than just a neighborly squabble?

A I don't understand that question.

Q Like, in your mind, did you see this as more of a neighborly dispute? When you were presented with this case on November 12th, you thought this was more than a neighborly dispute and you thought this was some sort of danger?

MS. VITALE: Objection.

A Well, it appeared that there was a long history, so that's why I think that it needed to be investigated a little more thoroughly.

Q After you thoroughly investigated this, what did Marcus do that demonstrated to you that he was reckless in some way, shape or form?

MS. VITALE: Objection.

A Again, based on what I had from the victim, the statement he gave, there was no reason to doubt the route he took and the actions by the other party that there was no reason for me to doubt that.

Q What are the normal -- well, let me -- when you conduct an investigation, what types of things give you doubt when taking the victim's statement? What do you look for to determine whether something's credible or not

in a statement?
MS. VITALE: Objection to form.
A I don't know how to answer that.
Q So if I come in and say whatever, "XYZ, this person committed a crime," are you just going to take it at face value?
A No, of course not.
Q Okay. So what method do you use to determine whether somebody's credible or not?
MS. VITALE: Objection to form.
A I don't know how to answer that question.
Q Did you factor in -- you mentioned multiple times that Marcus didn't, you know, provide his version of the events. Did that count against Marcus and the determination --
A No. I think the reason for that is because, again, probably why we're here today, but it would be nice to get his version of the events to answer to why. You know, why did he fall into that parking lot and then continue on? Why did he follow him onto the highway? Why did he follow him off the highway? Why did he follow him into another parking lot? Maybe there is a plausible

reason, but without that story, I believed I had probable cause. Again, would it have changed if I did? I don't know. I can't answer that. But it at least would have been -- his statement would have been included in the report.

Q You know, we're looking here at Nolan 12. I mean it look like he came in on May 26th and tried to give his version of the events, right?

A May 26th of 2018? But Castle was not involved, so I don't know how he was trying to get his version of the incident I was investigating when he was talking about an incident that occurred with Castle.

Q Well, the incident you were investigating, part of your investigation included what you call the context which began on May 22nd, correct?

MS. VITALE: Objection to form.

A I think the context of it was important, not the actual --

Q Would Marcus coming in on May 26th, giving his version of the events, provide any

assistance in determining context?
MS. VITALE: Objection to form.
A Possibly, but he didn't ask to speak with me.
Q What I'm saying, but did you not look for previous police reports as part of your investigation?
A I don't know whether I did or not. But wasn't this prior to -- I'm sorry, I need to look this up.
So the incident occurred on November of 2018, correct?
Q Yes.
A So he came in in May of 2018.
Q Yes.
A I guess I'm confused. Are you saying that he was trying to offer his versions of events in November?
Q No, not November.
A Oh, okay.
Q Back in May. So part of --
A Well, I think that is irrelevant.
Q I mean, if it's irrelevant, then why did we have -- I mean, why did you put in Steven Stebbins's statement -- it has multiple

pages. We'll put these aside for now and go back to 479. So let's look here. You have about three pages of Steven Stebbins's statements that begins talking about the events of November 12th, but it goes back in time with respect to -- on the third page, right, Stebbins says, (Reading):

"As a result of their very first interaction on May 22, 2018."

Why include that in your report if events before November 12th are not relevant?

A Because I was including his entire statement, that's why it's however many pages you said. Had Marcus Cameron come in and provided me with a 12-page statement about the events, that would have also been included in the report.

Q Okay, so you included it in the report, but you don't think it was relevant what happened on May 22, 2018?

A I think he's not explaining the incidence of

the November incident mid May.
Q Okay, but I guess my point is, it's included here solely for the reason that he stated it?
A I don't think that's solely the reason. But again, I had his statement. I included it in the case report. I didn't know about -- or I guess I probably didn't know about the statement in May. And that statement is not explaining the incident or the events that occurred in November.
Q No, it is not, but I'm asking you right now, is Steven Stebbins's recounting here on page 4 of 9, Bates 482, is his recounting in his statement their first interaction on May 2018, the May 26th statement, and then again on May 30th, are all those important or relevant to your determination as to the probable cause?
MS. VITALE: Objection to form.
A I think they're a part of his written statement giving about this incident in November are included in the case report.
Q I know they're a part of it. I know they're included. Are they relevant?

MS. VITALE: Objection.

A I believe they are relevant.

Q Okay.

A I guess to give context.

Q Okay, to give context, but Marcus is going on 5/26 --

A But that's not explaining the incident that happens here. Now, had he come in in November or I spoke to him in November and he gave the back story there, I would include his version of the back story.

Q But why not include him coming to the police station of 5/26 as part of the context that you put into it?

A I don't know.

Q Because we look on 484, the third paragraph, as a matter of context, (Reading):

"It is important to understand how the events began between Stebbins and Cameron."

Right?

A Mm-hmm.

Q It says, (Reading):

"On 5/26, Stebbins had filed a complaint with the Enfield Police Department."

Why not include on 5/26 Marcus Cameron came in as well to give his version?
A I don't know if I knew that.
Q You investigated this, right?
A No, I did not investigate the incident in May.
Q No, but you investigated the charge?
A Right.
Q So you said, "As a matter of context, it is important to understand how these events began," right?
A I don't know that I knew about this event.
Q But if context is important, right, if understanding how these events began between Stebbins and Cameron were important, wouldn't you investigate the police reports prior? I mean, you put in here that Stebbins filed a complaint with the Enfield Police

Department?

A This wasn't even a police -- I mean, it's not a -- there's no investigation that I see from the May incident that I know of.

Q But why not look to see if any other reports have been made by Marcus Cameron between May 22nd - if context - "As a matter of context, it's important to understand how the events began." Why not look up any reports that had been made by Marcus Cameron in between then and now?

A I suppose I could have. Maybe I did. I don't know. But I don't know that me including this in here gives any context because I don't have his version of events. This is third party. This is him telling another officer that's in a report that he came in in May about something six months prior to an incident.

Q So I think we might be confusing things a little because I'm -- with respect to you saying that "As a matter of context, it's important to understand how the events began" and then you essentially give -- I guess, you

provide Steven Stebbins's filing of a complaint on the very day that Marcus filed a complaint without including Marcus's, so if it doesn't matter, why include the statement that "As a matter of context, it's important to understand the events" at all?

A So I don't even think this is a -- where are we? Sorry, give me a second.

So this isn't an incident -- this is our old recording system. So essentially, now what we have is called CAD notes. So an incident report is documented through CAD notes. That's essentially what this is a CAD notes report.

Q Mm-hmm.

A As you'll see, the difference would be on an incident report you'll have the heading. Do you see where it has the people and stuff up top here and this does not (indicating), meaning it's not a --

Q This being 12 or 13?

A To 13. And 12 is a supplementary document to this one.

Q To 14?

A Yes, so 12 is a supplement to 14 case.

MR. MCLANE: Well, why don't we do this really quick? Why don't we take a pause and why don't we make -- can we make 14 12? I think that would make sense if we made 14 12 because I've made 12 the supplement to 14 --

MR. GERARDE: To make it chronologically flow?

MR. MCLANE: Yes, that's going to be much cleaner I think for the record if we make 14 and 12 to 12.

MS. VITALE: You're just changing the exhibit numbers?

MR. MCLANE: Yes. And 14 will be reserved for the next exhibit.

MR. GERARDE: And so do you want 12 to start with the two-paged report?

MR. MCLANE: Yes.

So 12 should start with the two-paged report, Michele.

THE COURT REPORTER: Sure.

MR. GERARDE: For clarification purposes, 12 starts at Stebbins 694 to 695,

then 692?

MR. MCLANE: Yes.

Q And I think, based on your representation here, that this is actually a supplemental report?

A Yes.

MR. MCLANE: And I think that clarifies things. I think it will make it easier for the record.

MR. GERARDE: Correct.

A So if I can just clarify, so you'll see up at the top of that third page of 12, you'll see an "S1" after "978"?

Q Yes.

A So that's essentially saying that's the incident report supplement one.

Q Okay.

A And then so as a matter of this, this one here, 13, isn't a case report. This is essentially a notes entry. And if I'm searching his name in this old system, I'm not going to see this report because you'll see the name headings up here.

Q Okay.

A So I don't know whether I saw this or not. A search through that system probably wouldn't have pulled that case up because it is not a case. So I'm just trying to clarify.
Q Well, let's go back to is now Exhibit, combined, 12.
A Okay.
Q And I don't think it makes it, I guess, any clearer for me because we will take Exhibit 12. We will also go to page 484 and look at these together This is Exhibit 1, Bates 484. So, (Reading):

> "As a matter of context, it is important to understand how these events began between Stebbins and Cameron. On 5/26/18, Stebbins had filed a complaint with the Enfield Police Department." In parentheses, it says "CEPD201815978."

A Mm-hmm.

Q Now you're telling me that the report 15978 is what I originally gave as 12 and that Marcus's coming into the station to file a report is actually a supplement to that report?
A The third page is a supplement to that report.
Q Right. So this should have popped up if you looked at the report?
A That's what I said.
Q So why not include that Marcus came in here -- if you're including the report that Stebbins made and there's a supplement to that report and there's an S number to the exact same report, why not include that in there?
A Because I don't have any information on what's in there. If you read that supplement, there's nothing in it.
Q But why not -- I guess in the sake of an investigation and completing making things objective, why not even just make a statement? Mr. Cameron did make a supplemental report and provided his version?

MS. VITALE: Objection to form.
A He didn't make a supplemental report.
Q He didn't?
A He came in and spoke with Sergeant Laurino, who completed the supplement, which doesn't say anything that he said. Now, again, I reached out to Mr. Cameron several times, which at that point, I guess I would have found out what he spoke about that day, but there's nothing in the supplemental to include.
Q I mean, did you ask James Laurino?
A I don't know if I did.
Q Okay. I mean, would you think that would be important to ask James Laurino who spoke with him about this incident for about 15 minutes?
A Sure, and maybe did. I just don't remember.
Q Well, let me ask you, if you spoke to a man who listened to Marcus Cameron give his version of the events for 15 minutes, would it have made its way into your report?
MS. VITALE: Objection to form.
Q Would that information that you spoke to Mr. Laurino about have made its way into your

report?

MS. VITALE: Objection to form.

A It depends on what the information was.

Q And then, (Reading):

"On 7/8, Stebbins reported to the Enfield Police Department that an unknown female had stopped in front of his home and was believed to have taken photos or videos of his property. The female appeared to take several photos of Stebbins' cruiser and personal vehicles" --

A I'm sorry, where are we?

Q We are on 484, the same paragraph, two sentence later.

A Okay.

Q (Reading):

"The female appeared to take several photos of Stebbins'

cruiser and personal vehicles. It also appeared that the female attempted to open one of the doors of Stebbins' police cruiser. This incident was captured on Stebbins' personal residential CCTV system; however, the female was never identified."

Why include that in this report at all?
A I don't know. It was included.
Q So we'll look at what's been marked as Exhibit 13, and this was taken by Mark Squires, right?
A Correct.
Q He was a lieutenant at the time?
A Yes.
Q Okay. What was his role in 2018?
A I believe he was the evening shift patrol commander.
Q And this is when he had stated -- this is when Marcus had stated to him about the May 30th incident of Stebbins' friend who

approached him on the road.
MS. VITALE: Objection to form.
Q Have you ever seen this before today?
A I don't know.
Q When you tell me that you couldn't have searched this or this wouldn't have appeared through a name search, can you explain that to me a little more?
A Yes. So as you'll see in Exhibit 12, at the top, there's a person tab if you will. And so if I searched one of those names in our in-house system, they would pop up related to this case. I don't see any names associated with this case in that tab, so a name search would not bring it up. You could search it by the case number or the incident number, but...
Q So you don't know if you spoke to James Laurino during your investigation?
A I don't remember that.
Q When you conducted your search, your email search for the discovery in this case, and you searched the names, did anything from James Laurino pop up in your email?

A Not that I saw.
Q In connection with any of the names?
A Not that I saw, no.
Q Did anything pop up between you and Lieutenant Squires -- is he still a lieutenant?
A No, he's a state's attorney.
Q Did anything between you and Attorney Squires pop up?
A No, not that I saw.
Q Did you speak to Lieutenant Squires during your investigation into Marcus Cameron?
A I would have had to because he was the approving supervisor and the approver on the warrant, so...
Q Do you remember those conversations?
A I don't.
Q Go back to 484 real quick. I'm still hung up on this. I don't know if I've gotten -- so with respect to the importance of understanding how the events began between Stebbins and Cameron, you'd agree with me that you felt it relevant to include the complaint that Stebbins had filed on May

26th?
A Mm-hmm.
MS. VITALE: Objection to form.
Q Did you not think it was relevant to include the supplement to that complaint?
A There is nothing of context in the supplement.
Q So you believe that the statement that James Laurino had spoken to Marcus for 15 minutes about his version of the events and the last sentence that states that he was just concerned that those complaints were going to continue and that he had his version also, you didn't think that was relevant at all?
A Looking back, I would think that's very relevant, which is probably why I reached out to Mr. Cameron so many times to get his version.
Q But not relevant enough to make it into your --
A No, I don't think that changes the probably cause.
MR. MCLANE: It's noon. I think the next line will be kind of lengthy. Why

don't we just go ahead and break for lunch now.

Let's go off the record.

(Short break.)

MR. MCLANE: Back on.

Q All right, Lieutenant, I'm going to give you another set of documents that are Bates numbered Stebbins 148 through 182, Exhibit 14. I want to go through this with you.

So in front of you it looks like we have the email that was sent to you from Steven Stebbins on Thursday, November 15, 2018, and we see the same attachments at the top, right, the 911 call, the C number, C18086 TFC Stebbins Report?

A Yes.

Q So this was produced by Steven Stebbins in this lawsuit, and it includes the attachments that were produced to you. Do you recall receiving the documents and reviewing these as part of your investigation?

A I don't recall.

Q Is there any reason to believe you wouldn't have reviewed these during the month, nearly month-long period of time between November 12th and December 11th?
A No.
Q So flip with me to 156 if you don't mind. It says at the top, "State of Connecticut Department of Public Safety." Actually, 157 because mine is not Bates stamped. So it would be number 157. Do you see where it says "Action taken, continued" up at the top?
A Yes.
Q In that first paragraph, it says, (Reading):

> "I responded by going directly to the Enfield PD and speaking with Sergeant Laurino and PO Carter."

Who is PO Carter?
A That would be Officer Carter.
Q (Reading):

> "And Sergeant Laurino

confirmed that there was, in fact, a 911 call placed." It says, "I reported the ongoing issue with Trooper Stebbins to the Enfield PD due to the possible chance that he will continuously to call them in an attempt to have them investigate me."

Do you recall reading this?
A No, I don't.
Q So further down on the page, the second paragraph from the bottom, it says, (Reading):

"Sergeant Laurino also explained to me that he offered Marcus Cameron to speak with Detective Castle who's standing close by listening. Marcus Cameron refused to speak to him."

Does this sound familiar to the supplemental report that was provided as Exhibit 12?

MS. VITALE: Objection to form.

A Yes, I believe so.

Q The next line says, (Reading):

"Sergeant Laurino also explained to me that he felt this complaint was a waste of time. If you got the two together, they could probably work it out." Further, it says, "I asked Sergeant Laurino is Marcus Cameron made any other comments to him. Sergeant Laurino explained that he did not recall."

Do you remember reading this?

A I don't.

Q Did you have any reason to believe it wasn't true?

A No.

Q So if you don't recall reading it, I know

that you stated that you probably would have
if it was sent to you as part of your
investigation. Why after reading this -- I
guess after reading this, you would agree
with me that Sergeant Laurino probably
thought this was a waste of time?
MS. VITALE: Objection to form.
A Because I'm investigating a case that
occurred in November.
Q But I think we've discussed that part of your
report stated that the back history was
important here?
MS. VITALE: Objection to form.
Q The history between the two individuals?
A Right.
Q Right. And if the history between the two
individuals, if what was provided to you by
one of those individuals contained statements
by one of your sergeants that said this was a
waste of time, would that not impact your
determination of probable cause?
MS. VITALE: Objection to form.
A No, I don't think that would have changed
probable cause on that day.

Q So one of your sergeants thought this was a waste of time and that if the two of them got together they could probably work it out?

MS. VITALE: Objection to form.

Q And that doesn't impact the context of the history between the two individuals?

A It does not affect the probable cause of the actions that occurred on November 18th to whatever the date was.

MS. VITALE: Objection to form.

Q Then why not include this as part of your report that one of your sergeants thought this was a waste of time?

MS. VITALE: Objection to form.

Q In the context portion of your report when you went in to -- you went into that portion where you said it was important - let me read it for you. When you say "As a matter of context, it's important to understand how these events began between Stebbins and Cameron," well, Stebbins provided this to you. Why not include in your report that, you know, this complaint could have been a waste of time and the two of them could have

gotten together to work this out?

MS. VITALE: Objection to form.

A I don't know, but I typically don't just put opinions of people thinking something's a waste of time in a report that's an incident that happened six months later.

Q Okay. Let's go to the beginning of this document, actually. Start with Stebbins 148, which is the email. Then we have an audio from 6/25. This would be the 911 audio that Stebbins provided. Is that accurate? Or is it -- no, this is a different audio. This is the 6/25 audio. So this is audio that was provided to you -- or a transcript of that audio conversation between Sergeant Samson and Marcus Cameron. Does that look accurate?

A It looks accurate.

Q Okay. If you have no reason to believe that you wouldn't have reviewed this as part of your investigation, would you agree with me that you could probably glean Marcus Cameron's position of his side of the story from the four corners of this document?

MS. VITALE: Objection to form.

A Not on the incident that I was investigating, no.
Q And with respect to the back story?
A I guess, but again, that doesn't change probable cause.
Q I guess stalking. So with respect to a stalking charged, does the history of the parties play into effect with respect to a stalking charge?
A It may or not.
Q Whether there was probably cause?
A It may or may not.
Q Would knowing Marcus Cameron's position about his prior relationship with Steven Stebbins weigh into your determination as to whether there's probable cause that he committed a reckless act?
A I'm sorry, so would Marcus Cameron's prior interactions with Steven Stebbins provide you any context as to whether his actions on November 12th were reckless?
MR. GERARDE: Objection to form.
A I'm sure it could.
Q What about with respect to whether Steven

Stebbins' fear was reasonable?

MR. GERARDE: Objection to form.

A I suppose it could, but I don't know.

Q And if Sergeant Laurino is saying -- and you have no reason to doubt that it's not true. If he's telling Sergeant Samson that this whole complaint is a waste of time and if you got the two of them together they could probably work it out, wouldn't that affect your determination as to whether Steven Stebbins was reasonably in fear on November 12th?

MS. VITALE: Objection to form.

A I would have to have more information. That's Sergeant Laurino's opinion that I'm getting from a...

Q Okay, well, let's continue in the document.

A All right.

Q Because we have the next page, the very next page, there's a 911 call from Marcus to the Enfield Police Department, correct? There seems to be a transcript of that 911 call?

MS. VITALE: Objection to form.

A Where is this?

Q On Page 158. We were provided the 911 call transcript from Marcus Cameron to the Enfield Police Department?
A No.
Q No?
A The person answering says State Police Troop H.
Q I'm sorry, the state police. So we have a 911 transcript from Marcus Cameron to the Troop H police, right? And we will flip to the next page. Marcus says, (Reading):

"He had absolutely he pulled into my driveway, and he asked me about my speeding and he was off duty, and I asked if he was writing a ticket or something because he wasn't pulling me over he was just following me. He told me, No. I came over here to speak to you man to man,' and that was his word for word.' He said, Did he give,'

question mark, you a name or
badge number.' Marcus says,
He refused his name. He said
he gives me his he is a white
male, a gray t-shirt, blue
jeans, and he was in a
Connecticut State Trooper
vehicle, white male, short
brown hair, clean-shaved face.
He said he was going to come
back and get me but he got a
question mark."

Can you not glean a portion of Marcus
Cameron's back story with respect to him and
Mr. Stebbins from this 911 transcript?
MS. VITALE: Objection to form.
A Without investigating it, no I --
Q As it pertains to May 22nd. Do you think
this information is relevant?
A No.
Q You don't think this information -- in
determining whether on November 12th of 2018
Steven Stebbins was reasonably in fear of

Marcus Cameron, you don't think Marcus
Cameron's prior 911 calls on Steven Stebbins
are relevant?
A I think, without me looking into this, I
couldn't comment.
Q You have no reason to doubt that you didn't
look into this, right?
A Right.
Q You reviewed this document?
A Well, I believe I did.
Q What would be the reason you wouldn't look
into this further?
A Because this isn't the incident that I was
investigating. This is an incident that's
being investigated by the Connecticut State
Police, obviously.
Q And you're saying it has no bearing as to
what occurred -- it has no bearing as to
whether Steven Stebbins was reasonably in
fear on November 12th?
MR. GERARDE: Objection to form.
A Well, without speaking with Mr. Cameron, I
have no way to put it in context with further
questioning.

Q So I'll go back to Sergeant Laurino. So when Sergeant Laurino said this complaint seemed like a waste of time, do you credit Sergeant Laurino's opinion?

MS. VITALE: Objection to form.

Q Do you think Sergeant Laurino is a credible person?

MS. VITALE: Objection to form.

A Yes.

Q Did you ask Sergeant Marino any further questions about the interactions between Steven Stebbins and Marcus Cameron after receiving these documents?

MS. VITALE: Objection to form.

A Not that I remember.

Q Why wouldn't you?

A I'm not saying I didn't.

Q If Marcus Cameron is not answering your question, right, if he's not answering you -- and we know that he has a right as an accused not to speak to lawyers -- so why not ask other people, for instance, Sergeant Laurino?

A Because I don't think that would change my probable cause for the incident on that day.

Q So for the incident on that day --
A It would create more questions for me that I would have to speak with Mr. Cameron about to get the context.
Q Even speaking to Sergeant Laurino.
So let's go back to two things I can't wrap my head around. On the incidents surrounding the day, on November 12, 2018, you had to determine that Marcus Cameron recklessly put Steven Stebbins in fear of his safety, correct?
MS. VITALE: Objection to form.
MR. GERARDE: Objection.
A Correct.
Q Right, and reasonable fear of his safety?
MS. VITALE: Objection to form.
MR. GERARDE: Objection.
Q Not just fear. It has to be a reasonable fear?
MS. VITALE: Objection.
MR. GERARDE: Objection to form.
A I don't understand the question.
Q So on November 12, 2018, those are the incidents you charged Marcus Cameron with a

crime over?
A Right.
Q You had to make a determination there was probable cause and on that day Marcus Cameron recklessly put Steven Stebbins in reasonable fear of his safety?
MS. VITALE: Objection.
MR. GERARDE: Objection.
A Okay.
Q You disagree with me on that?
A No, I think that's what happened.
Q So I'm asking you now. You don't think that the information here is relevant to determining whether Marcus Cameron was acting reckless on that day or whether Steven Stebbins was reasonably in fear?
A I don't think it changes the probable cause on that day.
Q It doesn't change the probable cause, or is it irrelevant?
A It doesn't change the probably cause.
Q Okay, so why doesn't it change the probable cause? Why don't you tell me what --
A Because I don't know how this information

justifies actions on November 18th.

Q So let's go back. So if Marcus Cameron had said he was harassing him, you know have evidence that Marcus Cameron called 911 on Steven Stebbins. You have one of your own sergeants saying this whole thing is a waste of time and these two could probably work it out. You're telling me that that doesn't impact your decision as to whether Steven Stebbins was reasonably in fear or this is a continuation of them not working their problems out?

MS. VITALE: Objection.

MR. GERARDE: Objection to form.

A I don't think it changes the fear that the victim was stating he had on an incident of an opinion of a sergeant six months prior to the incident. No, I don't.

(Exhibit Number 14, Stebbins000148 to Stebbins000182, was Marked for Identification.)

Q Okay, so if you turn with me to page 167, we have a recap provided to you regarding the Report Number P201815978, right, paragraph one?
A Mm-hmm.
Q This was initiated by Sergeant James Laurino.
Look at paragraph three. It says, "Enfield Police Report P201816525, initiated by Officer Mark Squires on May 30, 2018". Is this not referring to what we have already marked as an exhibit was Exhibit 13?
A Yes.
Q Right. So now knowing that you have stated there's no reason you wouldn't have reviewed this document, can you say that it's with reasonable certainty that you've heard about the May 30, 2018, interaction?
A Yes, that would be reasonable.
Q All right. So now seeing that Marcus has come in and made, now, a second report, it doesn't change your view as to whether Steven Stebbins' fear on that day was reasonable?
A No.
Q Okay, so let me give some hypotheticals.

A Okay.
Q So as a police officer, if somebody accuses another of stalking them, right, you have to determine whether that person's fear is reasonable, right?
MS. VITALE: Objection.
Q What do you look for to determine whether it's reasonable?
MS. VITALE: Objection.
A Several things.
Q What things? Name two.
MS. VITALE: Objection.
A Well, I mean, if the person is willing to give sworn testimony that that is in fact the case, that would be one.
Q So let me let me pause before we go on to the second.
So the person's reasonableness of their fear determines and one factor is that whether they're willing to make a statement about it?
A No, that's not what I said.
Q Okay.
A I said that a person willing to put down in

an official statement, willing to give a sworn statement or an official proceeding, that they were, in fact, in fear, that would be one factor that would go into that.
Q What about others?
A I guess, past interactions.
Q Okay. So do you not have any evidence before you in this document of past interactions?
A Not that I was able to follow up on.
Q So being provided even the recap, even knowing that Marcus Cameron made multiple complaints, we see at least one that I showed you as part of the report that you cited in your incident report, that was Exhibit 12, right?
A Mm-hmm.
Q And the other here, which is contained in this exhibit in paragraph three.
MS. VITALE: Objection.
Q Does any of this cast doubt as to the veracity of Steven Stebbins' account of his past interactions with Marcus Cameron?
A I don't see how it does and especially without further investigation.

Q So without a statement from Marcus Cameron, you're saying you can't have any reason to discount Steven Stebbins' account of interactions?

A No, I think it would be much easier if I was able to speak with them to get the full story instead of something that says "I spoke to him for 15 minutes about it," and that's it.

Q I want to put a pin here. We were on page 167. We'll go back to -- I'll continue on real quick. The next page, 168, Stebbins 168, the first paragraph, the last sentence says, (Reading):

"Detective Castle explained to me that he thinks Marcus Cameron works in Adult Probation in Massachusetts, and if Marcus Cameron does, there might be a residential requirement he might be violating."

Right?

A Okay.
Q Is that where you first discover that Marcus Cameron worked for Probation in Massachusetts?
MS. VITALE: Objection.
A I don't know.
Q You don't know?
A No.
Q Okay, the next paragraph, this says, (Reading):

"On July 2 of 2018, I requested COLLECT run a query see if anyone has ran TFC Stebbins' assigned interceptor vehicle license plate at TFC Stebbins' house and Marcus Cameron. This ended with negative results."

And then two pages from that, which would be 170, four paragraphs down, it says, (Reading):

On July 5, 2018, at approximately 1405 hours, I ran Marcus Cameron. The reason I ran Marcus Cameron is to find out his exact residency. COLLECT query results showed Marcus Cameron has two vehicles registered and a Connecticut driver's license with everything reflecting 49 Foxcroft Road. And the town of Enfield is Marcus Cameron's primary residency."

Go to 174. On the third paragraph, (Reading):

"On July 24, 2018, at approximately 0700 hours, I observed an email was sent from COLLECT regarding the information I submitted to query for First Class

Stebbins' vehicles due to the female going on his property and taking pictures of TFC Stebbins' wife's vehicle on July 8th. This resulted in negative findings."

So if you have no reason to believe you wouldn't have reviewed this report -- well, let me strike that.

At what point did you become aware that Marcus Cameron worked for the Probation Department in Massachusetts?

A I'm not sure.

Q Did you become aware of it before you wrote your incident report?

A Yes.

Q Okay, does that have any impact or bearing on your decision as to whether there was probable cause?

A No.

Q Even though he's in law enforcement?

A Right.

Q So you have two law enforcement officers,

right?
A Mm-hmm.
Q One says he is being followed. The other had stated to you on the scene that he is being harassed, right?
MS. VITALE: Objection.
A Yes.
Q You chose to believe the one?
A It's not that simple.
Q But I'm trying to understand what's more complicated because as I'm asking some of these questions about past interactions and information has been provided to you, you said it has no bearing. It seems to be boiling down to, unless he gave you a statement, nothing was going to change your mind, is that accurate?
MR. MANCINI: Objection.
MS. VITALE: Objection.
A Absolutely not.
Q What --
A Again, depending - go ahead.
Q No, go ahead. I interrupted you.
A Again, I conducted an investigation. One

party said this, gave statement. There was video evidence to support that statement. I tried on multiple attempts to get the other party's statements of what occurred that day, that person rightfully with, you know, all rights in mind did not choose to speak with me, which is perfectly fine, but it would have helped me get some more context. Again, would it have changed probable cause, I don't know. But it at least would have been included in the case report and his statement would have been included in the case report.

Q I'm going to read to you from page 482 of Exhibit 1. We're still going to put a pin in this document that was sent to you. So the third paragraph, in italics, (Reading):

"Stebbins further stated that he had since moved from Foxcroft Road as a result of Cameron's actions and now carries two mortgages, which is bringing financial and emotional stress to he and his

wife. Stebbins said that Cameron working as probation officer gives him direct access to probationees and Stebbins fears Cameron will use his position as probation officer to intimidate, harass, and endanger the physical safety of all of his family."

What did you take that sentence to mean, that Stebbins had said that Cameron working as a probation officer gives him direct access to probationees and that Stebbins fears that Cameron will use his position as a probation officer to intimidate, harass and endanger the physical safety of all of his family?

A Well, this was Stebbins' statement. That's why it's in italics.

Q And I'm asking you what you took it to mean?

A I don't know what I inferred that to mean, but that he has access to, possibly, public records and stuff like that. Or not even

public records. To records that aren't public.
Q What about with respect to Marcus's access to probationees? Have you ever heard of such a thing, probation officers sending probationers or probationees to --
A I have not.
Q Have you ever in your career experience in law enforcement --
A No.
Q -- seen probation officers work in concert with --
A Not that I had personal knowledge of.
Q Did you have any evidence in this case that Marcus Cameron would or was using or was acting in concert with any probationees to harass --
A No. If that was the case, it would have been in the report.
Q What page were we on, the --
A 174.
Q So you don't recall whether Steven Stebbins' statement was the first time you've ever seen that Marcus worked in Probation or this

document?

A I don't remember when that happened.

Q The next page will be what, 175?.

A Yes.

Q So on this page, the bottom two paragraphs, "On July 5th"?

A I'm on a different page.

MR. GERARDE: We have 175 the second-to-last paragraph starting "July 24."

MR. MCLANE: Because I am on 169.

MR. GERARDE: Should we go there?

MR. MCLANE: Yes.

MR. GERARDE: Okay.

Q So the bottom two paragraphs, on July 5th, between it looks like essentially five minutes of each other. So July 15, it looks like Sergeant Samson spoke with Alex Vasichenko via phone, and the next paragraph we see that he spoke with a police officer, Tera Carter, via phone. Did you speak to any of these individuals in your investigation into whether Marcus committed stalking in the third degree?

A Not that I recall.

Q Why not?
A I don't recall.
Q Do you think that would help provide context as to their past dealings with one another?
A I don't think it changed probable cause for that day.
Q The next page, it looks like there's another witness here, Joe Bernabucci. Did you speak with Joe Bernabucci?
A I don't recall ever hearing that name.
Q On July 17th -- if you go down to the third paragraph, it says, (Reading):

> "On July 17th, at approximately 0900 hours, Sergeant Samson called the Massachusetts Probation Legal Unit, left a voicemail for the woman named Sara.'"

And it goes on to say in the next paragraph that he had asked if there was a residency requirements for being a Massachusetts probation officer. Would that have played

any relevance, whether Marcus lived in Massachusetts and him working at the Probation Department, have any relevance whatsoever to the probable cause determination?

A No, that wouldn't have. As far as why he's in the neighborhood and why he was being followed, that would be relevant, but no, the fact that he's supposed to live in Mass. according to this, no.

Q I mean, what relevance would his residence have to do with --

A Well, that would explain --

Q -- your determination?

A I'm sorry. Well, that would explain why he was in the neighborhood.

Q Okay, so if he owned a home in the neighborhood but lived in Massachusetts, would that be of -- I mean, would that cause you alarm or would that cause any suspicion?

A No, but it gives a reason of why he's in the neighborhood.

Q Next page, Sergeant Stebbins -- or Lieutenant Stebbins, now, interviewed a woman with the

last name Cipolla, spelled C-I-p-o-l-l-a. So the last sentence in that first paragraph said, (Reading):

> "It appeared he was showing off in front of his friends by treating me this way, and I felt that he is racially against white people. This is not the first time he has treated me unfairly or for no apparent reason."

In your interactions with Marcus Cameron, did he act like he was racially against white people?
A No, but we had limited interaction.
Q Okay. Had you met Marcus Cameron before November 12, 2018?
A Not that I recall.
Q Had you met Steven Stebbins before November 12, 2018?
A No, not that I recall.
Q Had you met Stephen Samson?

A Not that I recall.
Q In discovery in this case, we've all exchanged documents. Have you reviewed any of the documents that Marcus Cameron has exchanged with the defendants in this case?
A No.
Q Have you reviewed any of the audio?
A No.
Q Any of the video?
A No.
Q So if you go to 174, the last paragraph, that last sentence -- well, let's go to the last paragraph. (Reading):

> "On July 24, 2018, at approximate 0737 hours, another query was conducted to see if Marcus Cameron had a Connecticut driver's license. Again, a positive query showed that Marcus Cameron had an active driver's license" -- it gives a number -- "with a possible issue date timeframe

of the year 2016."

I just want to ask, did anyone that -- any of your -- did you or anyone of the Enfield Police that you know of ever physically see a Connecticut driver's license in Marcus Cameron's possession?
A Do you mind if I look?
Q Yes, go ahead.
A No.
Q Do you know of anyone that in 2018 saw a physical copy of the Connecticut driver's license --
A Not that I know of.
Q I believe in Sergeant Caires' report --
A Officer.
Q Is that a male or female, you said?
A Male.
Q I believe he saw -- he was presented with a Mass. drivers license, is that correct?
A Correct. That's what I just referenced.
Q So I would say, is it possible that the Connecticut system that you looked up for the query would have -- did I ask this question?

Is it possible that the data was just out of date, that, in fact, Mr. Cameron only had a Massachusetts driver's license?

A That would be a question for DMV. I know a lot of it is real time. People can update their registration on a traffic stop, so...

Q But in the bottom sentence here, it says, (Reading):

> "This is in violation of the Connecticut General Statute 14-43, Obtaining an Operator's License by Fraud."

Isn't the very same statute that Officer Caires listed in his report?

A I'd have to refer to his report.

Yes, but he didn't charge him.

Q Do you know if Officer Caires spoke to Steven Stebbins at all during the period of November 12, 2018, to December 11, 2018?

A I don't know.

Q Do you know if Officer Caires spoke to Stephen Samson during that same period of

time?
A I don't know.
Q If you can go with me to 176.
A Okay.
Q At the top, it says, (Reading):

"On July 25, 2018, at approximately 0815 hours I met with and spoke with GA-13 Prosecutor Christopher Parakilas at his office regarding my findings during this investigation. I was also looking for guidance on how to proceed forth. Prosecutor Parakilas explained that since Marcus Cameron refused to give a written statement we cannot utilize Connecticut General Statute 53.157B, giving a false statement. However, Prosecutor Parakilas explained if Marcus Cameron had given a

sworn statement and signed it and an arrest warrant had been applied, he would sign it. Prosecutor Parakilas explained Connecticut General Statute 14-43, obtaining an operator license by fraud can be utilized for warrant against Marcus Cameron."

Next paragraph, (Reading):

"Prosecutor Parakilas also expressed if we arrest Marcus Cameron for this violation of the driver's license, it could possibly be viewed as retaliation by Marcus Cameron who filed a complaint against Trooper First Class Steven Stebbins."

The last sentence of that paragraph says, (Reading):

"Prosecutor Parakilas explained that we do not have enough to arrest Marcus Cameron; however, he advised me to contact the proper Massachusetts authorities with our findings and let them do their own investigation into these matters."

MR. GERARDE: I'm sorry, did you say -- I thought I heard you say, "We do not have enough."

MS. VITALE: Yes, he misread it.

MR. GERARDE: Okay.

Q (Reading):

"Prosecutor Parakilas explained that we do have enough; however, he advised me to contact the proper Massachusetts authorities with our findings and let them do their own investigation."

So why didn't Officer Caires arrest Marcus Cameron for that?

MS. VITALE: Objection.

MR. GERARDE: Objection.

A Discretion, I guess.

Q And you don't know if Officer Caires had spoken to Sergeant Samson about this?

A I do not.

Q Did either Sergeant Samson or Steven Stebbins ever speak to you about seeking to arrest Marcus Cameron under the driver's license statute?

A Not that I recall.

Q Not that you recall. Is it possible that they did?

MS. VITALE: Objection.

A I suppose. In all the interaction, I guess, somewhere in here, it could be and could infer that I read it, so I don't know.

MR. GERARDE: He would like to take a break.

MR. MCLANE: This is a perfect time.

(Short break.)

(Exhibit Number 15, Google Map, was Marked for Identification.)

Q So what I've just given is Exhibit 15. This was something that I printed out. I think some of the exhibits that we have had markings on them. Do you recognize this to be Google maps of the Foxcroft Road area?
A Yes.
Q Is this a pretty accurate description of the roads around the Foxcroft neighborhood?
A Yes.
Q So I'm going to actually go through the video that was part of Trooper Stebbins' dash cam that was provided.

MR. MCLANE: For exhibit purposes, I guess 16, 17 and 18. The Bates numbers are Stebbins, 492, Stebbins 493 and Stebbins 494. These are the dash cam videos that were provided.

(Exhibit Number 16, Video/492, was Marked for Identification.)

(Exhibit Number 17, Video/493, was Marked for Identification.)

(Exhibit Number 18, Video/494, was Marked for Identification.)

Q I'll do the same thing I did last time. I want to reference the map while we're going through the initial video portion. So I might stop the video, and then we'll reference on the map. We'll go through the map.
A Okay.
Q And then afterwards, I do have a well, we will get there.
I'll cover over to you. Is this the dash cam that you reviewed, at least one of the videos was on 11/12/2018?

A Yes.

Q I'm going to start playing it.

(Whereupon, Mr. McLane played video.)

Q Do you recognize this as Colony Road?

A Yes.

Q So if we look at the map, Exhibit 15, if we look at Colony Road, this would be the intersection -- you're referring to the intersection between Dover and Colony?

A Correct.

Q All right. So at this point in time, Marcus had already -- excuse me, Sergeant Stebbins -- Trooper Stebbins had told you that Marcus was outside his house and shouted something to him as Trooper Stebbins was on his way past Marcus's house, is that accurate?

MS. VITALE: Objection to form.

A Correct.

Q Prior to Trooper Stebbins arriving at the intersection of Colony and Dover?

A I believe so, yes.

Q Do you need to look at your report real quick?
A What was the question?
Q Whether at this point in time, where Trooper Stebbins is in this video, he had already encountered Marcus, according to him, outside of Marcus's house, where Marcus had shouted something to him?
A Yes.
Q And I believe we watched the video before, where you had asked Marcus about whether he shouted anything to Steven Stebbins, correct?
A Yes.
Q So if we look at the map of the intersection of Dover and Colony, is there any other alternate routes at the intersection to get to Route 5 other than just taking a left down Colony Road?
A No.
Q So I guess if Marcus Cameron is outside of his house and he was leaving at that period of time, would he necessarily be following Steven Stebbins if he was taking a left onto Colony Road?

MS. VITALE: Objection.
MR. GERARDE: Objection.
A No.
Q You wouldn't have to draw the conclusion that he was following at that point in time?
MS. VITALE: Objection.
A At that point, I would not consider it stalking.
Q Well, would you consider it following?
MS. VITALE: Objection.
A He is following, yes.
Q But how do you know that he's following instead of just taking Colony Road?
A Because he's behind him. Once you're behind someone, you're following them.
Q Interesting.

(Whereupon, Mr. McLane played video.)

Q Okay, so Stebbins takes a left.
This is at the point in time he takes -- he pulls over on the right side, right?

A Right.
Q And we're going to see -- is that what you recognize to be Marcus Cameron's vehicle?
A I believe so, yes.
Q So at this point in time can you necessarily draw a conclusion that Marcus was purposely following Trooper Stebbins for the purpose of stalking him?
A At that point, I wouldn't say he had enough probable cause at that point.
Q Right.
And here we have Marcus pulling off to the side. Right?
A Mm-hmm.
Q And at that point, once Trooper Stebbins had pulled off to the side, Marcus passed him, and Trooper Stebbins then began following Marcus, you would agree?
MS. VITALE: Objection.
A No, I wouldn't. I'm sorry, say it again?
Q So let's rewind a little bit.
A Oh, you're saying right now?
Q Yes.
A Is he behind him? Yes. Is he following?

Yes.

Q Okay. Well, you just said that following was traveling behind someone. So Stebbins is now following Marcus, and Marcus pulls off to the side. You would agree with me at this point in time Trooper Stebbins has passed Marcus, reached the STOP sign and he now is taking a right onto Route 5?

A Yes.

Q Okay. As of now, has Marcus committed any sort of reckless act?

MR. GERARDE: Objection.

MS. VITALE: Objection.

A Not that I've seen.

Q In your view, from watching that video, has any reckless act been committed?

MR. GERARDE: Objection.

MS. VITALE: Objection.

MR. MANCINI: Objection.

A Not that I would be aware of without any other information other than this video, no.

Q Okay.

(Whereupon, Mr. McLane played

video.)

Q So at this point in time, this is when Steven Stebbins is pulling into the bank parking lot.

A Yes.

Q Where you said he pulled over and went into the bank parking lot.

And he stopped, at this point, at what looks like a drive-up window for a drive-thru ATM.

The video is over.

At any point in time did you see Marcus's car after he pulled over into the drive-up ATM from that particular video?

A I did not, no.

Q We are just going to go to 493, Exhibit 17. I will start it.

(Whereupon, Mr. McLane played video.)

Q This would be what, the rear view of Stebbins' vehicle?

A It appears so, yes.
Q Okay, and it's the same stop at Dover and Colony Road?
A Yes.
Q So at this point in time you can see Marcus's vehicle behind Trooper Stebbins, right?
A Yes.
Q That would be the Acura?
A Yes.
Q So looking at this video and the map, could there be a number of explainable reasons why Marcus would be traveling behind Steven Stebbins at this point in time?
A Just this on that road --
Q Just by looking at the map and the video.
A -- yes.
Q Okay. The only way?
A Yes. Colony is a dead end road, so...
Q So same thing: You have not viewed anything on this video that you would consider reckless just by viewing this video?
MR. GERARDE: Objection.
A Just in this context, this snippet, no.
Q So we see Stebbins had pulled over and Marcus

passed him, you would agree?
A Yes.

(Whereupon, Mr. McLane played video.)

Q Going forward, we can see Marcus's vehicle behind and now Marcus has pulled forward, correct?
A Correct.
Q Now a car comes between them. Would you say at that point in time Marcus was driving in an erratic manner or anything like that?
MS. VITALE: Objection.
MR. GERARDE: Objection.
A No, not that I can see.
Q Was he driving in an aggressive manner?
MS. VITALE: Objection.
MR. GERARDE: Objection.
A I mean, I can't see when there's a car between us from the rear --
Q I'm saying, up to this point in time, have you seen, from this video, the Acura driving in any --

A Not that I've witnessed in this video.
MR. GERARDE: Objection.
Q At this frame, can you even see the Acura in this video?
MR. GERARDE: Just as a point, he is driving an Infinity.
MR. MCLANE: Oh, thank you.
Q At this point, can you see the Infinity in the video?
A I cannot, no.
Q Do you believe that to be the Infinity or --
A I don't know. I can't tell.
Q Okay, so you can't accurately tell what car that was that just passed behind Trooper Stebbins' vehicle, based on this video?
MS. VITALE: Objection to form.
A Not 100%.
Q I'll show you the last video that's been provided to me. Do you recognize where Trooper Stebbins' vehicle is here?
A It's the ramp to 49 Southbound.
Q Where on the map here is it on this map?
A No, it is not.
Q How far away from the bank that Trooper

Stebbins -- do you know the town of Enfield well?
A I do.
Q About how far away from the bank that Trooper Stebbins pulled into is this location?
MS. VITALE: Objection.
A I don't even believe a quarter mile quarter, bit I don't know.
Q A quarter mile?
A Less than.
Q Do you know why he would be pulled over?
A I believe in his statement he stated to see if Mr. Cameron was going to follow him onto the highway.
Q Okay, you don't know what happened between the bank and this location with respect to Trooper Stebbins and Marcus Cameron?
MS. VITALE: Objection.
A Was I there? No.
Q Do you have any video evidence of what happened between Trooper Stebbins pulling into the bank and when he arrived at this location and turned on his camera?
A Not that I'm aware of.

(Whereupon, Mr. McLane played video.)

Q Was that the Infinity?
A It appeared to be.
Q Can you say definitively?
MS. VITALE: Objection.
Q Do you want me to rewind a little bit?
A Can you zoom in and get the license plate?
Q I don't know if I can. Do you have that ability at the station?
A I don't know.
Q You don't know?
A Wait a minute. Are you saying -- I don't know their in-car camera system. Do we? Yes.
Q Okay. So that car right there --
A Appears to be the same car.
Q - appears to be an Infinity?
Okay. From watching those videos alone, do you see any evidence that Marcus Cameron was purposely following Steven Stebbins?
MS. VITALE: Objection.

MR. GERARDE: Objection.
MR. MANCINI: Objection.
A Just based on those videos, with no other information, just a third-party looking at those videos saying what's going on there, no.
Q So based on the statements that Steven Stebbins made -- let me ask you, do you think it's odd that Steven Stebbins stopped his video and then restarted it?
MR. GERARDE: Objection.
A No, I don't know.
Q If he's in fear and he has the ability to videotape something, do you think it would be reasonable for him to continue to videotape that?
MR. GERARDE: Objection.
A I couldn't comment or speculate on what he was thinking or what his actions were.
Q Well, we have to kind of speculate what he was thinking, right, because we have to determine whether he was in reasonable fear?
MS. VITALE: Objection.
MR. GERARDE: Objection.

A Right.
Q So you have to make that determination on --
A I don't have an answer of why he didn't.
Q Would it tend to discredit the witness who says he's in reasonable fear if he stops his video and then turns it back on when he has the ability to video the entire proceeding?
MS. VITALE: Objection.
A I don't think it necessarily does credit, but...
Q And you don't think it's odd?
MS. VITALE: Objection.
A I don't find it odd, no.
Q If you were being followed and you thought you were in fear and you were in fear of the person following you and you had the ability to videotape the entire event, would you keep the video on or would you turn it on and off?
MR. GERARDE: Objection.
MS. VITALE: Objection.
A I probably would if I knew they were still following me. I don't know if he knew at that point or did not know at that point. Because I believe once he got on the highway

is when he saw him again, so he might have already shut off his camera or he did shut off his camera by that point.

Q But you do know of any other video evidence from November 12, 2018, of Marcus allegedly following Steven Stebbins?

A No, but he was on scene of where we were called to.

Q On scene?

A Yes.

Q Video evidence I'm saying. I'm talking about in his car, driving the vehicle --

A Not that I'm aware of.

Q -- either behind or in front of Steven Stebbins, do you have any other videos evidence?

A Not that I'm aware of.

Q With respect to the statute --

MR. MCLANE: What was the statute number?

THE COURT REPORTER: Exhibit 4.

MR. MCLANE: Thank you.

Q If you look at Exhibit four, it says, (Reading):

"A person is guilty of
stalking in the third degree
when such person recklessly
causes another person to
reasonably, one, fear for his
or her physical safety or,
two, suffer emotional distress
as defined by Section 53A-181E
by willfully and repeatedly
following or lying in wait for
such other person."

So with respect to video evidence, do you have any video evidence that Marcus was willfully and repeatedly falling Steven Stebbins?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A Besides the video you showed, no, I don't have any.

Q What in the video I showed Marcus willfully and repeatedly following Steven Stebbins?

MS. VITALE: Objection.

MR. GERARDE: Objection.
A Well, that shows the beginning of the entire incident.
Q Well, I think at the beginning you had said that there was really nowhere else for Marcus to go other than left if he wanted to go on Route 5, right?
MS. VITALE: Objection.
Q From Colony Road, if he took a right, you would agree that it would be a dead end?
A From Foxcroft to Colony, I suppose you could go off Fremont or Montano, but I'm not positive.
Q Okay, let me ask you another question. So you can go a Freemont, you said, or...?
A Montano.
Q Montano, okay.
So do you know why -- let me ask you another question. In determination of whether somebody is reasonably in fear, did you consider why Steven Stebbins passed Marcus's house if he was in fear of Marcus?
MR. GERARDE: Objection.
MR. MANCINI: Objection.

A According to his statement, that was due to construction on Foxcroft. That was the only way he could go.
Q Oh, well, then it would be understandable that Marcus could only go that way as well, right?
A Correct. But my statement is that from Foxcroft that is not the only way to go out to Route 5. Trooper Stebbins took Dover to Colony. Yes, at the point you're on Dover, your only way to go would be Colony. However, while you're traveling Foxcroft, if you're looking to go out onto Route 5, you have three options.
Q But we do know that Steven Stebbins passed Marcus's house, right?
A Yes.
Q We just discussed that you said he was yelling something at him?
A Yes.
Q So at that point, it wouldn't be unreasonable for Marcus to take the same direction of travel, right?
MS. VITALE: Objection.

A I mean, I can't speak to why he was, but there is other -- you were saying is that the only way to Route 5, and it's not. Once you get onto Dover, yes, it is.

Q Well, we need to determine for probable cause whether Marcus willfully and repeatedly followed Mr. Stebbins --

MS. VITALE: Objection.

Q -- on November 12, 2018. So if Mr. Stebbins passed Marcus's house and took that direction of travel, reportedly due to construction, it wouldn't be unreasonable to think that Marcus might take the same direction of travel, is that accurate?

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A That in and of itself is not unreasonable.

Q So we don't have evidence; therefore -- or let me ask you, at that point in time, with him taking that direction of travel, just at this point in time, not further on past the bank, would we have any evidence that he was willfully following Mr. Stebbins?

MS. VITALE: Objection.

MR. GERARDE: Objection.
A The complainant stated he was, but...
Q Okay, but you need more than just the complainant statement --
A Correct.
Q -- for probable cause?
A Correct.
Q What about in the bank? We seem to -- I think you said you couldn't specifically identify the Infinity from Mr. Stebbins' video from his position in the bank ATM spot?
MS. VITALE: Objection.
Q Is that accurate?
MS. VITALE: Objection.
A I believe he gave statements that he saw him pass.
Q So he saw him pass, but you didn't see it on the video?
MS. VITALE: Objection.
A Not that I saw, no.
Q Did the video, in your mind, corroborate the witness's statement that he saw him pass?
A It didn't disprove otherwise
Q Didn't disprove otherwise. But did it

demonstrate to you Marcus willfully and repeatedly following Steven Stebbins?
MR. GERARDE: Objection.
MS. VITALE: Objection.
A I think it shows that, now, they're starting to continue the same way.
Q Okay, they are continuing the same way. But at that point, he wasn't behind Steven Stebbins. He was actually passing the bank, right?
A Right.
Q So what would be willfully and repeatedly following if Mark is passed him and continued on his way?
MR. GERARDE: Objection.
A Well, the next one would be -- or lying in wait would be when he pulled into the lawyer's office to wait for Trooper Stebbins to pull up.
Q Where is the video evidence of him going into the lawyer's office?
A I don't know that there's video evidence.
Q And we do know that Steven Stebbins had the ability to video this?

MS. VITALE: Objection.
A Yes.
Q He provided you video of everything else he found relevant.
And then we find the next video that was provided was when Stebbins went up about, what you say was about a quarter mile away, right, on the side of the road?
A Mm-hmm.
Q I'm going to stop this.
The original video was timestamped from his cruiser at what, 14:31: 56. That's essentially military time for 2:31 p.m., right?
A Yes.
Q Almost 2:32?
A Yes.
Q The next video was about four minutes later, is that accurate?
A Yes.
Q So he went up a quarter mile, and then at some point in time, a few minutes later, or a few minutes from being at the -- from the start of his travels on Dover, Marcus passes

him on the highway --
A Mm-hmm.
Q -- or on the ramp to the highway?
A Yes.
Q And so at that point in time, how do you draw the conclusion that Marcus was willfully and knowingly following Steven Stebbins?
MR. GERARDE: Objection.
A Again, you have to take in the totality of the circumstances. When we advance on and we end up at Brookside Plaza and you take all that put together, I believe either on that video or somewhere in the document I read that Mr. Cameron said he was going to the pet store, when you factor in all of those stops along the way, where their paths cross, that put together with the fact of that wouldn't be the route that typically someone would take to get to Brookside Plaza from that neighborhood.
Q How do you establish the typical route?
A Typically, when someone drives somewhere, they take the quickest route, not -- again, where this is, the Brookside Plaza is south

of this neighborhood, so it wouldn't make much sense to go north to get on south on the highway when Route 5 runs parallel with the highway. Again, I'm not saying how somebody has to take a route, but typically, you take the fastest route to get somewhere.

Q And you didn't ask Steven Stebbins where he was going?

A I'm sure I did at some point, but I don't recall.

Q Okay.

A But I don't believe he was going with the intention of going to Brookside Plaza because, from what I recall, he called his supervisor on the highway who said, "Call Enfield Police and get off the highway. I believe that was the next exit when you get off of Exit 47 East, the next shopping plaza is Brookside Plaza."

Q Where do you recall those statements being made?

A I'd have to look in my report.

So in his statement -- I'm sorry, I don't know if you want me to tell you where

I'm reading here.
Q Yes, the Bates number.
A So it's the incident report you would have to.
MR. MCLANE: What page are we looking at, page three of six?
MR. GERARDE: Yes, if have our production for Nolan, it's going to be D3.
A So this is just the part where --
MR. GERARDE: I believe that is 481 of Exhibit 1.
A Yes, it's the same thing.
(Reading):

"So at that time he contacted his supervisor, Sergeant Samson, advised him of what was going on, asked for guidance as what to do. Sergeant Samson advised him to call the Enfield Police Department. In turn, he would be contacting the CSP Lieutenant. As Stebbins

passed Exit 48, he observed Cameron pass it as well. Stebbins then merged over to prepare to Exit I91 via Exit 47E off ramp. As Stebbins entered the off ramp, Cameron activated his right turn signal and also exited via Exit 47E off ramp. At that time, Stebbins contacted Enfield Police Department via cell phone. He advised Enfield police dispatcher that Cameron was following him and requested they send the officer towards his location as he didn't know what Cameron's intentions were. As Stebbins traveled through the intersection of Route 190 and Phoenix Ave., he observed Cameron still following him. Cameron then stopped at the red control signal located at

Route 190 and Phoenix Avenue."

Q Well, let me ask you, before that, it says, "A short time later." So before that sentence, it says, (Reading):

"A short time later, Cameron entered the I91 southbound ramp and traveled south on 191. Again, Stebbins waited approximately 90 seconds and then entered the highway. As he emerged in the left lane of three, he noticed a vehicle pulled over on the right shoulder with its hazard lights activated. As he approached the vehicle, he immediately recognized it was Cameron pulled over."

Did you get video evidence of that?
A No, not that I know of.
Q Were you provided with -- okay, how many

times do you need to satisfy -- how many times of following do you need to satisfy probable cause from repeatedly following or lying in wait under the statute?

MR. GERARDE: Objection.

MR. MANCINI: Objection.

MS. VITALE: Objection.

A Yes, I'm not a legislature. I wouldn't put that number on it. But I think when you can demonstrate that it's more than one. Again, there's several in this instance where I believe --

Q So are there several on video, or is there several in Mr. Stebbins' statement?

A Several to believe that happened, which I have no reason to believe didn't happen.

Q From the video evidence or Mr. Stebbins' statement?

MS. VITALE: Objection.

A Both.

Q Okay, so from the video evidence alone, would you have concluded that Marcus repeatedly followed Steven Stebbins?

MS. VITALE: Objection.

MR. GERARDE: Objection.
A Not from just the video evidence, but that's not what I was relying my probably cause on.
Q And you don't think it's odd that we don't have video of the I91 on ramp? You don't think it's odd that Steven Stebbins turned off his video when he entered 91South?
MR. MANCINI: Objection.
MR. GERARDE: Objection.
A I don't have reason to believe it didn't happen since Mr. Cameron and Mr. Stebbins were in Brookside Plaza when we were called.
Q So if they're both in Brookside Plaza, that means that Marcus pulled over on the side of I91?
MS. VITALE: Objection.
MR. GERARDE: Objection.
A No, I'm saying the totality of the incident.
Q Well, this could be a total lie, right?
A Sure.
MR. GERARDE: Objection.
Q So I mean, that's what I'm saying.
A I have to develop probable cause. As you read the statute, a person is guilty of -- I

don't determine guilt. I determine to believe that an incident occurred.

Q And I guess I'm looking at this in an objective lens here. Somebody gives me three separate videos that don't include everything that they're telling me happened and they have the ability to record the whole event. It doesn't cause you pause at any period of time?

A That doesn't cause me to automatically say I'm just going to drop this case and not do anything about it.

Q Oh, but you have Mr. Cameron, when you approached his vehicles, that he was being harassed, right?

MS. VITALE: Objection.

A He wouldn't elaborate on what was going on.

Q Well, he said they've been trying to get his address for a long period of time and he said he felt uncomfortable.

A Okay.

Q I mean, did he not? We --

A He did, but he never called us. It was Trooper Stebbins that called us. He was the

one that followed him into the plaza.

Q Let me ask you another question.

Had Marcus Cameron made the call instead of Trooper Stebbins that day, would Trooper Stebbins be the one charged with stalking?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A That, I wouldn't be able to say without facts and circumstances. You could what-if it all day.

Q Did that route the Marcus took avoid traffic lights?

A It probably would avoid some traffic lights, yes.

Q Look at Exhibit 15. Route 15, I believe that day was the construction on Fremont, or was it on Montano?

A I'm not sure.

Q You don't know where the construction was?

A No.

Q Okay. Given the past dealings between Marcus and Trooper Stebbins -- I already asked you

that question. Let's move on.

There is some audio here of Mr. Cameron's arrest. Were you present when Mr. Cameron was placed under arrest?

A Yes.

Q I'm going to play an audio over here. This will be Cameron 34.

MR. GERARDE: Is this going to be an exhibit?

MR. MCLANE: Yes, Cameron 34 will be Exhibit 19.

(Exhibit Number 19, Video/Cameron34, was Marked for Identification.)

(Whereupon, Mr. McLane played video.)

Q Were you present on scene at this particular time?

A I'm not sure.

Q Okay, did you ever put anything in any report that Marcus Cameron resisted arrest?

A No.

(Whereupon, Mr. McLane played video.)

Q At this point in time, at least now, do you remember him saying, "How are we doing, Sergeant Nolan"?
A I don't.

(Whereupon, Mr. McLane played video.)

Q Who is this that is arresting Marcus now?
A I believe it is Officer Caires.

(Whereupon, Mr. McLane played video.)

Q Who was that asking this woman for her license?
A I'm not sure.
Q It wasn't you?
A It could have been. I don't know.

(Whereupon, Mr. McLane played video.)

A Yes, that's me.
Q So who was actually effectuating the arrest now when Marcus is making those statement?
A I believe, Officer Caires.
Q Officer Caires?
A I believe.
Q Did you recognize Officer Caires pushing Marcus Cameron against the car?
MR. GERARDE: Objection.
A Did I recognize him?
Q Yes.
A It sounds like I heard him saying that when I was talking to the female.

(Whereupon, Mr. McLane played video.)

Q Okay, I think the rest is kind of a bit of nothing.
With respect to Marcus asking why Officer Caires was pushing him up against the

vehicle, did you witness Officer Caires being rough in the way he arrested Marcus?
A Not that I recall, no.
Q Do you have any dash cam video from that day from the car that was there?
A I believe there is dash cam video.
MR. MCLANE: I guess I formally request that if there is.
MR. GERARDE: Okay.
Q Do you remember the cruise number that you were in?
A I do not.
Q Was there audio as well?
A I'm not sure.
Q So would we be able to see the rest of the arrest taking place from that dash cam?
A I would think it would, but I'm not 100% positive.
Q So we had sent some requests for production of documents and some interrogatories. We were under the impression that that particular vehicle the audio wasn't working and the video wasn't working that day. Are you saying that's inaccurate?

A Well, there was multiple cruisers on scene.
Q Okay, so one of those cruisers probably has a video of --
A I believe so.
Q How many cruisers were on scene?
A I don't remember.
MR. MCLANE: That is part of the request that we had made.
Q So Officer Caires, was he driving a separate cruiser?
A Yes.
Q Do you know that cruiser number he was driving?
A No.
Q In 2018, were you guys using the Ford Explorers?
A I believe so.
Q Those were relatively new at the time, right?
A Yes.
We still have some Crown Vics, so I don't know what was on the scene.
Q Okay, thank you.
I want to go over the booking video of Marcus being booked at the station.

MR. MCLANE: I'm going to mark this. So this was sent over as Cameron 37, but it is a ENC file, so I cannot play it on a Mac, and fortunately, Marcus has a PC, so we are going to play it from Marcus's computer.

This is Exhibit 20.

(Exhibit Number 20, Booking Video, was Marked for Identification.)

MS. VITALE: What is it?

MR. MCLANE: This is the booking video, Cameron 37.

So this is, like, 45 minutes. I'm going to start it and bring it to select periods of time, for the sake of time.

(Whereupon, Mr. McLane played video.)

Q Okay, so that's you. Is this the booking room at Enfield Police Department?

A Yes.

(Whereupon, Mr. McLane played video.)

Q Is that Officer Caires?
A It looks like it.

(Whereupon, Mr. McLane played audio.)

Q I'm going to stop it there. When he said "If you live in Connecticut, I can get you out without signing anything," what does that mean??
A Out-of-state residents typically have to have a cash bond set on them.
Q Well, wasn't the bond already set before you made that statement?
A I don't believe so. I don't know. I don't think so.
Q Do you have any reason to believe that you would have made that statement that the bond was already set?
A No.
Q You can look through the --

A Okay, thanks.
No, it was not set. He was processed and released on a $5,000 non-surety bond set by Lieutenant Squires, so that means that it was set that night by the headquarters commander.
Q When did they set that? Because this is pretty late in the evening, is it not?
A It's set at processing. The bonds aren't preset unless they're set by court.

(Whereupon, Mr. McLane played video.)

Q So why did you drive off when he was asking you who the other trooper was?
A Because we were all done there. The investigation, at that point, was complete. He had offered his side. Now he wanted to just know who the other officer on the scene was.
Q But why not tell him?
A I don't know.
Q And you said right here you just drove off?

A Yes, I don't know.
Q All right. You said you wanted to know who that other individual was. What did you mean?
A As I recall, there was another SUV in the parking lot that he appeared to be on the phone with and that possibly picked him up or something, so I think that's who we were referencing.
Q You don't know who it was?
A No.
Q Can you describe him?
A No.
Q White or black?
A If I can't describe him, I can't say if he was white or black.

(Whereupon, Mr. McLane played video.)

Q Do you have video of you asking him who was driving the other vehicle?
A I don't know.

(Whereupon, Mr. McLane played video.)

Q So when Officer Caires wrote in his report that Marcus is essentially being combative about getting his address --

MS. VITALE: Objection.

Q -- does this look combative to you?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A I don't think he wrote "combative."

Q Well, let's see. That is my memory.

I take that back. He did not say "combative." He just said "not entirely cooperative." Was he being uncooperative there?

A I would say he was not entirely cooperative.

Q Okay, but he's waiting for you, right, to get a confirmation?

A Yes, but I don't think it's wrong to say he was not entirely cooperative.

(Whereupon, Mr. McLane played

video.)

Q I'm just going to skip ahead for the sake of time because this is a long video.

(Whereupon, Mr. McLane played video.)

Q So he asked for a police report and you told him, no, he had to get it through the court?
A Right, or -- right before you stopped it, I heard I said, "Or you contact Records," but typically, yes, an arrestee would go through court for it.

(Whereupon, Mr. McLane played video.)

Q Now, if he asked it through Records, would he get the CJIS Report?
A I don't know what he would get through Records.
Q Did you ever run any COLLECT inquiries as part of your investigation into the charges

of stalking in the third degree?
A Any COLLECT inquiries into stalking?
Q To any individuals like Marcus or any witness to the events, did you run any queries --
A We typically would run anyone we come in contact with yes.
Q Whose did you run?
A I would assume Mr. Cameron.
Q Anyone else?
A I don't know.
Q Okay, well, did you keep any notes from this investigation?
A No.
Q You didn't keep any?
A No.
Q Did you run the COLLECT on any witnesses?
A I don't know.
Q So on the break, I looked up Connecticut's racial bias training. I looks like they have a racial profiling prohibition project. Have you had to participate in it?
A Racial profiling prohibition project?
Q Yes.
A I'm not aware what that is.

Q I'm just trying to refresh your memory as to the title of this type of training.
Was there an implicit bias training?
A Implicit bias training, yes.
Q Okay, what did you gather from that implicit bias training? What were the takeaways from that training?
A I mean, I'm assuming any implicit bias training would talk about exactly what that is, implicit bias, that everyone has some sort of bias to them, but that shouldn't be a factor for any law enforcement proceeding.
Q Okay, so on scene on November 12, 2018, obviously you recognize Marcus to be black?
A Correct.
Q And you said that two or at least one white police officer was harassing him?
MS. VITALE: Objection.
Q Is that accurate?
MS. VITALE: Objection.
A Harassing him? A white police officer harassing him?
Q Was Steven Stebbins black or white?

A White.

Q So Marcus said that Steven Stebbins was harassing him, is that accurate?

A If he said that, sure.

Q Let's play it back. I showed you an audio.

A I'm not denying he said that.

Q Okay. So when I showed you an audio earlier of the conversation between you ad Marcus when he said they were harassing him. And he is referring to Steven Stebbins and Stephen Samson.

A Okay.

MS. VITALE: Objection.

Q So do you disagree that that was in reference to Steven Stebbins?

A No.

Q I mean, with respect to a black man telling you that another police officer who is white has been harassing him, did you take any different steps than you would take if he was white?

MR. GERARDE: Objection.

MR. MANCINI: Objection.

MS. VITALE: Objection.

Q To me, it wasn't in the performance of his duties. It sounded like there was a dispute between neighbors. If he had ongoing issues with another agency, then yes, by all means, file a complaint with that agency, but the Enfield Police Department doesn't oversee Internal Affairs investigations for the Connecticut State Police.
Q Well, I'm not talking about an Internal Affairs investigation. I'm talking about with respect to this guy who was in his cruiser. Stebbins was in his cruiser that day.
A Mm-hmm.
Q Marcus, who is black, said that he was being harassed by him.
A Okay. And presented no --
Q Did that change the way you approach the situation with Marcus being black?
A No.
Q What about when Marcus told you he had a long history with him and Sergeant Samson and Steven Stebbins?
A What is the question?

Q I guess it would be the same question. You have a black man telling you that a white police officers and him have a long history of being harassed and that they're trying to find out his address.

A I think that race was irrelevant. It was a neighbor dispute.

Q It was irrelevant?

A Yes.

Q Okay. Does any Connecticut training or any Enfield training on how you handle the situations differently with respect to the race of the person making the claim?

A To handle people differently because of their race?

Q No, to handle the approach different based on the race of the person making the harassment claim?

MS. VITALE: Objection.

A I don't believe so if I'm understanding the question.

Q So a black man tells you that a Connecticut State Police officer is harassing him --

A I would say file a complaint with the

Connecticut State Police.
Q Regardless of the race of that officer?
A Right.
Q Would you factor the race of the parties into your determination as to the history between the parties as you reviewed in your investigation?
A No, not unless there was some incident that revolved around race, if there was some racial component.
Q Let me ask you another question. So when Marcus said there's been a long history and they've been trying to get my address, when Steven Stebbins had called you with the harassment, the supervisor shows up, did you in any way, shape or form feel that you might just be a conduit to try to get Marcus's address?
MS. VITALE: Objection.
MR. GERARDE: Objection.
MR. MANCINI: Objection.
MR. MCLANE: I think I need ten or fifteen minutes, and then I can wrap up.

(Short break.)

MR. MCLANE: Back on.

Q Well, I guess now there's been a lawsuit. We are in 2023. Do you still think you had probable cause to charge Marcus with stalking in the third degree?

A Yes.

Q Let me ask you a question. From that spot that Stebbins was waiting in in the second or the third video that we saw, the on ramp to Route 49, I believe --

A Yes.

Q -- how far about from there is the Brookside Plaza?

A A couple miles.

Q I mean, how long do you think it would take for a normal traffic day to get there?

A From Exit 49?

Q Yes, from where Stebbins was parked when he turned his video on the second time?

MS. VITALE: Objection.

A Depending on traffic, I would say five to ten minutes.

Q Would you say 10, 15 minutes?
MS. VITALE: Objection.
A Not that long.
Q I know I showed you the videos before. I want to look at the time stamp.
MS. VITALE: Which exhibit is this?
THE COURT REPORTER: Exhibit 16.
Q So Dover and Colony, it is 2:31:55 or 14:31:55, so it would be 2:31 in the afternoon, right, November 12th?
A Right.
Q Then we looked at the video where he is stopped on the side of the road near the ramp. This is where you indicated this was near the ramp to Exit 49, I believe --
MS. VITALE: Objection.
Q or is this 48?
A 49.
Q Okay, and we'd say that's 2:35 in the afternoon?
A That's what this says.
Q So it takes about 10 minutes to get to the Brookside Plaza, 15 at we discussed --
MS. VITALE: Objection.

Q -- so essentially, between 14:31 and just say 1500, 3:00 -- have you ever in your career charged anyone with stalking in third degree for events that occurred within a 25 minute period of time?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A I don't think I have, no.

Q Do you still think, today, that a person is capable of multiple events of willfully following and lying in wait within 25 minutes?

MR. GERARDE: Objection.

MR. MANCINI: Objection.

MS. VITALE: Objection.

A Yes.

Q Okay, you wouldn't consider that one event?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A I'm sorry?

Q You wouldn't consider it one event?

MS. VITALE: Objection.

MR. GERARDE: Objection.
MR. MANCINI: Objection.
A I don't understand.
Q So for a person to be charged -- I mean, not even convicted, charged with stalking in the third degree --
A Oh, I see. No, I think there yes, I understand now.
Q So you wouldn't consider this one event?
MR. GERARDE: Objection.
A I would say, per the statute, there's multiple times where the person is being followed.
Q How many times have you charged someone with stalking in the third degree?
MR. GERARDE: Objection.
A I don't know.
Q In your career?
A I don't know.
Q I'm going to play you a voicemail. It was disclosed at discovery and I know you had indicated you hadn't heard it. I just asked you a few minutes ago if you feel like you still had probable cause, and that's fine. I

guess aside from probable cause, I want to play this voicemail for the context, asking you questions about it afterwards.

We don't have to offer this as an exhibit because this was marked during Stebbins' deposition, but I want to see if you can listen to this voicemail and then answer some questions.

MS. VITALE: I think, for the record, we need to mark as exhibits everything that's --

MR. MCLANE: I don't need to mark it, but thank you.

(Whereupon, Mr. McLane played audio.)

Q After hearing that voicemail recording, referenced in -- well, that was the result of a phone call that was referenced in Exhibit 14, after hearing the recording of the audio that caught Sergeant Samson, Steven Stebbins, and a man named Marty Pirog discussing the Internal Affairs investigation, now, looking

back, after hearing that voicemail, would you question Steven Stebbins' credibility as to the accusations against Marcus Cameron?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A No, I don't think there's any question on what occurred that day. At least in my mind that there was enough probable cause to apply for the arrest warrant.

Q All right. With respect to the history of the dealings between parties, do you now believe there to be a racial component to this?

MS. VITALE: Objection.

MR. MANCINI: Objection.

MR. GERARDE: Objection.

A I have no clue without knowing more of it.

Q Okay, so when we talk --

A I didn't have any of this information when I submitted my arrest warrant.

Q Right, well, no, I'm asking now, looking back, so outside of the context of you finding probably cause, now, looking back at

the credibility, now having this information, looking back at Steven Stebbins' credibility, do you still believe he was telling the truth?

MS. VITALE: Objection.

MR. GERARDE: Objection.

MR. MANCINI: Objection.

A I believe he was telling the truth.

Q So even having heard them discussing having a mail woman see if Marcus was playing that racial card, you still think race wasn't an issue here?

MS. VITALE: Objection.

A I still don't think it changes what I applied for that day.

Q Now, hearing MR. Samson and Mr. Stebbins and Mr. Pirog, does it change the fact that you still think Mr. Stebbins was in reasonable fear of his safety?

A I believe he was, yes..

Q Okay, let me ask you another question. With respect to Internal Affairs investigations in the Enfield Police Department, how are those assigned?

A How are they assigned?
Q Yes. So say I make a complaint against one of your officers -- you're now a day shift commander -- what happens?
A So a control number would be hit, which assigns someone to look into it. If it rises to the level of an Internal Affairs investigation. Typically, it's assigned to the detective lieutenant, but it could be assigned to, essentially, any supervisor.
Q Okay. So if it gets assigned to a supervisor, does the supervisor assign someone to, what you said, look into it?
A If it gets assigned as an IA, there is an IA supervisor in charge of conducting the investigation.
Q So if one of your officers is a subject of investigation, who does the investigation?
A The IA supervisor.
Q So would you feel that it would be inappropriate for the IA supervisor, when conducting his investigation, to include the subject of the investigation in the investigation itself?

MR. MANCINI: Objection.
MR. GERARDE: Objection.
MS. VITALE: Objection.
A I'm sorry.
Q Well, let me ask you, in the context of that voicemail, do you think it was inappropriate for Steven Stebbins to be part of Stephen Samson's phone call to Marcus's employer --
MS. VITALE: Objection.
MR. GERARDE: Objection.
MR. MANCINI: Objection.
Q -- on July 17, 2018?
MS. VITALE: Objection.
MR. GERARDE: Objection.
MR. MANCINI: Objection.
A I don't know the whole context of it, but we typically don't disclose to the person we are investigating the information.
Q I'm going to give you this. These are the request for documents. I think I have the verification page and the request for documents. Let me switch these real quick.
MR. MCLANE: Let's go off record for two seconds, Michele

(Whereupon, a brief discussion was held of the record.)

MR. MCLANE: Back on.
This will be Exhibit 21.

(Exhibit Number 21, Request for Production of Documents, was Marked for Identification.)

Q I'm going to show you Exhibit 21, which are the request for production of documents that I sent and the responses to those requests for production of documents that was provided to me. I know I also sent requests to the Town of Enfield. Did you also assist in finding documents for the Town of Enfield or did somebody else?
A I think somebody else would do that. I provided whatever was asked of me.
Q So one of the requests was on page six of this. This is not Bates stamped. This was provided a response to a request for

production of documents. If you go to -- well, let's start with number three on page six. Other than the documents that have been turned over thus far and other videos that we have in our possession, do you have any other documents in your possession that demonstrate that Marcus Cameron committed a crime?

A Not that I'm aware of.

Q Okay, I guess I'm going to ask the question, number four, did you ever personally witness Marcus Cameron commit a crime?

MR. GERARDE: Objection.

A No.

Q So there wouldn't be any documents to that effect?

A No.

Q Do you have any communication between you and Steven Stebbins that you haven't turned over?

A Not that I have.

Q Do you have any communication between you and Stephen Samson that you haven't turned over?

A Not that I remember.
Q Do you have any communication between you and Officer Caires that you haven't turned over with respect to Marcus Cameron?
A Not that I know of.
Q To the best of your knowledge, the vehicles on the scene when Marcus was arrested on December 11, 2018, the audio and video were working?
A I don't know.
Q If they weren't working, what would be the reason?
A Back then, we had a horrible system that often wasn't working, so I don't know.
Q Well, would you have requested -- what was the process -- if the system wasn't working, what was the process you used to fix it back then?
A At that time, we were in the process of getting a whole new system which we since have gotten.
Q So in the prior system, what did you do to fix the problems when they rose?
A They would Bandaid them and do whatever they

could to keep it going.
Q Well, I mean, what do you mean? So what was the system that you used?
A The brand was called ICOP.
Q ICOP?
A Yes, I-C-O-P.
Q What were the issues that you had?
A Numerous issues, whether it be the mic is not operating correctly, footage not recording. There was many issues.
Q Who provided the maintenance for ICOP?
A Some of it was done in house by our IT personnel.
Q I mean, was it Enfield's policy to report any issues that officers were having with the ICOP system?
A It was a well-known problem that we needed to get away from it, which is why we went to the new Axon system.
Q So would people have reported the issues if there was audio/video issues from that day?
A I know occasionally they would, but it was known that we were leaving that system and going to another system.

Q Do you know who Danielle Dubuc is?
A No.
Q Do you know who Jean Paul is?
A No.
Q So when your officers -- or did you go to Marcus's house, or did your officers when you were investigating these charges?
A I believe I did at least once. I saw him there.
Q Did you run any license plates of the vehicles that were on that property?
A I'm not sure.
Q What steps did you take to check whether you did?
A I mean, a COLLECT History Report would show.
Q How do you obtain a COLLECT History Report?
A I think through the COLLECT Unit.
Q All right, you just contact the COLLECT Unit?
A I believe so.
Q How difficult is it for you to obtain it?
A I don't know. I've never requested it.
Q Do you know who Angela Harrington is?
A No.
Q Do you know who Latisha Bessman (phonetic)

is?

A No.

Q Did you ever get the identification of the woman who was in the car with Marcus on December 11th when he was arrested?

A I'm not positive, but I heard asking for a driver's license, so I would assume so.

Q Did anyone run Latisha Bessman's information through the COLLECT database?

A I would assume if we were letting her drive off the scene, we probably would have.

MR. MCLANE: Again, I'm going to make a formal request on the record but I'll follow up, Eric, for Latisha Bessman's information.

MR. GERARDE: All right.

Q Have you ever been sued before?

A No.

MR. MCLANE: Let's mark this as Nolan 22.

(Exhibit Number 22, Answers to Interrogatories, was Marked for Identification.)

Q Do you remember receiving interrogatories to answer in this case?
A Yes.
Q Is that your signature on the first page there?
A Yes.
Q So as of February 1, 2023, had you answered everything in the interrogatories with the truth and to the best of your knowledge?
A Yes.
Q Have you reviewed any of these answers to these interrogatories since you signed this certification on February 1, 2023?
A I don't believe so.
Q Is there anything in these interrogatories that you feel you want to change?
A No.
Q How did you come to find out that Stephen Samson was Steven Stebbins' supervisor?
A I believe he was on the scene at the Brookside Plaza.
Q I mean, did he tell you that when he was --
A I think so.
Q Have you ever spent any time with either

Stebbins or Samson off duty?
A No.
Q I think I might have asked, have you ever communicated with them on any other medium under than your work email or your work cell phone?
A Not that I'm aware of.
Q Did you check?
A Check?
Q On your personal cell phone, did you check to see whether you had texted Stephen Samson or Steven Stebbins?
A I have no record of it, no.
Q Did you search your --
A I don't know that I did.
MR. MCLANE: Eric, I guess I'll talk to you later, but if you could do a quick search if there's any other relevant documents.
MR. GERARDE: Okay.
Q Do you know who on the Enfield Police Department contacted the Massachusetts Probation Office?
A I don't.

Q In receiving these interrogatories, did you take any steps to find out?
A No, I don't know how I would find out.
Q What do you mean you don't know how you would find out?
A I don't know who --
Q So did you ask maybe Officer Caires -- is Officer Caires still with the Enfield PD?
A No.
Q How about the other two on the scene for November 12th?
A The original incident? Croteau or Chagnon?
Q Yes.
A No, I didn't ask them.
Q Are they still on the Enfield Police Department?
A Yes, Croteau and Chagnon are both on -- neither one of them are female, so Magagnoli would have been the other one.
Q As a lieutenant or day shift commander, do have access to the email server for the Enfield Police Department?
A No.
Q So you wouldn't be able to search --

A Not there, no. I would have to do that through IT.
Q So let me ask, why did you not ask IT to do a search, department-wide search as to who contacted Massachusetts Probation Department on Marcus Cameron?
A I don't know how a telephone call would be tracked on it.
Q Oh, so you know it was a phone call?
A No, I'm assuming that's why this is being said. Did it say who contacted -- strike that.
Q Do you believe it was a phone call?
A I don't know.
Q How often do you see in your role as the shift supervisor now, shift command, people being charged with stalking in the third degree?
A How often?
Q Yes.
A I don't know.
Q When is the last time you've seen one?
A I would have to do a records check through our in-house.

Q When is the last time you charged somebody with stalking in the third degree?
A I'm not sure. I don't want to say and --
Q Have you ever charged anyone with stalking in the third degree since you charged Marcus?
A I'm not sure.
Q Had you ever charged anyone stalking in the third degree before you charged Marcus?
A I believe so, but I'm not sure.
Q What is the normal context in which you charge? Are they domestic?
MR. GERARDE: Objection.
Q Stalking in the third degree?
MS. VITALE: Objection.
A No, I can't say.
Q That is all I have.
MS. VITALE: I have a question.

CROSS EXAMINATION
By Ms. Vitale:
Q Did you speak with Officer Magagnoli during your investigation to th November 12, 2018 incident?
A I'm not sure.

Q That's it.

MR. MCLANE: Dennis?

MR. MANCINI: I thought I had a questions and I'm blanking on it right now. Hag on one second.

CROSS EXAMINATION

By Mr. Mancini:

Q Have you ever had a situation where you were only able to get one side of an incident?

A Sure.

Q And have you been able to make an arrest based on just one side of an incident?

A Yes.

Q In that situation, have you tried to maker contact with the other party?

A I always try to make contact. In the booking video there, you can see I said to him "I tried many times to get your side of th story."

Q But at the end of the day, you have what you have and if you believe that you have enough information for probably cause, would you make an arrest?

A Yes.

Q Or apply for an arrest warrant at that time?

A I would apply for an arrest warrant if I believe there's probable cause, and then a prosecutor and a judge has to agree or disagree with me.

Q Nothing further.

MR. GERARDE: I have nothing.

(Whereupon, the deposition was concluded at 3:21 p.m.)

ERRATA SHEET

CASE: Marcus Cameron v. Steven Stebbins, et. al.

REMOTE/ZOOM DEPOSITION OF: Bryan Nolan

PAGE LINE PRESENTLY READS SHOULD READ

I, Bryan Nolan, do hereby certify that I have read the foregoing transcript of my testimony given in the aforementioned matter, and further certify that said transcript is a true, accurate and complete record of said testimony.

Signed under the pains and penalties of perjury

this day of

2023.

Bryan Nolan

C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, Michele C. DeCoste, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of Bryan Nolan, was taken before me on March 8, 2023. The said witness was duly sworn before the commencement of his testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

In witness whereof, I have hereunto set my hand and Notary Seal this 14th day of April 202

Michele C. DeCoste, Notary Public

My Commission Expires: June 30, 2028

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.