Volume: I

Pages: 1-118

Exhibits: 9

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:21CV00165(OAW)

- - - - - - - - - - - - - - - - - x

MARCUS CAMERON,

Plaintiff

V.

STEVEN STEBBINS, STEPHEN SAMSON, JOHN DOE, BRYAN NOLAN, MARK SQUIRES, ENFIELD POLICE DEPARTMENT, STATE OF CONNECTICUT, CONNECTICUT STATE POLICE, AND TOWN OF ENFIELD,

Defendants.

************************************

REMOTE/ZOOM DEPOSITION of MARK SQUIRES, a witness called on behalf of the Defendants, before Michele DeCoste, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at Kennebunkport, ME, on Wednesday, March 15, 2023, commencing at 10:36 a.m.

R E M O T E   A P P E A R A N C E S

MICHELLE S. CRUZ, ESQ.
Law Offices of Attorney Michelle S Cruz, LLC
1380 Main Street, Suite 403
Springfield, MA 01103
(860) 415-6529
cruz4law@gmail.com
Counsel for the Plaintiff

ERIC E. GERARDE, ATTORNEY
THOMAS R. GERARDE, ATTORNEY
Howd & Ludorf, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
(860) 707-6029
Counsel for Mark Squires, Bryan Nolan, & Town of Enfield

R E M O T E A P P E A R A N C E S CONT.

LAURA VITALE, ATTORNEY
Attorney General Office State of Connecticut
165 Capital Avenue, Suite 500
Hartford, CT 06106
(860) 808-5340
Counsel for Steven Stebbins

DENNIS V. MANCINI, ATTORNEY
Attorney General Office State of Connecticut
110 Sherman Street
Hartford, CT 06105
(860) 808-5450
Counsel for Stephen Samson

ALSO PRESENT:
Marcus Cameron

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK SQUIRES | | | | |
| (By Ms. Cruz) | 6 | | 107 | |
| (By Mr. Gerarde) | | 101 | | |
| (By Ms. Vitale) | | 102 | | |
| (By Mr. Mancini) | | 109 | | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Bates Document D53 | 30 |
| 2 | Bates Document Stebbins 593 | 32 |
| 3 | Bates Document Stebbins 52 | 35 |
| 4 | Bates Document Samson 83 | 38 |
| 5 | Bates Document Samson 135 | 48 |
| 6 | Bates Document Cameron 414 | 56 |
| 7 | Bates Documents D1 to D36 | 73 |
| 8 | Bates Document Stebbins 156 | 93 |
| 9 | Bates Documents Samson 463 to 494 | 100 |

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent shall have thirty (30) days to read and sign the deposition transcript, under the pains and penalties of perjury, after which time it shall be deemed to have been signed, and that the certification, filing and sealing of the deposition transcript are waived.

It is further stipulated and agreed that all objections, except objections as to the form of the question, and all motions to strike, shall be reserved to the time of trial.

MARK SQUIRES, after being satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CRUZ:

Q Good morning. My name is Michelle Cruz. I represent Marcus Cameron, along with Ryan McLane. And we're here today to do a deposition. Can you

introduce yourself?
A My name is Mark Squires.
Q And can you spell your last name?
A S-q-u-I-r-e-s.
Q Have you ever participated in a deposition before?
A No.
Q Okay, so let me just kind of go over some of the ground rules here. If you need to take a break, feel free. If at some point I ask you a question and you want to talk to your attorney, I'd ask that you answer the question, and then you can take a break and you can go make a phone call or mute yourself, whatever you're comfortable with.
If there's a phrase or a word that I'm using that you don't understand, just ask for clarification. Sometimes I might use acronyms. I might ask you if you understand them, but I might also not ask and if you have some confusion, please just let me know. And you understand that you are under oath, correct?
A Yes.
Q Okay, and we have the usual stipulations that I heard Attorney Gerarde, so I'll start with, what

did you do to prepare for this deposition?
A So I received some materials related to this incident, so I read those materials. There is also an email that was sent to me with some exhibits, I think, by the plaintiff's counsel, which I just briefly looked through. I didn't have an opportunity to actually get through all of what was sent to me. I did speak to my attorney to be noticed for the deposition today.
Q Okay. And what materials did you review besides the ones that we sent you?
A Hang on one sec. I can tell you where they are.
Q Okay.
There is a -- I'm sorry, we had a lot of snow here, so if it looks like I'm straining, there's a bunch of reflection here.
Q The three feet of snow that Maine got?
A We got about a foot. We should have three, but it melted, so it was quite annoying.
So last night, I reviewed a, looks like, Incident Report by James Laurino from 5/26/18. I reviewed an Incident Report by Detective Gary Castle on 5/26/18. I reviewed my report from 5/30/2018. I reviewed the arrest

warrant affidavit authored by Bryan Nolan. And I did review the Connecticut State Police -- I guess it's -- I don't know if it's an internal investigation or it's just a memorandum, but it's a lengthy memorandum, 27 pages long, regarding an internal involving Stebbins and Mr. Cameron. There was also a police report that was sent to me that would have come along with the affidavit. I did not have a chance to actually read that entire report, but that was sent to me.

Q And besides your attorney, did you talk to anybody else about this deposition?

A No.

Q Okay. So you haven't finished reviewing the documents we provided you?

A No, they were sent to me five minutes before 10:30 or so.

Q Okay. How much time did you spend reviewing those documents your referenced?

A I looked at the arrest warrant last night and looked at the other documents this morning. So I think maybe I spent an hour and a half with them, two hours or so.

Q Okay. And without telling me what you discussed,

how long did you spend -- I mean, I'm sorry. You said that you talked to your attorney. Without telling me what you discussed, how long did you spend preparing with your attorney?
A 20 minutes, 30 minutes maybe.
Q Okay, and do you understand the purpose of the deposition and to be truthful to all answers?
A Yes, of course. Yes.
Q What is your current position?
A My current position is a State's Attorney or District Attorney in York County, Maine. I prosecute cases within the county.
Q And how long have you been in that position?
A Since 2019. So I'd say three and a half years or so.
Q Okay. And then prior to being a State's Attorney in York County, Maine, where were you employed?
A The town of Enfield. I was employed there as a police lieutenant. Well, multiple roles, but about 20 a little over 20 years as a police officer there.
Q Okay. And let's go back to your training in law enforcement. Can you describe your training in

law enforcement?

A Sure. Over my 20-year career, there's quite a bit of different training that I attended. I can say that I attended the Police Training Academy in 1999. Following that, I completed a field training program with the agency. It's roughly a 16-to-20 week program. I don't remember how long it was. After completing that, if memory serves me right, we had to recertify every three years, so 40 to 60 credits, somewhere around there, of time spent in various topics. Throughout my time at the police department, I received training in first line supervisory classes. I've attended an FBI leader training, which is a leadership program. It's a three-part leadership program. I attended traffic reconstruction, all three phases. I'm sure there's many other trainings that I've attended, Internal Affairs investigations, things of that nature.

Q What with regards to the Internal Affairs investigation, do you remember when you took that training?

A I don't. I remember where it was. I don't remember the date or when that occurred.

Q Was it at POST, or was it somewhere else?
A No. It was at -- it would have been through POST. If memory serves me right, it was at the UConn Police Department in Storrs.
Q Can you tell me a little bit about the IA investigation training that you took? What do you remember was covered?
A I don't remember. I think, if memory serves me right, we covered things like Garrity rights, Weingarten rights for officers. We would have covered how to complete an investigation. It's been a long time. I don't remember exactly what we would have covered. But I'm sure that there's, like, a POST itinerary where there's subjects that had to be covered in order to, you know, get credit for the class and whatnot.
Q How long was that training, if you remember?
A I don't. I would imagine a couple of days.
Q Okay. And do you recall the steps to how to complete an IA investigation?
A Generally, I guess. I'm sure I would miss a step if I was to recite them to you. You know, generally, it's receiving the complaint. You know, typically, I would ask for some kind of

statement or account from the individual who's making the complaint, try to identify witnesses or other officers who might have been present for a complaint against an officer. Eventually, once there was enough information, the officer would be interviewed. If memory serves me right, we would issue what's known as Garrity rights to the officer right at the outset, conduct an interview, and then look at the evidence and compile a report. I do remember, as Internal Affairs investigator for the few that I had, we generally did not issue discipline. We typically referred that up the chain of command for disciplinary action. We just make findings.

Q Okay. And when you said receiving the complaint, take a statement from the person, the person issuing the complaint, correct?

A The person making the complaint. It wasn't necessary to take a written statement, but certainly, we tried to get it in writing so that we had it, you know, specific as to what the issue was.

Q And is it typical to begin an investigation within an investigation of the person making the

complaint?

MR. GERARDE: Object to the form.

You can answer that if you understand it.

A I think I know what you're asking, Counsel. You're asking me if I have an investigation into an officer and, during that course of an investigation, that investigation might change perspective towards the person making the complaint?

Q Or not necessarily change perspective, but that you would start to investigate the complainant.

A Okay, it could happen, specifically if I thought there was something wrong with the complaint or there was criminal conduct that was revealed during the investigation. I mean, I wouldn't find it as a common course of action where we would always do that, but of course, if you're investigating an Internal Affairs complaint and there's information that arises that leads you to believe the person made the complaint is not being truthful or is not -- whether some other criminal activity you could investigate them, yes.

Q When it comes to Internal Affairs investigation, does the investigation involve having open dialogue with the officer that is the subject of the investigation?

MR. GERARDE: Objection to the form. You can answer.

A I guess I think what you're asking is basically, like, an informal dialogue with that person outside of what would be, like, the interview?

Q Yes.

A It was my practice, generally, no. Again, we're talking about Enfield Police Department and the way that I conducted investigations. You know, generally, you would not talk about the substance of that investigation until the actual interview of the subject of the investigation.

Q And if you recall, why would you limit communication with the subject of the internal investigation?

MR. GERARDE: Objection to the form. You can answer.

A Quite frankly, the integrity of the investigation.

Q Back to your training, were you trained in racial

bias training, how to ensure that the work you do is free from any kind of racial bias or issues regarding racial discrimination?
A Yes, I have received training of that nature.
Q Do you know when?
A I don't have. I'd have to consult my training file.
Q Okay. Do you have a training file that you keep?
A Not me personally. It would be held within the agency.
Q Okay.
A I don't personally keep records.
Q And during that training, do you remember the topics you covered?
A So I don't remember the training specifically. I've had subsequent trainings as well in my new position, so I can't remember where I learned what and where. But I like I said, I'm sure that the training file would at least have, like, a course itinerary or lay out what the subjects might have been or topics that day.
Q And I want to ask you a question about the AI training that you attended.
A Sure.

Q You stated that it was through POST, but it was at Uconn. So when you went to this training, were there also Connecticut State Police officers at that training -- troopers?

A I don't know. There were other officers there for sure. I don't know if Connecticut State Police troopers would be there not. Sometimes a lot of their training is separate from municipal officers. They tend to train together, which was the same at the police academy when I was there, that it was not a mix of troopers and local or municipal officers.

Q And the training was provided by POST, correct, which is Connecticut State Police, is that correct?

A No. I don't remember who the training was provided by. What I was trying to convey was that in order to get credit POST would have to, I mean, basically, bless it. They would have to meet their standards to get credit. POST is a separate entity from Connecticut State Police, as I understand it. POST is the Municipal Police Training Academy, I think it is. And I think Connecticut State Police is a separate entity

with respect to their training requirements and prerequisites. At least that's how it was when I was there.

Q Okay, let's talk a little bit about your experience working in Enfield for 20 years. Can you talk a little bit about -- you indicated you ended up being a lieutenant. Can you talk about your tenure at the Enfield Police Department?

A What would you like to know? It was a long career. Where should I start? Well, can you give me a prompt or...?

Q How long were you a patrol officer? Let's start with that.

A Oh, sure, so 1999 I started as a patrol officer. I think I remained in that position till about 2006 or 07. In that capacity, I responded to calls for service. I worked the midnight shift and evening shift, primarily. Calls for service would range from anything from leaves blowing in the yard to, unfortunately, murders and manslaughter. Not too many of those, thankfully. I did transition into a community policing role for a very short period of time before being promoted to a sergeant. If memory serves me

right, in 2007 I was promoted to sergeant. I worked the midnight shift.

At some point, I think it was 2013 I transferred into the Traffic Division as the sergeant. The Traffic Division had three -- I would say three and a half officers. We had a part-time officer that assisted us in that unit. Our responsibilities were serious injury crashes, as well as fatalities within the jurisdiction of Enfield, as well as a regional team in Tolland County. I was there for about three years. I was promoted to lieutenant in 2016. I served, I think, all of my time on the evening shift and retired in 2019. As a lieutenant, my responsibilities were to essentially supervise a roughly 18-to-20 person shift as well as two or three sergeants. I think that would be the 1000 foot view of it.

Q That's helpful.

And did you oversee investigations?

A Some of them I did, yes. We had a Detective Division that often would take other investigations and they were supervised by other individuals, but if it was within patrol, I would

sometimes supervise them or review them or --
typically, if he was in the field, it would be a
sergeant who would supervise something and I
would just kind of oversee it.
Q During your tenure as a lieutenant or sergeant,
did you ever supervise Bryan Nolan?
A I think so. I think he was on the shift for a
period of time.
Q Working in Enfield, were you aware of other law
enforcement officers who lived within your city?
A Yes, there were. Actually, there were quite a
few, I believe, in that city that lived there.
Q And was it part of your regular knowledge --
like, would it be part of your regular work to be
aware of what police officers resided in your
town?
A No, not unless there was an issue, but I would --
there's not, like, a roster or, you know -- it
just would be more, like, common knowledge that
maybe someone resided in that town or -- but
there's not like a roster or -- I wasn't
responsible for knowing where they were or
anything like that.
Q Do you know a Steven Stebbins?

A Only through this issue here, this incident.
Q And what about a Stephen Samson?
A I just know him through the incident as well. At least through the documents that I've read and reviewed.
Q Let's talk a little bit about Marcus Cameron. When did you first encounter Marcus Cameron?
A If memory serves me right, it was in May of 2018. May 30th is the report that I reviewed.
Q Okay, and how did you first meet him?
A He came into the police department and ended up showing me a video. We watched the video. And that's the extent of it.
Q Was he showing you the video with some kind of concerns you may have had?
A Yes, I don't remember what his direct concern was or -- I'm missing the right word for it. He showed me the video. I know he was concerned about the video, but I know you know what the -- I guess the allegation was or what -- I don't remember what the driving concern was.
Q After seeing the video, what, if any, steps did you take?
A I completed a narrative report.

Q And what was the purpose of the narrative?
A The purpose of the narrative was that I met with an individual in the lobby of the -- or within the police department who showed me a video. I mean, the encounter was, to be quite frank, a little odd. So I wanted to make sure there was documentation purposes within our agency. It was common knowledge that if we had contact with someone in the field that was beyond, you know, a hello and goodbye that we would document it -- or should document it, anyways.
Q When you say that the encounter was odd, can you describe what you mean?
A Well, at the time, Mr. Cameron didn't identify himself, watched the video, and then he left, so it just struck me as a little bit odd.
Q Weren't you told that there was concern about a state trooper --
A Hindsight?
Q -- by Mr. Cameron at the time?
A I'm sorry, I was talking over you. Can you say it again?
Q That's okay.
Didn't Mr. Cameron inform you that he

was concerned about a state trooper harassing him?

A I don't remember. As we speak today, I know that that incident was involved with his concern that the trooper was bothering him.

Q Okay, when you watched the video, were you aware that the video showed a state trooper vehicle?

A I don't remember.

Q All right. When did you become aware of the Internal Affairs investigation against Mr. Stebbins?

A I don't know.

Q Okay, when did you become aware of the complaints by Marcus Cameron?

A The complaints --

MR. GERARDE: Objection to the form.

THE WITNESS: Is it okay to answer, Attorney Gerarde?

MR. GERARDE: Yes.

A I'm sorry, can you ask the question again?

Q When did you become aware that Marcus Cameron had complaints about Mr. Stebbins?

A With our agency or the internal?

Q Your agency.
A I really don't remember. I don't know. At some point I did know that there was a neighbor dispute of some sort between the two.
Q Okay. Can you describe your involvement in the incident regarding Marcus Cameron and Steven Stebbins?
A This is the November 2018 --
Q Is that when your involvement started?
A Well, I had the May 30th encounter with Mr. Cameron, which was documented. To the best of my knowledge, it was the affidavit warrant, which I reviewed prior to going to court.
Q All right. Were you Officer Nolan's direct supervisor?
A I think I was. It's been such a long time. I think he was on the evening shift. But he was assigned the evening shift. Yes, I think I was.
Q And with regards to being someone's direct supervisor, do you review their warrant applications?
A Not all the time. But as a lieutenant, we worked a five/two, five/three schedule, so, you know, I'm there the majority of the time. So when

reports would come in, I would typically review most of the officers' and sergeants' reports on the shift. It didn't mean that they necessarily had to turn them into me. But of course in this incident, I did review that affidavit.

Q Okay. And what is the purpose of reviewing an affidavit?

A The purpose of reviewing an affidavit of arrest is to ensure that it's prepared for court. We typically have a checklist of everything that has to be in there, to look at it, to make sure that it meets our standards and is prepared for court.

Q And when you say your standards, what standards are you referring to?

A To ensure that there's probable cause in maybe an arrest or an affidavit for arrest, to ensure that all the documents the court is going to be looking for are there and make sure that it's ready for court. We actually had a list of things that had to be in a package for court.

Q Enfield Police Department has a list?

A We did. Just an informal write-down, make sure the bailbond, you know, make sure you have the

report, any attendance statements, you know, things of that nature. It was more of a procedural checklist to make sure that stuff was there. Some of those things wouldn't be in it when there's an affidavit for arrest. Typically, I think the court, if memory serves me right, wanted the affidavit and the report that came along with it.

Q And the checklist you're referring to, is that a document that was created by Enfield police officers?

A No, I think it was just more of a checklist. Just something that you had next to the computer to make sure you didn't forget.

Q Does everybody have the same checklist?

A It was right there at the computer, but again, that was for -- that's not related to arrest warrants. That was more just like custody arrests, things of that nature.

Q Okay. Sorry, I lost my place.

So the documents I sent you, I'm going to be referring to them. Are you able to look at them and answer questions with regard to the documents?

A Yes.
Q I'm going to bring to your attention D00053. Can you find that document?
A Yes, so it's an email between Bryan Nolan and somebody, must be Sav Stebbins.
Q Yes.
Did you read the content of the email?
A Not yet.
Q Okay.
A Let me read it, ma'am.
Q Yes.
A Okay.
Q Okay. And Bryan Nolan is one of the officers at Enfield Police Department, correct?
A Yes, he was the sergeant.
Q Okay. Were you aware that Steven Stebbins had asked Nolan to provide him -- that he was going to provide documents and materials from the internal investigation?
MS. VITALE: Objection to form.
A I don't think so. I don't recognize this email.
Q Okay, but I'm not talking about the email. I'm talking about, were you aware -- first of all, were you aware that Bryan Nolan and Steven

Stebbins were having communications during this investigation?
A Yes, Mr. Stebbins made a complaint --
Q And --
A - that --
Q I'm sorry, go ahead.
A No, I'm good. Go ahead.
Q So Mr. Stebbins made a complaint. Were you aware that Officer Nolan and Steven Stebbins were exchanging documents?
MS. VITALE: Objection to form.
A I don't remember, ma'am.
Q Okay. Would there be concerns from you, when you read this email, where Steven Stebbins says, (Reading):

"I requested all reports, etcetera, from our IA Unit, and the lieutenant there said to have you send him a request for all reports and materials for Case Number C-18086 on your PD letter and he will run it through the Legal to get it released to

you."

A When I --
Q Does that --
A No, it doesn't.
Q So in conducting the investigation with regards to Marcus Cameron, is it normal to then also be provided with Marcus Cameron's Internal Affairs investigation information?
MS. VITALE: Objection to form.
A I think I know what you're asking. I think it's irrelevant in the sense that Sergeant Nolan would want the entire picture. So I think that internal investigation is part of that, so I don't have an issue with this.
Q So if the internal investigation information is relevant, would it be normal for the officer under the investigation for the Internal Affairs complaint to provide that to Officer Nolan? Is that the proper procedure for --
MS. VITALE: Objection.
MR. GERARDE: Objection to form.
A This is such a unique set of circumstances, ma'am, that I guess if you're asking my opinion

if I was investigating it. I mean, it's probably best form to ask the supervisors involved, which I think is what it looks like Stebbins is saying here, contact the lieutenant.

MS. CRUZ: This will be Exhibit 1. It's D53.

(Exhibit Number 1, Bates Document D53, was Marked for Identification.)

Q Let's turn your attention now to Stebbins593. Again, my voice is shot. I apologize.
A That's okay. Okay, I see 593.
Q So have you seen this? Are you looking at Stebbins593?
A I just read it, yes, ma'am.
Q Okay. After you got this email, did you ever request documents from Eric Cooke?

MS. VITALE: Objection to form.

Q Strike that.

Were you ever aware that documents from Eric Cooke were provided to Enfield Police?
A I don't remember. I think -- yes, I don't

remember. Are you asking if I made this request? I don't understand.

Q No, I'm sorry, I wanted to clarify. Were you were you aware whether or not the documents were ever provided to Eric Cooke and included in the investigation?

A I'm sorry, this looks like an email from someone named Steve MI to Nolan saying that -- oh, no, sorry, that's Steve Stebbins. It looks like it's an email from Steve Stebbins that says he requested all the reports from the IA Unit and the lieutenant there said to have you send him a request for the materials, etcetera, etcetera, etcetera, run it through Legal, but the reference to "lieutenant" I don't think is me.

Q Yes, so what I'm asking is, you see that he's asking the IA materials to be provided to Enfield Police Department.

A I see that, yes.

Q Do you know whether or not that occurred?

A I don't remember. I don't know if I was in the affidavit. I don't remember.

Q Okay. And you're not the lieutenant, correct, that's referenced here?

A No, I think he's referencing the lieutenant, Lieutenant Cooke, it looks like, from the state police.
Q Had you seen this document before?
A No. This is -- I think this is the first time I've ever seen this.
Q Okay.
A I don't recognize this.
Q And when you reviewed the warrant application, were you aware of these communications between Stebbins and Officer Nolan?
A I don't remember. I don't think so. I don't remember.
MS. CRUZ: This is Exhibit 2.

(Exhibit Number 2, Bates Document Stebbins 593, was Marked for Identification.)

MS. CRUZ: Let's take a brief break just for five minutes.

(Short break.)

MS. CRUZ: Back on.
Q I'm going to bring your attention to Stebbins52. If you can look at that document and read the content and then tell me what you're done.
A Okay.
Q First, I'll ask you, have you ever seen this document before, this email exchange?
A I don't think so.
Q Okay, and the email address of bnolan@enfield.org is, again, Officer Nolan, correct?
A Yes, ma'am.
Q And it looks like it's an exchange between B. Nolan and Steven Stebbins from his Connecticut State Police email, correct.
A Yes, ma'am.
Q And the first section talks about two videos that Cameron recorded on 5/30/2018, and then the second part looks like it's from Stephen Samson, who is a Connecticut State police officer, correct?
A Yes. Only by the discovery that I know that, yes.
Q Okay. It indicates, (Reading):

"This is a rough draft I sent to
Lieutenant. I would not give this
to the Enfield Police due to they
may might give it to him."

Now, does that communication, speaking of a rough draft of a complaint, concern you at all?

MR. GERARDE: Objection to form.

A Does it concern me?

Q Yes, would it give you concern that there was a rough draft of a complaint passed between Steve Stebbins and Steve Samson?

MS. VITALE: Objection to form.

MR. GERARDE: Objection to form.

A I think Samson is the -- is he the sergeant that did the investigation, I think, right?

Q Yes.

A I guess it could. I think -- I want to know what the complaint is. "Rough draft of the complaint I sent to lieutenant." I mean, it would be, you know, typical in my agency that if this is referring to an internal investigation, that we would complete the investigation. And then once that was done, that would be when an officer

would actually get, like, a finalized report. As a former internal investigations officer, I wouldn't give a rough draft to a person who is subject of a complaint.

Q And then the second part talks about not giving this report to the Enfield Police due to they might give it to him. Does that give you concern?

MS. VITALE: Objection to form.

MR. GERARDE: Objection to form.

A I don't know. I don't know what the concern would be. I mean, I know what they're saying, but I don't know what the concern would be. I guess I'm...

MS. CRUZ: And this is Exhibit 3.

(Exhibit Number 3, Bates Document Stebbins 52, was Marked for Identification.)

Q So now I'm going to ask that you look at document 000083. And once you have it, marked on the bottom of the sheet 000083, let me know when you have that document.

A I got it. This is my Aided Person Report.
Q This was a report where you indicated earlier that you had taken a statement from Marcus Cameron, correct?
A When you say "statement," I understand that, you know, generally, like, a written statement, but I don't have any recollection of taking a statement, a written statement. I did speak to him.
Q You spoke to him, and this is a reflection of the conversation you had, is that correct?
A Yes, ma'am.
Q Okay. Are you aware whether or not this contact with Marcus Cameron ever made it into the final warrant for Marcus Cameron?
A After reviewing the warrant, I see that my Incident Report is not in there. I do see in the Incident Report references this incident on the 30th in the affidavit.
Q Do you know why your Incident Report would not be included in the warrant?
A I don't know. I think you'd have to ask Sergeant Nolan.
Q Well, let's start with, normally when there's

several encounters with two individuals and then a warrant is eventually requested, do you include all contacts with the two individuals?

MS. VITALE: Objection.

Q Is that normal procedure?

MR. GERARDE: Objection to form.

A I mean, it wouldn't always. You know, I could certainly see a long history between two individuals and that, you know, results in, you know, an incident where someone gets arrested, you wouldn't, you know, put everything in there. I think -- but I think, you know, in this case that there's -- I'm looking at -- not case. In this incident, I'm looking at -- sorry, I have a new computer here, so I just closed it out. In this Aided Person Report, you know, I'm looking at the key and the -- you know, there's no -- Mr. Cameron's name is not in the key, so I can understand why this Incident Report might have gotten overlooked or not seen or located by Sergeant Nolan, but again, he'd have to speak to that. The question was, do we put all contacts between two parties that may result in an arrest warrant, not always. No, not always.

MS. CRUZ: And this is Exhibit Number 4.

(Exhibit Number 4, Bates Document Samson 83, was Marked for Identification.)

Q Would it be concerning that this particular encounter was not included in the arrest warrant but Mr. Stebbins' encounters were?

MR. MANCINI: Objection to the form.

MS. VITALE: Objection.

A It was included. The incident was included. What's not included in the affidavit is the fact that Mr. Cameron came in and spoke to me on that night. I don't think it's an over-urgent concern, though, in the affidavit.

Q So let me just ask you a question. When you do a query of records in Enfield Police Department, if you were to enter in "Foxcroft Road," would this Aided Person Report Number 00083 come up?

A Maybe. We had gone to a new system called CT Chief at the time. I don't think they use it anymore. It was a system that was plagued with

issue upon issue upon issue. There were a lot of different search fields that were supposed to be great. I can tell you it had substantial issues in cross-referencing, cross-searching for records within the agency. They were supposed to be able to do that, but I know from my own experiences it wasn't great at doing it. It was very specific. You know, you really had to be very specific in what you're querying, what you're looking for, to get it to work.

Q When you reviewed the warrant application, did you recall your encounter with Mr. Cameron and this particular report that you wrote?

A I don't remember. It seems -- if this encounter is not in the affidavit, it would seem that no, I didn't, but I don't have a specific memory of, you know, whether, at the time of reviewing it, I recalled or didn't recall.

Q So I'm going to play a 911 call. I'm not introducing it into evidence, but I'm playing the call and I'm going to have you listen to it.

A Sure.

(Whereupon, Ms. Cruz played audio.)

A Ma'am, I can't hear that. I'm sorry. It's all garbled. I'm very sorry.
Q Hold on one second. Hang on.
A Is it a file that can be emailed to the attorney maybe, or...?
Q Let me see if I can open it on my computer. Hold on.
A Sure.
Q Hang on one second.
Let me try to do this now and see if you can hear it if I play it on my computer.

(Whereupon, Ms. Cruz played audio.)

Q Were you able to hear that?
A Most of it I was. I think he was speaking quickly, so it was hard to hear exactly what he was saying.
Q Would you like to hear it again? I can play it again.
A Yes, yes, if you can. I'm going to try to turn my volume down and see if that will help.
Q Okay, I'm going to try to play it again, okay?
A Sure.

(Whereupon, Ms. Cruz played audio.)

A Actually, can you pause it for a minute?
Q Yes.
A I'm going to grab a set of earphones and that might help me. Is that all right?
Q Oh, no, that's fine, that's fine. I'll bring it back to the beginning and just let me know when you're ready.
You ready?
A Yes, it's working now.
Q Okay, I'll try it again.

(Whereupon, Ms. Cruz played audio.)

A I can hear it now.
Q Okay, so let me ask you a few questions first. Do you recall this phone call?
A Now that you played it, yes, I do recall that. Yes.
Q Okay. And prior to that phone call, had you talked to Steven Stebbins?
A I don't know. I don't think so, but it's been so long.

Q And is he calling you on an Enfield Police Department phone line?
A Yes, that's a recorded line. Yes.
Q And so you were at work right?
A I would have been, yes, ma'am.
Q And in the call, you told Stebbins to contact IA before the plaintiff. Do you remember hearing that?
A Call IA before what?
Q Mr. Cameron did.
A I'm sorry, ask it again. There was a reference to IA in that call, yes. What are you asking? I'm sorry.
Q Why did you inform him to contact IA?
A I don't know. I mean, it would -- I don't know when that call was or, you know, the date. And so, I mean, I must have had knowledge that there was an IA going on at the time or something.
Q And you stated in the voicemail that he should contact IA before Marcus Cameron. Do you remember hearing that?
A Actually, no. No, I remember saying make sure you call IA, but I remember saying call before he does. I don't -- maybe I just didn't hear it.

I'm sorry.
Q Okay. Do you want to listen to it again?
A Sure.
MR. GERARDE: Maybe you could tell him the part where you're referring to and let him focus on that.
MS. CRUZ: All right.

(Whereupon, Ms. Cruz played audio.)

Q So did you hear this time that you say, "Make sure you contact IA before that guy does"?
A I don't hear "that guy." I hear "make sure you call IA," something about "going through IA." I don't hear "before that guy." I just don't hear it, ma'am.
Q Okay, let me just play that section one more time.
A Okay.

(Whereupon, Ms. Cruz played audio.)

Q Were you able to hear "Make sure before that guy goes to IA"?

MR. GERARDE: Objection to the form.
A I thought I heard "because the guy's gone through IA" or something like that. I'm not doubting you, ma'am. I'm just having a hard time hearing you.
Q Okay, that's fine.
Is there a reason why you would want him to go through IA?
A Who, Stebbins?
Q Stebbins, yes.
A The only thing I can think of is that I was aware that there was an IA and he needed to report an incident to them if it's related to that.
Q Well, let's start with this. When were you informed that there was an IA investigation?
A I don't remember. Hearing this video today, this audio today, you know, would lead me to believe that I knew about it. I just don't know when I knew about that or how I came to know that there's an IA.
Q Okay, and in the call, Stebbins himself says that he doesn't know for sure that it's this particular person, Cameron, correct?

MS. VITALE: Objection to form.

MR. GERARDE: Objection to form.

A He is pretty garbled. Ma'am, what I got out of that was something about a video. I thought I heard something about his health. I think that call is talking about someone taking photos of his cars or something, but it's hard to hear what he's exactly saying.

Q Okay, I'm going to bring your attention to 0000135. If you can find that document.

A An email involving Keith Parent?

Q Yes.

A Yes, I have that. If you can let me read it, though, if you don't mind.

Q Yes, that's fine. Let me know when you're ready.

MS. VITALE: I'm sorry, what was the Bates number of this one? I missed it. I'm sorry.

MS. CRUZ: 0000135.

A Okay, I read it, ma'am.

Q First, are you aware of this communication between Keith Parent and Steve Samson?

A I don't have any recollection of this.

Q Okay, and who is Keith Parent?

A Keith parent is an officer at the police department. I think at the time he was a sergeant. He's a lieutenant now.
Q And was he someone that you worked with?
A Yes, ma'am.
Q Were you supervising him?
A I think, at one point. I don't remember if he was on the midnight shift and visiting on the evening shift. But if he was on the shift, I would have been supervising him. It's been a long time, so I don't remember if he was -- I think he was assigned to the shift, yes.
Q Okay. And did you talk to him about this particular investigation regarding a female, alleged female?
A I probably did. I just don't remember.
Q Okay. He referenced he was his running an audit through COLLECT. What is that?
A I think what he's looking for is -- I guess you could call it like a backdoor run of COLLECT, to find out if there's been any - like, if anyone has run a query in COLLECT. So, like, it wouldn't be a -- it's behind the scenes, so to speak. I think he's asking for, like, to see if

anyone ran Stebbins's vehicles behind the scenes to see if there's, like, a COLLECT user or someone who has access to COLLECT would have run Mr. Stebbins's vehicles.
Q And how was that background check conducted, if you know?
A I don't. I have no idea. I think that's done through state police or something like that. I have never done that. I don't know how to do that.
Q So you don't know what information is needed to run the background check, the behind the scenes check? Sorry.
A No, I can tell you that I think the request had to go to, like, COLLECT itself. COLLECT, I think, was an entity, and you actually had to go to them and make the request.
Q And have you ever done that or no?
A I can't recall ever doing that.
Q Okay. Did you have any contact with Steven Stebbins through his --
MS. CRUZ: I'm sorry, this is Exhibit Number 5.

(Exhibit Number 5, Bates Document Samson 135, was Marked for Identification.)

Q Strike that.
So did you have any contact with Steven Stebbins through his private cell phone?
A No.
Q Was all contact with him through your work phone?
A Yes, it would have been on that audio that you just played.
Q Okay. Did you have any contact with him through email?
A No, I don't think so.
Q Okay. Did you have any contact with Stephen Samson through his cell phone?
A I don't think so.
Q Okay, how about email?
A I don't think so, but it's been such a long time. I don't know if he would have emailed us regarding the complaint or not, but...
Q Okay. With regards to your employment at Enfield Police Department, did you have cell phones that were issued from the police department or just

your own private cell phone?
A I had a cell phone issued to me when I was in the Traffic Division. I don't think, as a lieutenant, I had one. I know -- I don't think as a lieutenant I had one, ma'am.
Q Okay, but on the Traffic Division, those officers have cell phones issued to them?
A Yes, they were on call. They were on call for overnights and whatnot, so they had to have a cell phone issued to them.
Q Now, those cell phones, are they issued to other officers of the Enfield Police Department?
A Yes, it would be, you know, like the K-9 Units. I don't know who else would have. Maybe detectives had them. I think that's changed, though. I think after I left they all have them, which should have happened many years ago, but...
Q Were you the patrol supervisor or field supervisor on November 12, 2018?
A Is that the night of the incident?
Q Yes.
A I think so. I'd have to look back at the roster just to confirm.
Q Do you have access to the roster?

A I do not.
Q Okay, were you aware of any issues -- sorry, did someone say something?
A I don't think so.
Q Okay. Were you aware of any issues with the Enfield Police Department cruisers present at the scene of the stop on 11/12/18?
A Issues like mechanical issues or -- is that what you're talking about?
Q Like, video or audio recording issues.
A Not to my knowledge. I don't recall having -- I don't know.
Q Okay. Do you know if the Enfield Police Department in November of 2018 had cruiser cams?
A They would have had them, yes, ma'am.
Q In all cruisers?
A If not all, I would say 90 percentile. I do know just from experience a lot of those cruisers had problems with their cameras. Not a lot of them. I shouldn't say that. There were problems with the system, but I don't know of any specific problems on that date with specific cruisers or anything.
Q Okay. And how do the cruiser cams work? Are

they turned on manually? Are they turned on automatically, if you know?

A If memory serves me right, if you activated your emergency lights, the camera would come on. That would be, like, the flashing lights, not the standalone cruise lights. I think there was a mic pack that was, you know, you would sign out or pick up. Sometimes it was in the cruiser. And if you clicked on that, that would start it. I know just from experience that the technology has advanced considerably since 2018. But at the time I think you had to manually activate it unless you have to turn your emergency lights on.

Q And can you manually turn on your camera if your lights are not on?

A Yes.

Q What information were you provided about the 11/12/18 incident at the Brookside Plaza stop?

A I reviewed the affidavit and I think the affidavit report.

Q Were you contacted when the stop occurred?

A I might have been.

Q Were you notified of Marcus Cameron's arrest in

any way?
A I don't recall ever being notified that he was arrested.
Q All right, hold on a second. We have another audio. Let me find it.
I'm going to play you some audio from the day Marcus Cameron was arrested. Tell me if you can't hear it, though.
A Sure.

(Whereupon, Ms. Cruz played audio.)

A It's gone silent. I don't know if...

(Whereupon, Ms. Cruz played audio.)

Q I'm going to stop and ask, can you hear this?
A I can hear it but it's kind of like I'm hearing bits and pieces of it. It's, like, it's an Enfield or something.
MS. CRUZ: Okay, so it's almost 12. I'm going to take -- like, I'm not sure how long of a break people need to eat or nourish themselves. I do see Laura is having a snack.

And if it's okay with everybody, I'm going to send some of these audios to Eric. And then when I play that, if he can't hear it, I can have him playing it on his computer so we all hear the same thing. And I can send this -- I'll send the audios to everybody. Does that sound okay?

MR. GERARDE: Yes.

MS. CRUZ: How about 30 minutes? Does that sounds good?

MR. GERARDE: Sure.

MS. CRUZ: All right, we'll come back at 12:30.

(Short break.)

MS. CRUZ: All right, I am back on.

Q Okay, so I am going to send out a document, an audio recording. I'm going to refer now to the document that I sent, which is Cameron 000414.

A It's sideways, so bear with me. I'm sorry. So this is a report dated 7- -- I think it's 7/8/2018, Keith Parent.

Q Okay, and can you -- sorry, it's sideways. Can you review that report and tell me when you're

done?

A Yes. No worries.

Okay.

Q Do you recognize this report?

A I do not.

Q And the complaining person is Steven Stebbins, is that correct?

A Yes.

Q And he's reporting that a female is outside his house, and he's having problems about this particular female, is that correct?

A Yes, he's reported it's captured on TV or, sorry, camera something.

Q Okay. And then you see at the bottom of Page 2 of 3, it says, "10/15/18, no information that would aid in identification of this female has been made available," and that Stebbins and you and the officer agreed that this case would be closed, correct?

MS. VITALE: Objection.

A The report says that he conducted a follow-up with Stebbins on 10/15/18 to advise him that "he," meaning, Parent was requesting the case be closed.

Q And the case was closed at that point, correct?
A I would imagine. I see it's approved. I don't know. I...
Q Do you know why this incident is included in the warrant application of Marcus Cameron?
A I don't. You'd have to ask Sergeant Nolan the thought process behind it, anyways.
Q Okay, but you would agree that the female was never identified, correct?
A By this report, yes, I would agree that it's not identified.
Q And that the female was never identified; therefore, not identified to be associated with Mr. Cameron, correct?
MS. VITALE: Objection.
THE WITNESS: Okay to answer?
MR. GERARDE: You can answer.
A The question was that there was no direct connection to Mr. Cameron?
Q Yes.
A Yes, I don't see any information in here that would directly connect Mr. Cameron with this incident.
MS. CRUZ: This is Exhibit 6.

(Exhibit Number 6, Bates Document Cameron 414, was Marked for Identification.)

Q Are you aware that Steven Stebbins tried to obtain a restraining order against Marcus Cameron?

MS. VITALE: Objection to form.

A Sorry, only by the discovery that had been provided for this hearing today.

Q So you're saying that you don't recall being notified that he had attempted to obtain a restraining order?

MS. VITALE: Objection.

A I don't recall. I mean, it's been four years, five years. I did see that in -- I don't know if it was the affidavit or the IA Report, but before that, I don't know. If it's in the affidavit, I would have known about it because I read it.

Q Okay. Do you recall, then, that on December 14, 2018, Marcus Cameron came to you after the restraining order was dismissed or that he came to the -- I'm sorry, strike that.

Are you aware of that Marcus Cameron

came to the is the Enfield Police Department after the restraining order was dismissed?
A I don't remember that happening.
Q Okay. With regards to the arrest warrant, I'm going to call your attention to D0001 through -36.
A That's the affidavit, ma'am?
Q Yes.
A Let me find it here.
Q It's the Incident Report and the affidavit.
A Can you give me the numbers again? I'm having a hard time locating it.
Q D0001 through -36.
A Okay, -1 through -36, yes, I have it in front of me.
Q Is this the document you reviewed before coming here today?
A As I stated, I didn't review the report, which would be the Incident Report Page 1 of 9, there's an attendant --it looks like an older police supplemental report. I did review the affidavit of arrest.
Q Do you want a moment to review these documents?
A Sure, if you can take it. I know it's a little

bit longer.
Q Okay, let's take five minutes for you to review them. Is that okay?
A Yes.

(Short break.)

MS. CRUZ: Back on the record.
Q Is this the Arrest Report that you reviewed?
A Yes, it's the report. It's -- yes, it's the whole -- it's the entire report, which would include, like, the date of arrest and when that occurs is also the attendant bail rights form, property forms. It's an appearance bond form as well.
Q Okay. And is this presented to the State's Attorney's Office, is that correct?
A Yes, these would be things that went to the State's Attorney's Office. Yes.
Q I may have misheard you, but I believe before, when we were talking, you mentioned that there's certain things that the prosecutor had asked for. Was this warrant submitted just one time, if you recall, or was it a couple of times?

A No, I think you misunderstood me. So what I was referring to is, basically, like, a list of what the court needs in order to receive a case. So this would be exactly what I'm talking about. When someone is arrested and the package goes to court, my job was to make sure that it had things like this notice of rights, criminal appearance bond, what I would know as a UAR, which is a Uniform Arrest Report, which is included here from Mr. Cameron. A property -- I think it's a medical form that would probably go to court as well.
Q And you were the supervising officer on that particular day regarding this arrest warrant?
A Yes, I did sign off on the arrest warrant, I believe --
Q And did you --
A -- December 5th.
Q Go ahead.
A No, all good.
Q There's, like, a delay with Zoom, so sometimes I accidentally talk over you. I apologize.
So when you review an arrest warrant, what do you do to review that warrant, or what

did you do back then?
A So, generally speaking, we would read it. We would make sure that it, you know, obviously made sense and that there was probable cause. I would take a -- if it was approved, so to speak, it would be -- an oath would be taken from the officer who was applying for the arrest warrant, which I believe is at the bottom of the Connecticut arrest warrant forms. We'd put that together with the case report, any statements if they were taken, and send it to the court.
Q And do you know if this warrant was submitted just once, or was it submitted more than once?
A I don't have any recollection of it being submitted more than once. I don't remember that.
Q And do you recall whether or not you had any conversation with State's Attorney Parakilas regarding this arrest warrant?
A I don't recall talking to Parakilas about this.
Q Okay. Are you aware if Stephen Samson spoke to Parakilas?
A I'm not aware.
Q Okay. Are you aware of whether Steven Stebbins

spoke to Parakilas?
A I'm not aware of that.
Q So I'm going to call your attention to D00032.
A Okay.
Q And you see under Number 11?
A Yes.
Q Did you review this footage as well?
A I don't know that I did. I don't think I did.
Q Okay.
A It's been a long time, but I don't think so.
Q And you would agree that the footage indicates that it was started at 1432, correct?
A I would agree that's what the warrant says.
Q And that the video ends at 1436, correct?
A That's what the warrant says, yes.
Q And that these, according to this warrant, are videos that Steven Stebbins took from his police cruiser, correct?
A They were captured on his in-car camera footage, yes.
Q So did you have concerns that he was turning on and off his camera during this period of time that he was alleged to being followed by Marcus Cameron?

MS. VITALE: Objection to form.
A No, I don't know. No, I didn't have any concerns.
Q Did you ever request to see whether or not he had video from 1432 straight through to 1436?
A No.
Q Okay. And at 1435, 36, the report indicates, (Reading):

"Steven Stebbins stops on the intersection of 91 South Exit 49 ramp."

Correct?
A Yes.
Q And then it says, (Reading):

"At approximately 143606 Cameron passes Stebbins."

Is that correct?
A That's what the warrant says, yes.
Q Did you have any concerns that Stebbins was waiting for Cameron on the highway?

MS. VITALE: Objection to form.
MR. GERARDE: Objection to form.
A No, I don't think so. He's in a police cruiser.
Q He indicated, though, in his complaint to the Enfield Police that he thought he was being followed, correct?
MS. VITALE: Objection.
A I think that's what he said, yes.
Q So at that point he's no longer being followed and he's waiting for Cameron on the side of the highway. Is that concerning to you?
MS. VITALE: Objection to form.
MR. GERARDE: Objection to form.
You can answer.
THE WITNESS: Oh, thanks.
A The question was -- sorry, rephrase the question. Or ask the question again. I'm sorry.
Q So according to the video and the rep- -- according to the report, Stebbins is pulled over on the side of the highway --
MS. VITALE: Objection.
MS. CRUZ: I didn't finish, so --
MS. VITALE: Sorry, I didn't hear you hadn't finished yet. I apologize.

MS. CRUZ: Okay.

Q All right. So according to the report, there was video that Stebbins had pulled over on the side of the highway, correct?

MS. VITALE: Objection.

A Correct.

Q And that the report, then, says, (Reading):

"Marcus Cameron passes Stebbins."

Correct?

A Correct.

Q So at that period, Marcus was not behind Stebbins, correct?

MS. VITALE: Objection.

A (Reading):

"At 143606, Cameron passes Stebbins."

Yes, Cameron would have been beyond where Stebbins was.

Q Okay, I'm going to bring your attention to D0001.

A That's the first page of this report?

Q Yes.
A Yes, okay.
Q Up on the top it says, "Incident occurred from, it says, 11/12/2018 from 1440 to 11/12/2018 1440," correct?
A Mm-hmm.
Q What does that mean?
A I think it's just a timestamp. I think the system was designed to -- if you put the proper data in, to explain what the period of time is for an incident, so I think that's what it's supposed to mean.
Q Okay. And then Date/Time Reported was 1440 on 11/12/18, correct?
A That's what it says, yes, Date/Time Reported, yes.
Q And then back to the Page D00032, you would agree that the video that Stebbins provided started at 1432, correct?
MS. VITALE: Objection.
A Yes, the video provided starts at 1432 in the affidavit, yes.
Q On this sheet, does it indicate in these documents what time the police arrived on scene

at the Brookfield Plaza?

A I don't know. I'll have to look through to see if he said he reported it. Let's see.

The affidavit says on 11/12/18 at approximately 2:55 in the afternoon, 1455 hours, the patrol units asked for the supervisor. Let me see if it's in the report, ma'am.

I'm sorry, the question was when they responded or when we got the call?

Q It's when they arrived at Brookfield Plaza.

A I don't see it. I don't see it. I don't see that here.

Q So --

A The thing to know --

Q Sorry, go ahead.

A All right. The thing to know about times is, you know, in the key here, as I'm looking at it, is sometimes, if I remember correctly, some of this is pushed in from a computer-aided dispatch. So, you know, they might have -- when they logged the call versus when it happened and if it's not corrected by the officer, it might not be perfect, I guess, is what I'm trying to say. I don't see where there's a time the officers

responded. If it's in the narrative and I missed it, I apologize on that.
Q So I want to look at Page D00002. The top sentence indicates that a supervisor was requested at 2:55?
A Yes.
Q Is that correct?
A Yes.
Q And are those officers on the scene requesting a supervisor?
A I don't know. I would be speculating. I think it sounds like it. It sounds like it because it says, (Reading):

> "Patrol units requested the supervisor to respond to the Brookside Plaza."

So I don't know if that was happening as this thing was transpiring or if they were already on scene, but it does the narrative does say that when the sergeant arrived, that Officers Croteau and Chagnon were on scene.
Q Okay, so let me ask you some questions about

stalking.
A Sure.
Q How many times in your 20-year career have you either charged someone with stalking in the third degree or signed off on the report of stalking in the third degree?
MR. GERARDE: Objection to form.
A I don't know.
Q Have you charged someone with -- as an officer, have you ever charged someone with stalking in the third degree?
A I don't know. I thought stalking came -- I don't know when the stalking statute came into being, so I can't recall charging someone as an officer with stalking.
Q Okay, do you recall, as a supervisor, approving warrants and in this stalking in the third degree?
A I don't recall.
Q Okay. You would agree, though, that the video starts at 2:32 and the officers are on scene at least by 2:55, correct?
MR. GERARDE: Objection.
A The officers requested a supervisor at that time

so I would say that they probably were on scene or close to it if not already.

Q Would you be surprised to know that the stalking charge, according to Officer Nolan, is regarding those 15 or so minutes that is when the stalking occurred?

MS. VITALE: Objection.

MR. GERARDE: Objection to form.

A I'm sorry, I don't know what you're asking.

Q Okay, so have you ever seen a stalking charge where the conduct that's the alleged stalking occurs within a 15-to-20-minute window?

MS. VITALE: Objection.

MR. GERARDE: Objection.

A I don't know.

Q Well, would you agree that this stalking charge, the behavior that Marcus Cameron was alleged to have occurred alleged to have engaged in, occurred within a 15-to-20-minute window?

MS. VITALE: Objection.

MR. GERARDE: Objection.

A The incident that occurred on that date, yes.

Q Okay. And that's the incident that he's charged with stalking, correct?

MR. GERARDE: Objection to form.
A Yes, ma'am.
Q Are you aware of the elements of stalking?
A Yes.
Q And what are they in the third degree in Connecticut?
A I'd have to look at the statute, but it basically -- I have, unfortunately, Maine law in my brain on this, but generally, it's when someone follows or, you know, lies in wait or watches somebody or does something, you know, to follow someone or puts them in some kind of fear or something like that.
Q Okay. And do you recall the Connecticut stalking third degree requires three incidents or more?
MS. VITALE: Objection.
MR. GERARDE: Objection.
A I don't recall, but the affidavit cites multiple different things that have occurred.
Q Okay, was there a request with regards to this arrest warrant for all the Connecticut State Police videos?
A I don't know. I know Sergeant Nolan requested

the videos. I don't know. Are you talking about all the videos from Stebbins's vehicle?
Q Yes.
A I know he requested them from Stebbins's vehicle. I don't know exactly the language that he used or what the specific request was.
Q Do you know if he received them?
A I know he received some videos and that he reviewed them. They were cited in the affidavit.
Q Do you know if he requested all Internal Affairs documents?
A I don't know. I don't recall.
Q I'm going to turn your attention to Page D00002. The first paragraph, the third line up, starts with "The complaints filed by Cameron." If you can read that sentence to yourself and let me know when you're done.
A Sorry, Page 2, third paragraph up?
Q Third sentence up. So third line up, and it starts with "The complaints filed by Cameron."
MR. GERARDE: That's the end of the first paragraph, correct?
MS. CRUZ: Yes.

A Oh, got it. Do you want me to read that?
Q Yes.
A Okay.
Q Okay, so, this sentence states, (Reading):

"The complaints filed by Cameron were found to be unfounded by the state police investigation."

What information did you have or the Enfield Police Department was in possession of that led you to believe that the complaints were unfounded?
MS. VITALE: Objection.
A I don't recall, ma'am.
Q I'm going to show -- do you have the map that was sent to your Counsel?
A I have it. Let me just download it. It's in my email. There it is.
MR. MANCINI: I'm sorry, are we marking D1 through -36 as Exhibit 7?
MS. CRUZ: Yes. Sorry about that.

(Exhibit Number 7, Bates Documents D1 to D36, was Marked for Identification.)

Q Do you have the map available to you?
A I do.
Q Okay. What does this map depict?
A This map depicts the area of Foxcroft Road, Colony Road, Enfield Street, I91. This would be the northwestern area of Enfield.
Q And Foxcroft Road was the residence of Stebbins and the home that Marcus Cameron owned. Is that your understanding?
A Yes.
Q And are you familiar with Colony Street?
A Yes.
Q And do you see Colony Street on the map?
A I do.
Q Is there a way to get through Colony Street to get to either Brainard or one of the other streets?
A Route 5. Colony connects with Route 5, not Brainard.
Q Okay, but Colony Street is a dead end,

essentially, correct?
A Yes.
Q So if you were to take Foxcroft and then exit out towards Colony Road, you would only be able to go left or you'd be in a dead end, correct?
A Yes.
Q Okay. And you're aware that there are -- do you know if there's a streetlight on Colony Avenue?
A I don't know.
Q Okay. Are you aware there's a streetlight on Montano Road that connects with Enfield Street?
A There might be one down by that business. I don't -- I don't know.
Q Okay.
A I don't know.
Q Are you aware of the Dunkin Donuts that's on Enfield Street?
A Yes.
Q Are you aware whether or not there was a light on Montano Road in the intersection by Dunkin Donuts?
A I'm thinking, when you say light, like, a --
Q Streetlight.
A -- traffic control signal?

Q Yes.
A I'm sorry. So yes, there's a traffic -- I'm thinking, like, just any ambient light --
Q Oh, I'm sorry.
A -- that would light it up.
No, no, that's okay. So Montano Road and Route 5 there would be a traffic light. I don't think there's one at Colony. At least there wasn't in Route 5. So Montano does have a traffic light.
Q What about Fremont Road and Enfield Street?
A I don't think it does. I don't think that has a streetlight. No, that doesn't. That's by Jimmy's Pub. No.
Q Okay, so I want to bring your attention back to D00002. Let me know when you have that document in front of you.
A Okay.
Q If you look at the second paragraph, the second sentence from the bottom, the sentence starting with "Stebbins," and then "took a left onto Colony Road."
A Okay.
Q Then it says, (Reading):

"Cameron continued to follow."

Correct?
A That's what it says, yes.
Q And we just looked at the map. And the only outlet on Colony Road is a left, correct?
A Do you mean, like, if you're coming off the street perpendicular to Colony --
Q Right.
A -- the only way to leave the area would be --
Q To go left?
A -- Colony.
If you're on Colony Street, yes, the only way to get out would be westbound towards Route 5, if you're using Colony Street, yes.
Q So to go right, you would end up at a dead end, correct?
A Yes, ma'am.
Q I'm going to turn your attention to D00004. It's the top sentence, (Reading):

"Cameron filed several false complaints with his department."

Again, so "his" is referring to Stebbins. Can you tell me --

A Okay.

Q -- what you relied on to confirm that there were false complaints filed against Stebbins?

MR. GERARDE: Objection.

A I spoke over you a little bit. Can I confirm what? Who relied on what?

Q Can you confirm what documents or information you were provided to establish that Cameron filed several false complaints against Stebbins' department against Stebbins?

MS. VITALE: Objection.

MR. GERARDE: Objection.

A This is not my investigation. This would be something that Sergeant Nolan wrote. I would have to ask him if he relied on anything or what he did with respect to that.

Q I'm going to bring you to the bottom part of that paragraph.

A Sure.

Q It talks about Marcus Cameron being a probation officer according to a LinkedIn search.

A Okay.

Q Do you see that information?
A I see that information. Yes, I see it.
Q What relevance does this information have with regards to the investigation of whether or not he was stalking Steven Stebbins?
MR. GERARDE: Objection.
A I don't know. It just says that Cameron mentioned several times to EPD and CSP that he worked in the capacity of law enforcement.
Q I'm referring to his residence.
A Oh, I'm sorry. Let me just read that email, sorry.
I don't know.
Q Did it assist in any way in the investigation or give information that you thought was necessary or relevant regarding the stalking allegations against Marcus?
MS. VITALE: Objection.
MR. GERARDE: Objection.
MR. MANCINI: Objection.
A I don't know.
Q On that same page, D004, there's reference to Stebbins having cameras in his home, the second paragraph. Do you see that section?

A Yes.
Q Did you review those cameras, or did anybody in your department that you know of?
A Sergeant Nolan might have. I did not. I don't know if he did. He might have.
Q I believe you also have an audio recording.
A Yes.
Q If you can listen to that and then -- I'm not sure.
MS. CRUZ: What's the Bates stamp on that one?
MR. CAMERON: Stebbins 506.
Q So we will listen to Stebbins 506.
A Okay. Do you want me to try to play it on my end and --
Q Yes, that's fine.
A Okay. I have my earphones in. Can you hear it?
Q No.
A Do you want me just to play it to myself, or what?
Q I can play it, and then I'll have you listen to it afterwards as well.
A Sure.

(Whereupon, Ms. Cruz played audio.)

Q Were you able to hear that, or do you want to try to listen on your computer as well?
A I heard it. Let me play it online just so that -- because it is a little hard, but I thought it was better than the other ones. Let me just --
Q Okay.

(Whereupon, the Witness played audio.)

A Okay. Playing it from here was a lot better.
Q Okay. Let me ask you, first, are you familiar with this phone call?
A That's the first time I heard of it.
Q Okay, and --
A Sorry, heard it.
Q First time you We heard it? Have you heard about the phone call before?
A Through this action, I have, yes.
Q So you were made aware of the phone call's existence through this action, but you haven't heard it until now?
A That's correct.

Q Okay. And at the beginning of the recording Samson is leaving a message and indicating the date of 7/17/18, correct?
A I didn't catch the date, I'm sorry.
Q Okay.
A I can go back and try to play it again.
Q Okay.
A He says, "Tuesday the 17th," so I don't know that it's July, but...
Q Okay. Listening to that recording, do you have concerns about the arrest warrant that was later issued against Marcus Cameron?
MR. GERARDE: Objection to form.
MS. VITALE: Objection.
A No. Not about the investigation, no.
Q Okay. Do you know why Samson called Marcus Cameron's employment?
MR. GERARDE: Objection form.
MR. MANCINI: Objection to form.
A I guess I could speculate, but he's probably better suited for that.
Q Okay. You spoke earlier about Internal Affairs investigations and your experience with them, correct?

A My personal experience, yes, ma'am.

Q In your experience, conducting Internal Affairs investigations, would you call a complainant's employer and leave a voicemail like you just heard?

MS. VITALE: Objection.

MR. MANCINI: Objection to form.

A If you are asking me about the beginning of that voicemail where he's asking for a callback in regards to that, it's very possible that an employer could be involved. So if the question is, would I reach out to an employer in an internal investigation, it's possible. You know, certainly every case is unique, different. So I mean, it's certainly possible.

Q Okay, so let's talk a little bit about what, if any, information did you have about the internal investigation that was conducted regarding Steven Stebbins?

MS. VITALE: Objection.

A I think it's just what's in the affidavit. I don't recall having much more than that or anything more than that.

Q So were you aware Marcus Cameron had filed a

complaint against Steven Stebbins about
harassment?

MS. VITALE: Objection.

A I think I was aware that a complaint had been filed. In fact, I think it was in the affidavit, too, when that happened, when I knew, how I knew. I don't know. I don't recall.

Q All right, I'm going to bring your attention to --

A Can we just go back to something, ma'am?

Q Yes.

A You had asked me, before we talked about the audio, about the cameras installed in the report.

Q Yes.

A And my screen is -- I don't have a full picture of the report, and what I was looking at was the word at the beginning of the "instilled fear." I thought you were referring to that. I don't see that in the report, although I thought I saw that somewhere. I don't know that it matters. I don't know why I'm bringing it up.

Q Okay.

A Sorry.

Q Let me bring your attention to Stebbins 000156.
A 156?
Q Yes, 156.
A Okay.
Q Actually, hold on.
It's 157. I think 156 is a stack of documents.
A Would 157 be --
Q Within 156. So in 156 there's a number of --
A Yes.
Okay, yes, 157, got it.
Q Okay. So if you go to the second-to-the-bottom paragraph, can you read that paragraph to yourself, and then let me know when you're done.
A Is this the one that starts with "Sergeant Laurino"?
Q Yes.
A Okay.
Q Page 156 indicates that this is a memorandum?
A Yes.
Q From Sergeant Stephen Samson from Troop H regarding allegations by Marcus Cameron, correct?
A Yes.

Q So Page 156, were you aware of this memo when you reviewed the warrant application?
A I don't recall. I don't remember seeing this.
Q Okay. With regards to the statement by Sergeant Laurino, is Sergeant Laurino an Enfield police officer?
A He was. He is retired. He was a sergeant.
Q Okay. He indicated it was a -- he explained he felt this complaint was a waste of time and, if the two could get together, they could probably work it out. Do you see that language there?
A I see that, yes.
Q Does that language there give you concern regarding the arrest warrant of Marcus Cameron?
MS. VITALE: Objection.
MR. GERARDE: Objection.
MR. MANCINI: Objection.
A No.
THE WITNESS: Attorney Cruz, can we take five minutes?
MS. CRUZ: Yes, we will come back at 1:45.

(Short break.)

MS. CRUZ: Back on.
Q The call that you listened to before, if you had heard that before the - strike that.
You spoke earlier about internal investigations and that you may have made a phone call, like, the first part of the mess- -- the voicemail that was left, the first part. Would you have done that with the complaining -- the subject of the investigation in the room with you?
MR. MANCINI: Objection.
A That's a hypothetical, I think. So I think, hypothetically, if I was doing the investigation and the subject of the investigation -- would I do it with them there? No, I wouldn't. That being said, I don't know who they are on the audio.
Q Yes, I understand.
A Okay.
Q And why wouldn't you conduct that call with the subject of the investigation in the room with you?
MS. VITALE: Objection.
A It just goes back to the integrity of an

investigation, so yes.
Q Okay. Can you tell me what steps Enfield PD took to investigate the harassment claims that Marcus Cameron had lodged with the Enfield Police Department?
MS. VITALE: Objection.
A I'm not sure which instance you're referring to. I had one involvement on the 30th in which case he showed me a video -- Mr. Cameron showed me a video and didn't tell me much more than that, so there wasn't much to go on.
Q Okay. And with regards to reviewing the arrest warrant, were you concerned at all that the charges that Stebbins had asked for or requested against Marcus were in retaliation for Marcus's IA complaint?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A No.
Q And why not?
A I read the facts and circumstances that were presented to me in the affidavit and I thought there was sufficient information for the charge.
Q Okay. Did you receive the discovery request sent

by the plaintiff to your attorney?

MR. GERARDE: We're still working on those. The due date is Monday, I believe, the 20th.

MS. CRUZ: So you'll provide those?

MR. GERARDE: Yes, we have -- you know, it's our intention to comply with that, the outstanding discovery.

MS. CRUZ: Can we take a two-minute break?

MR. GERARDE: Sure.

(Short break.)

MS. CRUZ: Back on.

Q Who was your immediate supervisor when you were a lieutenant at the Enfield PD during the time of the incident?

A It was either -- I know that Captain Golden was a captain. It was either Captain Golden, Captain Kaselouskas, or retired Captain Hall, and I just don't remember -- there's two things here. I don't remember when Captain Hall -- no, he was -- I think it was Captain Kaselouskas or Captain

Golden because Hall had been promoted. I don't know when he retired. Those two would have been my supervisors, but they often switched roles every so many months, so I don't remember who the operations commander was the time.
Q Okay, so it's those three?
A I don't think it would have been Hall because he was promoted to Deputy Chief and he had retired, but I just don't remember if he retired at that time. I think he had because this incident was pretty close to me retiring, so...
Q okay. Can you describe your relationship with Officer Nolan?
A Professional. I knew him through work, don't socialize outside of work. That would be the extent of it.
Q And you met him through work?
A Yes, ma'am.
Q Have you ever been involved in a lawsuit?
A No, this is my first one.
Q Were there any investigations or internal complaints against you while you were an Enfield police officer?
A Yes.

Q And what were the nature of those?
A I think one of them was an excessive force complaint. I'd have to go back. It's in my file. I'd have to go back and look.
Q Did you just have that one, or do you just not remember the rest?
A I don't remember the rest. I know I've had -- I've had more than one. I just don't -- I don't know what they were. I don't remember.
Q How many times have you had contact with Marcus Cameron, if you recall?
A So definitely on the 30th when he came in, so the 30th of May 2018 he came in. I don't know other than that. I did review this report now that you asked me to read it and I see that it appears I was working the night he actually got arrested. But face-to-face contact, I remember the 30th. I don't remember other ones.
Q Okay. Do you know how many times Marcus Cameron had contact with the Enfield Police Department?
A I do not.
Q Do you know who the Enfield police officer or employee -- I'm sorry, strike that.
Can you identify the Enfield Police

Department employee who contacted Mass. Probation regarding Marcus Cameron's arrest? If you know.
A I don't know.
Q Can you state whether you were a patrol supervisor or station house supervisor on July 8, 2018?
A I have no idea.
Q Okay. 11/12/2018?
A The question was, if I was a station house supervisor or a patrol -- on the road, you mean?
Q Yes.
A I think on November 12th I was in the station.
Q And then December 11, 2018, station house supervisor or patrol supervisor?
A I don't know. My job was generally in the police department. I didn't do a lot of patrol supervision unless it was, like, an overtime assignment or something.
Q What was your Enfield Police Department email at the time that you worked there?
A I would have been M -- as in Mark -- squires -- s-q-u-i-r-e-s -- @enfield.org.
Q With regards to Bryan Nolan, how did you

communicate with him when you were his supervisor?
A Face to face.
Q Would you communicate with him on your cell phone?
A No.
Q With emails?
A Yes, I mean, he could be in an email chain. Generally, we saw --
Q Did --
A Sorry. Go ahead.
Q I'm sorry. I interrupted you go ahead.
A Generally, we just saw each other, you know, within the police department or, you know, during shift.
Q Okay, with regards to emails, would those be Enfield Police Department emails or private emails?
A Enfield Police Department.
Q Did you ever use your private email to communicate with any officers in the Enfield Police Department?
A No.
Q Okay. Have you communicated with any other

individuals regarding Marcus Cameron for the allegations contained within this complaint?

A No.

Q With regards to the arrest warrant, you've just reviewed the arrest warrant from Officer Nolan, is that correct?

A I reviewed the arrest warrant and the attendant case report.

Q Okay, and with regards to Stebbins 156, I believe that is exhibit number --

A That's the memorandum.

Q Yes, I just forgot to mark it as an exhibit.

A Oh, I'm sorry.

Q No, that's fine.

MS. CRUZ: This will be Exhibit 8.

(Exhibit Number 8, Bates Document Stebbins 156, was Marked for Identification.)

MS. CRUZ: I'm just going to take about a 15-minute break. I'm not sure if I have any more questions, and then I'll be right back with you.

(Short break.)

MS. CRUZ: Back on the record.

Q With regards -- I think you mentioned that your training log, that would be a log of all the trainings you took while at the Enfield Police Department, is that correct?

A I don't remember a training log, but a training file. I know there's a training file.

Q Is that at the Enfield Police Department?

A They should be, although I retired, so I don't know if they move the records after retirement or if they keep them locally.

Q Okay. When it comes to arrest warrants, as a supervisor, you were a lieutenant at the time of Marcus Cameron's arrest warrant being issued and you signed off on it. What is your duty in reviewing an arrest warrant? What are you looking at?

MR. GERARDE: Objection to form.

A I missed one word in that, Attorney Cruz. I'm sorry.

Q I can restate it.

So you signed off on the arrest

warrant from Marcus Cameron, correct?

MR. GERARDE: Objection.

A Yes.

Q So when you signed off on that arrest warrant, what was your role in reviewing the arrest warrant?

A My role is to review the affidavit; make it ready for court; basically, make sure that it was my belief that probable cause was in there; take his sworn statement. Not sworn statement, sworn signature to the affidavit. Make sure that the report is with it and it's all packaged for court.

Q So as part of your duty as a supervisor, was it also to ensure that the allegations were completely investigated?

A I think my role as a supervisor is to make sure that the investigation was adequate and ensure there's probable cause. I...

Q In your role as a supervisor, either as a sergeant or a lieutenant, if you're reviewing an arrest warrant in your tenure with the Enfield Police Department, had you ever asked police officers to conduct further investigations or

interview other witnesses that were identified in the arrest warrant?
A I'm sure I have. I've asked for follow up or further investigation. Yes, I'm sure I have.
Q With regards to a sergeant who's conducting an investigation, if they're pursuing a charge that they're not very familiar with, would it be appropriate or expected that they would reach out to their supervisor to get some guidance?
MS. VITALE: Objection.
MR. MANCINI: Objection.
A They could. They could. Sometimes they do, sometimes they don't.
Q And would a sergeant know about the warrants checklist that you referenced before in filing an arrest warrant?
MR. GERARDE: Objection.
MR. MANCINI: Objection.
A It's not a checklist for arrest warrants. It's to make sure that when an arrest is made, it's a package -- that all the paperwork is together. If the sergeant -- I don't know if it's been there anymore because it's been four years, but if the sergeant had ever worked as the

headquarters commander, the acting lieutenant position, he or she should know that there was a piece of paper there that was just written to make sure that everything was together. And the reason for that is because supervisors were constantly forgetting to put in the right order or not including a copy of the bail form or whatever the circumstances were. It was really for the arrest. It was a procedural piece of paper. It wasn't a substantive checklist, and it wasn't a checklist that was necessarily in a general order or SOP or something of that nature. It was just something to say, "Hey, don't forget to put the bail bond" because the court is going to complain if we don't have it there.

Q I'm going to call your attention to 000463.

A Okay, I have Page 1. The first page of that is from Samson to Dennis Mancini. It might be on the Zoom.

Q Yes.

A Okay.

Q Can you just look through that document and then tell me when you reviewed it?

A I've reviewed it. I see -- it is the arrest

warrant, the report, and then Pages 21 through -- let me try to reopen it. I got it back. Okay, hang on.

Yes, I've got it all now.

Q And do you recognize the documents from -465 on, 00465?

A Let me go back to the top here.

This is the arrest warrant.

Q Yes.

A Yes.

Q Are you aware how Steven Stebbins obtained a copy of this arrest warrant?

MS. VITALE: Objection to form.

A I don't know.

Q Is it common practice for an alleged victim to get a copy of the arrest warrant?

MS. VITALE: Objection to form.

MR. MANCINI: Objection.

A I think they would get it at some point. I don't know when that is.

Q Okay, do you know what the procedure is for the alleged victim to get a copy of the arrest warrant?

A I think, normally, generally, they would make the

request through our Records Department, although I do recall, generally, releasing some statements, even to the public, on arrests and whatnot. Generally, it would be through our Records Department. They would be able to research the document, bring it up, copy it, etcetera, etcetera.

Q Let me bring your attention to Page 00492.

A Okay, yes, it looks like it's the booking entry.

Q On the bottom of the page, it says ID-38452. Do you know what that is? Sorry, my voice is going to die.

A No, I have no idea what that is.

Q And then it also says bond amount $5,000. Who sets the bond?

A Normally, it is the headquarters commander, but I think in this instance the officer reported that I did. It's a 5000, I think -- I thought it was non-surety. Non-surety, yes.

Q Okay. And so you set the bond on this?

A Let me just review the report of the officer.

The report says I did. I just don't have -- I just don't have recollection of it.

Q Is that normal that the lieutenant would set the

bond or --
A Any supervisor could. Generally, if the headquarters commander was there and available, he or she would set it.
Q Okay, and what goes into setting the bond?
A We consider a criminal history, the nature of the charge, perhaps where the individual lives, their ability to get back to Connecticut, failure-to-appears.
Q Okay, and in this case did you consider that Marcus lived in Massachusetts?
A I would have considered it. I don't remember or recollect, you know, my exact analysis of doing so.
MS. CRUZ: This will be Exhibit 9.

(Exhibit Number 9, Bates Documents Samson 463 to 494, was Marked for Identification.)

Q I do not have any further questions.
MS. CRUZ: Does anyone have any questions?
MR. GERARDE: I do have some

questions. If either of the Attorney Generals would like to go, by all means, the floor is yours.

MS. VITALE: I do have questions, but I'll wait till you go if that is okay.

MR. GERARDE: Sure.

CROSS EXAMINATION

By Mr. Gerarde:

Q Mr. Squires, in your testimony, you stated that you only recall speaking with Marcus Cameron one time at Enfield PD and that was in May of 2018, correct?

A Yes, that's what I recall him.

Q Am I correct that when you saw or spoke with Marcus Cameron in May 2018 at Enfield Police Department Cameron did not identify himself?

A Yes, that's correct.

Q And is it your understanding that Marcus Cameron did not want to identify himself to you when speaking with you at the Enfield Police Department in May 2018?

MS. CRUZ: Objection.

THE WITNESS: Can I still answer?

MS. CRUZ: Yes.
A Yes, that's how I understand it, yes, or remember it.
Q Okay, so is it your understanding that on May 30, 2018, when speaking with this individual who didn't identify himself, you effectively met with an unknown person?
A At the time --
MS. CRUZ: Objection.
A Sorry. At the time, yes.
Q Okay, and then subsequent to May 30, 2018, at some point beyond then you found out that that unknown person was Marcus Cameron?
A At some point, yes.
Q Okay, thank you. No further questions.
MS. VITALE: Okay, I have a few questions.

CROSS EXAMINATION

By Ms. Vitale:
Q Good afternoon. My name is Laura Vitale. I'm the Assistant Attorney General. I represent the defendant, Steven Stebbins. It's nice to meet you.

A Nice to meet you.

Q I just have a couple of questions for you. Was the arrest warrant application submitted to Assistant State's Attorney Christopher Parakilas?

A Yes.

Q Do you know specifically what documents were submitted to Assistant State's Attorney Parakilas along with the arrest warrant application?

A I don't remember exactly. It would be common practice that we would submit not only the arrest warrant affidavit, but the police report, any written statements that were sent, any -- I forget the name of the form, but there was a form that would show that we seized evidence so that the prosecutor knows that there's an existence of the evidence in our evidence room. In this specific instance, it's been so long that I'm not sure exactly what was submitted.

Q But the common practice was to submit the police report and any written statements. Did I understand that correctly?

MS. CRUZ: Objection.

A If they existed, yes.

Q And so in this case, the relevant police report would have been -- would the relevant police report have been the Incident Report that is Bates number 000479 through -485?
A Let me just take a look at it.
Q Absolutely.
A Did you say 485 was the ending number?
Q I apologize. Probably 487.
A Yes, that would be the Incident Report that would most likely have gone with it.
Q And then as far as written statements, what type of written statements would that be?
A I think you're asking what kind of statements would normally go with a case or in this case?
Q What would normally go with the case.
A Any written statement that --
MS. CRUZ: Objection.
A I'm sorry, any written statements that a witness would have given or a victim would have given or -- yes, those statements.
Q Okay, so a sworn statement by witness or victim?
A Yes. And it doesn't necessarily have to be a sworn statement. You know, anything that was generated as part of this, any statement that was

generated as part of this. So I guess, in theory, you could see an email, you know, maybe someone sent an email or something like that, you know, as their statement or something like that. That might be part of it. So but a sworn statement, yes, would go with it.

Q Okay. And, again, in this case, you don't know for sure what was sent along with the arrest warrant application?

A It's been four or five years. I really don't. I don't remember, but the report and his statement from Mr. Stebbins should have went over with this. If it didn't go over, our court officers would have flagged it, I imagine, and would have said "Hey, where's the rest of this." Hence, the list for some of the arrest reports that we have that, you know, "Don't forget this," "Submit this," because you're making a mistake.

Q And you just referenced the statement by Mr. Stebbins. So would that be the document that's Bates numbered 000488 through -491?

A Yes.

Q And who is the person who sends over the documents to the Assistant State's Attorney in

this case? Was that Bryan Nolan?

A I don't know who did it in this case, but it would be -- I mean, a supervisor could bring it over. Sometimes a warrant would go to our court officer and he would bring it over. Sometimes a supervisor would bring it over. You know, sometimes someone is going over that way, and they will drop it off, that nature.

Q And what does the phrase "documentation purposes only" mean?

MS. CRUZ: Objection

A I think you're probably --

MS. CRUZ: Sorry, I wanted to get that objection.

A I think it just explains why the document was generated. Well, you know, I think you're probably referring to my aided person assignment that I created. That was a term that I would use to say, "Hey, this happened. I'm just making sure that it's out there and documented I had this encounter."

Q Those are all of the questions I have. Thank you so much for your time. I appreciate it.

MR. GERARDE: Any more questions?

MR. MANCINI: I don't believe that I have any questions. Thank you.

MS. CRUZ: I have a follow-up question.

REDIRECT EXAMINATION

By Ms. Cruz:

Q You mentioned that in the warrant it would be Bates number 00479 to 00489. Are you saying that 00490, -491, -492, -493 and -494 would not be included in the arrest warrant?

A I think the question was asking me directly about those pages and whether those would go over, and the answer to that is yes, looking at -- I'll start at -489. So 489 is Page 2 of Stebbins' statement, -490 is Page 3 of Stebbins' statement, -491 is Page 4 of Stebbins' statement. That would have gone over. Number -492 is a booking entry, so that wouldn't have been there because that had not happened yet. Same with -493. It looks like that's a report that was generated. I have half a screen here, so I'm trying to see. And that's a report that was generated as a result of the arrest, so that would not have gone over because it had not happened yet. So all of

Mr. Stebbins's statement would have gone over to the court.

Q Okay. And do you know for certain that only 00479 to 00491, that's the entire packet that went over to the court?

A I don't know. I'm just looking at what's been provided to me. I don't know what went over to the court other than the arrest warrant, the report, Mr. Stebbins's statement. As I mentioned, there probably was an evidence sheet or something like that if there was evidence and I think there was some videos taken here. So I think those were probably logged into evidence. That would have went over there. And that's just a -- not the video, it is just the form showing they existed.

Q Okay, so if there are videos taken, there would be, essentially, an evidence form indicating that videos were taken in the police department's custody or care?

A Yes, there should be.

Q Okay, but there could have been other documents, you're saying?

MS. VITALE: Objection.

MR. GERARDE: Objection.

A I don't know.

Q No further questions.

MR. MANCINI: Can I ask a follow-up question? I don't know if Eric or Attorney Vitale have any. I would just like to ask a follow-up question just to clarify, a clarifying question.

MR. GERARDE: Go for it.

CROSS EXAMINATION

By Mr. Mancini:

Q My name is Attorney Dennis Mancini. I'm the Assistant Attorney General. I represent Mr. Stephen Samson. I just wanted to make one point of clarification. You indicated -- we were talking about documents numbered -465. That whole packet looks like -465 -- well, I guess it's Exhibit 9, I believe. It's -463 through -494. And speaking just about -465 through -494, would you agree that those look like documents that were generated by the Enfield Police Department in connection with this incident?

A Yes.

Q Okay. And just a point of clarification. So it started with the -- there's a looks like an information sheet. And then following that is an arrest warrant application, and you talked about -- looks like going through -491, and you indicated that those were documents that would have gone over to the court, and those would have gone over to the -- well, actually, I should make a correction. Those documents would have gone over to the court with the arrest warrant application, correct?
A That's correct.
Q Okay, but I do want to make one -- I do want to note one thing. It looks like -465, that's got -- it looks like about halfway through there's a date. It says 12/6/18 and then it says, "Signed, prosecuting authority."
A Let me get to the page here, sir.
Okay, yes. I see that. Yes.
Q Okay. So does that indicate to you that at the time that this document is scanned, that that had been reviewed by a prosecutor, is that correct?
A It indicates to me that a prosecutor reviewed it

on 12/6/18.
Q Okay, and signed it?
A And signed it, yes, sir.
Q Okay, so by the time that -- this document means that this has already gone to the court and been approved, is that correct?
A It's been approved by a prosecutor.
Q Okay, and then going to -466, now, if we look about halfway through, there's a part that says "By the court," and there's a signature there?
A Yes, sir.
Q And then there's a date, and then it says, "Name of Judge"?
A Yes.
Q Okay. And then below that, it says, "Return on arrest warrant," right?
A Yes.
Q And then there's a signature there and some dates there as well, correct?
A Yes.
Q Okay. So just correct me if I'm wrong here, but that would indicate that this had been approved by a judge?

A Yes.
Q Okay. And then at this point, this would have been signed after the defendant was arrested, correct?
A Are you talking about the return on the arrest warrant?
Q Correct.
A Yes, it would be at or after the time of arrest. It is just showing the court that the arrest warrant was served, executed.
Q That that was served, right?
A Yes, sir.
Q Okay, so there was a number of documents that followed, and if we go to -492, that would have been generated post arrest?
A Yes, it's a booking report. Yes.
Q Okay, and that same with -493 and -494?
A That's correct, yes.
Q Okay. And generally speaking, all of these documents would have gone to the court post arrest as well, right?
A Yes, it would have been.
I had to think about it for a minute. Yes.

Q So the warrant application would go to the court at some point?
A Yes, it should have been -- everything should have -- at least they should have a copy of everything that --
Q Well, let's take it one step at a time. Before the arrest is made, the warrant application goes to the -- somebody drafts a warrant application?
MS. CRUZ: Objection.
A Yes.
Q Okay. That warrant application is sent to the court?
A Yes.
Q Somebody at the court reviews that application and it's either signed or rejected or whatever happens with it?
MS. CRUZ: Objection.
A Correct. A prosecutor and a judge.
Q Speaking hypothetically, assuming that arrest warrant comes back and then assuming that the person is arrested, there would be a return on the warrant?
MS. CRUZ: Objection.

A Yes.
Q Okay. And then that whole packet and any reports that followed that arrest, all that would be put together and then transmitted, once again, back to the court?
MS. CRUZ: Objection.
A Yes, it should go b ack to the court. Yes.
Q All right. So I just wanted to -- the reason I wanted to clarify is because there's some documents that go to the court beforehand and then there's some documents that go to the court afterwards, so I just wanted to clarify that. Depending on what timeframe we're talking about, some documents may not have existed when the arrest warrant first went to the court, is that correct?
A Yes, that's correct.
Q All right. But afterwards, everything -- in an ideal world, everything related to the case should go to the court?
A Yes.
Q No further questions.
MS. CRUZ: No further questions.
MR. GERARDE: I don't have anything

else.

MS. VITALE: None here.

(Whereupon, the deposition was concluded at 2:39 p.m.)

ERRATA SHEET

CASE: Marcus Cameron v. Steven Stebbins, et. al.

REMOTE/ZOOM DEPOSITION OF: Mark Squires

| PAGE | LINE | PRESENTLY READS | SHOULD READ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I, Mark Squires, do hereby certify that I have read the foregoing transcript of my testimony given in the aforementioned matter, and further certify that said transcript is a true, accurate and complete record of said testimony.

Signed under the pains and penalties of perjury

this day of

2023.

Mark Squires

C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, Michele C. DeCoste, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing remote/ZOOM deposition of Mark Squires was taken before me on March 15, 2023. The said witness was duly sworn before the commencement of his testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

In witness whereof, I have hereunto set my hand and Notary Seal this 29th day of April 2023.

Michele DeCoste

Michele C. DeCoste, Notary Public

My Commission Expires: June 30, 2028

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

Electronically signed by Michele DeCoste (101-098-978-9052) dfce74d7-85f0-4041-8f93-d58082efa1a3