UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARCUS CAMERON,
*Plaintiff*,

v.

STEVEN STEBBINS, *et al.*,
*Defendants*.

Case No. 3:21-cv-165 (OAW)

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Marcus Cameron, brings this action against Connecticut State Police Troopers Steven Stebbins and Stephen Samson; the Town of Enfield, Connecticut ("Enfield"); the Enfield Police Department (EPD); and EPD Officers Bryan Nolan and Mark Squires. Plaintiff alleges that Defendants illegally seized him and "sought to enact both judicial and extra-judicial revenge" on him after Plaintiff filed an internal affairs complaint against Stebbins following an encounter in May 2018. He seeks relief under the Fourth, Fifth, Eighth, and Fourteenth Amendments; 42 U.S.C. § 1983; and state law. Defendants move for summary judgment against Plaintiff on all counts. ECF Nos. 98–100. The court has reviewed Defendants' motions, Plaintiff's response thereto, Pl.'s Mem. in Opp., ECF No. 103 (hereinafter "Opp."), Defendants' replies, ECF Nos. 106–08, as well as the record in this case. The court also has reviewed Plaintiff's motion for a hearing, ECF No. 109. After careful review and for the foregoing reasons, Defendants' motions are **GRANTED,** and Plaintiff's motion for a hearing is **DENIED.**

## I. BACKGROUND[1]

[1] All pagination herein is as generated by the court's CM/ECF system, and from any document therein.

The following facts are taken primarily from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise stated. Each material fact set forth in the moving party's Local Rule 56(a)1 statement and supported by the evidence is "deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement" of the non-moving party. D. Conn. L. Civ. R. 56(a)1. Therefore, where Plaintiff "fails to appropriately deny material facts set forth" in Defendants' Rule 56(a)(1) statement, "those facts are deemed admitted." *Barone v. Jud. Branch of Conn.*, No. 3:17-cv-644 (VAB), 2019 WL 7283383, at *11 (D. Conn. Dec. 27, 2019) (citation modified).

**A. <u>May 22, 2018, Incident in Plaintiff's Driveway</u>**

Between 2015 and June 2019, Plaintiff Cameron owned a property at 49 Foxcroft Road in Enfield. ECF No. 103-1 at 1, ¶ 1. Stebbins owned a property at 44 Foxcroft Road. *Id.* ¶ 3. Plaintiff's home was "close enough" to Stebbins's residence that Plaintiff could see Stebbins's residence when he stood outside his house. *Id.* at 12–13, ¶ 4.

On May 22, 2018, Plaintiff and Stebbins were both driving on Route 5 in Enfield. Stebbins was driving his Connecticut State Police cruiser. *Id.* at 13, ¶ 5. Plaintiff passed Stebbins on the right. *Id.* at 3, ¶ 6. Plaintiff was driving a Honda Accord, which was registered to his home on 49 Foxcroft Road. *Id.* ¶ 7. Plaintiff continued to drive to his home, and the route had two stop signs. *Id.* ¶ 8. Stebbins reported that he observed Plaintiff commit two traffic violations in Enfield "in the area of Route 5." *Id.* ¶ 6. Stebbins observed Plaintiff, followed him to his house, and approached him in his driveway. Stebbins informed Plaintiff that he was speeding and that he saw him run at least one stop sign. *Id.* at 2, ¶ 7; *id.* at 15, ¶ 12. Stebbins told Plaintiff he was there to talk to him

"man to man," and that he was not there to "issue him a ticket or arrest him." *Id.* at 5, ¶ 14. Stebbins left Plaintiff's property after Plaintiff told him to leave. *Id.* at 16, ¶ 15. Stebbins "did not follow the traffic stop procedures on this occasion." *Id.* at 3, ¶ 8. Thereafter, Plaintiff filed an internal affairs complaint with the Connecticut State Police. *Id.* ¶ 9.

**B. <u>Plaintiff Driving by Stebbins's House</u>**

On May 26, 2018, Stebbins saw Plaintiff drive by his home "multiple times in approximately a five-minute span, back and forth." *Id.* at 36–37, ¶ 3. Plaintiff alleges that it was necessary to go by Stebbins's residence twice, "due to construction on Montano Road." *Id.* at 18, ¶ 22. Stebbins called EPD to "document" Plaintiff's actions. *Id.* at 37, ¶ 4. Plaintiff went to EPD that day, after he saw an EPD officer respond to Stebbins's house and saw that they spoke to each other. *Id.* at 2, ¶ 5. Plaintiff "wanted to find out if a 911 call was placed and what the allegation in the 911 call was." *Id.*

On May 30, 2018, Plaintiff also drove by Stebbins's residence twice in the span of "a couple minutes." *Id.* at 18, ¶ 24. Plaintiff recorded a video while he was driving down Foxcroft Road towards Stebbins's residence on May 30, 2018. *Id.* at 8, ¶ 25. While recording the video, Plaintiff stopped his car outside of Stebbins's residence. *Id.* at 19, ¶ 26. A man was in the street, outside of Stebbins's house, and Stebbins was in his driveway next to his vehicle. *Id.* When Plaintiff stopped his car in front of Stebbins's house, Stebbins stayed in his driveway next to his vehicle and did not speak to Plaintiff. *Id.* at 9, ¶ 27. Plaintiff went to the EPD on May 30, 2018, because he wanted help in identifying the man outside of Stebbins's house, and to ask "about filing criminal charges against [that] gentleman." *Id.* at 20, ¶ 28.

On July 8, 2018, "a woman showed up" at Stebbins's house. She walked up the driveway and took photos of his police cruiser, personal vehicles, and his house. She appeared to try to open the door of Stebbins's police cruiser. *Id.* at 9, ¶ 29. Stebbins thought Plaintiff might know this woman. *Id.* ¶ 30.

**C. <u>Internal Affairs Complaint</u>**

Plaintiff's complaint was assigned to Samson. *Id.* at 4, ¶ 10. Samson met Plaintiff on June 25, 2018, to discuss the complaint. *Id.* ¶ 11. Upon investigation, Samson noted "inconsistencies" in Plaintiff's reporting of the incident. *Id.* ¶ 12. On October 11, 2018, Lieutenant Daniel Loughman issued a final report. *Id.* ¶ 13. It concluded that Stebbins "had the authority" to conduct a traffic stop, but violated State Police procedures by failing to "call-in" the vehicle stop, by failing to activate the "MVR in his cruiser," and by failing to identify himself when asked by Plaintiff. *Id.*

On October 11, 2018, a letter was sent to Plaintiff from Lt. Loughman "indicating that the investigation had been completed." *Id.* at 5, ¶ 14. It held Stebbins "had the authority to conduct a traffic stop, but . . . should have identified himself," and that the claim Stebbins had threatened Plaintiff "could not be substantiated." *Id.*

**D. <u>November 12, 2018, Incident</u>**

On November 12, 2018, Stebbins went to "check on the heating system" at his Foxcroft home. *Id.* at 21, ¶ 33. Plaintiff arrived at *his* nearby home at 2:28 pm, and noticed Stebbins drive by at 2:29 pm, in his police cruiser. *Id.* at 22 ¶¶ 34–36. Plaintiff got into his car and began driving "in the same general direction as Stebbins." *Id.* at 5, ¶ 15. When Stebbins turned left onto Colony Road, Plaintiff did the same. *Id.* at 23–24, ¶¶

42–43. And when Stebbins pulled over his police cruiser on the side of Colony Road, Plaintiff went around him and pulled over in front of the cruiser. *Id.* at 24, ¶ 43.

Stebbins then went around Plaintiff and turned right onto Route 5. *Id.* ¶¶ 43–44. Plaintiff followed. *Id.* ¶ 45. Stebbins turned right into a parking lot and Plaintiff "could see him loop the parking lot as if he was coming back out." *Id.* at 25, ¶ 46. Plaintiff drove past that parking lot and turned left into a different parking lot. *Id.* ¶ 47. Stebbins turned left out of the parking lot and continued driving on Route 5. *Id.* ¶ 48. Stebbins saw Plaintiff's car in a parking lot and "thought Plaintiff might be waiting for him." *Id.* ¶ 49. Stebbins entered the entrance ramp to I-91 and pulled over on the dirt shoulder of the ramp. *Id.* at 26, ¶ 50. Believing Plaintiff was following him, Stebbins contacted Samson (while parked), and Samson advised him to call EPD. *Id.* at 6, ¶ 19. Samson contacted his supervisor, who told him to respond to the scene with Stebbins. *Id.* at 7, ¶ 22.

Plaintiff turned left out of the parking lot and continued driving on Route 5. *Id.* at 26, ¶ 51. Plaintiff "got to the light at the entrance to I-91," and saw Stebbins parked on the dirt shoulder. *Id.* ¶ 52. Plaintiff then entered the entrance ramp to I-91, drove by Stebbins while he was parked on the shoulder, entered I-91, and then pulled over onto the right-hand side of I-91. *Id.* at 26–27, ¶¶ 53–55. Stebbins pulled onto I-91 and saw Plaintiff pulled over on the side of I-91. *Id.* at 27, ¶ 56. Plaintiff saw Stebbins drive by him while Plaintiff was pulled over; Plaintiff continued driving on I-91 after Stebbins passed him. *Id.* ¶ 57. Stebbins exited the highway, and Plaintiff took the same exit "directly behind" Stebbins. *Id.* at 28, ¶ 60. Plaintiff and Stebbins parked in the Brookside Plaza, and they took "essentially the same route" there. *Id.* ¶¶ 61–62. They remained there until EPD arrived. *Id.* at 7, ¶ 23.

When EPD arrived, Plaintiff spoke to EPD Officer Croteau. *Id.* at 8, ¶ 24. Plaintiff declined to give Croteau his identification or address and he requested a supervisor. *Id.* ¶ 25; ECF No. 100 Ex. M at 1:30–2:27, 3:20–3:40, 4:40–5:10. Nolan was dispatched to take over the scene in response to the call from Stebbins, due to EPD's policy related to incidents involving active-duty police officers. ECF No. 103-1 at 8, ¶ 26. When Nolan arrived, two Enfield officers were on site (including Croteau), in addition to Samson and Stebbins. *Id.* at 9, ¶ 27. Nolan asked Plaintiff why he was following Stebbins, and he stated that "he felt uncomfortable around Stebbins, and was pulling over to let Stebbins go around him." *Id.* at 47, ¶ 32. Plaintiff stated he pulled over on I-91 to use his phone. *Id.* ¶ 33. Plaintiff was not placed under arrest, "in part because Nolan believed that the involvement of a police officer necessitated further investigation." *Id.* at 9, ¶ 28. Plaintiff told officers that he lived in Massachusetts but provided his Foxcroft Road address in Enfield. *Id.* ¶ 29. Samson did not speak with Plaintiff on this date. *Id.* ¶ 30.

Following this incident, on November 13, 2018, Stebbins applied for a civil order of protection. *Id.* at 32, ¶ 76. A hearing thereupon was held on November 23, 2018; it was continued to December 14, 2018, and ultimately denied. *Id.* ¶ 77–78; *id.* at 63, ¶ 77.

**E. <u>Investigation Attempts, Plaintiff's Arrest, and Dismissal of the Charge</u>**

Nolan and Plaintiff spoke briefly on the phone on November 15, 2018, but the call ended up getting disconnected. *Id.* at 50, ¶ 40. Nolan tried calling Plaintiff back multiple times, but "was not able to connect," and left him a voicemail. *Id.* ¶ 41. Nolan also left Plaintiff a voicemail on November 19, 2018, stating that he needed to speak with Plaintiff about the incident, and to call him back. Plaintiff did not return his call. *Id.* The parties dispute as to how many attempts to contact Plaintiff that Nolan made. *Id.* ¶¶ 43–44.

Nolan investigated Stebbins's complaint, and "believing that he had sufficient probable cause" to charge Stalking in the Third Degree, submitted an arrest warrant affidavit on December 5, 2018. *Id.* at 10, ¶ 31; *see* Conn. Gen. Stat. § 53a-181e(a) (setting forth requirements for Stalking in the Third Degree). On December 6, Assistant State's Attorney Parakilas signed the arrest warrant. *Id.* ¶ 32. The warrant was approved by the Honorable Sheila Prats on December 10. *Id.* EPD Officer Caires arrested Plaintiff on December 11. *Id.* ¶ 33. Plaintiff "stated that the handcuffs were too tight and suffered striations on his wrists from them," he "didn't think the impact and the striations from the handcuffs" on his hands required examination at a hospital. *Id.* at 58, ¶ 62. Plaintiff was released to go home after he was arrested. *Id.* at 34, ¶ 83. Samson never arrested Plaintiff, nor did he use physical force against him. *Id.* at 10, ¶ 34.

On February 7, 2019, Plaintiff applied for and was granted the "Accelerated Rehabilitation program" for 30 days. *Id.* at 11, ¶ 35. The stalking charge was dismissed on March 7, 2019, after Plaintiff completed the program. *Id.* ¶ 36.

The fact that Plaintiff was "African-American did not change the way Nolan approached the situation between" Plaintiff and Stebbins, because "Nolan viewed it as a neighborly dispute." *Id.* at 61, ¶¶ 70–71. Nolan and Squires also received recertification training for racial bias every three years. *Id.* at 63, ¶¶ 78–79

### F. <u>Plaintiff's Allegations</u>

Plaintiff alleges that on May 22, 2018, he was driving home to 49 Foxcroft Road, when he saw Stebbins's police cruiser approach his home "at about 40-50 miles per hour." ECF No. 103-2 ¶¶ 2–3. Stebbins "placed his hand on his firearm" while he approached Plaintiff, *id.* ¶ 5, and "accost[ed]" him "with obscenities," *id.* ¶ 6. Plaintiff alleges Stebbins

threatened to "take care" of him, said he had "something for" him, and did not identify himself as a police officer though Plaintiff asked whether he was one. *Id.* ¶¶ 10–11. Plaintiff alleges that Stebbins ran Plaintiff through the "COLLECT database" five times. *Id.* ¶ 13. Plaintiff alleges that he felt "threatened" by Stebbins after this incident and feared "retaliation due to their close proximity." *Id.* ¶ 15.

On May 26, 2018, Plaintiff alleges he was driving to the gym when Stebbins's wife "walked directly into his line of travel." *Id.* ¶ 16. He alleged that he paused and waited for her to pass, while "unbeknownst to him," Stebbins called 911 and made a complaint about him. *Id.* ¶ 17. Plaintiff alleges that same evening, he left his residence with a guest and another police cruiser in Stebbins's driveway followed their vehicle. *Id.* ¶ 18. Plaintiff alleges he "immediately" went to EPD and "informed them" Stebbins "may be calling continuously in an attempt to have them 'investigate' him." *Id.* ¶ 19.

On May 28, 2018, Plaintiff alleges that Stebbins drove by 49 Foxcroft Road "about 'five to ten times' in a black muscle car, gesturing and staring." *Id.* ¶ 20. On June 21, Plaintiff alleges he was driving in Enfield and noticed a Connecticut State Police vehicle following him. *Id.* ¶ 25. He alleges he later found out that the officer following him was Stebbins, and that "he had run Plaintiff's license plate and name through the COLLECT database three times on that occasion." *Id.* ¶ 26.

On June 25, 2018, Plaintiff alleges Samson met with him at 49 Foxcroft Road and tried to dissuade him from continuing the investigation by saying "All I'm saying is, I'm a bulldog when it comes to investigations, I drive hard all I'm saying is, you sure you guys can't work it out or something you gentlemen can work out instead." *Id.* ¶¶ 27–28. Plaintiff alleges that Samson started investigating him, with the help of Stebbins, "rather than

investigating" Plaintiff's internal affairs complaint. *Id.* ¶ 30. Plaintiff alleges Stebbins and Samson disregarded an order to "not communicate with anyone other than legal counsel or STOP support personnel regarding" the internal complaint. *Id.* ¶¶ 31–32. He alleges that part of "Defendants'" investigation into him "included searching for him at his place of work and questioning his employer." *Id.* ¶ 33.

On June 15, 2018, Plaintiff alleges Stebbins ran the license plate of a vehicle in Plaintiff's driveway through the COLLECT database. *Id.* ¶ 34. On July 17, 2018, Samson called Plaintiff's supervisor at the Massachusetts Probation Office and left a voicemail requesting to speak about "Plaintiff regarding an investigation." *Id.* ¶ 35. The voicemail "did not disconnect" after Samson intended to end his voicemail message. *Id.* ¶ 36. During the voicemail, Stebbins and Samson "can be overheard discussing the Plaintiff, referring to him as an 'asshole,' coordinating to have a postal worker make a statement that Plaintiff was 'playing that race card,'" and making comments that suggest that Plaintiff's claim was "diminished" by, or that he was only bringing his claim because of, his race. *Id.* ¶ 37. At one point, someone in the voicemail, who Plaintiff alleges was another state trooper, "used 'blaccent' to mimic his interactions with African Americans." *Id.* ¶¶ 38–39.

Plaintiff alleges that during Defendants' investigation into him, Stebbins and "other Troopers" ran him through the COLLECT database "at least 29 times." *Id.* ¶ 41. Plaintiff alleges Defendants sent two state troopers to his apartment in Massachusetts, and that a retired trooper called the probation office in Massachusetts to inquire about a residency requirement. *Id.* ¶¶ 42–43. The retired trooper then sent the information to Samson. *Id.* ¶ 43. Samson then "sought guidance" on whether he could charge Plaintiff with a crime

for having a Massachusetts driver's license, "despite never confirming that Plaintiff had two licenses." *Id.* ¶ 44.

Plaintiff alleges that Samson spoke with Attorney Parakilas on July 25, 2018, where he was informed that arresting Plaintiff could be considered retaliation. *Id.* ¶ 45. Plaintiff alleges Samson and Stebbins contacted Plaintiff's work "several times" regarding allegations about his residency. *Id.* ¶¶ 46–47. He alleges that he lives in Massachusetts and has a Massachusetts's driver's license. *Id.* ¶¶ 48–49. Plaintiff alleges that he received a letter from his work "stating that there had been complaints about his residency due to the Defendants contacting his work." *Id.* ¶ 50.

Plaintiff alleges that on August 7, 2018, Stebbins followed a vehicle that he was in and ran the plate through COLLECT. *Id.* ¶ 51. He alleges Stebbins ran several cars on or near his property through COLLECT on several occasions. *Id.* ¶¶ 52–54.

Plaintiff alleges that he went to 49 Foxcroft on November 12, 2018, to "check on the home because he had people power washing the residence." *Id.* ¶ 55. He left the residence to go to Brookside Plaza in Enfield to "go to Petco and Staples." *Id.* ¶ 56. Plaintiff alleges he saw Stebbins's police cruiser drive by as he was walking to his car but that Stebbins had no reason to "drive past Plaintiff's property," and "no reason to drive in the direction that he was driving to get home that day." *Id.* ¶¶ 57–59. Plaintiff alleges that throughout that day, Stebbins ran his license plate eight times. *Id.* ¶ 64. He alleges that he pulled over to a parking lot to call his friend, Jean Paul, because he "feared" that Stebbins was following him and "intended to pull him over 'possibly at a remote location.'" *Id.* ¶ 66. Plaintiff alleges that he pulled over on the interstate to call Paul again, and "ask him to stay on the phone with him." *Id.* ¶ 68. He alleges that he went to take the first exit,

and that Stebbins "crossed three lanes of traffic to take the same exit before Plaintiff could get off." *Id.* ¶ 70. Plaintiff alleges that he waited in his car for Paul to get there. *Id.* ¶ 72.

He alleges Stebbins "knowingly turned his cruiser video off when he claims Plaintiff followed him on the highway," *id.* ¶ 74, and that Plaintiff "did not feel comfortable giving the officers on scene his Massachusetts address for fear of retaliation," *id.* ¶ 78. He alleges that he told officers on the scene that Stebbins and Samson had been harassing him. *Id.* ¶ 79. Plaintiff asserts Nolan never asked Plaintiff for a statement. *Id.* ¶ 85. He alleges that the arrest warrant application omitted material information, including his complaints or statements, and contained "numerous material false statements." *Id.* ¶¶ 92–93. These false statements include: (1) that construction forced Stebbins to drive by Plaintiff's residence; (2) that Plaintiff gave 49 Foxcroft Road as his address; (3) that "[a]ll the 'false' complaints to the State Police were unfounded"; (4) that Plaintiff followed Stebbins on Colony Road; (5) that Stebbins did not exit his vehicle; and (6) that Nolan confirmed construction was ongoing. *Id.* ¶ 93.

Plaintiff alleges the officer who arrested him was "very overly aggressive, abusive, and pushed him against the car numerous times." *Id.* ¶ 103. He claims when he arrived at the police department, Nolan, Squires, and the arresting officer "continued to question" him about his residency, and "threatened" him that if he told them that he lived at 49 Foxcroft, he would not have bail, but if he said he lived in Massachusetts, they would give him bail. *Id.* ¶¶ 104–05. Plaintiff alleges he told them he was a Massachusetts resident. *Id.* ¶ 106. After he was arrested, Plaintiff was placed on paid leave from the Massachusetts Probation Office. *Id.* ¶ 108; ECF No. 103-21. He was also placed on paid

leave by Holyoke Community College on December 13, 2018. ECF No. 103-2 ¶ 109; ECF No. 103-21.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue as to any material fact and it is clear that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view "the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998).

The moving party has the burden of showing that no genuine issue of material fact exists. "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party meets its burden, the non-moving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

To defeat a motion for summary judgment, the non-moving party must demonstrate there is a genuine dispute of material fact for trial. He must offer "significant, probative evidence on which a reasonable fact-finder could decide" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256–57. He may not "merely rely upon the allegations contained in the pleadings that raise no more than 'some metaphysical doubt as to the material facts.'" *Anderson v. Romano*, 2010 U.S. Dist. LEXIS 120395, at *7–*8 (S.D.N.Y. Oct. 22, 2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, (1986)). Summary judgment is appropriate if the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex*, 477 U.S. at 322).

## III. DISCUSSION

Initially, the court notes that Plaintiff brings claims under the Fifth and Fourteenth Amendments against Nolan, Squires, Enfield, and EPD, alleging that he was subjected to unreasonable and excessive force. Plaintiff also brings a claim under the Fourteenth Amendment against Samson, alleging he subjected Plaintiff to unreasonable and excessive force.[2]

"[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Kozey v. Quarles*, No. 3:04-cv-1724 (MRK), 2005 WL 2387708, at *6 (D. Conn. Sept. 28, 2005), *aff'd*, 252 Fed. Appx 387 (2d Cir. 2007). "Substantive due process analysis is inappropriate . . . only if the claim is covered by a more specific constitutional provision, such as the Fourth Amendment. *Cooper v. City of Hartford*, No. 3:07-cv-823 (JCH), 2009 WL 2163127, at *12 (D. Conn. July 21, 2009).

Here, because "the Fourth Amendment provides a more explicit textual source of constitutional protection for plaintiffs' claims of illegal [seizure] and excessive force," the

[2] Notably, Plaintiff did not dispute that "Plaintiff was never placed under arrest by Samson, nor did Samson ever use physical force against the Plaintiff." ECF No. 103-1 at 10–11, ¶¶ 32–34.

court need not address those claims under a substantive due process analysis. *Conroy v. Caron*, 275 F. Supp. 3d 328, 352 (D. Conn. 2017).

### A. Fourth Amendment Claim

#### 1. Samson

Plaintiff alleges Samson committed an "unreasonable seizure" and subjected him to unreasonable and excessive force, in violation of the Fourth Amendment. ECF No. 1 ("Compl.") ¶¶ 70–72. Samson counters that (1) Plaintiff cannot demonstrate his personal involvement in any seizure or use of force; (2) even if he had been involved in a seizure, the claim fails as the police had probable cause or reasonable suspicion to believe Plaintiff was engaged in criminal activity. ECF No. 98-1 at 10.

"As a preliminary matter . . . [Plaintiff] must allege each defendant's personal involvement in the denial of his rights." *Lawrence v. Finnucan*, No. 3:20-cv-1678 (VAB), 2021 U.S. Dist. LEXIS 87694, at *6 (D. Conn. May 7, 2021) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Personal involvement means direct participation, "such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Id.* (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). A "plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020).

"The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Chowaniec v. Whitesboro*

*Police Dep't*, No. 6:24-cv-85, 2024 WL 1075055, at *4 (N.D.N.Y. Mar. 12, 2024), *report and recommendation adopted sub nom. Chowaniec v. Whitesboro Police Dep't*, No. 6:24-cv-85, 2024 WL 1464634 (N.D.N.Y. Apr. 4, 2024). "A seizure takes place only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991).

Here, the record establishes that Samson was not involved in any seizure. In fact, Samson never spoke to Plaintiff during the November 2018 encounter. ECF No. 98-4, Ex. B, at 247–48 (showing that Plaintiff, in his deposition, stated (1) that he was never placed under arrest by Samson, (2) that Samson never told him he could not leave, and (3) that he never spoke to Samson during the November 2018, encounter). He argues that because Samson was present "at the scene" that he was not "allowed to leave from," Samson "seized" him. *Id.* at 247–49. However, that is insufficient to establish that Samson seized Plaintiff. *See Chowaniec*, 2024 WL 1075055, at *4; *Tyson v. Willauer*, No. 3:01-cv-1917 (GLG), 2003 WL 22519876, at *2 (D. Conn. Nov. 1, 2003) (concluding that there was no Fourth Amendment violation when the defendant officer "never had any contact" with the plaintiff). Further, Samson was not present at the initial May 2018 interaction between Plaintiff and Stebbins or at Plaintiff's arrest on December 11, 2018. ECF No. 103-1 at 2–4, ¶¶ 2–10 (noting that Stebbins was the only officer present during the May 2018 incident); *id.* at 10–11, ¶¶ 32–34 (noting that Plaintiff was arrested by Caires, and that "Plaintiff was never placed under arrest by Samson"); *id.* at 10–11, ¶¶ 32–34 (noting that "Plaintiff was never placed under arrest by Samson, nor did Samson ever use physical force against the Plaintiff"). Accordingly, because the record

establishes that Samson never seized or used force against Plaintiff, Samson is entitled to summary judgment on this claim.

### 2. <u>Nolan, Squires, Enfield, and EPD</u>

Plaintiff alleges that Squires and Nolan subjected him to an unreasonable seizure during the November 2018 incident and December 2018 arrest, in violation of the Fourth Amendment. Compl. ¶¶ 53–55, 70–72. Nolan and Squires argue that (1) Plaintiff was not seized in November 2018, as the interaction was "purely an investigatory stop, lasting longer than necessary" because he requested a supervisor; (2) even if Plaintiff was seized in November 2018, the seizure was reasonable; and (3) Plaintiff's claim regarding his December 2018 arrest fails at a matter of law, because probable cause exists. ECF No. 99-1 at 13, 16, 19–24.

"A seizure occurs where, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Pietrangelo v. Alvas Corp.*, 487 Fed. Appx 629, 632 (2d Cir. 2012) (citation modified) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Factors suggestive of seizure include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (citation modified).

Here, the record establishes that the stop was extended because Plaintiff refused to provide Croteau with any requested identifying information and requested a supervisor. ECF No. 103-1 at 46–48, ¶¶ 30–32, 34, 36; ECF No. 100 Ex. M at 1:30–2:27, 3:20–3:40, 4:40–5:10. Croteau informed Plaintiff that he was not under arrest. ECF No. 103-1 at 48,

¶ 34. Then, when Nolan (the supervisor) arrived at the scene, he asked Plaintiff why he was following Stebbins and requested identification (which Plaintiff again refused to provide at first, later providing his name). *Id.* at 46, ¶¶ 30–32; ECF No. 100 Ex. L at 1830–1930; *Clark v. Sikorski*, No. 16-cv-7744 (PKC), 2020 WL 469427, at *5 (S.D.N.Y. Jan. 29, 2020) ("It is proper for a police officer to ask an individual for identification, even without suspecting particular criminal activity"; noting that a request for identification is not, by itself, a Fourth Amendment seizure). Accordingly, the record establishes that, although multiple officers responded to the scene, they merely requested identification and asked general questions about why they were called out there. ECF No. 100 Ex. M at 1:30–2:27, 3:20–3:40, 4:40–5:10; ECF No. 100 Ex. L at 1830–1930; *Clark*, 2020 WL 469427, at *5; *see also Gallegos v. Haggerty*, 689 F. Supp. 93, 100 (N.D.N.Y. 1988) ("Police questioning relating to one's identity or a request for identification, without more, is not a seizure for purposes of the Fourth Amendment") (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). Accordingly, Defendants are entitled to summary judgment on this claim.

As to the December 11, 2018, arrest, Plaintiff alleges Nolan "effectuated the stop and arrest," based on "knowingly false" and omitted information in the arrest warrant application. ECF No. 103-1 at 21; Compl. ¶ 58.

"The Fourth Amendment gives individuals a right to be free from arrests made without probable cause." *Tuccio v. Papstein*, 516 F. Supp. 2d 199, 203 (D. Conn. 2007), *aff'd*, 307 Fed. Appx 545 (2d Cir. 2009). "This right is violated when the officer submitting an arrest warrant application 'knowingly and intentionally, or with reckless disregard for the truth,' makes a false statement or omits material information from his affidavit, and such information is necessary to the probable cause determination." *Id.* (quoting *Soares*

*v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993)). "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Boyd v. City of N.Y.*, 336 F.3d 72, 75–76 (2003).

The probable cause determination depends on the facts available to the officer "at the time of the arrest and immediately before it." *Tuccio*, 516 F. Supp. 2d at 204 (citing *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996)). "Courts must look to the totality of circumstances in determining whether probable cause existed, keeping in mind that probable cause is a fluid, situation-specific concept not readily reduced to a neat set of rules." *Id.* "The issuance of a warrant by a neutral magistrate generally creates a presumption that the arresting officer's belief in probable cause was reasonable." *Id.* Plaintiffs who argue that a warrant was issued "on less than probable cause faces a heavy burden," and must make a "substantial preliminary showing that the arresting officer violated his Fourth Amendment rights." *Id.* (citation modified) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

"In order to mount such a challenge, the plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Golino*, 950 F.2d at 870. "Intentional or reckless omissions of material information, like false statements, may serve as the basis" for a challenge, and "recklessness may be inferred where the omitted information was critical to the probable cause determination." *Id.*

When evaluating a claim that an arrest warrant contained false statements or omitted information, the court turns to the corrected affidavits doctrine. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Under this doctrine, the court looks "to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Id.* at 743–44. "If probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." *Soares*, 8 F.3d at 920. If the corrected affidavit does not support "an objective finding of probable cause, then the court should conclude that material factual disputes prevent summary judgment." *Id.* at 920–21.

Here, Plaintiff asserts in his opposition motion that he was seized during his December 2018 arrest, as the warrant omitted material information. Opp. at 22–23. Plaintiff does not rebut Defendants' argument that the corrected affidavit doctrine applies, and that the corrected affidavit would support probable cause. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-cv-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014). ("a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim"); *Lunsford v. Farrell Shipping Lines, Inc.*, No. 83-cv-7462, 1991 WL 150596, at *10 (S.D.N.Y. July 26, 1991) (dismissing complaint, as "plaintiffs have failed to come forth with any support for their claims," and citing "unsupported statement[s] by plaintiffs"). However, even if Plaintiff had provided a meaningful argument in opposition, it would have been dismissed for the reasons stated in Defendants' motion.

Plaintiff alleges that Nolan based his findings "primarily on Defendant Stebbins' willingness to provide a statement" and disagrees with the alleged attempts made to contact him after the November 2018 incident but admits Nolan left a voicemail sometime after November 15, 2018. ECF No. 103-2 at 13, ¶ 94; *id.* at 50, ¶¶ 40–43. He also alleges Nolan omitted the May 30, 2018, internal affairs complaint he made to EPD, but his name "was not in the key," which provided identifiable information. ECF No. 103-2 at 55, ¶ 54; ECF No. 99 Ex. F. at 36–37. He also alleges Nolan lied about construction in the Foxcroft neighborhood. ECF No. 103-2 at 13, ¶ 93. He alleges Nolan lied about him receiving a letter about the outcome of his internal affairs complaint, but the arrest warrant application does not state that Plaintiff *received* the letter, it just states that Connecticut State Police Internal Affairs Lieutenant Eric Cooke *mailed* Plaintiff a letter on October 11, 2018, informing him of the completion of the Internal Affairs investigation based on the complaint Plaintiff filed. Opp., Ex. Y ¶ 17. Importantly, Plaintiff did not dispute Defendants' statement of facts describing the instances on November 12, 2018, where Plaintiff was traveling behind Stebbins' vehicle, drove past Stebbins' vehicle in traffic, and ended up in the same parking lot as Stebbins. ECF No. 103-1 at 41, ¶¶ 13–15, 17–23, 25–29.

Including all these alleged omissions and correcting all these alleged falsehoods Plaintiff asserts were present in the arrest warrant application, probable cause still exists. Even if the May 2018 complaint Plaintiff made to EPD was included in the arrest warrant, it would only provide more context of his contentious history with Stebbins, which started six months before the November 2018 incident, and it would not have affected the facts surrounding the stalking charge determination. The arrest warrant application did include information as to some of the May 2018 interactions and complaint, noting that Plaintiff

had filed complaints against Stebbins, which provided context to his history with Stebbins, *see id.* Ex. Y, ¶¶ 5, 14 (providing information concerning some of Plaintiff and Stebbins' May 2018 interactions "as a matter of context . . . to understand how these events began"), but the stalking charge centered around events in November 2018. *Id.* ¶¶ 5–20. Looking at these "hypothetical contents" of the corrected affidavit, the facts would "still have been sufficient to support arguable probable cause." *Birch v. Town of New Milford*, No. 3:20-cv-1790 (VAB), 2023 WL 4684720, at *30 (D. Conn. July 21, 2023); *see also* Conn. Gen. Stat. § 53a-181e(a) (a person is "guilty of stalking in the third degree when such person recklessly causes another person to reasonably (1) fear for his or her physical safety, or (2) suffer emotional distress . . . by willfully and repeatedly following or lying in wait for such other person") (citation modified). Here, Plaintiff's admissions that he was traveling behind Stebbins in November 2018, considered with the additional information from May of 2018 (such as multiple passes of Stebbins' home), establish probable cause. *See United States v. Nejad*, 436 F. Supp. 3d 707, 723 (S.D.N.Y. 2020) (concluding there was probable cause based on the corrected affidavit, as the unchallenged allegations established probable cause).

Accordingly, Defendants are entitled to summary judgment on this claim.

**3. <u>Stebbins</u>**

Plaintiff alleges that Stebbins violated his Fourth Amendment rights against unreasonable seizures during the May 2018 and November 2018 incidents. Opp. at 14–21. As to the May 2018 incident, Stebbins argues (1) that it was not a seizure, as Stebbins was the only officer on the scene, Stebbins was wearing his plain clothes, and Plaintiff did not submit and (2) that, in the alternative, Stebbins was entitled to qualified

immunity. ECF No. 100-1 at 7–10. As to the November 2018 incident, Stebbins argues that (1) that he did not seize Plaintiff, as he did not speak or interact with Plaintiff that day; (2) that in the alternative, it was an investigatory stop based on reasonable suspicion; and (3) that Stebbins was entitled to qualified immunity. ECF No. 100-1 at 10–15. The court addresses each seriatim.

A person is seized by the police when "the officer by means of physical force or show of authority, terminates or restrains his freedom of movement. *Brendlin v. California*, 551 U.S. 249, 254 (2007). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission." *Id.* "[T]here is no seizure without actual submission." *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007). Further, "police questioning, by itself" is insufficient to state a Fourth Amendment seizure claim. *Delgado*, 466 U.S. at 216. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Id.*

Here, neither the May nor the November incident constitute as a seizure. As to the May 2018 incident, Stebbins was the only officer present. He parked his cruiser and approached the Plaintiff wearing civilian clothes. ECF No. 103-1 at 14, ¶ 11. His cruiser's lights were not activated, and he told Plaintiff that he was not going to arrest him. *Id.* at 15, ¶ 15. Plaintiff told Stebbins to leave, after which Stebbins left. *Id.* at 16, ¶ 15. At no point was there a command or order requesting Stebbins submit to any authority, and Stebbins's rude language did not raise this encounter to that of a seizure. *Mandola v. Cnty. of Nassau*, 222 F. Supp. 3d 203, 218–19 (E.D.N.Y. 2016) ("The fact that Plaintiffs

considered the Individual Defendants' responses to their inquiries to be laconic and rude does not elevate their actions to a seizure of Plaintiffs"); *see also Oliphant v. Villano*, No. 9-cv-862 (JBA), 2012 WL 3779160, at *5 (D. Conn. 2012) (granting summary judgment to police officer defendant on a Fourth Amendment claim because the record did not show that plaintiff "submitted to any show of authority" by defendant officer).

Plaintiff focuses on the fact that Stebbins had a holstered pistol, *see* ECF No. 103 at 16–17, but the mere fact that he possessed a firearm did not elevate the encounter to a seizure, *United States v. Drayton*, 536 U.S. 194, 205 (2002) ("that most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon").

Turning to the November 2018 incident, the record is dispositive. Stebbins called Samson and EPD, told EPD where Plaintiff was parked, and recounted to EPD his understanding of why he called EPD. ECF No. 103-1 at 27–30, ¶¶ 58–59, 61, 65–66, 71. It is unclear how Stebbins—who did not speak with Plaintiff that day, let alone interact with Plaintiff in his capacity as a police officer—committed an unreasonable seizure, in violation of the Fourth Amendment. *See Springer*, 946 F.2d at 1016 ("A seizure takes place only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."); *see also Chowaniec*, 2024 WL 1075055, at *4; *Tyson*, 2003 WL 22519876, at *2. Accordingly, Stebbins is entitled to summary judgment on this claim. As such, the court does not address the parties' arguments regarding qualified immunity.

**B. <u>Eighth Amendment Claim</u>**

1. **Excessive Force Claim**

Plaintiff alleges that "Defendants either participated or allowed the continued use of excessive force," in violation of the Eighth Amendment. Compl. ¶¶ 64, 74. Nolan, Squires, Enfield, and EPD argue that Plaintiff failed to state an Eighth Amendment claim because Plaintiff failed to demonstrate any physical involvement by Nolan and Squires in Plaintiff's arrest. ECF No. 99-1 at 24. Stebbins argues (1) that the Eighth Amendment "does not apply because there are no post-conviction allegations," (2) that Stebbins "never made physical contact," and (3) that Stebbins is entitled to qualified immunity. ECF No. 100-1 at 16–17. Plaintiff, in his opposition brief, alleges that he was "physically abused at the hands of the Enfield Defendants during his arrest." Opp. at 23 (citing ¶ 103 of Plaintiff's statement of additional facts).

Initially, the court notes that "[a]lthough the plaintiff cites the Eighth Amendment, the proper basis for an excessive force claim under the facts stated by plaintiff, is the Fourth Amendment." *Roman v. Walsh*, No. 5:13-cv-1273, 2014 WL 316724, at *7 (N.D.N.Y. Jan. 28, 2014) (noting that when an excessive force claim arises from an arrest or an investigatory stop, it is more properly characterized as one under the Fourth Amendment, not the Eighth Amendment).

Further, Plaintiff does not identify which Enfield officer put Plaintiff in handcuffs. Importantly, he did not dispute the portion of Defendants' statement of facts which stated that Caires was the officer who pulled over Plaintiff and put him in handcuffs, and that Nolan and Squires never had *any* physical contact with Plaintiff during the arrest. ECF No. 103-1 at 57–59, ¶¶ 60–61, 63; *Roman*, 2014 WL 316724, at *7 ("The problem with plaintiff's claim, is that he has not named any person responsible for the excessive force.

The only defendant that plaintiff has named in this complaint had no involvement in the arrest or the alleged use of excessive force"); *see also Sweet v. City of Hartford*, No. 15-cv-553 (CSH), 2018 U.S. Dist. LEXIS 87221, *11 (D. Conn. May 24, 2018) (defendant "is entitled to summary judgment on Plaintiff's excessive force claim because he had no physical contact" with him and the "undisputed evidence establishes that [Defendant] did not subject Plaintiff to force, let alone force that can be deemed excessive"). Stebbins also was not present during the arrest. ECF No. 103-1 at 34, ¶ 82; *Roman*, 2014 WL 316724, at *7. Accordingly, as the undisputed record establishes that Defendants did not have any physical contact with Plaintiff during his arrest, Defendants are entitled to summary judgment on this claim, whether brough under the Fourth or Eighth Amendment.

**2. <u>Summary Punishment Claim</u>**

Plaintiff argues in his Complaint that the "individual defendants violated Plaintiff's rights to be free from . . . summary punishment as guaranteed" in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments," referencing the previous entirety of the complaint in support. Compl. ¶ 74. Plaintiff argues in his opposition brief, that "Defendants, in their capacities as law enforcement officers, using their position and internal affairs investigations to enact extra-judicial summary punishment" on Plaintiff. Opp. at 23. He raised three allegations: (1) that Stebbins and Samson were working together to investigate "Plaintiff's residence, attempting to get Plaintiff fired from his position as a Probation Officer"; (2) that Stebbins and Samson were working together to investigate "whether Plaintiff had two driver's licenses so that they could have him criminally charged"; and (3) that Stebbins, Samson, and Nolan worked together to "manufacture an arrest warrant without obtaining official records through Connecticut

State Police after they were unsuccessful in getting Plaintiff fired." *Id.* at 24. Plaintiff cites to Samson's deposition as support, where Samons testifies that he did not tell Plaintiff's employer that he lived in Connecticut. *Id.* Ex. D at 190–91.

Even presuming that these allegations were not raised for the first time in Plaintiff's opposition brief, *see Lyman v. CSX Transp. Inc.*, Fed. Appx 699, 701 (2d Cir. 2010) (affirming district court's conclusion that it cannot consider claims raised for the first time in opposition to summary judgment), the record establishes that summary judgment is appropriate.

Plaintiff brings this claim against "Defendants" in a general sense, and later specifically mentions Samson, Stebbins, and Nolan. Upon reading the cited testimony, only Samson was identified as trying to see if Plaintiff lived in Massachusetts, and neither Nolan nor Squires is mentioned regarding allegations concerning his state of residence. Opp. at 25; ECF No. 103-5 at 193. Plaintiff argues that Nolan manufactured the stalking charge against Plaintiff by including false information and omitting information in the arrest warrant. However, this claim is duplicative of Plaintiff's Fourth Amendment claim against Nolan, Squires, Enfield, and EPD, wherein he alleged that he was arrested without probable cause. *See Ravalese v. Town of E. Hartford*, No. 3:16-cv-1642 (VAB), 2019 WL 2491657, at *10 (D. Conn. June 14, 2019) (granting summary judgment "as to these duplicative claims"); *see also Pac. Life Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 16-cv-555, 2026 WL 2474676, at *50 (S.D.N.Y. Aug. 24, 2026) (granting summary judgment on "impermissibly duplicate" claims); *Simmons v. Ferrigno*, No. 17-cv-6176, 2023 WL 5983797, at *10 (W.D.N.Y. Sept. 14, 2023) (concluding that the claims were duplicative, and because the defendants were "entitled to summary judgment on one, they [were] also

entitled to summary judgment on the other"). Plaintiff specifically alleges that he lost money because of his arrest—but the record clearly establishes that he was placed on paid administrative leave at the Massachusetts Probation Office and Holyoke Community College, ECF Nos. 103-2, 103-21, and ultimately was promoted in 2020. ECF No. 103-4 at 53–54. Accordingly, for the reasons already stated *supra* Section III.A.2, the court grants summary judgment as to these duplicative claims.

To the extent Plaintiff alleges an argument related to any alleged reputational damages, *see* Opp. at 26 (referring to "stigma"), "[t]he Supreme Court clearly established that damage to an individual's reputation is not by itself sufficient to invoke the procedural protection of the Due Process Clause." *Ramsaroop v. Dep't of Educ. of N.Y.*, No. 20-cv-4947, 2023 WL 22621, at *12 (S.D.N.Y. Jan. 2, 2023).

Accordingly, the undisputed record establishes that Defendants are entitled to summary judgment on this claim.

**C. <u>42 U.S.C. § 1983</u>**

Plaintiff alleges that Enfield and EPD failed to recruit, train, discipline, and supervise their officers, and that Enfield created an atmosphere that does not discourage its employees from falsely charging and illegally seizing citizens. Compl. ¶¶ 77–80, 83–84. Enfield argues that Plaintiff failed to establish that the alleged deprivations of constitutional rights were caused by an unconstitutional custom, policy, or practice. ECF No. 99-1 at 31.

"A municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see*

*also Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978). Absent a custom or policy, cities and towns are not liable under a theory of *respondeat superior*. *Id.* at 692. To state a claim against a municipality, a plaintiff "must allege the existence of a formal policy which is officially endorsed by the municipality," or a practice that is "so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed. Appx. 10, 13 (2d Cir. 2015) (citing *Jones*, 691 F.3d at 80–81). To establish a persistent and widespread employee practice, it must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020). Mere isolated acts are insufficient. *Jones*, 691 F.3d at 81. "A single act can be sufficient to establish such a policy, but only if it was accomplished by a city official with final policymaking authority." *Moultry v. City of Poughkeepsie*, 154 F. Supp. 2d 809, 813 (S.D.N.Y. 2001) (concluding that individual defendant officers are "not policymaking officials," and their actions "do no demonstrate a policy or custom on behalf of the City").

Here, Plaintiff has provided "no proof of a department policy" that encourages its officers to make false arrests or illegally seize citizens. *Moultry*, 154 F. Supp. 2d at 813. And "[t]o the extent that plaintiff charges that exercising police discretion can amount to a municipal policy, that argument necessarily fails," as there is no supervisor liability under § 1983. *Id.* Plaintiff fails to demonstrate that Enfield failed to train, supervise, or discipline its employees, and Plaintiff does not dispute that Nolan and Squires received recertification training for racial bias every three years. *Id.*; ECF No. 103-1 at 63,

¶¶ 78–79. Plaintiff merely points towards his own deposition, wherein he asserted that Nolan "perjured himself in his [arrest warrant] application"; that Enfield officers failed to investigate the November 2018 incident; that Nolan "could not talk about any of his bias or racial profiling training"; and that EPD "tamper[ed] with evidence." Opp., Ex. B at 275–77. However, absent any evidence in the record demonstrating this, Plaintiff's personal belief is insufficient to establish a claim. *Haynes v. Acquino*, No. 10-cv-0355, 2011 WL 13210092, at *5 (W.D.N.Y. Apr. 6, 2011) ("The Court recognizes that plaintiff believes" that the defendants have, pursuant to an official city policy, "have engaged in a conspiracy to falsely arrest and maliciously prosecute" him, "but said beliefs, in the absence of non-conclusory factual allegations, do not support" a *Monell* claim); *Phelps v. City of N.Y.*, No. 4-cv-8570, 2006 WL 1749528, at *8 (S.D.N.Y. June 27, 2006) (plaintiff's "bare assertion that the City had a policy of unlawfully stopping, searching, and seizing innocent individuals of African American descent and then committing perjury and/or manufacturing evidence in an effort to convict such individuals is insufficient to establish municipal liability under Section 1983") (citation modified).

Accordingly, Defendants are entitled to summary judgment as to these claims.

### D. State Law Claim (Defamation)

Plaintiff brought a state law claim for defamation *per se* against Stebbins, Nolan, Squires, and EPD. Compl. ¶¶ 88–98. Plaintiff alleges that Stebbins "falsely made statements" that Plaintiff was speeding, driving dangerously, and had "engaged in stalking," and that he made these statements to other Connecticut State police officers, EPD officers, and police dispatchers. *Id.* ¶ 89–90. These "false statements" resulted in

"numerous media outlets publishing the false allegations," and Plaintiff suffered "serious" reputational and professional injury. *Id.* ¶¶ 96–97.

The court, having dismissed all federal causes of action, declines to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 123 (2d Cir. 2023) ("after properly granting summary judgment on the federal claims, the District Court had discretion not to exercise supplemental jurisdiction over any remaining state law claims") (citation modified); *Ciliberti v. Int'l Bhd. of Elec. Workers Loc. 3*, No. 8-cv-4262, 2012 WL 2861003, at *13 (E.D.N.Y. July 10, 2012) (declining to exercise supplemental jurisdiction over plaintiff's state law claims, as the court granted defendant's motion for summary judgment as to the only federal claim); *Hasfal v. City of Hartford*, No. 6-cv-55 (CFD), 2009 WL 1870869, at *4 (D. Conn. June 25, 2009) (declining to exercise supplemental jurisdiction over plaintiff's defamation claim, as the court had dismissed all federal claims).

## IV. CONCLUSION

For the reasons discussed herein, the court hereby **GRANTS** Samson's motion for summary judgment **(ECF No. 98)**; Enfield, EPD, Nolan, and Squires's motion for summary judgment **(ECF No. 99)**; and Stebbins's motion for summary judgment **(ECF No. 100)** as to Plaintiff's federal claims. The court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and **DENIES** Plaintiff's motion for a hearing

**(ECF No. 109)**. The Clerk of Court is asked to please enter judgment consistent with this order and to please close the case.

The court further clarifies that this ruling addresses only those legal claims properly before the court. It is not a wholesale endorsement of the actions of either Mr. Cameron or Mr. Stebbins, nor a ruling as to the reasonableness or effectiveness of their tactics.

Law enforcement standards promote professionalism and mutual respect on and off the job. This ruling also does not assess whether these gentlemen adhered to those standards through their conduct described in this case, nor how their behaviors could be, should be, or likely will continue to be regarded by the public each was sworn to serve.

Similarly, the court, as it is all too often compelled to do, acknowledges the dangers of law enforcement employment. *See, e.g., United States v. Raymond Neuberger*, Case No. 3:25-cr-225-OAW at ECF No. 108 (June 30, 2026). It also reminds the named parties that another judge referred to them as "two people who have had a misunderstanding," and who might consider resolving it by "mov[ing] on." ECF No. 103 Ex. BB at 27:21–24.[3] Another judge opined that, "I think you guys are making this a bigger deal than it needs to be," and "I'm telling you, you guys got better stuff to do than this." *Id.* Ex. X at 5:4–13.[4] "[W]e have a troubled world, as you both know, a very troubled world, and it's best that we not make [unnecessary] trouble. Take care, all of you." *Id.* Ex. BB at 27:24–27.

**IT IS SO ORDERED** in Hartford, Connecticut, this 25th day of September, 2026.

*/s/*
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE

[3] *Hon. Constance L. Epstein, J.*
[4] *Hon. Kevin G. Dubay, J.*